## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL,<br>501 2nd Street, NE<br>Washington, DC 20002 | )<br>)<br>)<br>) | Civil Action No. _____ |
| | )<br>) | |
| Plaintiff, | )<br>) | |
| | ) | |
| v. | )<br>) | |
| KEN SALAZAR, in his official capacity as<br>Secretary of the U.S. Department of the<br>Interior; DANIEL ASHE, in his official<br>capacity as Director of the U.S. Fish and<br>Wildlife Service; and U.S. FISH AND<br>WILDLIFE SERVICE,<br>1849 "C" Street, NW<br>Washington, DC 20240 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants. | )<br>)<br>)<br>)<br>) | |

## COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF

### I.    INTRODUCTION

1.    On September 2, 2005, the Federal Defendants listed the scimitar-horned oryx,

dama gazelle and addax ("three antelope species") as endangered species throughout their ranges

under authority of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544. *Final Rule To*

*List the Scimitar-Horned Oryx, Addax, and Dama Gazelle as Endangered,* 70 Fed. Reg. 52319

(September 2, 2005) ("Final Listing Rule"). The U.S. Fish and Wildlife Service ("FWS")

included U.S. captive populations of the three species in that endangered species classification.

2.    Plaintiff Safari Club International ("Safari Club") brings this action against

Defendants Ken Salazar, in his official capacity as United States Secretary of the Interior; Daniel

Ashe, in his official capacity as Director of the United States Fish and Wildlife Service; and the United States Fish and Wildlife Service ("Federal Defendants").  This suit challenges Federal Defendants' violations of the Endangered Species Act ("ESA") and the Administrative Procedures Act ("APA") in their: (1) decision to include U.S. captive populations of the scimitar-horned oryx, dama gazelle and addax in the endangered species listing of the three antelope species on September 2, 2005; and (2) failure to correct that endangered species listing by removing the U.S. captive herds of the three species from endangered species status after the 2009 ruling by Judge Kennedy of the U.S. District Court for the District of Columbia, which found illegal federal regulations exempting those captive populations from ESA prohibitions.

3.     The U.S. captive herds of the three antelope species do not qualify for endangered species status.  In fact, the inclusion of the captive herds in the endangered species listing has a detrimental impact on the conservation status of these three species.  The continued listing of these U.S. captive populations and failure of the FWS to remove the U.S. captive herds from the endangered species list discourages private efforts to conserve these three species and will result in population reductions and a potential loss to the species as a whole.  The FWS has violated its statutory and regulatory obligations under the ESA and APA and has acted arbitrarily and capriciously in failing to promote, protect and encourage private conservation efforts currently being directed at captive herds within the United States.

4.     Prior to the date of the listing of the three antelope species as endangered under the ESA, U.S. owners of captive members of the three antelope species could buy, sell, and otherwise trade members of the three antelope species and could sell hunts for members of their captive U.S. herds of the three antelope species without any obligation to obtain permit authority from the FWS.  Because these three species were not listed under the ESA, no ESA prohibitions

applied to the three antelope species and no ESA permit requirements were imposed on these activities.

5.      During the period of time that the U.S. captive herds of the three antelope species were not classified as endangered, the number of U.S. captive populations grew and the number of individual members of the three antelope species in captivity in the United States increased significantly.  These increases were due in great part to the private conservation efforts of individual ranchers and other U.S. owners of the three species, many of whom sold hunts for members of their herds.  By September 2, 2005, several thousand of these three antelope species lived in captivity in the United States.

6.      Once the three antelope species were listed as endangered, U.S. owners of captive members of the three antelope species became obligated to obtain permit authority and/or permission from the FWS to engage in activities, including the take of these animals, which are otherwise prohibited for endangered species by the ESA.  16 U.S.C. § 1538(a)(1)(B); 16 U.S.C. § 1539(a)(1)(A).

7.      At the time of the listing, the FWS wanted to avoid unnecessary administrative obstacles to ongoing three antelope species conservation and to prevent bureaucratic burdens that could discourage the continuation of the ongoing private conservation efforts for the three antelope species.  On the same day as the listing, the FWS promulgated a regulation that exempted U.S. captive populations of the three species from ESA prohibitions on certain activities that the FWS deemed to enhance the propagation and survival of the three antelope species. *Exclusion of U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions*, 70 Fed. Reg. 52310 (September 2, 2005) ("regulatory exemption").

8.     Under the regulatory exemption, private conservation efforts continued and the number of herds of the three antelope species in captivity in the United States as well as the number of individual members of the three antelope species in captivity continued to increase.

9.     On June 22, 2009, Judge Kennedy of the U.S. District Court for the District of Columbia ruled that the regulatory exemption violated the ESA because it allowed the take of members of species listed as endangered without the requirement for individual enhancement of survival permit applications and the commensurate public notice and comment opportunities. *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 115 (D.D.C. 2009) ("2009 Order"). The Court remanded the matter to the Service for further proceedings consistent with his ruling, leaving it to the Service to promulgate new regulations that would not violate the ESA. *Id.*

10.    On June 28, 2010, Safari Club submitted a Petition to Remove U.S. Captive Herds of Scimitar-Horned Oryx, Dama Gazelle and Addax from the Endangered Species List Based Upon Error. Safari Club based its petition, in substantial part, on the premise that the FWS had erred in including U.S. captive populations of the three species in the endangered classification of the three species generally. In that petition, Safari Club reiterated to the Federal Defendants that regulations imposing permit requirements for the trade and take of U.S. captive populations of the three species would discourage private ranchers from continuing to raise, breed and trade these animals and would result in fewer herds and significant population reductions. The Federal Defendants have not acted on that petition.

11.    In response to the 2009 Order, on July 7, 2011, the FWS published regulations that proposed to withdraw the regulatory exemption and to impose permit requirements for the previously exempted activities, including the sale of hunts and/or the hunting of U.S. captive herds of the three antelope species. *Removal of the Regulation That Excludes U.S. Captive-Bred*

4

*Scimitary-Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions,* 76 Fed. Reg. 39804 (July 7, 2011).

12.     Safari Club submitted comments in response to that proposed rule, explaining how permit requirements would discourage private owners from continuing to own, raise and breed captive herds of the three antelope species, and recommending to the Service that it should instead delist the U.S. captive populations of the species.

13.     The imposition of permit requirements and the uncertainties that accompany the permit application and approval process are burdens and obligations that many private owners of U.S. captive herds of the three antelope species do not deem financially acceptable for the continued private conservation of herds of the three antelope species.  As a result, if permit requirements are imposed on activities related to the ownership, use and take of the three captive antelope species, many private owners of U.S. captive herds of the three antelope species plan to abandon their efforts to continue to own, raise, trade, take and sell hunts for these animals.

14.     The inclusion of the U.S. captive herds of the three antelope species in the endangered listing of the species does nothing to conserve the species.

15.     Instead, the endangered listing status of the U.S. captive herds of the three antelope species and the attendant restrictions on the sale of hunts and the hunting of U.S. captive herds of the three antelope species, in the absence of a regulatory exemption from permit requirements, will result in a loss of large numbers of herds and individual members of U.S. captive herds of the three antelope species.  The inclusion of the U.S. captive populations of the three antelope species in the endangered species listing of the three species will jeopardize the conservation of the three antelope species and will violate the conservation mandates of the ESA.

16.     The inclusion of the U.S. captive herds of the three antelope species in the endangered species listings of the three species is inconsistent with the approach that the FWS has followed in other situations involving the differentiation of the listing status of native populations in the wild and non-native populations of the same species.

17.     In listing the U.S. captive herds of the three antelope species, the Federal Defendants engaged in the following acts that violated the ESA and/or APA:

- Listing U.S. captive herds of scimitar-horned oryx, dama gazelle and addax as endangered;

- Failing to differentiate between the listing status of U.S. captive populations of the species and populations of the species located outside the United States;

- Failing to specify the portion of the ranges of the three antelope species, both captive and wild, living outside the United States that required listing as endangered, and failure to make the determination that no such listing status was necessary for any members of the species living within the U.S;

- Listing the U.S. captive herds of the three antelope species despite a lack of conservation benefit to populations of the species in the wild;

- Failing to designate the U.S. captive herds of the three species as one or more distinct population segments (DPS) and, following the establishment of two or more DPSs, failing to list only those DPSs of the three antelope species outside the United States;

- Failing to follow agency policy and practice by including non-native (exotic) captive populations of species in the endangered species classification of the species as a whole;

- Listing the U.S. captive herds of the three antelope species despite the fact that the captive members of the three herds do not interact geographically or reproductively with non-captive, native members of the species;

- Listing the U.S. captive herds of the three antelope species despite the fact that, at the time of listing, members of U.S. captive herds had not been used for reintroductions of populations of the species into their home range in the wild;

- Failing to analyze the status of the three species in their current ranges within the United States, and failing to find that the current ranges of the three species in the U.S. qualify as significant portions of the three species' ranges;

- Failing to determine that the U.S. captive populations of the three species were not in danger of extinction throughout all or the significant portion of their ranges in the United States;

- Listing the U.S. captive herds of the three antelope species despite the harm that listing would bring to the conservation of the species; and

- Failing to act on the delisting petition filed by Safari Club that identified the erroneous listing of the U.S. captive herds of the three antelope species.

18.     Safari Club seeks from this Court relief that includes but is not limited to:  (a) declaring as erroneous the Federal Defendants' decision to include the U.S. captive herds of the three antelope species in the endangered listing of the three species; (b) setting aside the portion of the September 2, 2005 rule that included the U.S. captive herds of the three antelope species in the listing of the three species; (c) enjoining the Federal Defendants from relying on or implementing the listing; (d) remanding the listing decision to the FWS for removal of the U.S. captive herds of the three antelope species from the endangered species list; (e) declaring illegal the Federal Defendants' failure to take any action on Safari Club's petition to delist the U.S. captive herds of the three antelope species; and (f) ordering the Federal Defendants to act on that rulemaking petition.

## II.     JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action under the APA, 5 U.S.C. §§ 702, 706 (judicial review of final agency action and inaction); 28 U.S.C. § 1331 (federal question jurisdiction); and 16 U.S.C. § 1540(g) (ESA citizen suit provision).  The Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201, 28 U.S.C. § 2202, and 5 U.S.C. §§ 701-706.

20.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) as this action is brought against an agency of the United States and against officers of agencies of the

United States in their official capacities; decisions and actions challenged here were made, at least in part, in this District; Safari Club maintains an office in this District; and no real property is involved.

21.     Members of Safari Club own captive herds of scimitar-horned oryx, dama gazelle and/or addax on ranches throughout the country.  Members of Safari Club have hunted and seek in the future to hunt members of the U.S. captive herds of the three antelope species.

22.     Safari Club satisfied the written notice requirements of the ESA citizen suit provision.  16 U.S.C. § 1540(g).  On June 29, 2011, Safari Club hand delivered a letter to the FWS and Department of the Interior that provided notice of the violations of the ESA outlined in this Complaint.  Federal Defendants received notice more than 60 days ago.

23.     The judicial review provisions of the APA and ESA waive the Federal government's sovereign immunity.  5 U.S.C. § 702, 16 U.S.C. § 1540(g).

## III.   PARTIES

24.     Safari Club International, a nonprofit IRC § 501(c)(4) corporation, has approximately 53,000 members worldwide.  Safari Club's mission is to protect the freedom to hunt and to promote wildlife conservation worldwide.  Safari Club's purposes include the following:

- To advocate, preserve and protect the rights of all hunters;
- To promote safe, legal and ethical hunting and related activities;
- To engage in advocacy within the limits imposed by law and regulation;
- To monitor, support, educate or otherwise take positions on local, national and international legislative, executive, judicial or organizational endeavors that foster and support these purposes and objectives; and
- To inform and educate the public concerning hunting and related activities.

25.     Members of Safari Club own captive herds of the scimitar-horned oryx, dama gazelle and/or addax on privately owned ranches throughout the United States.  Other members

of Safari Club have hunted one or more of the three antelope species from these U.S. captive,

privately owned herds and seek to do so in the future.

26.     Safari Club works in coordination with the Safari Club International Foundation

("SCIF"), a nonprofit IRC § 501(c)(3) corporation.  SCIF's mission is to fund and manage

worldwide programs dedicated to wildlife conservation, outdoor education and humanitarian

services.  SCIF's purposes include the following:

- To conduct and support scientific and technical studies in the field of wildlife conservation, to assist in the design and development of scientifically sound wildlife programs for the management of wildlife and sustainable use hunting, and to demonstrate the constructive role that hunting and hunters play in the conservation of wildlife and in preserving biodiversity worldwide; and
- To carry out and support education programs on wildlife conservation, ecology and natural resource management that include a demonstration of the constructive role that hunting and hunters play in natural resource conservation and land management.

27.     Safari Club promotes the principle and practice of sustainable use conservation.

Safari Club and Safari Club members' interests include the sound sustainable use conservation of

scimitar-horned oryx, dama gazelle and addax and Safari Club members' ability to continue to

raise, trade, breed and sell hunts for U.S. captive bred members of the three antelope species

under economically feasible conditions without the expense, difficulties and uncertainties of

unnecessary and burdensome permit requirements.  Safari Club and Safari Club members'

interests also include the ability to participate in the sustainable use conservation of these three

antelope species by hunting members of U.S. captive herds on private ranches without the

expense, difficulties and uncertainties of unnecessary and burdensome permit requirements.

28.     Safari Club and members of Safari Club are harmed and aggrieved by the

endangered classification of the U.S. captive herds of the three antelope species because the

resultant ESA prohibitions against certain kinds of conduct involving these animals, such as the

sale of hunts and the hunting of these animals, without a regulatory exception from these

prohibitions, has made it economically infeasible for Safari Club members to continue to own, trade, breed, sell hunts for members of the U.S. captive herds of the three antelope species and to continue their private conservation efforts for these species. As fewer Safari Club members find it financially viable to own herds of scimitar-horned oryx, dama gazelle and addax, the number of herds of the three species and the number of individual members of the three species in the United States will continue to dwindle, causing direct harm to the conservation interests and goals of Safari Club and Safari Club members. In addition, the smaller numbers of herds and fewer individual members of the three antelope species and the administrative burdens associated with obtaining the permits required for the take of members of the three species will result in fewer scimitar-horned oryx, dama gazelle and addax available for Safari Club members to hunt and to conserve through sustainable use methods.

29.     Safari Club possesses sufficient interests in the subject matter of this litigation to establish standing. Safari Club and Safari Club members have suffered concrete injury in fact caused by the FWS's listing of U.S. captive herds of the three antelope species under the ESA and failure to remove those U.S. captive herds from the endangered species list. A court ruling declaring illegal and setting aside the portion of the Final Listing Rule applicable to captive U.S. herds of the three species and a remand to the Federal Defendants with direction to the FWS to remove those U.S. captive herds from the endangered species list would redress those injuries. Safari Club members could once again own, raise, breed and sell hunts for members of the three antelope species without having to deal with the financial burdens and administrative uncertainties imposed by permit requirements for engaging in conduct otherwise prohibited for endangered species by the ESA. Safari Club and Safari Club members could then continue to find it economically feasible to engage in private conservation efforts, including sustainable use

hunting, and to increase the numbers of herds and individual members of U.S. captive herds of the three antelope species.

30.     Safari Club participated in numerous comment opportunities provided by the Federal Defendants in their consideration of the listing status of the three species generally and particularly the status of the U.S. captive populations of those species.  Safari Club also commented on the proposed regulation intended to exempt the U.S. captive populations from ESA take prohibitions and to allow continued hunting of members of the U.S. captive herds and other activities that enhance the propagation and survival of the species.  In some of those comments, Safari Club advocated that the FWS was not required to list those captive populations as endangered and that the Service had the authority to treat those captive populations differently than populations of members of the species living in their native ranges.  For example, in comments submitted on October 22, 2003, Safari Club advocated that the FWS designate the captive populations of the three species in the United States as "distinct population segments" ("DPSs") and that these DPSs "be given separate consideration" for the purpose of listing.

31.     In spite of Safari Club's strong recommendations against the listing of the U.S. captive herds of the three antelope species, Federal Defendants listed the animals and adopted the regulatory exemption for U.S. captive herds.  That exemption subjected Safari Club members and other private ranchers and owners of captive herds of the three species to record-keeping requirements, applicable only because of the listed status of the U.S. captive herds.  50 C.F.R. § 17.21(h).

32.     Safari Club also participated in the litigation in federal district courts in California and the District of Columbia to defend the regulatory exemption.

33.     To comply with the 2009 Order, the FWS has announced its intention to adopt a permit-based system for authorizing activities regarding the U.S. captive herds of the three antelope species, otherwise prohibited by the ESA. The finalization of that proposed rule is imminent and once a permit system in finalized, Safari Club members will be further adversely affected and aggrieved in their ability to own, raise, trade, breed, hunt and sell hunts for U.S. captive herds of the three antelope species and in their ability to engage in sustainable use conservation for the three species. Even in its proposed form, the new permit requirements have affected the value of members of the U.S. captive populations, making it more difficult for private ranchers, including Safari Club members, to obtain reasonable prices for the sale of members of their herds. But for the inclusion of the U.S. captive herds of the three antelope species in the endangered classification of the three antelope species, the permit requirements would be unnecessary.

34.     Safari Club and members of Safari Club are adversely affected and aggrieved by the actions of the Federal Defendants: (1) in including the U.S. captive bred populations of the three antelope species in the endangered listing of the three species; (2) in failing to remove the U.S. captive herds from the endangered species list; and (3) in failing to act on Safari Club's petition to remove the U.S. captive herds from the endangered species list based on error. These actions also harm Safari Club's interests in conservation of the three antelope species. Safari Club is an aggrieved party and is entitled to judicial review of the actions and inactions challenged here under the APA and ESA. Safari Club has standing to assert these claims.

35.     Defendant Ken Salazar is the Secretary of the Interior. He has ultimate responsibility for the administration of the ESA by the United States Department of the Interior. He is sued in his official capacity.

36.    Defendant Daniel Ashe is the Director of the Fish and Wildlife Service.  He has responsibility for the administration and implementation of the ESA, including with regard to the listing of the U.S. captive herds of the three antelope species.  He is sued in his official capacity.

37.    Defendant U.S. Fish and Wildlife Service is an agency within the Department of the Interior that is authorized to and does administer and implement the ESA.

## IV.    LEGAL BACKGROUND

### A.    The Endangered Species Act

38.    The purposes of the ESA "are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section." 16 U.S.C. § 1531(b).  No provision of the ESA authorizes Federal Defendants to engage in activities that discourage or hinder conservation or result in harm to the conservation of species.

39.    Among other things, the ESA provides for the listing of species as either endangered or threatened.  *Id.* § 1533.  The statute also authorizes the delisting of listed species.  *Id.*  A species is "endangered" if the agency determines it "is in danger of extinction throughout all or a significant portion of its range ...." *Id.* § 1532(6).  In the Final Listing Rule, the FWS determined that the scimitar-horned oryx, dama gazelle and addax, were all endangered throughout their ranges, and included in the listing the U.S. captive populations of the three antelope species.

40.    The ESA does not permit the Federal Defendants to list species indiscriminately, but directs the Service to selectively designate for listing and federal protection those portions of

the species' range that are in need of protection. "The Secretary of the Interior shall publish in the Federal Register a list of all species determined by him or the Secretary of Commerce to be endangered species . . . . Each list shall refer to the species contained therein by scientific and common name or names, if any, *specify with respect to each such species over what portion of its range it is endangered . . . ." Id.* § 1533(c)(1) (emphasis added).

41.     The ESA authorizes the Federal Defendants to designate distinct population segments ("DPS") of species for the purpose of listing only those populations of a species that require listing, and to prevent listing of populations that would be unnecessary or potentially harmful to conservation efforts. *Id.* § 1532(16). The ESA allows the Federal Defendants to list by "species," "subspecies," or "distinct population segment." 16 U.S.C. § 1532(15).

42.     The Department of the Interior and the Department of Commerce have promulgated a DPS policy that guides their determination of whether a group of animals is a DPS. *Policy Regarding the Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act*, 61 Fed. Reg. 4722 (Feb. 7, 1996). That policy authorizes the Federal Defendants to utilize international boundaries to distinguish between different DPSs of a species and to list those DPSs differently. *Id* at 4724.

43.     The ESA prohibits several forms of conduct related to species listed as endangered. These prohibitions are designed to protect endangered species, but not to inhibit conservation. *Id.* § 1538(a)(1). Included within those prohibited actions are the "take" of species, such as the hunting of members of endangered species. *Id.* § 1538(a)(1)(A).

44.     Federal Defendants may authorize exceptions to prohibited conduct through the issuance of permits or grants of permission in cases where the conduct will enhance the propagation or survival of the species. *Id.* § 1539(a)(1)(A).

45.     Error is one of the three grounds upon which the FWS may delist or remove a species or population from the endangered or threatened species lists. 50 C.F.R. § 414.11(d).

46.     Upon receiving a petition seeking the delisting of a species or DPS of a species, the Secretary (and the FWS by designation) is required to make a 90-day finding as to whether the petitioned action may be warranted. Upon making a positive 90-day finding, the FWS must make a determination, within one year of receiving the petition, that the petitioned action is warranted, not warranted, or warranted but precluded by other pending listing actions. Id. § 1533(b)(3)(A) and (B).

**B.     The Administrative Procedure Act**

47.     The APA provides for judicial review of final agency action by persons "aggrieved" by the action. 5 U.S.C. § 702.

48.     It also provides standards applicable when a Federal agency proposes and adopts final rules and regulations. *Id.* § 553; *id.* § 551(4).

49.     The APA imposes upon a reviewing court duties, including the requirements to

>   (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
>   (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
>   >   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

*Id.* § 706.

**V.     FACTUAL BACKGROUND**

**A.     The Three Antelope Species**

50.     The scimitar-horned oryx, dama gazelle, and addax are not native to the United States. Each was introduced into this country from populations in their home ranges in various

parts of Africa. The status of the species in the wild was well documented by the Service in the September 2, 2005 Final Listing Rule, which listed the species as endangered, and the regulatory exemption, which permitted the continuation of activities, including hunting of the species, for the purpose of enhancing the survival of the three species. 70 Fed. Reg. 52310 (September 2, 2005); 70 Fed. Reg. 52319 (September 2, 2005).

51.     The scimitar-horned oryx (oryx dammah) was historically found in the wild in Algeria, Burkina Faso, Chad, Egypt, Libyan Arab Jamahiriya, Mali, Mauritania, Morocco, Niger, Nigeria, Senegal, Sudan, Tunisia, and Western Sahara. It stands about 47 inches [119 centimeters (cm)] tall and weighs around 450 pounds [204 kilograms (kg)]. It is generally pale in color, but the neck and chest are dark reddish brown. Adult animals possess a pair of horns curving back in an arc up to 50 in (127 cm) long. 70 Fed. Reg. 52319. Scimitar-horned oryx have all but disappeared from the wild. There were an estimated 500 Scimitar-horned oryx in Chad and Niger until about 1985, but by 1988 only a few dozen individuals survived in the wild. Since then there have been no confirmed sightings in the wild. International Union for Conservation of Nature and Natural Resources ("IUCN"), http://www.iucnredlist.org/apps/redlist/details/15568/0 (June 28, 2011). Captive populations in fenced protected areas can be found in a number of range countries, including Tunisia, Morocco, and Senegal. 70 Fed. Reg. 52319.

52.     In 2005, at least 1,550 captive scimitar-horned oryx were held in managed breeding programs around the world (Gilbert 2005), not including those found on private ranches in the United States. *Id.* at 52321. In addition, it is believed that more than 4,000 are kept in a private collection in the United Arab Emirates. *Id.* Captive herds of scimitar-horned oryx are also found in South Africa.

53.     The addax (addax nasomaculatus) is generally about 42 inches (106 cm) tall at the shoulder and weighs around 220 pounds (100 kg). 70 Fed. Reg. 52319 (September 2, 2005). It has a grayish white coat and its horns twist in a spiral up to 43 inches (109 cm) long. *Id.* It was originally found in the wild in Chad, Mauritania, Niger, Algeria, Egypt, Libyan Arab Jamahiriya, Sudan, and Western Sahara. *Id.* Unlike scimitar-horned oryx, some addax can still be found in the wild. *Id.* In 2005, the IUCN approximated that there were 300 still living in Niger, Chad and Mauritania. *Id.* at 52320.

54.     Today, the only known remaining population of addax survives in the Termit/Tin Toumma region of Niger. There are sporadic records of small isolated groups and individuals from eastern Air Mountains/Western Ténéré desert in Niger, and from the Equey region of western Chad (Newby in press). Possible rare vagrants from these areas may be seen in north Niger, southern Algeria and Libya (Newby in press). In addition to those in fenced populations in their former home ranges in Tunisia and Morocco, some addax have been reintroduced into the wild in these countries. 70 Fed. Reg. at 52320.

55.     The dama gazelle (gazella dama) stands about 39 inches (99 cm) tall at the shoulder and weighs around 160 pounds (72 kg). 70 Fed. Reg. 52319 (September 2, 2005). Its upper body is mostly reddish brown, and the head, rump, and underparts are white. *Id.* Its horns curve back and up, but are generally less than half the length of those of the scimitar-horned oryx. *Id.* Their historic home range included Chad, Mali, Niger. Libyan Arab Jamahiriya, Mauritania, Morocco, Nigeria, Algeria, Tunisia, Senegal, Sudan and Western Sahara. *Id.* They are believed to have disappeared from North Africa but some still remain in Mali, Chad and Niger. *Id.* In 2005, some dama gazelle were living in home ranges in Morocco, Tunisia and Senegal. http://www.iucnredlist.org/apps/redlist/details/8968/0.  Currently, aside from the

remaining wild populations of addax and dama gazelle, captive herds of the three species are found both inside and outside the United States. 70 Fed. Reg. 52319, 52320 (September 2, 2005). In the United States, captive populations are growing and thriving. *Id.*

56.     In 2004, Dr. Elizabeth Cary Mungall conducted research for the Exotic Wildlife Association ("EWA") to assess population numbers and habitat conditions for captive populations of the three antelope species. Dr. Mungall reviewed a series of statewide censuses and collected data via a survey of EWA members who owned herds of one or more of the three species. Her research not only revealed significant numbers of each species on ranches in Texas and/or ranches owned by EWA members, but also demonstrated remarkable population increases over a relatively short period of time.

57.     A series of statewide censuses (1966, 1971, 1974, 1979, 1984, 1988, 1994) in Texas done by the Texas Parks and Wildlife Department demonstrate that members of the three subject species kept in private ownership have been increasing, Ramsey 1967, Cook 1972, Harmel 1975, Harmel 1980, Traweek 1985, Traweek 1989, Traweek 1995, Mungall and Sheffield 1994.

58.     A further census was done in 1996 at the request of the Exotic Wildlife Association (EWA) by the Texas Agricultural Statistics Service (anonymous 1996). Dama gazelle numbers were checked again in an October 2003 phone census done by Dr. Elizabeth Mungall for the EWA. (Mungall 2004).

59.     Starting with the first census in which the species appeared, the following increases in numbers were documented:

Scimitar-horned oryx: 32 in 1979 to 1,006 in 1994 to 2,145 in 1996.

Addax: 2 in 1971 to 587 in 1994 to 1,824 in 1996.

Dama gazelle: 9 in 1979 to 149 in 1994 to 91 in 1996 to 369 in 2003.

Technical report prepared for the Exotic Wildlife Association, by Elizabeth Cary Mungall, January 6, 2004.

**B.     Regulation and Litigation Concerning the Three Antelope Species**

60.     Federal Defendants listed the scimitar-horned oryx, dama gazelle and the addax throughout the world as endangered on September 2, 2005.  This listing followed almost 14 years of deliberation over the proper method to deal with the disparate conservation status of the members of the species in the wild as compared to the captive herds in the United States.  The Service first proposed an endangered species listing on November 5, 1991. 56 Fed. Reg. 56491.  After an initial public comment opportunity, the Service re-opened the comment period on June 8, 1992; again on July 24, 2003, 68 Fed. Reg. 43706; and then for a third time on November 26, 2003. 68 Fed. Reg. 66395.

61.     The Service's protracted deliberation over the listing status of the three species was due in great part to the dilemma of how to protect the species in the wild without severely undermining the pattern of trade and use of the species within the United States that had so benefitted the population numbers and health of the captive herds.   The Service took into consideration the fact that:  (1) an endangered classification creates severe restrictions on the use and trade of such animals; (2) the individual ranchers who own and maintain these herds do so on a strictly voluntary basis; (3) management and conservation of wildlife cannot occur without financial resources;  (4) to generate the funds necessary to feed, raise, breed and care for these exotic animals, many ranchers allow limited hunting of their herds; and (5) owners of these captive herds trade and sell members of their herds in order to bring in new blood lines and maintain genetic diversity and health.

62.     The Service realized that as long as the three species were free of federal listing classification, their value remained high, which facilitated an important incentive for the continued volunteer conservation efforts of the U.S. ranchers.  On the other hand, the Service knew that an endangered species classification would severely interfere with the economy and system by which the ranchers have been willing to participate in efforts that significantly increased the U.S. numbers of these animals.  The additional burdens, costs and uncertainties introduced by endangered species classification and the permits required to continue to own, raise, breed, trade, hunt and sell hunts for members of these species would significantly undermine the value of the animals, and encourage many ranchers to abandon their conservation efforts.

63.     Ultimately, on September 2, 2005, the Service decided to list the three species, in their entirety, as endangered.  The Service did not adopt Safari Club's recommendation to exclude U.S. captive populations from this listing, instead interpreting the ESA to prohibit disparate listing designations between wild and captive/exotic populations of a species.  The Service explained that "[i]t would not be appropriate to list captive and wild animals separately." 70 Fed. Reg. 52319, 52320.

64.     The Service decided to include U.S. captive populations in the endangered species listing despite the fact that the Service lacked evidence that these captive populations were being used to seed reintroductions of these species into the wild.  At best, the Service could only document reintroductions from captive herds into other captive herds, some but not all in their home range. *Id.* at 52320, 52322.

65.     Although noting the role that captive breeding could have for future reintroductions, the Service admitted that reintroductions into the wild were presently infeasible:

> Captive-breeding programs operated by zoos and private ranches have effectively
> increased the numbers of these animals while genetically managing their herds.
> As future opportunities arise for reintroduction in the antelope range countries,
> captive-breeding programs will be able to provide genetically diverse and
> otherwise suitable specimens. Currently, however, continued habitat loss and
> wonton (sic) killing have made reintroduction nonviable in most cases.

*Id*. at 52322.

66.     The listing rule documented only the ***potential*** for U.S. captive bred herds to support reintroductions into the wild.  At the time of listing, only introductions from captivity into captivity were possible, leaving to conjecture the value that U.S. captive herds will have for conservation of the species in the wild.

67.     The Service attempted to preserve the ongoing conservation efforts being conducted by private U.S. ranchers by carving out a special exception to the take prohibitions normally applicable to species listed as endangered.  On September 2, 2005, the Service issued a rule that exempted United States captive-bred members of the three antelope species from the take and other prohibitions of the ESA. 70 Fed.Reg. 52310 (Sept. 2, 2005) ("regulatory exemption").

68.     The regulatory exemption was challenged and on June 22, 2009, Judge Kennedy of the U.S. District Court for the District of Columbia ruled that regulation to be in violation of the ESA's permit notice and comment requirements. *Friends of Animals v. Salazar*, 626 F. Supp.2d 102 (D.D.C. 2009).  Judge Kennedy remanded the rule, directing the Service to issue new regulations that conformed to ESA requirements. *Id.* at 118.

## VI.   CAUSES OF ACTION

**Count I - Violations of the APA and ESA:**
**Federal Defendants Failed to Utilize Its Authority to**
**Distinguish and Specify the Portion of The Three Species' Ranges**
**in the United States and To Exclude That Portion from the**
**Endangered Species Listing**

69.   Safari Club realleges and incorporates herein by reference all the allegations of this Complaint, as though fully set forth below.

70.   Federal Defendants acted arbitrarily and capriciously and contrary to law in treating the U.S. and foreign populations of the three antelope species as a single, indivisible unit and in refusing to specify a different classification for U.S. captive populations, claiming that "[i]t would not be appropriate to list captive and wild animals separately." 70 Fed. Reg. 52319, 52320 (September 2, 2005). In basing its listing decision on that premise, the Service erroneously failed to take into account the captive populations of the three species that live within and outside of their home ranges in countries other than the U.S., such as South Africa, in zoos, private facilities and captive herds. Had Federal Defendants done so, they could have separated and differentiated populations based on geographical separation and not exclusively on a captive/wild basis.

71.   The FWS acted arbitrarily and capriciously and contrary to law in failing to follow its own DPS policy authority to divide the populations of the three antelope species by international geographical boundaries, rather than separate the species into strictly captive vs. wild designations, despite the fact that such division would benefit the conservation of the three species.

72.   The FWS erroneously failed to specify that only the portion of the range for all populations, both captive and wild, living *outside the United States*, required listing and that no

22

such listing status was necessary or warranted for the populations of the species living within the U.S.

73.     In addition, Federal Defendants acted arbitrarily and capriciously and contrary to law in rejecting Safari Club's recommendation that the Service designate the U.S. captive populations of the three species as distinct population segments, despite the fact that there is nothing in the Service's DPS Policy that prohibits the Service from designating the U.S. captive herds of the three species as three DPSs, distinct and separate from those outside of the United States that are being raised in captivity or exist in the wild.

74.     In illegally failing to designate the U.S. populations of the three species separately and to exclude the U.S. populations from the endangered classification, Federal Defendants undermined conservation efforts being conducted by private owners in the United States, jeopardized conservation of the species and violated the conservation mandates of the ESA.

75.     These actions of the Federal Defendants constitute a violation of the ESA and the APA. 5 U.S.C. § 706(2); 16 U.S.C. § 1531 and 1533.

76.     The remedies requested in this Complaint would remedy Safari Club and Safari Club members' injuries, as outlined in this Complaint.

### Count II – Violations of the APA and ESA: Federal Defendants Erroneously and Illegally Included the U.S. Captive Populations of the Three Species in the Endangered Listing Classification

77.     Safari Club realleges and incorporates herein by reference all the allegations of this Complaint, as though fully set forth below.

78.     Federal Defendants acted arbitrarily and capriciously and contrary to law in failing to follow its own policy and practice of listing non-native, captive populations of a

species only when there is evidence that such non-native captive populations will directly influence conservation of the species in the wild.

79.     Federal Defendants' duty to conserve species applies to species in the wild, not those in captivity.  That duty is reflected in the language of the statute itself.  Section 1539 of the ESA, describing the exceptions to prohibitions applicable to listed species, indicates that the Secretary of the Interior may issue permits for takings that "will not appreciably reduce the likelihood of the survival and recovery of the species *in the wild* ... ."  16 U.S.C. § 1539(a)(2)(B)(iv) (emphasis added).

80.     Federal Defendants failed to follow their own history and practice of not including non-native populations of a species when listing the native populations as endangered or threatened.  Federal Defendants' actions were in conflict with their approach to the listing of species such as the Arkansas River Basin Population of the Arkansas River Shiner, where the FWS refused to list a non-native introduced population of the species, finding that it could not improve the status of the native species in its historic range.  63 Fed. Reg. 64772 (November 23, 1998).

> The purpose of the Act is to conserve threatened and endangered species and the ecosystems on which they depend.  Non-native, introduced populations, while possibly useful in recovery/restoration efforts, are not a viable substitute for species conservation in native ecosystems.  We do not believe listing or active conservation of the introduced Pecos River population is appropriate nor is such conservation required by the Act.

*Id.* at 64777.

81.     Despite a lack of evidence that the U.S. captive populations of the three species contribute directly to reintroductions of the three species into the wild in their native ranges, Federal Defendants illegally included the U.S. captive populations of the three antelope species into the endangered species classification for the species in the wild.

24

82.     By acting arbitrarily and capriciously and contrary to law in failing to follow their own practice and policy of excluding from a species' listing non-native populations of that species, Federal Defendants chose a course of action for the three antelope species that jeopardizes the private conservation efforts being conducted for the three antelope species in the United States and violates the conservation mandates of the ESA.

83.     These actions by Federal Defendants constitute a violation of the ESA and the APA.  5 U.S.C. § 706(2); 16 U.S.C. §§1531 and 1533.

84.     The remedies requested in this Complaint would remedy Safari Club and Safari Club members' injuries, as outlined in this Complaint.

### Count III - Violations of the APA and ESA: Federal Defendants Erroneously Classified the U.S. Portions of the Species' Ranges as Endangered

85.     Safari Club realleges and incorporates herein by reference all the allegations of this Complaint, as though fully set forth below.

86.     The ESA obligates Federal Defendants to specify that portion of a listed species' range that is to be designated as "endangered" or "threatened."  16 U.S.C. § 1533(c)(1). Pursuant to this statutory directive, when Federal Defendants determined that an endangered species designation was required for some portion of the three antelope species' ranges, Federal Defendants erroneously failed to specify as endangered only those portions of the three antelope species' range in which the three species were in danger of extinction.

87.     Federal Defendants acted arbitrarily and capriciously and contrary to law in failing to act, pursuant to 1533(c)(1), to specify that it was only the scimitar-horned oryx, dama gazelle and addax living in the significant portion of their range *outside of the U.S.*, that were to

25

be classified as "endangered," while those living in captivity in the U.S. would not receive federal listing status or protection.

88.     Federal Defendants further erred in not analyzing the status of the three species in their current ranges within the United States, and in not making a finding that the current ranges of the three species in the U.S. qualify as significant portions of the three species' ranges.

89.     Federal Defendants also erred in failing to make the finding that the three antelope species are not endangered in all or a significant portion of their ranges that are located in the United States.

90.     These actions by Federal Defendants constitute a violation of the ESA and the APA.  5 U.S.C. § 706(2); 16 U.S.C. §§ 1531 and 1533.

91.     The remedies requested in this Complaint would remedy Safari Club and Safari Club members' injuries, as outlined in this Complaint.

### Count IV – Violation of the ESA:
### Inclusion of the U.S. Captive Populations
### Violates the Conservation Purposes of the ESA

92.     Safari Club realleges and incorporates herein by reference all the allegations of this Complaint, as though fully set forth below.

93.     Instead of conserving species in danger of extinction and encouraging the conservation of species in danger of extinction, Federal Defendants' listing of the U.S. captive herds of the three antelope species discourages private conservation efforts and harms the species' futures.

94.     By listing the U.S. captive populations as endangered, Federal Defendants have subjected the U.S. captive populations of the three antelope species to ESA prohibitions and have

illegally created a situation where private ranch owners must seek and the FWS must issue permits for the trade, use and take of members of these herds.

95.     The cost, bureaucracy and uncertainty associated with the application process fails to help the conservation of the species in any way and instead discourages private ranchers from assuming the expense and risk of raising and breeding herds of these animals, and has already prompted or will prompt many to avoid or abandon their voluntary conservation efforts for these animals.

96.     As a direct result of Federal Defendants' decision to include the U.S. captive populations in the endangered species listing, the U.S. captive numbers of these animals will diminish and the conservation efforts that have resulted in significant increases in the numbers of these animals in captivity in the U.S. will be lost.

97.     Federal Defendants' act of including the U.S. captive populations of the three antelope species in the endangered species classification undermines conservation of the species and violates the conservation mandates of the ESA.

98.     These actions by Federal Defendants violate the ESA and the APA.  5 U.S.C. § 706(2); 16 U.S.C. §§ 1531 and 1533.

99.     The remedies requested in this Complaint would remedy Safari Club and Safari Club members' injuries, as outlined in this Complaint.

**Count V - Violation of the ESA:**
**Federal Defendants Failed to Act on Safari Club's**
**Delisting Petition for the U.S. Captive**
**Herds of the Three Antelope Species**

100.     Safari Club realleges and incorporates herein by reference all the allegations of this Complaint, as though fully set forth below.

101.    Federal Defendants acted illegally in failing to act on Safari Club's rulemaking petition for the delisting of U.S. captive herds of the three antelope species, which Safari Club submitted 14 months ago.

102.    Federal Defendants failed to make a 90-day finding as to whether delisting may be warranted.

103.    Federal Defendants failed to make a determination, within one year of receiving Safari Club's petition, that the delisting of U.S. captive herds of the three antelope species is warranted, is not warranted, or is warranted but precluded by other listing proposals. Federal Defendants' failure to act on the petition, and failure to rectify its erroneous inclusion of the U.S. captive herds of the three antelope species, despite knowledge of its obligation to comply with the 2009 Order of the D.C. federal district court and to withdraw the regulatory exemption, sacrificed Federal Defendants' opportunity to comply with the Court's ruling without need to resort to individual permit requirements.

104.    Federal Defendants failure to act on Safari Club's petition has jeopardized the continued private conservation of the three antelope species and violates the conservation mandates of the ESA.

105.    These actions by Federal Defendants violate the ESA and the APA.  5 U.S.C. § 706(2); 16 U.S.C. §§ 1531 and 1533.

106.    The remedies requested in this Complaint would remedy Safari Club and Safari Club members' injuries, as outlined in this Complaint.

## VII.   PRAYER FOR RELIEF

For the reasons stated above, Safari Club respectfully requests that the Court grant the following relief:

1.      Declare that the Federal Defendants violated the ESA and the APA in promulgating the Final Listing Rule by including U.S. captive populations of the three antelope species and declare that the Final Listing Rule is invalid in this regard.

2.      Declare that the Federal Defendants' inclusion of the U.S. captive herds of the three antelope species in the endangered classification of the three species was arbitrary and capricious, contrary to law, an abuse of discretion, and not in accordance with law, and therefore the Final Listing Rule is invalid in this regard.

3.      Set aside the Final Listing Rule in whole or in part and remand it back to the Federal Defendants for consideration of excluding the U.S. captive populations of the three antelope species from the endangered species listing of the three antelope species.  Enjoin the Federal Defendants from relying on or enforcing the endangered status determination for the U.S. captive herds of the three antelope species.

4.      Award Safari Club the costs of litigation, including reasonable attorneys' fees.

5.      Award Safari Club such other relief that is just and proper.

Dated this 30th day of August, 2011.

Respectfully submitted,

Anna M. Seidman, Esq. (DC Bar No. 417091)
Douglas S. Burdin, Esq. (DC Bar No. 434107)
Safari Club International
501 2nd Street, NE
Washington, DC 20002
Telephone: (202) 543-8733
Facsimile: (202) 543-1205
aseidman@safariclub.org
dburdin@safariclub.org

*Counsel for Plaintiff,*
*Safari Club International*