# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| SAFARI CLUB INTERNATIONAL | ) | Case No. 11-cv-01564(BAH) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KEN SALAZAR, *et al.* | ) | |
| Defendants. | ) | |

_____

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SAFARI CLUB
INTERNATIONAL'S MOTION FOR A PRELIMINARY INJUNCTION**

## Table of Contents

I.      INTRODUCTION ................................................................................................1

II.     RELEVANT FACTS ...........................................................................................2

        A. The Scimitar-Horned Oryx, Dama Gazelle and Addax ................................2

        B. Regulations and Litigation Pertaining to the Three Antelope Species ..........5

        C. Safari Club International...............................................................................19

III.    STANDARD OF REVIEW ...............................................................................21

IV.     ARGUMENT.....................................................................................................22

        A. Safari Club International Will Succeed in Proving the Merits

            of Its Legal Challenge...................................................................................22

        B. Preliminary Injunction is Necessary to Prevent Irreparable Harm ...............32

        C. The Balance of Harms Tips in Favor of Preliminary Injunctive Relief.........41

        D. The Public Interest Will Be Served By the Requested Injunctive Relief ......42

V.      CONCLUSION.................................................................................................44

# Table of Authorities

## Cases

*Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154 (D. Or. 2001) ......................................... 26

*American Federation of Government Employees, Locals 225, 1504, and 3723, AFL-CIO v. Federal Labor Relations,* 712 F.2d 640 (D.C. Cir. 1983) ...................................................... 24

*American Wildlands v. Kempthorne***,** 530 F.3d 991 (D.C. Cir. 2008)......................................... 22

*Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) .......................... 24

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288 (D.C.Cir.2009) ........................................ 21

*District 50***,** *United Mine Workers of America v. International Union, United Mine Workers of America***,** 412 F.2d 165 (D.C. Cir. 1969) ................................................................................. 21

*Environmental Defense Fund v. Reilly***,** 909 F.2d 1497 (D.C. Cir. 1990)................................... 31

*Friends of Animals v. Salazar*, 626 F.Supp.2d 102 (D.D.C. 2009) ................................. 17, 41, 43

*Morton v. Ruiz*, 415 U.S. 199(1974) .......................................................................................... 31

*National Cable & Telecommunications Ass'n. v. Brand X Internet Services***,** 545 U.S. 967 (2005)........................................................................................................... 24

*Sherley v. Sebelius*, 644 F.3d 388 (D.C.Cir. Apr. 29, 2011)....................................................... 21

*Valdiviezo-Galdamez v. Attorney General of U.S.* 663 F.3d 582 (2011).................................... 25

*Winter v. Natural Res. Def. Council,* 555 U.S. 7 (2008) ............................................................ 21

## Statutes

Administrative Procedure Act ("APA") 5 U.S.C. § 706........................................................... 2, 22

Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*............................................... 2, 17, 23

## Rules

56 Fed. Reg. 56491 ........................................................................................................................ 5

52 Fed. Reg. 23148 ...................................................................................................................... 26

53 Fed. Reg. 38451 ...................................................................................................................... 26

55 Fed. Reg. 9129 ........................................................................................................................ 27

56 Fed. Reg. 56491 ........................................................................................................................ 5

57 Fed. Reg. 24220 ........................................................................................................................ 5

63 Fed. Reg. 64772 ................................................................................................................. 28, 29

68 Fed. Reg. 43706 ........................................................................................................................ 5

68 Fed. Reg. 66395 ........................................................................................................................ 5

75 Fed. Reg. 54708 ...................................................................................................................... 30

76 Fed. Reg. 54423 ...................................................................................................................... 27

77 Fed. Reg. 431 ............................................................................................................... 17, 40, 41

77 Fed. Reg. 6139 ........................................................................................................................ 40

77 Fed. Reg. 6816 ........................................................................................................................ 40

77 Fed. Reg. 9687 ........................................................................................................................ 40

61 Fed. Reg. 4722 ........................................................................................................................ 28

## Regulations

70 Fed. Reg. 52310 .................................................................................................... 4, 5, 17, 25, 41

70 Fed. Reg. 52319 .................................................................................................................. passim

## I.   INTRODUCTION

Safari Club International ("Safari Club") files this motion for preliminary injunctive relief to enjoin the enforcement of endangered species status for U.S. non-native captive herds of three antelope species; the scimitar-horned oryx, dama gazelle and addax ("three antelope species").  Although the U.S. non-native captive populations of the three antelope species have been classified as endangered since September 2, 2005, the majority of the prohibitions, restrictions and requirements attendant to that endangered classification have never been enforced.  This is because, on the same day that it listed the three antelope species as endangered, the U.S. Fish and Wildlife Service ("FWS" or "Service") promulgated a companion regulation that exempted the U.S. non-native captive populations of the three antelope species from most of those prohibitions, restrictions and requirements.  In effect, the enforcement of endangered status for these populations has been kept at bay for the last seven years.

On January 5, 2012, the Service published a Final Rule to withdraw the exemption.  As a result, on April 4, 2012, the FWS will, for the first time, fully enforce endangered species status for the U.S. non-native captive populations of the three antelope species.

Safari Club has filed this lawsuit to challenge the legality of the FWS's decision to list the U.S. non-native captive herds of the three species as endangered.  But for that endangered species listing, it would not be necessary for the FWS to implement permit requirements for the take of members of these populations.  Those impending permit requirements are causing Safari Club and its members irreparable harm in their ability to own, breed, maintain, enjoy and conserve the three antelope species.  With this preliminary injunction motion, Safari Club asks this court to enjoin enforcement of that endangered status until Safari Club's legal challenge to the listing can be resolved.

In this Memorandum of Points and Authorities, Safari Club demonstrates that it will succeed on the merits of its Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., and Administrative Procedure Act ("APA") 5 U.S.C. § 706 challenges to the endangered listing of the U.S. non-native captive populations of the three antelope species; that it has and will continue to suffer irreparable harm from the impending enforcement of endangered status; that the balance of harms tips in Safari Club's favor; and that the public's interest will be served by a grant of the preliminary injunctive relief. For these reasons, and for the additional reasons presented below and in the accompanying exhibits, Safari Club respectfully requests that this Court grant the preliminary relief that Safari Club seeks.

## II.   RELEVANT FACTS

### A.   The Scimitar-Horned Oryx, Dama Gazelle and Addax

The historic ranges for these three antelope species are in Africa. Wild populations of the addax and dama gazelle still exist in some parts of Africa, but the scimitar-horned oryx is believed to have disappeared from the wild. Captive populations of each of the three antelope species exist both in some of their historic range countries and in other parts of the world, including the United States. In the U.S., private conservation, free trade, and the ability to hunt these animals have succeeded in establishing large, healthy U.S. populations of each of these species.

The scimitar-horned oryx (*oryx dammah*) is a species of antelope that was historically found in the wild in Algeria, Burkina Faso, Chad, Egypt, Libyan Arab Jamahiriya, Mali, Mauritania, Morocco, Niger, Nigeria, Senegal, Sudan, Tunisia, and Western Sahara. It stands about 47 inches tall and weighs around 450 pounds. It is generally pale in color, but the neck and chest are dark reddish brown. Both male and female adult scimitar-horned oryx possess a

pair of horns curving back in an arc up to 50 inches long. 70 Fed. Reg. 52319 (September 2, 2005) The species is believed to have gone extinct in the wild as there have been no confirmed sightings in the wild since 1988.  International Union for Conservation of Nature and Natural Resources ("IUCN"), http://www.iucnredlist.org/apps/redlist/details/15568/0 (June 28, 2011). Captive populations in fenced protected areas can be found in a number of range countries, including Tunisia, Morocco, and Senegal. 70 Fed. Reg. at 52319.  In 2005, at least 1,550 captive animals were held in managed breeding programs around the world (Gilbert 2005), not including those found on private ranches in the United States.  *Id*. at 52321.  In addition, it is believed that more than 4,000 are kept in a private collection in the United Arab Emirates.  *Id*.  Captive herds of scimitar-horned oryx are also found in South Africa.

The addax (*addax nasomaculatus*) is generally about 42 inches tall at the shoulder and weighs around 220 pounds.  *Id.* at 52319.  It has a grayish white coat and its horns twist in a spiral up to 43 inches long.  *Id.*  It was originally found in the wild in Chad, Mauritania, Niger, Algeria, Egypt, Libyan Arab Jamahiriya, Sudan, and Western Sahara.  *Id.*  Unlike the scimitar-horned oryx, some addax can still be found in the wild.  *Id.*  The IUCN approximates that there are 300 still living in Niger, Chad and Mauritania.  *Id.* at 52320.   Captive-bred addax are being introduced into large fenced areas of protected habitat in Morocco and Tunisia.  *Id.*

The dama gazelle (gazella dama) stands about 39 inches tall at the shoulder and weighs around 160 pounds.  *Id*. at 52319.  Its upper body is mostly reddish brown, and the head, rump, and underparts are white.  *Id.*  Its horns curve back and up, but are generally less than half the length of those of the scimitar-horned oryx.  *Id.*  The dama gazelle's historic home range included Chad, Mali, Niger, Libyan Arab Jamahiriya, Mauritania, Morocco, Nigeria, Algeria, Tunisia, Senegal, Sudan and Western Sahara.  *Id.* It is believed to have disappeared from North

Africa but some still remain in Mali, Chad and Niger.  *Id.*  Some dama gazelle are living in enclosed facilities in their home ranges in Morocco, Tunisia and Senegal. http://www.iucnredlist.org/apps/redlist/details/8968/0.

Currently, aside from the remaining wild populations of addax and dama gazelle, captive herds of the three species are found both inside and outside the United States.  70 Fed. Reg. at 52320.  In the United States, captive populations are growing and thriving.  *Id.*  In 2004, Dr. Elizabeth Cary Mungall conducted research for the Exotic Wildlife Association ("EWA") to assess population numbers and habitat conditions for captive populations of the three antelope species.  Dr. Mungall reviewed a series of statewide censuses and collected data via a survey of EWA members who owned herds of one or more of the three species.  Her research not only revealed significant numbers of each species on ranches in Texas and/or ranches owned by EWA members, but also demonstrated remarkable population increases over a relatively short period of time:

> As shown by a series of statewide censuses (1966, 1971, 1974, 1979, 1984, 1988, 1994) in Texas done by the Texas Parks and Wildlife Department, the state wildlife agency, numbers of the three subject species kept in private ownership have been increasing (Ramsey 1967, Cook 1972, Harmel 1975, Harmel 1980, Traweek 1985, Traweek 1989, Traweek, 1995). This census series is further discussed in Mungall and Sheffield (1994). To confirm the situation, a further census was done in 1996 at the request of the Exotic Wildlife Association (EWA) by the Texas Agricultural Statistics Service (anonymous 1996).  Dama gazelle numbers were checked again in an October 2003 phone census done by the author for EWA as described in the next section (Mungall 2004).
>
> In summary, starting with the first census in which the species appeared:
> Scimitar-horned oryx: 32 in 1979 to 1,006 in 1994 to 2,145 in 1996.
> Addax: 2 in 1971 to 587 in 1994 to 1,824 in 1996.
> Dama gazelle: 9 in 1979 to 149 in 1994 to 91 in 1996 to 369 in 2003.

Submission for the Comment Period on Proposed Listing of Scimitar-Horned Oryx, Addax, and

Dama Gazelle Under the Endangered Species Act, A technical report prepared for the Exotic

Wildlife Association, by Elizabeth Cary Mungall, January 6, 2004.   AR. 221.0005 (Exhibit A)

**B.   <u>Regulations and Litigation Pertaining to the Three Antelope Species</u>**

On September 2, 2005, the FWS listed the scimitar-horned oryx, dama gazelle and the

addax throughout the world as endangered.  Final Rule To List the Scimitar-Horned Oryx,

Addax, and Dama Gazelle as Endangered, 70 Fed. Reg. 52319 (September 2, 2005) ("Antelope

Listing Rule").  The Service encompassed in that listing all captive populations, including those

living on private ranches in the United States.  Prior to issuing the final rule, the Service

deliberated for almost 14 years about how to deal with the disparate status of the members of the

species in the wild as compared to the non-native captive herds in the United States.  The Service

first proposed an endangered species listing on November 5, 1991.  56 Fed. Reg. 56491.   After

an initial public comment opportunity, the Service re-opened the comment period on June 8,

1992 (57 Fed. Reg. 24220), again on July 24, 2003 (68 Fed. Reg. 43706), and then for a third

time on November 26, 2003 (68 Fed. Reg. 66395).   On the date that it issued the Antelope

Listing Rule, the Service also published  a separate rule, exempting the U.S. captive herds of the

three species from the majority of prohibitions that accompany endangered species listing.

Exclusion of U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle From Certain

Prohibitions, 70 Fed. Reg. 52310 (September 2, 2005) ("Exemption Rule").

The Service's protracted deliberation over the listing status of the three species was due

in great part to the agency's dilemma as to how to protect the species in the wild without

severely undermining the trade and use that had so benefitted the U.S. population numbers and

health of the captive herds.  Between proposing the listing in 1991 and its finalization in 2005,

the Service drafted multiple variations of the rule, some that included the U.S. captive herds in

the listing and others that did not.  The Service could find no concrete evidence that listing the

U.S. captive herds would benefit the conservation of either the populations in the wild or the

U.S. populations.  In fact, the evidence collected by the Service indicated that there was no actual

connection between the U.S. non-native captive and African native wild populations.  Although

the Service, and others involved in conservation of the three species, expressed hopes that U.S.

non-native captive populations would someday serve as the seed populations for future

reintroductions into the wild, the FWS found that no reintroductions into the wild from U.S. non-

native captive populations were currently taking place and that, as a result, the U.S. populations

had no current, direct role in restoring the species into the wild of their home range:

> No self-sustaining, free living scimitar horned oryx, addax, or dama gazelle
> population has been established as a result of reintroduction.

U.S. FWS Notes for Final Rule, July 20, 2005, AR. 0352 (Exhibit B).  According to Steven L.

Monfort, DVM, PhD, a Research Veterinarian at Smithsonian National Zoological Park,

Chairman of the Sahelo-Saharan Interest Group, and one of the three peer reviewers selected by

the Service to review the proposed rule to list the three species as endangered:

> The scimitar-horned oryx is already extinct in the wild, the addax and dama
> gazelle are declining, and at current rates these two species could be extinct in the
> wild within a decade.  Although good fenced reintroduction programs enjoy
> strong government support in Tunisia, Morocco and Senegal, ***these flagship
> programs have not yet resulted in the establishment of self-sustaining 'free-
> living' populations of any of these three species.***

Letter from Steven L. Monfort to Robert R. Gabel, October 20, 2003.  AR. 198.0018-19 (Exhibit

C) (emphasis added).  The scientific data available convinced the Service that U.S. non-native

captive populations were having no direct conservation impact on the species in the wild.  At

best, the Service could only document reintroductions from captive herds into other captive

herds, some but not all in their home range, but not into the wild.  In the final version of the

Antelope Listing Rule, the FWS documented the lack of reintroductions into the wild for

scimitar-horned oryx:

> Fenced reintroductions of scimitar-horned oryx are ongoing in Morocco, Tunisia,
> and Senegal (Monfort in litt. 2003, Monfort 2003). Five dama gazelle have been
> introduced to a large enclosure in Senegal (Ba and Clark 2003). These specimens
> are fenced in large tracts of suitable or recovering habitat and held for breeding
> and eventual reintroduction. The founder stock was largely derived from captive-
> breeding facilities. ***However, threats to survival of the antelopes still occur
> outside of the fenced areas so reintroduction into the wild has rarely occurred.***

70 Fed. Reg. at 52322 (emphasis added).  The Antelope Listing Rule also noted the role that

captive breeding *could* someday have in future reintroductions, but admitted that reintroductions

into the wild were presently infeasible:

> Captive-breeding programs operated by zoos and private ranches have effectively
> increased the numbers of these animals while genetically managing their herds.
> As future opportunities arise for reintroduction in the antelope range countries,
> captive-breeding programs will be able to provide genetically diverse and
> otherwise suitable specimens. ***Currently, however, continued habitat loss and
> wonton (sic) killing have made reintroduction nonviable in most cases.***

*Id*. (emphasis added).  The Environmental Assessment for the Exemption Rule similarly

documented the lack of direct connection between U.S. captive herds of scimitar-horned oryx

and the species in the wild:

> Since the final rule only pertains to U.S. captive bred animals and no wild-caught
> specimens have been imported into the United States since 1997 (as far back as
> USFWS law enforcement records go), it is unlikely that wild specimens will be
> imported.  Thus, the only possible interaction these specimens may have with
> wild specimens is ***upon eventual reintroduction into the wild*** of Northern Africa.
> Currently, the scimitar-horned oryx may only found in captivity.  There are long-
> range plans for reintroduction of scimitar-horned oryx and addax, but appropriate
> safeguards and monitoring pre-and post release will be followed (SSIG 2002).

Final Environmental Assessment at 10, AR. 384.0013 (emphasis added) (Exhibit D).    At the

time that the FWS listed the three species as endangered, only introductions from captivity into

captivity were possible, leaving to conjecture whether U.S. non-native captive herds would ever

prove to be a source of animals for reintroduction of the animals in their native ecosystems.  The evidence demonstrated that while the non-native, introduced U.S. portions of the three antelope species *could* at some point in the future be important in efforts to supplement native populations of the three antelope within their historical ranges, protection of the U.S. populations would not *presently* improve the status of the three antelope within the species' historical range.

During the 14 years that it collected data and analyzed its legal strategies for dealing with the thriving and growing U.S. captive population, the FWS was well aware that it had listing options that would allow the Service to exclude those U.S. non-native captive members from the endangered classification of the animals in the wild, particularly because no direct connection could be found between the wild and captive/non-native populations.  Not only had the Service utilized those options in the past, but at the time that the Service adopted the final Antelope Listing Rule, several of those exclusions for other species were ongoing and in full effect.  For example, Marshall Jones of the Office of Management Authority of the FWS offered the following comments to Dr. Charles Dane, Chief of the Office of Scientific Authority, on April 2, 1991:

> As you already knew, I am definitely in favor of consideration of alternative listing strategies for some captive individuals.
>
> Dick Robinson's comments on Ron's note emphasize the need for all split listings to have a biological basis.  I agree, but I also would argue that many animals in captivity are biologically irrelevant to the species, e.g. subspecific crosses, animals of unknown blood lines.  Where an SSP exists, surplus (genetically overrepresented) animals might also fit into this category.  All of these are animals which could be considered not part of the biological species which is being listed (i.e. the wild popualations (sic) plus all genetically identified members of those popualations (sic) in captivity).
>
> A further alternative is available when the captive population is considered to be self-sustaining (e.g. chimpanzees).  This provides a different basis for split listing.

Letter from Marshall Jones, to Charlie (Dr. Charles Dane), 2 April 1991, AR 2.002 (Exhibit E).

On March 11, 1991, FWS Biologist, Ronald W. Nowak wrote to the Chief of the Office of

Scientific Authority:

> However, being that we are starting the procedure from the situation of no
> coverage at all, it might not be contrary to the intent of the law to issue a
> classification excepting populations in the United States.  We then would state
> that our main purpose is to properly recognize the status of the natural
> populations, based on the data available, and that we are not now prepared to deal
> with the U.S. stock.  This approach would be something akin to what was done
> with the chimpanzee.

Memo, Ronald M. Nowak to Chief Office of Scientific Authority, Re:  Proposed Listing of Three

African Antelopes, 11 March 1991, AR 1.0001 (Exhibit F).

The FWS drafted early versions of the Antelope Listing Rule, relying on its authority to

treat the U.S. non-native captive populations differently than the populations in the wild.  For

example, in one of the earliest versions, U.S. non-native captive populations were excluded from

the listing:

> The Service determines endangered status for wild populations of three species of
> antelopes:  scimitar-horned oryx, addax, and dama gazelle. . . .  This rule
> implements the protection of the Endangered Species Act of 1973, as amended,
> for these species.  Captive and free-roaming groups, outside of the natural ranges
> of the species, are not now included in this determination.

(Draft) Final Rule on Endangered and Threatened Wildlife and Plants; Endangered Status for

Scimitar-horned Oryx, Addax and Dama Gazelle, dated 3/25/1992, AR 65.0005 (Exhibit G).  In

another version, the Service listed wild populations of the three species as endangered and non-

native captive populations as threatened, based on its recognized authority to treat or list U.S.

non-native captive populations differently than wild populations:

> Section 3(15) of the Endangered Species Act of 1973 (Act) defines the term
> "species" to include "any distinct population segment of any species of
> vertebrate."  From time to time, the Service has treated groups of vertebrates that
> are in captivity, or that have originated from captive stock, as separate population

9

> segments, distinct from fully natural populations, for purposes of the Act.   The
> example closest to that now at hand involves the chimpanzee (Pan troglodytes),
> which in the Federal Register of March 12, 1990 (55 FR 9135), was classified as
> endangered in the wild and as threatened in captivity.

(Draft) Endangered Status for Scimitar-horned Oryx, addax and dama gazelle in Their Historic

Range, Final Rule, 2/10/1994, AR. 135.0076-77 (Exhibit H).   In the end, the Service considered

yet rejected threatened status for the U.S. non-native captive populations in favor of listing them

as endangered.

The Service listed the U.S. non-native captive populations, despite being fully aware that

the listing would deter ongoing conservation of these populations and undermine conservation

successes achieved by the private ranching and hunting communities.  In the 1994 draft version

of the Final Rule that listed the U.S. non-native captives as threatened, the Service admitted:

> An endangered classification might not only be inappropriate for the captives, but
> it might impose restrictions on their management that could interfere with efforts
> conducive to the propagation and survival of the species.

*Id*. AR. 135.0077.  The Service continued in the same draft Final Rule:

> Notwithstanding the above, and even though the populations of scimitar-horned
> oryx, addax, and dama gazelle outside of their historic range equal or exceed the
> captive populations of many species that are not on the List of Endangered and
> Threatened wildlife, the Service will classify them as threatened.

*Id.,* AR 135.0078.

The Service was well aware of the incredible strides that private ranchers had achieved

because they were able to freely trade, sell and sell hunts for these animals in the absence of an

endangered species listing and its prohibitions and requirements.  The Service noted these

conservation achievements in the Environmental Assessment prepared for the Exemption Rule:

> In a survey of Exotic Wildlife Association members in Texas, 63 ranches held
> scimitar-horned oryx, 31 maintained addax, and 14 maintained dama gazelle.  In
> summary, starting with the first census in which the species appeared; scimitar-
> horned oryx went from 32 in 1979 to 2145 in 1996, addax went from 2 in 1971 to

> 1,824 in 1996, and dama gazelle went from 9 in 1979 to 369 in 2003 (Mungall 2004).  Captive populations of the three antelope species increase rapidly after a specimen has been on the ranch for seven years.
>
> The last census for the three antelope populations showed that in 1996 there were 2,145 scimitar-horned oryx, 1,824 addax, and 91 dama gazelle in Texas ranches. According to Mungall (2004), these species are experiencing substantial population growth rates, with the oryx herd growing at 205 percent from 1983 to 2003, the addax herd growing at 115 percent from 1986 to 2003 and the dama gazelle herd growing at 118 percent from 1984 to 2003.

Appendix, Economic Analysis of the Proposed Rule (Exemption), AR. 237.0043-44 (Exhibit I).

Those who commented on the proposed listing of the species, including the rule's peer reviewers

and individuals directly involved with conservation of the species, warned the Service that a

listing would reverse these conservation successes.   For example, the American Zoo and

Aquarium Association ("AZA") recommended the exclusion of the U.S. non-native captive

populations to avoid the creation of disincentives for species conservation:

> The goal of maintaining the genetic diversity of the captive populations of these antelope species may be adversely compromised through the inclusion of the captive population of any of these three species as a USFWS endangered species. Our efforts to move animals back and forth between the captive populations in North America, Europe, and elsewhere could be severely hampered by the listing of the captive populations as endangered and the resulting permitting process, possible restrictions and enhancement requirements imposed by such listing.  The ability to effectively manage the captive programs for these antelope species may be critical to their future existence, given the continuing pressures on the remaining wild populations.
>
> As there is no longer a direct impact between the wild and captive populations, AZA urges the USFWS to consider a bifurcated listing, with the wild populations of addax and dama gazelle listed as endangered, and the captive populations of addax and dama gazelle and scimitar-horned oryx retaining the current non-listed status.

Letter from AZA to Chief Division of Scientific Authority, October 20, 2003, AR. 198.0012,

198.0014 (Exhibit J).  One of the Antelope Listing Rule's Peer Reviewers, Steven Monfort,

similarly explained:

> Given the disparate situation between the wild (critical) and captive (abundant) populations, a bipartite listing would be most appropriate for these species. This would provide strict protection of wild populations (including scimitar-horned oryx, should they move beyond fence reintroductions), while minimizing restrictions on the use and movement of captive individuals to support the formation of 'world herds' and reintroduction efforts.

Letter from Steven L. Monfort, DVM, PhD, Research Veterinarian and Chair, Sahelo-Saharan

Interest Group, (Peer Reviewer) Smithsonian National Zoological Park to Robert R. Gabel,

October 20, 2003, AR. 198.0018-19 (Exhibit K).   Citing the success of captive breeding both

within and outside the U.S., Alan F. Rost, another peer reviewer of the Antelope Listing Rule,

wrote to the Service in October of 2003:

> I therefore believe that it is not appropriate or necessary for the scimitar-horned oryx (Oryx dammah) to be added as an endangered species to the U.S. Endangered Species Act.

Letter from Alan F. Rost, SSP Coordinator and Studbook Keeper of Scimitar-Horned Oryx to

Eleanora Babij, U.S. Fish and Wildlife Service, October 22, 2003, AR. 199.0002 (Exhibit L).

The Peer Reviewers were not alone in arguing against listing the captive populations.

Ranchers who owned herds of one or more of the three species and groups involved with

sustainable use conservation recommended that the Service distinguish between populations of

the three species based on international boundaries, which would enable the Service to list those

living outside the U.S., yet exclude those within U.S. boundaries.

> We would like to support the position taken by the U.S. game ranchers that the Service ***not list these species as endangered within the U.S***.

Safari Club International comment letter, September 1, 1992 to Dr. Charles Dane, Chief, Office

of Scientific Authority, AR. 82.0019 (emphasis added) (Exhibit M).  In August of 1992, Terrie

Correll, Species Survival Plan (SSP) coordinator for addax, wrote the following:

> At this time the captive population is neither threatened nor endangered and does not warrant listing.  A <u>bipartite listing</u> would be appropriate in this situation where

> the wild population is endangered but the captive group exists in sizeable numbers
> but has no impact on wild addax. The Fish and Wildlife Service has set a
> precedent for bipartite listings for other species such as the desert tortoise.

Letter from Terrie Correll to Dr. Charles Dane, Chief, Office of Scientific Authority, August 27,

1992, AR. 82.0012 (emphasis in the original) (Exhibit N). J. David Bamberger, a private rancher

who worked with the AZA and the SSP for scimitar-horned oryx, and who volunteered his ranch

to provide a breeding ground for 29 of the 31 remaining scimitar-horned blood lines,

emphatically warned the Service against listing the U.S. captive populations on multiple

occasions:

> There is no need to list the addax, the scimitar-horned oryx, or the dama gazelle.
> The information I have supports this conclusion.
>
> These species are breeding so well in captivity that listing would serve no
> purpose, rather it would slow down our progress because private holders would
> dump what they have. It would burden the specie coordinator with paperwork
> when important moves of animals needed to be made.

Letter from J. David Bamberger to Charles W. Dane, Chief, Office of Scientific Authority,

August 24, 1992, AR. 82.0010 (Exhibit O).

> Listing of this species would do more to cause the certain extinction of this
> species than any environmental or political event, as it would cause the cessation
> of breeding programs such as ours.

Letter from J. David Bamberger to Chief of DSA, USFWS, January 19, 2003, AR. 0156 (Exhibit

P).

The Service was fully aware of the detrimental conservation implications of listing the

U.S. captive herds. As early as 1992, Dr. Charles Dane, the Chief of the Scientific Authority of

the FWS, acknowledged how permit requirements and ESA prohibitions would inhibit private

conservation:

> The counterpoint is that an ESA listing (even a Threatened S/A listing) would
> require a permit (and this create unnecessary delays in issuance of permits for

sport-hunted trophies taken in the United States) unless there was a special rule
that exempted the need for permits in which case there would appear to be little
benefit from listing captive populations.

Note from C. Dane to "Reviewers" November 12, 1992, AR. 134.001 (Exhibit Q).  The Service

knew that the ESA permit application process involved many potential delays and that an

applicant could never be sure of receiving a permit and might have to wait months to over a year

to receive any kind of answer in response to a permit application.  For example, Hunter

Schuele's March 17, 1992 permit application for the take, transport in interstate commerce and

export sport-hunted trophies of captive-bred wildlife did not receive a response from the Service

for 14 months.  Finally, the Service denied it in a letter dated May 7, 1993, from Kenneth

Stansell, Deputy Chief, Office of Management Authority, U.S. Fish and Wildlife Service, AR.

135.004[1] (Exhibit R)

In preparing Environmental Assessment for the Exemption Rule ("Exemption EA"), the

Service recognized both the conservation role that hunting plays for the benefit of the species:

Sport-hunting of U.S. captive-bred specimens of these three antelopes will also
have positive consequences.  Limited hunting of captive-bred specimens
facilitated the captive antelope increases by generating revenue for herd
management and the operation of the facility.  Ranches need to manage herds
demographically (i.e., age, gender) and genetically (i.e., maximize genetic
diversity).  Such management may include culling specimens, which may be
accomplished through sport hunting.  For example, a ranch may need to reduce
the number of adult males to achieve the necessary sex ration for establishing a
polygamous breeding group and facilitating the typical breeding behavior of the
species.  Hunting also provides an economic incentive for private landowners
such as ranchers to continue to breed these species and maintain them as a genetic
reservoir for future reintroduction or research, and as a repository for excess
males from other captive herds.

---

[1] While 14 months may not be the standard waiting time for response to a permit application,
knowledge of the potential for such delays can act and has acted as a deterrent to private
rancher's participating in the permit process.  The mere possibility of months of uncertainty as to
when and whether the FWS will act on a permit is enough to discourage private ranchers from
assuming the risk of retaining animals that require this process.

Final Exemption EA at 10, AR. 384.0013 (Exhibit D).  In the Record of Compliance the Service

prepared for the Exemption Rule, the Service acknowledged the harmful conservation

consequences that could result from a listing of the U.S. non-native captive populations of the

three species without exempting the three antelope species from prohibitions associated with an

endangered listing:

> The gene pool management for the recovery of scimitar-horned oryx, addax, and
> dama gazelle depends on the movement of captive-bred specimens among
> institutions across state boundaries.  In addition, we are including sport-hunted
> trophies because trophy hunting on private ranches that breed these species may
> be necessary for wildlife management purposes, provides revenue for the
> continued operation of captive-breeding operations, and economic incentive for
> ranchers to continue breeding these species.  ***Listing the species without
> exempting the U.S. captive-bred population could be a deterrent to further
> captive breeding.***

United States Department of the Interior, Record of Compliance for a Rulemaking Document,

signed by Robert R. Gabel, Acting Assistant Director, International Affairs, January 7, 2005, AR

237.0122 (emphasis added) (Exhibit S).  The Appendix to that Record of Compliance also

explained why permit requirements for the sale of hunts of the U.S. captive populations would

serve as a deterrent to future participation by private ranchers in three antelope conservation.

> Under Alternative 2[2], individuals subject to the jurisdiction of the United States
> would need permits to engaging (sic) in domestic and international trade in live or
> dead captive-bred specimens for commercial purposes.  This process takes time,
> sometimes causing delays in moving animals for breeding or reintroduction.  Such
> movements must often be completed within a narrow time frame and can be
> further complicated by quarantine requirements and other logistics.  This, coupled
> with the prohibition on interstate commerce of sport-hunted trophies, could
> remove the incentive to breed these species, which rely on captive breeding for
> their recovery.

Appendix, Economic Analysis of the Proposed Rule, AR. 237.0126-0127 (Exhibit T).

---

[2] Alternative 2 indicates an endangered species listing for the three antelope, without any
exemption from permit requirements and other endangered species classification prohibitions.

> Alternative 2 is possible, but it would remove all economic incentive to conserve the species by discouraging captive-breeding.  Without the ability to cover all costs of captive breeding there is no economic incentive to continue.

*Id.* at AR. 237.0128.

In deciding how to deal with the U.S. captive populations of the three antelope species, the Service was well aware that an endangered classification creates severe restrictions on the use and trade of such animals and that it would undermine private ongoing conservation efforts taking place on ranches in Texas and other U.S. states.  The Service acknowledged the fact that an endangered species classification would interfere with the economy and system by which the ranchers had been willing to participate in efforts that significantly increased the U.S. numbers of these animals.  The Service understood that the additional burdens, costs and uncertainties introduced by endangered species classification would significantly undermine the value of the animals and encourage many ranchers to abandon their conservation efforts.

Despite this knowledge, on September 2, 2005, the Service listed the three species, in their entirety, as endangered.  The Service did not adopt the recommendations of Safari Club International, the Antelope Listing Rule's Peer Reviewers and others intimately involved with the conservation of the three species.  The FWS chose not to exclude U.S. captive populations from this listing, instead interpreting the ESA to prohibit disparate listing designations between wild and captive populations of a species.  The Service offered little to no explanation as to why it did not adopt an approach that would 1) resemble what the Service had followed in its separate listings for other ranched or captive populations; 2) rely on international boundaries for distinguishing between different populations rather than a captive/wild distinction; or 3) exclude the non-native members of the three antelope species from the listing due to the lack of direct conservation connection between the U.S. non-native captive herds and the species in the wild.

16

The only explanation that the Service gave for not excluding the U.S. non-native captive populations was that "[i]t would not be appropriate to list captive and wild animals separately." 70 Fed. Reg. 52319, 52320 (September 2, 2005).

Instead of excluding the U.S. non-native captive populations from the endangered species listing, the Service attempted to preserve the ongoing conservation efforts being conducted by private U.S. ranchers by carving out a special exception to the take prohibitions normally applicable to endangered species.  The Service issued the Exemption Rule, a rule that exempted United States non-native captive-bred members of the three antelope species from take and other prohibitions of section 9 of the ESA.  70 Fed. Reg. 52310 (Sept. 2, 2005)[3].  That regulation made it possible for ranchers to continue to sell hunts and facilitate the hunting of members of the three species without applying for permits.  That Exemption Rule provided only a temporary fix.

Two different groups of plaintiffs challenged the legality of the Exemption Rule.  On June 22, 2009, Judge Kennedy of the U.S. District Court for the District of Columbia ruled that the Exemption Rule violated the ESA's permit notice and comment requirements because it authorized the take of endangered animals without giving the public notice and the opportunity to comment on the exempted takings.  *Friends of Animals v. Salazar*, 626 F.Supp.2d 102 (D.D.C. 2009).  Judge Kennedy remanded the matter to the FWS for further action consistent with the Court's ruling.  *Id.* at 118.

On January 5, 2012, the FWS announced a Final Rule withdrawing the regulatory exemption for the three antelope species.

---

[3] 16 U.S.C. §1538(a)(1)(B) makes it unlawful for any person to "take" any member of an endangered species within the United States.  16 U.S.C. §1539(a)(1)A) authorizes the Secretary of the Interior (delegated to the FWS) to issue permits, under certain circumstances, for the take of members of an endangered species.

> We, the U.S. Fish and Wildlife Service (Service), are revising the regulations that implement the Endangered Species Act of 1973, as amended (Act), by removing the exclusion of U.S. captive-bred live wildlife and sport-hunted trophies of three endangered antelopes—scimitar-horned oryx, addax, and dama gazelle—from the prohibition of certain activities, such as take and export, under the Act. This change to the regulations is in response to a court order that found that the rule for these three species violated section 10(c) of the Act. These three antelope species remain listed as endangered under the Act, and a person will need to qualify for an exemption or obtain an authorization under the current statutory and regulatory requirements to conduct any prohibited activities.

77 Fed. Reg. 431 (January 5, 2012) ("Withdrawal Rule").  The Withdrawal Rule did not create any new permit requirements, but simply removed the exemption promulgated on September 2, 2005 and, for the first time, subjected the U.S. non-native captive herds of the three antelope species to all the prohibitions, restrictions and requirements applicable to endangered species. Now, those seeking to "take" one of these animals, either by selling hunts for these antelope or by hunting them, have to apply for a permit to do so.  The withdrawal of the exemption goes into effect on April 4, 2012.  *Id.*

The announcement of the impending endangered species requirements has irreparably harmed Safari Club International and its members who own, breed, sell hunts for the three antelope species or hunt for them.  SCI and its members have lost the ability to participate in the conservation of these animals.  The impending permit requirements, in place only because of the endangered classification of the U.S. captive populations of the three species have (1) caused the value of these animals to drop precipitously and (2) severely undermined the industry that has long demonstrated how sustainable use conservation, in the form of hunting, has been the key to the recovery of wildlife.

Safari Club has done its best to avoid this irreparable harm.  On June 28, 2010, Safari Club filed a petition with the FWS, seeking the delisting of the U.S. non-native captive herds of the three antelope species. AR. 1160 (Exhibit U). The Service has not taken any action on that

petition other than to explain in a response letter, dated September 23, 2010, that it anticipated making a finding in Fiscal Year 2011 as to whether Safari Club's petition "contains substantial information indicating that the action may be warranted." AR. 1248 (Exhibit V).  In its July 25, 2011 response to Safari Club's 60 day notice of intent to sue in the instant matter for the Service's failure to take action on the petition to delist, the Service expressed its intent to further delay its consideration of the delisting, explaining that it expected to make an initial finding on Safari Club's petition in the *next* fiscal year.  AR 1305 (Exhibit W).

In its August 8, 2011 letter to the Service responding to the Service's proposal to withdraw the Exemption Rule (76 Fed. Reg. 39804 (July 7, 2011)) Safari Club warned against the conservation consequences of enforcing endangered species prohibitions and restrictions on the U.S. non-native captive populations.  Safari Club also attempted to persuade the Service to find alternative, less harmful means of dealing with the U.S. non-native captive populations. Safari Club International August 8, 2011 Comment Letter, (Exhibit X).  These efforts to prevent irreparable harm have been to no avail.

## C.  Safari Club International

Safari Club International, a nonprofit IRC § 501(c)(4) corporation, has approximately 53,000 members worldwide.  Declaration of Rew Goodenow, Chairman of Safari Club International Legal Task Force, ¶4 (Exhibit AA).  Safari Club's mission is to protect the freedom to hunt and to promote wildlife conservation worldwide. *Id*., ¶5.  Members of Safari Club own captive herds of the scimitar-horned oryx, dama gazelle and/or addax on privately owned ranches throughout the United States. *Id*., ¶9.  Other members of Safari Club have hunted one or more of the three antelope species from these U.S. captive, privately owned herds and seek to do so in the future. *Id.*

Safari Club and Safari Club members' interests include the sound sustainable use conservation of scimitar-horned oryx, dama gazelle and addax and Safari Club members' ability to continue to raise, trade, breed and sell hunts for U.S. captive bred members of the three antelope species under economically feasible conditions without the expense, difficulties and uncertainties of unnecessary and burdensome permit requirements.  *Id*., ¶8.  Safari Club's and Safari Club members' interests also include the ability to participate in the sustainable use conservation of these three antelope species by hunting members of U.S. captive herds on private ranches without the expense, difficulties and uncertainties of unnecessary and burdensome permit requirements.  *Id.*

Safari Club and members of Safari Club are harmed and aggrieved by the endangered classification of the U.S. captive herds of the three antelope species.  The impending enforcement of ESA prohibitions against certain kinds of conduct involving these animals and the requirement of permits to engage in such activities, such as the sale of hunts and the hunting of these animals, has already and will continue to make it economically infeasible for Safari Club members to continue to own, trade, breed, and sell hunts for members of the U.S. captive herds of the three antelope species and to continue their private conservation efforts for these species. *Id*., ¶11.  As fewer Safari Club members find it financially viable to own herds of scimitar-horned oryx, dama gazelle and addax, the number of herds of the three species and the number of individual members of the three species in the United States has dwindled and will continue to dwindle, causing direct harm to the conservation interests and goals of Safari Club and Safari Club members.  *Id*., ¶12.  In addition, the smaller numbers of herds and fewer individual members of the three antelope species and the administrative burdens associated with obtaining the permits required for the take of members of the three species will result in fewer scimitar-

horned oryx, dama gazelle and addax available for Safari Club members to hunt and to conserve through sustainable use methods.  *Id.*, ¶¶12, 14.

## III.   STANDARD OF REVIEW

A Plaintiff seeking preliminary injunctive relief must demonstrate that 1) he is likely to succeed on the merits of his claim; 2) he is likely to suffer irreparable harm in the absence of the requested preliminary relief; 3) that the balance of equities tips in his favor; and 4) that the injunctive relief sought is in the public interest.  *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 20 (2008).  "The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation."  *District 50***,** *United Mine Workers of America v. International Union, United Mine Workers of America***,** 412 F.2d 165, 168 (D.C. Cir. 1969).

Prior to the U.S. Supreme Court's ruling in *Winter*, *supra*, courts assessed a movant's ability to establish the four requisites for preliminary injunctive relief on a "sliding scale," where an unusually strong demonstration of one of the four factors potentially lessened the showing needed for another factor.  *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291–92 (D.C.Cir.2009) (citing *Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 361 (D.C.Cir.1999)). In *Winter*, the Supreme Court indicated that the Plaintiff must show that, without the requested relief, his irreparable injury is likely, rather than a possibility. 555 U.S. at 20-21.  As a result of the *Winter* ruling, the circuit courts have been left to determine whether the sliding scale is still a viable means of evaluating a movant's entitlement to preliminary injunctive relief.  As of yet, this Circuit has declined to make that decision.  *Sherley v. Sebelius,* 644 F.3d 388, 393 (D.C.Cir. Apr. 29, 2011) (declining to address continued validity of sliding scale approach, but stating "we read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction,'" quoting *Davis,* 571 F.3d at 1296 (concurring

opinion)).  Regardless of whether the sliding scale approach did survive the *Winter* decision,

Safari Club is entitled to preliminary injunctive relief, because this Motion for a Preliminary

Injunction and Memorandum of Points and Authorities demonstrate the likelihood of both Safari

Club's success on the merits and irreparable harm if preliminary injunctive relief is not granted.

The underlying decision that Safari Club challenges in this litigation is the Service's

decision to "list" the U.S. captive herds of the scimitar-horned oryx, dama gazelle, and addax as

endangered.  Listing decisions are subject to review under the APA and must be set aside if

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A); *American Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C. Cir. 2008) (Court

affirmed under the APA the FWS's decision not to list the westslope cutthroat trout as

threatened).

## IV.     ARGUMENT

### A.     Safari Club International Will Succeed in Proving the Merits of Its Legal Challenge

Safari Club challenges the legality of the FWS's decision to include non-native, captive

members of scimitar-horned oryx, dama gazelle and addax living in the U.S. in the endangered

species listing for the three species in the wild.  Below, Safari Club demonstrates that the Service

1) acted arbitrarily and capriciously and in a manner inconsistent with ongoing agency decision-

making made for other similarly situated species; and 2) ignored the conservation mandates of

the ESA and the fact that inclusion of the captive populations would harm rather than serve the

conservation of populations of the three antelope species.  Thus, Safari Club will succeed in

proving the merits of its ESA and APA[4] challenges to the listing of the U.S. captive herds of the three antelope species.

The ESA obligates the Secretary of the Interior (through the FWS) to list a species as endangered (or threatened) when the species qualifies for that status based on one or more of the five following factors:

> **(A)** the present or threatened destruction, modification, or curtailment of its habitat or range;
> **(B)** overutilization for commercial, recreational, scientific, or educational purposes;
> **(C)** disease or predation;
> **(D)** the inadequacy of existing regulatory mechanisms; or
> **(E)** other natural or manmade factors affecting its continued existence.

16 U.S.C. §1533(a)  The Service's decision to list species as endangered or threatened must be based solely on the basis of the best scientific and commercial data available, "after taking into account those efforts, if any, being made by any State or foreign nation, …, to protect such species …. *Id.* §1533(b).

Although Section 1533 does not itself address whether captive or non-native members of a species should be included in species' listings, other sections of the ESA evince Congress' intent that the ESA's purposes and strategies focus on the conservation of species *within their native ecosystems*.  For example, one of the purposes of the ESA is to:

> provide a means whereby *the ecosystems upon which endangered species and threatened species depend may be conserved*, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

*Id.*, § 1531(b) (emphasis added).   When a Court must determine the meaning of a statute, it first must ask whether the intent of Congress is clear.  If so, "that is the end of the matter; for the

---

[4] Safari Club will at least demonstrate that it has a high likelihood of success on the merits on these claims.

court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress." *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843 (1984).

If the language of the statute is ambiguous, courts generally defer to the administering agency's

interpretation of the statutory language.  That general rule is subject to exception if the agency's

interpretation falls short of the requirements of the APA:

> If Congress has explicitly left a gap for the agency to fill, there is an express
> delegation of authority to the agency to elucidate a specific provision of the
> statute by regulation. Such legislative regulations are given controlling weight
> ***unless they are arbitrary, capricious, or manifestly contrary to the statute.***

*Id*. at 843-44 (emphasis added).

An agency's inconsistent interpretation of the law can amount to arbitrary and capricious

action if not explained adequately, as is the case here.  Of course, reversal of a previous position

or policy ***alone*** does not qualify as arbitrary and capricious conduct.  *National Cable &*

*Telecommunications Ass'n. v. Brand X Internet Services***,** 545 U.S. 967, 982 (2005) (FCC's

reasoned explanation for disparate treatment of cable modem and DSL dispelled arbitrary and

capricious claims).  But a reversal of position without an adequate explanation is a different

story.  An agency's failure to explain inconsistent treatment may indeed qualify as arbitrary and

capricious conduct and a violation of the agency's APA obligations.  *Id*.  The agency's

simultaneous application of inconsistent interpretations to similarly situated scenarios may

qualify.  "If an agency construes its charter erratically or inconsistently, however, little or no

deference will be owed to its decisions." *American Federation of Government Employees, Locals*

*225, 1504, and 3723, AFL-CIO v. Federal Labor Relations,* 712 F.2d 640, 643 n. 17 (D.C. Cir.

1983)(Court considered Federal Labor Relations Authority's interpretation of Federal Service

Labor-Management Relations Act) *citing Adamo Wrecking Co. v. United States*, 434 U.S. 275,

287 n. 5 (1978). "Agencies are *not* free, under *Chevron,* to generate erratic, irreconcilable

interpretations of their governing statutes ... Consistency over time and across subjects is a relevant factor [under *Chevron* ] when deciding whether the agency's current interpretation is 'reasonable.'" *Valdiviezo-Galdamez v. Attorney General of U.S.* 663 F.3d 582, 604 (2011) (court refused to defer to Bureau of Indian Affairs definition of phrase "particular social group" in review of agency's determination of whether member of group qualified as "refugee" eligible for asylum ) citing *Marmolejo–Campos v. Holder,* 558 F.3d 903, 920 (9th Cir. 2009) (Berzon, J., dissenting) (citing *Cardoza–Fonseca,* 480 U.S. at 446 n. 30, 107 S.Ct. 1207) (emphasis in original).

In the instant matter, the Service's decision to include the U.S. captive non-native populations of the three antelope species in the listing of the species in the wild qualifies as erratic.  In its consideration of other captive and/or non-native populations of species that, similar to the U.S. non-native captive populations of the three antelope species, had no direct connection with the conservation of the species in the wild, the Service had dealt separately with those captive and/or non-native populations and in some cases had not listed them at all.  Several of these listing decisions were in effect at the time that the FWS decided that it had no choice but to include the U.S. captive, non-native members of the three antelope species in the listing of the species in the wild.  70 Fed. Reg. at 52320 ("It would not be appropriate to list captive and wild animals separately.")[5]  The Service offered no explanation to justify its inconsistent treatment of

---

[5] The Exemption Rule only once mentions the Service's refusal to separately designate the U.S. captive populations as "populations."  In response to a comment that the "proposed rule referred to 'populations' of captive-bred scimitar-horned oryx, dama gazelle, and addax, and that this usage is inconsistent with the definition of this term in the applicable regulations," the FWS responded:

> We agree that captive-held animals may not qualify as populations as defined at 50 CFR 17.3 and have changed the rule accordingly.

70 F.R. 52310, 52312 (September 2, 2005)

similarly situated populations.  These unexplained inconsistent actions are arbitrary and capricious and require this Court to abandon the deference generally extended to an agency's statutory interpretation.

Although in the Antelope Listing Rule, the Service refused to deal with the U.S. populations separately, the Service had no such problem in 1987 when it identified "ranched populations" (another version of captivity) of the Nile Crocodile in Zimbabwe as "populations" for the purpose of determining listing status.  The FWS promulgated regulations that reclassified those ranched populations as "threatened" while leaving all other populations of the species as endangered.[6]  Reclassification of Ranched Nile Crocodile Populations in Zimbabwe From Endangered to Threatened, 52 Fed. Reg. 23148 (June 17, 1987).  In that rule, in response to criticisms for splitting the wild and captive animals into distinct populations, the Service explained:  "[T]he Endangered Species Act (Act) provides for the reclassification of only certain populations of a species.  For these reasons, the Service decided to split ranched from wild populations and to propose a downlisting for only the later (sic)."  Id. at 23149.  Neither the Antelope Listing Rule, nor the Exemption Rule offered any explanation to justify why the Service could consider ranched Nile Crocodiles in Zimbabwe as a population, but could not apply the same approach to U.S. captive herds of the scimitar-horned oryx, dama gazelle and addax.[7]

---

[6] Over a year later, the Service reclassified wild crocodile populations from endangered to threatened status as well.  53 Fed. Reg. 38451 (September 30, 1988)

[7] Note that the situation involving the U.S. captive herds of the three antelope species is quite different than the one encountered by an Oregon District court in the case of *Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154 (D. Or. 2001).  In that case, the Court rejected the National Marine Fisheries Service's ("NMFS") attempt to exclude hatchery salmon from the DPS and threatened listing of naturally spawned salmon.  The NMFS argued that the hatchery born salmon were not essential to the species' recovery.  In that case, unlike in the instant matter,

The Antelope Listing Rule also did not explain the Service's disparate treatment of captive chimpanzee populations.  On the date that the FWS refused to consider the U.S. non-native captive populations of the three antelope species as "populations" for the purpose of determining listing status, the Service was actively recognizing captive chimpanzees in the United States as a distinct population, classified differently from wild populations of the same species in their home range.  55 Fed. Reg. 9129 (March 12, 1990).  In response to comments challenging the legality of identifying a population exclusively of captive members of the chimpanzee species, the Service explained:

> In the Endangered Species Act of 1973, as amended (Act), the definition of "species" is not the same as the usual biological definition of species but is expanded specifically to include "any species, subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." Captive animals are distinct from wild populations and may have the potential to interbreed when mature. In the case of the chimpanzee, some animals are specifically being managed as an interbreeding population. In listing the ranched population of the Nile crocodile in Zimbabwe, the Service has previously classified specimens in captivity differently than wild populations.

*Id*. at 9130.  That classification of a population composed exclusively of captive chimpanzees persists today.[8]

The Antelope Listing Rule rejected the idea of designating a population based exclusively on captive status, but offered no explanation why the Service could not alternatively designate the population based on a separation from other populations by international boundaries and regulatory mechanisms.  While wild members of at least two of the three antelope species live only in Africa, captive populations of all three species live throughout the world.  The Service

---

the natural and hatchery born salmon were not reproductively isolated and were literally swimming side-by-side in the same stream.  In addition, both natural and hatchery born salmon were located within the species' historic range.  *Id*. at 1162-63.

[8] The Service recently initiated a status review to determine whether the population should be designated as "endangered" rather than "threatened."  76 Fed. Reg. 54423 (September 1, 2011)

had the ability, based on its "Policy Regarding the Recognition of Distinct Vertebrate Population

Segments Under the Endangered Species Act ("DPS Policy"), 61 Fed. Reg. 4722 (February 7,

1996) to classify all scimitar-horned oryx, dama gazelle and addax populations outside of the

U.S. as one population and all the non-native antelope of the three species living in the U.S., as

separate and distinct population segments.  In the DPS Policy, the Service explained:

> [I]t appears to be reasonable for national legislation, which has its principal
> effects on a national scale, to recognize units delimited by international
> boundaries when these coincide with differences in the management, status, or
> exploitation of a species.

*Id*. at 4723.

In the Antelope Listing Rule, the FWS also did not explain why, as an alternative to

recognizing the U.S. captive population as a "population," the agency did not simply exclude the

non-native members living in the U.S. from the listing of the native populations, as it had with

other species.  The FWS used that very approach when addressing a non-native, introduced

population of the Arkansas River Shiner ("ARS").  Seven years before the Antelope Listing

Rule, the FWS issued a final rule listing the native Arkansas River Basin Population of the

Arkansas River Shiner as threatened, but excluded from that listing a non-native population of

the species living in the Pecos River.  63 Fed. Reg. 64772 (November 23, 1998).  The agency

explained:

> Because it is both discrete and significant, the Arkansas River Basin population of
> the ARS qualifies as a distinct population segment under the Act.  Although it is
> discrete, the Pecos River population of the ARS is not significant because it is an
> introduced population located outside of the species' historic range and, at this
> time, is not essential for recovery of the species within its historic range.
> Therefore, the Arkansas River basin population of the ARS is a listable entity
> under the Act, and the non-native, introduced Pecos River population is not a
> listable entity under the Act.

*Id*. at 64774.  Like the U.S. non-native captive herds of the three antelope, the Pecos River

population of the Arkansas River Shiner had been artificially introduced and was not living in a

portion of the species' historic range.  *Id*. at 64777.  Also like the U.S. non-native captive herds

of the three antelope, the Pecos River ARS population was not having any direct recovery impact

on the native populations living in the species' home range.  Nevertheless, the Service

recognized that the Pecos River population had *potential* for future recovery efforts.  "We agree

that the Pecos River population could serve as a source of individuals for transplantation into

suitable, unoccupied, historic habitat. "  *Id*. at 64778.  The Service further explained:

> While the non-native, introduced Pecos River population of the ARS could be
> important in efforts to supplement native populations of the ARS within the
> species' historical range, protection of the Pecos River population would not
> improve the status of the ARS within the Species' historical range.

*Id*.  at  64774.  The Service explained its position that the ESA's conservation purposes are

focused on native recovery and that the ESA does not require the Service to list non-native

populations.

> The purpose of the Act is to conserve threatened and endangered species and the
> ecosystems on which they depend.  Non-native, introduced populations, while
> possibly useful in recovery/restoration efforts, are not a viable substitute for
> species conservation in native ecosystems.  We do not believe listing or active
> conservation of the introduced Pecos River population is appropriate nor is such
> conservation required by the Act.

*Id*. at 64778.  Today, as it did on September 2, 2005 (when the FWS refused to exclude the U.S.

non-native captive populations of the three antelope species), the Pecos River population of the

ARS remains separate from and unaffected by the threatened species listing of native portions of

the species.  The Service has never explained why it could decide not to list the non-native ARS

population, but had no choice but to list the non-native U.S. three antelope populations.

Similarly, the Service has recently excluded non-native, introduced populations of the arctic grayling living in Montana from its consideration of the listing status of native populations of that species.  In making its determination to include only native populations of the arctic grayling, the FWS explained that the Service had interpreted the ESA's "statutory directive to conserve species in their native ecosystems" to authorize the exclusion of non-native populations that have no direct conservation benefit to the native populations.  Revised 12-Month Finding to List the Upper Missouri River Distinct Population Segment of Arctic Grayling as Endangered or Threatened, 75 FR 54708, 54712- 13 (September 8, 2010).  On its website, the FWS offers the following explanation of its exclusion of the non-native arctic grayling populations:

> The DPS does not include introduced, naturalized populations that currently exist in lakes that did not historically contain Arctic grayling or that are outside the native range of the species in the upper Missouri River basin. We excluded these introduced lake-dwelling populations because they are not native populations. These populations were introduced to provide recreational fishing opportunities in remote and semi-remote lakes, and were not established for any stated conservation purpose nor do they appear to have any formally recognized conservation value with respect to native populations.

http://www.fws.gov/mountain-prairie/species/fish/grayling/QuestionsAndAnswers09082010.pdf

Evidence of the Service's approach to ranched populations of the Nile Crocodile, captive populations of chimpanzees, and non-native populations of the Arkansas River Shiner and the arctic grayling, as compared to its approach to U.S. non-native captive populations of the three antelope, demonstrates the Service's erratic behavior with respect to its treatment of captive and/or non-native populations of species requiring listing in the wild.  That erratic behavior, combined with the Service's failure to explain why it could not distinguish or exclude U.S. non-native captive herds of the three antelope species as it had done with other species, renders the Service's conduct arbitrary and capricious.

30

The FWS's treatment of the three antelope species is not only inconsistent with its own conduct, but it is also inconsistent with the conservation purposes of the ESA.  "In order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose." *Morton v. Ruiz*, 415 U.S. 199, 237 (1974) (Court rejected agency's interpretation of Snyder Act that prevented native Americans who did not live on reservation from accessing benefits).

The statutory purpose of the ESA is conservation.  The inclusion of the U.S. non-native captive herds of the three antelope species does not directly conserve the species in their native ecosystems.  Instead it undermines the conservation that has been achieved for the populations living in the United States.  The Service has not asserted that including the U.S. non-native captive populations will bring some direct benefit to the conservation of the species in their native ecosystems.  Instead, the Service admittedly included the U.S. non-native captive populations only because they claimed to have no authority to designate a population composed exclusively of captive members.

The inclusion of the U.S. populations causes more harm to conservation of the species than good.  Congress could never have intended to obligate the Service to list a population, where the listing would do nothing other than undermine ongoing conservation.  A well accepted rule of statutory construction holds that statutory interpretations that would produce absurd results should be avoided.  *Environmental Defense Fund v. Reilly***,** 909 F.2d 1497, 1505–06 (D.C. Cir. 1990) (court rejected EPA interpretation of Toxic Control Substances Act).

The Service's decision to include the U.S. non-native captive populations was arbitrary and capricious because it amounted to an unexplained diversion from existing agency conduct and because it directly undermined the conservation purposes of the ESA.  For these reasons,

Safari Club will likely succeed in its ESA and APA challenges to the legality of the FWS's decision to include the U.S. non-native captive members of the three antelope species in the listing of the species in the wild.

**B. Preliminary Injunction is Necessary to Prevent Irreparable Harm**

Safari Club and its members are being irreparably harmed by the impending permit requirements and other prohibitions and restrictions that will officially go into effect on April 4, 2012. But for the endangered listing status of the U.S. non-native captive herds of the three antelope species, no permits, prohibitions or restrictions would be required for the continued sustainable use conservation of these animals. Even though the permit requirements do not officially go into effect until April 4th, the harm is already occurring. The value of these animals has plummeted which has severely undermined the ability of ranchers to continue to invest in these animals and to continue to feed, maintain and breed these animals.

The reality of conservation is that it is dependent upon funding. Non-profit organizations finance their conservation efforts by soliciting funds from their members and the public generally. Private conservation is a different matter. Until the endangered status of these antelope species caused their value to drop, ranchers could finance their ownership, maintenance and breeding of these animals from sales of the animals and sales of hunts for members of their herds. Knowledge that they could soon be in possession of a heavily regulated endangered species has prompted many ranchers to attempt to sell off their herds. The huge increase in willing sellers has resulted in a glut in the market and a precipitous drop in the value of these animals. The drop in value has made it economically infeasible for private ranchers to finance their continued ownership of scimitar-horned oryx, dama gazelle and addax. As a result ranchers are being forced to discontinue their ownership as well as their participation in the conservation of these species. Although the underpinnings of Safari Club's irreparable harm are

financial, the harm cannot be recompensed via the reimbursement of funds.  The drop in value of the animals has deprived Safari Club members and others of the incentive to continue to conserve these animals and of the herds and willing breeders and ranchers necessary to support their conservation efforts.  The loss to conservation is the irreparable harm that only an injunction can remedy.

During the last several decades, hunting has played a significant part in the conservation of the U.S. populations of the three antelope species.  Ranchers were able to remove surplus animals and maintain the carrying capacity of their herds by selling hunts to willing recreational hunters.  The sale of the hunts helped the ranchers pay for the cost of the ownership and upkeep of the antelope.  The ability to sell these hunts without the uncertainty and bureaucracy of permit requirements gave the animals great value.  The success of the U.S. populations of scimitar-horned oryx, dama gazelle and addax has proven to be one of the most profound examples of how sustainable use hunting plays an invaluable role in the conservation of wildlife.  The loss of these animals and of the conservation successes achieved over the last several years has irreparably harmed Safari Club, whose mission is to promote sustainable use hunting as a key conservation strategy.  Declaration of Rew Goodenow, ¶¶5, 7 (Exhibit AA).

The declarations of Travis Wier, Timothy Mark Terry, David Lesco and J. David Bamberger demonstrate the irreparable harm that the enforcement of endangered status is bringing to the conservation of these animals and to those who wish to own, hunt, conserve and otherwise enjoy them.

Travis Wier is a hunter, ranch owner, hunting guide and Safari Club International member.  Declaration of Travis Wier at ¶¶2, 5 (Exhibit BB).  His Texas ranch is a breeding operation.  *Id*. at¶ 7.  He does not sell hunts for the scimitar-horned oryx on his ranch.  He started

out with 15 scimitar-horned oryx in 2009 and in three years, that herd grew to 40 animals.  *Id.* at¶

8.  In his declaration, he explains that scimitar-horned oryx, addax and dama gazelle have done

amazingly well in Texas because they are well suited to the dry conditions found in the state.  *Id.*

at ¶24.  As a result, many ranchers that bred one or more of the three species were able to double

or triple the sizes of their original herds.  *Id.* at ¶24.

Mr. Wier explains that the value of his herd started to drop around May of 2011, when

the ranching community first got wind of the fact that the FWS was getting reading to withdraw

the Exemption Rule.  *Id.* at ¶11.  His male scimitar-horned oryx dropped from a value of $3,500

per bull to $1,100 per animal.  His female scimitar-horned oryx dropped in value from $2,000-

$2,500 to $600-700 per cow.  *Id.* at ¶¶12, 13.  His dream of someday selling these animals as his

retirement fund has disappeared.  *Id.* at ¶10.

Mr. Wier is also a hunting guide.  He guides hunts for scimitar-horned oryx and addax on

other ranches where owners seek to remove surplus animals from their herds.  *Id.* at ¶15.  He

reports that the ranches where he has long guided hunts are reducing or eliminating their herds

entirely.   *Id.* at 19.  On one ranch where he has guided hunts, there are now no scimitar-horned

oryx or addax where there were previously 30-40 of each species.  *Id.* at ¶20.  On another ranch,

there are only five remaining scimitar-horned oryx from a population of 30-40 and there are no

remaining addax.   *Id.*  On a third ranch there are no scimitar-horned oryx or addax remaining

from a population of 20-25 of each species.  *Id.*  Mr. Wier explains that his guiding business for

hunts for these animals has increased dramatically over the last few months, but that soon there

will be few if any scimitar-horned oryx or addax hunts left for him to guide. *Id.* at ¶¶21-22.

Mr. Wier also explained why the participation of fewer owners and breeders of the three

antelope herds will have genetic consequences for the remaining members of the species,

including the ones he now owns.  With fewer ranches, there will be less genetic variety for the

remaining ranchers to introduce into their herds.  The absence of new bloodlines could lead to

genetic mutations and unhealthy animals.  *Id*. at ¶28

In his declaration, Mr. Wier explained the devastating conservation reversal that is taking

place due to the impending enforcement of endangered status for the three species:

> Unfortunately, now that the prices have dropped for these animals, and permit
> requirements are about to come into play, very few ranchers will continue to raise
> them.  These animals cost a great deal to keep and feed and without revenue from
> the sale of these animals, it will become too costly for most ranchers to continue
> to breed them.  The uncertainties and costs involved with permit requirements
> have discouraged many ranchers from continued ownership of these animals.  If
> things continue as they have for the last few months, the numbers of these animals
> and the number of herds will soon be very small.

*Id*. at ¶25.  Mr. Wier has suffered from the drop in the value of his herd and from the impending

loss of opportunities to guide hunts for these species.  In viewing the reduction of herds and

animals, he is also troubled by the loss of conservation gains that he and the ranching and

hunting community had achieved for the three species.  He explains: "I am devastated to watch

the decline in these animals and the absolute loss of conservation incentives for ranchers to raise

and breed these species."  *Id*. at ¶29.

SCI member Timothy Mark Terry also owns a ranch in Texas. Declaration of Timothy

Mark Terry ¶¶1, 2 (Exhibit CC).   Until recently, herds of scimitar-horned oryx and addax

roamed on 2200 acres of his ranch.  *Id*. at ¶3.  He began with 25 scimitar-horned oryx and 14

addax in January of 2003.  *Id*. at ¶5.  At one time, he had as many as 50 scimitar-horned oryx and

38 addax.  *Id*. at ¶6.  In February of 2012, he eliminated his entire herds of 45 scimitar-horned

oryx and 35 addax by selling the animals and selling hunts for the animals.  *Id*. at ¶4.

Mr. Terry has regularly sold hunts to help pay for the feeding, breeding and labor required for the animals. *Id*. at ¶10. He explained that, "[w]ithout this revenue it would not have been financially possible for [him] to continue to raise and provide for these animals." *Id*.

Mr. Terry also explained that, after the FWS's announcement that the three antelope species' endangered status would be enforced and permits would be required to continue to sell hunts for these species, he decided not to continue to keep his herds. *Id*. at ¶15. He explained:

> The ownership of members of an endangered species together with government involvement and permit requirements mean red tape, uncertainty and potential liability. I cannot continue to operate my business under those conditions, and I decided to sell my herd rather than take on additional costs, risks, responsibilities, obstacles and financial insecurity to my ranch operation.

*Id*. at ¶15. Mr. Terry took a huge loss in the sale of his antelope. At their peak, his scimitar herd should have been worth approximately $100,000 and his addax herd would have been worth around $114,000. *Id*. at ¶16. Instead, he was only able to sell both herds for a total of $16,000. Even at this price, he had a hard time finding a buyer who was willing to purchase them. *Id*. at ¶13.

Like Mr. Weir, Mr. Terry is both a rancher and a conservationist. *Id*. at ¶22. Because of this, Mr. Terry explains how the rapid disappearance of the three antelope from private ranches in the U.S. troubles him. "Ranchers and hunters who are true conservationists – myself included – hate to see this happen and are saddened to see our industry and all of the successes we have achieved for these animals disappear." *Id*.

Mr. Terry also provides an excellent description of why an injunction against the enforcement of endangered status would relieve his irreparable harm:

> It is only because there were no restrictions and no permit requirements for these herds that these animals thrived in the U.S. The lack of listing and lack of permit restrictions allowed ranchers to freely raise their herds, and to trade and sell hunts for members of those herds. That gave those animals value and encouraged more

36

and more ranchers to invest in them.  Now that permits are being required, the
freedom and incentives to keep these animals is gone.  The value has dropped as
fewer ranchers want to assume the risk of owning the animals or to depend on the
government to permit the activities necessary to make these animals financially
worth maintaining.

*Id.*  A preliminary injunction against the enforcement of endangered status for the U.S. non-

native captive populations will restore the conservation and financial incentives necessary to

encourage ranchers like Mr. Terry to return to the business of raising, breeding and selling hunts

for members of the three species.  Preliminary injunctive relief will allow the value of these

animals to return and will pave the way for a reparation of the damage that the announcement of

endangered status enforcement has already caused.

David Andrew Lesco successfully raised scimitar-horned oryx on his ranch in Texas, but

does not intend to continue to do so after April 4, 2012.  Declaration of David Andrew Lesco at ¶

¶3, 4 (Exhibit DD).  He explains that he can no longer afford to breed these animals:

The permit requirements that have been announced have made it economically
infeasible to continue to maintain these animals.  The prices have dropped so low
that my scimitar-horned oryx cannot pay for their own upkeep.  I am a business
man and I cannot afford to continue to raise and breed animals that are expensive
to keep yet generate little revenue.

*Id*. at ¶18.  Mr. Lesco chose not to apply for permits to continue raising these animals because he

believes that, even with permits, federal regulation will deprive him of the controls he needs to

manage his herds.  *Id*. at ¶22.  Mr. Lesco believes that, without the ability to make herd

management decisions on an as-needed basis, his ranch would be at risk of eventual

overpopulation of these animals. *Id*.

Mr. Lesco's declaration also demonstrates the need for preliminary injunctive relief.  He

states that "[i]f not for the endangered status of these animals and the permit requirements and

restrictions, I would continue raising and breeding my scimitar and continue to participate in the conservation of the species." *Id.* at ¶23.

J. David Bamberger is not a member of Safari Club International, but the fate of his scimitar-horned oryx herd impacts the fate of all those who seek to conserve the three antelope species. He is the founder of the Selah Bamberger Ranch Preserve. Declaration of J. David Bamberger at ¶1 (Exhibit EE). Until recently, Mr. Bamberger's ranch held the largest herd of scimitar-horned oryx in the world with known genetic background. *Id*. at ¶2. In 1991, Mr. Bamberger turned over 640 acres of his ranch for the exclusive use of captive breeding of the scimitar-horned oryx Species Survival Program (SSP). *Id*. at ¶¶9,10. He started with 28 scimitar-horned oryx, representing the 31 documented species bloodlines from Africa. *Id*. at ¶14. He met the SSP goal of producing 400 animals and then started selling surplus scimitar-horned oryx to ranches in Texas to help these ranches increase the genetic diversity of their herds. *Id*. at ¶¶19, 20. Mr. Bamberger has researched and traveled to Africa in the hope of finding a location where scimitar-horned oryx could be released back into their native habitat. *Id*. at ¶21. His efforts to find such a location have been unsuccessful, as he has found that there is little remaining viable habitat and that without high fences and protection, the scimitar-horned oryx would be eaten or hunted before a reintroduced herd could become viable. *Id*.

Although Mr. Bamberger has not sold hunts for scimitar on his own ranch, he has sold surplus animals to ranches that allow hunting. He acknowledged that "hunting has played a significant role in our conservation because hunting ranches, with few exceptions, were the only market for our surplus." *Id*. at ¶26.

Mr. Bamberger explained that once the FWS announced that it would be enforcing endangered species status requirements and restrictions for the scimitar-horned oryx, he has been

unable to find buyers for his surplus animals.  *Id*. at ¶24.  As a result, his ranch will cease its

breeding operations.  *Id*. at ¶25.  He explained:

> If we were to continue breeding, with no reasonable way to sell our surplus
> animals, we would overpopulate our 640 acres within three years.  Overgrazing
> and hoof action from overpopulation would quickly destroy the efforts of the last
> 43 years that we have devoted to habitat conservation.

*Id*. at ¶29.  Mr. Bamberger notes that, at the time of the preparation of his declaration, there were

already many fewer scimitar-horned oryx on ranches in the U.S. than prior to the Service's

announcement of the impending permit requirements.  He worries that, by the time permit

requirements actually go into effect, the numbers of these animals in the U.S. will have dropped

even further.  *Id*. at ¶35.

With the loss of Mr. Bamberger's breeding operation, the continued genetic health of the

remaining U.S. scimitar-horned oryx populations is in great jeopardy.  Mr. Bamberger's

operation represented a key component in the genetic variability of U.S. populations.  Without a

preliminary injunction to stop the enforcement of endangered species prohibitions and

requirements, the Selah ranch will no longer produce the surplus animals that have had such a

beneficial impact on the status of U.S. populations of these animals.

But for the impending enforcement of endangered status, the three antelope species

would not be declining in value and in numbers in the United States.  An injunction against the

prohibitions and requirements of endangered status would allow the animals to regain their value

and would encourage private ranchers to continue or return to investing in and owning, raising

and breeding these animals.  A reprieve from the impending permit requirements for the sale of

hunts for these animals will encourage ranchers to resume or even start operations in which

surplus animals can be culled via the sale of hunts.  The market and status of these animals will

have a chance to regain some of its equilibrium and these antelope will once again become valued animals rather than financial and legal liabilities to private ranchers.

Federal Defendants are likely to argue that ranchers, breeders and hunters can avoid irreparable harm simply by applying to participate in the Captive Bred Wildlife Registration Program and by applying for permits for the take of members of U.S. non-native captive herds of the three antelope species. That was the only solution that the FWS offered to ranchers who wished to continue to participate in activities involving the sale of hunts for these animals. 77 Fed. Reg. 431 (January 5, 2012). It is true that, as of the date of the filing of this motion, some ranchers have applied for these permits.[9] Because the Service has imposed a 30 day notice and comment opportunity period following the publication of these permit applications, the individuals whose permit applications were published prior to March 4, 2012 are the only ranches that may have permits in hand on April 4, 2012, when the permit requirements go into effect.

Contrary to what the FWS is likely to argue, Safari Club and its members cannot avoid the irreparable harm they are suffering and will continue to suffer simply by obtaining permits. The permits will not restore the value of these animals, nor will they rejuvenate the market for surplus animals. Permits in the hands of Safari Club members will not reverse the fact that numerous ranchers and breeders have chosen not to continue to maintain their herds and that there will be fewer herds, fewer animals and fewer opportunities to hunt and conserve these antelope.

When it published the Withdrawal Rule, the Service erroneously predicted that the withdrawal of exemptions would cause no harm:

---

[9] 77 Fed. Reg. 9687 (February 17, 2012), 77 Fed. Reg. 6816 (February 8, 2012); 77 Fed. Reg. 6139 (February 7, 2012).

> The elimination of this regulation should not result in lower economic incentives or a negative economic impact, provided that the ranches were carrying out activities that were approved under the regulation.

*Id*. at 433.  Unfortunately, the prediction did not appear to account for the fact that many ranchers would simply choose not to continue to participate in a process that requires heavy federal regulation, and that, as a result, the value of these antelope would plummet so precipitously that other ranchers would also find it necessary to discontinue their participation in the conservation of these animals.  The Service's enforcement of the endangered status of these animals has proved to be cataclysmic for the conservation of these species.  Only a preliminary injunction against the enforcement of unnecessary protections and restrictions will help to reverse this harm.

### C.  The Balance of Harms Tips in Favor of Preliminary Injunctive Relief

In contrast to the severity of Safari Club's irreparable harm from the impending enforcement of the endangered status for the three antelope species, the government's potential harm from a grant of preliminary injunctive relief would be minimal if not non-existent.  Safari Club seeks only to maintain the status quo by enjoining enforcement of the endangered status of the U.S. captive populations of the three Antelope.  This would essentially prolong the implementation of the Exemption Rule for the duration of this litigation. 70 Fed. Reg. 52310 (September 2, 2005).  The injunction that Safari Club seeks would simply continue a regulatory scheme that the FWS implemented seven years ago, on September 2, 2005, when the Service listed the U.S. non-native captive populations of the three antelope species as endangered.  70 Fed. Reg. 52319 (September 2, 2005).  The Service even continued to implement the Exemption Rule for two years after Judge Kennedy of the U.S. District Court ruled the Exemption Rule to be in violation of the ESA.  *Friends of Animals v. Salazar*, 626 F. Supp.2d 102 (D.D.C. 2009).  A

41

preliminary injunction, prohibiting the FWS from implementing the endangered status would simply authorize the Service to do what it has been doing all along.

The Service will suffer no harm from a delay of the enforcement of endangered status prohibitions and requirements.  The FWS has noted no conservation benefit to be gained from treating the U.S. non-native captive herds as endangered.  70 Fed. Reg. at 52322.  To the contrary, the Service has acknowledged the harm that endangered status will (and already has) caused for conservation of the U.S. non-native captive herds.  Appendix, Economic Analysis of the Proposed Rule, AR. 237.0126-0128 (Exhibit U).  The sole reason that the Service has offered for enforcing the endangered classification is that the Service does not believe that it can separate out the U.S. non-native captive herds from populations of the species in the wild in Africa and in other parts of the world.  70 Fed. Reg. at 52320.  This is enforcement for the sake of enforcement.  A delay in that enforcement, especially since endangered status undermines the ESA's conservation mandates, would cause the Service no harm.

### D. The Public Interest Will Be Served By the Requested Injunctive Relief

The purpose of the ESA is conservation.  For that reason, the public interest is served by measures that fulfill that conservation mandate.  The impending enforcement of endangered species status for the U.S. non-native captive populations does nothing to benefit their conservation nor does it provide conservation benefits for members of the three antelope populations in the wild.  In fact, as described throughout this brief, enforcement will harm the three species.  In contrast, the preliminary injunction that Safari Club seeks *does* serve the ESA's conservation mandate.  A stay of endangered status enforcement will restore incentives for private ranchers to continue, recommence or even initiate breeding operations for the three species, and will rejuvenate the market for surplus animals.  A delay of permit requirements will

42

help to recalibrate the prices of these animals and improve the market for the sale and purchase of U.S. non-native captive members of the three antelope species.  A grant of preliminary injunctive relief will restore the system by which the species' conservation has long been achieved through sustainable use.  The end result will be more and healthier scimitar-horned oryx, dama gazelle and addax in the U.S.  That conservation result is in the public's best interest.

Some members of the public have adverse interests.  Some would rather sacrifice all U.S. members of the three antelope species rather than recognize hunting as part of species conservation.  Although those who oppose hunting are certainly members of the public, they do not speak for the public at large.  The public is served by having the ESA's conservation mandates implemented, rather than undermined.

The ruling in *Friends of Animals v. Salazar*, *supra*, indicated that the public is entitled to notice and the opportunity to comment on permit applications for the take of members of an endangered species.  The entitlement to notice and comment only applies if the animal taken qualifies as an endangered species.  Because the U.S. non-native captive herds of the scimitar-horned oryx, dama gazelle and addax should not be classified as endangered, the public sacrifices nothing if the Court grants preliminary injunctive relief that essentially continues the status quo -- no permit requirements for the duration of this litigation.  If Safari Club ultimately prevails, then these permits requirements were properly never applied.  If the Service prevails, the Court can lift the injunction and the new requirements will come into effect then.

The end result of a grant of preliminary injunctive relief would be conservation of U.S. non-native captive herds of the three antelope species.  This conservation benefit easily outweighs any contradictory interests and serves the general public.

43

V.       CONCLUSION

Safari Club has filed a lawsuit challenging the legality of the FWS's decision to include U.S. non-native captive populations of scimitar-horned oryx, dama gazelle and addax in the endangered classification for the three species generally.  On April 4, 2012, for the first time since the listing of the three species on September 2, 2005, the FWS will fully enforce that endangered status through prohibitions, restrictions and requirements applicable to the take of members of these captive populations.  In this lawsuit, Safari Club is very likely to succeed in proving the merits of its ESA and APA challenges to the listing of these populations, based on the Service's unexplained erratic and inconsistent approach to these non-native, captive populations and to its conservation obligations to these antelope species under the ESA.  The impending enforcement of endangered status has triggered a precipitous decline in the value of these animals leading to a tremendous disincentive to continued private conservation of the three antelope species.  As a result, Safari Club and its members are suffering and will continue to suffer irreparable harm in their ability to own, maintain, trade, sell hunts, and engage in the sustainable use conservation of these animals.  A preliminary injunction against the enforcement of endangered status is the only way that Safari Club's irreparable harm can be prevented, or at least reduced.  The injunctive relief that Safari Club seeks will cause little if any detriment to the Federal Defendants, and the conservation benefits that injunctive relief will bring will serve the public interest.

For the aforementioned reasons, Safari Club respectfully requests that this Court grant a preliminary injunction against the enforcement of endangered status for the three antelope species.

Dated this 8th day of March, 2012.

<div style="margin-left: 40%;">

Respectfully submitted

/s/ Anna M. Seidman
Anna M. Seidman
Safari Club International
501 2nd Street NE
Washington, D.C.  20002
Tel:  202-543-8733
Fax:  202-543-1205
aseidman@safariclub.org
*Counsel for Plaintiff Safari Club International*

</div>

## CERTIFICATE OF SERVICE

       I hereby certify that I caused copies of the Motion for A Preliminary Injunction, Memorandum of Points and Authorities in Support of Motion For A Preliminary Injunction and Proposed Order to be served on the following via the court's ECF system:

Meredith L. Flax
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, D.C. 20044-7369
Meredith.Flax@usdoj.gov
*Counsel for Federal Defendants*

Michael Ray Harris
Environmental Law Clinic
Ricketson Law Building
University of Denver Sturm College of Law
2255 E. Evans Avenue, Suite 335
Denver, CO 80208
elc@law.du.edu
*Counsel for Proposed Intervenors Friends of Animals*

William S. Eubanks II
Meyer Glitzenstein & Crystal
1601 Connecticut Avenue NW, Suite 700
Washington, D.C. 20009
beubanks@meyerglitz.com
*Counsel for Proposed Intervenors Defenders of Wildlife et al.*

Dated this 8th day of March, 2012.

                    Respectfully submitted

                    /s/ Anna M. Seidman
                    Anna M. Seidman
                    D.C. Bar No. 417091
                    Douglas S. Burdin
                    D.C. Bar No. 434107
                    Safari Club International
                    501 2nd Street NE
                    Washington, D.C.  20002
                    Tel:  202-543-8733
                    Fax:  202-543-1205
                    aseidman@safariclub.org