## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL,<br><br>   Plaintiff,<br><br>v.<br><br>KEN SALAZAR, in his official capacity as Secretary of the U.S. Department of the Interior, DANIEL ASHE, in his official capacity as Director of the U.S. Fish and Wildlife Service, and U.S. FISH AND WILDLIFE SERVICE,<br><br>   Defendants. | )<br>)<br>) 1:11-cv-01564-BAH<br>)<br>) **FEDERAL DEFENDANTS'**<br>) **OPPOSITION TO PLAINTIFF'S**<br>) **MOTION FOR PRELIMINARY**<br>) **INJUNCTIVE RELIEF**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### I.  Introduction

Federal Defendants hereby enter their opposition to Plaintiff's Motion for Preliminary Injunction, filed with the Court on March 8, 2012 (ECF No. 26). Plaintiff asks the Court to "enjoin the enforcement of endangered species status for U.S. non-native captive herds of three antelope species; the scimitar-horned oryx, dama gazelle and addax [the "Three Antelope species"]," ECF No. 26-1 at 1, because of the impending removal on April 4, 2012 of a separate rule issued by the U.S. Fish and Wildlife Service ("the Service") that exempted U.S. holders of these endangered species from the requirement to obtain individual permits to engage in activities that are otherwise prohibited under the Endangered Species Act ("ESA").

The Court should deny Plaintiff's motion, as Plaintiff has not carried its heavy burden of demonstrating that it is entitled to emergency relief. To begin with, Plaintiff has not and cannot

demonstrate that it is likely to succeed on the merits.  The Service's decision to list the Three Antelope species, including the U.S. captive members of the species, was consistent with Service policy and practice, and with the purposes of the ESA.

Plaintiff also has not and cannot demonstrate that it will suffer irreparable harm if the Court does not grant its requested injunction. To the extent that Plaintiff can point to any action by the Service that is causing a purported "injury," that action is the Service's removal of the exemption from permitting requirements (which Plaintiff does not challenge), not the continued listing status of the U.S. herds of the Three Antelope species. In any event, such an "injury" does not constitute irreparable harm which would warrant the emergency injunctive relief Plaintiff now seeks, particularly because such injury flows naturally from the implementation of the statute, is purely economic, and is injury that Plaintiff has inflicted upon itself.

Finally, Plaintiff has not and cannot demonstrate that the balance of harms or the public interest favor granting its requested injunction. Were Plaintiff able to obtain its injunction, the U.S. members of the Three Antelope species would lose their protection under the ESA, which obviously runs counter to the purpose and intent of the statute, designed to afford endangered species the "highest priority."

For these reasons, as explained fully below, the Court should deny Plaintiff's motion.

## II.  Statutory Background

### a.  ESA's Application to Domestic Species

In 1973, Congress enacted the Endangered Species Act ("ESA") "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and

threatened species." 16 U.S.C. § 1531(b). Section 4 of the ESA directs the Secretary[1] to determine by regulation whether a given species should be listed as endangered or threatened. 16 U.S.C. § 1532(6); 16 U.S.C. § 1532(20); 16 U.S.C. § 1533. This determination is made on the basis of the "best scientific and commercial data available to him after conducting a review of the status of the species . . ." 16 U.S.C. § 1533(b)(1)(A).

The ESA defines "species" as including any species, subspecies, "and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). The ESA does not define "distinct population segment" ("DPS"), but the Service has concluded that a DPS is a population that is generally "discrete" and "significant" in relation to the species to which the population belongs. *See* DPS Policy, 61 Fed. Reg. 4,722 (Feb. 7, 1996).

Once a species has been placed upon the list of endangered species, it is unlawful under Section 9 of the ESA "for any person subject to the jurisdiction of the United States" to perform certain activities, including "taking" the species, and selling or offering for sale in interstate commerce. 16 U.S.C. § 1538(a)(1). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" any listed species. 16 U.S.C. § 1532(19).

The general prohibition against take notwithstanding, the ESA establishes specific statutory mechanisms by which a federal agency or private actor may obtain permission lawfully to take a species or its habitat. A federal agency may obtain an "incidental take statement"

---

[1] Depending on the species, either the Secretary of Commerce or the Secretary of the Interior classifies a species as endangered or threatened. 16 U.S.C. § 1533(a). The Secretary of the Interior has responsibility for the Three Antelope species.

through the Section 7 consultation process. 16 U.S.C. § 1536(b)(4). Furthermore, an "incidental take permit" can be obtained by a non-federal applicant under Section 10, which authorizes take that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

In addition to these provisions for incidental take, Section 10(a)(1)(A) of the ESA authorizes the Secretary to allow take "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A). Applications for permits for scientific or enhancement of propagation or survival purposes are subject to the notice and review provisions of Section 10(c). 16 U.S.C. § 1539(c); 50 C.F.R. § 17.22. Section 10(d) further provides for "exceptions under subsections 10(a)(1)(A) and (b)" if the Secretary finds and publishes in the Federal Register that "(1) such exceptions were applied for in good faith, (2) if granted and exercised will not operate to the disadvantage of such endangered species, and (3) will be consistent with the purposes and policy set forth in section 1531 of this title." 16 U.S.C. § 1539(d). The Service has issued regulations setting forth general application requirements and issuance criteria governing individual permits granted for scientific purposes, enhancement of propagation or survival, or incidental take. 50 C.F.R. § 17.22.

In 1979, under ESA Section 10 authority, the Service established a permit program for enhancement of propagation or survival of captive-bred wildlife ("CBW Regulation"). 50 C.F.R. § 17.21(g). Under the CBW Regulation, a person may "take; export or re-import; deliver, receive, carry, transport or ship in interstate or foreign commerce, in the course of a commercial activity; or sell or offer for sale in interstate or foreign commerce any endangered wildlife that is

bred in captivity in the United States provided . . . that . . . [t]he purpose of such activity is to enhance the propagation or survival of the affected species." 50 C.F.R. § 17.21(g)(1)(ii).

**b.  ESA's Application to Foreign Species**

In addition to species native to the United States, foreign species can be listed as threatened or endangered under the ESA. 16 U.S.C. § 1533(a). Individual members of a foreign species located in the United States or on the high seas receive similar protections as domestic species. 50 C.F.R. § 17.11(e).

For example, no critical habitat is designated for foreign species concurrently with listing as occurs for domestic species pursuant to 16 U.S.C. § 1533(a)(3)(A). 50 C.F.R. § 424.12(h); 49 Fed. Reg. 38,900, 38,904 (Oct. 1, 1984) (explaining to a commenter that the ESA "does not contain authority to designate critical habitat in areas outside U.S. jurisdiction."). For similar reasons, consultation under ESA Section 7(a)(2) is not required for agency actions beyond U.S. jurisdiction or the high seas. *See* 50 C.F.R. § 402.01(a) (Section 7(a)(2) consultation requirement applies to Federal agency actions "in the United States or upon the high seas"); 50 C.F.R. § 402.02 ("'action' means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas.").

Generally, the take prohibition of Section 9 also does not apply to take of species in foreign countries, but only to the U.S., U.S. waters, or the high seas. 16 U.S.C. § 1538(a)(1)(B)-(C); 50 C.F.R. § 17.31. Nevertheless, Section 9 does prohibit the import, export, possession, sale, delivery, transportation, etc. of any listed species, including foreign species. 16 U.S.C. § 1538(a)(1)(A), (D), (E), (F) & (d). Similarly, Section 9 incorporates the provisions of the Convention on International Trade in Endangered Species of Wild Fauna and Flora, which

prohibits the import, export, trade and possession of species listed under the Convention. 16 U.S.C. § 1538(c). Thus, while the United States does not have the jurisdiction to prohibit take of listed species in foreign countries, it is able to discourage take of and trade in such species through these other provisions.

### III. Factual Background

#### a.  The Three Antelope Species

"Historically, the scimitar-horned oryx (*Oryx dammah*), addax (*Addax nasomaculatus*), and dama gazelle (*Gazella dama*) occupied the same general region of North Africa." 70 Fed. Reg. 52,310 (Sept. 2, 2005). The primary reasons for the decline of all three species is habitat loss through desertification, permanent human settlement, competition with domestic livestock, and regional military activity and uncontrolled killing. *Id.* Of the Three Antelope species, the scimitar-horned oryx is the most imperiled in the wild. *Id.* By the mid-1980s, it was estimated that only a few hundred were left in the wild. *Id.* However, since the late 1980s, no sightings of this species in the wild have been reported, and at least one source indicates the species is "extinct in the wild." *Id.* Captive-bred scimitar-horned oryx have been placed into large fenced areas for breeding in Morocco and Tunisia and it is anticipated that these animals can re-establish wild populations. *Id.* The addax was extirpated from Tunisia, Libya and Algeria, but it is believed that remnant populations may still exist in the remote desert areas of Chad, Niger, and Mali, with occasional movements into Libya and Algeria during times of good rainfall. *Id.* In 2005 when the Service listed the species as endangered, it was believed that there were fewer than 600 addax in the wild. *Id.* Of the Three Antelope species, the dama gazelle is the least susceptible to pressures from humans and livestock. *Id.* Nevertheless, all subspecies of the dama

gazelle have declined rapidly over the last 20 years, with recent estimates of fewer than 700 in the wild. *Id.* The dama gazelle was previously extinct in Senegal, but has since been reintroduced, and in 1997, at least 25 animals existed there as part of a semi-captive breeding program. *Id.*

### b.   Regulatory History

On November 5, 1991, the Service published a proposed rule to list the Three Antelope species as endangered under 50 C.F.R. § 17.11(h). 56 Fed. Reg. 56,491. The Service re-opened the comment period to request information and comments from the public regarding the proposed rule on June 8, 1992 (57 Fed. Reg. 24,220), and then again on July 24, 2003 (68 Fed. Reg. 43,706), and November 26, 2003 (68 Fed. Reg. 66,395).

From the outset of the rulemaking process, the Service announced that it was considering a separate regulatory scheme to cover captive-held individuals of these three species outside the species' natural ranges. 56 Fed. Reg. at 56,491, 56,492 & 56,494; *see also* 68 Fed. Reg. at 43,707. The Service proposed such a separate regulatory scheme on February 1, 2005. 70 Fed. Reg. 5,117. The Service sought "data and comments from the public on this proposed rule and the draft Environmental Assessment [ ]" of the impact of the proposed rule pursuant to the National Environmental Policy Act. *Id.* In July 2005, the Service issued a Final Environmental Assessment for the proposed exemption for U.S. captive-bred antelopes. 70 Fed. Reg. 52,310. On August 9, 2005, it issued a Finding of No Significant Impact, concluding that the exemption would have "no discernible adverse effects" on the antelope, native wildlife and habitat, or human health. *Id.*

On September 2, 2005, the Service issued both a final listing determination, listing the Three Antelope species as endangered ("Listing Rule"), and a final rule adding a new regulation authorizing certain otherwise-prohibited activities with U.S. captive-bred individuals of the Three Antelope species ("Management Rule"). 70 Fed. Reg. 52,319 and 70 Fed. Reg. 52,310; *see also* 50 C.F.R. § 17.21(h).

In the Listing Rule, the Service examined the five listing factors, as required by ESA Section 4(a)(1)(A), and found that the Three Antelope species were in danger of extinction based on all five factors other than "disease or predation." 70 Fed. Reg. at 52,321-22. The Service specifically considered captive animals under the "other natural or manmade factors affecting [the species'] continued existence" factor. *Id.* at 52,322. The Service explained that while captive breeding programs "have effectively increased the numbers of these animals . . . continued habitat loss and wonton killing have made reintroduction nonviable in most cases." *Id.* The Service also explained the negative impact of human development projects on the species and natural pressures on the species from drought and desertification of their habitat. *Id.* Overall, the Service concluded "that the scimitar-horned oryx, addax, and dama gazelle are in danger of extinction from natural factors such as drought and manmade factors that result in habitat loss and uncontrolled killing." *Id.*

### c. Litigation History – The Management Rule

Animal rights groups filed separate lawsuits challenging the Management Rule in the U.S. District Court for the Northern District of California, and in this Court. After dismissing in part on standing grounds, the Northern District of California court granted Federal Defendants' motion to transfer that case to this Court for consolidation with *Friends of Animals v. Salazar*,

04-cv-01660 (HHK), a case already pending here challenging the same rule. The cases were consolidated before Judge Kennedy, and the parties filed cross-motions for summary judgment. Safari Club International and the Exotic Wildlife Association intervened on behalf of the Federal Defendants in both cases.

On June 22, 2009, Judge Kennedy issued an opinion granting in part and denying in part the parties' cross-motions for summary judgment. *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009). The Court held that the plaintiffs had standing for their ESA Section 10(c) claim only, and did not have standing for their ESA Sections 4, 7, 10(a), and 10(d) claims, or their NEPA claim. *Id.* at 110-114. On the merits of the ESA Section 10(c) claim, the Court held that the Management Rule violated Section 10(c) because, under a *Chevron* step one analysis, the Service was not allowed to issue a blanket permit for all similar activities, but must require the filing of an application for an exemption or a permit, publish notice of each such application, and conduct a case-by-case assessment of that application. *Id.* at 115. The Court remanded to the Service "for further proceedings consistent with the memorandum opinion." *Friends of Animals*, 04-cv-1660 (HHK), ECF No. 85-2.

To comply with the Court's Order, on July 7, 2011, the Service published a proposed rule to remove the regulation at 50 C.F.R. § 17.21(h) and eliminate the blanket permit allowing certain activities that would otherwise have been prohibited under the ESA. 76 Fed. Reg. 39,804. The Service provided a 30 day comment period on the proposed rule. *Id.* On January 5, 2012, the Service issued a final rule revising the ESA regulations by removing 50 C.F.R. § 17.21(h). 77 Fed. Reg. 431 ("Removal Rule"). The Service explained that it was changing the regulations "in response to a court order that found that the rule for these three species violated section 10(c) of

the Act." *Id.* The Service also explained that "[t]he elimination of this regulation does not alter the current listing status of the species, but does now require that the Service must grant individuals authorization prior to their conducting any activity that is prohibited by the Act." *Id.* at 432. The Service considered whether there were alternative means to comply with the Court's order, but determined there were not. *Id.* The Service provided responses to all comments received. *Id.* at 432-436. The Service made the rule effective as of April 4, 2012, in order to facilitate outreach to the affected communities and "allow the affected community to either legally sell their specimens, if they choose to divest themselves of these species, or to apply for authorization or permits to continue carrying out previously approved activities." *Id.* at 431.

Exotic Wildlife Association and a number of individuals filed suit on March 2, 2011 challenging the Removal Rule. *Exotic Wildlife Ass'n v. U.S. Dep't of the Interior*, 12-cv-340 (BAH) (D.D.C.), ECF No. 1. These plaintiffs filed a motion for preliminary injunction on March 6, 2011, seeking to enjoin the Removal Rule. *Id.*, ECF No. 3.

### d.  Litigation History – The Listing Rule and Petitions to Delist

On June 28, 2010, Safari Club International submitted a petition to the Service to delist the U.S. captive-bred herds of the Three Antelope species. Exotic Wildlife Association ("EWA") submitted a similar petition to the Service, dated June 29, 2010. The Service has not yet completed a 90-day finding on either petition. *See* 16 U.S.C. § 1533(b)(3)(A).

On August 31, 2011, Safari Club International filed the instant litigation alleging that the Listing Rule is arbitrary because, among other reasons, the Service failed to consider the captive portion of the Three Antelope species in the U.S. separately and to exclude these captive animals from the endangered classification. ECF No. 1.

10

On October 17, 2011, the Exotic Wildlife Association and other individuals filed a complaint in the U.S. District Court for the Northern District of Texas alleging that the Service's failure to make a 90-day finding on their petition to delist antelopes held in captivity in the U.S. violates the ESA. *Owen v. U.S. Department of the Interior*, 11-cv-82 (N.D. Tex.), ECF No. 1. Federal Defendants moved to dismiss the complaint for failure to provide adequate notice prior to filing suit, and alternatively to transfer the case to this Court to be consolidated with Safari Club International's case. *Id.*, ECF No. 9. The Texas court granted the motion to transfer on February 6, 2012. *Id.*, ECF No. 16. Exotic Wildlife Association's case was ultimately consolidated with Safari Club's case. *Owen v. U.S. Department of the Interior*, 12-cv-00194 (BAH) (D.D.C.). The plaintiffs' opening summary judgment briefs in those cases are currently due to be filed on March 23, 2012.

Notwithstanding the Service's announcement on January 5, 2012 that the Removal Rule would go into effect on April 4, Plaintiff waited until March 8, 2012 to file the instant motion for emergency relief, attempting to use its pending challenge to the Listing Rule as a vehicle to enjoin the wholly separate Removal Rule.

**IV. Legal Standards**

**a. Standard for Preliminary Injunctive Relief**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citations omitted). Plaintiffs have the burden of proving the need for injunctive relief; Defendants bear no burden to defeat the motion. *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 442-43 (1974). Moreover, because preliminary

11

injunctive relief is an extraordinary remedy, the power to issue such an injunction "should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (quotation omitted).

To prevail on a motion for temporary restraining order or preliminary injunction, plaintiffs must satisfy a four-part test: (1) there must be a substantial likelihood of success on the merits; (2) there must be a showing of irreparable injury if an injunction is not granted; (3) an injunction must not substantially injure other parties; and (4) the public interest must be furthered by the proposed injunction. *See, e.g., Cityfed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). The four factors have typically been evaluated on a "sliding scale," whereby if the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (citing *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999)). It is unclear whether the "sliding scale" survives in light of the Supreme Court's decision in *Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008).[2] *See Sanofi-Aventis U.S. LLC v. Food & Drug Admin.*, 733 F. Supp. 2d 162, 167 (D.D.C. 2010). However, the Court need not decide this issue, because Plaintiffs' request for a preliminary

---

[2] In *Winter*, the Supreme Court struck down the standard applied by the Ninth Circuit that a preliminary injunction may be entered where there is only a "possibility" of irreparable harm if plaintiff has demonstrated a "strong likelihood" of prevailing on the merits. 555 U.S. at 20-21 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). While *Winter* did not explicitly address other variations on the "sliding scale" approach, it described the four-part test for the granting of a preliminary injunction as follows: "A plaintiff seeking a preliminary injunction must establish that he is <u>likely to succeed on the merits</u>, that he is <u>likely to suffer irreparable harm</u> in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 19-20 (emphasis added).

injunction here fails even under the less stringent "sliding scale" analysis of *Davenport*, as none of the four injunctive relief factors weighs in Plaintiffs' favor. *Davis*, 571 F.3d at 1292 (declining, given the facts of the case, to decide if *Winter* created a "stricter standard" to obtain interim injunctive relief); *Northern Air Cargo v. U.S. Postal Serv.*, 756 F. Supp. 2d 116, 121 (D.D.C. 2010) (same).

### b. Standard for Review of Agency Action

In assessing Plaintiffs' likelihood of success on the merits, the Court must apply the standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C). The APA provides that an agency action may be overturned only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376 (1989); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971). Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citing, *inter alia*, *Overton Park*, 401 U.S. at 419). The Court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416. "[T]he ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency." *Id.*

## V. Argument

### a. <u>Plaintiff is Unlikely to Succeed on the Merits</u>.

As discussed below, Plaintiff is unlikely to succeed on the merits, because its arguments are infirm. First, Plaintiff has not established that the Service has a policy of excluding animals

held in captivity when listing a foreign species. Indeed, Plaintiff waived its right to make this argument by failing to raise the issue in the rulemaking process. Second, Plaintiff has failed to show that the Service was required to designate captive members of the Three Antelope species in the United States as a distinct population segment. And third, Plaintiff has not shown that the Listing Rule is inconsistent with the conservation purpose of the ESA. For these reasons, Plaintiff's motion should be denied.

i. **The Service Appropriately Afforded Listed Status to the Three Antelope Species Held in Captivity.**

Notwithstanding the Service's reasonable determination to list the Three Antelope species, Plaintiff attempts to suggest that there is some type of mandatory or otherwise established policy for the Service to exclude animals held in captivity, by designating a DPS or otherwise, when listing a species. *See* ECF No. 26-1 at 25. In an attempt to bolster this argument, Plaintiff points to four isolated listing decisions out of thousands that the Service has made since Congress enacted the ESA in 1973. *Id.* at 26-30 (discussing the listing decisions for the Nile crocodile, the Chimpanzee, the Arkansas river shiner and the Arctic grayling). However, these anomalous examples do not represent any sort of "policy" that would bind the Service; rather, the Service made a reasoned judgment to extend endangered status to the Three Antelope species including members of the species held in captivity, and this determination is, in fact, entirely consistent with the Service's practice.

As a threshold matter, Plaintiff never raised this issue regarding the appropriate designation of animals held in captivity, during the comment period for either of the rulemaking processes that are the subject of the instant motion, and as such, that argument should not be

14

heard now. *See, e.g., Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.*, 494 F.3d 188, 211 (D.C. Cir. 2007) (holding that a court <u>must</u> reject an argument without addressing its merits if the plaintiff failed to raise the issue during the comment period of the rulemaking process) (citing *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C.Cir.2002) ("It is well established that issues not raised in comments before the agency are waived and this Court will not consider them.")). During the comment periods for the Listing Rule and the Management Rule, Plaintiff submitted five letters and one fax to the Service. *See* AR 65.0001; AR 82.0019-0020; AR 199.0004-0005; AR 237.0364-0365; AR 237.1363-1377; AR 237.1378-1379. Nowhere in these comments did Plaintiff raise the issue of the Service allegedly having a set policy on how to treat animals held in captivity when making a listing determination, nor did it identify the isolated listing decisions upon which it now relies. *Id.*[3] Now, for the first time in its emergency motion papers, Plaintiff alleges that the Service's decision to treat the Three Antelope species' listing determination differently than four other species runs contrary to some purported "policy." *Id.* Plaintiff's failure to raise this issue during the comment period precludes this Court from reviewing it here. *See, e.g., Owner-Operator Independent Drivers Ass'n,* 494 F.3d at 211.[4]

---

[3] While Plaintiff did make a reference to the Service's "policy" in one submission, it was in reference to the Service's written DPS Policy. AR 199.0004-0005. The DPS Policy is memorialized at 61 Fed. Reg. 4,722 (Feb. 7, 1996) and is wholly distinct from the unwritten "policy" that Plaintiff alleges exists with regard to animals held in captivity.

[4] Even if this Court is unwilling to wholly reject Plaintiff's "exclusion" argument on the basis of waiver, it is beyond dispute that Plaintiff's reliance on the listing decisions for the Arkansas river shiner and the Arctic grayling has been waived. Nowhere in Plaintiff's comments did Plaintiff allege that U.S. members of the Three Antelope species should be excluded merely because they are a non-native species. *See* Exhibit A. Indeed, it would have been impossible to mention the Artic grayling decision, because it post-dates the Listing Rule. *See* 75 Fed. Reg. 54708 (Sept. 8,

However, even if the Court determines that this argument has not been waived, of the four listing decisions Plaintiff points to, two are completely irrelevant to the instant litigation, because they do not involve members of a species held in captivity. *See* ECF No. 26-1 at 26-28 (discussing the listing decisions for the Arkansas river shiner and the Arctic grayling, which are not captive species).[5] In the instant litigation, one of the most salient aspects of the rule being challenged is the captive nature of the Three Antelope species located in the United States. Neither the Arkansas river shiner nor the Arctic grayling listing decisions involved a captive

_____

2010). In any event, these two decisions are irrelevant in the context of animals held in captivity. *See supra.*

[5] Moreover, nothing in the ESA or the Service's implementing regulations states that the Service is required to exclude non-native members of a species from ESA listing decisions. Recognizing that fact, Plaintiff attempts to argue that the Service has interpreted the ESA to require this type of exclusion. ECF No. 26-1 at 26-30. Not so. In making its argument, Plaintiff identified two instances where the Service excluded non-native members of a species from a listing rule. *Id.* at 28-30 (discussing the Arkansas river shiner and the Artic grayling). But both of these listing decisions are readily distinguishable from the Listing Decision that is at issue here. In documents cited liberally in Plaintiff's brief, it is clear that it is the expert opinion of the Service that members of the Three Antelope species held in captivity in the United States may eventually be used to recover the species in its native habitat. *See, e.g.*, ECF No. 26-1 at 7 (where multiple documents make clear that non-native antelope may be reintroduced into their native habitat as part of an effort to "recover" the species). This stands in stark contrast with the Arkansas river shiner and the Artic grayling, where the Service expressly stated that non-native animals were not part of the respective recovery efforts for each species. *See* ECF No. 26-1 at 28 (stating that non-native Arkansas river shiners are "not essential for recovery of the species within its historic range"); *id.* at 30 (citing a statement from the Service's website, which expressly states that non-native Arctic grayling do not have "any formally recognized conservation value with respect to native species"). In short, in the two cases where the Service excluded non-native animals from the listing decision, it was clear that the non-native animals would not be part of the recovery effort. In contrast, it is clear that the Service believes that the Three Antelope species held in captivity in the United States may well be used as part of the reintroduction and recovery effort in the future. This key distinction defeats Plaintiff's argument.

16

species. Because the crux of Plaintiff's argument is that the Service is required to afford captive members of a species different status than wild individuals, this distinction renders the shiner and grayling listing determinations wholly immaterial here.

Moreover, for the other two listing decisions (for the Chimpanzee and the Nile crocodile), which <u>did</u> involve animals held in captivity, the Service found that, based on the records for those particular species, it was appropriate for animals held in captivity to have a listing status different than those in the wild. Nevertheless, these two decisions do not establish that the Service has a policy of <u>always</u> designating animals in captivity with a different status than those in the wild. To the contrary, the listing decisions for the Chimpanzee and the Nile crocodile decisions are outliers – the exceptions that prove that the Service does <u>not</u> have a policy, which has now been deviated from, as Plaintiff suggests.

When determining the status of members of a species held in captivity, the Service makes its decision on a case-by-case basis, based on the data available. In this case, based on the record before the agency, the Service determined that disparate listing statuses would not be appropriate. 70 Fed. Reg. at 52,320. That said, it is the general practice of the Service animals held in captivity to have the same status animals in the wild of the same species. Indeed, this fact is borne out by an examination of the Service's list of protected species. In the table set out in Section 17.11(h), the Service identifies (i) the historic range of the species and (ii) where each species is threatened or endangered. *See* 50 C.F.R. § 17.11(h).[6] Thus, for example, the entire

---

[6] Section 17.11(e) of the Service's regulations makes clear that the reference to historic range does not reduce the protections of the ESA for animals found outside the historic range. 50

vertebrate population of the Addax is listed as endangered. *Id.* Contrast this with the Chimpanzee, which, under Section 17.11(h) is listed as threatened in captivity and endangered in the wild. *Id.* Notably, however, one can contrast the Chimpanzee with <u>every</u> <u>other</u> species on the list, because the Chimpanzee is the <u>only</u> species to have a distinction between the wild and captive animals of the same species.[7] *Id.* This in and of itself shows that the approach taken with listing the Chimpanzee is an outlier – not the general rule.[8]

In short, the Service does not have a formal policy of treating captive animals of a species differently than those in the wild, as Plaintiff suggests. Instead, the Listing Rule was reasonable based on its own record, and further, is fully consistent with the Service's general practice for captive members of a species to be afforded the same status as those members of the species in the wild.

//

_____

C.F.R. § 17.11(e) ("This column does not imply any limitation on the application of the Act or implementing rules. Such prohibitions apply to all individuals of the species, wherever found.").

[7] The disparate listing statuses of the captive and native Nile crocodiles were reconciled in less than 18 months, 53 Fed. Reg. 38,451 (Sept. 30, 1988), and remain the same today. *See* 50 C.F.R. § 17.11(h). The Service was recently petitioned to list all chimpanzees as endangered, which, if granted, would bring the listing status of the captive-bred chimpanzees in line with the status of the wild ones, 76 Fed. Reg. 54,423 (Sept. 1, 2011), and there will be no instances in which members of a species held in captivity are designated differently than the species in the wild.

[8] Moreover, one only need look at the many threatened and endangered species that are held captive in zoos across the United States and the rest of the world to understand this point. With the exception of the Chimpanzee, all of these animals have the same listing status as those in the wild. 50 C.F.R. § 17.11(h).

### ii.   The Service Was Under No Obligation to Designate the Three Antelope species in the United States as a DPS and Appropriately Exercised its Discretion.

Plaintiff next argues that the Service was obligated to designate the Three Antelope species located in the United States as a DPS like the agency did with the Nile crocodile and the Chimpanzee. ECF No. 26-1 at 26-28. But in arguing that the Service was obligated to designate a DPS, Plaintiff fundamentally misunderstands how and when the Service designates distinct population segments. *See* ECF No. 26-1 at 22-28.

There are two scenarios in which the Service may designate a DPS.  First, the Service can act on its own initiative and use its discretion to designate a DPS based on the factors in the DPS Policy. *See* 16 U.S.C. 1533(a), (c); *Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 804 (9th Cir. 2008) (describing the "two methods … for listing species"); *National Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir. 2003) (discussing the Service's discretion in designating DPSs). But the Service is under no <u>obligation</u> to designate a DPS on its own initiative – instead, designating a DPS is merely an optional approach for making a listing classification. *See id.* Here, the Service determined, in its expert opinion, that designating the Three Antelope species located in the United States as a DPS (or DPSs) was not advisable, 70 Fed. Reg. at 52,320, and that exercise of discretionary judgment is not subject to review. *See generally Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior*, 731 F. Supp. 2d 15, 28-29 (D.D.C. 2010) (decisions whether to exclude areas from a critical habitat designation are unreviewable because the plain language of the statute does not provide a standard by which to judge such discretionary decisions). To be clear, the alleged failure of the Service to designate a DPS does not constitute a non-discretionary duty enforceable through the ESA's citizen-suit

19

provision. *Cf. Hurst v. United States*, 882 F.2d 306, 308 (8th Cir. 1989) (where agency conduct "involves an element of policy judgment or choice on the part of the agency," such conduct is deemed discretionary).

The second method by which a species may be designated as a DPS is that any "interested" party can petition the Service to determine whether designation of a DPS is appropriate. 16 U.S.C. § 1533(b)(3)(A). In that scenario, the ESA <u>mandates</u> that the Service respond to the petition in compliance with the framework set forth in Section 4(b). *Id.* § 1533(b); *Coos Cnty.*, 531 F.3d at 805, 808 (the petition process is governed "by a series of carefully calibrated deadlines" and works to replace "the Secretary's discretion with mandatory, nondiscretionary duties") (quoting *Ctr. for Biological Diversity v. Norton*, 254 F.3d 833, 840 (9th Cir. 2001)). The decision that results from that review, of course, is subject to judicial review.[9] But in the instant case, neither Plaintiff -- nor any other interested party -- petitioned the Service to designate the Three Antelope species located in the United States as a DPS (or DPSs) prior to the issuance of the Listing Rule.[10] Accordingly, the Service was not obligated to provide a rationale as to why it decided not to designate a DPS. Plaintiff's argument fails as a result.

//

---

[9] The citizen-petition process is intended to "force action on listing and delisting proposals," *Coos County*, 531 F.3d at 808 (internal quotations omitted), and does so by establishing "mandatory bright lines of both timing and behavior that are readily open to judicial review." *Wyoming v. U.S. Dep't of Interior*, 360 F.Supp.2d 1214, 1229 (D. Wyo. 2005) (citing 16 USC § 1533(b)(3)(C)(ii)), *aff'd on other grounds*, 442 F.3d 1262 (10th Cir. 2006).

[10] The fact that Plaintiff alleged in its Complaint a failure to respond to its petition to <u>delist</u> the Three Antelope species in the United States does not help Plaintiff's argument here. Plaintiff has not alleged that it is entitled to emergency injunctive relief on this claim. *See* ECF No. 26-1.

### iii.   The Service's Inclusion of Captive Animals in the Listing Rule is Consistent with the Purposes of the ESA.

Plaintiff also argues that, in addition to being inconsistent with the Service's policy and past practice, the decision to include the members of the Three Antelope species held in captivity in the U.S. in the Listing Rule is inconsistent with the purposes of the ESA. ECF No. 26-1 at 31. This misguided argument should be rejected. The Service's interpretation of the ESA, as embodied by the Listing Rule, is consistent with the purposes of the ESA, while Plaintiff's interpretation is wholly untenable.

The Service's interpretation that captive and wild members of a species generally should be listed together is entirely consistent with the purposes of the ESA. The overarching purposes of the ESA are provided in Section 2(b) of the Act:

> The purposes of this Act are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

16 U.S.C. § 1531(b). Giving the same listing status captive and wild members of a species furthers these purposes in a number of ways. First, once a species is listed as endangered, the full protections of the Act apply, including all the prohibitions found in ESA Section 9(a)(1), such as the prohibitions against take, import, and export. *See* 16 U.S.C. § 1538(a)(1). By giving the same listing status to both the wild and captive members of a species, the Service ensures that these protections inure to the benefit of the species' conservation because it eliminates any potential confusion as to the status of an animal or animal parts that are imported, exported, or re-imported. In contrast, if wild and captive members of the same species have different statuses it

becomes easier to attempt to circumvent the system by trying to pass off wild animals or their parts as originating from captive stock.

Second, providing the same listing status to wild and captive animals furthers the purpose of "tak[ing] such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section." 16 U.S.C. § 1531(b). Specifically, the purposes of the Convention on International Trade in Endangered Species ("CITES"), one of the conventions set forth in subsection (a) of Section 2, are furthered by the Service's reading of the ESA as generally requiring the same listing status of wild and captive animals of the same species. All of the Three Antelope species are included on Appendix I of CITES.[11] For species listed on Appendix I, CITES states as its purpose that "[t]rade in specimens of these species must be subject to particularly strict regulation in order not to endanger further their survival and must only be authorized in exceptional circumstances." CITES, Article II. As explained above, if captive and wild members had different statuses under the ESA, it would increase the potential for confusion and gaming of the system when animals were moved between areas where it had one status to an area with a different status. In other words it would be more difficult to regulate the trade in the species. Given that the purpose of CITES is to subject trade of species such as the Three Antelope species to "particularly strict regulation," adopting an interpretation that would have the opposite effect, *i.e.*, a system that would make trade in the species easier, would be contrary to the purposes of CITES. Conversely, the Service's interpretation, which makes trade

---

[11] http://www.cites.org/eng/app/appendices.php.

in the species more difficult and subjects it to "particularly strict regulation" is consistent with the purposes of CITES and thus the ESA.

Notwithstanding this rational approach, Plaintiff alleges that by including the U.S. captive herds of the Three Antelope species in the listing, the Service's decision is inconsistent with the purposes of the ESA because it allegedly "undermines the conservation that has been achieved for the populations living in the United States." *Id.* Plaintiff's argument is, at a minimum, inconsistent, but in any event, it is flawed as a matter of fact and law.

Plaintiff acknowledges that the ESA is designed to bring about conservation of the species in the wild, not simply conservation of a species in captivity. ECF No. at 23 (citing ESA Section 2(b)'s statement that one purpose of the ESA is to "provide a means whereby ***the ecosystems upon which endangered species and threatened species depend may be conserved***"). In arguing that the Service's interpretation of the ESA is inconsistent with the purposes of the ESA, Plaintiff then paradoxically contends that including captive members of the Three Antelope species in the species listing is undermining the conservation of those captive animals in the United States. ECF No. at 31. Plaintiff cannot have it both ways. Under its own reading of the statute, there is no conservation purpose for captive members of a species, except to the extent that they might further the conservation of the species in the wild. But Plaintiff does not argue that the inclusion of the U.S. captive members of the species undermines the conservation of the species in the wild. To the contrary, Plaintiff argues that "[t]he Service has not asserted that including the U.S. non-native captive populations will bring some direct benefit to the conservation of the species in their native ecosystems." ECF No. 26-1 at 31. If the purpose of the ESA is to conserve species in the wild, then even assuming Plaintiff was correct that the

23

Listing Decision has some negative impact only upon the conservation of the antelopes held in captivity in the U.S., it would not be inconsistent with the conservation purposes of the ESA. However, affording endangered status to the Three Antelope species held in captivity in the U.S. serves to protect those individuals, as well as advancing the ultimate conservation objectives for the species in the wild.

In sum, Plaintiff is not likely to succeed on the merits because the Service's construction is consistent with the purposes of the ESA, and Plaintiff has not demonstrated otherwise. *Beth Rochel Seminary v. Bennett*, 624 F. Supp. 911, 916 (D.D.C. 1985) ("It is also well settled that 'the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.'") (citations omitted).

### b. **Plaintiff Will Not Suffer Irreparable Harm.**

In addition to failing to show it is likely to succeed on the merits, Plaintiff is not entitled to a preliminary injunction because it has not shown that it is likely to suffer "irreparable harm" without one. Plaintiff's allegations of harm fail for at least two reasons.[12] First, to the extent

---

[12] The Court should also factor in Plaintiff's delay in filing its motion for preliminary injunction. Judge Kennedy issued his opinion holding the Management Rule in violation of the ESA in June 2009. While the Court did not vacate the Management Rule, Plaintiff's have been on notice since that time that the Management Rule might be withdrawn. Even if that were not the case, the Service issued its final rule removing the Management Rule on January 5, 2012 with a delayed effective date of April 4, 2012. Yet despite the fact that it filed this case in August 2011, Plaintiff waited until March 8, 2012, more than two months after the Service issued the Removal Rule, to file for a preliminary injunction. At a minimum, this delay bolsters the conclusion that Plaintiff will not suffer irreparable harm. *Air Transport Ass'n of America v. Export-Import Bank of the U.S.*, --- F. Supp. 2d ---, Civ. No. 11-2024 (JEB), 2012 WL 119557, at *11 (D.D.C. Jan. 13, 2012) ("While Plaintiffs' delay is far from the sole basis upon which the Court denies their Motion, this inaction, coupled with the economic and speculative nature of Plaintiffs' alleged impending harm, dictates against the granting of injunctive relief."); *Gordon v. Holder*, 632 F.3d

Plaintiff is harmed at all (which it is not), the harm is caused by the removal of the Management Rule, not by the continued enforcement of endangered status in the United States.  Second, even if the continued enforcement of endangered status in the United States resulted in any harm to Plaintiff, the nature of that harm is economic and/or self-inflicted; certainly  not the type of "irreparable harm" that must be demonstrated to justify an injunction.  Thus, the Court could deny Plaintiff's motion on this basis alone.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("a movant must demonstrate at least some injury for a preliminary injunction to issue") (citation and quotations omitted).

> i.   The Challenged Rule is Not the Cause of Plaintiff's Alleged Harm.

In its Complaint, Plaintiff alleged five violations of law. ECF No. 1 at ¶¶ 69-106.[13] Nowhere in the Complaint did Plaintiff allege that the Service's decision to withdraw the Management Rule constituted a violation of law. And yet, to the extent that Plaintiff will experience any "harm," it would arise from <u>that</u> agency action. *See* ECF No. 26-1 at 1 (stating, in the second paragraph, that the harm will come about when the Service withdraws the Management Rule). The Listing Rule has been in place for well over six years. 70 Fed. Reg. 52,319. It was only when it became apparent that the Service intended to withdraw the

---

722, (D.C. Cir. 2011) (delay not a basis on its own for denial of preliminary injunction, but can bolster a denial).

[13] The allegations are: (i) failure to exclude the Three Antelope populations located in the United States from the Listing Rule pursuant to the Service's DPS authority; (ii) failure to follow agency policy and practice for listing non-native, captive populations; (iii) erroneous classification of the Three Antelope populations located in the United States as endangered; (iv) failure to comply with the conservation purpose of the ESA; and (v) failure to act on Plaintiff's petition to delist the Three Antelope populations located in the United States. *Id.*

Management Rule that Plaintiff chose to sue the Service and challenge the Listing Rule. *See* ECF No. 1. However, the Listing Rule has remained consistent throughout; nothing about that Rule has changed in any way to cause Plaintiff harm. What <u>has</u> changed is the announcement of the removal of the Management Rule.

While Plaintiff has the right to challenge the Listing Rule on the merits,[14] if Plaintiff wished to prevent the Service from withdrawing the Management Rule, Plaintiff should have challenged that agency action itself, rather than the Listing Rule. Indeed, a plaintiff group whose interests are aligned with Plaintiff has done just that. *See supra* at 10. In short, this case is not the proper vehicle to bring an ancillary back-door challenge to the propriety of the agency's decision to withdraw the Management Rule. Accordingly, Plaintiff's motion should be denied.

ii.  <u>The Continued Listing of U.S. Members of the Three Antelope Species Will Not Cause Irreparable Harm</u>.

Plaintiff has failed to demonstrate that maintaining the endangered listing status for the Three Antelope species in the United States will cause irreparable harm that would justify an injunction. Plaintiff has submitted declarations indicating that members of the Plaintiff organization have apparently decided to sell off, or allow the hunting of, these endangered antelope instead of simply applying for the permits that will be required by the law starting in

---

[14] Indeed, summary judgment briefing is set to occur shortly. *See supra* at 11. This fact further highlights the inappropriateness of this eleventh-hour emergency motion. A preliminary injunction is to remain in place only until the Court is able to reach the merits of the case, and the parties are set to commence merits briefing (further delayed only at Plaintiff's request). *See District 50, United Mine Workers of America v. International Union, United Mine Workers of America*, 412 F.2d 165, 168 (D.C. Cir. 1969) ("The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation.")

April.[15] To the extent they suffer injury from their own actions, however, such harm is self-inflicted and cannot form the basis for an injunction against the enforcement of the Listing Rule.

Plaintiff broadly alleges two kinds of harm in its motion: economic harm and harm to the species' conservation. *See generally*, ECF No. 26-1 at 32-41. As to the former, Plaintiff claims that its members have lost earnings and that the value of their animals has "plummeted." *Id.* at 32; *see, e.g.,* Goodenow Decl., ECF No. 26-27 ¶ 11 ("the price of these animals has plummeted"); Wier Decl., ECF No. 26-28 ¶¶ 11-13 ("prices have dropped to $1,100 for mature bulls and to $600-700 for cows" when before May 2011 "mature bulls were selling at $3500 per bull and cows were selling at $2,000-$2,500"); Terry Decl., ECF No. 26-29 ¶¶ 13-14, 17, 22 ("The value of these animals has plummeted" and he sold his herds in February 2012 for $16,000 whereas the herds would have been worth approximately $214,000 before the Service announced that permits would be required); Lesco Decl., ECF No. 26-30 ¶¶ 12-13, 16, 18-19 ("The value of my scimitar-horned oryx has dropped dramatically in the last few months."). But even if these

---

[15] One of Plaintiff's declarants, J. David Bamberger, has not alleged that he is a member of the plaintiff organization, Safari Club International. Bamberger Decl., ECF No. 26-31. Consequently, any harm to this individual cannot be considered harm to Plaintiff for the purpose of standing, or for the purpose of demonstrating irreparable harm necessary for the issuance of an injunction. *Coal. for Mercury-Free Drugs v. Sebelius*, 725 F. Supp. 2d 1, 9 (D.D.C. 2010) (organizational plaintiff's can bring action on behalf of its members). To the extent the Court were to deem this declaration relevant at all, for the same reasons provided herein with respect to the other declarations, the Bamberger Declaration does not demonstrate that Plaintiff is likely to suffer irreparable harm in the absence of an injunction.

allegations are true, the law is clear that "economic loss does not, in and of itself, constitute irreparable harm."[16] *See, e.g., Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Perhaps mindful that economic harm alone cannot justify a preliminary injunction, Plaintiff next tries to show that maintaining the endangered listing of the Three Antelope species held in captivity in the U.S. -- while removing the exemption afforded by the Management Rule -- will impair the species' conservation by "depriv[ing] Safari Club members and others of the incentive to continue to conserve these animals and of the herds and willing breeders and ranchers necessary to support their conservation efforts." ECF No. 26-1 at 33.[17] Or more properly, Plaintiff alleges that allowing antelopes held in captivity in the U.S. to continue to be listed – in the absence of the exemption from permitting requirements -- will injure their interest in these species (since Article III remedies must redress an "injury to the plaintiff," not an "injury to the environment."). *See Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167,

---

[16] Even if economic harm could constitute irreparable harm, moreover, Plaintiff has not demonstrated that a temporary injunction would improve market conditions such that ranchers would stop divesting themselves of these animals or would reinvest in them.

[17] *See also* Goodenow Decl. ¶¶ 11-14 ("On information and belief, the dramatic drop in the value of these animals caused by the impending permit requirements and the potential legal risks of owning and maintaining animals regulated as endangered species have erased the incentive for private ranchers to continue to own, raise, breed and sell hunts for these animals."); Wier Decl. ¶¶ 27-29 (alleging he is devastated by "the absolute loss of conservation incentives for ranchers to raise and breed these species); Terry Decl. ¶¶18-22 ("Conservation takes money and the system that the ranchers and the hunters in the U.S. are part of has generated the money for conservation and has raised the value of these animals so that ranchers were willing to continue to own and breed them. That incentive is now gone."); Lesco Decl. ¶¶ 20-21 ("The endangered status and the permit requirements have forced me to get out of the business of raising and breeding these animals. As a result, I can no longer participate in their conservation.").

180-81 (2000).   However, Plaintiff's interest in the species is not irreparably harmed by maintaining endangered status for members of the Three Antelope species held in captivity in the U.S. because, even without the permit exemption, it will not be illegal for holders of these animals to continue to raise, breed, or even hunt these animals. As the Service has confirmed, ranchers "should be able to continue those activities." 77 Fed. Reg. at 433. But they will now need permits to do so.

Plaintiff does not argue that the permitting process is unlawful, and they have not challenged the regulations that govern that process. Instead, they contend that the requirement to obtain a permit before engaging in otherwise-prohibited activities means "red tape, uncertainty and potential liability" and therefore renders their continued operations "economically infeasible." *See, e.g.,* Terry Decl. ¶¶ 15-18; Lesco Decl. ¶¶ 18-20; ECF No. 26-1 at 32 (impending requirement to obtain permits "has severely undermined the ability of ranchers to continue to invest in these animals and to continue to feed, maintain and breed these animals.").

This is untrue. First, the ESA does not regulate the possession of these animals or "purely intrastate activities (with the exception of take)," so Plaintiff's members may continue to possess these animals, transport them within a State, or sell them to another party in the same State without a permit. 77 Fed. Reg. at 433; Van Norman Decl. ¶ 8. Second, the forms that Plaintiff's members must fill out to obtain the permits for other activities are relatively simple. For example, to sell and transport these animals between States, Plaintiff's members may either obtain an interstate commerce permit for the sale (Form 3-200-37), or they may engage in multiple interstate sales if both parties register for a "captive-bred wildlife" (or CBW) permit

(Form 3-200-41).[18] Van Norman Decl. ¶ 3. If Plaintiff's members get a captive-bred wildlife permit, they may also cull their animals as necessary to maintain a viable and healthy herd. *Id.* Plaintiff's members that obtain a captive-bred wildlife permit, however, are required to submit annual reports to the Service (Form 3-200-41a).[19] *Id.* ¶ 4. The interstate commerce permit is valid for a single sale; the captive-bred wildlife permits are valid for five years. *Id.* ¶ 3. More than 400 facilities nation-wide currently hold captive-bred wildlife permits (including both zoos and individual hobbyists). *Id.* ¶ 9.

In addition, if Plaintiff's members want to allow hunters to come onto their ranches to hunt these animals, they will also have to obtain a "take" permit (Form 3-200-37). *Id.* ¶ 5. The take permit is valid for one year, but may be renewed annually. *Id.*

So to continue all of the activities that were allowed under the old, unlawful exclusion, Plaintiff's members must obtain two permits. The Service's official estimates of the time required to fill out the forms for these permits are: (1) two hours for the initial captive-bred wildlife permit registration (which must be filled out again every five years), and then an additional 30 minutes each year for the annual report; and (2) two hours to apply for the required take permit and then an additional 15 minutes each year for the renewal of the permit. 75 Fed. Reg. 53,330 (Aug. 31, 2010); Van Norman Decl. ¶ 6.[20] Thus, the Service estimates that

---

[18] *See* www.fws.gov/forms/3-200-41.pdf; www.fws.gov/forms/3-200-37.pdf. Last visited March 19, 2012.

[19] *See* www.fws.gov/forms/3-200-41a.pdf. Last visited March 19, 2012.

[20] These time estimates were prepared to comply with the Paperwork Reduction Act and not for this litigation. *See* 75 Fed. Reg. 53,300.

Plaintiff's members would have to spend roughly <u>seven hours</u> every <u>five years</u> filling out the forms to obtain the necessary permits. Van Norman Decl. ¶ 6.

This burden is very modest, and the Service has tried to reduce it even further by providing additional guidance to ranchers and others that own these animals and by eliminating questions on these forms that do not apply to them. *Id.* In fact, Plaintiff's members were already required to compile much of this information under the old, unlawful exclusion. 77 Fed. Reg. at 433; 50 C.F.R. § 17.21(h)(7) (requiring persons claiming the benefit of the exception to "maintain accurate written records of activities, including births, deaths, and transfers of specimens . . . ."). The Service also provided an "extended effective date" for the Removal Rule so that the agency could work with ranchers and so that the ranchers would have more time to "either . . . apply for authorization or permits to continue carrying out previously approved activities" or to "legally sell their specimens, if they choose to divest themselves of these species." 77 Fed. Reg. at 431.

The Service is also working to improve the permitting process more generally by developing "electronic applications and more timely review processes." 77 Fed. Reg. at 436. The permits do not impose "any significant financial burden," and cost at most $700 over five years. *Id.* at 433, 437. The Service should be able to approve permits for all of Plaintiff's members because the criteria are "similar or identical to the criteria" established under the old exclusion. *Id.* at 435. The Service estimates that it will generally take about 45 days to process applications for these permits (if Plaintiff's members apply)[21], Van Norman Decl. ¶ 7—and it would be hard

---

[21] As Plaintiff notes, some ranchers have already applied for these permits.  ECF No. at 40 n.9; *see also* Van Norman Decl. ¶ 7.

(if not impossible) for the Service to reduce that time because applications must be subject to public notice and comment for 30 days.

So the evidence does not support Plaintiff's claims that the endangered classification absent the permit exemption introduces "additional burdens, costs and uncertainties." ECF No. 26-1 at 16; *see, e.g.,* Terry Decl. ¶ 15 (alleging without evidence that the permit requirements will mean he has to "take on additional costs, risks, responsibilities, obstacles and financial insecurity to [his] ranch operation."); Lesco Decl. ¶ 18 (alleging without evidence that "The permit requirements that have been announced have made it economically infeasible to continue to maintain these animals."). The declarants' claims about this permitting process are simply bald allegations, unsupported by any evidence whatsoever, which ignore recent guidance from the Service. Plaintiff has not cited any cases where this kind of modest regulatory burden was found to cause irreparable harm (or any case where any regulatory burden, however costly and onerous, was found to cause irreparable harm).

Moreover, if Plaintiff is harmed here, the harm is self-inflicted.  Plaintiff's members have a choice, and they have apparently decided to sell off, or allow the hunting of these endangered antelope instead of applying for the required permits. *See, e.g.*, Terry Decl. ¶ 15 ("I chose not to apply for permits for these animals and instead decided not to continue to keep these animals."); Lesco Decl. ¶ 15 ("I made some inquiries about applying for the Captive Bred Wildlife Registration program, but decided not to participate."). The courts will not grant an injunction to protect Plaintiff from its members' decision because no litigant "can be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam). The D.C. Circuit has consistently held that such "self-inflicted harm doesn't satisfy the

basic requirements for standing": it "does not amount to an 'injury' cognizable under Article III" and, even if it did, "it would not be fairly traceable to the defendant's challenged conduct." *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (citations omitted). Similarly, the law is "well-settled that '[a] preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Lee v. Christian Coal. of America, Inc.*, 160 F. Supp. 2d 14, 33 (D.D.C. 2001) (citations omitted).

In fact, at least one court that reviewed this exact issue found that a plaintiff's refusal to obtain a permit required by law (or, in that case, a license) cannot constitute irreparable harm. *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003). That court concluded that, "[i]f the license can be had, then the lack of an injunction does not lead to irreparable harm." *Id.* Rather, "[a]ny injury that [plaintiff] incurs by [not obtaining a license] is of its own choosing" and "self-inflicted," and "self-inflicted wounds are not irreparable injury." *Id. See also Kaplan v. Board of Educ.*, 759 F.2d 256, 259 (2d Cir. 1985) (holding that plaintiff board members' threat to "resign or face dismissal rather than comply with the [challenged] regulation" did not constitute irreparable harm necessary to enjoin the regulation).

Even if any harm could be demonstrated, it is clear the alleged harm would arise as a result only of the operation of the ESA itself. Once a species is listed as endangered, the prohibitions of ESA Section 9(a)(1) apply absent a permit or other exemption. While the Service previously believed it could issue a blanket exemption to allow otherwise-prohibited activities with respect to U.S. captive members of the Three Antelope species, Judge Kennedy found the blanket exemption was unlawful. *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 115-120 (D.D.C. 2009). The Court found that the text of the ESA, its "context, purpose, and legislative

33

history," all show that "Congress intended permits for the enhancement of propagation or survival of an endangered species to be issued <u>on a case-by-case basis following an application and public consideration of that application</u>." *Id.* at 115 (emphasis added). The Court held that the ESA requires holders of the Three Antelope species in the United States to submit "[a] full statement of the reasons why [they are] justified in obtaining a permit" so that the Service can determine whether their activities will, in fact, "enhance the propagation or survival of the species." *Id.* at 118. The Court also held that creating an exclusion from these permitting requirements "shut out" the public and "deprive[d] [environmental and animal rights groups] of the information they would otherwise be provided to assess whether individual facilities will or are in fact maintaining the antelope species in a manner that contributes to their propagation or survival." *Id.* Finally, the Court also concluded that the ESA expressly requires the Service to publish notice of applications for these permits in the Federal Register so that they may be the subject of public comment for 30 days. *Id.* at 106 (citing 16 U.S.C. § 1539(c)).

The Service cannot allow Plaintiff's members to continue to operate under the old, unlawful exclusion consistent with this Court's order. Nor can it "unquestionably accept that the activities of a ranch with these species have a presumptive enhancement value and therefore issue a permit or other authorization 'pro forma.'" 77 Fed. Reg. at 432. Thus, the Service appropriately engaged in a rulemaking process to remove the Management Rule and eliminate the exclusion that this Court has already found was unlawful. 77 Fed. Reg. at 431 (stating that the Service removed this exclusion "in response to a court order that found that the rule for these three species violated section 10(c) of the Act."); *id.* at 435 (to comply with the ESA and this Court's order, the Service had "no other option than to remove" the old, unlawful exclusion).

34

Because the removal of the exemption does not impact the endangered status of the species and the protections that status provides, those wishing to engage in previously-exempted activities must now obtain a permit before engaging in those activities. To the extent any harm to Plaintiff results from the removal of the exclusion, that harm also arises from the Service's compliance with the ESA. Either way, harm caused by operation of or compliance with the ESA cannot be considered irreparable harm to Plaintiff.

Plaintiff believes that its members' efforts contribute more to the survival and recovery of these species than the stricter permitting requirements that will now be required by the ESA. The Service does not dispute the value of the conservation efforts of Plaintiff's members or other ranchers of these animals. *See, e.g., id.* at 435. But if Plaintiff believes that it has been harmed by the continued listing of the species after the loss of this exclusion, it must direct its complaints to Congress, not this Court or the Service, because "[o]nce Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforcement them . . . ." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). Plaintiff's motion should be denied because it has failed to show that it is likely to be irreparably harmed by the Service's listing rule.

### c. The Balance of the Harms and the Public Interest Weighs Against the Proposed Injunction.

While the Court can deny Plaintiff's motion due to Plaintiff's failure to demonstrate either a likelihood of success on the merits or irreparable harm, an evaluation of the third and fourth injunction factors also demonstrates that the Court should deny the motion, because

granting the motion would mean fewer protections for an endangered species and is contrary to the purposes of the ESA.

The third and fourth injunction factors – the balance of harms and the public interest -- generally tip in favor of the species in ESA cases. *American Rivers v. U.S. Army Corps of Engineers*, 271 F. Supp. 2d 230, 261 (D.D.C. 2003) ("Congress' enactment of the ESA clearly indicates that the balance of interests 'weighs heavily in favor of protected species.'") (quoting *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1510 (9th Cir. 1994)). Here, Plaintiff has requested that the Court enjoin the enforcement of endangered species status to U.S. captive members of the Three Antelope species. If the Court were to grant that requested relief, however, it would mean that absolutely <u>zero</u> protections would apply to these animals. In other words, ranchers or other holders of these animals could do anything they wanted with these animals – move them in interstate or foreign commerce, or even allow lethal take, without violating the law. Such a state of affairs would be far <u>less restrictive</u> than the status quo under the invalidated Management Rule, because even that rule contained a number of restrictions to those wishing to engage in otherwise-prohibited activities with respect to the U.S. captive members of the Three Antelope species. For example, such activity currently has to be conducted in a "manner that contribute[d] to increasing or sustaining captive numbers or to potential reintroduction to range countries." 50 C.F.R. § 17.21(h)(1); *see also id.* § 17.21(h)(3)-(8) (additional restrictions including prevention of hybridization, maintenance of genetic diversity, etc.). A state of affairs

where there is no regulation of activities with respect to these endangered species does not favor the species or the public interest.[22]

Plaintiff may argue that the ranchers have demonstrated their commitment to the conservation of these animals over many years, and there is no reason to believe that would change if the Court were to enjoin enforcement of the listing in the United States. This argument is not compelling. Even if the Court were to grant Plaintiff's request, the species would remain listed everywhere but in the United States, and allowing unregulated trade in the captive U.S. animals would undermine the conservation of the species in the wild. Van Norman Decl. ¶ 12.

## VI. Conclusion

The Service's decision to list the Three Antelope species complied with the ESA, and is consistent with the Service's practice and the purposes of the statute. Therefore, Plaintiff is unlikely to succeed on the merits of its claims. Plaintiff also has failed to demonstrate that it will be irreparably harmed if the Court denies the requested preliminary injunctive relief while the Court adjudicates the merits of Plaintiff's claims at summary judgment. Moreover, the balance of harms and the public interest weigh against issuing the requested relief. For the foregoing reasons, the Court should deny Plaintiff's motion for preliminary injunctive relief.

Dated: March 19, 2012

//

//

---

[22] The fact that Plaintiff is not seeking to maintain the status quo also weighs against granting Plaintiff's motion because "the purpose of a preliminary injunction is to preserve the status quo pending a hearing on the merits." *Allina Health Services v. Sebelius*, 756 F. Supp. 2d 61, 69 (D.D.C. 2010).

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

SETH M. BARSKY, Section Chief
S. JAY GOVINDAN, Asst. Section Chief


*/s/ Meredith L. Flax*
MEREDITH L. FLAX
Sr. Trial Attorney (D.C. Bar No. 468016)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0404
Facsimile: (202) 305-0275
Meredith.Flax@usdoj.gov

*/s/ Erik E. Petersen*
ERIK E. PETERSEN
Trial Attorney (D.C. Bar No. 489073)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0339
Facsimile: (202) 305-0275
Erik.Petersen@usdoj.gov


**Attorneys for Federal Defendants**