**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____    )
                                     )
SAFARI CLUB INTERNATIONAL            )
                                     )   Case No. 11-cv-01564(BAH)
Plaintiffs,                          )
                                     )   (consolidated with cases 1:12-cv-00194-
v.                                   )   BAH and 1:12-cv-00340-BAH)
                                     )
KEN SALAZAR, *et al.*                )
                                     )
Defendants.                          )
                                     )
_____    )
                                     )
TERRY OWEN, *et al,*                 )
                                     )
Plaintiffs,                          )
                                     )
v.                                   )
                                     )
U.S. DEPARTMENT OF THE INTERIOR,     )
*et al.*                             )
Defendants.                          )
                                     )
_____    )
                                     )
EXOTIC WILDLIFE ASSOCIATION, *et     )
al,*                                 )
                                     )
Plaintiffs,                          )
                                     )
v.                                   )
                                     )
U.S. DEPARTMENT OF THE INTERIOR,     )
*et al.*                             )
                                     )
Defendants.                          )
                                     )
_____    )

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Safari Club International ("Safari Club") moves for summary judgment on all counts of Safari Club's Complaint.  Safari Club challenges the determination of Defendants Ken Salazar *et al.* ("Federal Defendants") to include U.S. non-native populations of the scimitar-horned oryx, dama gazelle and addax ("three antelope species") in the endangered species classification for the species generally. Safari Club also challenges Federal Defendants' failure to take timely and reasonable action on Safari Club's petition to delist the U.S. captive non-native herds of the three antelope species.  This motion is supported by the memorandum below, the attached declarations, and the other papers filed in these proceedings.  For the reasons detailed in these documents, the Court should set aside the rule that classified the three antelope species as endangered and remand the matter to the FWS to reissue a rule that excludes the U.S. non-native captive herds from the endangered classification.

Dated this 23rd day of March, 2012.

<div style="margin-left: 40%;">

Respectfully submitted

/s/ Anna M. Seidman
Anna M. Seidman
Safari Club International
501 2nd Street NE
Washington, D.C.  20002
Tel:  202-543-8733
Fax:  202-543-1205
aseidman@safariclub.org
*Counsel for Plaintiff Safari Club International*

</div>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

SAFARI CLUB INTERNATIONAL

Plaintiffs,

v.

KEN SALAZAR, *et al.*

Defendants.

_____

TERRY OWEN, *et al,*

Plaintiffs,

v.

U.S. DEPARTMENT OF THE INTERIOR,
*et al.*
Defendants.

_____

EXOTIC WILDLIFE ASSOCIATION, *et al,*

Plaintiffs,

v.

U.S. DEPARTMENT OF THE INTERIOR,
*et al.*

Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 11-cv-01564(BAH)

(consolidated with cases 1:12-cv-00194-BAH and 1:12-cv-00340-BAH)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

# Table of Contents

I.     INTRODUCTION ...........................................................................................1

II.    FACTUAL AND LEGAL BACKGROUND AND STANDARD OF REVIEW ............2

    A.  The Scimitar-Horned Oryx, Dama Gazelle and Addax ............................................2

    B.  Regulations and Litigation Pertaining to the Three Antelope Species .....................5
    C.  Safari Club International..................................................................................20
    D.  Legal Background...........................................................................................21
    E.  Standard of Review........................................................................................23
    F.  Standing .......................................................................................................24

III.    ARGUMENT ..........................................................................................31

    A.  The Service's Unexplained Inconsistent Approach to Non-native and/or Captive
        Members of Species Was Arbitrary and Capricious....................................................31

    B.  The FWS Failed To Make a Timely 90 Day Finding on Safari Club's Delisting
        Petition ........................................................................................................40

IV.    CONCLUSION ...........................................................................................42

# Table of Authorities

*Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154 (D. Or. 2001) .......................................... 35

*American Federation of Government Employees, Locals 225, 1504, and 3723, AFL-CIO v. Federal Labor Relations,* 712 F.2d 640 (D.C. Cir. 1983) ........................................................ 33

*American Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008).......................................... 24

Bennett v. Spear, 520 U.S. 154 (1997) .......................................................................................... 25

*Biodiversity Legal Foundation v. Babbitt*, 63 F. Supp. 31 (D.D.C. 1999) .................................. 42

*Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) .......................... 32

*Engine Manufacturers Association v. EPA,* 88 F.3d 1075 (D.C. Cir. 1996) ............................... 37

*Environmental Defense Fund v. Reilly*, 909 F.2d 1497 (D.C. Cir. 1990).................................... 40

*Friends of Animals v. Salazar*, 626 F.Supp.2d 102 (D.D.C. 2009) ............................................. 18

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977) ............................. 25

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................. 24

*Morton v. Ruiz*, 415 U.S. 199 (1974).......................................................................................... 40

*National Association of Home Builders v. Norton*, 340 F.3d 835 (9th Cir. 2003) ...................... 36

*National Cable & Telecommunications Ass'n. v. Brand X Internet Services*, 545 U.S. 967 (2005).................................................................................................................. 32

*Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir. 1983) ............... 37

*Valdiviezo-Galdamez v. Attorney General of U.S.* 663 F.3d 582 (2011)...................................... 33

*Wilderness Society v. Griles*, 824 F.2d 4 (D.C. Cir. 1984) ........................................................ 31

**Statutes**

16 U.S.C. § 1532 (16) .................................................................................................................. 22

16 U.S.C. § 1533(b)(3)(A)............................................................................................................ 23

16 U.S.C. §1533(a) ...................................................................................................................... 21

16 U.S.C. §1539(a)(1)(A) ............................................................................................................ 18

Administrative Procedure Act ("APA") 5 U.S.C. § 706........................................................... 2, 42

Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*................................................. 1, 21, 22


**Rules**

"Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act ("DPS Policy"), 61 Fed. Reg. 4722 (February 7, 1996) ... 1, 22, 23, 36

52 Fed. Reg. 23148 ...................................................................................................................... 34

53 Fed. Reg. 38451 ...................................................................................................................... 34

55 Fed. Reg. 9129 ........................................................................................................................ 35

56 Fed. Reg. 56491 ................................................................................................................... 5, 10

57 Fed. Reg. 24220 ........................................................................................................................ 5

59 Fed. Reg. 37738 ...................................................................................................................... 39

63 Fed. Reg. 64772 ................................................................................................................. 37, 38

68 Fed. Reg. 43706 ........................................................................................................................ 5

68 Fed. Reg. 66395 ........................................................................................................................ 5

70 Fed. Reg. 69903 ...................................................................................................................... 36

75 Fed. Reg. 54708 ...................................................................................................................... 39

76 Fed. Reg. 54423 ...................................................................................................................... 35

77 Fed. Reg. 431 .......................................................................................................................... 18

**Regulations**

70 Fed. Reg. 52310 (September 2, 2005) ........................................................................ 6, 18, 34

70 Fed. Reg. 52319 (September 2, 2005) ............................................................. 3, 4, 5,7, 17, 33

## I.    INTRODUCTION[1]

Safari Club International ("Safari Club") files this motion for summary judgment to challenge the U.S. Fish and Wildlife Service's ("FWS" or "Service") September 2, 2005 decision to include U.S. non-native captive herds of three antelope species; the scimitar-horned oryx, dama gazelle and addax ("three antelope species") in the endangered species classification for the three species in general.  The Service's decision to list the U.S. non-native captive herds was not designed to carry out the purposes of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, as it did nothing to benefit the conservation of the U.S. non-native captive populations or the species living in their home ranges in the wild.  In fact, the FWS included the U.S. non-native captive populations despite acknowledging that the endangered status would actually undermine private conservation efforts that had succeeded in recovering large numbers of the three species in the United States.  Without explanation the Service included the U.S. non-native captive populations in the endangered classification despite excluding other captive and non-native populations when listing species in similar circumstances.  The Service rejected the idea of designating a distinct population segment for the U.S. population of the three antelope species, claiming that it would "not be appropriate" to classify captive populations separately, but offered no analysis under its own "Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act ("DPS Policy"), 61 Fed. Reg. 4722 (February 7, 1996) to justify its conclusion of impropriety.   The Service's arbitrary and capricious approach to the listing status of the U.S. non-native captive populations of the three antelope species violated both the ESA and the Administrative Procedure Act ("APA") 5 U.S.C. § 706.

---

[1] In accordance with Local Rule 7(h)(1), Safari Club is not filing a separate Statement of Material Facts, since judicial review of this case is to be based solely on the Administrative Record.  The facts of this case, with citations to the Administrative Record (AR) are included within this Memorandum.

In addition, the Service failed to act in a timely or reasonable manner on a petition to delist the U.S. non-native captive herds of the three antelope species.  Instead of taking action that would have prevented a complete reversal of U.S. conservation successes for the three species, despite complete awareness of the harms that full enforcement of endangered status would bring, the Service acted unreasonably, arbitrarily and capriciously and in violation of both the ESA and APA.

Safari Club International ("Safari Club") and its members have a strong interest in the three antelope species and in the role that hunting has played in the conservation of the U.S. populations of the three antelope species.  They have been and will continue to be harmed by the endangered classification of these populations.  The only remedy that will alleviate that harm is for this Court to invalidate and vacate the regulation designating U.S. non-native captive herds of the three antelope species as endangered.  Only once these animals are released from unnecessary and harmful regulatory authority will conservation incentives return and will the private ranching and hunting conservation community be able to restore these animals to the status they had previously achieved.

## II.   FACTUAL AND LEGAL BACKGROUND AND STANDARD OF REVIEW

### A.   The Scimitar-Horned Oryx, Dama Gazelle and Addax

The historic ranges for these three antelope species are in Africa.  Wild populations of the addax and dama gazelle still exist in some parts of Africa, but the scimitar-horned oryx is believed to have disappeared from the wild.  Captive populations of each of the three antelope species exist both in some of their historic range countries and in other parts of the world, including the United States.  In the U.S., private conservation, free trade, and the ability to hunt

these animals have succeeded in establishing large, healthy U.S. populations of each of these species.

The scimitar-horned oryx (*oryx dammah*) is a species of antelope that was historically found in the wild in Algeria, Burkina Faso, Chad, Egypt, Libyan Arab Jamahiriya, Mali, Mauritania, Morocco, Niger, Nigeria, Senegal, Sudan, Tunisia, and Western Sahara. It stands about 47 inches tall and weighs around 450 pounds. It is generally pale in color, but the neck and chest are dark reddish brown. Both male and female adult scimitar-horned oryx possess a pair of horns curving back in an arc up to 50 inches long. 70 Fed. Reg. 52319 (September 2, 2005) The species is believed to have gone extinct in the wild as there have been no confirmed sightings in the wild since 1988. International Union for Conservation of Nature and Natural Resources ("IUCN"), http://www.iucnredlist.org/apps/redlist/details/15568/0 (June 28, 2011). Captive populations in fenced protected areas can be found in a number of range countries, including Tunisia, Morocco, and Senegal. 70 Fed. Reg. at 52319. In 2005, at least 1,550 captive animals were held in managed breeding programs around the world (Gilbert 2005), not including those found on private ranches in the United States. *Id.* at 52321. In addition, it is believed that more than 4,000 are kept in a private collection in the United Arab Emirates. *Id.* Captive herds of scimitar-horned oryx are also found in South Africa.

The addax (*addax nasomaculatus*) is generally about 42 inches tall at the shoulder and weighs around 220 pounds. *Id.* at 52319. It has a grayish white coat and its horns twist in a spiral up to 43 inches long. *Id.* It was originally found in the wild in Chad, Mauritania, Niger, Algeria, Egypt, Libyan Arab Jamahiria, Sudan, and Western Sahara. *Id.* Unlike the scimitar-horned oryx, some addax can still be found in the wild. *Id.* The IUCN approximates that there

3

are 300 still living in Niger, Chad and Mauritania.  *Id.* at 52320.   Captive-bred addax are being introduced into large fenced areas of protected habitat in Morocco and Tunisia.  *Id.*

The dama gazelle (gazella dama) stands about 39 inches tall at the shoulder and weighs around 160 pounds.  *Id.* at 52319.  Its upper body is mostly reddish brown, and the head, rump, and underparts are white.  *Id.*  Its horns curve back and up, but are generally less than half the length of those of the scimitar-horned oryx.  *Id.*  The dama gazelle's historic home range included Chad, Mali, Niger, Libyan Arab Jamahiriya, Mauritania, Morocco, Nigeria, Algeria, Tunisia, Senegal, Sudan and Western Sahara.  *Id.* It is believed to have disappeared from North Africa but some still remain in Mali, Chad and Niger.  *Id.*  Some dama gazelle are living in enclosed facilities in their home ranges in Morocco, Tunisia and Senegal. http://www.iucnredlist.org/apps/redlist/details/8968/0.

Currently, aside from the remaining wild populations of addax and dama gazelle, captive herds of the three species are found both inside and outside the United States.  70 Fed. Reg. at 52320.  In the United States, captive populations are growing and thriving.  *Id.*  In 2004, Dr. Elizabeth Cary Mungall conducted research for the Exotic Wildlife Association ("EWA") to assess population numbers and habitat conditions for captive populations of the three antelope species.  Dr. Mungall reviewed a series of statewide censuses and collected data via a survey of EWA members who owned herds of one or more of the three species.  Her research not only revealed significant numbers of each species on ranches in Texas and/or ranches owned by EWA members, but also demonstrated remarkable population increases over a relatively short period of time:

> As shown by a series of statewide censuses (1966, 1971, 1974, 1979, 1984, 1988, 1994) in Texas done by the Texas Parks and Wildlife Department, the state wildlife agency, numbers of the three subject species kept in private ownership have been increasing (Ramsey 1967, Cook 1972, Harmel 1975, Harmel 1980,

Traweek 1985, Traweek 1989, Traweek, 1995). This census series is further
discussed in Mungall and Sheffield (1994). To confirm the situation, a further
census was done in 1996 at the request of the Exotic Wildlife Association (EWA)
by the Texas Agricultural Statistics Service (anonymous 1996).  Dama gazelle
numbers were checked again in an October 2003 phone census done by the author
for EWA as described in the next section (Mungall 2004).

In summary, starting with the first census in which the species appeared:
Scimitar-horned oryx: 32 in 1979 to 1,006 in 1994 to 2,145 in 1996.
Addax: 2 in 1971 to 587 in 1994 to 1,824 in 1996.
Dama gazelle: 9 in 1979 to 149 in 1994 to 91 in 1996 to 369 in 2003.

Submission for the Comment Period on Proposed Listing of Scimitar-Horned Oryx, Addax, and

Dama Gazelle Under the Endangered Species Act, A technical report prepared for the Exotic

Wildlife Association, by Elizabeth Cary Mungall, January 6, 2004.   AR. 221.0005 (Exhibit A)

### B.  Regulations and Litigation Pertaining to the Three Antelope Species

On September 2, 2005, the FWS listed the scimitar-horned oryx, dama gazelle and the

addax throughout the world as endangered.  Final Rule To List the Scimitar-Horned Oryx,

Addax, and Dama Gazelle as Endangered, 70 Fed. Reg. 52319 (September 2, 2005) ("Antelope

Listing Rule").  The Service encompassed in that listing all captive populations, including those

living on private ranches in the United States.  Prior to issuing the final rule, the Service

deliberated for almost 14 years about how to deal with the disparate status of the members of the

species in the wild as compared to the non-native captive herds in the United States.  The Service

first proposed an endangered species listing on November 5, 1991.  56 Fed. Reg. 56491.   After

an initial public comment opportunity, the Service re-opened the comment period on June 8,

1992 (57 Fed. Reg. 24220), again on July 24, 2003 (68 Fed. Reg. 43706), and then for a third

time on November 26, 2003 (68 Fed. Reg. 66395).   On the date that it issued the Antelope

Listing Rule, the Service also published a separate rule, exempting the U.S. captive herds of the

three species from the majority of prohibitions that accompany endangered species listing.

Exclusion of U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions, 70 Fed. Reg. 52310 (September 2, 2005) ("Exemption Rule").

The Service's protracted deliberation over the listing status of the three species was due in great part to the agency's dilemma as to how to protect the species in the wild without severely undermining the trade and use that had so benefitted the U.S. population numbers and health of the captive herds.  Between proposing the listing in 1991 and its finalization in 2005, the Service drafted multiple variations of the rule, some that included the U.S. captive herds in the listing and others that did not.  The Service could find no concrete evidence that listing the U.S. captive herds would benefit the conservation of either the populations in the wild or the U.S. populations.  In fact, the evidence collected by the Service indicated that there was no actual connection between the U.S. non-native captive and African native wild populations.  Although the Service, and others involved in conservation of the three species, expressed hopes that U.S. non-native captive populations would someday serve as the seed populations for future reintroductions into the wild, the FWS found that no reintroductions into the wild from U.S. non-native captive populations were currently taking place and that, as a result, the U.S. populations had no current, direct role in restoring the species into the wild of their home range:

> No self-sustaining, free living scimitar horned oryx, addax, or dama gazelle population has been established as a result of reintroduction.

U.S. FWS Notes for Final Rule, July 20, 2005, AR. 0352 (Exhibit B).  According to Steven L. Monfort, DVM, PhD, a Research Veterinarian at Smithsonian National Zoological Park, Chairman of the Sahelo-Saharan Interest Group, and one of the three peer reviewers selected by the Service to review the proposed rule to list the three species as endangered:

> The scimitar-horned oryx is already extinct in the wild, the addax and dama gazelle are declining, and at current rates these two species could be extinct in the wild within a decade.  Although good fenced reintroduction programs enjoy

> strong government support in Tunisia, Morocco and Senegal, ***these flagship programs have not yet resulted in the establishment of self-sustaining 'free-living' populations of any of these three species.***

Letter from Steven L. Monfort to Robert R. Gabel, October 20, 2003.  AR. 198.0018-19 (Exhibit C) (emphasis added).  The scientific data available convinced the Service that U.S. non-native captive populations were having no direct conservation impact on the species in the wild.  At best, the Service could only document reintroductions from captive herds into other captive herds, some but not all in their home range, but not into the wild.  In the final version of the Antelope Listing Rule, the FWS documented the lack of reintroductions into the wild for scimitar-horned oryx:

> Fenced reintroductions of scimitar-horned oryx are ongoing in Morocco, Tunisia, and Senegal (Monfort in litt. 2003, Monfort 2003). Five dama gazelle have been introduced to a large enclosure in Senegal (Ba and Clark 2003). These specimens are fenced in large tracts of suitable or recovering habitat and held for breeding and eventual reintroduction. The founder stock was largely derived from captive-breeding facilities. ***However, threats to survival of the antelopes still occur outside of the fenced areas so reintroduction into the wild has rarely occurred.***

70 Fed. Reg. at 52322 (emphasis added).  The Antelope Listing Rule also noted the role that captive breeding *could* someday have in future reintroductions, but admitted that reintroductions into the wild were presently infeasible:

> Captive-breeding programs operated by zoos and private ranches have effectively increased the numbers of these animals while genetically managing their herds. As future opportunities arise for reintroduction in the antelope range countries, captive-breeding programs will be able to provide genetically diverse and otherwise suitable specimens. ***Currently, however, continued habitat loss and wonton (sic) killing have made reintroduction nonviable in most cases.***

*Id*. (emphasis added).  The Environmental Assessment for the Exemption Rule similarly documented the lack of direct connection between U.S. captive herds of scimitar-horned oryx and the species in the wild:

Since the final rule only pertains to U.S. captive bred animals and no wild-caught specimens have been imported into the United States since 1997 (as far back as USFWS law enforcement records go), it is unlikely that wild specimens will be imported.  Thus, the only possible interaction these specimens may have with wild specimens is **upon eventual reintroduction into the wild** of Northern Africa. Currently, the scimitar-horned oryx may only be found in captivity.  There are long-range plans for reintroduction of scimitar-horned oryx and addax, but appropriate safeguards and monitoring pre-and post release will be followed (SSIG 2002).

Final Environmental Assessment at 10, AR. 384.0013 (emphasis added) (Exhibit D).    At the time that the FWS listed the three species as endangered, only introductions from captivity into captivity were possible, leaving to conjecture whether U.S. non-native captive herds would ever prove to be a source of animals for reintroduction of the animals in their native ecosystems.  The evidence demonstrated that while the non-native, introduced U.S. portions of the three antelope species *could* at some point in the future be important in efforts to supplement native populations of the three antelope within their historical ranges, protection of the U.S. populations would not *presently* improve the status of the three antelope within the species' historical range.

During the 14 years that it collected data and analyzed its legal strategies for dealing with the thriving and growing U.S. captive population, the FWS was well aware that it had listing options that would allow the Service to exclude those U.S. non-native captive members from the endangered classification of the animals in the wild, particularly because no direct connection could be found between the wild and captive/non-native populations.  Not only had the Service utilized those options in the past, but at the time that the Service adopted the final Antelope Listing Rule, several of those exclusions for other species were ongoing and in full effect.  For example, Marshall Jones of the Office of Management Authority of the FWS offered the following comments to Dr. Charles Dane, Chief of the Office of Scientific Authority, on April 2, 1991:

8

As you already knew, I am definitely in favor of consideration of alternative listing strategies for some captive individuals.

Dick Robinson's comments on Ron's note emphasize the need for all split listings to have a biological basis.  I agree, but I also would argue that many animals in captivity are biologically irrelevant to the species, e.g. subspecific crosses, animals of unknown blood lines.  Where an SSP exists, surplus (genetically overrepresented) animals might also fit into this category.  All of these are animals which could be considered not part of the biological species which is being listed (i.e. the wild populations (sic) plus all genetically identified members of those popualations (sic) in captivity).

A further alternative is available when the captive population is considered to be self-sustaining (e.g. chimpanzees).  This provides a different basis for split listing.

Letter from Marshall Jones, to Charlie (Dr. Charles Dane), 2 April 1991, AR 2.002 (Exhibit E).

On March 11, 1991, FWS Biologist, Ronald W. Nowak wrote to the Chief of the Office of

Scientific Authority:

However, being that we are starting the procedure from the situation of no coverage at all, it might not be contrary to the intent of the law to issue a classification excepting populations in the United States.  We then would state that our main purpose is to properly recognize the status of the natural populations, based on the data available, and that we are not now prepared to deal with the U.S. stock.  This approach would be something akin to what was done with the chimpanzee.

Memo, Ronald M. Nowak to Chief Office of Scientific Authority, Re:  Proposed Listing of Three

African Antelopes, 11 March 1991, AR 1.0001 (Exhibit F).

At the time that the Service initiated the process to list the three antelope species, it was

fully aware of its authority to separately classify non-native populations of a species.  When it

first proposed to list the three antelope species in 1991, the Service specifically announced to the

public that a populations' non-native status, regardless of whether the population was captive or

wild, was a legitimate bases for separately classifying that population:

Captive and free-roaming groups, outside of the natural ranges of the species, may be covered separately from natural populations in any final rule.

Proposed Endangered Status for Scimitar-horned Oryx, Addax, and Dama Gazelle, 56 Fed. Reg. 56491(November 5, 1991).

The FWS drafted early versions of the Antelope Listing Rule, relying on its authority to treat the U.S. non-native captive populations differently than the populations in the wild.  For example, in one of the earliest versions, U.S. non-native captive populations were excluded from the listing:

> The Service determines endangered status for wild populations of three species of antelopes:  scimitar-horned oryx, addax, and dama gazelle. . . .  This rule implements the protection of the Endangered Species Act of 1973, as amended, for these species.  Captive and free-roaming groups, outside of the natural ranges of the species, are not now included in this determination.

(Draft) Final Rule on Endangered and Threatened Wildlife and Plants; Endangered Status for Scimitar-horned Oryx, Addax and Dama Gazelle, dated 3/25/1992, AR 65.0005 (Exhibit G).  In another version, the Service listed wild populations of the three species as endangered and non-native captive populations as threatened, based on its recognized authority to treat or list U.S. non-native captive populations differently than wild populations:

> Section 3(15) of the Endangered Species Act of 1973 (Act) defines the term "species" to include "any distinct population segment of any species of vertebrate."  From time to time, the Service has treated groups of vertebrates that are in captivity, or that have originated from captive stock, as separate population segments, distinct from fully natural populations, for purposes of the Act.   The example closest to that now at hand involves the chimpanzee (Pan troglodytes), which in the Federal Register of March 12, 1990 (55 FR 9135), was classified as endangered in the wild and as threatened in captivity.

(Draft) Endangered Status for Scimitar-horned Oryx, addax and dama gazelle in Their Historic Range, Final Rule, 2/10/1994, AR. 135.0076-77 (Exhibit H).  In the end, the Service considered yet rejected threatened status for the U.S. non-native captive populations in favor of listing them as endangered.

10

The Service listed the U.S. non-native captive populations, despite being fully aware that the listing would deter ongoing conservation of these populations and undermine conservation successes achieved by the private ranching and hunting communities.  In the 1994 draft version of the Final Rule that listed the U.S. non-native captives as threatened, the Service admitted:

> An endangered classification might not only be inappropriate for the captives, but it might impose restrictions on their management that could interfere with efforts conducive to the propagation and survival of the species.

*Id*. AR. 135.0077.  The Service continued in the same draft Final Rule:

> Notwithstanding the above, and even though the populations of scimitar-horned oryx, addax, and dama gazelle outside of their historic range equal or exceed the captive populations of many species that are not on the List of Endangered and Threatened wildlife, the Service will classify them as threatened.

*Id.,* AR 135.0078.

The Service was well aware of the incredible strides that private ranchers had achieved because they were able to freely trade, sell and sell hunts for these animals in the absence of an endangered species listing and its prohibitions and requirements.  The Service noted these conservation achievements in the Environmental Assessment prepared for the Exemption Rule:

> In a survey of Exotic Wildlife Association members in Texas, 63 ranches held scimitar-horned oryx, 31 maintained addax, and 14 maintained dama gazelle.  In summary, starting with the first census in which the species appeared; scimitar-horned oryx went from 32 in 1979 to 2145 in 1996, addax went from 2 in 1971 to 1,824 in 1996, and dama gazelle went from 9 in 1979 to 369 in 2003 (Mungall 2004).  Captive populations of the three antelope species increase rapidly after a specimen has been on the ranch for seven years.

> The last census for the three antelope populations showed that in 1996 there were 2,145 scimitar-horned oryx, 1,824 addax, and 91 dama gazelle in Texas ranches. According to Mungall (2004), these species are experiencing substantial population growth rates, with the oryx herd growing at 205 percent from 1983 to 2003, the addax herd growing at 115 percent from 1986 to 2003 and the dama gazelle herd growing at 118 percent from 1984 to 2003.

Appendix, Economic Analysis of the Proposed Rule (Exemption), AR. 237.0043-44 (Exhibit I).

Those who commented on the proposed listing of the species, including the rule's peer reviewers

and individuals directly involved with conservation of the species, warned the Service that a

listing would reverse these conservation successes.   For example, the American Zoo and

Aquarium Association ("AZA") recommended the exclusion of the U.S. non-native captive

populations to avoid the creation of disincentives for species conservation:

> The goal of maintaining the genetic diversity of the captive populations of these
> antelope species may be adversely compromised through the inclusion of the
> captive population of any of these three species as a USFWS endangered species.
> Our efforts to move animals back and forth between the captive populations in
> North America, Europe, and elsewhere could be severely hampered by the listing
> of the captive populations as endangered and the resulting permitting process,
> possible restrictions and enhancement requirements imposed by such listing.  The
> ability to effectively manage the captive programs for these antelope species may
> be critical to their future existence, given the continuing pressures on the
> remaining wild populations.
>
> As there is no longer a direct impact between the wild and captive populations,
> AZA urges the USFWS to consider a bifurcated listing, with the wild populations
> of addax and dama gazelle listed as endangered, and the captive populations of
> addax and dama gazelle and scimitar-horned oryx retaining the current non-listed
> status.

Letter from AZA to Chief Division of Scientific Authority, October 20, 2003, AR. 198.0012,

198.0014 (Exhibit J).  One of the Antelope Listing Rule's Peer Reviewers, Steven Monfort,

similarly explained:

> Given the disparate situation between the wild (critical) and captive (abundant)
> populations, a bipartite listing would be most appropriate for these species.  This
> would provide strict protection of wild populations (including scimitar-horned
> oryx, should they move beyond fence reintroductions), while minimizing
> restrictions on the use and movement of captive individuals to support the
> formation of 'world herds' and reintroduction efforts.

Letter from Steven L. Monfort, DVM, PhD, Research Veterinarian and Chair, Sahelo-Saharan

Interest Group, (Peer Reviewer) Smithsonian National Zoological Park to Robert R. Gabel,

October 20, 2003, AR. 198.0018-19 (Exhibit K).   Citing the success of captive breeding both

within and outside the U.S., Alan F. Rost, another peer reviewer of the Antelope Listing Rule,

wrote to the Service in October of 2003:

> I therefore believe that it is not appropriate or necessary for the scimitar-horned
> oryx (Oryx dammah) to be added as an endangered species to the U.S.
> Endangered Species Act.

Letter from Alan F. Rost, SSP Coordinator and Studbook Keeper of Scimitar-Horned Oryx to

Eleanora Babij, U.S. Fish and Wildlife Service, October 22, 2003, AR. 199.0002 (Exhibit L).

The Peer Reviewers were not alone in arguing against listing the captive populations.

Representatives from the sustainable use conservation community, such as Safari Club

International, recommended that the Service distinguish between populations of the three species

based on international boundaries, which would enable the Service to list those living outside the

U.S., yet exclude those within U.S. boundaries.

> We would like to support the position taken by the U.S. game ranchers that the
> Service **not list these species as endangered within the U.S**.

Safari Club International comment letter, September 1, 1992 to Dr. Charles Dane, Chief, Office

of Scientific Authority, AR. 82.0019 (emphasis added) (Exhibit M).   In August of 1992, Terrie

Correll, Species Survival Plan (SSP) coordinator for addax, wrote the following:

> At this time the captive population is neither threatened nor endangered and does
> not warrant listing.  A <u>bipartite listing</u> would be appropriate in this situation where
> the wild population is endangered but the captive group exists in sizeable numbers
> but has no impact on wild addax.  The Fish and Wildlife Service has set a
> precedent for bipartite listings for other species such as the desert tortoise.

Letter from Terrie Correll to Dr. Charles Dane, Chief, Office of Scientific Authority, August 27,

1992, AR. 82.0012 (emphasis in the original) (Exhibit N).  J. David Bamberger, a private rancher

who worked with the AZA and the SSP for scimitar-horned oryx, and who volunteered his ranch

to provide a breeding ground for 29 of the 31 remaining scimitar-horned blood lines,

13

emphatically warned the Service against listing the U.S. captive populations on multiple

occasions:

> There is no need to list the addax, the scimitar-horned oryx, or the dama gazelle. The information I have supports this conclusion.
>
> These species are breeding so well in captivity that listing would serve no purpose, rather it would slow down our progress because private holders would dump what they have.  It would burden the specie coordinator with paperwork when important moves of animals needed to be made.

Letter from J. David Bamberger to Charles W. Dane, Chief, Office of Scientific Authority,

August 24, 1992, AR. 82.0010 (Exhibit O).

> Listing of this species would do more to cause the certain extinction of this species than any environmental or political event, as it would cause the cessation of breeding programs such as ours.

Letter from J. David Bamberger to Chief of DSA, FWS, January 19, 2003, AR. 0156 (Exhibit P).

The Service was fully aware of the detrimental implications of listing the U.S. herds.  As

early as 1992, Dr. Charles Dane, the Chief of the Scientific Authority of the FWS, acknowledged

how permit requirements and ESA prohibitions would inhibit private conservation:

> The counterpoint is that an ESA listing (even a Threatened S/A listing) would require a permit (and this create unnecessary delays in issuance of permits for sport-hunted trophies taken in the United States) unless there was a special rule that exempted the need for permits in which case there would appear to be little benefit from listing captive populations.

Note from C. Dane to "Reviewers" November 12, 1992, AR. 134.001 (Exhibit Q).  The Service

knew that the ESA permit application process involved many potential delays and that an

applicant could never be sure of receiving a permit and might have to wait months to over a year

to receive any kind of response.  For example, Hunter Schuele's March 17, 1992 permit

application for the take, transport in interstate commerce and export sport-hunted trophies of

captive-bred wildlife did not receive a response from the Service for 14 months.  Finally, the

14

Service denied it in a letter dated May 7, 1993, from Kenneth Stansell, Deputy Chief, Office of

Management Authority, U.S. Fish and Wildlife Service, AR. 135.004[2] (Exhibit R)

In preparing its Environmental Assessment for the Exemption Rule ("Exemption EA"),

the Service recognized the conservation role that hunting plays for the benefit of the species:

> Sport-hunting of U.S. captive-bred specimens of these three antelopes will also
> have positive consequences.  Limited hunting of captive-bred specimens
> facilitated the captive antelope increases by generating revenue for herd
> management and the operation of the facility.  Ranches need to manage herds
> demographically (i.e., age, gender) and genetically (i.e., maximize genetic
> diversity).  Such management may include culling specimens, which may be
> accomplished through sport hunting.  For example, a ranch may need to reduce
> the number of adult males to achieve the necessary sex ration for establishing a
> polygamous breeding group and facilitating the typical breeding behavior of the
> species.  Hunting also provides an economic incentive for private landowners
> such as ranchers to continue to breed these species and maintain them as a genetic
> reservoir for future reintroduction or research, and as a repository for excess
> males from other captive herds.

Final Exemption EA at 10, AR. 384.0013 (Exhibit D).  In the Record of Compliance the Service

prepared for the Exemption Rule, the Service acknowledged the harmful conservation

consequences that could result from a listing of the U.S. non-native captive populations of the

three species without exempting the three antelope species from prohibitions associated with an

endangered listing:

> The gene pool management for the recovery of scimitar-horned oryx, addax, and
> dama gazelle depends on the movement of captive-bred specimens among
> institutions across state boundaries.  In addition, we are including sport-hunted
> trophies because trophy hunting on private ranches that breed these species may
> be necessary for wildlife management purposes, provides revenue for the
> continued operation of captive-breeding operations, and economic incentive for
> ranchers to continue breeding these species.  ***Listing the species without***

---

[2] While 14 months may not be the standard waiting time for response to a permit application,
knowledge of the potential for such delays can act and has acted as a deterrent to private
rancher's participating in the permit process.  The mere possibility of months of uncertainty as to
when and whether the FWS will act on a permit is enough to discourage private ranchers from
assuming the risk of retaining animals that require this process.

> *exempting the U.S. captive-bred population could be a deterrent to further captive breeding.*

United States Department of the Interior, Record of Compliance for a Rulemaking Document, signed by Robert R. Gabel, Acting Assistant Director, International Affairs, January 7, 2005, AR 237.0122 (emphasis added) (Exhibit S).  The Appendix to that Record of Compliance also explained why permit requirements for the sale of hunts of the U.S. captive populations would serve as a deterrent to future participation by private ranchers in three antelope conservation.

> Under Alternative 2[3], individuals subject to the jurisdiction of the United States would need permits to engaging (sic) in domestic and international trade in live or dead captive-bred specimens for commercial purposes.  This process takes time, sometimes causing delays in moving animals for breeding or reintroduction.  Such movements must often be completed within a narrow time frame and can be further complicated by quarantine requirements and other logistics.  This, coupled with the prohibition on interstate commerce of sport-hunted trophies, could remove the incentive to breed these species, which rely on captive breeding for their recovery.

Appendix, Economic Analysis of the Proposed Rule, AR. 237.0126-0127 (Exhibit T).

> Alternative 2 is possible, but it would remove all economic incentive to conserve the species by discouraging captive-breeding.  Without the ability to cover all costs of captive breeding there is no economic incentive to continue.

*Id.* at AR. 237.0128.

In deciding how to deal with the U.S. captive populations of the three antelope species, the Service was well aware that an endangered classification creates severe restrictions on the use and trade of such animals and that it would undermine private ongoing conservation efforts taking place on ranches in Texas and other U.S. states.  The Service acknowledged the fact that an endangered species classification would interfere with the economy and system by which the ranchers had been willing to participate in efforts that significantly increased the U.S. numbers of

---

[3] Alternative 2 refers to an endangered species listing for the three antelope, without any exemption from permit requirements and other endangered species classification prohibitions.

these animals.  The Service understood that the additional burdens, costs and uncertainties introduced by endangered species classification would significantly undermine the value of the animals and encourage many ranchers to abandon their conservation efforts.

Despite this knowledge, on September 2, 2005, the Service listed the three species, in their entirety, as endangered.  The Service did not adopt the recommendations of Safari Club International, the Antelope Listing Rule's Peer Reviewers and others intimately involved with the conservation of the three species.  The FWS chose not to exclude U.S. non-native captive populations from this listing, instead interpreting the ESA and/or its DPS policy to prohibit disparate listing designations between wild and captive populations of a species.  The Service offered little to no explanation as to why it did not 1) adopt an approach that was consistent with the Service separate listings decisions for ranched or captive populations of other similarly situated species; 2) rely on international boundaries for distinguishing between different populations rather than a captive/wild distinction; or 3) exclude the non-native members of the three antelope species from the listing due to the lack of direct conservation connection between the U.S. non-native captive herds and the species in the wild.   The only explanation that the Service gave for not excluding the U.S. non-native captive populations was that "[i]t would not be appropriate to list captive and wild animals separately."  70 Fed. Reg. 52319, 52320 (September 2, 2005).

Instead of excluding the U.S. non-native captive populations from the endangered species listing, the Service attempted to preserve the ongoing conservation efforts being conducted by private U.S. ranchers by carving out a special exception to the take prohibitions normally applicable to endangered species.  The Service issued the Exemption Rule, a rule that exempted United States non-native captive-bred members of the three antelope species from take and other

prohibitions of section 9 of the ESA.  70 Fed. Reg. 52310 (Sept. 2, 2005)[4].  That regulation made

it possible for ranchers to continue to sell hunts and facilitate the hunting of members of the three

species without applying for permits.  That Exemption Rule provided only a temporary fix.

Two different groups of plaintiffs went to court to challenge the legality of the Exemption

Rule.  The cases were consolidated before Judge Henry Kennedy of this District Court.  On June

22, 2009, Judge Kennedy ruled that the Exemption Rule violated the ESA's permit notice and

comment requirements because it authorized the take of endangered animals without giving the

public notice and the opportunity to comment on the exempted takings.  *Friends of Animals v.*

*Salazar*, 626 F.Supp.2d 102 (D.D.C. 2009).  Judge Kennedy remanded the matter to the FWS for

further action consistent with his ruling.  *Id.* at 118.

On January 5, 2012, the FWS published a Final Rule to withdraw the Exemption Rule

and with it, the regulatory exemptions for the U. S. non-native captive herds of the three antelope

species:

> We, the U.S. Fish and Wildlife Service (Service), are revising the regulations that
> implement the Endangered Species Act of 1973, as amended (Act), by removing
> the exclusion of U.S. captive-bred live wildlife and sport-hunted trophies of three
> endangered antelopes—scimitar-horned oryx, addax, and dama gazelle—from the
> prohibition of certain activities, such as take and export, under the Act. This
> change to the regulations is in response to a court order that found that the rule for
> these three species violated section 10(c) of the Act. These three antelope species
> remain listed as endangered under the Act, and a person will need to qualify for
> an exemption or obtain an authorization under the current statutory and regulatory
> requirements to conduct any prohibited activities.

77 Fed. Reg. 431 (January 5, 2012) ("Withdrawal Rule").  For the first time since they were

classified as endangered the U.S. non-native captive herds would be subjected to full

---

[4] 16 U.S.C. §1538(a)(1)(B) makes it unlawful for any person to "take" any member of an
endangered species within the United States.  16 U.S.C. §1539(a)(1)(A) authorizes the Secretary
of the Interior (delegated to the FWS) to issue permits, under certain circumstances, for the take
of members of an endangered species.

enforcement of their endangered status including all the prohibitions, restrictions and requirements applicable to endangered species.  Once that Withdrawal Rule goes into effect on April 4, 2012, those seeking to "take" one of these animals, either by selling hunts for these antelope or by hunting them, have to apply for a permit to do so.  *Id.*

Recognizing, as the Service itself did, that the enforcement of endangered status would "remove all economic incentive to conserve the species by discouraging captive-breeding," (AR. 237.0128) Safari Club sought regulatory relief for the U.S. populations.  On June 28, 2010, Safari Club filed a petition with the FWS, seeking the delisting of the U.S. non-native captive herds of the three antelope species.  AR. 1160 (Exhibit U). For almost two years since receiving Safari Club's petition, the Service has not taken any action other than to explain in a response letter, dated September 23, 2010, that it anticipated making a finding in Fiscal Year 2011 as to whether Safari Club's petition "contains substantial information indicating that the action may be warranted."  AR. 1248 (Exhibit V).  In its July 25, 2011 response to Safari Club's 60 day notice of intent to sue in the instant matter for the Service's failure to take action on the petition to delist, the Service expressed its intent to further delay its consideration of the delisting, explaining that it expected to make an initial finding on Safari Club's petition in the *next* fiscal year.  AR 1305 (Exhibit W).

In its August 8, 2011 comment letter to the Service, responding to the Service's proposal to withdraw the Exemption Rule (76 Fed. Reg. 39804 (July 7, 2011)) Safari Club warned against the conservation consequences of enforcing endangered species prohibitions and restrictions on the U.S. non-native captive populations.  Safari Club also attempted to persuade the Service to find alternative, less harmful means of dealing with the U.S. non-native captive populations.

19

Safari Club International August 8, 2011 Comment Letter, (Exhibit X).  These efforts to prevent their own injuries have been to no avail.

      **C.**      **<u>Safari Club International</u>**

Safari Club International, a nonprofit IRC § 501(c)(4) corporation, has approximately 53,000 members worldwide.  Declaration of Rew Goodenow, Chairman of Safari Club Legal Task Force, ¶4 (Exhibit AA).  Safari Club's mission is to protect the freedom to hunt and to promote wildlife conservation worldwide.  *Id*., ¶5.   Members of Safari Club own herds of the scimitar-horned oryx, dama gazelle and/or addax on private ranches throughout the United States.  *Id*., ¶9.  Other members of Safari Club have hunted one or more of the three antelope species from these U.S. captive, privately owned herds and seek to do so in the future.  *Id.*

Safari Club and Safari Club members' interests include participation in sound sustainable use conservation of the three antelope species and the ability to continue to raise, trade, breed and sell hunts for U.S. captive bred members of the three antelope species under economically feasible conditions without the expense, difficulties and uncertainties of unnecessary and burdensome permit requirements.  *Id*., ¶8.

Safari Club and members of Safari Club are harmed and aggrieved by the endangered classification of the U.S. captive herds of the three antelope species.  The endangered status of these antelope populations imposes ESA prohibitions against certain kinds of conduct involving these animals and the requirement of permits to engage in such activities, such as the sale of hunts, the hunting of these animals, and transportation of animals across state lines.  The imposition of these restrictions and requirements has already and will continue to make it economically infeasible for Safari Club members and others to continue to own, trade, breed, and sell hunts for members of the U.S. captive herds of the three antelope species and to continue

their private conservation efforts for these species. *Id.*, ¶11.  As fewer ranchers and breeders find it financially viable to own herds of scimitar-horned oryx, dama gazelle and addax, the number of herds of the three species and the number of individual members of the three species in the United States has dwindled and will continue to dwindle, causing direct harm to the conservation interests and goals of Safari Club and Safari Club members. *Id.*, ¶12.  In addition, the smaller numbers of herds and fewer individual members of the three antelope species and the administrative burdens associated with obtaining the permits required for the take of members of the three species will result in fewer scimitar-horned oryx, dama gazelle and addax available for Safari Club members to hunt and to conserve through sustainable use methods.  *Id.*, ¶¶12, 14. (Additional information about Safari Club's interests and the harm to these interests can be found in Standing section of this brief, below.)

### D.  <u>Legal Background</u>

The ESA obligates the Secretary of the Interior (through the FWS) to list a species as endangered (or threatened) when the species qualifies for that status based on one or more of the five following factors:

> **(A)** the present or threatened destruction, modification, or curtailment of its habitat or range;
> **(B)** overutilization for commercial, recreational, scientific, or educational purposes;
> **(C)** disease or predation;
> **(D)** the inadequacy of existing regulatory mechanisms; or
> **(E)** other natural or manmade factors affecting its continued existence.

16 U.S.C. §1533(a)  The Service's decision to list species as endangered or threatened must be based solely on the basis of the best scientific and commercial data available, "after taking into account those efforts, if any, being made by any State or foreign nation, …, to protect such species …. *Id.* §1533(b).  Although Section 1533 does not itself address whether captive or non-

native members of a species should be included in species' listings, other sections of the ESA evince Congress' intent that the ESA's purposes and strategies focus on the conservation of species *within their native ecosystems*. For example, one of the purposes of the ESA is to:

> provide a means whereby ***the ecosystems upon which endangered species and threatened species depend may be conserved***, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

*Id.*, § 1531(b) (emphasis added).

The ESA does not rely on the common or scientific meaning of the term "species" and instead provides a statutory specific definition:

> The term "species" includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature.

16 U.S.C. § 1532 (16). Although the ESA's definition for species includes the phrase "distinct population segment" ("DPS"), that phrase is not defined in the statute. The Service has therefore promulgated its own policy to define the phrase and to use to determine whether a population qualifies as a DPS. 61 Fed.Reg. 4722 (February 7, 1996) ("DPS Policy") The DPS Policy requires the Service to examine the population for three criteria: 1) discreteness in relation to the remainder of the species; 2) significance to the species; and 3) conservation status. A population may be considered discrete if it is markedly separated from other populations of the species by physical, physiological ecological or behavior factors. *Id.* at 4725. Alternatively, discreteness results when the population is " delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act." *Id.* A species' significance may be based on a finding of one or more of the following:

1. Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon,

2. Evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon,

3. Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range,[5] or

4. Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

*Id.* If the Service finds a population to be both discrete and significant, it will then evaluate the species for endangered or threatened status. The DPS policy makes a point of clarifying that "[i]t may be appropriate to assign different classifications to different DPS's of the same vertebrate taxon." *Id.*

The ESA establishes specific requirements for the Service to follow when it receives a petition from a member of the public to list or delist a species. The Service is required to make a finding on the petitioned listing or delisting "to the maximum extent practicable" within 90 days of receiving the petition. 16 U.S.C. § 1533(b)(3)(A). Within this time period, the Service must make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petition action may be warranted. *Id*.

**E.      Standard of Review**

The underlying decision that Safari Club challenges in this litigation is the Service's decision to "list" the U.S. captive herds of the scimitar-horned oryx, dama gazelle, and addax as endangered. Listing decisions are subject to review under the APA and must be set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

_____

[5] Although the DPS Policy notes natural occurrence as a factor to consider in determining the significance of a population, nothing in the Policy specifically states that a population must be either free-ranging or in its home range to be considered a DPS.

§ 706(2)(A); *American Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C. Cir. 2008) (Court affirmed under the APA the FWS's decision not to list the westslope cutthroat trout as threatened).

###### F.   Standing

Safari Club has standing to bring its claims.  Safari Club promotes and support sustainable use conservation – in particular conservation of wildlife via hunting.  For the last few decades, hunting has played an essential role in providing conservation incentives and financial resources for the recovery of these animals on private ranches in the U.S.  Safari Club members own and have owned herds of the three species and hope to continue to do so.  Safari Club members hunt and/or guide hunts for these animals and hope to do so in the future.  In addition, Safari Club members wish to preserve the conservation successes they have achieved in the ownership, breeding and sustainable use of these animals.  The endangered status of the U.S. non-native captive herds stands directly in the way of Safari Club's and its members' conservation efforts and interests.  Because of that endangered status, the number of animals and herds is declining and the ability to breed healthy populations and sell hunts for these animals is diminishing. But for that endangered status, Safari Club members would be able to continue to participate in the conservation victory that has turned single digit populations of these antelopes into the thousands.  Safari Club supports its standing allegations with the declarations of several members.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992).

The "irreducible minimum" of Article III standing requires "that [a plaintiff] has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162

(1997).[6]  For those claims brought under the APA, both Article III standing and prudential

standards, including the "zone of interests" test, apply.  *See id.* at 163. The Supreme Court has

explained that, for purposes of applying the zone of interest test for claims under the APA, the

court must look to the purposes of the substantive provision of the statute under which the

plaintiff is suing.  *Id.* at 175.  Safari Club can demonstrate Article III and prudential standing.

Safari Club has strong interests in the hunting, importation, and conservation of the

species.  See Declaration of Rew Goodenow, ¶¶5, 7 (Exhibit AA).  Safari Club members in

particular have an interest in owning and sustainably using and conserving the scimitar-horned

oryx, dama gazelle.  For example, Safari Club member Laurent and Diane Delagrange own the

Indianhead Ranch in Del Rio, Texas, where they have been raising scimitar-horned oryx and

addax for over 25 years.  Declaration of Laurent Delagrange, ¶¶ 1-5. (Exhibit HH)  They started

with 25 scimitar-horned oryx and 25 addax, and successfully bred those animals to the point

where they had as many as 250 scimitar-horned oryx and 150 addax at one time. *Id.*, at ¶¶ 5-7.

They sell hunts for their scimitar-horned oryx and addax to help pay for the cost of feeding and

maintaining the antelope.  *Id.*, at ¶¶ 8-9. In order to maintain healthy blood lines, they regularly

buy and sell members of these species from other ranches.  *Id.*, at ¶¶ 10.  At the time that Laurent

Delagrange gave his declaration in October of 2011, the value of their scimitar-horned oryx and

addax had already dropped by more than half, taking their value to approximately $300,000,

down from approximately $700,000.  *Id.*, at ¶¶ 11, 12.  The Delagranges had already found it

---

[6] A plaintiff establishes associational standing by showing:
    (a) its members would otherwise have standing to sue in their own right;
    (b) the interests it seeks to protect are germane to the organization's purpose; and
    (c) neither the claim asserted nor the relief requested requires the participation of
    individual members in the lawsuit.
*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977).

necessary to significantly reduce the size of their herds because the cost of maintaining these animals had stayed the same while the value of the animals had decreased.  *Id.*, at ¶ 13.  When he originally signed his declaration in October of 2011, Mr. Delagrange did not intend to continue his ownership of scimitar-horned oryx and addax once the FWS imposed endangered species status (required permits) for the sale of hunts and take of these animals. *Id.*, at ¶¶ 22.  After the Service published the Withdrawal Rule, the Delagranges decided to apply for permits to continue to breed and sell hunts.  Declaration of Diane Delagrange, ¶¶ 1-3, Exhibit II.  Although they applied for their permits on January 23, 2012, they had not received the permits by March 23, 2012.  *Id.*, at ¶¶ 4.  Despite their decision to utilize permits to continue their breeding and hunting operations, the Delagranges have still sustained significant harm from the endangered status of the scimitar-horned oryx and addax.  Because of federal regulatory interference, many ranchers are no longer continuing to raise, breed and sell these animals.  *Id.*, at ¶¶ 6, 7.  Mrs. Delagrange explains:

> As a result of the federal interference, these have now become rare animals again.
> We will not be able to offer as many hunts for these animals and because there are
> fewer sources to replenish our animals, we will have difficulty restocking our
> herds.  With fewer sources of animals, our ability to maintain our herd numbers
> and keep our animals healthy by bringing in new blood lines is harmed.

*Id.*, at ¶¶ 7.  Ms. Delagrange also notes that the reduction in antelope numbers has increased the price of hunting the three antelope species, which means that fewer hunters will be able to afford to hunt them.  *Id.*, at ¶¶ 9.  She explained:

> Hunting is what provided the incentive for the conservation of these animals in
> the U.S.   All that the federal listing of these species has managed to do is to
> remove the incentives for conservation and undermine the recovery of the species.

*Id.*

Declarant and Safari Club member Travis Wier is a hunter, ranch owner, and hunting guide.  Declaration of Travis Wier at ¶¶2, 5 (Exhibit BB).  His Texas ranch is a breeding

operation.  *Id.*, at¶ 7.  He does not sell hunts for the scimitar-horned oryx on his ranch.  He started out with 15 scimitar-horned oryx in 2009 and in three years, that herd grew to 40 animals. *Id.*, at¶ 8.  In his declaration, he explains that scimitar-horned oryx, addax and dama gazelle have done amazingly well in Texas because they are well suited to the dry conditions found in the state.  *Id.*, at ¶24.  As a result, many ranchers that bred one or more of the three species were able to double or triple the sizes of their original herds.  *Id.*, at ¶24.

Mr. Wier explains that the value of his herd started to drop around May of 2011, when the ranching community first got wind of the fact that the FWS was getting reading to withdraw the Exemption Rule.  *Id.*, at ¶11.  His male scimitar-horned oryx dropped from a value of $3,500 per bull to $1,100 per animal.  His female scimitar-horned oryx dropped in value from $2,000-$2,500 to $600-700 per cow.  *Id.*, at ¶¶12, 13.  His dream of someday selling these animals as his retirement fund has disappeared.  *Id.*, at ¶10.

Mr. Wier is also a hunting guide.  He guides hunts for scimitar-horned oryx and addax on other ranches where owners seek to remove surplus animals from their herds.  *Id.*, at ¶15.  He reports that the ranches where he has long guided hunts are reducing or eliminating their herds entirely.  *Id.*, at 19.  On one ranch where he has guided hunts, there are now no scimitar-horned oryx or addax where there were previously 30-40 of each species.  *Id.*, at ¶20.  On another ranch, there are only five remaining scimitar-horned oryx from a population of 30-40 and there are no remaining addax.  *Id.*  On a third ranch there are no scimitar-horned oryx or addax remaining from a population of 20-25 of each species.  *Id.*  Mr. Wier explains that his guiding business for hunts for these animals has increased dramatically over the last few months, but that soon there will be few if any scimitar-horned oryx or addax hunts left for him to guide. *Id.*, at ¶¶21-22.

Mr. Wier also explained why the participation of fewer owners and breeders of the three antelope herds will have genetic consequences for the remaining members of the species, including the ones he now owns.  With fewer ranches, there will be less genetic variety for the remaining ranchers to introduce into their herds.  The absence of new bloodlines could lead to genetic mutations and unhealthy animals.  *Id.*, at ¶28

In his declaration, Mr. Wier explained the devastating conservation reversal that is taking place due to the impending enforcement of endangered status for the three species:

> Unfortunately, now that the prices have dropped for these animals, and permit requirements are about to come into play, very few ranchers will continue to raise them.  These animals cost a great deal to keep and feed and without revenue from the sale of these animals, it will become too costly for most ranchers to continue to breed them.  The uncertainties and costs involved with permit requirements have discouraged many ranchers from continued ownership of these animals.  If things continue as they have for the last few months, the numbers of these animals and the number of herds will soon be very small.

*Id.*, at ¶25.  Mr. Wier has suffered from the drop in the value of his herd and from the impending loss of opportunities to guide hunts for these species.  In viewing the reduction of herds and animals, he also has been harmed by the loss of conservation gains that he and the ranching and hunting community had achieved for the three species.  He explains: "I am devastated to watch the decline in these animals and the absolute loss of conservation incentives for ranchers to raise and breed these species."  *Id.*, at ¶29.

Several other Safari Club members provided their declarations to demonstrate the harm that the enforcement of endangered status for the U.S. non-native captive herds will bring. Declaration of Steve Wright (Exhibit JJ) and Supplemental Declaration of Steve Wright (KK) (forced to abandon his ownership and breeding of scimitar-horned oryx); Declaration of Timothy Mark Terry (Exhibit CC) (unable to afford to continue to raise and breed his scimitar-horned oryx and addax and unwilling to accept the uncertainties associated with ownership of a federally

regulated endangered species); Declaration of David Lesco (Exhibit DD) (no longer able to afford to breed his scimitar-horned oryx and fearful of lack of management discretion due to federal regulation.  Mr. Lesco stated: "If not for the endangered status of these animals and the permit requirements and restrictions, I would continue raising and breeding my scimitar and continue to participate in the conservation of the species."  *Id.* at ¶23.)

J. David Bamberger is not a member of Safari Club International, but the fate of his scimitar-horned oryx herd impacts the fate of Safari Club members and others who seek to conserve the three antelope species.  He is the founder of the Selah Bamberger Ranch Preserve. Declaration of J. David Bamberger at ¶1 (Exhibit EE).  Until recently, Mr. Bamberger's ranch held the largest herd of scimitar-horned oryx in the world with known genetic background.  *Id*. at ¶2.  In 1991, Mr. Bamberger turned over 640 acres of his ranch for the exclusive use of captive breeding of the scimitar-horned oryx Species Survival Program (SSP). *Id*. at ¶¶9,10.  He started with 28 scimitar-horned oryx, representing the 31 documented species bloodlines from Africa. *Id*. at ¶14.  He met the SSP goal of producing 400 animals and then started selling surplus scimitar-horned oryx to ranches in Texas to help these ranches increase the genetic diversity of their herds.  *Id*. at ¶¶19, 20.  Mr. Bamberger has researched and traveled to Africa in the hope of finding a location where scimitar-horned oryx could be released back into their native habitat. *Id*. at ¶21.  His efforts to find such a location have been unsuccessful, as he has found that there is little remaining viable habitat and that without high fences and protection, the scimitar-horned oryx would be eaten or hunted before a reintroduced herd could become viable.  *Id*.

Although Mr. Bamberger has not sold hunts for scimitar on his own ranch, he has sold surplus animals to ranches that allow hunting.  He acknowledged that "hunting has played a

significant role in our conservation because hunting ranches, with few exceptions, were the only

market for our surplus." *Id.* at ¶26.

Mr. Bamberger explained that once the FWS announced that it would be enforcing

endangered species status requirements and restrictions for the scimitar-horned oryx, he has been

unable to find buyers for his surplus animals. *Id*. at ¶24.  As a result, his ranch will cease its

breeding operations. *Id*. at ¶25.  He explained:

> If we were to continue breeding, with no reasonable way to sell our surplus
> animals, we would overpopulate our 640 acres within three years.  Overgrazing
> and hoof action from overpopulation would quickly destroy the efforts of the last
> 43 years that we have devoted to habitat conservation.

*Id*. at ¶29.  Mr. Bamberger notes that, at the time of the preparation of his declaration, there were

already many fewer scimitar-horned oryx on ranches in the U.S. than prior to the Service's

announcement of the impending permit requirements.  He worries that, by the time permit

requirements actually go into effect, the numbers of these animals in the U.S. will have dropped

even further. *Id*. at ¶35.

With the loss of Mr. Bamberger's breeding operation, the continued genetic health of the

remaining U.S. scimitar-horned oryx populations is in great jeopardy.  Mr. Bamberger's

operation represented a key component in the genetic variability of U.S. populations.  Without a

preliminary injunction to stop the enforcement of endangered species prohibitions and

requirements, the Selah ranch will no longer produce the surplus animals that have had such a

beneficial impact on the status of U.S. populations of these animals.

Safari Club's harm has resulted from the logical, predictable response to the FWS's

enforcement of endangered status.  It matters not that Safari Club and its members' harms result

from the reactions of the hunting and ranching community.  The trigger for Safari Club's harm

was the endangered classification of the U.S. non-native captive herds.  "If the third party's

conduct is sufficiently dependent upon the incentives provided by the defendant's action, then the resultant injury will be fairly traceable to that action and a court order binding the defendant will likely cure the plaintiff's harm." *Wilderness Society v. Griles*, 824 F.2d 4, 17 (D.C. Cir. 1984)(Court ruled that BLM policy served as trigger for plaintiffs' harms even though harms would result from state and tribal reaction to policy)

Safari Club has suffered an injury due to the loss of conservation and conservation incentives that were responsible for the amazing success and recovery of the three antelope species in the United States. The catalyst for that loss is the Service's decision to classify the U.S. herds as endangered. But for the Service's imminent enforcement of endangered status for these animals, the private conservation efforts previously at work in Texas and other states would be continuing to maintain and encourage thriving and numerous populations of these animals. Although permits issued by the FWS may authorize some take, trade and hunting for members of these, those permits will not replace the conservation incentives that regulation-free trade has achieved. The only way to restore the conservation climate that succeeded in recovering thousands of these animals in the U.S. is to turn conservation back to the private ranching and hunting community that achieved so much success without federal interference.

## III.  ARGUMENT

### A.  The Service's Unexplained Inconsistent Approach to Non-native and/or Captive Members of Species Was Arbitrary and Capricious

Safari Club challenges the legality of the FWS's decision to include non-native, captive members of scimitar-horned oryx, dama gazelle and addax living in the U.S. in the endangered species listing for the three species in the wild. Below, Safari Club demonstrates that the Service 1) acted arbitrarily and capriciously and in a manner inconsistent with ongoing agency decision-making made for other similarly situated species; and 2) ignored the conservation mandates of

the ESA and the fact that inclusion of the captive populations would harm rather than serve the conservation of populations of the three antelope species.

When a Court must determine the meaning of a statute, it first must ask whether the intent of Congress is clear.  If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843 (1984).  If the language of the statute is ambiguous, courts generally defer to the administering agency's interpretation of the statutory language.  That general rule is subject to exception if the agency's interpretation falls short of the requirements of the APA:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight **unless they are arbitrary, capricious, or manifestly contrary to the statute.**

*Id*. at 843-44 (emphasis added).

An agency's inconsistent interpretation of the law can amount to arbitrary and capricious action if not explained adequately, as is the case here.  Of course, reversal of a previous position or policy **alone** does not qualify as arbitrary and capricious conduct.  *National Cable & Telecommunications Ass'n. v. Brand X Internet Services*, 545 U.S. 967, 982 (2005) (FCC's reasoned explanation for disparate treatment of cable modem and DSL dispelled arbitrary and capricious claims).  But a reversal of position without an adequate explanation is a different story.  An agency's failure to explain inconsistent treatment may indeed qualify as arbitrary and capricious conduct and a violation of the agency's APA obligations.  *Id.*  The agency's simultaneous application of inconsistent interpretations to similarly situated scenarios may qualify.  "If an agency construes its charter erratically or inconsistently, however, little or no deference will be owed to its decisions." *American Federation of Government Employees, Locals*

*225, 1504, and 3723, AFL-CIO v. Federal Labor Relations,* 712 F.2d 640, 643 n. 17 (D.C. Cir.

1983)(Court considered Federal Labor Relations Authority's interpretation of Federal Service

Labor-Management Relations Act) *citing Adamo Wrecking Co. v. United States*, 434 U.S. 275,

287 n. 5 (1978). "Agencies are *not* free, under *Chevron,* to generate erratic, irreconcilable

interpretations of their governing statutes ... Consistency over time and across subjects is a

relevant factor [under *Chevron* ] when deciding whether the agency's current interpretation is

'reasonable.'" *Valdiviezo-Galdamez v. Attorney General of U.S.* 663 F.3d 582, 604 (2011) (court

refused to defer to Bureau of Indian Affairs definition of  phrase "particular social group" in

review of agency's determination of whether member of group qualified as "refugee" eligible for

asylum ) citing *Marmolejo–Campos v. Holder,* 558 F.3d 903, 920 (9th Cir. 2009) (Berzon, J.,

dissenting) (citing *Cardoza–Fonseca,* 480 U.S. at 446 n. 30, 107 S.Ct. 1207) (emphasis in

original).

In the instant matter, the Service's decision to include the U.S. captive non-native

populations of the three antelope species in the listing of the species in the wild qualifies as

erratic.  In its consideration of other captive and/or non-native populations of species that, similar

to the U.S. non-native captive populations of the three antelope species, had no direct connection

with the conservation of the species in the wild, the Service had dealt separately with those

captive and/or non-native populations and in some cases had not listed them at all.  Several of

these listing decisions were in effect at the time that the FWS decided that it had no choice but to

include the U.S. captive, non-native members of the three antelope species in the listing of the

species in the wild.  70 Fed. Reg. at 52320 ("It would not be appropriate to list captive and wild

33

animals separately.")[7]  The Service offered no explanation to justify its inconsistent treatment of similarly situated populations.  These unexplained inconsistent actions are arbitrary and capricious and require this Court to abandon the deference generally extended to an agency's statutory interpretation.

Although in the Antelope Listing Rule, the Service refused to deal with the U.S. populations separately, the Service had no such problem in 1987 when it identified "ranched populations" (another version of captivity) of the Nile Crocodile in Zimbabwe as "populations" for the purpose of determining listing status.  The FWS promulgated regulations that reclassified those ranched populations as "threatened" while leaving all other populations of the species as endangered.[8]  Reclassification of Ranched Nile Crocodile Populations in Zimbabwe From Endangered to Threatened, 52 Fed. Reg. 23148 (June 17, 1987).  In that rule, in response to criticisms for splitting the wild and captive animals into distinct populations, the Service explained:  "[T]he Endangered Species Act (Act) provides for the reclassification of only certain populations of a species.  For these reasons, the Service decided to split ranched from wild populations and to propose a downlisting for only the later (sic)."  *Id*. at 23149.  Neither the Antelope Listing Rule, nor the Exemption Rule offered any justification for why the Service

---

[7] The Exemption Rule only once mentions the Service's refusal to separately designate the U.S. captive populations as "populations."  In response to a comment that the "proposed rule referred to 'populations' of captive-bred scimitar-horned oryx, dama gazelle, and addax, and that this usage is inconsistent with the definition of this term in the applicable regulations," the FWS responded:

> We agree that captive-held animals may not qualify as populations as defined at 50 CFR 17.3 and have changed the rule accordingly.

70 F.R. 52310, 52312 (September 2, 2005)

[8] Over a year later, the Service reclassified wild crocodile populations from endangered to threatened status as well.  53 Fed. Reg. 38451 (September 30, 1988)

could consider ranched Nile Crocodiles in Zimbabwe as a population, but could not apply the same approach to U.S. captive herds of the scimitar-horned oryx, dama gazelle and addax.[9]

The Antelope Listing Rule also did not explain the Service's disparate treatment of captive chimpanzee populations.  On the date that the FWS refused to consider the U.S. non-native captive populations of the three antelope species as "populations" for the purpose of determining listing status, the Service was actively recognizing captive chimpanzees in the United States as a distinct population, classified differently from wild populations of the same species in their home range.  55 Fed. Reg. 9129 (March 12, 1990).  In response to comments challenging the legality a population composed exclusively of captive members, the Service demonstrated that its decision was more than an anomalous finding:

> In the Endangered Species Act of 1973, as amended (Act), the definition of "species" is not the same as the usual biological definition of species but is expanded specifically to include "any species, subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." Captive animals are distinct from wild populations and may have the potential to interbreed when mature. In the case of the chimpanzee, some animals are specifically being managed as an interbreeding population. In listing the ranched population of the Nile crocodile in Zimbabwe, the Service has previously classified specimens in captivity differently than wild populations.

*Id.* at 9130.  That captive chimpanzee classification persists today.[10]

---

[9] Note that the situation involving the U.S. captive herds of the three antelope species is quite different than the one encountered by an Oregon District court in the case of *Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154 (D. Or. 2001).  In that case, the Court rejected the National Marine Fisheries Service's ("NMFS") attempt to exclude hatchery salmon from the DPS and threatened listing of naturally spawned salmon.  The NMFS argued that the hatchery born salmon were not essential to the species' recovery.  In that case, unlike in the instant matter, the natural and hatchery born salmon were not reproductively isolated and were literally swimming side-by-side in the same stream.  In addition, both natural and hatchery born salmon were located within the species' historic range.  *Id.* at 1162-63.

[10] The Service recently initiated a status review to determine whether the population should be designated as "endangered" rather than "threatened."  76 Fed. Reg. 54423 (September 1, 2011)

In addition, within weeks of including the U.S. non-native captive populations of the three antelope species in the endangered classification of the species generally, the National Marine Fisheries Service listed the Southern Resident killer whale distinct population segment as endangered, but specifically excluded from that DPS "killer whales from J, K, or L pod placed in captivity prior to listing" and their "captive born progeny." 70 Fed. Reg. 69903, 69910-11 (November 18, 2005). That listing disparity continues today.

In the Antelope Listing Rule the Service summarily rejected the idea of designating a population based exclusively on captive status. It offered no explanation why the FWS could not alternatively designate the population based on a separation from other populations by international boundaries and regulatory mechanisms. While wild members of at least two of the three antelope species live only in Africa, captive populations of all three species live throughout the world. The Service had the ability, based on its "Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act ("DPS Policy"), 61 Fed. Reg. 4722 (February 7, 1996) to classify all scimitar-horned oryx, dama gazelle and addax populations outside of the U.S. as one population and all the non-native antelope of the three species living in the U.S., as separate and distinct population segments. In the DPS Policy, the Service explained:

> [I]t appears to be reasonable for national legislation, which has its principal effects on a national scale, to recognize units delimited by international boundaries when these coincide with differences in the management, status, or exploitation of a species.

*Id*. at 4723. Despite apparently relying on the DPS policy for its authority to determine what qualifies as a population, the Service did not follow the DPS policy's tenets. "Having chosen to promulgate the *DPS Policy,* the FWS must follow that policy." *National Association of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003)(Court ruled that FWS acted arbitrarily and

capriciously and in conflict with DPS Policy in failing to provide rational basis for finding

population of Arizona pygmy owl to be significant), citing *Steenholdt v. FAA,* 314 F.3d 633, 639

(D.C.Cir.2003) (noting that federal agencies must follow their own rules).[11]

In the Antelope Listing Rule, the FWS also did not explain why, as an alternative to

recognizing the U.S. captive population as a "population," the agency did not exclude the non-

native members living in the U.S. from the listing of the native populations, as it had with other

species.  The FWS used that very approach when addressing a non-native, introduced population

of the Arkansas River Shiner ("ARS").  Seven years before the Antelope Listing Rule, the FWS

issued a final rule listing the native Arkansas River Basin Population of the Arkansas River

Shiner as threatened, but excluded from that listing a non-native population of the species living

in the Pecos River.  63 Fed. Reg. 64772 (November 23, 1998).  The agency explained:

> Because it is both discrete and significant, the Arkansas River Basin population of
> the ARS qualifies as a distinct population segment under the Act.  Although it is
> discrete, the Pecos River population of the ARS is not significant because it is an
> introduced population located outside of the species' historic range and, at this
> time, is not essential for recovery of the species within its historic range.
> Therefore, the Arkansas River basin population of the ARS is a listable entity
> under the Act, and the non-native, introduced Pecos River population is not a
> listable entity under the Act.

---

[11] The FWS received adequate notice from the comments submitted by Safari Club, other
members of the public, and agency officials themselves, to realize that they had an obligation to
address this issue. So long as there is evidence that the agency actually considered the issue prior
to the legal challenge, even if discussion of the issue was generated within the agency itself, the
Plaintiff cannot be barred from raising the matter in litigation.  *Engine Manufacturers
Association v. EPA,* 88 F.3d 1075, 1084 (D.C. Cir. 1996) (litigation held proper despite lack of
public comment over issue raised by Congressman in letter to EPA Administrator).  Even had
there been no such comments, the question of whether the Service could exclude non-native
and/or captive populations was so essential to its determination, that it was obligated to consider
the issue.   The agency bears an obligation to "examine key assumptions as part of its affirmative
'burden of promulgating and explaining a non-arbitrary, non-capricious rule.'"  *Small Refiner
Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 535 (D.C. Cir. 1983).

*Id*. at 64774.  Like the U.S. non-native captive herds of the three antelope, the Pecos River

population of the Arkansas River Shiner had been artificially introduced and was not living in a

portion of the species' historic range.  *Id*. at 64777.  Also like the U.S. non-native captive herds

of the three antelope, the Pecos River ARS population was not having any direct recovery impact

on the native populations living in the species' home range.  Nevertheless, the Service

recognized that the Pecos River population had *potential* for future recovery efforts.  "We agree

that the Pecos River population could serve as a source of individuals for transplantation into

suitable, unoccupied, historic habitat. "  *Id*. at 64778.  The Service further explained:

> While the non-native, introduced Pecos River population of the ARS could be
> important in efforts to supplement native populations of the ARS within the
> species' historical range, protection of the Pecos River population would not
> improve the status of the ARS within the Species' historical range.

*Id*.  at  64774.  The Service explained that the ESA's conservation purposes are focused on

native recovery and that the ESA does not require the Service to list non-native populations.

> The purpose of the Act is to conserve threatened and endangered species and the
> ecosystems on which they depend.  Non-native, introduced populations, while
> possibly useful in recovery/restoration efforts, are not a viable substitute for
> species conservation in native ecosystems.  We do not believe listing or active
> conservation of the introduced Pecos River population is appropriate nor is such
> conservation required by the Act.

*Id*. at 64778.  Today, as it did on September 2, 2005 (when the FWS refused to exclude the U.S.

non-native captive populations of the three antelope species), the Pecos River population of the

ARS remains separate from and unaffected by the threatened species listing of native portions of

the species.  The Service has never explained why it could decide not to list the non-native ARS

population, but had no choice but to list the non-native U.S. three antelope populations.

Similarly, the Service has excluded non-native, introduced populations of the arctic

grayling living in Montana from its consideration of the listing status of native populations of

that species.  In making its determination to include only native populations of the arctic

grayling, the FWS explained that the Service had interpreted the ESA's "statutory directive to

conserve species in their native ecosystems" to authorize the exclusion of non-native populations

that have no direct conservation benefit to the native populations.  Revised 12-Month Finding to

List the Upper Missouri River Distinct Population Segment of Arctic Grayling as Endangered or

Threatened, 75 FR 54708, 54712- 13 (September 8, 2010).[12]  On its website, the FWS offers the

following explanation of its exclusion of the non-native arctic grayling populations:

> The DPS does not include introduced, naturalized populations that currently exist
> in lakes that did not historically contain Arctic grayling or that are outside the
> native range of the species in the upper Missouri River basin. We excluded these
> introduced lake-dwelling populations because they are not native populations.
> These populations were introduced to provide recreational fishing opportunities in
> remote and semi-remote lakes, and were not established for any stated
> conservation purpose nor do they appear to have any formally recognized
> conservation value with respect to native populations.

http://www.fws.gov/mountain-prairie/species/fish/grayling/QuestionsAndAnswers09082010.pdf

Evidence of the Service's approach to ranched populations of the Nile Crocodile, captive

populations of chimpanzees, southern killer whale and plains bison and non-native populations

of the Arkansas River Shiner and the arctic grayling, as compared to its approach to U.S. non-

native captive populations of the three antelope, demonstrates the Service's erratic behavior with

respect to its treatment of captive and/or non-native populations of species requiring listing in the

wild.  That erratic behavior, combined with the Service's failure to explain why it could not

distinguish or exclude U.S. non-native captive herds of the three antelope species as it had done

with other species, renders the Service's conduct arbitrary and capricious.

---

[12] This is consistent with its determination for the non-native populations on July 25, 1994, 59
Fed. Reg. 37738.

The FWS's treatment of the three antelope species is inconsistent with the conservation purposes of the ESA.  "In order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose."  *Morton v. Ruiz*, 415 U.S. 199, 237 (1974) (Court rejected agency's interpretation of Snyder Act that prevented native Americans who did not live on reservation from accessing benefits).

The statutory purpose of the ESA is conservation.  The inclusion of the U.S. non-native captive herds of the three antelope species does not directly conserve the species in their native ecosystems.  Instead it undermines the conservation that has been achieved for the populations living in the United States.  The Service did not offer evidence that including the U.S. non-native captive populations would bring some direct benefit to the conservation of the species in their native ecosystems.  Instead, the Service admittedly included the U.S. non-native captive populations only because it claimed to have no authority to designate a population composed exclusively of captive members.

Sadly, the inclusion of the U.S. populations causes far more harm to conservation of the species than good.  Congress could never have intended to obligate the Service to list a population, where the listing would do nothing other than undermine ongoing conservation.  A well accepted rule of statutory construction holds that statutory interpretations that would produce absurd results should be avoided.  *Environmental Defense Fund v. Reilly*, 909 F.2d 1497, 1505–06 (D.C. Cir. 1990) (court rejected EPA interpretation of Toxic Control Substances Act).

### B.  The FWS Failed To Make a Timely 90 Day Finding on Safari Club's Delisting Petition

Safari Club attempted to avoid this lawsuit and to prevent the damage to three antelope species conservation by submitting a petition to delist the U.S. captive herds of the three antelope

species.  Safari Club based its petitioned delisting on the fact that the Service had included the

U.S. non-native captive population in the endangered classification in error.  The ESA requires

that the Service act on the petition within 90 days of its receipt, but conditions the deadline with

the phrase "to the maximum extent practicable."

The Service delayed taking action on Safari Club's petition twice and the delay has now

last almost two years.  As a result of the delay, the Service could not actually focus all of its

energies and resources on other pressing species related matters.  Instead, the Service had to

develop, publish, solicit comments, review comments and ultimately publish a rule to withdraw

the permit exemption for the U.S. non-native captive herds.  If the Service had, almost two years

ago, complied with the statutorily imposed 90 day response time, it is possible (and in Safari

Club's impression likely), that the Service would not have needed to withdraw the exemption,

because the three antelope species populations in the U.S. would already have been removed

from the endangered species list.

While the Service may have had other species that also required its attention, its priorities

should have included an action that could have prevented avoidable harm.  In this case, the threat

to three antelope conservation was something that the Service had acknowledged during

rulemaking, but decided to ignore when petitioned by Safari Club for delisting.  The agency's

conduct was neither reasonable nor "practical" and should be rejected as illegal.

> The "maximum extent practicable" language of the statute is not a license to
> pursue any and all other legitimate priorities of the Department of the Interior.
> "The phrase is not intended to allow the Secretary to delay commencing the
> rulemaking process *for any reason other than* the existence of pending or
> imminent proposals *to list species subject to a greater degree of threat* that would
> make allocation of resources to such petition unwise." H.R.Conf.Rep. No. 97–835
> at 2 (1982) *reprinted in* 1982 U.S.C.C.A.N. 2860, 2862 (emphasis added).

*Biodiversity Legal Foundation v. Babbitt*, 63 F. Supp. 31, 34 n.2 (D.D.C. 1999).   It was not practical for the Service to delay consideration of delisting while occupying itself with the consequences of listing.  At the very least, the Service could have addressed both issues simultaneously since they involve the same populations of animals.

As there is nothing practical or reasonable, Safari Club submits that the almost two year delay in acting on Safari Club's delisting petition violated both the ESA and the APA as arbitrary and capricious, an abuse of discretion and not in accordance with law.  5 U.S.C. §706.

## IV.      CONCLUSION

The FWS has inexplicably listed U.S. non-native captive populations of three antelope species to their detriment.  Though the listing conflicts with past and existing FWS practices and does nothing to benefit the conservation of the species in the wild, the Service classified these U.S. captive populations as endangered.  The only explanation the FWS offered for conduct that completely undermines the conservation purposes of the ESA, is that separating captive populations would be "inappropriate."  Yet the Service has employed this inappropriate strategy on multiple occasions.  To compound the error, when given the opportunity to rectify its error via a petition for delisting, the Service took no action.  As a consequence, proven conservation incentives and recovery successes for the three antelope species have been sacrificed.  Without an explanation for the erratic, cavalier and disparate approach, the Service's conduct qualifies arbitrary, unreasonable and illegal and must be set aside.

For the aforementioned reasons discussed in this brief, the Court should grant Safari Club's motion for summary judgment.  This Court should set aside the Service's endangered classification of the U.S. non-native, captive three antelope populations so that the private ranching and hunting communities can once again freely conserve the three antelope species. Dated this 23rd day of March, 2012.


Respectfully submitted

/s/ Anna M. Seidman
Anna M. Seidman
Safari Club International
501 2nd Street NE
Washington, D.C.  20002
Tel:  202-543-8733
Fax:  202-543-1205
aseidman@safariclub.org
*Counsel for Plaintiff Safari Club International*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused copies of the Motion for Summary Judgment, Memorandum in Support of Summary Judgment, Exhibits, Proposed Order and Letter Requesting Oral Argument:

Dated this 23rd day of March, 2012.

Respectfully submitted

/s/ Anna M. Seidman
Anna M. Seidman
D.C. Bar No. 417091
Douglas S. Burdin
D.C. Bar No. 434107
Safari Club International
501 2nd Street NE
Washington, D.C.  20002
Tel:  202-543-8733
Fax:  202-543-1205
aseidman@safariclub.org