## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL, <br><br> Plaintiff, <br><br> v. <br><br> KEN SALAZAR, in his official capacity as Secretary of the U.S. Department of the Interior, *et al*., <br><br> Defendants. | Civil Action No. 11-cv-01564 (BAH) <br> Judge Beryl A. Howell |
| OWEN, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, *et al*., <br><br> Defendants. | Civil Action No. 12-cv-00194 (BAH) <br> Judge Beryl A. Howell |
| EXOTIC WILDLIFE ASSOCIATION, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, *et al*., <br><br> Defendants. | Civil Action No. 12-cv-00340 (BAH) <br> Judge Beryl A. Howell <br> (Consolidated Cases) |

## <u>MEMORANDUM OPINION</u>

Pending before this Court are two Motions for a Preliminary Injunction, one filed by the

plaintiff in *Safari Club International v. Salazar, et al*., Case No. 11-cv-01564 ("*SCI* Action"), ECF

No. 26, and the other filed by the plaintiffs in *Exotic Wildlife Association, et al. v. United States*

*Department of the Interior, et al.*, Case No. 12-cv-00340, ECF No. 3 ("*EWA* Action").[1]  The

plaintiffs seek different injunctive relief.  Specifically, the plaintiff in the *SCI* Action seeks to enjoin

enforcement of endangered species status for U.S. non-native captive populations of three antelope

species – the scimitar-horned oryx, dama gazelle, and addax ("Three Antelope species"), while the

plaintiffs in the *EWA* Action are seeking more narrow relief to enjoin enforcement of a Final Rule

promulgated by the Fish and Wildlife Service ("FWS") that goes into effect on April 4, 2012

("Final Rule").  The Final Rule would remove a regulation that has, since 2005, exempted U.S. non-

native captive populations of the Three Antelope species from many of the prohibitions, restrictions,

and requirements attendant to their classification as endangered species.  Since the exemption

regulation was issued at the same time the Three Antelope species were listed as endangered in

2005, the removal of the 2005 exemption would, for the first time, allow for full enforcement of

endangered species status of the Three Antelope species.  For the reasons explained below, the two

pending Motions for a Preliminary Injunction are denied.[2]

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Endangered Species Act, Fish and Wildlife Service, and The National Environmental Policy Act

The Endangered Species Act ("ESA") was enacted by Congress in 1973 "to provide a means

---

[1] It is helpful to understand the procedural background of this case before delving into the pending motions.  The *SCI* and *EWA* Actions have been consolidated, along with *Owen, et al. v. United States Department of the Interior, et al.*, Case No. 12-cv-00194 ("*Owen* Action").  The *Owen* and *EWA* Actions were reassigned as related cases to the presiding judge on February 10 and March 14, 2012, respectively.  Each of the three consolidated actions is against Ken Salazar, in his official capacity as Secretary of the U.S. Department of the Interior; the U.S. Fish and Wildlife Service ("FWS"); and Daniel Ashe, in his official capacity as Director of the FWS.  The U.S. Department of the Interior is also a defendant in Case Nos. 12-cv-00194 and 12-cv-00340.  (The Court refers to the defendants collectively as "Federal Defendants").  On March 23, 2012, this Court granted the Motions to Intervene by two organizations, Friends of Animals ("FOA") and Defenders of Wildlife ("DOW") (collectively, "defendant-intervenors").  *See* Order, Case No. 11-cv-01564, ECF No. 42.

[2] The plaintiffs have requested a hearing on their motions for injunctive relief.  *See* Letter from SCI counsel, dated March 23, 2012, ECF No. 44-5; *EWA* Reply in Supp. of Mot. for Prelim. Inj. ("*EWA* Reply"), ECF No. 40 at 20.  The Court finds, however, that "the record is sufficient to demonstrate a lack of right to relief" without the need for a hearing.  *Smith v. Harvey*, No. 06-1117 (RWR), 2006 U.S. Dist. LEXIS 48150, at *5 (D.D.C. July 17, 2006) (citing *Johnson v. Holway*, 329 F. Supp. 2d 12, 14 n.1 (D.D.C. 2004)); Local Civil Rule 65.1(d) (noting "practice in this jurisdiction" to decide a motion for preliminary injunction on the papers).

whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection(a) of this section." 16 U.S.C. § 1531(b).

Under the Endangered Species Act, the Secretary[3] "shall . . . determine whether any species is an endangered species or a threatened species because of any of the following factors:"

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a).  The Secretary makes this determination "solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas."  16 U.S.C. § 1533(b)(1)(A).

Once an animal species has been listed as "endangered," it is unlawful under the ESA "for any person subject to the jurisdiction of the United States" to, *inter alia*, "take any such species within the United States or the territorial sea of the United States" or  "sell or offer for sale in interstate or foreign commerce any such species" or "deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species."  16 U.S.C. § 1538(a)(1).  To "take" under the ESA means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

---

[3] The Secretary of the Interior is responsible for classifying the Three Antelope species as threatened or endangered.

The ESA does, however, allow some "taking" of endangered species through its permitting programs.  In 1979, the FWS established, pursuant to ESA section 10 authority, "a permit program for enhancement of propagation or survival of captive-bred wildlife ("CBW Regulation")."  *See* Fed. Defs.' Mem. in Opp. to *SCI* Mot. for Prelim. Inj. ("*SCI* Opp. Mem.") at 4.  The CBW regulation provides that "any person may take; export or re-import; deliver, receive, carry, transport or ship in interstate or foreign commerce, in the course of a commercial activity; or sell or offer for sale in interstate or foreign commerce any endangered wildlife that is bred in captivity in the United States provided . . . that" a number of conditions are met, including that the "purpose of such activity is to enhance the propagation or survival of the affected species."  50 C.F.R. § 17.21(g)(1). The FWS has also set forth regulations for application for individual permits authorizing "take" that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity," *see* 16 U.S.C. § 1539(a)(1)(B), or "for scientific purposes or to enhance the propagation or survival of the affected species," *see* 16 U.S.C. § 1539(a)(1)(A).

The National Environmental Policy Act ("NEPA") is a statute that, *inter alia*, requires preparation of an environmental impact statement in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).

**B.     Three Antelope Species**

This case concerns three antelope species, the scimitar-horned oryx, dama gazelle, and addax ("Three Antelope species") living on private ranches in the United States.  The Three Antelope species are native to the African continent.  *See* 70 Fed. Reg. 52,310 (Sept. 2, 2005).  The three animal species at the center of this dispute are briefly described below:

> The scimitar-horned oryx stands about 47 inches [in, 119 centimeters (cm)] tall and weighs around 450 pounds [lb, 204 kilograms (kg)]. It is generally pale in color, but the neck and chest are dark reddish brown. As the name suggests, adult animals possess a pair of horns curving back in an arc up to 50 in (127 cm) long. The

4

> scimitar-horned oryx once had an extensive range in North Africa throughout the
> semi-deserts and steppes north of the Sahara, from Morocco to Egypt.
>
> The addax stands about 42 in (106 cm) tall at the shoulder and weighs around 220 lb
> (100 kg). It is grayish white and its horns twist in a spiral up to 43 in (109 cm) long.
> The addax once occurred throughout the deserts and sub-deserts of North Africa,
> from the Atlantic Ocean to the Nile River.
>
> The dama gazelle stands about 39 in (99 cm) tall at the shoulder and weighs around
> 160 lb (72 kg). The upper part of its body is mostly reddish brown, whereas the head,
> rump, and underparts are white. Its horns curve back and up, but reach a length of
> only about 17 in (43 cm) long. The dama gazelle, the largest of the gazelles, was
> once common and widespread in arid and semi-arid regions of the Sahara.

70 Fed. Reg. 52,319 (Sept. 2, 2005). Wild populations of the addax and dama gazelle still exist in

Africa, while the scimitar-horned oryx is thought to have disappeared from the wild. *See SCI* Mem.

in Support of Mot. for a Prelim. Inj. ("*SCI* Mem.") at 2.

Captive populations of the Three Antelope species exist in the United States and other parts

of the world, including on the ranches of some of the plaintiffs in this consolidated case. SCI

argues that "captive populations are growing and thriving" in the United States, *see SCI* Mem. at 4,

or were until announcement of the Final Rule going into effect on April 4, 2012. The *EWA*

plaintiffs argue, too, that the Three Antelope species have "thrived" thanks to "a few foresighted

livestock ranchers" who decided to collect and breed the Three Antelope species. *EWA* Mem. in

Support of Mot. for a Prelim. Inj. ("*EWA* Mem.") at 6. "[P]opulations of Texas-raised scimitar-

horned oryx exploded from 32 in 1979 to 11,032 in 2010; addax from 2 specimens in 1971 to 5,112

in 2010; and dama gazelle from 9 individuals in 1979 to 894 in 2010." *Id.*

In promulgating the exemption of the Three Antelope species from certain prohibitions, on

September 2, 2005, the FWS acknowledged that the captive breeding has been helpful for the

survival of the Three Antelope species:

> Captive breeding in the United States has enhanced the propagation or survival of the
> scimitar-horned oryx, addax, and dama gazelle worldwide by rescuing these species
> from near extinction and providing the founder stock necessary for reintroduction.
> The scimitar-horned oryx is possibly extinct in the wild; therefore, but for captive

breeding, the species might be extinct.  Addax and dama gazelle occur in very low numbers in the wild, and a significant percentage of remaining specimens survive only in captivity (71% and 48%, respectively).  Captive-breeding programs operated by zoos and private ranches have effectively increased the numbers of these animals while genetically managing their herds . . .  Threats that have reduced these species' numbers to current levels in the wild continue throughout most of the historic range.  As future opportunities arise for reintroduction in the antelope range countries, captive-breeding programs will be able to provide genetically diverse and otherwise suitable specimens.

70 Fed. Reg. 52,310-52,311 (Sept. 2, 2005) (internal citation omitted).

> ### C.     Safari Club International and Exotic Wildlife Association

The plaintiffs bringing the Motions for Preliminary Injunctions are two private associations based in the United States.  SCI is a non-profit organization with 53,000 members worldwide.  *SCI* Mem. at 19.  SCI's mission is to "protect the freedom to hunt and to promote wildlife conservation worldwide."  *Id.*  Some SCI members own captive herds of the Three Antelope species throughout the United States, while others have hunted the Three Antelope species and wish to do so in the future.  *Id.*  EWA is an association of ranchers who own the majority of Texas' exotic wildlife, which they raise on private property.  *EWA* Mem. at 6.

The plaintiffs argue that private conservation and herding of the Three Antelope species has been helpful for increasing the population of these animals.  SCI, for example, argues that "[i]n the U.S., private conservation, free trade, and the ability to hunt these animals have succeeded in establishing large, healthy U.S. populations of each of these species."  *SCI* Mem. at 2.

> ### D.     Overview of the Consolidated Cases

The FWS Final Rule scheduled to go into effect on April 4, 2012 has a history reaching back more than two decades.  In 1991, the FWS published a proposed rule to list as endangered species under the Endangered Species Act ("ESA") three antelope species, namely, the scimitar-horned oryx, dama gazelle, and addax.  *See* 56 Fed. Reg. 56,491 (Nov. 5, 1991).  The FWS opened comment periods on this proposed rule on June 8, 1992 (57 Fed. Reg. 24,220), July 24, 2003 (68

Fed. Reg. 43,706), and November 26, 2003 (68 Fed. Reg. 66,395).  According to the Federal

Defendants, "[f]rom the outset of the rulemaking process, the [FWS] announced that it was

considering a separate regulatory scheme to cover captive-held individuals of [the Three Antelope

species] outside the species' natural ranges."  *SCI* Opp. Mem. at 7 (citing 56 Fed. Reg. at 56,491,

56,492, 56,494 & 68 Fed. Reg. at 43,707).  No further action was taken on the introduction of this

proposed rule until February 1, 2005, when the FWS proposed a separate regulatory scheme for

captive-bred species.  *See* 70 Fed. Reg. 5117.

Subsequently, on September 2, 2005, the FWS listed the Three Antelope species as

endangered under the ESA, after finding that the Three Antelope species faced extinction because

of all of the endangered species listing factors other than "disease or predation."  *SCI* Opp. Mem. at

8; 70 Fed. Reg. at 52,321-52,322 (Sept. 2, 2005) ("Listing Decision").  At the same time, the FWS

added a new regulation, codified at 50 C.F.R. § 17.21(h), authorizing certain otherwise prohibited

activities for U.S. captive-bred individuals of the Three Antelope species ("Captive-bred

Exemption").  *See* 70 Fed. Reg. 52,319-52,320 (Sept. 2, 2005).  The FWS noted at that time that

"[c]aptive-breeding programs operated by zoos and private ranches have effectively increased the

numbers of these animals while genetically managing their herds.  As future opportunities arise for

reintroduction in the antelope range countries, captive-breeding programs will be able to provide

genetically diverse and otherwise suitable specimens.  Currently, however, continued habitat loss

and wonton killing have made reintroduction [of captive-bred herds to the wild] nonviable in most

cases." 70 Fed. Reg. at 52,322 (Sept. 2, 2005).

Animals rights groups, including the defendant-intervenors, subsequently and successfully

filed suit alleging that the FWS unlawfully promulgated the Captive-bred Exemption.  *See Friends

of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009) (Kennedy, J.).  SCI and EWA intervened

as defendants in that consolidated case.  There, Judge Kennedy found that "[a]fter examining the

text, context, purpose and legislative history of section 10 [of ESA] . . . subsection 10(c) requires

case-by-case consideration before the FWS may permit otherwise prohibited acts to enhance the

propagation or survival of endangered species," and that the "blanket exemption" reflected by the

Captive-bred Exemption violated the ESA's subsection 10(c) requirement to provide public notice

in the Federal Register of each application for a permit allowing such otherwise prohibited acts.  *Id.*

at 116, 118.  The court remanded the rule to the FWS for further proceedings.

In 2010, both SCI and the *Owen* plaintiffs petitioned the FWS to delist from the endangered

species list the U.S. captive-bred herds of the Three Antelope species.  *See SCI* Action, ECF No. 1,

*SCI* Compl. ¶ 10; *Owen* Action, ECF No. 1, *Owen* Compl. at 2.  The FWS has taken no action on

those petitions other than responding, on September 23, 2010, that "initial review . . . does not

indicate that an emergency situation exists," and, on July 25, 2011, that the "Service anticipates it

will be able to make an initial finding on your petition in the next fiscal year."  *SCI* Mem., Case No.

11-cv-01564, ECF No. 25, Exs. V (Sept. 23, 2010 Letter from Jamie Van Norman, Chief, Branch of

Foreign Species, to Anna Seidman, Director of Litigation, SCI), W (July 25, 2011 Letter from Gina

Shultz, Chief, Office of ESA Litigation, to Kevin Anderson, President, SCI).[4]

On July 7, 2011, the FWS published a proposed rule to withdraw the Captive-bred

Exemption, consistent with the holding in *Friends of Animals*.  *See* 76 Fed. Reg. 39,804 ("Removal

of the Regulation that Excludes U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama

Gazelle From Certain Prohibitions") (July 7, 2011).  This would eliminate the exclusion for the

Three Antelope species from certain prohibitions in the ESA and require any person intending to

engage in otherwise prohibited activity to qualify for an exemption or obtain a permit authorizing

such activity.  The FWS opened the proposed rule for a 30-day comment period in which it received

93 individual comments, 2 from state agencies, 8 from nongovernment groups, and 86 from

---

[4] All references to ECF numbers are references to Case No. 11-cv-01564 unless otherwise noted.

individuals, most of whom were ranchers or individuals associated with ranches.  The vast majority of the comments opposed the proposed regulation.  *See* 77 Fed Reg. 431, 432 (Jan. 5, 2012).

The *SCI* Action was then filed in this district on August 31, 2011, alleging that the Federal Defendants violated the ESA and Administrative Procedure Act (APA) by including U.S. captive-bred herds of the Three Antelope species in the 2005 listing determination, failing to remove U.S. captive herds from endangered species status after Judge Kennedy's ruling, and failing to respond in a timely manner to SCI's petition for delisting.  *See SCI* Action, ECF No. 1, *SCI* Compl. ¶¶ 2, 10.  Likewise, the *Owen* Action, which was filed in the Northern District of Texas in October, 2011, alleges that the FWS violated the ESA and the APA by failing to respond to the EWA's petition for delisting.  *See Owen* Action, ECF No. 1, *Owen* Compl. at 2.  Following transfer of the *Owen* Action to this jurisdiction, this Court consolidated the *SCI* Action with the *Owen* Action.  *See* Case No. 11-cv-01564, Minute Order (Feb. 21, 2012).[5]

On January 5, 2012, FWS issued its final rule removing the Captive-bred Exemption, effective on April 4, 2012 ("Final Rule").  77 Fed. Reg. 431 (Jan. 5, 2012).  The Final Rule explained that "[t]his change to the regulations is in response to a court order that found that the rule for these three species violated section 10(c) of the Act.  These three antelope species remain listed as endangered under the Act, and a person will need to qualify for an exemption or obtain an authorization under the current statutory and regulatory requirements to conduct any prohibited activities."  *Id.*  The Final Rule stated that the FWS "considered whether there were alternative means to comply with the Court's ruling without requiring ranches or other facilities holding these species to obtain a permit or other authorization" and determined that there was no alternative "other than the currently established regulations at 50 C.F.R. 17.21(g) and 17.22 – providing for the registration of captive-bred wildlife or issuance of a permit – that would provide the public an

---

[5] The *Owen* Action was transferred from the Northern District of Texas to this jurisdiction on February 6, 2012.  *See* Case No. 12-cv-00194, ECF No. 16.  Seven of the nineteen plaintiffs in the *Owen* Action are also plaintiffs in the *EWA* Action.

opportunity to comment on proposed activities being carried out with these species." 77 Fed. Reg. at 432. The Final Rule also noted that the FWS "did not receive any comments or suggestions from the public that presented a viable alternative." *Id.* The FWS provided an "extended effective date" of April 4, 2012 for the Final Rule in order to "allow the affected community to either legally sell their specimens, if they choose to divest themselves of these species, or to apply for authorization or permits to continue carrying out previously approved activities." *Id.*

The *EWA* Action was filed on March 2, 2012, to invalidate and set aside the Final Rule. *See EWA* Action, ECF No. 1, *EWA* Compl. at 4. The plaintiffs in the *EWA* Action filed a Motion for Preliminary Injunction on March 6, 2012, seeking to enjoin enforcement of the Final Rule. *See EWA* Action, ECF No. 3.

On March 8, 2012, the plaintiffs in the *SCI* Action filed a Motion for a Preliminary Injunction, seeking more generally to enjoin the "enforcement of endangered status for U.S. non-native captive herds of the [Three Antelope species]." *See SCI* Action, ECF No. 26, at 1.

The Court addresses both pending motions for a preliminary injunction below.

## II.     STANDARD OF REVIEW

The purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). It is an extraordinary form of interim relief, however, and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal citations and emphasis omitted). Plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities tip in their favor; and (4) injunctive relief is sought in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011); *CityFed*

*Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).  Historically, these four factors have been evaluated on a "sliding scale" in this Circuit, such that a stronger showing on one factor could make up for a weaker showing on another.  *See Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360-61 (D.C. Cir. 1999).  Recently, however, the continued viability of that approach has been called into some doubt, as the United States Court of Appeals for the District of Columbia Circuit has suggested, without holding, that a likelihood of success on the merits is an independent, free-standing requirement for a preliminary injunction.  *See Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011).  However, absent binding authority or clear guidance from the Court of Appeals, the Court considers the most prudent course to bypass this unresolved issue and proceed to explain why a preliminary injunction is not appropriate under the "sliding scale" framework.  If the plaintiffs cannot meet the less demanding "sliding scale" standard, then they cannot satisfy the more stringent standard alluded to by the Court of Appeals.

That being said, in meeting the requisite burden for injunctive relief, "[i]t is particularly important for the [plaintiffs] to demonstrate a likelihood of success on the merits."  *Konarski v. Donovan*, 763 F. Supp. 2d 128, 132 (D.D.C. 2011).  Without a "substantial indication" of the [plaintiffs'] likelihood of success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review."  *Elite Entm't, Inc. v. Reshammiya*, No. 08-cv-0641, 2008 U.S. Dist. LEXIS 31580, at *4 (D.D.C. Apr. 18, 2008) (quoting *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999)).  Assessing the likelihood of success on the merits "does not involve a final determination of the merits, but rather the exercise of sound judicial discretion on the need for interim relief."  *Nat'l Org. for Women, Wash. D.C. Chapter v. Soc. Sec. Admin. of the Dep't of Health and Human Servs.*, 736 F.2d 727, 733 (D.C. Cir. 1984) (footnote and internal quotation marks omitted).  "As an

extraordinary remedy, courts should grant such relief sparingly." *Konarski*, 763 F. Supp. 2d at 133; *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969).

Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C), an agency action may be overturned if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376 n.21 (1989). Review of agency actions under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid." *Envt'l. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981). In assessing an agency decision, the Court reviews whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). "The scope of the Court's review under this standard 'is narrow and a court is not to substitute its judgment for that of the agency.'" *United Steel v. Pension Benefit Guar. Corp.*, No. 09-517, 2012 U.S. Dist. LEXIS 36962, at *34 (D.D.C. Mar. 20, 2012) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983)). "In exercising its narrowly defined duty under the APA, a court must consider whether the agency acted within the scope of its legal authority, whether the agency adequately explained its decision, whether the agency based its decision on the facts in the record, and whether the agency considered the relevant factors." *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 679 (D.D.C. 1997). The "deference a court must accord an agency's scientific or technical expertise is not unlimited, however," *see id.*, and a Court may not simply "rubber stamp" an agency decision. *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976).

## III.   DISCUSSION

In filing their Motions for Injunctive Relief, the plaintiffs are asking this Court to evaluate the chance of their success on the merits of their claims in order to decide whether they should be

awarded the extraordinary remedy of injunctive relief.  In this consolidated case, the plaintiffs'

chance of success on the merits must be evaluated separately as the plaintiffs are challenging

different rules in their Complaints and thus relying on different administrative records.  The Court

finds that neither SCI's challenge to the 2005 Listing Decision, nor the *EWA* plaintiffs' challenge to

the 2012 Final Rule appears at this stage to have a likelihood of success on the merits.[6]  Nor have

the plaintiffs carried their heavy burden of demonstrating irreparable harm in the absence of

preliminary relief, nor that the balance of equities tip in their favor.  Finally, the plaintiffs have not

carried their burden of showing that injunctive relief is truly in the public interest.  The Court

discusses each of these factors *seriatim* below.[7]

### 1.    Plaintiffs Do Not Establish A Likelihood Of Success On The Merits

#### a.  *SCI* Action

SCI filed its lawsuit in order to challenge the FWS decision, over six years ago, in 2005, to

list the non-native, captive members of the Three Antelope species as endangered species.  SCI

argues in support of its Motion for a Preliminary Injunction that the FWS (1) "acted arbitrarily and

capriciously and in a manner inconsistent with ongoing agency decision-making made for other

similarly situated species" and (2) "ignored the conservation mandates of the ESA and the fact that

---

[6] The Court notes that the arguments considered here regarding the merits of the claims may be supplemented once briefing is complete on the pending motions for summary judgment.  Even if these other arguments would persuade the Court on the merits, the plaintiffs would still not meet the other criteria required for preliminary injunctive relief, as explained below.

[7] As an initial matter, the Court finds that the plaintiffs have standing to seek relief, which is unchallenged by the Federal Defendants.  "[T]he requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'"  *Davis v. FEC*, 554 U.S. 724, 733 (2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  In order to establish standing under Article III, a claimant must show: (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *See Lujan*, 504 U.S. at 560-61; *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).  "An association has standing to bring suit on behalf of its members when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Env'l. Servs.* (TOC), Inc., 528 U.S. 167, 180-181 (2000) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).  While the Court concludes that the plaintiffs have not shown that they face "irreparable harm," the plaintiffs have demonstrated "an injury in fact" that is concrete and particularized, actual or imminent, fairly traceable to the defendant's actions, and potentially remedied by this Court's decision.  The plaintiffs therefore have standing and this Court may properly hear their claims.

inclusion of the captive populations would harm rather than serve the conservation of populations of the three antelope species." *SCI* Mem. at 22.  The Federal Defendants argue that SCI is unlikely to succeed on the merits for three reasons: (1) SCI has not shown that the FWS "has a policy of excluding animals held in captivity when listing a foreign species;" (2) SCI "has failed to show that [FWS] was required to designate captive members of the Three Antelope species in the United States as a distinct population;" and (3) SCI "has not shown that the Listing Rule is inconsistent with the conservation purpose of the ESA." *SCI* Opp. Mem. at 13-14.  The Court concludes that SCI has not established a likelihood of success on the merits because SCI has not shown that the FWS acted arbitrarily and capriciously in deciding to list the Three Antelope species as endangered.  As the Court explains, the Listing Decision (1) was issued only after years of consultation and research, and appears to be consistent (2) with the policy and practice of the FWS as well as (3) with the purpose of the ESA.

> **i.     The FWS Decision to List the Three Antelope Species As Endangered Was the Result of Many Years of Consultation and Research**

The FWS decision to list the Three Antelope species was reached only after a period of many years of research and consultation.  Indeed, SCI acknowledges that the FWS devoted significant time over many years to developing its policies with respect to the Three Antelope species.  SCI references FWS' "protracted deliberation over the listing status of the three species," *see* SCI Mem. at 5, and the "14 years that [FWS] collected data and analyzed its legal strategies for dealing with the thriving and growing U.S captive population." *SCI* Mem. at 8.  SCI notes, for example, that the FWS "was well aware that it had listing options that would allow the [FWS] to exclude those U.S. non-native captive members from the endangered classification of the animals in the wild . . . ." *Id*.  The FWS also "drafted early versions of the Antelope Listing Rule, relying on its authority to treat the U.S. non-native captive populations differently than the populations in the

wild." *Id.* at 9.  The FWS approach thus seems to have been a thorough one, in which the FWS

comprehensively reviewed the possible ways in which to regulate the Three Antelope species.

> ### ii.     The FWS Decision to List the Three Antelope Species As Endangered Was Consistent with FWS Policy and Practice

SCI argues that the FWS "acted arbitrarily and capriciously and in a manner inconsistent

with ongoing agency decision-making made for other similarly situated species." *SCI* Mem. at 22.

"In its consideration of other captive and/or non-native populations of species that . . . had no direct

connection with the conservation of the species in the wild, the [FWS] . . . dealt separately with

those captive and/or non-native populations and in some cases had not listed them at all."[8]  *Id*. at 25.

The FWS decision not to make separate listing decisions for wild populations and captive

populations of the Three Antelope species when it has done so in other cases, however, does not

mean that the FWS listing decision was arbitrary and capricious.  SCI cites in particular four

examples where the FWS purportedly decided to treat captive animals differently than their wild

counterparts.  *SCI* Mem. at 26-30 (discussing listing decisions for Nile Crocodile, the Chimpanzee,

the Arkansas River Shiner, and the Arctic Grayling).  The FWS, for example, classified "ranched

populations" of the Nile Crocodile as "threatened" while it left other populations of the species

classified as "endangered."  *SCI* Mem. at 26; *see* Reclassification of Ranched Nile Crocodile

Populations in Zimbabwe From Endangered to Threatened, 52 Fed. Reg. 23,148 (June 17, 1987);

*see also* Revised 12-Month Finding to List the Upper Missouri River Distinct Population Segment

of Arctic Grayling as Endangered or Threatened, 75 Fed. Reg. 54,708, 54,712-13 (Sept. 8, 2010);

Final Rule to List the Arkansas River Basin Population of the Arkansas River Shiner (Notropis

---

[8] The Federal Defendants argue that SCI waived this argument about the designation of animals held in captivity by not raising it during the comment period.  The Court disagrees.  To the extent that this issue was not raised during the comment period, that is understandable because the FWS itself was contemplating creating a different rule for animals held in captivity versus animals held in the wild.  *See, e.g,* Proposed Endangered Status for Scimitar-horned Oryx, Addax, and Dama Gazelle, 56 Fed. Reg. 56,491 (Nov. 5, 1991) ("Captive and free-roaming groups, outside of the natural ranges of the species, may be covered separately from natural populations in any final rule.").  Furthermore, "[i]t is sufficient that an issue was raised by any commentator; the party petitioning for judicial review need not have done so itself."  *Northeast Maryland Waste Disposal Auth. v. EPA*, 358 F.3d 936, 948 n.12 (D.C. Cir. 2004) (citing *Reytblatt v. Nuclear Regulatory Comm'n.*, 105 F.3d 715, 721 (D.C. Cir. 1997)).

girardi) as Threatened, 63 Fed. Reg. 64,772 (Nov. 23, 1998); Endangered Status for Chimpanzee and Pygmy Chimpanzee, 55 Fed. Reg. 9129 (Mar. 12, 1990).  SCI argues, therefore, that the FWS decision not to differentiate between wild and captive antelope when listing the Three Antelope Species was inconsistent.  "Inconsistency, without an explanation," SCI argues, "qualifies as arbitrary and capricious agency action."  *SCI* Reply in Support of Mot. for Prelim. Inj. ("*SCI* Reply") at 1.

The Court disagrees.  SCI's arguments fail because the treatment of the wild and captive animals in their examples are just that—examples.  The plaintiffs have pointed to no evidence suggesting that differentiating between wild and captive animals in listing decisions is a policy of the FWS, nor that any policy was abrogated when the FWS decided not to differentiate between wild and captive animal populations when listing the Three Antelope species as endangered.  In fact, the Federal Defendants note that the examples cited by SCI are "four isolated listing decisions out of thousands that the [FWS] has made since Congress enacted the ESA in 1973."  *SCI* Opp. Mem. at 14.  An agency decision to treat the wild and captive antelope together in the Listing Decision came only after consideration over the period from 1991 to 2005.  The fact that the FWS has over time differentiated between wild and captive animals in the case of other animal species does not, on its own, suggest to the Court that the decision not to do so in this case was arbitrary and capricious.[9]

Indeed, the examples cited by SCI are not even necessarily analogous to the Three Antelope species in captivity.  The Federal Defendants point out that two of the examples cited by SCI (the Arkansas River Shiner and the Arctic Grayling) do not even involve "captive" populations, *see SCI*

---

[9] SCI argues that "[t]he issue is not whether the FWS had any sort of policy to deal with inclusion or exclusion of non-native captive members of a species for the purposes of listing.  The point is that the [FWS] had, on other occasions, followed a practice of disparately classifying captive and wild populations.  When the FWS addressed the three antelope species, it claimed that it could not treat captive populations differently and yet failed to explain the reason for that inconsistency."  *SCI* Reply at 10.  This argument is unavailing.  This Court will not grant preliminary injunctive relief on the basis that associations are dissatisfied with an agency's explanation for why, after years of considering an issue, it did not decide the issue the same way it decided another issue related to a completely different animal species.

Opp. Mem. at 16, which makes them wholly distinguishable from the Three Antelope species.  The

Federal Defendants also note that disparate treatment of captive and native populations of Nile

Crocodiles was abolished in less than 18 months.  *See SCI* Opp. Mem at 18 n.7 (citing 53 Fed. Reg.

38,451 (Sept. 30, 1998); 50 C.F.R. § 17.11(h)).  The FWS was also "recently petitioned to list all

chimpanzees as endangered. . . ."  *Id.* (citing 76 Fed. Reg. 54,423 (Sept. 1, 2011)).  If all

chimpanzees are listed as endangered, the Federal Defendants argue that there would be "no

instances in which members of a species held in captivity are designated differently than the species

in the wild."  *Id.*  The argument that the FWS made a wildly "inconsistent" decision here by not

distinguishing the wild and captive populations of the Three Antelope species is unavailing.  SCI

has simply not demonstrated that FWS acted arbitrarily and capriciously in treating captive animals

differently than native animals in its decision to list the Three Antelope species as endangered.[10]

Nor has SCI shown that the FWS was obligated to designate a "Distinct Population Segment

Policy" ("DPS") as it did in the cases of the Nile Crocodile and Chimpanzee, or to provide a reason

for not creating a DPS.  First, the FWS may designate a DPS, in which an animal species is

designated differently based on whether it is captive or in the wild, in its discretion.  16 U.S.C. §

1533(a)(1) ("The Secretary shall . . . determine whether any species is an endangered species or

threatened species . . .").  Second, although a party may petition the FWS to determine whether

designation of a DPS is appropriate, *see* 16 U.S.C. § 1533(b)(3)(A), SCI did not do so before the

Listing Rule went into effect, according to Federal Defendants.  *See* SCI Opp. Mem. at 20.  Thus,

the FWS was not required to designate a DPS, nor to explain why it had not done so.  The resulting

listing decision, while different than the decision to distinguish between captive and native

---

[10] SCI argues that "[f]ederal defendants . . . incorrectly inform the Court" that the chimpanzees are the last example of a
case where the FWS has differentiated between captive and wild populations.  *SCI* Reply at 12.  SCI points to
classification of the Southern Resident killer whale by the National Marine Fisheries Service as another example.  *See*
70 Fed. Reg. 69,903, 69,910-11 (Nov. 18, 2005).  Nevertheless, the Court is still not convinced that examples of this
type demonstrate that the FWS has *in this case* acted arbitrarily and capriciously by grouping together the wild and
captive populations of the Three Antelope species in its Listing Decision.

members of the Chimpanzee and the Nile Crocodile species, has not been shown to be arbitrary and capricious.

### iii.   The FWS Decision to List the Captive Populations as Endangered Was Consistent with the Purpose of the Endangered Species Act

SCI argues that the FWS "ignored the conservation mandates of the ESA and the fact that inclusion of the captive populations would harm rather than serve the conservation of populations of the three antelope species." *SCI* Mem. at 22.  The Federal Defendants, however, respond that the FWS interpretation of the ESA, as embodied in the Listing Rule, is consistent with the purposes of the ESA.  *SCI* Opp. Mem. at 21.  The Court agrees.

The purposes of the ESA are enumerated in section 1531(b):

> The purposes of this Act are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

16 U.S.C. § 1531(b).

SCI has not shown that the FWS has "ignored the conservation mandates of the ESA." Indeed, by listing both the captive and wild populations of the Three Antelope species as endangered, the FWS has ensured that prohibitions against taking, importing, and exporting will apply to all members of the Three Antelope species.  There will be no confusion about whether a party is attempting to "take" a captive-bred antelope or a wild antelope as there might be if only some of the Three Antelope species were considered "endangered."  The FWS' decision to list the U.S. non-native captive-bred members of the Three Antelope species as endangered was clearly not "erratic," as SCI argues.  *SCI* Mem. at 25.  It was not "unexplained," nor "inconsistent."  *Id*. at 44. Rather, it was based on years of research and included several comment periods.

SCI notes that the FWS itself acknowledged in 2005 that "[l]isting the species without exempting the U.S. captive-bred population could be a deterrent to further captive breeding."

18

United States Department of Interior, Record of Compliance for a Rulemaking Document, signed by Robert R. Gabel, Acting Assistant Director, International Affairs, AR 237.0122, ECF No. 26, Ex. S (Jan. 5, 2005) (cited in *SCI* Reply at 17-18).  This is not a surprising revelation given that the FWS promulgated the exemption for the captive-bred Three Antelope species at the same time as it listed them as endangered.  Following *Friends of Animals*, however, the FWS needed to develop a regulation that was consistent with Judge Kennedy's decision that the exemption violated section 10 of the ESA.  The FWS decision to remove the exemption rather than to promulgate an alternative regulation, or to delist the captive-bred Three Antelope species, has not been shown to be arbitrary and capricious.  Accordingly, SCI has not demonstrated that the initial Listing Decision was "arbitrary and capricious" and thus has not shown that it is likely to succeed on the merits.

> **b.  *EWA* Action**

The *EWA* plaintiffs' Motion for a Preliminary Injunction asks the Court to enjoin the Final Rule, which is the same rule the *EWA* plaintiffs challenge in their underlying lawsuit.  The *EWA* plaintiffs argue that the Final Rule is arbitrary and capricious because (1) "there is no support in the record for the permitting scheme[,]" *EWA* Mem. at 19; (2) "FWS failed to consider alternatives to the permitting scheme[,]" *id*. at 21; and (3) "FWS failed to consider delisting the U.S. captive-bred populations."  *Id*. at 30.  The *EWA* plaintiffs further argue that the Final Rule is contrary to law (4) "because it destroys rather than conserves the species as required by [section 7(a)(2) of] the ESA[,]" *id*. at 31; and (5) "because FWS failed to consider the environmental impacts as required by the [National Environmental Policy Act ("NEPA")]".  *Id.* at 34.  The Federal Defendants argue that the *EWA* plaintiffs are unlikely to succeed on the merits of their claims because the plaintiffs have not provided legal support for their claims and because their claims are otherwise meritless.  Specifically, the Federal Defendants argue that (1) the Final Rule "is entirely rational and supported by the record[,]" *EWA* Opp. Mem. at 16; (2) the FWS "adequately responded to comments and, to

the extent required, adequately considered alternatives," *id.* at 18; (3) the FWS "did not have to

consider delisting the U.S. population of the three antelope species in the context of the removal of

the management rule[,]" *id.* at 20; (4) and, since the plaintiffs "failed to provide the required notice

for their Section 7 claim, the [FWS] did not have to consult under ESA Section 7, and in any case,

the [Final Rule] will not jeopardize the continued existence of the species." *Id.* at 24.  The Federal

Defendants also argue that the plaintiffs are not likely to succeed on their NEPA claim.  *Id.* at 26-

31.  For the reasons explained below, the Court agrees that the *EWA* plaintiffs have not established

that they are likely to succeed on the merits of their claims.

### i.        The Final Rule Is Supported by the Record

The *EWA* plaintiffs argue that the Final Rule is arbitrary and capricious "because there is no

support in the record for the permitting scheme." *EWA* Mem. at 19.  The plaintiffs argue that the

FWS' assertion that it "does not believe that ranchers or other holders of these species that are

working for the conservation of the species will reduce or eliminate their herds just because a

permit or other authorization will be required" is baseless because the record is "chockfull" of

comments stating that "these three species will soon disappear from the face of the earth if the

permitting scheme [in] the rule is imposed on the ranchers." *Id.* at 19-20.  "That FWS simply

ignored this evidence and promulgated the rule anyway," the *EWA* plaintiffs argue, "is plainly

arbitrary and capricious." *Id.* at 21.

The Federal Defendants argue, however, that the decision to issue the Final Rule was a

"rational" one supported by the record. *EWA* Opp. Mem. at 16.  Specifically, the Federal

Defendants argue that the FWS issued the Final Rule in order to comply with Judge Kennedy's

decision in *Friends of Animals*. *Id.* at 16.  They argue that they had "to act to comply with the

Court's order and, conversely, not acting would have allowed a regulation that violates the ESA to

remain in place." *Id.*  The Court agrees.  Judge Kennedy ruled that the FWS rule exempting the

Three Antelope species from many of the regulations and prohibitions of ESA violated ESA section 10(c), by not providing the public notice and an opportunity to comment on each permit application, and remanded the matter to the FWS for further proceedings consistent with his decision.  The FWS' decision to remove the exemption for captive-bred animals of the Three Antelope species was consistent with Judge Kennedy's decision.  The FWS decision means that the Three Antelope species will be subject to the permitting requirements attendant to animals listed as "endangered" under the Endangered Species Act.  The Court agrees with the Federal Defendants that the decision to issue a Final Decision consistent with Judge Kennedy's opinion, and after a public comment period, was not arbitrary and capricious.

> ii.     **The FWS Adequately Responded to Comments and Considered Alternatives to the Final Rule to the Extent it Was Required to Do So**

The *EWA* plaintiffs next argue that the Final Rule is "arbitrary and capricious because FWS failed to consider alternatives to the permitting scheme." *EWA* Mem. at 21.  "Not only did FWS impose an arbitrary, one-size-fits-all rule never meant to apply to these ranches," the *EWA* plaintiffs argue, but "FWS also completely failed to consider any alternative to the permitting scheme envisioned in the final rule." *Id.*  As the Federal Defendants point out, the *EWA* plaintiffs do not point to any authority to suggest that the FWS had to consider any other particular alternatives. EWA Opp. Mem. at 18; *see, e.g*, *WHHT, Inc. v. FCC*, 656 F.2d 807, 818 (D.C. Cir. 1981) ("It is only in the rarest and most compelling of circumstances that this court has acted to overturn an agency judgment not to institute rulemaking.").  Even so, the FWS noted in the preamble to the Final Rule that it had "considered whether there were alternative means to comply with the Court's ruling [in *Friends of Animals*] without requiring ranches or other facilities holding these species to obtain a permit or other authorization."  77 Fed. Reg. at 432.  "However," the FWS noted, it "was unable to identify an alternative other than the currently established regulations at 50 C.F.R. 17.21(g) and 17.22 – providing for the registration of captive-bred wildlife or issuance of a permit –

that would provide the public an opportunity to comment on proposed activities being carried out with these species." *Id.*

The *EWA* plaintiffs also argue that the FWS failed to respond to numerous comments about the Final Rule during the comment period. *EWA* Mem. at 22-30. The FWS argues convincingly, however, that it was not required to respond to alternatives to removing the exemption rule if the alternative suggestions did not "offer a solution to fix the ESA Section 10(c) problem . . . ." *EWA* Opp. Mem. at 19. Since the FWS only proposed the Final Rule in order to be consistent with Judge Kennedy's decision with respect to ESA Section 10(c), not answering those comments that were outside of the scope of this rulemaking is not arbitrary and capricious.

### iii.    The FWS Was Not Required To Consider Delisting the Captive-Bred Three Antelope Species

The plaintiffs argue that the Final Rule is "arbitrary and capricious because FWS failed to consider delisting the U.S. captive-bred populations." *EWA* Mem. at 30. The *EWA* plaintiffs argue that "[f]or no reason at all FWS refused to consider removing the three species from the endangered species list – even though they would not have been listed without the tandem exemption rule back in 2005 . . . ." *Id.* The Federal Defendants argue, and the Court agrees, however, that FWS was not required to initiate a delisting of the Three Antelope species, or even consider a delisting, as part of its rulemaking with respect to the Final Rule. *EWA* Opp. Mem. at 20-23. Not considering delisting the captive-bred species from endangered species status does not establish that the FWS acted arbitrary and capriciously in issuing the Final Rule.

### iv.    Plaintiffs Have Not Shown That The Challenged Rule Is Contrary To Law "Because It Destroys Rather Than Conserves The Species As Required By The ESA"

The plaintiffs argue that the Final Rule is "contrary to law because it destroys rather than conserves the species as required by the ESA." *EWA Mem.* at 31. The *EWA* plaintiffs argue that that "FWS was obligated under the ESA to ensure the conservation of these three species of

endangered antelope but did not do so . . . ."  *Id.* at 34.  "Since the ultimate goal of the ESA is for

species to be removed from the endangered or threatened lists because of recovery," the *EWA*

plaintiffs argue, "action that limits (or prevents) the endangered antelope populations from

recovering is contrary to the requirements of the ESA."  *Id.* at 32.   The *EWA* plaintiffs argue that

the permitting requirements that will go into effect on April 4, 2012 will "result in a reduction of the

reproduction, numbers, and distribution of the antelope," which will mean a "decrease in genetic

diversity," and will "also ultimately reduce the sustainable population size."  *Id.* at 33-34.  The FWS

considered these possible implications of the Final Rule, however, and disagreed with the plaintiffs.

The Federal Defendants note in particular that the FWS "considered the possibility that holders of

U.S. captive members of the Three Antelope species might dispose of their stock rather than obtain

authorization or permits before carrying out previously exempted activities and determined that it

did not believe this would occur, and, if it did, that it would not significantly impact the

conservation of the species."  *EWA* Opp. Mem. at 31 (citing 77 Fed. Reg. at 433 (Resp. to Cmt. 4)).

While the plaintiffs have raised compelling questions about the implications of the Final Rule, the

Court concludes that the plaintiffs have not shown that the FWS decision to issue the Final Rule

was contrary to law.  Accordingly, while the Court need not reach a final decision on the plaintiffs'

claims in the context of the instant motions, it concludes that plaintiffs have not carried the burden

of showing their likelihood of success on the merits, as would be necessary for this Court to grant

preliminary injunctive relief.[11]

---

[11] The plaintiffs also argue that the Final Rule is "contrary to law because FWS failed to consider the environmental impacts as required by the NEPA."  *EWA* Mem. at 34.  Under Section 102(2)(C) of NEPA, agencies shall "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on," *inter alia*, "the environmental impact of the proposed action."  42 U.S.C. § 4332.  The *EWA* plaintiffs argue that the FWS "circumvented compliance with these requirements, claiming that the rulemaking in this case was 'administrative' and 'legal' in nature, and required by the district court's invalidation of an earlier rule."  *EWA* Mem. at 34.  The Court concludes that the *EWA* plaintiffs have not shown a likelihood of success on this question.  The Court declines, however, to provide a detailed statutory analysis on this issue until there is more complete briefing from the parties.

### 2.     Plaintiffs Do Not Establish That A Preliminary Injunction Is Necessary To Prevent Irreparable Harm

The plaintiffs argue that, although the Final Rule does not go into effect until April 4, 2012, "the harm is already occurring." *SCI* Mem. at 32.  The FWS' enforcement of the endangered species status, SCI argues, has already "proved to be cataclysmic for the conservation of these species." *Id.* at 41.  EWA argues that "[t]he draconian effect of this new rule is easy to predict since publication of the proposed rule last summer, many owners have already disposed of half or all of their oryx, addax and dama gazelles." *EWA* Mem. at 2.  These claims about the adverse impact on the U.S. herds of these endangered species from the Final Rule, even before it becomes effective, are obviously disturbing.  Neither SCI nor the *EWA* plaintiffs have shown, however, that they are entitled to a preliminary injunction because they will suffer irreparable harm.  In the case of both SCI and the *EWA* plaintiffs, the harm alleged is (1) primarily economic and (2) in any case, remedied by the permit practice that is already in place.

### a.     Alleged Irreparable Harm is Primarily Economic

The plaintiffs' primary arguments for irreparable harm are economic harm arguments.  SCI argues that "[t]he value of these animals has plummeted which has severely undermined the ability of ranchers to continue to invest in these animals and to continue to feed, maintain, and breed these animals." *SCI* Mem. at 32.  SCI emphasizes that "[t]he reality of conservation is that it is dependent upon funding." *Id.*  According to SCI, some ranchers have already sold their herds of the Three Antelope species in anticipation of the Final Rule, which has led to an increase in sellers, resulting in a "glut in the market and a precipitous drop in the value of these animals." *Id.*  These events, according to SCI, "demonstrate the irreparable harm that the enforcement of endangered status is bringing to the conservation of these animals and to those who wish to own, hunt, conserve, and otherwise enjoy them." *SCI* Mem. at 33; Decl. of Thomas Wier, Case No. 11-cv-01564, ECF No. 26, Ex. BB, at ¶¶ 12-13 (noting that the value of his male scimitar-horned oryx dropped from a

value of $3,500 to a value of $1,100); Decl. of Timothy Mark Terry, Case No. 11-cv-01564, ECF

No. 26, Ex. CC, at ¶ 4 (who eliminated entire herd of 45 scimitar-horned oryx and 35 addax by

hunting and selling the animals); Decl. of David Andrew Lesco, Case No. 11-cv-01564, ECF No.

26, Ex. DD, at ¶ 18 (noting that "[t]he permit requirements that have been announced have made it

economically infeasible to continue to maintain these animals. The prices have dropped so low that

my scimitar-horned oryx cannot pay for their own upkeep"); Decl. of J. David Bamberger, Case No.

11-cv-01564, ECF No. 26, Ex. EE, at ¶ 26 (a breeder of scimitar-horned oryx who notes that

"hunting has played a significant role in our conservation because hunting ranches, with few

exceptions, were the only market for our surplus").

The *EWA* plaintiffs likewise argue that irreparable harm to these species is demonstrated by

the declarations submitted by Exotic Wildlife Ranchers "who find themselves forced to drastically

reduce their herds, or eliminate them entirely, as a direct result of the FWS permit requirements that

make it financially impossible to raise, breed, manage, and conserve these species." *EWA* Mem. at

39. *See* Ed Valicek Decl., Case No. 12-cv-00340, ECF No. 3, Ex. L, ¶¶ 3, 5 (noting that he has

already reduced his herd from between 75-100 animals to 47 and plans to sell the rest if the FWS

permitting requirements go into effect); Tommy E. Oates Decl., Case No. 12-cv-00340, ECF No. 3,

Ex. K, ¶ 5 (observing a 50% reduction in prices for juvenile oryx and addax because of the FWS

rule); Eddy Blassingame Decl., Case No. 12-cv-00340, ECF No. 3, Ex. D, ¶ 3 (noting that he has

decreased his herd from 80 animals to 30 animals "having sold off most of our animals at a

substantial loss after the [FWS] announced they were going to be requiring permits"). The *EWA*

plaintiffs tell of the economic loss to individual ranchers. Eddy Blassingame, for example, "bought

his exotic animal ranch and started breeding scimitar-horned oryx with the dream of passing along

something to his children and grandchildren." *EWA* Mem. at 40. "[W]ith the permitting

requirements . . . ," however, "and the resulting impact on the values of the animals and the ranch as

a whole, he now sees it as more of [a] liability." *Id.* at 40-41.  The *EWA* plaintiffs argue that these

stories of loss are not isolated to individuals and are reflected community-wide amongst those

ranchers involved with the Three Antelope species, noting with linguistic flourish that "[f]ew

plagues have proved as lethal to a species as the FWS [F]inal [R]ule." *Id.* at 41.

The Court does not underestimate the significance of the economic loss to individual

ranchers resulting from the depreciation in the value of the animals.  Nevertheless, the standard for

showing irreparable harm in this jurisdiction is strict, and economic harm alone is generally not

sufficient to warrant this Court's granting of a motion for a preliminary injunction.  The D.C.

Circuit has made it clear that "economic loss does not, in and of itself, constitute irreparable harm."

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  In *Wisconsin Gas Co.*, the D.C.

Circuit emphasized that "'[t]he key word in this consideration is *irreparable*.  Mere injuries,

however substantial, in terms of money, time and energy necessarily expended in the absence of a

stay are not enough.  The possibility that adequate compensatory or other corrective relief will be

available at a later date, in the ordinary course of litigation weighs heavily against a claim of

irreparable harm.'"  *Id.* (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.

Cir. 1958)) (internal quotation marks omitted).  Furthermore, "[r]ecoverable monetary loss may

constitute irreparable harm only where the loss threatens the very existence of the movant's

business."  *Id.* (citing *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*,

559 F.2d 841, 843 n.2 (D.C. Cir. 1977)).  While the plaintiffs have demonstrated that they are

facing or may face significant economic loss, they have not demonstrated that the existence of their

businesses is imperiled by the market changes in the economic value of the Three Antelope

species.[12]

---

[12] The economic success of the private ranchers depends on the willingness of sportsmen to pay thousands of dollars for
the opportunity to hunt an animal from the Three Antelope species.  *See* Decl. of Timothy Mark Terry, ECF No. 26, Ex.
CC, ¶ 11 ("I sold scimitar-horned oryx hunts for $2,750 and addax hunts for $5,000); *see also SCI* Notice of
Information Regarding Permit Implications, ECF No. 57, at 2 ("the hunting and sale of hunts . . .  have been the

Furthermore, the plaintiffs have not shown that a temporary injunction would stop or reverse the drop in the value of these animals that has already taken place.  Thus, to the extent that the plaintiffs are presenting purely economic harm arguments, these arguments do not suffice to warrant the extraordinary remedy of injunctive relief.

>    **b.**     **Any Potential Irreparable Harm is Remedied By The Permitting Regulations Already in Place**

Although SCI acknowledges that "the underpinnings" of the harm it is alleging are financial, SCI argues that "the harm cannot be recompensed via the reimbursement of funds" and the "loss to conservation is the irreparable harm that only an injunction can remedy."  *SCI* Mem. at 32-33.  Likewise, the *EWA* plaintiffs also emphasize that this economic loss does more than devastate the ranchers.  Specifically, they state that there is a "rush on hunting these three antelope species" since the notice of the FWS Final Rule.  *EWA* Mem. at 42.   "While the market has dropped out for the Exotic Wildlife Ranchers who wish to breed, raise, conserve, and have 'live sales' of these species, the same cannot be said for those wishing to hunt the species.  In fact, the FWS rule has caused an explosion of hunting before the rule goes into effect."  *Id.*  The *EWA* plaintiffs also argue that the elimination of the U.S. captive-bred members of the Three Antelope species may also "halt efforts to reintroduce these species in their native lands."  *Id.*  The Federal Defendants argue that SCI will not be irreparably harmed with respect to its interest in the conservation of the Three Antelope species because ranchers "should be able to continue [their] activities," but will now require a permit to do so.  *SCI* Opp. Mem. at 29 (quoting 77 Fed. Reg. at 433).  The Court agrees that any potential irreparable harm with respect to the plaintiffs' interest in the animals, and conservation of the animals, is remedied by the permitting regulations that are already in place.

---

mainstay of the three antelope species' conservation for the last few decades.").  If, as claimed, fewer ranchers handle these animals, no party explains whether the value of and concomitant price for such hunts may increase to the benefit of those ranchers who both continue to support the animals and engage in the available permitting process to allow such hunts.

The regulations in place after the Final Rule goes into effect on April 4, 2012 should allow plaintiffs to continue raising the animals from the Three Antelope species.  First, the ESA does not regulate "purely intrastate activities (with the exception of take)."  77 Fed. Reg. at 433.  Thus, plaintiffs will be able to continue to possess animals, transport them within the state, or sell them to another party within the state without a permit.  *SCI* Opp. Mem. at 29.  Beyond those activities, permits will be available for many of the other activities currently engaged in by the plaintiffs.  The Federal Defendants explain:

> For example, to sell and transport these animals between States, Plaintiff's members may either obtain an interstate commerce permit for the sale (Form 3-200-37) or they may engage in multiple interstate sales if both parties register for a "captive-bred wildlife" (or CBW) permit (Form 3-200-41).  Van Norman Decl. ¶ 3.  If Plaintiff's members get a captive-bred wildlife permit, they may also cull their animals as necessary to maintain a viable and healthy herd.  *Id.*  Plaintiff's members that obtain a captive-bred wildlife permit, however, are required to submit annual reports to the Service (Form 3-200-41a).  *Id.* ¶ 4.  The interstate commerce permit is valid for a single sale; the captive-bred wildlife permits are valid for five years.  *Id.* ¶ 3.  More than 400 facilities nation-wide currently hold captive-bred wildlife permits (including both zoos and individual hobbyists).  *Id.* ¶ 9.  In addition, if Plaintiff's members want to allow hunters to come onto their ranches to hunt these animals, they will also have to obtain a "take" permit (Form 3-200-37).  *Id.* ¶ 5.  The take permit is valid for one year, but may be renewed annually.  *Id.*

*SCI* Opp. Mem. at 29-30 (footnotes omitted).[13]

Notwithstanding the availability of this permitting process, the plaintiffs argue that the irreparable harm facing its members cannot be avoided by obtaining permits.  SCI argues, for example, that "[t]he permits will not restore the value of these animals, nor will they rejuvenate the market for surplus animals.  Permits in the hands of Safari Club members will not reverse the fact that numerous ranchers and breeders have chosen not to continue to maintain their herds and that there will be fewer herds, fewer animals and fewer opportunities to hunt and conserve these antelope."  *SCI* Mem. at 40.  The *EWA* plaintiffs also warn that the permitting requirements that will

---

[13] Indeed, a number of ranchers have applied for permits to engage in interstate commerce and the take of these animals.  According to the FWS, of the 62 applications received since January 17, 2012, the FWS has granted 26 permits for these activities, denied none and have the remaining under review.  Defs.' Statement on the Effects of the Rescission Rule, ECF No. 55, at 4.  The Federal Defendants point out that "only one of the Plaintiffs has chosen to apply."  *Id.*

be in effect after April 4, 2012 are potentially dangerous to the future of the Three Antelope species. They reference, for example, the decline of a closely-related species, the Arabian Oryx.  "Listed as an endangered species in the 1970's, the Arabian oryx has long been subject to the same permitting requirements and restrictions that will be imposed by the [F]inal [R]ule.  There were more than 1,500 Arabian oryx in the United States when they were listed; today, there are less than 250." *EWA* Mem. at 42.  Similarly, the *EWA* plaintiffs invoke the fate of the Barasingha Deer to warn the Court of the possible effects of a permitting requirement for ranchers.  As one of the plaintiffs explains, "[b]ecause these Barasingha Deer were subject to the permitting requirements as soon as they were listed, we have to get a time consuming government permit and annual government approval to harvest a Barasingha for meat, trophy or cull . . . Since no one will buy them, and we no longer want them on our place, we were told by the government that our only option is to separate the males and females and let them attrite away."  *EWA* Mem. at 3 (quoting Nancy Green Decl., Case No. 12-cv-00340, Ex. I, ¶ 2).  The plaintiffs argue that requiring ranchers to seek permits to continue working with the Three Antelope species will similarly lead to the decline of the captive-bred Three Antelope species.

The plaintiffs engage in a certain level of hyperbole in describing what will happen to ranchers holding members of the Three Antelope species upon the effective date of the Final Rule. The *EWA* plaintiffs state, for example, that "when the FWS permit requirement goes into effect, Exotic Wildlife Ranchers' raising herds of the three antelope species without a permit becomes illegal, subjecting them to civil and criminal penalties under the Endangered Species Act."  *EWA* Mem. on Penalties of ESA that Become Effective April 4, 2012, ECF No. 56, at 2.  SCI asserts that "Ranchers/owners cannot even segregate their males from females to prevent further breeding as this is an activity that likely qualifies as a 'taking' which is prohibited by regulation under the Endangered Species Act."  *SCI* Notice of Information Regarding Permit Implications, ECF No. 57,

at 1-2.  In response to the Court's request[14] for supplemental information to clarify the ranching

activities that would be prohibited by the ESA without a permit upon the effective date of the Final

Rule, the FWS made amply clear that these predictions are incorrect.  After the Final Rule becomes

effective, ranchers "may continue to possess these animals, transport them within a State, or sell

them to another party in the same State."  Fed. Defs.' Statement on the Effects of the Rescission

Rule, ECF No. 55, at 3.  The Federal Defendants further state that "Contrary to the claims of

opposing counsel, even if the Plaintiffs do not obtain the necessary permits, the Rescission Rule will

**not** render it illegal to possess these antelope, to hold them captive, or to enclose them within a

fence.  The Plaintiffs may also engage in generally accepted animal husbandry practices, breeding

procedures, and veterinary care of these captive endangered species."  *Id*.  Plaintiffs will still be able

to cull and hunt the animals after the Final Rule becomes effective, "if they obtain the required

permits."  *Id*. at 3-4.

The Court does not find the plaintiffs' assertions about irreparable harm sufficiently

persuasive to grant the extraordinary remedy of preliminary injunctive relief.  The FWS has

provided a viable permitting process through which ranchers and other interested parties could have

sought permits to continue their activities related to the Three Antelope species for the duration of

these lawsuits.  Many ranchers have already availed themselves of this process and obtained

permits.  *See* note 13, *supra*.  The plaintiffs' failure to do so – or lack of interest in maintaining

these animals if permitting requirements are in place – does not constitute a reason for this Court to

grant them the extraordinary remedy of injunctive relief from a Final Rule, which the plaintiffs have

known is going into effect at least since it was announced in early January of 2012.  By applying for

permits, the plaintiffs and other interested parties could have protected their interest in continuing

with their activities with the Three Antelope species for the duration of this lawsuit.  *See, e.g.*, Decl.

---

[14] The Court made this request during a telephonic conference with the parties on April 2, 2012.

of Timothy Mark Terry, Case No. 11-cv-01564, ECF No. 26, Ex. CC, at ¶ 15 ("I chose not to apply

for permits for these animals and instead decided not to continue to keep these animals"); Decl. of

David Andrew Lesco, Case No. 11-cv-01564, ECF No. 26, Ex. DD, at ¶ 15 ("I made some inquiries

about applying for the Captive Bred Wildlife Registration program, but decided not to participate").

It is "well-settled that a preliminary injunction movant does not satisfy the irreparable harm

criterion when the alleged harm is self-inflicted." *Lee v. Christian Coal. of America, Inc*., 160 F.

Supp. 2d 14, 33 (D.D.C. 2001) (internal citation and quotation marks omitted).

In analogous circumstances, plaintiffs who decline the opportunity to avail themselves of a

regulatory scheme to avoid the very harm for which they seek injunctive relief have been denied the

relief.  For example, in *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 847 (7th Cir.

2003), relied upon by the Federal Defendants, the plaintiff sought a preliminary injunction to

prevent the City from applying to established businesses an ordinance requiring dealers in used

audio and video equipment to obtain licenses to sell the merchandise.  The Seventh Circuit found

the plaintiff "would incur no detriment by the act of applying" for the license, and rejected the

plaintiff's contention that it would suffer irreparable harm without the injunction.  *Id*. at 849.  In the

Court's view, if the plaintiff went out of business, such injury would be self-inflicted because the

plaintiff could have avoided that injury by simply applying for a license.  *Id*. at 850.  Rather than

enjoin the ordinance, the Seventh Circuit concluded that the "sensible way to proceed is for [the

plaintiff] to obtain a license and continue to operate while it builds a record."  *Id*.

More recently in this jurisdiction, the court in *National Mining Association v. Jackson*, 768

F. Supp. 2d 34 (D.D.C. 2011), denied the plaintiff mining association's request for injunctive relief

to prevent imposition of additional permitting conditions required by the Environmental Protection

Agency.  These conditions "creat[ed] a new level of review by the EPA and an alternate permitting

pathway not contemplated by the current regulatory structure."  *Id*. at 40 (citation omitted).  In the

face of the plaintiff's claim that its members were likely to incur substantial economic losses as a result of the permitting change, the court found the plaintiff had not shown that the losses "would threaten the survival of the business" or were "imminent or certain," since the plaintiff had "not demonstrated how or why these losses cannot ultimately be recovered if and when the mining projects in question are permitted to proceed." *Id.* at 53-54 & n.13.  *Accord Sociedad Anonima Vina Santa Rita v. United States Dep't of the Treasury*, 193 F. Supp. 2d 6, 26 (D.D.C. 2001) (court denied requested injunctive relief to suspend effective date of agency's final rule designating area as an American viticultural area where plaintiff failed to show irreparable injury since plaintiff could petition agency for alternative name and "[q]uite simply, if Plaintiff provides the ATF with evidence . . . and if Plaintiff offers a viable alternative name, the [agency] may meaningfully alter the challenged final rule and thereby avert the harm . . . Plaintiff anticipates.").

SCI disputes the idea that the harm could possibly be "self-inflicted" and argues that a "blind reliance on process completely ignores" market forces that are at play "that are totally outside the control of Safari Club and its members."  *SCI* Reply at 2.  SCI argues, for example, that "[t]he announcement of permits and federal regulation required by the enforcement of endangered status for these populations affected the market for these animals and undermined the incentive for continued conservation."  *Id.*  "The result," SCI argues, "is fewer breeders, fewer animals, depressed value and a stark reversal of the conservation achievements won through a free market and sustainable use conservation."  *Id.*   Similarly, the *EWA* plaintiffs note that FWS' permit system was designed for zoos and wildlife preserves and that the permit system "robs the Exotic Wildlife Ranchers of the economic incentive – destroying the private captive breeding system that has saved these three African antelope species from extinction."  *EWA* Reply at 6.

This kind of market harm, however, even where it impacts the fate of the animals, is just not sufficient to warrant preliminary injunctive relief, especially where the status of the Three Antelope

species as endangered species has been a topic of debate over a period of many years and where

ranchers had the opportunity to seek permits to alleviate at least temporarily some of the forces of

the market that were outside of their control.  Even if the FWS "grossly underestimates the burdens

of its regulatory permitting requirements for these ranchers," *see EWA* Reply at 15, a burdensome

permitting system to take or hunt an animal listed as an "endangered species" is not sufficient

justification for a preliminary injunction in this case.  SCI has not demonstrated irreparable harm to

warrant preliminary injunctive relief.

### 3.        Plaintiffs Do Not Establish That The Balance Of Equities Tips In Their Favor

SCI points out that the Federal Defendants and SCI "actually agree that the balance of

interests, including public interest, must tilt in favor of protected species."  *SCI* Reply at 23.

Similarly, the *EWA* plaintiffs note that "[a] preliminary injunction, pending resolution of the validity

of the FWS's new permit rule, helps the species – and so aids, not injures, FWS."  *EWA* Mem. at

43.  The Federal Defendants and the plaintiffs of course disagree on what "helping the species"

means.  While the FWS stands behind its decision to implement the Final Rule, SCI, for example,

argues, instead, that the "best medicine for three antelope conservation would be to return to a free,

unrestricted trade system and let the ranching and hunting community restore their extremely

successful private conservation system."  *SCI* Reply at 24.  SCI argues that it seeks only to

"maintain the status quo" and that the government's "potential harm from a grant of preliminary

injunctive relief would be minimal if not non-existent."  *SCI* Mem. at 41.  The Federal Defendants

counter that SCI is seeking more than maintenance of the "status quo," and that, by seeking to

enjoin enforcement of endangered status for the U.S. captive members of the Three Antelope

species, SCI is actually arguing that "absolutely <u>zero</u> protections would apply to these animals."

*SCI* Opp. Mem. at 36.

The Court concludes that the balance of equities tips towards the FWS here given its Congressionally mandated role of protecting endangered species. *American Rivers v. U.S. Army Corp of Engineers*, 271 F. Supp. 2d 230, 261 (D.D.C. 2003) ("Congress' enactment of the ESA clearly indicates that the balance of interests 'weighs *heavily* in favor of protected species.'") (quoting *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1510 (9th Cir. 1994)) (emphasis in original). The Court sees no reason to entrust the interest of endangered species to private ranchers, when Congress has already delegated that authority elsewhere. The plaintiffs have not shown that the balance of equities tips in their favor.

### 4. Plaintiffs Do Not Establish That The Public Interest Will Be Served By The Requested Injunctive Relief

Similarly to the discussion concerning the balance of harms, the Federal Defendants and plaintiffs disagree over whether the public interest in conservation of the Three Antelope Species would be more or less served by enforcement of the ESA and the Final Rule against U.S. captive herds of these animals. According to SCI, its requested "stay of endangered status enforcement will restore incentives for private ranchers to continue, recommence or even initiate breeding operations for the three species, and will rejuvenate the market for surplus animals," thereby "restor[ing] the system by which the species' conservation has long been achieved through sustainable use." *SCI* Mem. at 42-43. Likewise, the *EWA* plaintiffs argue that the Final Rule "threatens to extinguish both" the Three Antelope species and the $1.3 billion exotic wildlife ranching industry, with an associated 14,000 jobs, and that, therefore, the public interest favors issuance of injunctive relief staying enforcement of the Final Rule "to conserve these endangered antelope." *EWA* Mem. at 44. The Texas Department of Agriculture, which the Court permitted to file an amicus brief, expresses its view in stark terms that "the Final Rule will kill the sport of hunting these animals, which in turn will kill the industry of breeding and raising these animals, which in turn will kill, through regulation, the three species of Antelope made the subject of this suit, leading to their inevitable

extinction."  Amicus Curiae Brief of the Texas Department of Agriculture in Supp. of Pls.' Mot. for

Prelim. Inj., Case No. 11-cv-01564, ECF No. 52, at 4.

The FWS does not dispute the contributions of private ranching to the conservation of the

Three Antelope species, nor the economic benefits to ranchers and others of the current regulatory

scheme.  Instead, the FWS points out that the Final Rule, although eliminating the Captive-bred

Exemption, would permit continued handling of the animals, including culling and sport hunting.

*See* Decl. Van Norman, Case No. 11-cv-01564, ECF No. 35, Ex. 1, ¶ 3 ("Registration under the

CBW program also allows a facility to cull animals in its herd to maintain a viable and healthy

herd."); ¶ 5 ("In order to allow outside hunters to come on to a ranch to hunt animals, the facility

must obtain an interstate commerce/take permit . . . Through the permit process, the ranch would

identify the number of animals that would likely be culled to maintain a healthy population over a

one-year period [and] [i]f the application were approved, . . . a single permit . . .  would authorize all

approved activities for a one-year period.  This single permit would allow the facility to advertise all

proposed hunts being anticipated during the one-year period to facilitate herd management, since

most advertisements would be considered interstate commerce, and it would authorize individuals

other than employees of the facility to lethally take listed specimens.").

The FWS identifies two ways in which the public interest would be disserved if the

requested relief were granted.  First, the relief requested by SCI would result in the wholesale de-

regulation of any domestic activity regarding these animals, eliminating even the regulation in

effect under the Captive-bred Exemption.  The FWS explains that SCI seeks "absolutely <u>zero</u>

protections [to] apply to these animals" so that "ranchers or other holders of these animals could do

anything they wanted with these animals – move them in interstate or foreign commerce, or even

allow lethal take," without having to comply with current regulatory requirements, let alone the

permitting requirements that become effective with the Final Rule.  *SCI* Opp. Mem. at 36.

Specifically, under the current Captive-bred Exemption, the Three Antelope species must be handled in a "manner that contributes to increasing or sustaining captive numbers or to potential reintroduction to range countries." 50 C.F.R. § 17.21(h)(1); *see also id*. § 17.21(h)(3)-(8) (additional restrictions including prevention of hybridization, maintenance of genetic diversity, etc.). *See SCI* Opp. Mem. at 36. The FWS cautions that "allowing unregulated trade in the captive U.S. animals would undermine the conservation of the[se] species in the wild," *id*. at 37, by making it more difficult to enforce the ESA and the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), which prohibits the import, export, trade and possession of species listed under the Convention, including the Three Antelope species. *Id*.; Van Norman Decl., Case No. 11-cv-01564, ECF No. 35, Ex. 1, ¶ 12. Even accepting as entirely valid the success under the current regulatory framework of private ranching in the conservation of the Three Antelope species, the Court cannot ignore the risk of the harms to these endangered species identified by the FWS from elimination of all regulation of the Three Antelope species.

Moreover, the Court is cognizant that to effectuate the over-arching goal of the ESA to conserve endangered species, the law expressly requires the FWS to publish in the Federal Register notice, with a 30 day comment period, of applications for permits to handle listed species in a manner otherwise contrary to the law. *Friends of Animals v. Salazar*, 626 F. Supp. 2d at 106 (citing 16 U.S.C. § 1539(c)). This provision provides a mechanism for "meaningful public participation" and an opportunity for the public "to monitor whether hunting ranches actually fulfill the purposes of the ESA . . . ." *Id*. at 117-18. Since promulgation of the Captive-bred Exemption in 2005, this mechanism has been subverted and the public has been "shut out," *id*. at 118, because the exemption allows holders of the Three Antelope species to engage in otherwise prohibited activities without a case-by-case review of each permit application. Granting the relief requested by the *EWA* plaintiffs to enjoin enforcement of the Final Rule, even though this request is more narrow than the

relief sought by SCI, would persist in denying the public that information which the ESA requires to be made public under an exemption found to be unlawful almost three years ago.  This is a disservice to the public interest that weighs against grant of the requested injunctive relief.

## IV.    CONCLUSION

For the reasons explained above, the Court denies the Motions for Preliminary Injunctions of SCI and the *EWA* plaintiffs.  An appropriate Order will accompany this Memorandum Opinion.


**DATED: April 3, 2012**

/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge