UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil No. 11-cv-01564 (BAH) |
| | ) |
| KEN SALAZAR, Secretary of the Interior, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| ——————————————————— | ) |
| | ) |
| TERRY OWEN, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil No. 12-cv-00194 (BAH) |
| | ) |
| UNITED STATES DEPARTMENT OF THE | ) |
| INTERIOR, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| ——————————————————— | ) |
| | ) |
| EXOTIC WILDLIFE ASSOCIATION, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil No. 12-cv-00340 (BAH) |
| | )   (Consolidated Cases) |
| UNITED STATES DEPARTMENT OF THE | ) |
| INTERIOR, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| ——————————————————— | ) |

**<u>FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

Federal Defendants Ken Salazar, et al., hereby cross-move for summary judgment on

Counts I-IV in Plaintiff Safari Club International's ("SCI") Complaint pursuant to Federal Rule

of Civil Procedure 56(c) and Local Civil Rules 7 and 56.1.[1]  This motion is supported by the

accompanying Memorandum, and the administrative record.

April 27, 2012                                    Respectfully submitted,

                                                 IGNACIA S. MORENO
                                                 Assistant Attorney General
                                                 Environment & Natural Resources Division

                                                 SETH M. BARSKY, Section Chief
                                                 S. JAY GOVINDAN, Asst. Section Chief


                                                 /s/ Meredith L. Flax
                                                 MEREDITH L. FLAX
                                                 Sr. Trial Attorney (D.C. Bar No. 468016)
                                                 U.S. Department of Justice
                                                 Environment & Natural Resources Division
                                                 Wildlife & Marine Resources Section
                                                 Ben Franklin Station, P.O. Box 7611
                                                 Washington, D.C. 20044-7611
                                                 Telephone: (202) 305-0404
                                                 Facsimile: (202) 305-0275
                                                 Meredith.Flax@usdoj.gov

                                                 *Attorneys for Federal Defendants*

---

[1] Count V of SCI's Complaint and the Complaint filed by Plaintiffs Owen, *et al.* also allege that the Service has failed to make a timely 90-day finding on their petitions to delist the U.S. captive-bred herds of the Three Antelope species.  ECF No. 1 (in Civil No. 11-cv-1564 (BAH)) at ¶¶ 100-106; ECF No. 1 (in Civil No. 12-cv-00194 (BAH)).  SCI and the Owen Plaintiffs moved for summary judgment on these claims on March 23, 2012.  ECF No. 45at 40-42; ECF No. 43-1. The parties filed a stipulation to stay those claims to allow them time to discuss settlement.  ECF No. 67.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 11-cv-01564 (BAH) |
| ) | |
| KEN SALAZAR, Secretary of the Interior, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| TERRY OWEN, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 12-cv-00194 (BAH) |
| ) | |
| UNITED STATES DEPARTMENT OF THE ) | |
| INTERIOR, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| EXOTIC WILDLIFE ASSOCIATION, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 12-cv-00340 (BAH) |
| ) | (Consolidated Cases) |
| UNITED STATES DEPARTMENT OF THE ) | |
| INTERIOR, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**INTRODUCTION**.................................................................................................................. 1

**BACKGROUND** ................................................................................................................. 2

I.   STATUTORY BACKGROUND.................................................................................. 2

   A.  ESA's Application to Domestic Species.......................................................... 2

   B.  ESA's Application to Foreign Species............................................................. 4

II.  FACTUAL BACKGROUND ....................................................................................... 6

   A.  The Three Antelope species ............................................................................ 6

   B.  Regulatory History .......................................................................................... 7

   C.  Litigation History – The Management Rule .................................................... 9

   D.  Litigation History – Petitions to Delist ......................................................... 10

**STANDARD OF REVIEW** .............................................................................................. 11

**ARGUMENT**.................................................................................................................... 13

I.   THE SERVICE'S DECISION TO LIST ALL MEMBERS OF THE THREE
   ANTELOPE SPECIES AS ENDANGERED WAS CONSISTENT WITH SERVICE
   POLICY AND PRACTICE AND BASED ON YEARS OF CONSIDERATION. .......... 13

II.  THE SERVICE WAS NOT REQUIRED TO DESIGNATE THE THREE  ANTELOPE
   SPECIES IN THE UNITED STATES AS A DISTINCT  POPULATION SEGMENT
   AND APPROPRIATELY EXERCISED ITS  DISCRETION........................................ 20

III. THE SERVICE'S DECISION TO LIST ALL MEMBERS OF THE THREE
   ANTELOPE SPECIES AS ENDANGERED WAS CONSISTENT WITH THE
   PURPOSES OF THE ESA. .......................................................................................... 22

IV. TO THE EXTENT ANY REMEDY IS REQUIRED, REMAND WITHOUT VACATUR
   WOULD BE THE ONLY APPROPRIATE REMEDY.................................................. 25

**CONCLUSION** ................................................................................................................. 27

## **TABLE OF AUTHORITIES**

**CASES**                                                                                     **PAGE**

Advocates for Highway and Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136
   (D.C. Cir. 2005)....................................................................................................................... 25

Alliance for the Wild Rockies v. Allen, No. 04-cv-1813-JO, 2009 WL 2015407 (D. Or. July 1,
   2009).......................................................................................................................................... 25

Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146 (D.C. Cir. 1993) ........... 25

Am. Wildlands v. Kempthorne, 478 F. Supp. 2d 92 (D.D.C. 2007), aff'd 530 F.3d 991 (D.C. Cir.
   2008).................................................................................................................................. 11, 12

Am. Wildlands v. Kempthorne, 530 F.3d 991 (D.C. Cir. 2008).................................................... 12

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87 (1983) ............................ 11

Beth Rochel Seminary v. Bennett, 624 F. Supp. 911 (D.D.C. 1985) ........................................... 24

Bowman Transp. v. Arkansas-Best Freight Sys., 419 U.S. 281 (1974) ...................................... 11

Camp v. Pitts, 411 U.S. 138 (1973) ............................................................................................. 13

Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior, 731 F. Supp. 2d 15 (D.D.C. 2010)
   ................................................................................................................................................... 20

Center for Biological Diversity v. Norton, 254 F.3d 833 (9th Cir. 2000) .................................... 21

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402(1971).......................................... 11, 13

Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne, 531 F.3d 792 (9th Cir. 2008) ........... 19, 20, 21

Endangered Species Comm. v. Babbitt, 852 F. Supp. 32 (D.D.C. 1994) ..................................... 25

Envtl. Def. Fund v. Costle, 657 F.2d 275 (D.C. Cir. 1981)........................................................... 11

Ethyl Corp. v EPA, 541 F.2d 1 (D.C. Cir. 1976) (en banc)........................................................... 12

Friends of Animals v. Salazar, 626 F. Supp. 2d 102 (D.D.C. 2009) .............................................. 9

Home Builders Ass'n v. U.S. Fish and Wildlife Serv., No. S-05-cv-0629 WBS-G, 2007 WL
   201248 (E.D. Cal. Jan. 24, 2007) ........................................................................................... 26

Humane Soc'y v. Kempthorne, 579 F. Supp. 2d 7 (D.D.C. 2008)................................................. 25

Hurst v. United States, 882 F.2d 306 (8th Cir. 1989) ................................................................... 20

Int'l Fabricare Inst. v. EPA, 972 F.2d 384 (D.C. Cir. 1992) ....................................................... 12

In re Polare Bear Endangered Species Act listitng and 4(d) Rule Litig., 794 F. Supp. 2d. 65
    (D.D.C. 2011) .......................................................................................................................... 20

Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989) ..................................................... 11

Milk Train, Inc. v. Veneman, 310 F.3d 747 (D.C. Cir. 2002) ...................................................... 26

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983) ................... 12

N.C. Fisheries Ass'n v. Gutierrez, 550 F.3d 16 (D.C. Cir. 2008) ................................................ 24

National Ass'n of Home Builders v. Norton, 340 F.3d 835 (9th Cir. 2003) .......................... 19, 20

Nat'l Ass'n of Home Builders v. Norton, No. 00-cv-0903-PHX-SRB, 2004 WL 3740765 (D.
    Ariz. June 28, 2004) ................................................................................................................ 25

Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 254 F. Supp. 2d 1196(D. Or. 2003)........... 26

Natural Res. Def. Council v. U.S. Dep't of Interior, 275 F. Supp. 2d 1136 (C.D. Cal. 2002)...... 26

New York v. Reilly, 969 F.2d 1147 (D.C. Cir. 1992) ................................................................... 12

United Mine Workers v. Fed. Mine Safety & Health Admin., 920 F.2d 960 (D.C. Cir. 1990) ... 25

United Steel v. Pension Benefit Guaranty Corp., --- F. Supp. 2d --- No. 09-cv-517 (BAH), 2012
    WL 917554,  (D.D.C. Mar. 20, 2012) .................................................................................... 13

Wyoming v. U.S. Dep't of Interior, 360 F. Supp. 2d 1214 (D. Wyo. 2005), aff'd on other grounds,
    442 F.3d 1262 (10th Cir. 2006) ............................................................................................... 21

**STATUTES**                                                                                      **PAGE**

16 U.S.C. § 1531(b) ................................................................................................................. 2, 22

16 U.S.C. § 1532(6) ....................................................................................................................... 2

16 U.S.C. § 1532(16) ..................................................................................................................... 3

16 U.S.C. § 1532(19) ..................................................................................................................... 3

16 U.S.C. § 1532(20) ............................................................................................ 2

16 U.S.C. § 1533 ................................................................................................... 2

16 U.S.C. § 1533(a) .......................................................................................... 4, 19

16 U.S.C. § 1533(c) ............................................................................................. 19

16 U.S.C. § 1533(a)(1) ........................................................................................... 8

16 U.S.C. § 1533(b)(1)(A) ...................................................................................... 3

16 U.S.C. § 1533(a)(3)(A) ...................................................................................... 5

16 U.S.C. § 1533(b)(3)(A) ............................................................................... 10, 20

16 U.S.C. § 1536(b)(4) ........................................................................................... 3

16 U.S.C. § 1538(a)(1) ............................................................................... 3, 22, 23

16 U.S.C. § 1538(a)(1)(A) ...................................................................................... 5

16 U.S.C. § 1538(a)(1)(B) ...................................................................................... 5

16 U.S.C. § 1538(a)(1)(C) ...................................................................................... 5

16 U.S.C. § 1538(a)(1)(D) ...................................................................................... 5

16 U.S.C. § 1538(a)(1)(E) ...................................................................................... 5

16 U.S.C. § 1538(a)(1)(F) ...................................................................................... 5

16 U.S.C. § 1538(c) ............................................................................................... 5

16 U.S.C. § 1539(a)(1)(A) ...................................................................................... 3

16 U.S.C. § 1539(a)(1)(B) ...................................................................................... 3

16 U.S.C. § 1539(c) ............................................................................................... 4

16 U.S.C. § 1539(d) ............................................................................................... 4

5 U.S.C. § 702 ..................................................................................................... 25

5 U.S.C. § 706 ................................................................................................ 11

5 U.S.C. § 706(2)(A) ................................................................................. 11, 24


**REGULATIONS**                                                                **PAGE**

49 Fed. Reg. 38900 (Oct. 1 1984) ............................................................ 5

50 C.F.R. § 17.11(e) .............................................................................. 4, 18

50 C.F.R. § 17.11(h) ........................................................................ 7, 18, 19

50 C.F.R. § 17.21(g) .................................................................................. 4

50 C.F.R. § 17.21(g)(1)(ii) ....................................................................... 4

50 C.F.R. § 17.21(h) .................................................................... 7, 8, 9, 10

50 C.F.R. § 17.22 ...................................................................................... 4

50 C.F.R. § 17.31 ...................................................................................... 5

50 C.F.R. § 402.01(a) ............................................................................... 5

50 C.F.R. § 402.02 .................................................................................... 5

50 C.F.R. § 424.12(h) ............................................................................... 5

52 Fed. Reg. 23148 (June 17, 1987) ...................................................... 17

53 Fed. Reg. 38451 (Sept. 30, 1988) ..................................................... 18

56 Fed. Reg. 56491 (Nov. 5, 1991) .......................................................... 7

57 Fed. Reg. 24220 (June 8, 1992) ........................................................... 7

61 Fed. Reg. 4722 (Feb. 7, 1996) ............................................................. 3

68 Fed. Reg. 43706 (July 24, 2003) .......................................................... 7

68 Fed. Reg. 66395 (Nov. 26, 2003) ......................................................... 7

70 Fed. Reg. 52310 (Sept. 2, 2005) .......................................................... 7

70 Fed. Reg. 52319 (Sept. 2, 2005) ......................................................................................... 6, 7

70 Fed. Reg. 5117 (Jan. 31, 2006) .............................................................................................. 8

76 Fed. Reg. 54423 (Sept. 1, 2011) ...................................................................................... 17, 18

77 Fed. Reg. 431(Jan. 5, 2012) ................................................................................................ 10

76 Fed. Reg. 39804 (July 7, 2011)......................................................................................... 9, 10

### INTRODUCTION

The Endangered Species Act ("ESA") directs the Secretaries of the Interior and Commerce to determine whether to list species of flora and fauna as endangered or threatened, thereby bestowing upon them various statutory protections. In 1991, the U.S. Fish and Wildlife Service (the "Service") proposed to list the scimitar-horned oryx, addax, and dama gazelle (the "Three Antelope species") as endangered species under the ESA. In the years following that proposal, the Service deliberated over the proper listing status for the species in light of the large numbers of the species held in captivity, including in the United States, and then took no further action on the proposed listing rule due to funding constraints. After environmental and animal rights groups sued the Service for failing to complete the rulemaking process, the Service ultimately issued two rules concurrently on September 2, 2005: a final rule listing the Three Antelope species as endangered ("Listing Rule"); and a final rule exempting the U.S. captive-bred members of the Three Antelope species from certain otherwise-prohibited acts ("Management Rule").

The Listing Rule extends endangered status to all members of the Three Antelope species, whether living in the wild or held in captivity. Indeed, the Service explained that it had determined "[i]t would not be appropriate to list captive and wild animals separately." AR 386.[1] The administrative record demonstrates that the Service sought and considered all available scientific information on the Three Antelope species and considered extensive public comments on the proposed listing rule before making its final determination. The record also shows that

---

[1] Citations to the Service's Administrative Record ("AR") are to the Bates numbers within each document. The Service filed the Administrative Record with the Court on January 18, 2012. ECF No. 22.

the agency considered all of the relevant factors required by the statute and articulated a rational connection between its findings on these factors and its ultimate decision.   The Service's determination is also consistent with Service policy and practice, and with the purposes of the ESA.   In accordance with well-settled principles of administrative law, the Service's decision is entitled to deference and should be upheld as lawful.   Therefore, Federal Defendants are entitled to summary judgment on Counts I-IV in Plaintiff Safari Club International's ("Plaintiff" or "SCI") Complaint.[2]

## BACKGROUND

I.   **STATUTORY BACKGROUND**

A.   **ESA's Application to Domestic Species**

In 1973, Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Section 4 of the ESA directs the Secretary[3] to determine by regulation whether a given species should be listed as endangered or threatened. 16 U.S.C. § 1532(6); 16 U.S.C. § 1532(20);

---

[2] Count V of SCI's Complaint and the Complaint filed by Plaintiffs Owen, *et al.* allege that the Service has failed to make a timely 90-day finding on SCI's and the Exotic Wildlife Associations' petitions to delist the U.S. captive-bred herds of the Three Antelope species.   ECF No. 1 (in Civil No. 11-cv-1564 (BAH)) at ¶¶ 100-106; ECF No. 1 (in Civil No. 12-cv-00194 (BAH)).   SCI and the Owen Plaintiffs moved for summary judgment on these claims on March 23, 2012.   ECF No. 45 at 40-42; ECF No. 43-1. The parties filed a stipulation earlier today to stay those claims to allow them time to discuss settlement.   ECF No. 67.

[3] Depending on the species, either the Secretary of Commerce or the Secretary of the Interior classifies a species as endangered or threatened. 16 U.S.C. § 1533(a). The Secretary of the Interior has responsibility for the Three Antelope species.

16 U.S.C. § 1533. This determination is made on the basis of the "best scientific and commercial data available to him after conducting a review of the status of the species . . ." 16 U.S.C. § 1533(b)(1)(A).

The ESA defines "species" as including any species, subspecies, "and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). The ESA does not define "distinct population segment" ("DPS"), but the Service has concluded that a DPS is a population that is generally "discrete" and "significant" in relation to the species to which the population belongs. *See* DPS Policy, 61 Fed. Reg. 4,722 (Feb. 7, 1996).

Once a species has been placed upon the list of endangered species, it is unlawful under Section 9 of the ESA "for any person subject to the jurisdiction of the United States" to perform certain activities, including "taking" the species, and selling or offering it for sale in interstate commerce. 16 U.S.C. § 1538(a)(1). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" any listed species. 16 U.S.C. § 1532(19).

The general prohibition against take notwithstanding, the ESA establishes specific statutory mechanisms by which a federal agency or private actor may obtain permission lawfully to take a species or its habitat. A federal agency may obtain an "incidental take statement" through the Section 7 consultation process. 16 U.S.C. § 1536(b)(4). Whereas, an "incidental take permit" can be obtained by a non-federal applicant under Section 10, which authorizes take that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

In addition to these provisions for incidental take, Section 10(a)(1)(A) of the ESA authorizes the Secretary to allow take "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A). Applications for permits for scientific or enhancement of propagation or survival purposes are subject to the notice and review provisions of Section 10(c). 16 U.S.C. § 1539(c); 50 C.F.R. § 17.22. Section 10(d) further provides for "exceptions under subsections 10(a)(1)(A) and (b)" if the Secretary finds and publishes in the Federal Register that "(1) such exceptions were applied for in good faith, (2) if granted and exercised will not operate to the disadvantage of such endangered species, and (3) will be consistent with the purposes and policy set forth in section 1531 of this title." 16 U.S.C. § 1539(d). The Service has issued regulations setting forth general application requirements and issuance criteria governing individual permits granted for scientific purposes, enhancement of propagation or survival, or incidental take. 50 C.F.R. § 17.22.

In 1979, under ESA Section 10 authority, the Service established a permit program for enhancement of propagation or survival of captive-bred wildlife ("CBW Regulation"). 50 C.F.R. § 17.21(g). Under the CBW Regulation, a person may "take; export or re-import; deliver, receive, carry, transport or ship in interstate or foreign commerce, in the course of a commercial activity; or sell or offer for sale in interstate or foreign commerce any endangered wildlife that is bred in captivity in the United States provided . . . that . . . [t]he purpose of such activity is to enhance the propagation or survival of the affected species." 50 C.F.R. § 17.21(g)(1)(ii).

B.     **ESA's Application to Foreign Species**

In addition to species native to the United States, foreign species can be listed as threatened or endangered under the ESA. 16 U.S.C. § 1533(a). Individual members of a foreign

species located in the United States or on the high seas receive similar protections as domestic species. 50 C.F.R. § 17.11(e).

However, certain portions of the ESA do not apply to foreign species located outside the United States or on the high seas.  For example, no critical habitat is designated for foreign species concurrently with listing as occurs for domestic species pursuant to 16 U.S.C. § 1533(a)(3)(A). 50 C.F.R. § 424.12(h); 49 Fed. Reg. 38,900, 38,904 (Oct. 1, 1984) (explaining to a commenter that the ESA "does not contain authority to designate critical habitat in areas outside U.S. jurisdiction."). For similar reasons, consultation under ESA Section 7(a)(2) is not required for agency actions beyond U.S. jurisdiction or the high seas. *See* 50 C.F.R. § 402.01(a) (Section 7(a)(2) consultation requirement applies to Federal agency actions "in the United States or upon the high seas"); 50 C.F.R. § 402.02 ("'[a]ction' means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas.").

Generally, the take prohibition of Section 9 also does not apply to take of species in foreign countries, but only to the U.S., U.S. waters, or the high seas. 16 U.S.C. § 1538(a)(1)(B)-(C); 50 C.F.R. § 17.31. Nevertheless, Section 9 does prohibit the import, export, possession, sale, delivery, and transportation of any listed species, including foreign species.[4] 16 U.S.C. § 1538(a)(1)(A), (D), (E), (F) & (d). Similarly, Section 9 incorporates the provisions of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), which prohibits trade in specimens contrary to the provisions of the Convention. 16 U.S.C. § 1538(c). Thus, while the United States does not have the jurisdiction to prohibit take of listed

---

[4] *See also* ECF No. 55 regarding application of Section 9 to captive members of a listed species.

5

species in foreign countries, it is able to discourage take of and trade in such species through these other provisions.

## II.     FACTUAL BACKGROUND

### A.     The Three Antelope species

"Historically, the scimitar-horned oryx (*Oryx dammah*), addax (*Addax nasomaculatus*), and dama gazelle (*Gazella dama*) occupied the same general region of North Africa." 70 Fed. Reg. 52,310 (Sept. 2, 2005). The primary reasons for the decline of all three species is habitat loss through desertification, permanent human settlement, competition with domestic livestock, and regional military activity and uncontrolled killing. *Id.*

Of the Three Antelope species, the scimitar-horned oryx is the most imperiled in the wild. *Id.* By the mid-1980s, it was estimated that only a few hundred were left in the wild. *Id.* However, since the late 1980s, no sightings of this species in the wild have been reported, and at least one source indicates the species is "extinct in the wild." *Id.* Captive-bred scimitar-horned oryx have been placed into large fenced areas for breeding in Morocco and Tunisia and it is anticipated that these animals can re-establish wild populations. *Id.*

The addax was extirpated from Tunisia, Libya, and Algeria, but it is believed that remnant populations may still exist in the remote desert areas of Chad, Niger, and Mali, with occasional movements into Libya and Algeria during times of good rainfall. *Id.* In 2005 when the Service listed the species as endangered, it was believed that there were fewer than 600 addax in the wild. *Id.*

Of the Three Antelope species, the dama gazelle is the least susceptible to pressures from humans and livestock. *Id.* Nevertheless, all subspecies of the dama gazelle have declined rapidly

over the last 20 years, with recent estimates of fewer than 700 in the wild. *Id.* The dama gazelle was previously extinct in Senegal, but has since been reintroduced, and in 1997, at least 25 animals existed there as part of a semi-captive breeding program. *Id.*

**B.      Regulatory History**

On November 5, 1991, the Service published a proposed rule to list the Three Antelope species as endangered under 50 C.F.R. § 17.11(h). 56 Fed. Reg. 56,491. The Service re-opened the comment period to request information and comments from the public regarding the proposed rule on June 8, 1992 (57 Fed. Reg. 24,220), and then again on July 24, 2003 (68 Fed. Reg. 43,706), and November 26, 2003 (68 Fed. Reg. 66,395).

From the outset of the rulemaking process, the Service announced that it was considering a separate regulatory scheme to cover captive-held individuals of these three species outside the species' natural ranges. 56 Fed. Reg. at 56,491, 56,492 & 56,494; *see also* 68 Fed. Reg. at 43,707. The Service proposed such a separate regulatory scheme on February 1, 2005. 70 Fed. Reg. 5,117. The Service sought "data and comments from the public on this proposed rule and the draft Environmental Assessment [ ]" of the impact of the proposed rule pursuant to the National Environmental Policy Act ("NEPA"). *Id.* In July 2005, the Service issued a Final Environmental Assessment for the proposed exemption for U.S. captive-bred antelopes. 70 Fed. Reg. 52,310. On August 9, 2005, it issued a Finding of No Significant Impact. *Id.*

On September 2, 2005, the Service issued both a final listing determination, listing the Three Antelope species as endangered, and a final rule adding a new regulation authorizing certain otherwise-prohibited activities with U.S. captive-bred individuals of the Three Antelope species. 70 Fed. Reg. 52,319 and 70 Fed. Reg. 52,310; *see also* 50 C.F.R. § 17.21(h).

In the Listing Rule, the Service examined the five listing factors,[5] as required by ESA Section 4(a)(1), and found that the Three Antelope species were in danger of extinction based on all five factors other than "disease or predation." 70 Fed. Reg. at 52,321-22. The Service specifically considered captive animals under the "other natural or manmade factors" affecting the species' continued existence factor. *Id.* at 52,322. The Service explained that while captive breeding programs "have effectively increased the numbers of these animals . . . continued habitat loss and w[a]nton killing have made reintroduction nonviable in most cases." *Id.* The Service also explained the negative impact of human development projects on the species and natural pressures on the species from drought and desertification of their habitat. *Id.* Overall, the Service concluded "that the scimitar-horned oryx, addax, and dama gazelle are in danger of extinction from natural factors such as drought and manmade factors that result in habitat loss and uncontrolled killing." *Id.*

The Service also specifically explained, in response to comments, that

> [i]t would not be appropriate to list captive and wild animals separately. Indeed, in the case of the scimitar-horned oryx, there are possibly no wild individuals. However, the Service may authorize otherwise prohibited activities that enhance the propagation or survival of the species, such as captive breeding to increase the

---

[5] The Service is required to determine whether any species is an endangered species or a threatened species because of any of the following five factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms;

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).

population size or improve the gene pool, under section 10(a)(1)(A) of the Act. In response to these comments, on February 1, 2005 (70 FR 5117), we initiated a separate rulemaking by announcing a proposed rule and notice of availability of a draft environmental assessment to add a new subsection, 17.21(h), to govern certain activities with U.S. captive-bred scimitar-horned oryx, addax, and dama gazelle, should they become listed as endangered.

70 Fed. Reg. at 52,320.

### C.     Litigation History – The Management Rule

Different animal rights groups (including the Defendant-Intervenors in this case) filed separate lawsuits challenging the Management Rule in the U.S. District Court for the Northern District of California, and in this Court. After dismissing in part on standing grounds, the Northern District of California court granted Federal Defendants' motion to transfer that case to this Court for consolidation with *Friends of Animals v. Salazar*, 04-cv-01660 (HHK), a case already pending here challenging the same rule. The cases were consolidated before Judge Kennedy, and the parties filed cross-motions for summary judgment. SCI and the Exotic Wildlife Association intervened on behalf of the Federal Defendants in both cases.

On June 22, 2009, Judge Kennedy issued an opinion granting in part and denying in part the parties' cross-motions for summary judgment. *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009). The Court held that the plaintiffs had standing for their ESA Section 10(c) claim only, and did not have standing for their ESA Sections 4, 7, 10(a), and 10(d) claims, or their NEPA claim. *Id.* at 110-114. On the merits of the ESA Section 10(c) claim, the Court held that the Management Rule violated Section 10(c) because, under a *Chevron* step one analysis, the Service was not allowed to issue a blanket permit for all similar activities, but must require the filing of an application for an exemption or a permit, publish notice of each such application, and conduct a case-by-case assessment of that application. *Id.* at 115. The Court remanded to the

Service "for further proceedings consistent with the memorandum opinion." *Friends of Animals*, 04-cv-1660 (HHK), ECF No. 85-2.

To comply with the Court's Order, on July 7, 2011, the Service published a proposed rule to remove the regulation at 50 C.F.R. § 17.21(h) and eliminate the blanket exemption allowing certain activities that would otherwise have been prohibited under the ESA. 76 Fed. Reg. 39,804. The Service provided a 30-day comment period on the proposed rule. *Id.* On January 5, 2012, the Service issued a final rule revising the ESA regulations by removing 50 C.F.R. § 17.21(h). 77 Fed. Reg. 431 ("Removal Rule"). The Service explained that it was changing the regulations "in response to a court order that found that the rule for these three species violated section 10(c) of the Act." *Id.* The Service also explained that "[t]he elimination of this regulation does not alter the current listing status of the species, but does now require that the Service must grant individuals authorization prior to their conducting any activity that is prohibited by the Act." *Id.* at 432. The Service considered whether there were alternative means to comply with the Court's order, but determined there were not. *Id.* The Service provided responses to all comments received during the comment period. *Id.* at 432-436. The Service made the rule effective as of April 4, 2012, in order to facilitate outreach to the affected communities and "allow the affected community to either legally sell their specimens, if they choose to divest themselves of these species, or to apply for authorization or permits to continue carrying out previously approved activities." *Id.* at 431.

### D.    Litigation History – Petitions to Delist

On June 28, 2010, Safari Club International submitted a petition to the Service to delist the U.S. captive-bred herds of the Three Antelope species.  The Exotic Wildlife Association

("EWA") submitted a similar petition to the Service, dated June 29, 2010. The Service has not yet completed a 90-day finding on either petition. *See* 16 U.S.C. § 1533(b)(3)(A).

On August 31, 2011, SCI filed the instant litigation alleging that the Listing Rule is arbitrary because, among other reasons, the Service failed to consider the captive portion of the Three Antelope species in the U.S. separately and to exclude these captive animals from the endangered classification. ECF No. 1.  SCI also alleged that the Service has violated the ESA by failing to make a timely 90-day finding. *Id.* at ¶¶ 100-106.

## STANDARD OF REVIEW

The Service's decision to list the Three Antelope species as endangered is reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which provides a right to judicial review of certain final agency action.  The APA provides that a court may set aside final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid." *Envtl. Def. Fund v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citing, *inter alia*, *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 419 (1971)); *see also Am. Wildlands v. Kempthorne*, 478 F. Supp. 2d 92, 96 (D.D.C. 2007), aff'd 530 F.3d 991 (D.C. Cir. 2008) ("Under the APA's standard of review, there is a presumption of validity of agency action") (citation omitted).  A reviewing court is forbidden from "substituting its judgment for that of the agency." *Envtl. Def. Fund*, 657 F.2d at 283 (citing, *inter alia*, *Overton Park*, 401 U.S. at 416).  Rather, the APA standard "mandates judicial affirmance if a rational basis for the agency's decision is presented . . . even though [a court] might otherwise disagree." *Id.* (citations omitted).  An agency's treatment of the evidence need

not be a "paragon of clarity," but rather what is required is that the reviewing court be able to discern a "rational basis" for the agency's treatment of the evidence. *Bowman Transp. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 289-90 (1974).

Reviewing courts are to be at their "most deferential" when the agency is "making predictions, within its area of special expertise, at the frontiers of science." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 93, 96, 103, 105-106 (1983); *see also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375-77 (1989) (where analysis "requires a high level of technical expertise," court must defer to informed discretion of agency).   As the D.C. Circuit noted in *Ethyl Corp. v EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc), the court "must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Id.*  This Court has explained that:

> [w]ith regard to FWS decisions in particular, "[g]iven the expertise of the [Service] in the area of wildlife conservation and management and the deferential standard of review, the Court begins with a strong presumption in favor of upholding decisions of the [Service]." . . . .   In addition, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."

*Am. Wildlands*, 478 F. Supp. 2d at 96 (citations omitted).   The D.C. Circuit is "particularly deferential when reviewing agency actions involving policy decisions based on uncertain technical information." *New York v. Reilly*, 969 F.2d 1147, 1150-51 (D.C. Cir. 1992) (citation omitted); *see also Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008) ("'[I]n an area characterized by scientific and technological uncertainty[,] this court must proceed with

particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives'"), quoting *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992).

A reviewing court may reverse under the "arbitrary and capricious" standard only "if the agency has relied on factors which Congress has not intended it to consider, [has] entirely failed to consider an important aspect of the problem, [or has] offered an explanation for [that] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   In the APA context, "summary judgment is an appropriate mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *United Steel v. Pension Benefit Guaranty Corp.*, --- F. Supp. 2d ---, No. 09-cv-517 (BAH), 2012 WL 917554, at *12 (D.D.C. Mar. 20, 2012) (citations and quotations omitted).   A reviewing court should determine agency compliance with the law solely on the record on which the decision was made.   *Overton Park*, 401 U.S. 402; *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

## ARGUMENT

## I.   THE SERVICE'S DECISION TO LIST ALL MEMBERS OF THE THREE ANTELOPE SPECIES AS ENDANGERED WAS CONSISTENT WITH SERVICE POLICY AND PRACTICE AND BASED ON YEARS OF CONSIDERATION.

The Service's decision to list all members of the Three Antelope species is consistent with Service policy and practice and was based on years of deliberation over the appropriate way to list these particular species.   Between 1991, when the Service proposed listing these three species, and 2005, when the Service issued its final listing determination, the Service debated internally what would be the proper way to list these species in light of the fact that the species

13

are unquestionably endangered (and, in the case of the oryx, thought to be extinct) in their native ranges, but exist in fairly high numbers in captivity, most notably in the United States. The Service ultimately determined that separately listing captive and wild animals "would not be appropriate." 70 Fed. Reg. at 52,320; AR 386. While the Service determined it was not appropriate to separately list captive and wild animals, it recognized the potentially useful role the U.S. captive animals might play in future reintroduction efforts and the importance of maintaining genetically diverse stocks of these animals by issuing a management rule concurrently with the listing rule that exempted the U.S. captive members of the Three Antelope species from certain otherwise-prohibited activities, including take. AR 386; AR 384.0038.

The record is replete with documents in which the Service discussed internally the appropriate listing status of the Three Antelope species. When it proposed listing these three species, the Service indicated that "[c]aptive and free-roaming groups, outside of the natural ranges of the species, may be covered separately from natural populations in any final rule. Among the alternatives for such groups would be listing as endangered, as threatened with special regulations, or as threatened by reason of similarity of appearance." 56 Fed. Reg. at 56,491; AR 56.0001. Over the next decade, the Service drafted a number of final listing rules based on these alternatives. *See* AR 65.0005 (draft rule to list only wild members of the Three Antelope species as endangered); AR 83-109 (draft rule to list captive and wild members of the Three Antelope species in their native ranges as endangered); AR 109.002 (draft rule to list only wild members of the Three Antelope species as endangered); AR 135.0014, 135.0044, 135.0071 (draft rules to list wild members of the Three Antelope species as endangered and captive animals as threatened); AR 140.0013 (draft rule to list all members of the Three Antelope species

14

as endangered).  But none of these draft final listing rules was ever finalized because the Service disagreed internally on whether a split listing for the Three Antelope species was consistent with Service policy.[6]  *See* AR 134.0001; AR 134.0002; AR 135.0001; AR 135.0008; AR 135.0043; AR 136.0001; AR 136.0002; AR 136.0003; AR 136.0004; AR 136.0006; AR 140.0001; AR 140.0007; AR 141.0001; AR 202.  Between 1994 and 1995, the Service seemed to have reached consensus that the appropriate listing status for the Three Antelope species was to list all members of the species as endangered and to deal with captive members of the species through the ESA Section 10 permitting system.  AR140.0001; AR 140.0007; AR 140.0013; AR 141; AR 141.0001; AR 141.0002.  As explained by Ron Nowak, the primary Service biologist responsible for the listing determination for the Three Antelope species at that time, a split listing would have been "contrary to most listing precedent" and "[c]aptive members of a species should automatically be covered by whatever classification is appropriate for the species as a whole, thereby avoiding any confusion about listing."  AR 140.0001, 141.0002.  *See also* AR 135.0008 (classifying entire species as endangered "would be most in keeping with listing precedent"); AR 1.0001 ("[m]ost precedent suggests that the classification of a species depends on its status in the wild and that any captive stock takes the same classification.").

    Despite the consensus at that time, a final listing determination for the Three Antelope species was delayed by a funding moratorium on listing decisions and action was not

---

[6] These internal discussions demonstrate that the Service was well aware of the split listing for the Chimpanzee when it made the decision that it would not be appropriate to similarly split list the Three Antelope species.  AR 1.0001; AR 2.0002; AR 135.0008.  As these discussions show, at least some Service staff did not believe that the Service had properly considered the policy implications of the decision to confer different statuses on wild and captive Chimpanzees.  AR 135.0008.

recommenced until the Center for Biological Diversity sent the Service a notice of intent to sue letter and then filed suit to compel the Service to complete the rulemaking process. *See* AR 147 (further action on final rule to list Three Antelope species deferred during moratorium); AR 149 (Service's Division of Scientific Authority decides not to move forward with a final rule on the Three Antelope species due to other issues and species listing proposals of higher priority); AR 150 (draft letter responding to notice of intent to sue by Center for Biological Diversity). After reopening the comment period again, the Service ultimately listed all members of the Three Antelope species as endangered. The Service explained that "[i]t would not be appropriate to list captive and wild animals separately. Indeed, in the case of the scimitar horned oryx, there are possibly no wild individuals." AR 386. In recognition of the role that captive breeding to increase the population size or improve the gene pool could play in enhancing the propagation or survival of the species, the Service explained that it had simultaneously issued a separate rule authorizing certain otherwise-prohibited activities with U.S. captive-bred members of the Three Antelope species. *Id.* The Service also stated that its listing determination was proper as "[n]o comments were submitted that demonstrate that the three antelope species do not qualify as endangered under the Act." *Id.*

Notwithstanding the Service's reasonable determination to list all members of the Three Antelope species as endangered, SCI argues that the Service has some type of mandatory or otherwise-established practice or policy to exclude animals held in captivity, by designating a DPS or otherwise, when listing a species, and that the Service failed to explain why it deviated from this practice in the case of the Three Antelope species. *See* ECF No. 45 at 33-34. In an attempt to bolster this argument, Plaintiff points to four isolated listing decisions out of

16

thousands that the Service has made since Congress enacted the ESA in 1973. *Id.* at 34-39 (discussing the listing decisions for the Nile crocodile, the chimpanzee, the Arkansas River shiner, and the Arctic grayling). However, these anomalous examples do not represent any sort of "policy" that would bind the Service; rather, the Service made a reasoned judgment to extend endangered status to the Three Antelope species, including members of the species held in captivity, and this determination is, in fact, entirely consistent with the Service's practice.[7]

Of the four listing decisions Plaintiff points to, two are completely irrelevant to the instant litigation, because they do not involve members of a species held in captivity. *See* ECF No. 45 at 34-35 (discussing the listing decisions for the Arkansas River shiner and the Arctic grayling, which are not captive species).[8] In the instant litigation, one of the most salient aspects of the rule being challenged is the captive nature of the Three Antelope species located in the United States. Neither the Arkansas River shiner nor the Arctic grayling listing decisions involved a captive species. Because the crux of Plaintiff's argument is that the Service is

---

[7] Plaintiff also cites to a decision by the National Marine Fisheries Service ("NMFS") to exclude certain captive-born killer whales when it listed a DPS of the species as endangered.  ECF No. 45 at 36.  While the Service and NMFS both have responsibility to list species under the ESA, depending on the species involved, where, as here, the two agencies do not have a formal policy on treatment of animals in captivity, NMFS's actions do not establish a norm that the Service is bound to follow.  Furthermore, NMFS did not provide the basis for excluding the captive whales from the listing.

[8] Moreover, for both the Arkansas River shiner and the Arctic grayling, the Service found that a native population qualified as a DPS, but that the non-native population did not qualify as a DPS, and so listed only the DPS.  In contrast, as will be discussed in more detail below, the Service was not required to designate DPSs of the Three Antelope species and, in any case, determined that it would not be appropriate to do so.

required to afford captive members of a species different status than wild individuals, this distinction renders the shiner and grayling listing determinations wholly immaterial here.

Moreover, for the other two listing decisions (for the chimpanzee and the Nile crocodile), the Service found that, based on the records for those particular species, it was appropriate for animals held in captivity or as ranched specimens to have a listing status different than those in the wild. Nevertheless, those two decisions do not establish that the Service has a policy of always designating animals in captivity with a different status than those in the wild.[9] To the contrary, the listing decisions for the chimpanzee and the Nile crocodile decisions are outliers – the exceptions that prove that the Service does not have a policy, which has now been deviated from, as Plaintiff suggests.

When determining the status of members of a species held in captivity, the Service makes its decision on a case-by-case basis, based on the data available. In this case, based on the record before the agency, the Service determined that disparate listing statuses would not be appropriate, and indeed would not be possible for the scimitar-horned oryx because "there are possibly no wild individuals." AR 386. That said, it is the general practice of the Service to provide the same listing status to animals held in captivity as animals in the wild of the same species. Indeed, this fact is borne out by an examination of the Service's list of protected species. In the table set out in Section 17.11(h), the Service identifies (i) the historic range of the species

_____

[9] Notably, when the Service first listed the chimpanzee and the Nile crocodile, it conferred the same listing status on all members of the species (for chimpanzees a threatened listing and for the Nile crocodile an endangered listing). *See* 76 Fed. Reg. 54,423, 54,424 (Sept. 1, 2011); 52 Fed. Reg. 23,148, (June 17, 1987).  The Service then later proposed changing the status of certain members of each species that resulted in a split listing. *Id.*  The Service did not initially list only the wild members of the species, as Plaintiff advocates the Service should have done with the Three Antelope species.

18

and (ii) where each species is threatened or endangered. *See* 50 C.F.R. § 17.11(h).[10] Thus, for example, the entire vertebrate population of the addax is listed as endangered. *Id.* Contrast this with the chimpanzee, which, under Section 17.11(h) is listed as threatened in captivity and endangered in the wild. *Id.* Notably, however, one can contrast the chimpanzee with <u>every</u> <u>other</u> species on the list, because the chimpanzee is the <u>only</u> species to have a distinction between the wild and captive animals of the same species.[11] *Id.* As this Court noted in its preliminary injunction ruling on this same issue, ECF No. 61 at 17, this in and of itself shows that the approach taken with listing the chimpanzee is an outlier – not the general rule.[12]

In short, the Service does not have a formal policy of treating captive animals of a species differently than those in the wild, as Plaintiff suggests. Instead, the Listing Rule was reasonable based on its own record, and further, is fully consistent with the Service's general practice for

---

[10] Section 17.11(e) of the Service's regulations makes clear that the reference to historic range does not reduce the protections of the ESA for animals found outside the historic range. 50 C.F.R. § 17.11(e) ("This column does not imply any limitation on the application of the prohibitions in the Act or implementing rules. Such prohibitions apply to all individuals of the species, wherever found.").

[11] The disparate listing statuses of the ranched and wild Nile crocodiles were reconciled in less than 18 months, 53 Fed. Reg. 38,451 (Sept. 30, 1988), and remain the same today. *See* 50 C.F.R. § 17.11(h). The Service was recently petitioned to list all chimpanzees as endangered, which, if granted, would bring the listing status of the captive-bred chimpanzees in line with the status of the wild ones, 76 Fed. Reg. 54,423, and there will be no instances in which members of a species held in captivity are designated differently than the species in the wild.

[12] Moreover, one need look only at the many threatened and endangered species that are held captive in zoos across the United States and the rest of the world to understand this point. With the exception of the chimpanzee, all of these animals have the same listing status as those in the wild. 50 C.F.R. § 17.11(h) (*see, e.g.*, African elephant, Asian elephant, panda, Grevy's zebra).

19

captive members of a species to be afforded the same status as those members of the species in the wild.

II.    **THE SERVICE WAS NOT REQUIRED TO DESIGNATE THE THREE ANTELOPE SPECIES IN THE UNITED STATES AS A DISTINCT POPULATION SEGMENT AND APPROPRIATELY EXERCISED ITS DISCRETION.**

SCI next argues that the Service was obligated to designate the Three Antelope species located in the United States as a distinct population segment like the agency did with the Arkansas River shiner and is contemplating doing with the Arctic grayling. ECF No. 45 at 36-39. But in arguing that the Service was obligated to designate a DPS, SCI fundamentally misunderstands how and when the Service designates distinct population segments.

There are two scenarios in which the Service may designate a DPS.  First, the Service can act on its own initiative and use its discretion to designate a DPS based on the factors in the DPS Policy. *See* 16 U.S.C. § 1533(a), (c); *Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 804 (9th Cir. 2008) (describing the "two methods … for listing species") (citation omitted); *National Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir. 2003) (discussing the Service's discretion in designating DPSs). But the Service is under no <u>obligation</u> to designate a DPS on its own initiative – instead, designating a DPS is merely an optional approach for making a listing classification. *See id.*  Furthermore, it is an authority that Congress has urged the Service to use "sparingly."  *See In re Polar Bear Endangered Species Act Listing and 4(d) Rule Litig.*, 794 F. Supp. 2d 65, 98 (D.D.C. 2011) (citing the Service's DPS Policy, which in turn cites S. Rep. No. 96-151, at 7 (1979)).

Here, the Service determined, in its expert opinion, that designating the Three Antelope species located in the United States as a DPS (or DPSs) was not advisable (and with respect to the oryx, not possible given that the species is thought to be extinct in the wild), 70 Fed. Reg. at 52,320, and that exercise of discretionary judgment is not subject to review. *See generally Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior*, 731 F. Supp. 2d 15, 28-29 (D.D.C. 2010) (decisions whether to exclude areas from a critical habitat designation are unreviewable because the plain language of the statute does not provide a standard by which to judge such discretionary decisions). To be clear, the alleged failure of the Service to designate a DPS does not constitute a non-discretionary duty enforceable through the ESA's citizen-suit provision. *Cf. Hurst v. United States*, 882 F.2d 306, 308 (8th Cir. 1989) (where agency conduct "involves an element of policy judgment or choice on the part of the agency," such conduct is deemed discretionary).

The second method by which a species may be designated as a DPS is that any "interested" party can petition the Service to determine whether designation of a DPS is appropriate. 16 U.S.C. § 1533(b)(3)(A). In that scenario, the ESA mandates that the Service respond to the petition in compliance with the framework set forth in Section 4(b). *Id.* § 1533(b); *Coos Cnty.*, 531 F.3d at 805, 808 (the petition process is governed "by a series of carefully calibrated deadlines" and works to replace "the Secretary's discretion with mandatory, nondiscretionary duties") (quoting *Ctr. for Biological Diversity v. Norton*, 254 F.3d 833, 840 (9th Cir. 2001)). The decision that results from that review, of course, is subject to judicial

review.[13] But in the instant case, neither SCI -- nor any other interested party -- petitioned the Service to designate the Three Antelope species located in the United States as a DPS (or DPSs) prior to the issuance of the Listing Rule.[14] Accordingly, the Service was not obligated to provide a rationale as to why it decided not to designate a DPS. SCI's argument fails as a result.

## III.  THE SERVICE'S DECISION TO LIST ALL MEMBERS OF THE THREE ANTELOPE SPECIES AS ENDANGERED WAS CONSISTENT WITH THE PURPOSES OF THE ESA.

SCI also argues that, in addition to being inconsistent with the Service's policy and past practice, the decision to include the members of the Three Antelope species held in captivity in the U.S. in the Listing Rule is inconsistent with the purposes of the ESA. ECF No. 45 at 40. This misguided argument should be rejected. The Service's interpretation of the ESA, as embodied by the Listing Rule, is consistent with the purposes of the ESA, while Plaintiff's interpretation is wholly untenable.

The Service's interpretation that captive and wild members of a species generally should be listed together is entirely consistent with the purposes of the ESA. The overarching purposes of the ESA are provided in Section 2(b) of the Act:

The purposes of this [Act] are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to

---

[13] The citizen-petition process is intended to "force action on listing and delisting proposals," *Coos County*, 531 F.3d at 808 (citation omitted), and does so by establishing "mandatory bright lines of both timing and behavior that are readily open to judicial review." *Wyoming v. U.S. Dep't of Interior*, 360 F. Supp. 2d 1214, 1229 (D. Wyo. 2005) (citing 16 USC § 1533(b)(3)(C)(ii)), *aff'd on other grounds*, 442 F.3d 1262 (10th Cir. 2006).

[14] The fact that SCI (and the Exotic Wildlife Association) petitioned the Service to delist the Three Antelope species in the United States in 2010 does not help its argument here, as that action occurred after the 2005 listing decision at issue in this case.

provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

16 U.S.C. § 1531(b). Giving the same listing status to captive and wild members of a species furthers these purposes. Once a species is listed as endangered, the full protections of the Act apply, including all the prohibitions found in ESA Section 9(a)(1), such as the prohibitions against take, import, and export. *See* 16 U.S.C. § 1538(a)(1). By giving the same listing status to both the wild and captive members of a species, the Service ensures that these protections inure to the benefit of the species' conservation because it eliminates any potential confusion as to the status of an animal or animal parts that are imported, exported, or re-imported. In contrast, if wild and captive members of the same species have different statuses it becomes easier to attempt to circumvent the system by trying to pass off wild animals or their parts as originating from captive stock.[15]

Notwithstanding this rational approach, SCI alleges that, by including the U.S. captive herds of the Three Antelope species in the listing, the Service's decision is inconsistent with the purposes of the ESA because it allegedly "undermines the conservation that has been achieved

---

[15] Similarly, providing the same listing status to wild and captive animals furthers the purpose of "tak[ing] such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section." 16 U.S.C. § 1531(b). Specifically, the purposes of CITES, one of the conventions set forth in subsection (a) of Section 2, are furthered by the Service's reading of the ESA as generally requiring the same listing status of wild and captive animals of the same species.  CITES purpose is for "States" to take appropriate measures to protect wild fauna and flora against over-exploitation through international trade. http://www.cites.org/eng/disc/text.php#VII (last visited Apr. 26, 2012). As explained above, if captive and wild members of a species had different statuses under the ESA, it would increase the potential for confusion and gaming of the system when an animal is moved between areas where it had one status to an area with a different status. In other words it would be more difficult to regulate the trade in the species.

for the populations living in the United States." ECF No. 45 at 40. SCI's argument is, at a minimum, inconsistent, but in any event, it is flawed as a matter of fact and law.

SCI has acknowledged that the ESA is designed to bring about conservation of the species in the wild, not simply conservation of a species in captivity. ECF No. 26-1 at 23 (citing ESA Section 2(b)'s statement that one purpose of the ESA is to "provide a means whereby *the ecosystems upon which endangered species and threatened species depend may be conserved*"). In arguing that the Service's interpretation of the ESA is inconsistent with the purposes of the ESA, SCI then paradoxically contends that including captive members of the Three Antelope species in the species listing is undermining the conservation of those captive animals <u>in the United States</u>. ECF No. 45 at 40. SCI cannot have it both ways. Under its own reading of the statute, there is no conservation purpose for captive members of a species, except to the extent that they might further the conservation of the species in the wild. But SCI does not argue that the inclusion of the U.S. captive members of the species undermines the conservation of the species <u>in the wild</u>. To the contrary, SCI argues that "[t]he Service did not offer evidence that including the U.S. non-native captive populations would bring some direct benefit to the conservation of the species in their native ecosystems." *Id.* If the purpose of the ESA is to conserve species in the wild, then even assuming SCI was correct that the Listing Decision has some negative impact only upon the conservation of the antelopes held in captivity in the U.S., it would not be inconsistent with the conservation purposes of the ESA. However, affording endangered status to the Three Antelope species held in captivity in the U.S. serves to protect those individuals, as well as advancing the ultimate conservation objectives for the species in the wild.

24

In sum, the Service's construction is consistent with the purposes of the ESA, and SCI has not demonstrated otherwise. *Beth Rochel Seminary v. Bennett*, 624 F. Supp. 911, 916 (D.D.C. 1985) ("It is also well settled that 'the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.'") (citation omitted), aff'd, 825 F.2d 478 (D.C. Cir. 1987).

## IV.     TO THE EXTENT ANY REMEDY IS REQUIRED, REMAND WITHOUT VACATUR WOULD BE THE ONLY APPROPRIATE REMEDY.

Plaintiff has asked the Court to declare the Listing Rule invalid with regard to the U.S. captive bred herds of the Three Antelope species and to "[s]et aside the Final Listing Rule in whole or in part and remand it back to the Federal Defendants for consideration of excluding the U.S. captive populations of the three antelope species from the endangered species listing of the three antelope species."  ECF No. 1 at 29 (Prayer for Relief ¶ 3).  While the Service believes, for all of the foregoing reasons, that the Court should uphold the Service's decision to list all members of the Three Antelope species as endangered, should the Court disagree, the appropriate remedy would be remand without vacatur.

The APA provides that if agency action is found to be arbitrary and capricious, the Court shall "hold unlawful and set aside [such] agency action."  5 U.S.C. § 706(2)(A); *N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) ("under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end:  the case must be remanded to the agency for further action consistent with the corrected legal standards.") (citations omitted).  The APA also states, however, that "[n]othing [in the APA's judicial review provisions] affects . . . the power or duty

of the court to . . . deny relief on any . . . appropriate legal or equitable ground."  5 U.S.C. § 702.

As relevant here, the Court has discretion to remand an agency rule without vacating it.

*Advocates for Highway and Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136,

1151 (D.C. Cir. 2005) ("While unsupported agency action normally warrants vacatur . . . , this

court is not without discretion.") (citation omitted); *Allied-Signal, Inc. v. U.S. Nuclear*

*Regulatory Comm'*n, 988 F.2d 146, 150-51 (D.C. Cir. 1993) ("An inadequately supported rule,

however, need not necessarily be vacated.") (citations omitted); *Humane Soc'y v. Kempthorne*,

579 F. Supp. 2d 7, 21 (D.D.C. 2008).

The D.C. Circuit has "commonly remanded without vacating an agency's rule or order

where the failure lay in lack of reasoned decisionmaking, . . . but also where the order was

otherwise arbitrary and capricious." *United Mine Workers v. Fed. Mine Safety & Health Admin.*,

920 F.2d 960, 966 (D.C. Cir. 1990) (citations omitted).  Moreover, courts have frequently

exercised their discretion to leave the Service's ESA rules, including listing rules, in place

pending remand.  *See Endangered Species Comm. v. Babbitt*, 852 F. Supp. 32, 42-43 (D.D.C.

1994) (remanding listing determination for violation of ESA without vacating); *Nat'l Ass'n of*

*Home Builders v. Norton*, No. 00-cv-0903-PHX-SRB, 2004 WL 3740765 (D. Ariz. June 28,

2004) (leaving listing rule in place pending completion of remand); *Alliance for the Wild Rockies*

*v. Allen*, No. 04-cv-1813-JO, 2009 WL 2015407, at *2 (D. Or. July 1, 2009) (granting voluntary

remand of ESA critical habitat designation and leaving designation in place during remand);

*Natural Res. Def. Council v. U.S. Dep't of Interior*, 275 F. Supp. 2d 1136, 1143-47 (C.D. Cal.

2002) (same); *Home Builders Ass'n v. U.S. Fish and Wildlife Serv.*, No. S-05-cv-0629 WBS-G,

2007 WL 201248 (E.D. Cal. Jan. 24, 2007) (same); *Friends of Animals v. Salazar*, 04-1660-

HHK (D.D.C.) Order dated Jun. 22, 2009 (ECF No. 85-2) (attached hereto as Exhibit 1)

(remanding an ESA Section 10 rule allowing take of U.S. captive-bred antelopes, listed as

endangered, without vacating); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 254 F.

Supp. 2d 1196, 1215-16 (D. Or. 2003) (remanding biological opinion without vacatur to give

agency the opportunity to consult on defects the court had identified in the biological opinion).

The decision whether to vacate or not "depends on (1) the seriousness of the order's

deficiencies (and thus the extent of doubt whether the agency chose correctly) and (2) the

disruptive consequences of an interim change that may itself be changed." *Milk Train, Inc. v.

Veneman*, 310 F.3d 747, 755-56 (D.C. Cir. 2002) (quoting *Allied-Signal, Inc*., 988 F.2d at 150-

151).  In this case, remand without vacatur is the appropriate remedy to allow the agency to

correct any deficiency on remand, the Listing Rule provides the appropriate protections to the

Three Antelope species, and there would be significant, negative consequences of vacating the

Listing Rule.  Under such circumstances, the Court should exercise its discretion to leave the

Listing Rule in place.

## **CONCLUSION**

The Service's decision to list all members of the Three Antelope species – both wild and

captive – as endangered under the ESA was rational, consistent with Service policy and practice,

and consistent with the purposes of the statute.  Accordingly, the Court should grant Federal

Defendants' cross-motion for summary judgment.

April 27, 2012                                      Respectfully submitted,

                                                   IGNACIA S. MORENO
                                                   Assistant Attorney General
                                                   Environment & Natural Resources Division

SETH M. BARSKY, Section Chief
S. JAY GOVINDAN, Asst. Section Chief


*/s/ Meredith L. Flax*
MEREDITH L. FLAX
Sr. Trial Attorney (D.C. Bar No. 468016)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0404
Facsimile: (202) 305-0275
Meredith.Flax@usdoj.gov

**Attorneys for Federal Defendants**

28