## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| SAFARI CLUB INTERNATIONAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:11-cv-1564 BAH |
| | ) | |
| KEN SALAZAR, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## INTERVENOR-DEFENDANTS DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES, AND BORN FREE USA'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. Pro. 56 and Local Rule 7(h), Intervenor-Defendants Defenders

of Wildlife, The Humane Society of the United States, and Born Free USA hereby move for

summary judgment regarding Plaintiff Safari Club International's challenge to the U.S. Fish and

Wildlife Service's September 2, 2005 rule listing as endangered under the Endangered Species

Act ("ESA"), 16 U.S.C. §§ 1531-1544, the Scimitar-horned oryx, Addax, and Dama gazelle, 70

Fed. Reg. 52319 (Sept. 2, 2005), on the grounds that there are no material factual issues in

dispute and Intervenor-Defendants are entitled to judgment as a matter of law.

In support of this motion, Intervenor-Defendants submit the accompanying memorandum

and a proposed order.

Respectfully Submitted,

_____/s/_____
Katherine A. Meyer (D.C. Bar No. 244301)
William S. Eubanks II (D.C. Bar No. 987036)
Meyer Glitzenstein & Crystal

1601 Connecticut Avenue NW, Suite 700
Washington, D.C. 20009
(202) 588-5206 / (202) 588-5049 (fax)
kmeyer@meyerglitz.com
beubanks@meyerglitz.com

Date:   April 27, 2012                    Counsel for Defenders, HSUS, and Born Free USA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| SAFARI CLUB INTERNATIONAL, | ) | |
| | ) | Civ. No. 1:11-cv-1564 BAH |
| Plaintiff, | ) | (consolidated with cases |
| | ) | 1:12-cv-00194-BAH and |
| v. | ) | 1:12-cv-00340-BAH) |
| | ) | |
| KEN SALAZAR, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**INTERVENOR-DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
WITH RESPECT TO PLAINTIFFS' CHALLENGE TO THE 2005 LISTING RULE**

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.     The Endangered Species Act and Pertinent Regulations . . . . . . . . . . . . . . . . . . . 2

          1.     The Purpose Of The ESA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

          2.     The Prohibitions of Section 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          3.     Section 10 Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          4.     The FWS's Captive-Bred Wildlife Regulations . . . . . . . . . . . . . . . . . . . 9

     B.     The Antelope Listing Rule and Exemption Regulation . . . . . . . . . . . . . . . . . . . 10

          1.     The Fourteen Year Delay In Listing The Species . . . . . . . . . . . . . . . . . 10

          2.     The Agency's Captive-Bred Antelope Exemption Rule . . . . . . . . . . . . . 14

     C.     Litigation Challenging The Exemption Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.     SCI's STANDING STEMS FROM ECONOMIC HARM ONLY,
NOT HARM TO THE ANTELOPE SPECIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II.     IN INCLUDING ALL MEMBERS OF THE SPECIES IN THE LISTING
DETERMINATION, THE FWS ACTED COMPLETELY LAWFULLY. . . . . . . . . . 23

     A.     The ESA Requires The FWS To Afford Protection To The Captive
Members Of A Listed Species. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

     B.     The Mere Fact That The Government Has Provided Less Protection For
Captive Members Of A Few Listed Species In The Past Does Not Make Its
Decision Here Arbitrary And Capricious . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

     C.     The Agency Cogently Explained The Reasons It Included The Captive
Members Of The Antelopes In The Listing Determination. . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE**

Alabama-Tombigbee Rivers Coalition v. Kempthorne,
    477 F.3d 1250 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

American Society for the Prevention of Cruelty v. Ringling Brothers,
    502 F. Supp. 2d 103 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Citizens to Preserve Overton Park, Inc. v. Volpe,
    401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Department of Housing and Urban Development v. Rucker,
    535 U.S. 125 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Environmental Defense Fund, Inc. v. Costle,
    657 F.2d 275 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

* Friends of Animals v. Salazar,
    626 F. Supp. 2d 102 (D.D.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Humane Society of the U.S. v. Kempthorne,
    481 F. Supp. 2d 53 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

* Motor Veh. Mfrs. Assn. v. State Farm Mutual Auto. Insurance Co.,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25, 28

Roosevelt Campobello International Park v. EPA,
    684 F.2d 1041 (1st Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Sierra Club v. Clark,
    577 F. Supp. 783 (D. Minn. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Tennessee Valley Authority v. Hill,
    437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Udall v. Tallman,
    380 U.S. 1 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**STATUTES**

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 23, 27

16 U.S.C. §§ 1531-1544 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

16 U.S.C. § 1531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 1532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 5, 7, 11, 23

16 U.S.C. § 1533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

16 U.S.C. § 1538 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 13, 14, 15, 23

16 U.S.C. § 1539 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 18

**REGULATIONS**

50 C.F.R. § 17.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 26

50 C.F.R. 17.21(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 19, 30

50 C.F.R. § 17.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 16, 19

50 C.F.R. § 424.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## **<u>INTRODUCTION</u>**

In this case, Plaintiff Safari Club International ("SCI") challenges a final regulation issued by the U.S. Fish and Wildlife Service ("FWS" or "Service") in 2005 listing three African antelope species as "endangered" under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, on the ground that the agency should have found a way to exempt from that listing determination all of the captive members of the antelope species that are bred for the purpose of being hunted and killed at enclosed ranches in the United States that are operated and used by members of SCI.  Although, as explained <u>infra</u>, the FWS <u>did</u> attempt to exempt these captive members of the species from the impact of the listing determination through a separate regulation, that regulation was declared unlawful under the ESA on June 22, 2009, by Judge Kennedy of this Court in consolidated cases brought by the Intervenor-Defendants and others. <u>See</u> <u>Friends of Animals v. Salazar</u>, 626 F. Supp. 2d 102 (D.D.C. 2009).  As a result, the FWS has now withdrawn the illegal exemption, which means that the captive members of these species are now covered by the "endangered" designation that applies to these species as a whole, and hence that anyone wishing to engage in otherwise illegal activities with respect to such animals – including breeding, killing, or otherwise harming them – must apply for a permit to do so under the ESA.  It is because SCI and its members do not want to abide by this statutory requirement that they have sought to challenge the agency's original 2005 listing decision for failing to exempt the captive members of the species from the "endangered" designation.

However, as demonstrated below, SCI cannot meet its heavy burden to demonstrate that in including all of the members of the species in the "endangered" listing, and requiring those who wish to use those animals in ways that otherwise violate the statute to apply for a permit to do so, was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with

law" within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2). Indeed, in including all members of the species in the listing determination, the Service acted in accordance with the ESA. Accordingly, SCI's motion for summary judgment on this issue must be denied and judgment should be entered for the FWS and Intervenor-Defendants Defenders of Wildlife, The Humane Society of the United States, and Born Free USA ("Intervenor-Defendants").

## BACKGROUND

To explain why there is no merit to any of SCI's arguments, it is important to review the relevant statutory and regulatory framework, as well as the facts that bear on SCI's claims.

### A.   The Endangered Species Act and Pertinent Regulations

#### 1.   The Purpose Of The ESA

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978) ("TVA").  In shaping the legislation, Congress  observed that "'[t]he two major causes of extinction are hunting and destruction of natural habitat.'"  Id. at 179 (quoting S. Rep. No. 93-307 at 2 (1973), reprinted in 1973 U.S.C.A.A.N. 2989, 2993).

The overall purpose of the statute is to "provide a program for the conservation of . . . endangered species and threatened species."  16 U.S.C. § 1531(b).  An "endangered species" is "any species which is in danger of extinction," 16 U.S.C. § 1532(6), and a "threatened" species is one that is "likely to become an endangered species within the foreseeable future."  16 U.S.C. § 1532(20).   The term "species" is defined to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which

interbreeds when mature." Id. § 1532(16).  Thus, the Service may list a species, subspecies, or distinct population segment as threatened or endangered.

Because the value of these species is "incalculable," and extinction is irreparable, the ESA represents the "institutionalization of caution" – i.e., in implementing the statute the FWS must always give the benefit of any doubt to species, not to those who seek to exploit them for commercial gain.  See, e.g., H.R. Rep. No. 93-412 p. 4-5 (1973), reprinted in "A Legislative History of the Endangered Species Act of 1973," at 143-44, 97th Cong., 2d Sess. (Feb. 1982) (hereinafter "Legislative History"); TVA, 437 U.S. at 177; Roosevelt Campobello Int'l Park v. EPA, 684 F.2d 1041, 1049 (1st Cir. 1982).

Toward that end, the statute provides that the FWS "shall" make listing determinations "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A) (emphasis added).  Thus, while the agency may take economic concerns into account when deciding other matters required by the statute, such as the designation of the species' "critical habitat," see 16 U.S.C. § 1533(b)(2) (authorizing the agency to consider "the economic impact" of any such designation), it is not permitted to consider economic impacts in deciding whether to list a species.  See, e.g., 50 C.F.R. § 424.11(b) ("[t]he Secretary shall make any [listing] determination . . .  solely on the basis of the best available scientific and commercial information regarding a species' status, without reference to possible economic or other impacts of such determination") (emphasis added); S. Rep. No. 97-418, at 12 (1982) (the statute "preclude[s] the Secretary from considering economic or other non-biological factors in determining whether a species should be listed") (emphasis added); Ala.-Tombigbee Rivers Coal. v. Kempthorne, 477 F.3d 1250, 1266 (11th Cir. 2007) (Congress "added the word 'solely'

before the phrase 'on the basis of the best scientific and commercial data available' to insulate the listing decision from the influence of economic factors") (emphasis added).[1]

As the FWS also long ago explained and recently confirmed, the ESA applies to every member of a listed species, whether wild or captive.  44 Fed. Reg. 30044 (May 23, 1979) ("the Act applies to both wild and captive populations of a species . . . ." ); 77 Fed. Reg. 431, 434 (Jan. 5, 2012) ("The Act specifically covers any species that is listed as endangered or threatened, whether it is native to the United States or non-native and whether it is in captivity or in the wild. The prohibitions apply to all listed specimens.").  This is because "[c]aptive propagation and other uses of captive wildlife can benefit wild populations" in various ways, such as by (1) "[i]ncreasing the likelihood that captive breeding populations will be established as a source of known genetic stock to bolster or replenish populations in the wild;" (2) "[r]educing the need to take stock from the wild for scientific or other purposes;" and (3) "[p]roviding opportunities for research that can lead to improved management of wild populations."  44 Fed. Reg. 2044-45 (May 23, 1979).  Further, the Service has recognized that there is a danger of "captive-bred animals . . . [being] used for purposes that do not contribute to conservation, such as for pets, for research that does not benefit the species, or for entertainment."  57 Fed. Reg. 548, 550 (Jan. 7, 1992). Thus, as the FWS has explained in the past, "[f]or listed species, the Act makes no distinction between wild or captive populations, populations of native or non-native species or

---

[1]  Thus, the FWS "shall" list a species as either endangered or threatened if it determines that one or more of five enumerated biological or commercial factors exist: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence."  16 U.S.C. § 1533(a)(1).

species that are bred in captivity.  The same prohibitions, and availability of permits, apply

equally." FWS Letter to Hunter Schuele at 1 (May 7, 1993), AR 135.004 (emphasis added).

### 2.    The Prohibitions of Section 9

Section 9 of the ESA prohibits the import or export of an endangered species, interstate

or foreign sale of an endangered species, shipment of an endangered species in interstate or

foreign commerce "in the course of a commercial activity," and the "take" of any endangered

species within the United States.  16 U.S.C. § 1538(a).  The term "take" is broadly defined to

mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to

engage in any such conduct."  Id. § 1532(19).

Under the plain language of the statute, the "take" prohibition applies both to endangered

animals living in the wild as well as those held in captivity.  In fact, although the statute

specifically provides exceptions to other prohibited activities with respect to listed species "held

in captivity or in a controlled environment" on either the date the ESA was enacted or the date

the species was formally added to the list of endangered species, those exceptions do not include

the "take" prohibition.  See 16 U.S.C. § 1538(b)(1);[2] see also Am. Soc. for the Prevention of

Cruelty v. Ringling Bros., 502 F. Supp. 2d 103, 109-110 (D.D.C. 2007) (the "take" prohibition

applies to wildlife held in captivity before the species was listed as endangered).  Furthermore,

none of these exceptions applies to any listed species held "in the course of a commercial

activity." 16 U.S.C. § 1538(b)(1).

---

[2] Thus, the "grandfather clause" for captive animals applies to "subsection (a)(1)(A)" of Section 9 (concerning the import,  export, and sale of wildlife) and "subsection (a)(1)(G)" (violations of regulations), but does not apply to the prohibition against the "take" of an endangered species, which is found in subsection (a)(1)(B) of Section 9.

The term "harm" in the statute's definition of "take" has been further defined by regulation to include any act that "kills or injures wildlife," and "harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering."  50 C.F.R. § 17.3.  In 1998, the definition of "harass" as applied to <u>captive</u> wildlife was amended by the FWS to exclude "generally accepted" animal husbandry, breeding, and veterinary practices.  63 Fed. Reg. 48634, 48639-40 (Sept. 11, 1998); 50 C.F.R. § 17.3.  In the preamble to that rule, the FWS explained that, although several commenters had suggested that the agency should amend the definition of "take" to apply only to animals in the wild, the agency could not do so because the statute defined "take" to apply to all listed wildlife "<u>whether wild or captive</u>."  63 Fed. Reg. at 48636 (emphasis added).  Thus, the agency explained, although the statutory definition of take could be "clarif[ied]" by the FWS as it applies to captive wildlife, "the statutory term <u>cannot be changed administratively</u>."  <u>Id.</u> (emphasis added).

### 3.     <u>Section 10 Permits</u>

Section 10 of the ESA affords the FWS limited authority to issue permits to allow activities that are otherwise prohibited by Section 9 "for scientific purposes or to <u>enhance the propagation or survival</u> of the affected species . . . ."  16 U.S.C. § 1539(a)(1)(A) (emphasis added).  This limited exception authorizes the FWS to permit what would normally be an unlawful "take" or other prohibited act where necessary to preserve the species in the wild (<u>i.e.</u>, activities that go beyond having a neutral effect and actually have a positive effect on conservation) – for example, to prevent the spread of wildlife disease or to allow captive

breeding designed to ensure genetic integrity and facilitate reintroduction.  See, e.g., H. R. Rep.

No. 93-412 p. 17 (1973), Legislative History at 156 (explaining that "[a]ny such activities to

encourage propagation or survival may take place in captivity . . . so long as this is found to

provide the most practicable and realistic opportunity to encourage the development of the

species concerned").

 However, because all actions authorized by Section 10 must be "consistent" with the

overall conservation purposes of the statute, 16 U.S.C. § 1539(d), and the Act authorizes the

killing of a listed species in the name of "conservation" only "in the extraordinary case where

population pressures cannot otherwise be relieved," see 16 U.S.C. § 1532(3) (definition of

"conservation"), the killing of an endangered species purely for recreation is not permitted under

any construction of Section 10.  See id.; see also Fund for Animals v. Turner, 1991 WL 206232,

at *7 (D.D.C. Sept. 27, 1991) (finding unlawful FWS regulation allowing the hunting of grizzly

bears to make them "war[y] of humans" for their own good); Sierra Club v. Clark, 577 F. Supp.

783, 790 (D. Minn. 1984) (reducing the level "wolf-human contact" is not a valid basis for

allowing a public sport trapping of wolves); Humane Soc'y of the U.S. v. Kempthorne, 481 F.

Supp. 2d 53, 62 (D.D.C. 2006) (Kollar-Kotelly, J.) ("[t]he language 'propagation or survival of

the affected species'" in Section 10 "is, on its face, antithetical to the killing of 43 members of an

endangered species barring some direct and immediate danger imposed by the individual animals

killed to other members of the species."), vacated as moot, 527 F.3d 181 (D.C. Cir. 2008).

 Section 10 further provides that the FWS "shall publish notice in the Federal Register of

each application for an exemption or permit," that each such notice "shall invite the submission

from interested parties . . . of written data, views, or arguments with respect to the application,"

and that "[i]nformation received by the [FWS] as a part of any application <u>shall be available to</u>

<u>the public as a matter of public record at every stage of the proceeding</u>."  16 U.S.C. § 1539(c)

(emphasis added).  It also provides that the Service may "only" grant a permit if the agency finds

"and publishes in the Federal Register" that the permit (1) "was applied for in good faith," (2) if

granted and exercised "will not operate to the disadvantage of such endangered species," and (3)

will be "consistent with the purposes and policy" of the Act.  <u>Id.</u> § 1539(d).  As explained by

Congress, these requirements were intended "to <u>limit substantially the number of exemptions</u>

<u>that may be granted</u> under the act."  H. R. Rep. No. 93-412 p. 17 (1973), <u>reprinted in</u> Legislative

History p. 156 (emphasis added).

　　　　Under the agency's implementing regulations, persons seeking to commit an act

otherwise prohibited by Section 9, on the grounds that such activities will "enhance[ ] the

propagation or survival" of the species, must include with their permit applications "[a] full

statement of the reasons why the applicant is justified in obtaining a permit including the details

of the activities sought to be authorized by the permit," and "a statement of the applicant's

willingness to participate in a cooperative breeding program."  50 C.F.R. § 17.22 (a)(1)(vii)-

(viii).  In deciding whether to issue such a permit, the FWS must consider "[t]he probable and

indirect effect which issuing the permit would have on the wild populations of the wildlife

sought to be covered by the permit;" "[w]hether the permit . . . would in any way, directly or

indirectly, conflict with any known program intended to enhance the survival probabilities of the

population from which the wildlife sought to be covered by the permit was or would be

removed;" "[t]he opinions or views of scientists or other persons or organizations having

expertise concerning the wildlife or other matters germane to the application;" and "[w]hether

the expertise, facilities, or other resources available to the applicant appear adequate to

successfully accomplish the objectives stated in the application."  Id. § 17.22(a)(2).

**4.**     **The FWS's Captive-Bred Wildlife Regulations**

In 1979, the FWS issued special "captive-bred wildlife regulations" ("CBW regulations")

that granted permission under Section 10 of the Act to any person to engage in activities

otherwise prohibited by Section 9 with respect to non-native endangered and threatened animals

that are bred in captivity in the U.S., but only if "[t]he purpose of such activity is to enhance the

propagation or survival of the affected species."  44 Fed. Reg. 54002, 54007 (Sept. 17, 1979);

see also 50 C.F.R. § 17.21(g)(1)(ii).  Accredited zoos and conservation facilities that breed

endangered species for reintroduction programs typically rely on the CBW regulations to engage

in activities that would normally be prohibited under the ESA, such as confining the animals in

enclosures and manipulating their reproduction.  See, e.g., 50 C.F.R. § 17.3(a) (CBW regulations

permit "normal practices of animal husbandry needed to maintain captive populations that are

self-sustaining and that possess as much genetic vitality as possible").  The FWS has made clear

that the CBW permit is available "only [to] those persons who engage in beneficial captive

breeding," 58 Fed. Reg. 68323, 68325 (Dec. 27, 1993).  See also 77 Fed. Reg. 431, 434 (Jan. 5,

2012) ("While the Service does believe that captive breeding can provide a significant benefit to

endangered species, such benefits can only be realized when the breeding program is

scientifically based and conducted in a manner that contributes to the continued survival of the

species . . . . However, breeding just to breed, without adequate attention to genetic composition

and demographics of the breeding population, may not provide a clear conservation benefit to an

endangered species.").  Further, CBW registration is not available to sanction any activities that

-9-

"involve interstate or foreign commerce, in the course of a commercial activity, with respect to non-living wildlife."  50 C.F.R. § 17.21(g)(1)(iii).

      **B.**      **The Antelope Listing Rule and Exemption Regulation**

           **1.**      **The Fourteen Year Delay In Listing The Species**

The FWS originally proposed listing the three antelope species at issue here as "endangered" on November 5, 1991.  See 56 Fed. Reg. 56491, AR 52-56.  The three species are all endemic to the desert or semidesert habitat of the Sahara and Sahel regions of North Africa. See generally id., AR 52-56; 70 Fed. Reg. 52319 (Sept. 2, 2005), AR 384.0032.  The scimitar-horned oryx is a large, heavy antelope with a pale coat and dark reddish cloak around the neck and chest, and long horns that arc dramatically over its back.  Although the oryx once roamed the Sahel in herds up to 1000 strong, it is now believed to be extinct in the wild, having been decimated by hunting, habitat loss, and severe drought.  See 70 Fed. Reg. at 52319, AR 384.0032; see also Comments of Defenders of Wildlife and The Humane Society of the United States, at 7 (April 4, 2005) ("DOW/HSUS Comments") (citing R. Nowak, et al., Walter's Mammals of the World, The Johns Hopkins Univ. Press, Baltimore, MD 2:1407-1473 (5th Ed. 1991)), AR 237-0427.

The dama gazelle is reddish brown in color with a white head and lower body, and is one of several gazelles of North Africa to have been severely depleted as a result of human exploitation, grazing pressure from domestic livestock, and habitat loss.  See 56 Fed. Reg. at 56491, AR 52.  Like the oryx, the dama gazelle could once be found in large herds, but has now been reduced to only remnant populations due to hunting and habitat loss.  70 Fed. Reg. at 52321, AR 384.0034.  Only small numbers of this species survive in most of the eight countries

-10-

within its historical range.  Id. at 52320, AR 384.0033.  The addax is a mid-sized antelope, grayish in winter and sandy-white in summer, with long, thin horns that spiral back and upward as much as 45 inches.  56 Fed. Reg. at 56491, AR 52.  The most desert-adapted of the three species, the addax once roamed North Africa from the Atlantic Ocean to the Nile Valley, and possibly as far east as the Arabian Peninsula.  See DOW/HSUS Comments at 8,  AR 237-0428. Following decades of decline caused by hunting and habitat destruction, there are now fewer than 600 of these animals remaining in the wild.  70 Fed. Reg. at 52319-20, AR 384.0032-33.

When it originally proposed listing the three species in 1991, the FWS noted that all three species "have declined drastically in recent decades through habitat deterioration and excessive hunting by people," and that, accordingly, several of the listing criteria enumerated in Section 4 of the statute compelled the conclusion that these species qualified as "endangered" under the statute – i.e., that they were already in danger of extinction.  See 56 Fed. Reg. at 50491-92, AR 52-53; 16 U.S.C. § 1532(6) (definition of "endangered").  Consistent with the statutory scheme, described supra at 3-5, the agency further explained that the proposal to list the species as endangered "applies to all individuals of each species" – i.e., both the wild and captive members. 56 Fed. Reg. at 50491, AR 52 (emphasis added).  However, noting that there were "large breeding groups of each species in captivity . . . in the United States," the FWS "encourage[d]" the submission of "data on the current and potential status of these groups," stating that the agency "may decide to treat these groups in a manner differently from the natural populations." Id. at 50491-92, AR 52-53.

Despite the dire state of the three species in 1991 when the endangered listing was originally proposed, the agency delayed issuing a final listing rule for fourteen years due to

intense opposition from trophy hunting organizations and particularly the "canned hunting" industry, which operates lucrative hunting ranches where individuals go to kill rare species for "sport" even though these facilities are completely enclosed with fencing, and hence the animals have no ability to escape.[3]  For example, at the time the final listing rule was issued, the record showed that for approximately $3000 - $3500, a person could kill and take home the "trophy" of the critically imperiled scimitar-horned oryx, dama gazelle, or addax from a canned hunting ranch in Texas, where these animals are bred to be killed.  See, e.g., AR 237.0687-720.   Indeed, according to the FWS, the "estimated annual sales" of these captive antelopes was "just over $ 5 million."  See Environmental Assessment for Exemption Rule at 7, AR 384.0010 (emphasis added).

However, because, as explained supra at 3-4, in making listing decisions, the FWS is statutorily prohibited from taking into account the economic impact of such decisions, and instead must base such decisions "solely" on the biological status of the species in the wild, the agency faced a major political dilemma.  Thus, as expressed in the agency's own internal memorandum, although "[m]ost precedent suggests that the classification of a species depends on its status in the wild and that any captive stock takes the same classification," the agency was "not . . . prepared to deal with the U.S. stock."  Memorandum from Ron Nowak, FWS Office of Scientific Authority (March 11, 1991), AR 1.001 (emphasis added).  Accordingly, the way the agency chose to deal with this dilemma was to let the listing of these incredibly imperiled species languish for fourteen years – during which time, according to the Service's own

---

[3] Indeed, because the animals cannot escape, many of these ranches "guarantee" their patrons that they will go away with one of these prized trophies.  See, e.g., AR 237.0695.

economic calculation, the Texas hunting ranches made approximately $70 million from selling these animals to be bred and from selling hunts for them.  See EA, AR 384.0010 (estimating the sales of captive antelopes to be over $5 million each year for "breeding stock and trophy sales").

It was only when a group of conservation organizations sued the FWS over its egregious delay in making a final decision that the agency issued a final listing rule on September 2, 2005, 70 Fed. Reg. 52319, AR 384.0032; see Friends of Animals v. Salazar, 626 F. Supp. 2d at 107 ("[i]t was not until 2005, following a lawsuit . . . that the FWS listed the antelope species as endangered"); see also id., Civ. No. 04-01660, Docket Entry 1 (Complaint challenging the FWS's failure to finalize the proposed rule to list the antelope species); Docket Entry 12 (Joint Status Report explaining that this claim had become moot because the agency had issued the final listing decision).

In the final rule listing the species as "endangered," the FWS explained that all three species "are in danger of extinction throughout their ranges," that the oryx may already be extinct in the wild, and that the addax is "near-extinction."  70 Fed. Reg. 52319, AR 384.0032. The agency further explained that "uncontrolled killing" had contributed greatly to the decline of all three species in the wild, and that "[a]n important new problem has been the arrival of non-resident hunters" who seek to obtain "trophies" of these exotic wild animals.  Id. at 52321, AR 384.0034.

As explained supra, the listing of these species made it illegal under Section 9 of the Act to import or export any of these species, and to sell or commercially transport them in interstate or foreign commerce.  16 U.S.C. § 1538(a).  Despite soliciting comments on, and considering whether, to treat wild and captive members of the species differently, the Service's final listing

determination made it illegal to "take" <u>any</u> members of the species "within the United States," whether captive or wild.  <u>Id.</u>  However, as explained, <u>supra</u> at 6-9, any entity truly engaged in a legitimate captive-breeding program for the benefit of these species could have continued to engage in certain otherwise prohibited Section 9 activities either by obtaining a Section 10 permit from the FWS or authorization under the FWS's CBW regulations.

## 2.    The Agency's Captive-Bred Antelope Exemption Rule

On the same day that the Service issued the final listing rule, it also issued a special regulation permitting a host of otherwise unlawful activities with respect to the <u>U.S. captive-bred members</u> of the three species – hereinafter referred to as the "exemption rule."  70 Fed. Reg. 52310, AR 384.0038.  The exemption rule authorized any person to "take; export or re-import; deliver, receive, carry, transport or ship in interstate or foreign commerce, in the course of a commercial activity; or sell or offer for sale in interstate or foreign commerce live wildlife . . . and sport-hunted trophies" of any scimitar-horned oryx,  addax, or dama gazelle that was "captive-bred" in the United States.  <u>Id.</u> at 52318, AR 384.0046.  The FWS acknowledged that the regulation would allow hunting ranches in the U.S. to continue their commercial operations, and, in a futile attempt to make its decision consistent with the purposes of Section 10 of the statute, purported to justify this blanket exemption on the grounds that all captive-breeding of these species necessarily "enhances the propagation of the species" within the meaning of that provision of the statute.  <u>See id.</u> at 52310-19, AR 384.0038-47.

Many environmental groups, conservationists, and biologists had strongly objected to the proposed exemption rule because it violated the plain language of the statute, U.S. captive-bred antelopes were not needed to replenish the wild populations now or in the foreseeable future, and

-14-

the exemption would inevitably <u>undermine</u> conservation of these imperiled species in the wild

by contributing to the illegal trade in antelope trophies (as it would be difficult to differentiate

between those that were killed in captivity and those that were killed in the wild).  <u>See, e.g.</u>,

Comments by DOW, HSUS, Born Free USA, and 20 national and international conservation

groups (April 4, 2005), AR 237.1380-92;[4] <u>id.</u> at 3, AR 237.1383  ("[t]his proposal is inconsistent

with the letter and spirit of the ESA and contrary to the best conservation interests of the

scimitar-horned oryx, addax and dama gazelle"); <u>id.</u> at 4, AR 237.1384 (pointing out that there

are plenty of captive-bred antelopes already in the range countries and that "[p]roduction of

additional captive-bred specimens – in the U.S. or elsewhere – is simply not a priority in the

conservation of wild populations of these species"); <u>id.</u> at 8, AR 237.1388 ("by introducing a

large stream of legal commerce in specimens that would otherwise be prohibited, the change

proposed by the Service would make enforcing the ban on wild specimens more difficult, and

increase the chances that wild populations are targeted illegally").

　　　Nevertheless, pointing out that <u>some</u> captive-breeding facilities in the United States – but

none of the ranches that allow the killing of these species for recreational purposes – have

"enhanced the propagation or survival" of the three species by providing founder stock for

existing reintroduction programs, the FWS decided to grant a broad exemption to <u>all</u> entities that

engage in captive-breeding of these animals, including those that operate canned hunts.  <u>See</u> 70

─────────────────────

　　　[4] The additional groups included Animal Asia Foundation, Center for Biological Diversity,
Center for Native Ecosystems, Earthjustice, Easter Caribbean Coalition for Environmental
Awareness, Endangered Species Coalition, Humane Society of Canada, International Fund for
Animal Welfare, International Primate Protection League, League Against Cruel Sports, Pan
African Sanctuaries Alliance, Pro Wildlife, Society for Animal Protective Legislation, WildAid,
and World Society for the Protection of Animals.

Fed. Reg. at 52310-11, AR 384.0038-39.[5]  The FWS further stated that granting a broad

exemption for all ranches engaged in hunting of the species would necessarily "enhance the

propagation of these species by providing an incentive to continue to raise animals in captivity,"

regardless of whether these entities are engaged in cooperative breeding programs with

accredited zoos and similar institutions that actually breed these species for reintroduction into

the wild.  Id. at 52312, AR 384.0040; see also id. at 52315, AR 384.0043 (noting that such

"collaboration" was not required); but see 50 C.F.R. § 17.22 (a)(1)(viii) (requiring applicants for

Section 10 permits under the ESA for "enhancement of propagation" to provide a "statement of

the applicant's willingness to participate in a cooperative breeding program . . . .").

     The preamble to the regulation acknowledged that current reintroduction programs in

Africa – the home range of the species – had already established captive-bred herds of the

antelopes, that entities affiliated with accredited zoos were already involved in those programs,

that until more habitat is secured for those captive-bred animals they cannot be released into the

wild, and that there are already so many captive-bred antelopes in the United States that

"surplus" animals may need to be "culled" to manage those herds.  70 Fed. Reg. at 52313, AR

384.0041.  Nevertheless, in an effort to justify its decision as consonant with the "conservation"

---

[5] The only citation provided by the agency in support of its statement that "[c]aptive-breeding programs operated by zoos and private ranches have effectively increased the numbers of these animals while genetically managing their herds," 70 Fed. Reg. at 53210, AR 384.0038, does not refer to any of the canned hunting ranches located in U.S.  See id. (citing Mallon and Kingswood 2001); AR 401.0062-329; see also 70 Fed. Reg. 5117, 5118 (Feb. 1, 2005), AR 237-0156 (the proposed rule for the exemption also cites only Mallon and Kingswood, and specifically that publication's discussion of certain "captive-breeding operations in Germany, the United Kingdom, and the United States" that have "provided scimitar-horned oryx, addax, and dama gazelle to Bou-Hedma National Park in Tunisia" – none of which was done by any of the U.S. ranches that breed these animals for recreational hunting.

purposes of the ESA, the agency insisted that the exemption rule was "critical" to "provide an incentive" to hunting ranches "to continue captive breeding of these species." Id.[6]

### C.  Litigation Challenging The Exemption Rule

Two separate lawsuits were brought challenging the exemption rule – one in the northern district of California by the Intervenor-Defendants and several individuals (Cary v. Hall, Civ. No. 05-4363 (N.D. Ca.)), and another by Friends of Animals and the Center for Biological Diversity.  See 626 F. Supp. 2d 102.  After the government's motion to dismiss on standing was dismissed in part, the Cary case was transferred to D.C., and the two cases were consolidated before Judge Kennedy.  See id. at 109.

On June 22, 2009, Judge Kennedy agreed with the conservation organizations that in granting a blanket exemption for all entities engaged in otherwise illegal activities with respect to captive-bred members of the antelope species, the FWS had violated its duty to assess such permit applications on a case-by-case basis, and to provide notice and an opportunity to comment on each such permit application, pursuant to the plain language of Section 10(c) of the ESA.  Thus, Judge Kennedy explained, because Section 10 provides that the FWS "shall publish notice in the Federal Register of each application for an exemption or permit," that such notice "shall invite the submission from interested parties . . . of written data, views, or arguments with

---

[6] The agency's efforts to devise an innovative way to allow the continued commercial use of an endangered species may be explained by the close ties between Safari Club International and the Administration that issued the 2005 exemption rule.  See, e.g., DOW/HSUS Comments at 21 n.11, AR 237.0441("It seems that the desire to increase traffic in 'canned hunted' or trophy animals may be the major impetus for this proposal"); "Sabotaging The Endangered Species Act" at 15, AR 237.1293 (detailing close ties between SCI and the Administration); AR 237.1327 (2005 FWS Press Release announcing the appointment of Matthew Hogan – former "government affairs manager for Safari Club International" – as acting director of the FWS).

respect to the application," and that "[i]nformation received by the [FWS] as part of <u>any</u> <u>application</u> shall be available to the public," "Congress clearly contemplated that the FWS would exercise its authority to grant exceptions" to the prohibitions of Section 9 "by <u>responding to</u> <u>individual applications</u>."  626 F. Supp. 2d at 116-117 (emphases added).  Judge Kennedy further ruled that the blanket exemption "hinder[ed] the ability of individuals and groups to participate in the meaningful way contemplated by the ESA" because without requiring the submission of information otherwise required to obtain a Section 10 permit, "<u>it is impossible to evaluate</u> <u>whether each permitted act will enhance the propagation or survival of the species</u>."  626 F. Supp. 2d at 118 (emphasis added).

Finally, Judge Kennedy agreed with the conservation organizations that the FWS's blanket exemption was also "at odds" with the legislative history of Section 10 which demonstrates that Congress intended to "limit substantially the number of exemptions that may be granted under the act," by requiring certain "findings" by the FWS – including that granting the permit "will not operate to the disadvantage" of the species and will be "consistent" with the conservation purposes of the statute.  626 F. Supp. 2d at 119; <u>see also</u> 16 U.S.C. § 1539(d). Thus, Judge Kennedy concluded, "[b]lanket exemptions under regulations are anathema to this intention <u>because they allow the FWS to permit a great number of exemptions at once without</u> <u>providing the detailed information to the public that would be required in an individualized</u> <u>analysis</u>."  626 F. Supp. 2d at 119 (emphasis added).  Therefore, Judge Kennedy granted summary judgment to the organizations on this claim, and remanded the matter to the FWS for further proceedings.  <u>See</u> <u>id.</u> at 120.

Consistent with that decision, on July 7, 2011, the FWS published a proposed rule to withdraw the illegal antelope exemption regulation, 76 Fed. Reg. 39804, and on January 5, 2012, it issued a final regulation removing the regulation, 77 Fed. Reg. 431.  As the agency explained, with the elimination of the unlawful exemption, the captive members of the species remain protected by the original 2005 listing rule, and "anyone wishing to carry out otherwise prohibited activities" with respect to any such antelopes "would need to either apply for a permit . . . or for the captive-bred wildlife registration."  77 Fed. Reg. at 432; see also id. ("[a]ny applicant requesting authorization to carry out an otherwise prohibited activity would need to provide adequate information and documentation in their application to show that they are meeting the issuance criteria established at 50 C.F.R. 17.21(g) [the CBW requirements] or 17.22 [Section 10 enhancement permits] before authorization can be granted by the Service") (emphasis added).

Moreover, to "allow the affected community to either legally sell their specimens, if they choose to divest themselves of these species, or to apply for authorization or permits to continue to carry out previously approved activities," the FWS did not make the withdrawal regulation effective until April 4, 2012.  See 77 Fed. Reg. at 431. Pursuant to that notice, dozens of U.S. hunting ranches have already applied for such permits, see, e.g., 77 Fed. Reg. 2314. 2315 (Jan. 17, 2012); 77 Fed. Reg. 3493 (Jan. 24, 2012); 77 Fed. Reg. 6139 (Feb. 7, 2012); 77 Fed. Reg. 6816 (Feb. 9, 2012); 77 Fed. Reg. 9687 (Feb. 17, 2012); 77 Fed. Reg. 14035 (Mar. 8, 2012); 77 Fed. Reg. 15383 (Mar. 15, 2012); 77 Fed. Reg. 17494 (Mar. 26, 2012); 77 Fed. Reg. 19311 (Mar. 30, 2012); 77 Fed. Reg. 20838 (Apr. 6, 2012); 77 Fed. Reg. 24510 (Apr. 24, 2012), and others have decided to phase out their herds.  See Declarations, SCI Exhibits BB-DD (Docket Numbers 45-29, 45-30, 45-31).  However, because some entities that breed antelopes for

-19-

commercial recreational hunting either do not want to apply for such permits, or apparently

believe they would not be able to meet the necessary statutory requirements to obtain them,[7]

plaintiff SCI has now filed this lawsuit challenging the government's September 2, 2005

decision listing all of the antelopes, including those that are captive-bred, as "endangered."

    As demonstrated below, however, there is absolutely no merit to any of SCI's arguments.

Accordingly, its challenge to the listing rule must be rejected.

## ARGUMENT

## I.    SCI's STANDING STEMS FROM ECONOMIC HARM ONLY, NOT HARM TO THE ANTELOPE SPECIES.

    As a preliminary matter, the Intervenor-Defendants feel compelled to point out that,

while they do not contest SCI's standing in this case, that standing stems only from the economic

harm that SCI's members will purportedly suffer as a result of the fact that they can no longer

breed or use endangered antelopes for recreational hunting, and not from the "conservation"

harm that SCI has proffered here.  Thus, while it is clear that those who cannot satisfy the strict

requirements of Section 10 of the ESA, which would allow them to obtain permits to engage in

otherwise unlawful activities with respect to an endangered species, will no longer be able to sell

canned hunts of these antelopes for profit – as a direct result of the captive members of the

species being listed as "endangered," see supra at 6 – this is not the injury that has been alleged

by SCI in support of its standing in this case.

---

    [7] See, e.g., Declaration of Timothy Mark Terry, SCI Exhibit CC (Docket Number 45-30), at ¶ 15 (explaining the he decided to sell his herd of antelopes because of the "red tape, uncertainty, and potential liability" that accompanies the "ownership of members of an endangered species.") (emphasis added).

Rather, acutely aware that economic factors are <u>not</u> a permissible basis for listing decisions under the statute, <u>see</u> <u>supra</u> at 3-4, and hence that stressing its members' economic harm is not helpful to its underlying legal argument, SCI has instead asserted that it has Article III standing because of its members' "conservation efforts and interests" in these species.  <u>See</u> SCI Summary Judgment Memorandum ("SCI S.J. Mem.) at 24; <u>see also</u> <u>id.</u> ("Safari Club members wish to preserve the conservation successes they have achieved in the ownership, breeding and sustainable use of these animals").

However, as SCI admits elsewhere in its brief – in an effort to demonstrate that the Service abused its discretion in failing to exclude the captive members of the species from the endangered listing – the proliferation of thousands of captive-bred antelopes on canned hunting ranches in Texas has <u>nothing</u> whatsoever to do with conserving these species in the wild.  SCI acknowledges that "[c]aptive populations of each of the three antelope species [already] exist . . . in some of their historic range countries," SCI S.J. Mem. at 2, that using U.S. bred antelopes for "reintroductions into the wild" is "presently infeasible," <u>id.</u> at 7, and that it is pure "conjecture whether U.S. non-native captive herds would ever prove to be a source of animals for reintroduction of the animals in their native ecosystems."  <u>Id.</u>  at 8.  Accordingly, as SCI also emphasizes, "[i]n fact, the evidence collected by the Service indicated that <u>there was no actual connection between the U.S. non-native captive and African native wild populations</u>" in terms of conservation benefits to the species, and that "[a]lthough the Service, and others involved in conservation of the three species, expressed hopes that U.S. non-native captive populations would someday serve as the seed populations for future reintroductions into the wild, the FWS found that no reintroductions into the wild from the U.S. non-native captive populations were

currently taking place, and that, as a result, the U.S. populations had <u>no current, direct role in</u> <u>restoring the species into the wild of their home range</u>." SCI S.J. Mem. at 6 (emphasis added).

Indeed, SCI includes in its brief comments from the agency's own expert questioning the biological value of breeding and maintaining "animals of unknown blood lines," SCI S.J. Mem. at 9 (quoting FWS official Marshall Jones, AR 2.002) – an observation that is particularly relevant here, where the record shows that <u>none</u> of the members of SCI that operate hunting ranches with these antelope species participates in the "Species Survival Plans" implemented by the Association of Zoos and Aquariums ("AZA") for these species – the sole basis upon which the genetic integrity of the species is tracked and maintained for possible future reintroductions into the wild.  <u>See</u> DOW/HSUS Comments at 9-10, AR 237.0429-30 (explaining that "[a]ll AZA member organizations are required to participate in the SSP for species they hold in captivity"); <u>id.</u> (the only private ranch breeding antelopes that has any affiliation with the SSP (Bamberger) does not allow the antelopes to be hunted).

In any event, because, as SCI itself admits, the breeding and recreational hunting of the captive antelopes has "<u>no current, direct role in restoring the species into the wild of their home</u> <u>range</u>." SCI S.J. Mem. at 6, SCI simply cannot demonstrate that it has any viable "conservation" interests at stake in this litigation for purposes of Article III standing.  Rather, its only legitimate interests for purposes of standing are its members' lucrative financial interests in being allowed to continue to breed these animals for the high-priced trophies that they yield for those who wish to kill them for sport.  <u>See</u> <u>supra</u> at 12 (hunting ranches charging $3000- $3500 to kill one antelope); <u>id.</u> (FWS estimate of over $5 million in "annual sales" of captive antelopes);

Declaration of Travis Wier, SCI Ex. BB (Docket Number 45-29) ¶ 16 ("[t]ypically, a hunt for a

scimitar-horned oryx cost approximately $3,500 and a hunt for an addax sold for $5,000).

## II.   IN INCLUDING ALL MEMBERS OF THE SPECIES IN THE LISTING DETERMINATION, THE FWS ACTED COMPLETELY LAWFULLY.

As to the merits of SCI's claim, it has presented no basis for setting aside the 2005 listing

rule.  This case is governed by the APA's judicial review provision which provides that the

Court may not overturn the agency's decision unless it is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  The scope of review

under this standard is "narrow," and "a court is not to substitute its judgment for that of the

agency."  Motor Veh. Mfrs. Assn. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Thus, review under the "arbitrary and capricious" standard is "highly deferential" and "presumes

the agency's action to be valid."  Envtl. Def. Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C. Cir.

1981) (citing, Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 419 (1971)).

Here, particularly in view of the statutory framework governing its listing decision, the

FWS acted entirely properly in including the captive members of the listed species in its final

2005 listing rule – indeed, it was required by law to do so.

### A.   The ESA Requires The FWS To Afford Protection To The Captive Members Of A Listed Species.

As demonstrated supra, pursuant to the plain language of the statute, the protections of

the ESA apply to the captive members of a species that has been listed as endangered as well as

those members of the species that live in the wild.  Thus, Section 9 prohibits the take of "any

endangered species of fish or wildlife," 16 U.S.C. § 1538(a)(1) (emphasis added), and the term

"fish or wildlife" means "any member of the animal kingdom," regardless of where, or under

what circumstances it was born.  16 U.S.C. § 1532(8) (emphasis added); <u>see also</u> <u>Dep't of Hous.</u>
<u>& Urban Dev't v. Rucker</u>, 535 U.S. 125, 131 (2002) ("the word 'any' has an <u>expansive meaning,</u>
that is, '<u>one or some indiscriminately of whatever kind</u>'") (emphasis added) (internal citation
omitted).  Indeed, the legislative history confirms that the definition of "fish or wildlife" "means
all wild animals, <u>whether or not raised in captivity</u>."  H.R. Report 93-412, 93d Cong., 1st Sess.
(1973) at 10, Legislative History at 149 (emphasis added).

As further discussed, <u>supra</u> at 4-5, the Service itself long ago explained, and recently
confirmed, that the ESA applies to every member of a listed species, whether wild or captive.
<u>See</u> 44 Fed. Reg. 30044 (May 23, 1979) ("the Act applies to both wild and captive populations
of a species . . . ."); 77 Fed. Reg. 431, 434 (Jan. 5, 2012) ("The Act specifically covers any
species that is listed as endangered or threatened, whether it is native to the United States or non-
native and whether it is in captivity or in the wild.  The prohibitions apply to all listed
specimens."); <u>see also</u> 63 Fed. Reg. 48634, 48636 (Sept. 11, 1998) (explaining that "take" was
defined by Congress to apply to endangered or threatened wildlife "whether wild or captive"); 42
Fed. Reg. 28052 (June 1, 1977) (explaining that "captive individuals provide gene pools that
deserve continued preservation," that "such individuals make it possible to re-establish or
rejuvenate wild populations," and that "[f]or these reasons, <u>the Service will continue to enforce</u>
<u>the stringent prohibitions of the Act as they relate to captive individuals of a species that is</u>
<u>endangered in the wild</u> . . . .") (emphasis added).

In fact, in 1998, when the Service amended the definition of "harass" as it applies to the
"take" of a captive-held member of an endangered species, it expressly rejected the suggestion
that the agency should amend the definition of "take" to apply only to animals in the wild, on the

-24-

grounds that the statute defined "take" to apply to all listed wildlife "<u>whether wild or captive</u>." 63 Fed. Reg. at 48636 (emphasis added).  Thus, the agency explained, although the statutory definition of take could be "clarif[ied]" by the FWS as it applies to captive wildlife, "the statutory term <u>cannot be changed administratively</u>." <u>Id.</u> (emphasis added).  Yet, that is precisely what SCI argues should have happened here – <u>i.e.</u>, it contends that when the agency listed these antelope species as "endangered" in 2005, it should have carved out a special exception for the captive-bred antelopes in the U.S. that would have allowed them to continue to be "taken" – indeed <u>killed</u> – for recreational purposes.  However, that the agency refused to promulgate what would have been a patently illegal exception from the requirements of the statute is hardly "arbitrary and capricious."  <u>See</u> <u>State Farm</u>, 463 U.S. at 43 (normally an agency's decision is not arbitrary or capricious unless it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could be not ascribed to a difference in view or the product of agency expertise").

**B.**     **The Mere Fact That The Government Has Provided Less Protection For Captive Members Of A Few Listed Species In The Past Does Not Make Its Decision Here Arbitrary And Capricious.**

The fact that the agency has issued a handful of other "split-listing" determinations in the forty years since the ESA was enacted, SCI S.J. Mem. at 31-39, does not render its decision not to do so here unlawful.  Not only are those determinations the extreme exception rather than the norm, but the agency has provided various rationales for those "split-listings" that are highly fact-specific and that simply do not apply to the captive-bred antelopes at issue in this case.  <u>See, e.g.</u>, FWS's Opposition To SCI's Motion For A Preliminary Injunction (Docket Number 35) at

16-17 (and Federal Register notices cited therein); see also Memorandum Opinion Denying

Preliminary Injunction (Docket Number 61) at 16-17.[8]

Nor does SCI's protest that the FWS failed to explain why it did not designate the captive

antelopes as a "distinct population segment" ("DPS"), see SCI S.J. Mem. at 36-36-37, help its

cause.  No such showing could possibly have been made here.  First, as the FWS explained in the

preamble to the exemption rule that was issued on the same day that it listed the antelopes as

endangered, it agreed that the captive-held antelopes existing on several different ranches in the

U.S. "may not qualify as populations" as defined by the agency's implementing regulations.  See

70 Fed. Reg. at 52313; see also Comments of DOW/HSUS (to which the FWS is referring) at 8-

9, AR 237.0428-29 (explaining that "any such reference is contrary to the FWS's own definition

of the term 'population,' which only includes 'a group of fish or wildlife in the same taxon . . . in

common spatial arrangement that interbreed when mature,' 50 C.F.R. § 17.3," and that "[t]his

definition necessarily forecloses a majority of the Antelopes in captivity from ever being

considered a 'population,' because these animals are neither in common spatial arrangement that

would allow them to interbreed, or genetically managed in a way that would allow them to

contribute genetically to reintroduced or wild populations.") (emphasis added); see also AR

---

[8] Moreover, the Intervenor-Defendants believe that these other "split-listing" decisions also violate the plain language of the statute.  Indeed, HSUS and others have petitioned the FWS to eliminate the "split-listing" of chimpanzees, upon which SCI relies, SCI S.J. Mem. at 35, so that all members of the species are protected as "endangered" – a matter that is currently under consideration by the agency.  See 76 Fed. Reg. 54423 (Sept. 1, 2011) (announcing status review to determine if listing the entire species as endangered is warranted).  Other groups have challenged the decision by the National Marine Fisheries Service to exclude the captive members of the Southern Resident Killer Whale from the "endangered" listing of that species – another example relied on by SCI, see SCI S.J. Mem. at 36 – in a case that is currently pending in the District Court for the Western District of Washington.  Proie v. Natl. Marine Fisheries Serv., Civ. No. 11-05955 (W.D. Wa.).

1.001 (internal FWS memorandum noting that "[t]he problem with the oryx . . . is that there are lots of them in captivity, but relatively few whose bloodlines are charted for optimum breeding").

Second, captive members of the species in the U.S. do not qualify as being "significant" to the wild populations, as is additionally required to qualify as a "distinct population segment." See 61 Fed. Reg. 4722 (Feb. 7, 1996) (a population segment must be both "discrete" and "significant" to qualify for listing as a DPS); see also id. at 4724 (explaining that "significance" refers to the role the population plays in preserving the species in the wild).  Indeed, as demonstrated supra at 21, SCI takes the position here that these U.S. captive herds do not benefit the conservation of wild populations, relying heavily on the fact that "[t]he Service could find no concrete evidence that listing the U.S. captive herds would benefit the conservation of . . . the populations in the wild."  SCI S.J. Mem. at 6 (emphasis added).  Hence, by no stretch of the imagination could these captive-bred antelopes be considered "significant" within the meaning of the agency's DPS Policy.  Therefore, the agency's refusal to consider this option was hardly unlawful.  See 5 U.S.C. § 706(2) (agency's decision must be "in accordance with law"); Udall v. Tallman, 380 U.S. 1, (1965) (agencies must abide by their own regulations).

### C.   The Agency Cogently Explained The Reasons It Included The Captive Members Of The Antelopes In The Listing Determination.

Although, as explained supra, the FWS was in fact required to give the captive members of the species "the same classification" that was afforded to the wild antelopes, see Memorandum from Ron Nowak, AR 1.001, there also is no merit to SCI's contention that the Service "refused to deal" with arguments that "the U.S. populations" should be treated "separately" when it issued the final listing determination.  See SCI's S.J. Mem. at 34; see also

id. at 36 (complaining that the FWS "offered no explanation" for failing to designate the captive

populations separate from the wild populations).  On the contrary, the agency very clearly

explained that the reason it was including the captive-bred members of the species was because,

under the statute, which allows listings of species, subspecies, and distinct population segments,

"[i]t would not be appropriate to list captive and wild animals separately."  70 Fed. Reg. at

52320, AR 384.0033 (emphasis added).

Indeed, although that explanation should have been the end of the matter, the agency

went much further, explaining that because "the Service may authorize otherwise prohibited

activities that enhance the propagation or survival of the species, such as captive breeding to

increase the population size or improve the gene pool, under Section 10" of the Act, it was the

same day issuing its special exemption rule for the captive-bred members of these species.  See

70 Fed. Reg. at 52320, AR 384.0033.  Thus, the agency explained in great detail that "in

response to comments" opposing the listing of the captive members of the species, including

those of "[t]he exotic animal ranching community [which] was uniformly against the proposed

rule because listing the species would provide a disincentive to continue captive breeding of

these three species on ranches," the agency granted a blanket exemption that would allow those

entities to continue those operations without obtaining any permits.  Id.  Indeed, SCI cannot

legitimately now complain that the FWS somehow failed to explain why it chose that particular

route "to deal with the U.S. populations," SCI S.J. Mem. at 34, when, at the time, SCI stressed

that this precise approach was "the only viable solution for these captive populations in the event

that the wild populations of these antelopes must be listed as endangered."  Comments of SCI

(March 29, 2005), AR 237.0364 (emphasis added); see also State Farm, 463 U.S. at 48

(explaining that an agency's decision is not arbitrary and capricious if it is "cogently

explain[ed]"); id. at 51 ("rulemaking 'cannot be found wanting simply because the agency failed

to include every alternative device and thought conceivable by the mind of man").

Thus, the agency clearly explained that the answer to the dilemma urged by SCI and

others was to provide the captive-bred owners of the species broad authority under Section 10

that would allow them to continue many of their activities.  However, now that this blanket

authorization has been declared unlawful under the plain language of the statute, this simply

means that owners of captive-bred antelopes, and those who wish to kill them, must individually

apply for and obtain a valid Section 10 permit and/or a CBW registration.  See supra at 7-9; see

also 626 F. Supp. 2d at 120 (finding that "the text, context, purpose and history of section 10

show a clear Congressional intent that permits must be considered on a case-by-case basis")

(emphasis added).  Accordingly, other than the fact that each entity seeking to engage in

otherwise unlawful activities with respect to these antelopes must now actually make the

showing required by the Act and the Service's implementing regulations, SCI's members are

faced with the same situation that applied when the FWS issued the original 2005 listing rule –

and that normally applies when the agency decides to list a species as "endangered" under the

statute  – i.e., they may not "take" the species, or otherwise violate the requirements of Section 9,

without obtaining a permit to do so under Section 10.

While some entities that engage in the captive-breeding of these species may be able to

meet these stringent requirements, see, e.g., Comments of Bamberger Ranch Preserve (Jan. 19,

2003), AR 156-58 (explaining that this ranch partners with the AZA's "Species Survival

Program" for the oryx),[9] others clearly may not – precisely what Judge Kennedy contemplated when he struck down the blanket exemption rule.  <u>See</u> 626 F. Supp. 2d at 118 (noting that without requiring a case-by-case analysis of each such permit "<u>it is impossible to evaluate whether each permitted act will enhance the propagation or survival of the species</u>") (emphasis added); <u>see also</u> <u>supra</u> at 7 (explaining that recreational killing of endangered species is not permitted under Section 10); 50 C.F.R. § 17.21(g)(1)(iii) (making clear that the CBW permit does not apply to activities with respect to "non-living wildlife"); 44 Fed. Reg. 30044, 20045 (May 23, 1979) (FWS recognizes that "uses of captive wildlife can be detrimental to wild populations" because "consumptive uses" can "stimulate a demand for products which might further be satisfied by wild populations").  However, the mere fact that those wishing to engage in otherwise prohibited activities with respect to an endangered species must actually now apply for a permit to do so is certainly not a basis for holding unlawful the government's original listing rule.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, SCI's motion for summary judgment with regard to its challenge to the FWS's 2005 listing rule should be denied and judgment should be entered on this claim for the defendants.[10]

---

[9] <u>See also</u> DOW/HSUS Comments at 9-10, AR 237.0429-30 (noting that the Bamberger Ranch is the only private ranch affiliated with the SSP and that it does not allow hunting of its animals).

[10] Intervenor-Defendants take no position on SCI's additional claim challenging the agency's delay in responding to its delisting position.

Respectfully Submitted,

_____/s/_____
Katherine A. Meyer (D.C. Bar No. 244301)
William S. Eubanks II (D.C. Bar No. 987036)
Meyer Glitzenstein & Crystal
1601 Connecticut Avenue NW, Suite 700
Washington, D.C. 20009
(202) 588-5206 / (202) 588-5049 (fax)
beubanks@meyerglitz.com
kmeyer@meyerglitz.com

Date:   April 27, 2012          Counsel for Defenders, HSUS, and Born Free USA