**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| SAFARI CLUB INTERNATIONAL ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| Ken Salazar, *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | Case No. 11-cv-01564 (BAH) |
| ) | (consolidated with cases |
| Terry Owen, *et al.* ) | 1:12-cv-00194-BAH and |
| ) | 1:12-cv-00340-BAH) |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| U.S. DEPARTMENT OF THE INTERIOR, ) | |
| *et. al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |
| ) | |
| EXOTIC WILDLIFE ASSOCIATION, *et.* ) | |
| *al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| U.S. DEPARTMENT OF THE INTERIOR, ) | |
| *et. al.* ) | |
| ) | |
| Defendants. ) | |
| _____ | |

**FRIENDS OF ANIMALS' OPPOSITION TO SAFARI CLUB'S**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………...……………………..2

TABLE OF AUTHORITIES………………………………………...………….…………4

INTRODUCTION…………………………………………………..………………8

I.    FACTUAL BACKGROUND………………………………….………………9

      A.    The Three Antelope Species……………………………….…………9

      B.    ESA Listing and Subsequent Administrative Action………………………….....10

      C.    Friends of Animals ………………………………………………………12

II.   LEGAL BACKGROUND………………………….……………………13

      A.    The Endangered Species Act………………………………………..…13

      B.    ESA Section 9 Prohibitions and Section 10 Incidental Take Permits…………...14

      C.    The Distinct Population Segment Policy………...………………………....15

STANDARD OF REVIEW……………………………………………………………...16

ARGUMENT……………………………………………………………17

I.    U.S. FISH AND WILDLIFE SERVICE DID NOT ABUSE ITS DISCRETION………17

      A.    FWS Properly Considered and Dismissed Application of the DPS Policy Where
            No Interested Party, Including SCI, Came Forward with Relevant Information
            That Such a Listing Would Be Warranted ……………………..............................18

      B.    The Lack of a DPS Determination for the U.S. Population is Consistent with the
            Purpose of the DPS Policy……………………………...…………………..20

      C.    If the U.S. Populations Are a DPS, the U.S. Populations Are Endangered Under
            the ESA Listing Factors…………………..……………………………...22

            1.    Present or threatened destruction, modification, or curtailment of its
                  habitat or range…………………………………………….23

            2.    Overutilization for commercial and recreational purposes………………24

            3.    Disease or predation…………………………………………………25

       4.      Inadequacy of existing regulatory mechanisms……………………………27

       5.      Other natural or manmade factors affecting its continued existence…….28

II.    THE ANTELOPE LISTING IS NOT INCONSISTENT WITH FWS PRACTICES………………………………………………….…………………29

III.   CAPTIVE BREEDING AND COMMERCIAL USE DO NOT JUSTIFY IGNORING THE ESA'S CONSERVATION MANDATE………………………...……………32

    A.  FWS Upheld the ESA's Conservation Mandate……………………………32

    B.  This Court and FWS Cannot Consider Economic Loss……………………...33

IV.  IF THE COURT WERE TO FIND THAT FWS' DECISION TO LIST THE U.S. POPULATIONS WAS ARBITRARY AND CAPRICIOUS, THE PROPER REMEDY IS TO REMAND THE RULE BACK TO FWS FOR FURTHER CONSIDERATION ……………………………………………………………………………………34

    A.     In the Event DPS Should Apply, This Court Has Discretion to Remand to FWS to Determine Whether the DPS Should Be Endangered or Threatened……………34

    B.     Vacatur is Not Appropriate in This Case Because It Would Harm All Antelope Populations………………………………………………………………35

       1.      A complete vacatur of the Final Listing Rule is too drastic because it sets aside protections for both the U.S. and wild populations………...............37

       2.      Even if this Court were to only vacate the listing of the U.S. populations, there could still be an impact on the wild species because it would undermine legal protections on poaching and smuggling…......................38

CONCLUSION………………………………………………………………………..44

**TABLE OF AUTHORITIES**

## FEDERAL CASES

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136 (D.C. Cir. 2005)…….......……………………………………………………………………………35

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993)..….35, 37

*Am. Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008)…………………………………16

*Camp v. Pitts*, 411 U.S. 138 (1973)…………………………………………………………...17

*Cary v. Hall*, No. C05-4363 VRW, 2006 WL 6198320 (N.D. Cal. Sept. 30, 2006)……………38

*Cayman Turtle Farm, Ltd. v. Andrus*, 478 F. Supp. 125 (D.D.C. 1979)…...……………14, 41, 42

*Ctr. for Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137 (D. Colo. 2004)………… 27

*Checkosky v. S.E.C.*, 23 F.3d  452 (D.C. Cir. 1994)……………………………………………35

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)……………………..………17

*Conservation Force v. Salazar*, No. 10-1057, 2012 WL 1059732 (D.D.C. Mar. 30, 2012)…….15

*Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96 (D.D.C. 2011)……………………........36

*Defenders of Wildlife v. Salazar*, 729 F.Supp. 2d 1207 (D. Mont. 2010)………..……………..33

*Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005)...21

*Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009)………………………...11, 37

*Humane Soc'y of U.S. v. Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008)……...……………….35

*In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 794 F. Supp. 2d 65 (D.D.C. 2011)………………………………………………………………………16, 18, 21, 34

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, (D.C. Cir. 1990)……………………………………………………………………………….37

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989)……………………………………17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)…...…………17

*Or. Natural Res. Council v. Daley*, 6 F. Supp. 2d 1139……………………………………27

*Sw. Ctr. for Biological Diversity v. Babbit*, 939 F. Supp. 49 (D.D.C. 1996)……………………27

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978)……………………………………………………33

**FEDERAL STATUTES**

5 U.S.C. § 706 (2006)…………………………………………..……………………………17, 35

16 U.S.C. §§ 1531-1544 (2006)…………………………………………………………………...8

16 U.S.C. § 1531 (2006)…………………………………………………………13, 15, 32

16 U.S.C. § 1532 (2006)…………………………………………………………...13, 14, 15, 28

16 U.S.C. § 1533 (2006)………………………………………………………… *passim*

16 U.S.C. § 1538 (2006)…………………………………………………………………14

16 U.S.C. § 1539 (2006)………………………………………………………….......14, 15

**FEDERAL REGULATIONS**

50 C.F.R. § 10.12 (2011)…………………………………………………………...14

50 C .F.R. § 13.21(b) (2011)…………………… …………………………….................15

50 C.F.R. § 17.22 (2011)…………………………………………………………………15

50 C.F.R. § 424.11(d) (2011)……………………………………………………………...22

50 C.F.R. § 424.13 (2011) ………………………………………………….……………33

41 Fed. Reg. 45,990 (Oct. 19, 1976)…...………………………………………………29

43 Fed. Reg. 16,144 (Apr. 14, 1978)………………………………………………………32

44 Fed. Reg. 30,044 (May 23, 1979)……………………………………………………………32

52 Fed. Reg. 23,148 (June 17, 1987)……………………………………………………30

53 Fed. Reg. 38,451 (Sept. 30, 1988)………………………………………………….......30

55 Fed. Reg. 9,129 (Mar. 12, 1990)……………………………………………………...29

56 Fed. Reg. 56,491 (Nov. 5, 1991)…………………………………………………10, 19, 30

58 Fed. Reg. 68,323 (Dec. 27, 1993)……………………………………………………………32

61 Fed. Reg. 4,722 (Feb. 7, 1996)…………………………………………………...16, 21, 22, 23

63 Fed. Reg. 64,772 (Nov. 23, 1998)……….....…………………………………………….31

68 Fed. Reg. 1,826 (Jan. 14, 2003)……….……………………………………………14

68 Fed. Reg. 43,706 (July 24, 2003)…………………………………………………..…19

68 Fed. Reg. 66,395 (Nov. 26, 2003)…………………………………………..…….....20

70 Fed. Reg. 52,310 (Sept. 2, 2005)……………………………………………..……11

70 Fed. Reg. 52,319 (Sept. 2, 2005)………………………………………………..… *passim*

70 Fed. Reg. 71,554 (Nov. 29, 2005)………………………………………………….14

70 Fed. Reg. 72,645 (Dec. 6, 2005)………………………………………………….....15

71 Fed. Reg. 16,823 (April 4, 2006)…………………………………………………….15

74 Fed. Reg. 21,816 (May 11, 2009)…………………………………………………….15

76 Fed. Reg. 10,300 (Feb. 24, 2011)……………………………………………………29

76 Fed. Reg. 39,804 (July 7, 2001)……………………………………………………….11

76 Fed. Reg. 54,423 (Sept. 1, 2011)…………………………………………..……30

77 Fed. Reg. 431 (Jan. 5, 2012)…..……………………………………………………12, 37

## LEGISLATIVE MATERIALS

H.R. Rep. No. 93-412 (1973)……………………………………………………………14

## OTHER AUTHORITIES

Carolyn Fischer, Complex Interactions of Markets for Endangered Species Products, J. Envtl.
Econ. & Mgmt., 926-27 (2004)……………….…………………………………39, 40, 41

CITES Appendices, valid from April 3, 2012, *available at*
http://www.cites.org/eng/app/appendices.php……….........……………………………..…27, 30

CITES Arts. II(1), III, Mar. 3, 1973, 27. U.S.T. 1087, 12 I.L.M 1085…………………………..27

Dener Giovanni, Taking Animal Trafficking Out of the Shadows, 1 Innovations 25-35, 28 (2006)…………………………………………………………………………………38

Economic Impact of the Exotic Wildlife Industry, Agricultural and Food Policy Center – Texas A&M University, August 2007, *available at* http://www.afpc.tamu.edu/pubs/2/496/rr-2007-02.pdf..............................................................................................................26

Erwin H. Bulte & Richard Damania, An Economic Assessment of Wildlife Farming and Conservation, Conservation Biology 1224 (2004)………………………………………………39

IndianHead Ranch Website *available at* http://www.indianheadranch.com/IndianheadExpeditions/HunterTraining.aspx.........................24

Jason C. Rylander, *Recovering Endangered Species in Difficult Times: Can the ESA Go Beyond Mere Salvage?,* 42 Envtl. L. Rep. News & Analysis 10017, 10021 (2012)……………………..21

Laurel A. Neme, Animal Investigators (2009)...……………………………………………..38, 39

Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/arbitrage (last visited Mar. 7, 2012)…………………………….……………………………………………40

U.S. Fish and Wildlife Service, Annual Report FY 2008, 8 (2008), *available at* http://www.fws.gov/le/pdffiles/FinalAnnualReportFY2008.pdf...…………………………....42

U.S. Fish and Wildlife Service, U.S. CITES Biennial Report for 2007-2008, 32 (2009), *available at* http://www.cites.org/common/resources/reports/pab/07-08UnitedStates.pdf.........................42

**INTRODUCTION**

Plaintiff Safari Club International ("SCI") challenges the U.S. Fish and Wildlife

Service's ("FWS") September 2, 2005 decision to list three species of antelope—scimitar-horned

oryx, dama gazelle, and addax ("three antelope species")—as endangered under the Endangered

Species Act ("ESA").  16 U.S.C. §§ 1531-1544 (2011); s*ee Final Rule to List the Scimitar-*

*Horned Oryx, Addax, and Dama Gazelle as Endangered,* 70 Fed. Reg. 52,319 (Sept. 2, 2005)

[hereinafter Final Listing Rule].  SCI challenges this on the basis that the rule impermissibly

listed U.S. captive populations of the three antelope species that are being raised on hunting

ranches for commercial use.

Ironically, it was hunting—both legal and illegal—that caused the demise of these

species in their home ranges in Africa.  More importantly, SCI's challenge must fail because

these species fair no better when raised by ranchers for hunting purposes in the United States.

Captive breeding and commercial use do not justify ignoring the ESA's conservation mandate.

Regardless of whether they are in the United States or in Africa, the remaining members of these

three species are constantly at risk of extinction.

Legally, there is no language in the ESA or FWS policies that state FWS **must** designate

the U.S. populations of the antelope species as a designated population segment ("DPS").  In

choosing not to do so, FWS considered all of the information it had about the U.S. captive

populations, and even specifically asked the owners of hunting ranches in the United States for

information regarding the U.S. populations that might be relevant to either the listing decision or

consideration of a DPS.  Nothing was produced during the rulemaking process that would be

relevant to FWS's decision to list both populations and decline the use of the DPS policy.  In

fact, if anything, the decision not to make a DPS determination for the U.S. populations **is**

**wholly consistent with FWS policies**. The DPS process is intended as an additional means for FWS to protect species, not to select certain populations to exclude from listing for political or economic reasons.   Further, even if U.S. populations were a DPS, the U.S. populations are endangered under the ESA.   In fact, the U.S. populations are **more endangered** than the African populations, because in the United States the antelope live on hunting ranches, are not subject to any binding regulatory protection, and are vulnerable to being killed at any time.

## I.    FACTUAL BACKGROUND

### A.    The Three Antelope Species.

The scimitar-horned oryx, addax, and dama gazelle once thrived in the deserts of northern Africa.   Humans have decimated all three populations, the "addax and scimitar-horned oryx have not been sighted [in wild herds] since the 1950s" and the dama gazelle "is on the verge of extinction."  AR 401.0082.   At the beginning of the twentieth century, all three antelope species inhabited what is now Morocco[1] (AR 401.0082), but are now, all but extirpated (AR 401.00119).   The most important and direct cause of this decline is hunting.  *Id.*

> Antelopes are, and have for many years been, freely hunted throughout [Egypt] at all seasons and in any numbers.   Animals of all age groups and of both sexes are hunted.   Illegal hunting of antelope in Egypt has reached an unprecedented scale in the last few years. . . . Another factor contributing to the fast and catastrophic decline of antelopes in Egypt is commercial exploitation.   Large numbers of gazelles and other species . . . are trapped and sold locally or exported.   Stuffed gazelles, ibex, and many other mammals, and their horns or skins are openly sold throughout the country and are often exported.

*Id.*

> Since World War II, the numbers of vehicles and firearms have increased by several orders of magnitude and the practice of mortised hunting has

---

[1] Addax and Oryx are extinct in Morocco, Algeria, Tunisia, Libya, and Egypt.  AR 401.0082, 401.0092, 401.0101, 401.0112, 401.0119.  The dama gazelle is threatened in Algeria and Morocco (AR 401.0082, 401.0092), but extinct in Tunisia and Libya (AR 401.0101, 401.0112).

> become extremely widespread.  This involves pursuing animals until they are immobilized by exhaustion and then shooting them.  This form of hunting has had a devastating impact on antelope populations in many semi-arid and arid environments.

AR 401.0126.  Poaching, hunting, civil wars, and habitat destruction have led to the demise of the three antelope species.  70 Fed. Reg. 52,319.   While some countries have implemented hunting bans and created protected areas, illegal hunting still runs rampant.  AR 401.0082-0112.  If not for hunting, the three antelope species would not be endangered as they are today.

**B.**      **ESA Listing and Subsequent Administrative Action.**

FWS recognized the imperiled status of the three antelope species, and on November 5, 1991, published in the Federal Register a proposed rule to list the three antelope species as "endangered" under the ESA.  Proposed Endangered Status for Scimitar-horned Oryx, Addax, and Dama Gazelle, 56 Fed. Reg. 56,491, 56,491-95 (Nov. 5, 1991) [hereinafter Proposed Listing Rule].  The Proposed Listing Rule indicated that FWS might treat captive antelope differently than wild antelope and requested information about the status of captive populations.  *Id*. at 56,491.  FWS reopened the notice and comment period three times between June 1992 and November 2003—but FWS never finalized this proposed rule.

It was not until 2005, following a lawsuit, that the FWS listed the antelope species as endangered.  *See* 70 Fed. Reg. at 52,319.  On September 2, 2005, FWS published the Final Listing Rule, listing the three antelope species as endangered throughout their ranges due to habitat loss through desertification, permanent human settlement, competition with domestic livestock, and by regional military activity and uncontrolled killing.  *Id*.  FWS found that, due to these threats, the scimitar-horned oryx is most likely extinct in the wild and that the addax and the dama gazelle are near-extinct in the wild.  *Id*.  FWS also found that, but for captive breeding of the three species for the purpose of maintaining founder stock necessary for reintroduction,

10

the species might be extinct.  *Id.*  Concurrently with the Final Listing Rule, the FWS issued the

Sport-Hunting Rule.  Exclusion of U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama

Gazelle From Certain Prohibitions, 70 Fed. Reg. 52,310 (Sept. 2, 2005) [hereinafter Sport-

Hunting Rule].

Meanwhile, private ranches in the United States, mainly in Texas, breed the three

antelope species solely to sell "hunts" of these rare species within fenced areas.  For a hefty

price, up to $5,250, these sport-hunting operations guarantee success and a mounted trophy.

Friends of Animals' Motion to Intervene, Exhibit A: Declaration of Priscilla Feral ¶ 20, *Safari*

*Club Int'l v. Salazar, et al.*, Case No. 11-cv-01564, ECF No. 11 [hereinafter Feral Decl.].  In

2009, Friends of Animals filed suit against FWS for violating the ESA and the National

Environmental Policy Act by promulgating the Sport-Hunting Rule—which in effect provided a

blanket exemption allowing hunters to hunt these antelopes without obtaining individual permits.

*Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 102 (D.D.C. 2009).  In *Friends of Animals*,

this Court held that the Sport-Hunting Rule violated the ESA because it permitted the continued

killing of the three antelope species without the required case-by-case showing that each

proposed take will enhance the survival of the species.  *Id.* at 120.  The court remanded to FWS

for further proceedings consistent with its opinion.  *Id.*

As a result of the court's decision, in July 2011, FWS finally posted its proposal to

rescind the Sport-Hunting Rule.  Removal of the Regulation That Excludes U.S. Captive-Bred

Scimitar-Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions: Proposed Rule*,* 76

Fed. Reg. 39,804, 39,804 (July 7, 2011).

On August 31, 2011, SCI filed this action.  SCI's case consists of three claims alleging

that the listing of the U.S. captive-bred populations of the three antelope species as endangered

violates the procedural and substantive mandates of the ESA and the Administrative Procedure

Act ("APA") and that FWS failed to exclude the U.S. populations as endangered because they

are a distinct population segment.  Safari Club Int'l Compl. ¶¶ 70-106, *Safari Club Int'l v.*

*Salazar, et al.*, Case No. 11-cv-01564, Doc. No. 1 [hereinafter SCI Compl.].  On January 5,

2012, FWS rescinded the Sport-Hunting Rule and published the Removal of Sport-Hunting Final

Rule, which took effect on April 4, 2012.  Removal of the Regulation that Excludes U.S.

Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions, 77

Fed. Reg. 431 (Jan. 5, 2012) [hereinafter Removal of Sport-Hunting Final Rule].  Currently, the

FWS considers all populations of the three antelope species endangered under the ESA, and "a

person will need to qualify for an exemption or obtain an authorization under the current

statutory and regulatory requirements to conduct any prohibited activities."  *Id*.

**C.     Friends of Animals.**

Friends of Animals ("FoA") is a non-profit animal advocacy organization which

maintains offices in Connecticut, New York, and Washington, D.C., and regularly consults and

communicates with experts, scientists, and government agencies worldwide.  Feral Decl. ¶ 3.

FoA has approximately 200,000 journal subscribers and members in the United States and

internationally.  *Id*.  FoA, its members, and staff value the ways that humans and nonhuman

species benefit from protecting native biological diversity.  *Id*.  FoA's mission is to cultivate a

respectful view of nonhuman animals, free-living and domestic.  *Id*.  Its goal is to free animals

from cruelty and institutionalized exploitation around the world.  *Id*.  FoA uses the best available

science to forward its mission through active participation in international and national policy

and law formation, including law and policy involving the Convention on International Trade in

Endangered Species of Wild Fauna and Flora ("CITES"), ratified by the United States in

September 1973, and implemented through the ESA; and through national administrative

processes, legal action, public outreach, and education.  *Id*.  FoA often participates in public

processes involving endangered species and seeks to influence legislation regarding endangered

and other protected species.  *Id*.  FoA has a limited number of resources, in terms of both staff

and financial resources, to further its mission.  *Id*.

## II.     LEGAL BACKGROUND

### A.     The Endangered Species Act.

The purpose of the ESA is to "provide a means whereby the ecosystems upon which

endangered species and threatened species depend may be conserved, [and] to provide a program

for the conservation of such endangered and threatened species . . . ."  16 U.S.C. § 1531(b).  The

ESA defines conservation as "the use of all methods and procedures that are necessary to bring

any endangered species or threatened species to the point at which the measures provided

pursuant to [the ESA] are no longer necessary."  *Id*. § 1532(3).  However, the protective

provisions of the ESA do nothing to conserve a species until that species is officially "listed" as

either threatened or endangered under the terms of the ESA.  *Id*. § 1533.

Species are listed or delisted after notice is given and there has been an opportunity to

comment.  *Id*. § 1533(b)(5).  Listing is initiated either by FWS or as a result of a petition

submitted by any interested person.  *Id*. § 1533(b)(1), (3), (5).  FWS is required to list as either

threatened or endangered any species facing extinction due to any one or any combination of the

listing factors: (1) present or threatened destruction, modification, or curtailment of its habitat or

range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3)

disease or predation; (4) inadequacy of existing regulatory mechanisms; and (5) other natural or

manmade factors affecting its continued existence.  *Id*. § 1533(a)(1)(A)-(E).  In evaluating these

factors, FWS must consider "the best scientific and commercial data available" to it in making its decision on whether to list.   *Id*. § 1533(b)(1)(A).

**B.      ESA Section 9 Prohibitions and Section 10 Incidental Take Permits.**

Once a species is listed, Section 9 of the ESA makes it unlawful for any person to "take" endangered or threatened species (*Id*. § 1538(a)(1)(B)), and the ESA defines "take" to mean to "harass, harm, pursue," " wound," or "kill"  (*Id*. § 1532(19)).   Section 9 also makes it illegal for any person to "import," "export," or "possess, sell, deliver, carry, transport or ship in interstate or foreign commerce . . . in the course of a commercial activity" any endangered species.   *Id*. § 1538(a)(1).   Section 9 protections apply equally to captive and wild endangered animals.   50 C.F.R. § 10.12; H.R. Rep. No. 93-412, at 10 (1973); *Cayman Turtle Farm, Ltd. v. Andrus*, 478 F. Supp. 125, 129-30 (D.D.C. 1979).

Section 10 of the ESA provides FWS with some flexibility to grant limited exceptions to Section 9's prohibitions, even for endangered species.   16 U.S.C § 1539.   Congress recognized that it would be necessary to take actions that would otherwise violate Section 9 in order to aid in the recovery of species.   Accordingly, Section 10(a)(1)(A) allows FWS to permit "any act otherwise prohibited by [Section 9] for scientific purposes or to enhance the propagation or survival of the affected species."   *Id*. § 1539(a)(1)(A).   FWS uses Section 10(a)(1)(A) to authorize captive breeding and reintroduction programs.   For example, FWS has a permit allowing it to handle endangered Mexican wolves as part of an effort to reintroduce the species in the southwestern United States.   Notice of Receipt of Applications for Permit, 70 Fed. Reg. 71,554 (Nov. 29, 2005).   Similarly, the National Marine Fisheries Service, FWS's counterpart for marine species, issues permits for hatchery operations involving endangered salmon.   Receipt of an Application for Direct Take Permit, 68 Fed. Reg. 1,826 (Jan. 14, 2003).

Under 16 U.S.C. § 1539(a)(1)(A) and 50 C.F.R. § 17.22 (2011), an agency "may" permit under Section 10 otherwise forbidden actions that will enhance the survival of an endangered species. *Conservation Force v. Salazar*, No. 10-1057, 2012 WL 1059732, *13 (D.D.C. Mar. 30, 2012). Under 50 C.F.R. § 13.21(b) (2011), an agency need not issue a permit if "[t]he applicant has failed to demonstrate a valid justification for the permit" or if "[t]he authorization requested potentially threatens a wildlife or plant population." *Conservation Force,* 2012 WL 1059732, at *13. Moreover, an agency's decision to issue a permit must be consistent with the broader "purposes and policy of the ESA," which take into account effects on the ecosystem in addition to outcomes for a specific species.[2] *See* 16 U.S.C. §§ 1531(b), 1539(d); *Conservation Force*, 2012 WL 1059732, at *13.

## C.     The Distinct Population Segment Policy.

The ESA defines "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). However, the meaning of DPS is not explicitly defined in the ESA. FWS and National Marine Fisheries Service jointly promulgated regulations in 1996 to guide the agency in clarifying "their interpretation of the phrase 'distinct population segment . . .'" under the ESA. Policy Regarding the Recognition of Distinct Vertebrate Population

---

[2] Interestingly, in another context, FWS considered whether sport hunting of these three species met the broader purpose of the ESA. Since 2005, FWS has received permit applications from U.S. citizens wanting to import oryx trophies after sport hunting in South Africa; each claiming, but not elaborating that the permit and sport hunting enhance the survival of the species. Receipt of Applications for Permit to import the sport-hunted trophy of one male scimitar-horned oryx (Oryx dammah) culled from a captive herd in the Republic of South Africa, for the purpose of enhancement of the survival of the species: John C. Wirth, Jr., Dubois, WY, PRT-111987, 70 Fed. Reg. 72,645 (Dec. 6, 2005); Michael E. Willard, Hailey, ID, PRT-110509, 70 Fed. Reg. 72,645 (Dec. 6, 2005); August S. Haugen, Springfield, OR, PRT-114675, 71 Fed. Reg. 16,823 (April 4, 2006); Linda M. Straw, Sacramento, CA, PRT-116481, 71 Fed. Reg. 16,823 (April 4, 2006); Alan J. Schimelpfenig, Grafton, WI, PRT-193940, 74 Fed. Reg. 21,816 (May 11, 2009).

Segments Under the Endangered Species Act, 61 Fed. Reg. 4,722 (Feb. 7, 1996) [hereinafter

DPS Policy].  The DPS Policy requires three elements for determination of a DPS: (1)

discreteness in relation to the remainder of the species, (2) significance in relation to the species,

and (3) the segment's conservation status.  *Id.* at 4,725.  FWS determines the final element,

listing status of each DPS, by applying the listing factors.  *Id.*  Courts have held that the DPS

Policy should be afforded *Chevron* deference.  *In re Polar Bear Endangered Species Act Listing

& 4(d) Rule Litig.*, 794 F. Supp. 2d 65, 97 (D.D.C. 2011) (citing *Nw. Ecosystem Alliance v. U.S.

Fish & Wildlife Serv.*, 475 F.3d 1136, 1141-42 (9th Cir. 2007)).

The intent of the DPS Policy is to allow FWS to list a DPS as threatened or endangered,

and thereby provide a level of protection that is different from other populations within the same

species.  61 Fed. Reg. at 4,722.  The DPS Policy states that "Congress has instructed the [FWS]

to exercise this authority with regard to DPS's sparingly and only when the biological evidence

indicates that such action is warranted."  *Id.* (citing Senate Report 151, 96th Congress, 1st

Session).  As of 1996, FWS had "used this authority rarely; of over 300 native vertebrate species

listed under the [ESA], only about 30 [were] given separate status as DPS's."  *Id.*  The purpose

of a DPS designation is to "enable protection and recovery of declining organisms in a more

timely and less costly manner, and on a smaller scale, than would be required for an entire

species or subspecies."  *In re Polar Bear,* 794 F. Supp. 2d at 97 (citing 61 Fed. Reg. 4,722,

4,725).

## STANDARD OF REVIEW

The FWS's listing decisions are subject to review under the APA.  *See, e.g., Am.

Wildlands v. Kempthorne,* 530 F.3d 991, 997 (D.C. Cir. 2008).  Under APA review, federal

agency actions are to be held unlawful and set aside when they are "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006).  An

agency action must be reversed when the agency has

> relied on factors which Congress has not intended it to consider, entirely
> failed to consider an important aspect of the problem, offered an explanation
> for its decision that runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in view or the product
> of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  This

determination must be made solely on the basis of the record before the agency when it made its

decision.  *Camp v. Pitts,* 411 U.S. 138, 142 (1973).

Finally, while deference to the agency's judgment is appropriate where the decision at

issue "requires a high level of technical expertise," (*Marsh v. Or. Natural Res. Council,* 490 U.S.

360, 375–77 (1989)) an agency's decision is not shielded from a "thorough, probing, in-depth"

review (*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)).  The court's

inquiry into the facts must be both "searching and careful."  *Overton Park*, 401 U.S. at 416.

## ARGUMENT

## I.      U.S. FISH AND WILDLIFE SERVICE DID NOT ABUSE ITS DISCRETION.

FWS did not abuse its discretion in choosing not to designate a DPS for several reasons:

(1) no one, not even SCI, specifically asked FWS to consider a DPS, nor did they present

relevant information regarding the status of the U.S. captive populations; (2) FWS acted

consistently with the purpose of the DPS Policy by not designating a DPS; and (3) if the U.S.

captive populations of the three antelope species are a DPS, they are, in fact, endangered under

the ESA.

A.    **FWS Properly Considered and Dismissed Application of the DPS Policy Where No Interested Party, Including SCI, Came Forward with Relevant Information That Such a Listing Would Be Warranted.**

There is no language in the ESA or the DPS Policy that states FWS **must** designate a DPS.  As this Court noted, "the FWS was not required to designate a DPS, nor to explain why it had not done so."  Mem. Op. Den. Prelim. Inj. Order at 10, *Safari Club Int'l v. Salazar, et al.*, Case No. 11-cv-01564, ECF No. 61 [hereinafter Prelim. Inj. Order].  Moreover, while any interested person may petition FWS to determine whether a DPS is appropriate, pursuant to the DPS Policy, FWS has the final say and "**may** designate a DPS to avoid listing an entire species where only a portion of its population warrants ESA protections*."  In re Polar Bear*, 794 F. Supp. 2d at 97 (citing *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir. 2003)) (emphasis added); 16 U.S.C. § 1533(a)(1), (b)(3)(A).

Here, the record demonstrates that FWS did raise the possibility that a DPS could be considered, and even requested information.  Interestingly, many members of the hunting community, including SCI, commented on the proposed listing rule, but no one stepped forward to either request or provide a basis for FWS to consider the use of the DPS policy. The exotic wildlife hunting community was uniformly against the Proposed Listing Rule because they believed "listing the [captive-bred] species would provide a disincentive to continue captive breeding of these three species on ranches" and because they believed they would "need to go through potentially lengthy and cumbersome permit processes."  70 Fed. Reg. at 52,320. However, no one formally petitioned FWS to consider a DPS and "no comments were submitted that demonstrate[d] that the three antelope species [did] not qualify as endangered under the [ESA]."  *Id*.  FWS made its decision to list both the wild and U.S. captive populations of the three antelope species as endangered based on the best data available to it.

When FWS originally proposed to list the three antelope species in November of 1991, it explicitly stated:

> [T]he proposal applies to all individuals of each species, but reflects primarily an assessment of wild populations . . . there are also known to be large breeding groups of each species in captivity . . . [t]he Service encourages submission of data on the current and potential status of these groups. Depending in part on such information (or lack thereof) . . . [the Service] may decide to treat these groups in a manner differently from the natural populations.

56 Fed. Reg. at 56,491-92.  The Proposed Listing Rule further stated that FWS may list the captive populations "as endangered, as threatened with special regulations, or as threatened by reason of similarity of appearance."  *Id*.

FWS was fully aware that it may have to treat the populations separately; however, FWS concluded that "it would not be appropriate to list captive and wild animals separately," particularly considering there are no scimitar-horned oryx left in the wild.  70 Fed. Reg. at 52,320.  FWS determined that the three antelope species are dependent on captive breeding for their conservation and therefore need ESA protection.  *See id*.  With wild population numbers dwindling for the addax and dama gazelle, and no known wild individuals of the scimitar-horned oryx, FWS found it necessary to protect those living species regardless if they were wild or U.S. captive populations.

FWS considered the evidence and the comments to the Proposed Listing Rule for almost fourteen years.  70 Fed. Reg. at 52,319.  FWS reopened the commenting period three times and specifically asked for comments regarding "alternatives to the treatment of captive and non-native free-ranging populations" of the three antelope species and "information on the genetic integrity of captive and non-native free ranging populations" of the three species.  Endangered Status for Scimitar-Horned Oryx, Addax, and Dama Gazelle, 68 Fed. Reg. 43,706, 43,707 (July

24, 2003); Endangered Status for Scimitar-Horned Oryx, Addax, and Dama Gazelle, 68 Fed.

Reg. 66,395, 66,396 (Nov. 26, 2003). Not only did FWS receive fifty-six comments, but it also

selected three independent specialists to review the Proposed Listing Rule. 70 Fed. Reg. at

52,320.

Throughout this whole period, SCI had the opportunity to petition FWS to further

consider the DPS issue, but it waited until June 28, 2010, an entire five years after the Final

Listing Rule was published, to petition FWS to delist the U.S. captive populations of the three

antelope species. SCI Summ. Judg. Mot. at 19. Not only did SCI and other ranchers fail to

petition FWS, but they also failed to submit persuasive comments regarding a DPS.

**B.**     **The Lack of a DPS Determination for the U.S. Populations is Consistent with the Purpose of the DPS Policy.**

SCI argues that FWS failed to follow its own DPS Policy, and that FWS is required to

abide by its own regulation. *See* SCI Mot. Summ. Judg. at 36. From this proposition, SCI wants

the Court to simply jump to the conclusion that if FWS had followed its policy, it would have

found that the U.S. captive populations are not only a DPS, but should not be listed as

endangered or threatened under the ESA. SCI Compl. ¶ 29; SCI Mot. Summ. Judg. at 36 ("[t]he

Service had the ability, based on its [DPS Policy] to classify all scimitar-horned oryx, dama

gazelle and addax populations outside the U.S. as one population and all the non-native antelope

of the three species living in the U.S., as separate and distinct population segments."). However,

this jump in logic suffers from a fatal flaw—legally, FWS could not have done what SCI

suggests. FWS created the DPS Policy to **protect** segments of species, not prevent the listing of

certain populations of a species for political or economic reasons.[3]

---

[3] Although it is legally unsettled whether FWS can delist a species by population solely in the
segments in which it has rebounded, courts have found that the statute is ambiguous as to this

The first line of the DPS Policy explicitly states that "three elements are considered in a decision regarding the **status of a possible DPS as endangered or threatened** under the Act." 61 Fed. Reg. at 4,725 (emphasis added).  In making this decision, FWS must expressly consider "[t]he population segment's conservation status in relation to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?)."  *Id.* at 4,722.

Courts looking at this policy have concluded that the purpose of a DPS designation is to protect and recover a smaller segment of species "in a more timely and less costly manner . . . ." *In re Polar Bear*, 794 F. Supp. 2d at 97 (citing 61 Fed. Reg. at 4,725).  The DPS Policy is intended to allow FWS to "designate a DPS to avoid listing an entire species where only a portion of its population warrants ESA protections."  *In re Polar Bear*, 794 F. Supp. 2d at 69. DPSs were not intended to be used as "a tactic for subdividing a larger population that FWS has already determined, on the same information, warrants listing across a larger range."  *Id.* at 97 (citing *Friends of the Wild Swan v. U.S. FWS*, 12 F. Supp. 2d 1121, 1133 (D. Or. 1997)).  In this case, SCI is attempting to use a DPS designation as a "tactic for subdividing" the wild and U.S. captive populations of the three antelope species that FWS has already determined are endangered.  This use of a DPS is contrary to the purpose of the DPS policy.

Similarly, SCI wrongly argues that U.S. captive populations of the three antelope species should be designated as a DPS, followed by a delisting from ESA protection.  *See* SCI Mot. Summ. Judg. at 1 ("The Service rejected the idea of designating a distinct population segment for the U.S. population of the three antelope species . . . ").  The DPS Policy applies to listing a DPS

---

issue and there is no congressional mandate that delisting occur in a piecemeal fashion. *Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1171 (D. Or. 2005); Jason C. Rylander, *Recovering Endangered Species in Difficult Times: Can the ESA Go Beyond Mere Salvage?,* 42 Envtl. L. Rep. News & Analysis 10017, 10021 (2012).

as endangered or threatened, not delisting a population.  Therefore, the remedy requested by SCI

is not permitted under the ESA or the DPS Policy.  *See* SCI Mot. Summ. Judg. at 2 ("the only

remedy that will alleviate that harm is for this Court to invalidate and vacate the regulation

designating U.S. non-native captive herds of the three antelope species as endangered.").

      This is not the first time misuse of the DPS Policy has been suggested.  During

promulgation of the DPS Policy, some comments suggested state boundaries should be used to

delist or reclassify populations when a state has provided a successful recovery program.  *See* 61

Fed. Reg. at 4,723-24.  However, FWS responded that "the Act provides no basis for applying

different standards for delisting than those adopted for listing;" therefore, recognition of state

boundaries for delisting is not appropriate.  *Id.* at 4,724.  Delisting an endangered species may

only happen if the species: is completely extinct from captivity and the wild, has recovered, or

the original data for classification was in error.  50 C.F.R. § 424.11(d)(1)-(3).  SCI neither argues

that: the three antelope species are completely extinct, nor that the data used to list the species

was an error; instead SCI contends that increased numbers of the antelope on hunting ranches is

evidence of species recovery.  *See* SCI Mot. Summ. Judg. at 24.  Irrespective of population

numbers in Texas, the three antelope species have failed to recover in their native habitats – the

three antelope species remain endangered today, just as they were when listed in the Final

Listing Rule in 2005.

**C.**    **If the U.S. Populations Are a DPS, the U.S. Populations Are Endangered Under the ESA Listing Factors.**

      Even if the U.S. populations of the three antelope are a DPS, FWS still must determine

their ESA classification.  61 Fed. Reg. at 4,725 ("If a population segment is discrete and

significant (i.e., it is a distinct population segment) its evaluation for endangered or threatened

status will be based on the Act's definitions of those terms and a review of the factors

enumerated in section 4(a).").  In other words, even if a population is both discrete and

significant, under the policy FWS must still consider the conservation status of the species.  *See*

*id.* (the third factor for a DPS is "the population segment's conservation status in relation to the

Act's standard for listing (i.e., is the population segment, when treated as if it were a species,

endangered or threatened?)").  In doing so, FWS must address the five factors in Section 4 of the

ESA that determine whether a species is endangered.  *See* 16 U.S.C. § 1533(a)(1)(A)-(E).

Although a species does not need to meet all five listing factors, the U.S. populations of

the~~the~~three antelope species **<u>do</u>** meet all listing factors, and therefore are endangered.  In fact, for

reasons discussed below, the U.S. populations are **<u>more endangered</u>** than the African

populations because in the U.S. the antelope live on hunting ranches, are not subject to any

binding regulatory protection, and are vulnerable to being killed at any time.

1.  <u>Present or threatened destruction, modification, or curtailment of its habitat or range.</u>

The U.S. captive populations of the three antelope species face continued threats that

could destroy, modify, or curtail their habitat and range.  *See* 16 U.S.C. § 1533(a)(1)(A).

Habitats for the U.S. populations of the three antelope species are fenced-in **<u>private</u>** hunting

ranches.  Ranchers keep the three antelope species fenced-in, which prevents the animals from

escaping, but also prevents hunting without the rancher's knowledge and permission.  Feral Decl.

¶ 18.  Individuals who manage the animals on their ranches have complete control over the

species' habitat, causing a constant threat of destruction, modification, or curtailment.  If the U.S.

populations were delisted per SCI's request, nothing would prevent ranchers from removing

fences or taking other actions that would destroy the antelopes' habitat and/or range.

2. <u>Overutilization for commercial and recreational purposes.</u>

Absent ESA protections, the three antelope species are subject to overutilization for commercial and recreational purposes. *See* 16 U.S.C. § 1533(a)(1)(B). Currently, most of the captive U.S. antelope live on hunting ranches in Texas and other states. SCI claims they are aiding conservation of the species; however, they "own, trade, breed, and sell hunts for members of the U.S. captive herds of the three antelope species." SCI Mot. Summ. Judg. at 20. Indeed, the Final Listing Rule explicitly states that "uncontrolled killing has contributed to the decline of all three species." 70 Fed. Reg. at 52,321. Failure to continue protection for the three antelope species in the U.S. – delisting – would allow uncontrolled killing, which is the primary problem that led to the species' endangered status. *See id.*

Additionally, "[t]raditional hunting methods—involving spears, bows, nets, and dogs—had little overall effect on antelope populations. Rather . . . the most devastating losses . . . [result from] high-caliber weaponry." *Id.* Hunters on the ranches use these exact weapons to slaughter the U.S. captive populations. The Indianhead Ranch in Del Rio, Texas, where SCI members keep the scimitar-horned oryx and addax, encourage scoped medium or open-sight large caliber weapons "to maximize your capabilities for Africa!" *See* SCI Mot. Summ. Judg. at 25; IndianHead Ranch Website *available at* http://www.indianheadranch.com/IndianheadExpeditions/HunterTraining.aspx. This type of recreational use of hunting antelope, is why the entire species was listed in the first place. *See* 70 Fed. Reg. at 52,321.

Economic incentives is all that keeps the three antelope species alive; causing concern over what would happen to these animals if ranchers decided they were no longer financially beneficial. *See* SCI Exhibit DD ¶ 16 ("Hunting is an essential element of what has encouraged

ranchers like me to **_invest_** in [scimitar-horned oryx]. **Market conditions** for selling these animals are based, in great part, on the value of hunts for these animals.") (emphasis added); SCI Mot. Summ. Judg. at 24 ("hunting has played an essential role in providing conservation incentives and financial resources for the recovery of these animals on private ranches in the U.S. . . . . [B]ecause of that endangered status, the number of animals and herds is declining and the ability to breed healthy populations and sell hunts for these animals is diminishing."). Without ESA protections, private ranchers would be free to govern their own herds, kill animals at individual discretion, and destroy the entire U.S. populations of the three antelope species.

Before the Removal of Sport-Hunting Final Rule, hunting on ranches would occur when "owners [sought] to remove surplus animals from their herds." SCI Mot. Sum. Judg. at 27. Leaving the definition of "surplus" to the ranchers is unacceptable when it is in reference to an endangered animal. SCI has demonstrated this unreasonable power by admitting that prior to the Removal of Sport-Hunting Final Rule becoming law, "ranches . . . [were] reducing or eliminating their herds entirely." SCI Mot. Sum. Judg. at 27. This is proof that the ranchers are not conservationists as they claim, since they were so willing to get rid of their antelope herds, and without ESA protections they would be free to do so. If the private ranches are in fact participating in conservation of the species, ESA protection should not restrict those activities. Instead, the U.S. populations of the three antelope species are vulnerable to extreme overutilization for the rancher's economic gain and recreational purposes of those who pay to hunt the species.

> 3. <u>Disease or predation.</u>

The three antelope species in the United States live on confined, fenced-in ranches, leaving opportunity for disease without a management mechanism. Indeed, according to SCI

declarations, ranchers of the three antelope species spend a substantial amount of money on upkeep.  SCI Exhibit BB ¶ 25 ("These animals cost a great deal to keep and feed . . ."); SCI Exhibit CC ¶ 10 ("Being able to allow hunters to take members of these herds paid for the feeding breeding and labor to care for these animals."); SCI Exhibit DD ¶ 18 ("The prices have dropped so low that my scimitar-horned oryx cannot pay for their own upkeep.")  If a rancher finds that an animal is no longer "paying for their own upkeep," without ESA protection, an antelope is susceptible to being killed without regard for its worth as an endangered species.

Additionally, according to the Texas A&M University Agricultural and Food Policy Center,[4] "general costs" or upkeep, includes veterinary needs and disease monitoring.  Economic Impact of the Exotic Wildlife Industry, Agricultural and Food Policy Center – Texas A&M University, August 2007, *available at* http://www.afpc.tamu.edu/pubs/2/496/rr-2007-02.pdf [hereinafter A&M Study].  The A&M Study sent surveys to exotic wildlife breeders to report on their breeding and herding operations.  *Id.* at 17.  Although the study produced numbers for all exotic wildlife, the survey clarified that "annual costs of medical supplies refers to the yearly expense for medicine, vaccines, syringes, etc."  *Id.*  Results showed that ranchers spend thousands of dollars per year on medical and veterinary supplies for all species of exotic animals. *Id.* at 9.  The three antelope species, based on SCI's declarations and the A&M Study, require significant resources to keep free of disease.  Without vaccinations and veterinary attention, it is unknown what diseases the three antelope species would carry.  Further, these vaccinations are

---

[4] This study was cited in Amicus Curiae Brief submitted to this Court by the State of Texas in support of a preliminary injunction to prevent the Removal of Sport-Hunting Final Rule from going into effect, which is part of this consolidated case.  Tex. Amicus Curiae Br. of the Tex. Dep't of Agric. In Supp. of Pls' Mot. For Prelim. Inj. at 3, *Safari Club Int'l v. Salazar, et al.*, Case No. 11-cv-01564, ECF No. 52 [hereinafter Tex. Amicus Br.].

voluntary.  Ranchers could decide at any time to stop providing the animals with medical care and leave them vulnerable to disease.

4.   Inadequacy of existing regulatory mechanisms.

If the "endangered" status is removed from the U.S. populations of the three antelope species, there would be inadequate regulatory mechanisms to prevent them from becoming extinct in the U.S.  *See* 16 U.S.C. § 1533(a)(1)(D).  Although the antelope are protected under Appendix I of CITES, they are only protected from international trade.  CITES Appendices, valid from April 3, 2012, *available at* http://www.cites.org/eng/app/appendices.php [hereinafter CITES Appendix]; CITES Arts. II(1), III, Mar. 3, 1973, 27. U.S.T. 1087, 12 I.L.M 1085. However, the Final Listing Rule stated that although the three antelope species are listed under Appendix I of CITES, "CITES provides some protection, but these three species are not threatened by trade.  Thus CITES is inadequate to prevent or reduce threat of extinction for these species."  70 Fed. Reg. at 52,322.

Additionally, courts have consistently held that state protection or future promise for conservation of a species is insufficient to avoid ESA listing.  *See Ctr. for Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137, 1141 (D. Colo. 2004); *Or. Natural Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1153-55 (D. Or. 1998); *Sw. Ctr. for Biological Diversity v. Babbit*, 939 F. Supp. 49 (D.D.C. 1996).  Regardless of a voluntary conservation agreement, any protection for a species must be legally binding and enforceable to prevent a species from meeting the fourth listing factor.  *See Ctr. for Biological Diversity*, 351 F. Supp. 2d at 1141; *Or. Natural Res. Council*, 6 F. Supp. 2d at 1155 ("Absent some method of enforcing compliance, protection of a species can never be assured.  **Voluntary actions . . . are necessarily speculative** . . . . [FWS]

should explicitly disclaim any reliance on the hoped-for benefits of voluntary actions in making

its listing decision") (emphasis added).

Any "conservation" claims made by ranchers are just that, claims, and are unenforceable

and voluntary.  *See* SCI Mot. Sum. Judg. at 20-21 ("Safari Club's members' interests include

participation in sound sustainable use conservation of the three antelope species . . . members

and others . . . continue their **private conservation efforts**.") (emphasis added).  There are no

protections in place for the three antelope species except the ESA – without the current ESA

endangered status, anyone could "take" an antelope without repercussions.  "Take" includes

"hunt," (16 U.S.C. § 1532(19)) which would leave the three antelope species extremely

vulnerable since ranchers are free to individually decide what is "conservation" or surplus.

   5. <u>Other natural or manmade factors affecting its continued existence.</u>

Both natural and manmade factors affect the three antelope species' continued existence.

*See* 16 U.S.C. § 1533(a)(1)(E).  There are no known surviving natural occurrences of scimitar-

horned oryx or addax populations left in the wild.  AR 401.0082, 401.0092, 401.0101, 401.0112,

401.0119.  The dama gazelle is on the verge of extinction in the wild in two countries and is

extinct in two countries.  *Id*.  This evidences how important it is to protect any living scimitar-

horned oryx, addax, and dama gazelle so that the species do not become extinct.

Of course, ultimately, genetic viability of existing members of these species will be of

great importance to their ultimate success in the wild.  But given the captive nature of the species

today, it is essential to monitor the genetics of individual antelopes and prevent possible

contamination of the genetic pool by excessive inbreeding of small populations or cross-breeding

with other antelopes.  Other domesticated wild species' genetics have been spoiled; one of the

most well-known examples of this is the plight of the American Bison.  *See* 90-Day Finding on a

Petition To List the Wild Plains Bison or Each of Four Distinct Population Segments as
Threatened, 76 Fed. Reg. 10,300 (Feb. 24, 2011).  Historically wide-spread, wild plains bison
currently exist only in conservation herds.  *Id.*  The U.S. captive populations of the three antelope
species face the same fate, since they are fenced in on private hunting ranches where the
animals' lives are subject to the hunters' discretion – natural selection is replaced by selective
culling.  Absent ESA protections, there is no possible way to regulate or assure the genetic health
of these animals.

## II.      THE ANTELOPE LISTING IS NOT INCONSISTENT WITH FWS PRACTICES.

SCI wrongly argues that listing both the wild and U.S. captive populations of the three
antelope species is "inconsistent with ongoing agency decision-making made for other similarly
situated species."  SCI Mot. Summ. Judg. at 31.  But, as this Court stated, SCI's examples are
simply that—examples.  Prelim. Inj. Order at 9.  Not only did SCI use four isolated examples out
of over a thousand animal species listed worldwide, but the examples do not show
inconsistencies in FWS practice, nor are they analogous to the three antelope species.  The three
antelope species differ from the examples SCI provided for a number of reasons.

First, the wild and U.S. captive populations of chimpanzees were listed separately, prior
to FWS promulgating the DPS Policy in 1996.  Determination of 26 Species of Primates as
Endangered or Threatened Species, 41 Fed. Reg. 45,990 (Oct. 19, 1976).  FWS listed the wild
and U.S. captive populations of chimpanzees separately to "facilitate legitimate activities of U.S.
research institutions, zoos and entertainment operations, without affecting wild chimpanzee
populations."  Endangered Status for Chimpanzee and Pygmy Chimpanzee*,* 55 Fed. Reg. 9,129,
9,129 (Mar. 12, 1990).  However, based on its review, FWS recently found that a petition to list
all chimpanzees as endangered presented "substantial scientific or commercial information

indicating that listing all chimpanzees as endangered may be warranted." 90-Day Finding on a Petition To List All Chimpanzees (Pan troglodytes) as Endangered, 76 Fed. Reg. 54,423 (Sept. 1, 2011). FWS is currently conducting a 12-month status review to determine if removing the U.S. captive chimpanzee exemption and listing the entire species as endangered is warranted. *Id*. Similar to the chimpanzees, FWS knew it could list the wild and U.S. captive populations of the three antelope species separately, but unlike the chimpanzees, FWS chose not to list the three antelope species separately and made this decision after promulgating the DPS Policy. 56 Fed. Reg. at 56,491-92; 70 Fed. Reg. at 52,319.

FWS also listed the wild and ranched populations of the Nile crocodile separately and prior to FWS promulgating the DPS Policy in 1996. Reclassification of Ranched Nile Crocodile Populations in Zimbabwe From Endangered to Threatened, 52 Fed. Reg. 23,148 (June 17, 1987). Ironically, FWS originally listed the ranched populations of the Nile crocodile separately as threatened because at the time FWS published the proposed rule, it believed the wild population had not been transferred from Appendix I to Appendix II of CITES. *Id*. at 23,149. Less than eighteen months after FWS listed the wild and captive populations separately, it listed both populations as threatened based on biological data and because FWS learned that the wild populations had also moved from Appendix I to Appendix II under CITES. Reclassification of Wild Nile Crocodile Populations in Zimbabwe from Endangered to Threatened, 53 Fed. Reg. 38,451 (Sept. 30, 1988). Unlike the Nile crocodile, the best data available to FWS supported listing both the wild and U.S. captive populations of the three antelope species as endangered and the three antelope species remain on Appendix I of CITES. CITES Appendices.

With regard to the Arkansas River shiner, as this Court already pointed out, the non-native, introduced populations of this fish are not a captive species and FWS chose not to list it

because: (1) it was not essential for the recovery of the species within its historic range, and (2) it would conflict with the preservation of two other species of fish.  Final Rule to List the Arkansas River Basin Population of the Arkansas River Shiner (Notropis girardi) as Threatened, 63 Fed. Reg. 64,772, 64,774 (Nov. 23, 1998).  Similarly, the non-native, introduced Montana populations of the Arctic grayling were not listed because, as SCI itself points out, they "were not established for any stated conservation purpose nor do they appear to have any formally recognized conservation value with respect to the native populations," but they are also not captive.  SCI Mot. Summ. Judg. at 38-39.[5]  The U.S. captive populations of the three antelope species are non-native introduced species.  However, unlike SCI's fish examples, the three antelope species are captive and FWS has formally recognized and explicitly stated that the three antelope species are dependent on captive breeding for their survival.  70 Fed. Reg. at 52,320.

There is no policy or practice that establishes FWS must list wild and captive populations separately.  Further, SCI attempted to use examples that are not only very different from the three antelope species, but they also do not show inconsistencies in FWS's practices.  Therefore, FWS did not act inconsistently with its previous practices.

///

///

///

///

---

[5]In the Revised 12-Month Finding for the Arctic Grayling, FWS stated that the listing does not include the non-native introduced populations of the Arctic Grayling because they provide no conservation value or genetic value.  FWS further explained its reasoning in a question and answer format that SCI quotes.  Revised 12-Month Finding to List the Upper Missouri River Distinct Population Segment of Arctic Grayling as Endangered or Threatened, 75 Fed. Reg. 54708, 54712-13 (Sept. 8, 2010); http://www.fws.gov/mountain-prairie/species/fish/grayling/QuestionsAndAnswers09082010.pdf.

**III.     CAPTIVE BREEDING AND COMMERCIAL USE DO NOT JUSTIFY IGNORING THE ESA'S CONSERVATION MANDATE.**

In listing the U.S. captive population as endangered, FWS both upheld the ESA's

conservation mandate and properly excluded consideration of the species' commercial value.

**A.     FWS Upheld the ESA's Conservation Mandate.**

The ESA is not designed to protect endangered species by placing them in cages or

behind fences for human enjoyment.  Rather, the primary purpose of the ESA is to provide for

the conservation and continued existence of wild populations of endangered and threatened

species and the ecosystems on which they depend.  16 U.S.C. § 1531.  In this regard, FWS has

long recognized that captive-breeding is important under the ESA only to the extent that it

contributes to the recovery of species in the wild.  In enacting the captive bred wildlife

regulations, FWS stated:

> The Service considers the purpose of the Act to be best served by conserving
> species **in the wild** along with their ecosystems.  Populations of species in
> captivity are, in large degree, removed from their natural ecosystems and have
> a role in survival of the species **only** to the extent that they maintain genetic
> integrity and offer the potential of restocking natural ecosystems where the
> species has become depleted or no longer occurs.

Captive Wildlife Regulation, 43 Fed. Reg. 16,144 (Apr. 14, 1978) (emphasis in original).  *See*

*also* Captive Bred Wildlife Regulation, 58 Fed. Reg. 68,323, 68,324 (Dec. 27, 1993) (stating the

purpose of the captive breeding regulations was to ensure animals are "available for any

legitimate and appropriate effort to re-establish or augment wild populations"); Captive Wildlife

Regulation, 44 Fed. Reg. 30,044, 30,047 (May 23, 1979) (Captive populations are important

because "they can be used to bolster or restock wild populations, they provide an alternative to

wild populations, as a source of animals for research or other uses, and they provide

opportunities for research that can benefit wild populations.").

SCI's private hunting ranches do not fit within this framework because they are not engaged in captive breeding for the purpose of recovery; they are engaged in captive breeding to profit from the killing of rare animals. SCI admits that the hunting ranches with "non-native captive populations [have] no direct conservation impact on the species in the wild." SCI Mot. Summ. Judg. at 7. Listing U.S. populations of the three antelope species ensures that any captive breeders comply with the ESA's conservation mandate, and obtain necessary permits that guarantee breeders are contributing to conservation if they want a "take" permit. Contrary to SCI's argument, failure to list both the wild and U.S. captive populations of the three antelope species as endangered would violate the ESA's conservation mandate.

**B.      This Court and FWS Cannot Consider Economic Loss.**

"The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). "The plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as 'incalculable.' Quite obviously, it would be difficult for a court to balance the loss of a sum certain . . . against a congressionally declared 'incalculable' value." *Id.* Similarly, FWS must make listing decisions "'solely on the basis of the best scientific and commercial data available,' and without reference to possible economic or other impacts of such a determination." *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1214 (D. Mont. 2010) (citing 16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(b); 50 C.F.R. § 424.13). FWS cannot make delisting decisions "based on the constituent interests of economic, recreational or other purposes. The decision must be based on the best available science." *Id.* at 1214. In *In re Polar Bear*, the court rejected the plaintiff's claim that "the agency was obligated to avoid making a listing decision for the polar bear that would negatively impact sport-hunting

programs." 794 F. Supp. 2d at 103.  The court went on to say that "neither the statute itself nor its legislative history makes clear that the ESA requires FWS to avoid making listing decisions that might affect those programs." *Id.*

In the current case, SCI constantly refers to the economic and recreational impacts the Final Listing Rule has on its members.  SCI argues that the value of the three antelope species has already dropped.  SCI Mot. Summ. Judg. at 28 ("Mr. Wier has suffered from the drop in the value of his herd and from the impending loss of opportunities to guide hunts for these species;" the value of Mr. and Ms. Delagrange's three antelope species has "already dropped by more than half").   However, there is no precedent whatsoever to justify SCI's economic and recreational arguments.  Courts have explicitly stated that FWS cannot consider economic impacts nor can FWS consider the negative impacts on sport-hunting programs when determining whether to list or delist a species.  *In re Polar Bear*, 794 F. Supp. 2d at 103.  Both the state of Texas and SCI rely solely on their economic harm, financial hardships, and loss of recreational enjoyment because of the Final Listing Rule.  Tex. Amicus Br. at 3-4 ("the exotic wildlife industry in the United States had total economic impact of $1.3 billion annually and supported 14,383 jobs"); SCI Mot. Summ. Judg. at 25-31 ("[Mr. Wier's] dream of someday selling these animals as his retirement fund has disappeared").

**IV.    IF THE COURT WERE TO FIND THAT FWS' DECISION TO LIST THE U.S. POPULATIONS WAS ARBITRARY AND CAPRICIOUS, THE PROPER REMEDY IS TO REMAND THE RULE BACK TO FWS FOR FURTHER CONSIDERATION.**

**A.    In the Event DPS Should Apply, This Court Has Discretion to Remand to FWS to Determine Whether the DPS Should Be Endangered or Threatened.**

In the event this Court determines that FWS acted arbitrary and capricious by failing to apply the DPS Policy, this Court can remand the action back to FWS to determine to what extent

the DPS Policy should apply.  As previously recognized in this judicial district, "absent [] clarity [in the agency's decision], the proper course. . . is to remand so as to afford the agency an opportunity to set forth its view in a manner that would permit reasoned judicial review." *Checkosky v. S.E.C.*, 23 F.3d  452, 462-66 (D.C. Cir. 1994).  Thus, even in condemning an agency action as arbitrary and capricious, courts have the remedial discretion not to vacate the agency decision: "[i]n fashioning a remedy for an agency's failure to present an adequate statement of basis and purpose, this court may either remand for specific procedures to cure the deficiency without vacating rule." *Id.*

FWS, and only FWS, has the proper expertise to determine whether a population should be designated as a DPS.  This Court should remand, in lieu of vacatur, to allow FWS the time to make a requisite finding.  If designating a DPS is appropriate in this case, FWS must be allowed the time and opportunity to cure its lack of use.

**B.     Vacatur is Not Appropriate in This Case Because It Would Harm All Antelope Populations.**

Under the APA, the decision whether to vacate a federal agency decision depends on the seriousness of the order's deficiency and the disruptive consequences of an interim change that may itself be changed.  5 U.S.C § 706; *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146, 150-151 (D.C. Cir. 1993) ("An inadequately supported rule . . . need not necessarily be vacated."); *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) ("While unsupported agency action normally warrants vacatur . . . this court is not without discretion [to remand without vacating]"); *see also Humane Soc. of U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008) (citing *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.,* 920 F.2d 960, 967 (D.C. Cir. 1990)) (the decision whether to vacate hinges on "the seriousness of the [regulation's]

deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences" of vacatur).

SCI's request for a remedy is inconsistent. SCI's Complaint begs this Court to set aside the Final Listing Rule in whole or in part. SCI Compl. at 29. However, SCI's Motion for Summary Judgment requests this Court to "set aside the rule that classified the three antelope species as endangered;" yet, SCI's Memorandum in Support only requests that this Court "set aside the Service's endangered classification of the U.S. non-native, captive three antelope populations." SCI Mot. Summ. Judg. at 43. It is unclear whether SCI requests this Court to vacate the Final Listing Rule in whole or whether SCI requests this Court to vacate the Final Listing Rule in part.

Vacating any part of the Final Listing Rule would be highly disruptive, and therefore weighs in favor of remand. *Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96 (D.D.C. 2011) (holding that the high likelihood that vacatur would cause significant disruption weighs strongly against it). A complete vacatur of the Final Listing Rule would extinguish all ESA protections for both the wild and U.S. captive populations of the three antelope species, leaving the three species highly vulnerable. A partial vacatur, as explained below, would have the same effect, because it could encourage poaching and illegal trafficking of the three antelope species. Regardless of SCI's murky remedial request, any vacatur would be too drastic of a remedy because: (1) a complete vacatur of the Final Listing Rule it would set aside the protections for both the U.S. and wild populations, and (2) even if this Court were to only vacate the listing of the U.S. populations, there could still be an impact on the wild species because it would undermine legal prohibitions on poaching and smuggling.

1.   <u>A complete vacatur of the Final Listing Rule is too drastic because it sets
aside protections for both the U.S. and wild populations.</u>

Should this Court vacate any part of the Final Listing Rule it would remove all ESA

protections from all three antelope species in the United States and Africa, captive and wild, until

FWS published a proposed rule, opened the proposed rule up for public notice and comment, and

eventually published a final rule; no comparable protections are afforded by other statutory

schemes.

This Court must consider any disruptions that vacatur of the Final Listing Rule might

engender, especially if the wild and/or U.S. populations of the antelope species were later

relisted as an endangered species.  *See Allied-Signal*, 988 F.2d at 150–51; *Int'l Union, United

Mine Workers*, 920 F.2d at 967. The consequences of an interim change in the instant case could

be dire; if the Court vacates the Final Listing Rule and FWS later determines that the wild and/or

U.S. populations should be relisted as endangered, the unprotected population may have suffered

irreversible harm in the intervening time.

Equitable concerns in this case weigh against setting the Final Listing Rule aside. When

combined with equitable concerns for the three antelope species, the disruptiveness of an interim

change, and the lack of a showing of any prejudice to SCI or others resulting from leaving the

listing in place, the mere possibility that FWS might be unable to substantiate its determination

of endangered status does not mandate vacatur.  Further, protection for these species has spanned

over a decade.  After this Court, in *Friend of Animals* (626 F. Supp. 2d at 120) remanded the

Sport-Hunting Rule back to the agency, it took FWS more than two years to rescind the Sport-

Hunting Rule (77 Fed. Reg. 431).  If the Court determines that FWS should have considered the

DPS policy, then this Court should remand the Final Listing Rule to FWS for reconsideration,

37

but leave the Final Listing Rule in place for the duration of the agency's deliberations.  Therefore, entry of final judgment is inappropriate at this time.

    2.  <u>Even if this Court were to only vacate the listing of the U.S. populations, there could still be an impact on the wild species because it would undermine legal prohibitions on poaching and smuggling.</u>[6]

If the U.S. captive populations of the three antelope species were delisted, hunters could potentially be encouraged to hunt either the addax or dama gazelle in the wild, bring the trophy back to the United States, and claim that it was legally killed on one of the U.S. private hunting ranches.  In doing so, the person would essentially be cleansing, or laundering, the antelope's illegal origin, which contradicts the purpose of the ESA.

Laundering is when an illegally obtained object—money, art, artifacts, or animals—goes through a process to "cleanse" its origin to make the object look like it was legally obtained. Animal laundering is the act of illegally trading, trafficking, or smuggling both live animals and animal parts.  It "capitalizes on an asymmetric economic relationship between the source, usually developing countries with fragile and under-funded enforcement capacity...and the demand, wealthy countries with purchasing power."  Dener Giovanni, Taking Animal Trafficking Out of the Shadows, 1 Innovations 25-35, 28 (2006).  Therefore, the United States is typically on the receiving end of laundered animals.  Some estimate that the illegal wildlife trafficking business to be worth twenty billion dollars annually.  Laurel A. Neme, Animal Investigators xii (2009).

---

[6] The court in *Cary v. Hall*, No. C05-4363 VRW, 2006 WL 6198320 (N.D. Cal. Sept. 30, 2006), rejected the animal laundering theory as it relates to the three Antelope species, however it did so within the context of the standing analysis.  *Cary* was a related case to *Friends of Animals,* in which FoA challenged the FWS sport-hunting rule of African antelope on Texas ranches.  In determining standing, the *Cary* court concluded that the causal connection between the challenged regulation and plaintiff's alleged injury was too speculative and unquestionably relied on the unfettered decisions of third parties; thus, plaintiffs failed to show a concrete injury.  But here, there only needs to be sme rational basis for FWS to consider whether delisting the species in the United States could harm the African populations because of the threat of animal laundering.  In this regard, as discussed below, there is ample information that it could.

"[T]he scale of illegal wildlife trafficking is dependent on the risk-reward trade-off.  Strong consumer demand for illicit wildlife products equals large profits for traffickers, while the risks they face are often modest at best."  *Id.* at 191.  This is evident from a 1991 study on the FWS wildlife inspection program, "the [Government Accountability Office] noted that only a quarter of violators of the [ESA] received any penalty, with a far lower percentage sentenced to probation or prison.  Even repeat offenders rarely received substantial fines or jail time."  *Id.* at 191.

SCI argues that "hunting has played an essential role in providing conservation incentives and financial resources for the recovery of these animals."  SCI Mot. Summ. Judg. at 24.  Other hunters have argued that ranched animals could be used to restock wild populations or provide a genetic safety net for wild populations and the profit made from the ranching facilities could go towards funding conservation measures.  Erwin H. Bulte & Richard Damania, An Economic Assessment of Wildlife Farming and Conservation, Conservation Biology 1224 (2004).

On the other hand, "introducing a legal flow of [ranched] output may facilitate the 'laundering' of illegal output from the wild . . . ."  *Id.*  The availability of legally harvested species may confuse consumers by sending a signal that these species are no longer endangered or it may reduce the stigma associated with consuming or hunting these species.  *Id.* at 1231.  Additionally, a closed ranching system "may remove the incentive to protect the wild resources altogether."  *Id.*

Another study indicates that using hunting ranches as a conservation method may be too much of a generalization.  Carolyn Fischer, Complex Interactions of Markets for Endangered Species Products, J. Envtl. Econ. & Mgmt., 926, 927-30 (2004).  Many factors affect the economics of a dual market with dual externalities; therefore, a legal market may actually

increase demand for the illegal market.  *Id.*  The elephant-ivory analysis is synonymous to

allowing the hunting of antelope on private ranches under the ESA.

> [M]ore legal trade can lower the odds of being caught in an illegal
> exchange, affecting prices and incentives in the illegal market . . . the legal
> supply may be intrinsically tied to the illegal supply, as in the case of selling
> confiscated products obtained from poaching.  These kinds of interactions
> seem to be at the root of concerns voiced by animal preservationist groups
> that legal trade will remove the stigma of owning ivory, stimulate demand,
> facilitate smuggling, and increase poaching.

*Id.* at 927.  Additionally, "laundering opportunities bring illegal goods frequently to legal

markets and can bid up illegal prices if legal demand is higher."  *Id.* at 930.

Demand and supply sides for the three antelope species can also interact through

arbitrage.  *See id.* at 933.  Arbitrage is the simultaneous purchase and sale of the same securities,

commodities, or foreign exchange in different markets to profit from unequal prices.  Merriam-

Webster Dictionary Online, http://www.merriam-webster.com/dictionary/arbitrage (last visited

Mar. 7, 2012).  Arbitrage occurs when law-ignoring consumers cross into the legal market to buy

goods, or when launderers make illegally supplied goods available in the legal market.  Fischer,

at 928.  The primary concern with dual markets for the same product is that laundering may

bring illegal goods to legal markets when trade is allowed.  *Id.* at 929.  When the market

equilibrium involves separation, laundering offers a vehicle to use illegal supplies to satisfy

excess demand among legal consumers.  *Id.*  Lower laundering costs could still increase

poaching.

Additionally, there are characteristics that are peculiar to a dual market.  Legalization of

killing antelope on sport-hunting ranches can reduce stigma, not only toward killing the animals,

but also toward owning antelope horns or heads.  Therefore, the demand from law-abiding

consumers to consume the illegal product may increase.  Confusion could result from reduced

stigma.  Just as people were concerned that the legalized ivory trade would encourage people to believe that all international ivory trade was legal *(Id.)*, legalizing the U.S. captive populations of the three antelope species could encourage people to believe that hunting both the captive and wild populations is legal.

Increased demand for antelope will likely create an illegal market that could easily be utilized for trafficking illegally hunted wild antelope from Africa.  The District Court of the District of Columbia held in *Cayman Turtle Farm v. Andrus* that animal trafficking is likely to occur when marketed animal products have the potential to increase consumer demand for those animal products.  478 F. Supp. at 132-33.  There, an action was brought challenging regulations prohibiting importation and trade in the United States of all green sea turtle products produced in mariculture operations.  *Id*. at 127.  Plaintiff Cayman Turtle Farm bred green sea turtles on Grand Cayman Island for scientific and commercial use, and sought to invalidate regulations issued by the Secretaries that prohibited importation of green sea turtle products produced in mariculture operations (cultivation of marine organisms in their natural environment).  *Id.*

The district court determined that based on evidence in the record, plaintiff's marketing of sea turtle products would increase consumer demand for these products.  *Id*. at 132-33. Increased demand would provide a strong economic incentive for the illegal marketing of wild sea turtles, following that increased illegal poaching of wild sea turtles may reduce the total number of wild sea turtles.  *Id.*  The likelihood of such illegal trade is increased by evidence indicating that the products of wild sea turtles can readily be substituted for the products of turtles reared at the Cayman Turtle Farm.  *Id.* at 133.  Further, evidence in the record was sufficient to demonstrate that many farm sea turtle products, such as oil, soup ingredients, and shell sections, were virtually indistinguishable from wild sea turtle products.  *Id.*  Although the

Secretaries had evidence that Cayman Turtle Farm could rear increasing numbers of sea turtles in a commercially successful manner, the Secretaries had a sufficient evidentiary basis to conclude that a mariculture exemption would threaten the existence of sea turtles in the wild.  *Id*.  Wild caught turtles could easily be laundered as commercially farmed turtles because sea turtle products from farms and the wild are indistinguishable.  *Id*.

The reasoning from *Cayman Turtle Farm* can easily be analogized to free-for-all hunting in the United States, which is the result SCI demands be requesting this Court to set aside the listing of the U.S. populations of the three antelope species.  Without ESA protections in place for the three antelope species in the United States, antelope illegally taken in Africa could be passed off as U.S. captive-bred antelope trophies.  Allowing sport hunting creates a market for hunters to illegally traffic poached African antelope into the United States.  The three antelope species are analogous to the sea turtles because it is impossible to distinguish horns from wild antelope species and those from hunting ranches.

Additionally, there is evidence that oryx trophies have been smuggled in the past.  A sampling of seizures and penalties from FWS in 2008 includes "an outfitter from Mexico [who] paid a $5,000 penalty for importing a CITES Appendix I oryx trophy without the required U.S. CITES permit."[7]  The oryx trophy and another non-CITES trophy that had been mislabeled were both forfeited.  U.S. Fish and Wildlife Service, U.S. CITES Biennial Report for 2007-2008, 32 (2009), *available at* http://www.cites.org/common/resources/reports/pab/07-08UnitedStates.pdf.

---

[7] CITES Appendix I lists two different types of Oryx, the Oryx Dammah and the Oryx Leucoryx.  The FWS report fails to classify which species of Oryx was confiscated.  U.S. Fish and Wildlife Service, Annual Report FY 2008, 8 (2008), *available a*t http://www.fws.gov/le/pdffiles/FinalAnnualReportFY2008.pdf.  A FOIA request was sent to the U.S. Fish and Wildlife Service Division of Information Resources & Technology Management on March 7, 2012.  FWS acknowledged receipt of the request on March 9, 2012.  FWS Tracking # FWS-2012-00598.

This is evidence that smuggling of oryx into the United States does occur, and that the potential to launder trophies is substantial.

If the U.S. captive populations of the three antelope species are delisted, papers for imported antelope could be changed to indicate the origin as Texas instead of Africa.  Because there is no way to distinguish between horns of a wild antelope and a U.S. captive-bred antelope, it would be difficult to prove where the antelope originated.  It follows that if smugglers have attempted to import oryx trophies into the United States and most likely succeeded in other cases, once trophies are in the United States, owners could simply claim that the trophies are from legally hunted antelope from private hunting ranches in Texas.  As there would be no way to differentiate between the illegally poached trophies and the legally hunted trophies, if the U.S. captive populations of the three antelope species were not listed as endangered, antelope laundering is possible and foreseeable.

///

///

///

///

///

///

///

///

///

///

///

**CONCLUSION**

For the foregoing reasons, FoA requests this Court deny SCI's Motion for Summary Judgment and uphold the Final Listing Rule that classified both the wild and U.S. captive populations of the three antelope species as endangered.

Dated this 27th day of April, 2012.

Respectfully Submitted,

/s/ Michael Ray Harris
Michael Ray Harris (DC Bar # CO0049)
Environmental Law Clinic
Ricketson Law Building
University of Denver Sturm College of Law
2255 E. Evans Avenue, Suite 335
Denver, CO 80208
Phone: (303) 871-6140
Fax: (303) 871-6847
elc@law.du.edu

Attorney for Defendant-Intervenor
Friends of Animals