**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| SAFARI CLUB INTERNATIONAL ) | |
| ) | Case No. 11-cv-01564(BAH) |
| Plaintiffs, ) | |
| ) | (consolidated with cases 1:12-cv-00194- |
| v. ) | BAH and 1:12-cv-00340-BAH) |
| ) | |
| KEN SALAZAR, *et al.* ) | |
| ) | |
| Defendants. ) | |
| _____ ) | **REPLY OF SAFARI CLUB INTERNATIONAL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO CROSS MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS AND DEFENDANT INTERVENORS** |
| TERRY OWEN, *et al,* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| U.S. DEPARTMENT OF THE INTERIOR, ) | |
| *et al.* ) | |
| Defendants. ) | |
| _____ ) | |
| EXOTIC WILDLIFE ASSOCIATION, *et al,* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| U.S. DEPARTMENT OF THE INTERIOR, ) | |
| *et al.* ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

# Table of Contents

I.      Introduction ................................................................................................................. 1

II.     The FWS's Inexplicable Refusal to Follow Its Own Precedent for Captive
        Populations Was Arbitrary and Capricious.......................................................... 2

III.    The FWS's Treatment of Similarly Situated Non-Native Species Provided
        Precedent That the FWS Erroneously Ignored Without Explanation ................................ 7

IV.     The U.S. Non-Native Captive Herds of the Three Antelope Species Have
        a Potential Future Role to Play in Native Species Recovery ........................................... 11

V.      The Decision to List the U.S. Non-Native Captive Populations of the
        Three Antelope Species Violates the Purposes of the Endangered Species Act .............. 14

VI.     Safari Club Has Standing To Bring This Action ................................................................ 16

VII.    The FWS Has a Duty to Follow Its Own Policy.............................................................. 16

VIII.   The FWS Has A Duty to Be Consistent in Interpreting the Law and
        Applying Precedent........................................................................................................ 19

IX.     This Court Cannot Conduct the Scientific Analysis that the FWS Failed to Do .............. 22

X.      Remand With Vacatur is the Appropriate Remedy for the U.S. Populations of
        the Three Antelope ......................................................................................................... 23

XI.     Conclusion ...................................................................................................................... 25

# Table of Authorities

**Cases**

*AirlinePilot's Assoc. Int'l. v. Dept. of Aviation, City of Chicago*, 45 F.3d 1144 (7th Cir. 1995).. 20

*Allied Signal Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993) ....... 24

*Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior,* 731 F. Supp. 2d 15 (D.D.C. 2010) ............................................................................................................................................... 18

*Citizens for Environmental Quality v. U.S.,* 731 F. Supp. 970 (D.Colo. 1989) ........................... 20

*Columbia Broad. Sys. v. FCC,* 454 F.2d 1018 (D.C. Cir.1971) ................................................... 21

*Friends of Animals v. Salazar*, 626 F. Supp.2d 102 (D.C. Cir. 2009) ........................................ 25

*General Electric Co. v. Gilbert,* 429 U.S. 125 (1976) ................................................................. 20

*Greater Boston Television Corp., v. FCC,* 444 F.2d 841 (D.C.Cir.1970) .................................... 21

*Idaho Farm Bureau v. Babbitt*, 900 F. Supp. 1349 (D. Idaho 1995) ........................................... 16

*International Union v. FMSHA,* 920 F.2d 960 (D.C. Cir. 1990) ................................................... 24

*Jicarilla Apache Nation v. U.S. Department of the Interior*, 613 F.3d 1112 (D.C. Cir. 2010) .... 21

*LeBron v. National Railroad Passenger Corporation*, 69 F.3d 650 (2nd Cir. 1995) ................... 20

*M.M. & P. Maritime Advancement, Training, Educ. & Safety Program v. Department of Commerce*, 729 F.2d 748 (Fed. Cir. 1984) ................................................................................. 21

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) ................... 20

*National Association of Home Builders v. Norton*, 340 F.3d 835 (9th Cir. 2003) ....................... 18

*National Classification Committee v. U.S.*, 22 F.3d 1174 (D.C. Cir. 1994) ................................. 20

*National Conservation PAC v. FCC*, 626 F.2d 953 (D.C. Cir. 1980) .......................................... 20

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,* 145 F.3d 1399 (D.C. Cir.1998) ..................... 23

*Proie v. National Marine Fisheries Service,  2012 WL 1536756 (W.D. Wash. May 1, 2012)* ....... 4

*Ramaprakash v. FAA,* 346 F.3d 1121 (D.C. Cir. 2003) ............................................................... 21

*Realty Income Trust v. Eckerd,* 564 F.2d 447 (D.C.Cir.1977) .................................................... 16

*Safari Club International v. Salazar*, 2012 WL 1095851 (D.D.C. April 2, 2012) ....................... 16

*South Coast Air Quality Management Dist. v. E.P.A.*, 489 F.3d 1245 (D.C. Cir. 2007) .............. 23

*Squaw Transit Co. v. United States,* 574 F.2d 492 (10th Cir. 1978) ........................................... 20

*Steenholdt v. FAA,* 314 F.3d 633 (D.C.Cir.2003) ....................................................................... 18

*United Transportation Union v. Lewis*, 711 F.2d 233 (D.C. Cir. 1983) ...................................... 20

**Statutes**

16 U.S.C. 1531(b) ......................................................................................................................... 14

16 U.S.C. 1532(3) .................................................................................................................. 14, 18

16 U.S.C. 1533(a)(1) ..................................................................................................................... 22

**Rules**

44 Fed. Reg. 30044 ......................................................................................................................... 6

52 Fed. Reg. 23148 ......................................................................................................................... 3

55 Fed. Reg. 9131 .................................................................................................... 3, 6

58 Fed. Reg. 64927, 64928 .......................................................................................... 4

59 Fed.Reg. 37738 ..................................................................................................... 10

61 Fed. Reg. 4722 ........................................................................................................ 4

61 Fed. Reg. 4723 ...................................................................................................... 10

61 Fed. Reg. 4725 ...................................................................................................... 18

63 Fed.Reg. 64772 ..................................................................................................... 12

64 Fed. 3915................................................................................................................ 9

65 Fed. Reg. 19686 ..................................................................................................... 8

70 Fed. Reg. 52310 ................................................................................................... 13

70 Fed.Reg. at 52312 .................................................................................................. 7

70 Fed. Reg. 52313 ..................................................................................................... 7

70 Fed. Reg. 52315 ................................................................................................... 13

70 Fed. Reg. 52319 ................................................................................................... 17

70 Fed.Reg. 52320 ................................................................................................. 7, 22

70 Fed. Reg, 52321 ................................................................................................... 13

74 Fed. Reg. 65056 ..................................................................................................... 9

75 Fed. Reg. 54708 ................................................................................................... 10

75 Fed. Reg. 54713 ................................................................................................... 10

76 Fed. Reg. 10299, 10300 ....................................................................................... 10

76 Fed. Reg. 63094 ..................................................................................................... 9

## I.    Introduction

On September 2, 2005, the U.S. Fish and Wildlife Service ("FWS" or "Service") faced a dilemma – how to list the scimitar-horned oryx, dama gazelle and addax ("three antelope species") as endangered without undermining conservation of U.S. non-native populations living in captivity.  The Service wanted to list the three antelope populations as endangered in the wild yet exempt the U.S. non-native captive populations ("U.S. populations") from the prohibitions that accompany endangered status.  Without such an exemption, the listing would achieve the opposite of the conservation purposes of the Endangered Species Act ("ESA").

The FWS had several options to accomplish this task.  At least two of these options involved separate classifications and/or exclusions of the U.S. populations from endangered status -- strategies the Service had previously and successfully implemented without legal challenge.  A third option involved a new and untested strategy -- the inclusion of the three antelope in the endangered species classification, accompanied by a specially promulgated regulation designed to exempt the captive populations from the ESA's take prohibitions.

The Service chose the latter strategy -- to include the U.S. captive populations in the endangered classification, an option that a D.C. federal district court later held to be illegal. The FWS did not support its choice with science, but decided simply on the premise that it lacked the authority to designate and/or separately classify a population made entirely of captive animals. The Service offered no reasoned explanation for this decision.  Not only was the FWS's terse excuse based on an erroneous interpretation of the law, but it was inconsistent with agency precedent and ongoing practice.

In its defense, the Service states that it had no obligation to act consistently or to explain its disparate treatment of these other captive or non-native populations.  In its ruling on Safari

1

Club's Preliminary Injunction motion, this Court agreed with the Service's position.  Safari Club

seeks to convince this Court that the Service cannot justify an unsupported decision solely by

claiming it has no other legal option, when it does.  Safari Club files this Reply in Support of

Summary Judgment and in Opposition to the Cross-Summary Judgment motions of Federal

Defendants and Defendant-Intervenors.  Safari Club asks this Court to vacate and remand the

Service's arbitrary and capricious decision to list the U.S. populations of the three species.

## II.   The FWS's Inexplicable Refusal to Follow Its Own Precedent for Captive Populations Was Arbitrary and Capricious

In its Opposition to Safari Club's Motion for Summary Judgment, the Service

inaccurately portrayed its approach to its decisions regarding the separate classification or

exclusion of captive/ranched/commercial populations of federally listed species.  The Service

referred to its decisions to separately designate and/or classify captive/ranched/commercial

populations of other species, such as the Nile Crocodile and the Chimpanzee, as "outliers."

Federal Defendants' Memorandum in Support of Cross Motion for Summary Judgment ("Fed.

Def. SJ Mem.") at 18, 19 (Dkt. 68).  It may be true that the Service has not established a formal

policy to deal with species with self-sustaining captive or ranched populations that would not

benefit from or perhaps would suffer from inclusion in an endangered or threatened

classification.  The Service, however, has established a practice of separately classifying such

populations and the Service has, on multiple occasions, acknowledged the Nile Crocodile and

Chimpanzee "split-listings" as precedent for decisions relating to other, similarly situated

populations.  Moreover, the "outlier" defense does not explain why the Service based its listing

decision for the U.S. populations on the legal determination that the FWS lacked authority to

designate a population composed exclusively of captive members, where that statutory

interpretation directly conflicted with its previous interpretations of the ESA.

2

To Safari Club's knowledge, the practice regarding designation of captive populations was initiated with the FWS's decision to separately list as "threatened" ranched populations of the Nile Crocodile.  52 Fed. Reg. 23148 (June 17, 1987).  Subsequently, the Service expressly identified the separate listing of the captive Nile Crocodile population as "precedent" for subsequent decisions to separately classify captive/ranched/commercial populations of species. When, during the public comment on a rule to list chimpanzees, the Service was questioned about its legal authority to separately classify captive populations of chimpanzees, the FWS acknowledged its Nile Crocodile listing as "precedent" for the chimpanzee decision:

> (1) Comment: There is no legislative history suggesting that captive populations can be treated as distinct "species" and there is no ***precedent*** for listing captive populations differently than wild populations.

> Response: . . . In listing the ranched population of the Nile crocodile in Zimbabwe, the Service has previously classified specimens in captivity differently than wild populations.

55 Fed. Reg. 9129, 9131 (March 12, 1990) (emphasis added).[1]

The chimpanzee decision then became precedent for other "split-listing" considerations. Upon receiving a petition to reclassify the North American captive population of cotton-top tamarin (also known as cotton-top marmoset), the Service made a 90-day finding that reclassification may be warranted, noting that "the provision being sought by the petitioner

---

[1] Intervenor-Defendant, Defenders of Wildlife *et al.* ("DoW"), raises the fact that others have recently attempted, by petition, to persuade the FWS to uplist captive chimpanzees to endangered status.  DoW SJ Mem. at 26.  Such petition, and the FWS's recent action on that petition are irrelevant to this litigation because, on the date of the three antelope endangered listing, the U.S. had already made and was relying on the legality of its "split-listing" of the chimpanzee. Even if the Service ultimately determines that the conservation status of captive chimpanzees has changed and that the population no longer qualifies for a separate classification that decision, by itself, will not reverse the Service's determination at the time of making the three antelope listing, that it had the authority to separately designate and classify a population composed exclusively of captive members of a species.

3

would be similar to the one covering the chimpanzee." 58 Fed. Reg. 64927, 64928 (December 10, 1993).[2] To Safari Club's knowledge, the Service has not made a 12-month finding.

When considering how to classify the U.S. populations of the three antelope species, the Service also acknowledged the chimpanzee decision as precedent, and as a legal and effective option for dealing with the antelope. For example, on April 2, 1991, Marshall Jones of the Office of Management Authority wrote the following to Charles Dane: "A further alternative is available when the captive population is considered to be self-sustaining (e.g. chimpanzees). This provides a different basis for split listing." AR 2.0002. (Ex. HH) On November 26, 1993, Charles Dane prepared a Summary document that cited the chimpanzee determination as precedent for the Service's decision to separately classify the U.S. captive herds of the three antelope:

> Such treatment is in accordance with the Endangered Species Act's provision that vertebrate species may be divided into distinct population segments for purposes of classification, and with certain similar previous division, most notably that of the chimpanzee, which in the Federal Register of March 12, 1990 (55 FR 9135), was classified as endangered in the wild and as threatened in captivity.

AR 135.0071. In a memo to the Assistant Director of Ecological Services on April 14, 1994, the Chief of the Office of Scientific Authority cited the FWS's split classification of chimpanzees and similar treatment for 12 other primates as justification for a split classification for the three antelope species. AR 140.0003. (Ex. JJ) Similarly, in a March 14, 1994 memorandum from the

---

[2] Even today, the National Marine Fisheries Service ("NMFS"), the FWS's sister agency and partner in the development of the Distinct Population Segment ("DPS") Policy, 61 Fed. Reg. 4,722 (Feb. 7, 1996), continues to stand by a decision in which it separately designated a captive population of wildlife. When animal rights groups challenged the NMFS's decision to exclude a captive population of Southern Resident Killer Whales from the endangered listing of the species in the wild, the NMFS defended its decision. That case was recently dismissed, based on the NMFS's motion to dismiss on procedural grounds. *Proie v. National Marine Fisheries Service,* 2012 WL 1536756 (W.D. Wash. May 1, 2012)

Chief of the Office of Scientific Authority to the Chief of the Division of Endangered Species,

the former responded to concerns raised on a split-listing by the Office of Management

Authority:

> This is not a new approach; U.S. captive populations of primates were treated
> differently, and the captive chimpanzees were listed differently.  While this may
> have created some procedural concern, these listing have provided effective
> protection, allowed legitimate use, and avoided unnecessary paperwork.

AR 136.0004, (Ex. KK)

Contrary to Federal Defendants' "outlier" defenses, the chimpanzee decision served as

precedent, not only because it preceded the Service's decision on the three antelope species, but

also because of the similarities between conditions of the species involved in those listings.  In

both, captive populations were considered to be self-sustaining and interbreeding.  In addition,

the FWS determined that an endangered listing of the captive populations could pose harm to

conservation of the species generally. The FWS chose to isolate and differentiate its treatment of

the captive chimpanzees because an endangered classification would "discourage propagation

efforts and lead to a decline in the population here, and possibly contribute to greater demand for

wild-caught animals elsewhere."  55 Fed. Reg. at 9130.

The chimpanzee decision also served as precedent because within it, the Service offered

an interpretation of the ESA that extended far beyond the specifics of the chimpanzee scenario.

In that decision, the FWS explained that the ESA authorized the Service to create and separately

classify an interbreeding population made exclusively from captive members of the species:

> In the Endangered Species Act of 1973, as amended (Act), the definition of
> "species" is not the same as the usual biological definition of species but is
> expanded specifically to include "any species, subspecies of fish or wildlife or
> plants, and any distinct population segment of any species of vertebrate fish or
> wildlife which interbreeds when mature." Captive animals are distinct from wild
> populations and may have the potential to interbreed when mature. In the case of

5

the chimpanzee, some animals are specifically being managed as an interbreeding population.

55 Fed. Reg. at 9131.[3]

At the time that it decided to include the U.S. populations of the three antelope species in the endangered classification, the Service had established precedent via the Nile Crocodile and chimpanzee decisions for a separate listing of a captive population where 1) the conservation status of a captive population differed from the status of populations in the wild; 2) the captive population was interbreeding and self-sustaining; and 3) including the captive population in an endangered classification would provide no benefit to the status of the species in the wild and/or could cause more harm than good.  The Service attempts to justify its decision to ignore this precedent by offering examples where the Service included captive members in a listing of a species as a whole.  Fed. Def. SJ Mem. at 19 n. 12.  An examination of these examples demonstrates that there is no evidence in the published decisions for the African elephant, Asian elephant, panda, and Grevy's zebra that these species shared the above criteria or that the Service considered these criteria in its listing decision-making for these species.

The FWS did not make a scientific or conservation-based decision not to separately designate or classify the U.S. captive populations differently from the populations in the wild.  It decided not to exclude the U.S. captive populations based on an erroneous legal conclusion that

---

[3] Defendant-Intervenor DOW's reference to a 1979 FWS statement that "the [ESA] applies to both wild and captive populations of a species . . ." (44 Fed. Reg. 30044 (May 23, 1979)) (DOW SJ Mem. at 4) actually supports Safari Club's premise that the Service has the authority under the ESA to treat captive populations in the same manner as wild populations, and therefore has the authority to exclude or separately classify a population composed exclusively of captive members of a species from a listing of other populations of the species. This authority is the same whether the population in question is composed of only wild or only captive members. In addition, the Federal Register Notice that DOW cites begins with the statement that regulations governing captive populations *"should interfere as little as possible with captive propagation of these species*." *Id. (emphasis added).*

it "could not" do so.  The Service initiated its consideration of whether it could designate a

distinct population by first considering whether the captive population was in fact a

"population."  The analysis abruptly ended when the Service erroneously concluded that "captive

held animals may not qualify as populations."  70 Fed. Reg. 52310, 52312 (September 2, 2005)

and that it therefore "would not be appropriate" to designate and classify the captive populations

separately.[4]  Not only was the legal conclusion wrong, but it conflicted with the Service's

previous and ongoing interpretation of the law pertaining to the creation of captive populations.

The Service ignored the precedent established by the chimpanzee decision and offered no

reasoned explanation for rejecting a split-listing.  Its decision also contradicted its previous

interpretation of the law without explanation.  For these reasons, the listing decision must be

rejected as arbitrary and capricious and must be vacated.

**III.     The FWS's Treatment of Similarly Situated Non-Native Species Provided Precedent
        That the FWS Erroneously Ignored Without Explanation**

In its opening brief, Safari Club explained that the Service's treatment of the listing of

non-native species provided further support that the Service has the authority to not list the U.S.

populations of the three antelope species.  Federal Defendants summarily reject Safari Club's

argument based on the premise that such species are not in captivity. Fed. Def. SJ Mem. at 17.

In doing so, Federal Defendants ignore the fact that the U.S. populations of the three antelope

---

[4] Federal Defendants argue that the propriety of designating a population composed exclusively
of U.S. captive members was clarified by the Service's statement that there may no longer be any
scimitar-horned oryx living in the wild.  Fed. Def. SJ Mem at 16; 70 Fed.Reg. at 52320.
However, that single explanatory comment does not justify the application to addax and dama
gazelle that do still have some members in the wild.  Nor did it respond to Safari Club's request
that the Service base its population designation on international boundaries rather than captive
vs. wild populations (AR 199.0004-5; Ex. Y), since there are several captive populations of
scimitar-horned oryx living outside of the U.S.  70 Fed. Reg. at 52320.  That sentence also does
not counteract the statement, made by the Service in the other three antelope regulation
promulgated on September 2, 2005, in which the Service stated "captive-held animals may not
qualify as populations." 70 Fed.Reg. at 52312.

species are both captive and non-native to the U.S. and that precedent concerning the agency's treatment of non-native populations is just as relevant as precedent related to captive populations.

A careful reading of the FWS's multiple decisions to exclude non-native/introduced populations from the listing of native populations of species reveals that, although the Service assessed the listing status of these populations on a case-by-case basis, the Service was also guided by consistent criteria.  In example after example, when confronted with a decision about whether to include a non-native/introduced population in a listing classification, the Service did **not** list the non-native population.  This occurred even when the Service determined that members of the introduced population could *potentially* be useful for future reintroductions into the species' native range.  The only exception was when the non-native population was immediately crucial to the recovery of the species in the wild.  The Service followed this consistent approach both before and after making the three antelope listing decision.

Contrary to allegations made by Federal Defendants' Safari Club's opening memorandum did not offer the only viable examples of the Service's treatment of non-native populations.  Fed. Def. SJ at 17.  Other examples demonstrate that these two cases were not anomalous.  Just as it did with the non-native Pecos River population of the Arkansas River Shiner and Montana population of the Arctic Grayling, discussed in Safari Club's opening memorandum, (Safari Club SJ Mem. at 37-39) the Service excluded the non-native/introduced Santa Clara River population of the Santa Ana sucker from the listing of the native members of this species.  65 Fed. Reg. 19686, 18687, 19689 (April 12, 2000); 74 Fed. Reg. 65056, 65058 (December 9, 2009).  The Service excluded the non-native population despite finding that "the Santa Clara River population is important for recovery of the Santa Ana sucker within the Los

Angeles, San Gabriel and Santa Ana River basins, and ***may be used*** in efforts to re-establish the species within its native range." 64 Fed. 3915, 3916 (January 29, 1999).

The California Golden Trout provided yet another example.  In its 12-Month Finding on a Petition to List species, the FWS applied a similar analysis.  After explaining that it had no formal policy for addressing whether an introduced population should be included, the FWS articulated the process that the Service consistently follows in evaluating whether to include an introduced population in a native species listing:

> In our evaluation of whether or not to include introduced populations in the potential listable entity we considered the following:

> (1) Our interpretation of the intent of the Act with respect to the disposition of native populations;
> (2) A policy used by the National Marine Fisheries Service (NMFS) to evaluate whether hatchery-origin populations warrant inclusion in the listable entity; and
> (3) A set of guidelines from another organization (International Union for Conservation of Nature (IUCN)) with specific criteria for evaluating the conservation contribution of introduced populations.

76 Fed. Reg. 63094, 63096 (October 11, 2011).[5]  The FWS further explained that it interpreted the ESA so as to preserve ***native*** populations in their ecosystems.  Because it found that the introduced populations of California golden trout at issue were not part of any conservation program to benefit the native populations, the Service did not consider the introduced populations to be part of the listable entity.  *Id.*

This was the approach the Service followed in its assessment of a non-native population of the arctic grayling, previously referenced in Safari Club's opening memorandum.  Safari Club SJ Mem. at 39 ) The Service explained that its interpretation of the ESA,  requiring conservation of native, as opposed to non-native populations, was designed to be consistent with its regulations pertaining to the introduction of experimental populations as well as its DPS Policy:

---

[5] The Service applies criteria 1 and 3 for wildlife and adds criteria 2 in cases involving fish.

The primary purpose of the Act is to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved. The Service has interpreted the Act to provide a statutory directive to conserve species in their native ecosystems (49 FR 33890, August 27, 1984) and to conserve genetic resources and biodiversity over a representative portion of a taxon's historical occurrence (61 FR 4723, February 7, 1996). This priority on natural populations is evident in the Service's DPS policy within the third significance criteria. In that, a discrete population segment may be significant if it represents the only surviving natural occurrence of the taxon that may be more abundant elsewhere as an introduced population outside of its historical range.

75 Fed. Reg. 54708, 54712 (September 8, 2010).  As with the California Golden Trout, the Service found that the non-native introduced populations of arctic grayling were not part of an existing conservation program designed to benefit the native populations and, for that reason, excluded them from the listing.  75 Fed. Reg. 54713.  While the Service did not make its final listing rule for the arctic grayling until after the three antelope listing decision, the Service has consistently excluded the non-native population from consideration for listing since 1994.  59 Fed. Reg. 37738, 37739 (July 25, 1994).

The FWS has applied the same approach to commercial populations.  Last year, when issuing a 90-day finding that listing was not warranted for wild plains bison, the Service specifically excluded commercial populations from consideration.  The Service noted that neither the ESA nor its regulations address whether commercial populations should be included in a listing and that the Service had not adopted a formal policy to address the question.  76 Fed. Reg. 10299, 10300 (February 24, 2011).  Nevertheless, the Service, using its analyses of non-native/introduced species as precedent and referring to its treatment of non-native arctic grayling, applied the same listing guidelines: 1) its interpretation of the ESA with respect to the disposition of native populations; and 2) criteria from the IUCN.  *Id.*   Because members of the commercial populations were not being used for any restoration programs and therefore had no direct

conservation value for the native populations, the Service excluded the commercial populations from consideration for listing.  *Id.*

Both before and following the three antelope listing decision, the Service has consistently approached the question of listing non-native and even commercial populations of species.  It relied on a long-standing statutory interpretation that the ESA requires conservation of populations in their native ecosystems and that non-native/introduced and/or commercial populations that do not present a direct conservation benefit to the native populations, ***even where they offer a future potential recovery benefit***, do not belong in the listing.  The Service never conducted this analysis with the three antelope species and offered no explanation for departing from this approach.  For this reason, the Service's finding on the listing status of the U.S. non-native captive populations should be vacated as arbitrary and capricious.

**IV.   The U.S. Non-Native Captive Herds of the Three Antelope Species Have a Potential Future Role to Play in Native Species Recovery**

According to consistently applied FWS statutory interpretation, practice and decision precedent, for a non-native and/or commercial population to be included in a listing for native populations of a species, that non-native population and/or commercial population must have a direct impact on conservation of the native population.  DoW correctly notes that Safari Club, in its opening brief, explained that there is currently no direct connection between U.S. captive populations of the three antelope species and populations in the wild.  (DoW SJ Mem. at 21-22).  DoW misrepresents the significance of this fact.  A current, direct connection between non-native populations of a species and native species is crucial to the FWS's decision whether to include the non-native population in the listing classification for the species.  Non-native populations that have value for future recovery efforts, but do not have a *direct*, *current* involvement in conservation in the wild, are excluded from the listing.  Because habitat and

conservation conditions in the three antelope species' home range are not currently ready for reintroduction from U.S. populations, the U.S. populations of the three antelope species do not presently bear that direct connection that authorizes the inclusion of these non-native populations in the listing of the species in the wild, *despite their future potential for aid in recovery*.

The Service has followed this approach over and again in considering the listing status of non-native populations, a practice well demonstrated by the Service's threatened listing of the Arkansas River Basin Population of the Arkansas River Shiner ("ARS"). 63 Fed. Reg. 64772 (November 23, 1998). Like the U.S. captive herds of the three antelope, the Pecos River population of the Arkansas River Shiner had been artificially introduced and was not living in a portion of the species' historic range. *Id*. at 64777. Also like the U.S. captive herds of the three antelope, the Pecos River ARS population was not having any direct recovery impact on the native populations living in the species' home range. Nevertheless, the Service recognized that the Pecos River population had potential for future recovery efforts. "We agree that the Pecos River population could serve as a source of individuals for transplantation into suitable, unoccupied, historic habitat. " *Id*. at 64778. The Service excluded the population, explaining:

> While the non-native, introduced Pecos River population of the ARS could be important in efforts to supplement native populations of the ARS within the species' historical range, protection of the Pecos River population would not improve the status of the ARS within the Species' historical range.

*Id*. at 64774.

While not part of current reintroduction efforts, the U.S. populations of the three antelope species do have a future role to play in species conservation. Defendant-Intervenor DoW misrepresents the future conservation values of U.S. captive herds by attempting to draw some significance from the fact that ranches that allow hunting of one or more of the three antelope species are not members of the Species Survival Program (SSP). DoW SJ Mem. at 22. DoW

12

fails to offer any suggestion, let alone proof that membership in the SSP is required to provide benefit to the recovery of the species.  Moreover, DoW conveniently neglects to mention that J. David Bamberger, who provided a declaration in support of Safari Club's Summary Judgment motion and who was a member of the SSP at the time of the three antelope listing decision, was the keeper of all the original, known blood lines of the three species, and sold surplus animals from his ranch to ranches that provided hunting opportunities.  Bamberger Decl. at 2. (Ex. EE) Among the key benefits that the FWS recognizes about hunting of the three antelope species on ranches in the U.S. is that it provides the opportunity for the removal of surplus animals and maintenance of genetic diversity.  70 Fed. Reg. 52310, 52312.

Defendant-Intervenor FoA attempts to mislead this Court as to the U.S. populations' status and potential for future recovery efforts by asserting  that the U.S. populations are actually "more endangered" than the populations in the wild.  FoA S. J. Mem. at 23.  FoA tries to blame hunting, but inappropriately confuses the illegal and uncontrolled killing being carried out by military personnel and poachers in Africa with the strictly managed hunts taking place on ranches in Texas.  70 Fed. Reg, 52321.  FoA presents a story that ignores the scientific data demonstrating that the populations within the U.S. have increased from numbers in the single digits to thousands in the last few decades and that hunting has raised the value of these animals, which encourages numerous ranches to maintain herds.  70 Fed. Reg. 52315.  FoA also ignores the important role that hunting has played for the efforts of the SSP.  FoA neglects to mention the fact that the SSP for scimitar-horned oryx relied on the assistance of the private ranch owned by J. David Bamberger to provide a captive breeding program for the 31 remaining blood lines of the species.  This effort not only met its goal of producing 400 healthy, genetically pure animals, but also generated large numbers of surplus animals, many of which were sold to

hunting ranches to alleviate potentially unhealthy over-populations on the Bamberger Ranch.

Bamberger Decl. at 3 (Ex. EE).

With no active, current role in native ecosystem reintroduction, the U.S. captive herds do not qualify under existing statutory interpretation and precedent for inclusion in the species listing. This is not inconsistent with the fact that, as a potential source for future species reintroductions, continued unfettered private conservation via an unlisted status for U.S. captive herds *does* qualify as a viable tool for future species recovery. For that reason, any act, including the listing of these populations, that undermines that tool should be vacated as a violation of the ESA's conservation mandates.

## V.   The Decision to List the U.S. Non-Native Captive Populations of the Three Antelope Species Violates the Purposes of the Endangered Species Act

All parties to this litigation agree that the purpose of the ESA is conservation:

> The purposes of this Act are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

16 U.S.C. § 1531(b). The ESA defines conservation as:

> the use of ***all methods and procedures which are necessary*** to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.

16 U.S.C. §1532(3). The FWS had methods available to conserve the scimitar-horned oryx, dama gazelle and addax, namely the decision not to list these antelope, that ***it did not use***. The FWS knew that the three antelope species in the wild were endangered. It also knew that including U.S. populations of the three species as endangered and subjecting them to all the prohibitions associated with endangered species, would harm rather than benefit the species.

14

> The gene pool management for the recovery of scimitar-horned oryx, addax, and dama gazelle depends on the movement of captive-bred specimens among institutions across state boundaries.  In addition, we are including sport-hunted trophies because trophy hunting on private ranches that breed these species may be necessary for wildlife management purposes, provides revenue for the continued operation of captive-breeding operations, and economic incentive for ranchers to continue breeding these species.  ***Listing the species without exempting the U.S. captive-bred population could be a deterrent to further captive breeding.***

United States Department of the Interior, Record of Compliance for a Rulemaking Document, signed by Robert R. Gabel, Acting Assistant Director, International Affairs, January 7, 2005, AR 237.0122 (emphasis added) (Ex. S).  The Appendix to that Record of Compliance also explained why permit requirements associated with an endangered species listing would serve as a deterrent to future participation by private ranchers in three antelope conservation.

> Under Alternative 2[6], individuals subject to the jurisdiction of the United States would need permits to engaging (sic) in domestic and international trade in live or dead captive-bred specimens for commercial purposes.  This process takes time, sometimes causing delays in moving animals for breeding or reintroduction.  Such movements must often be completed within a narrow time frame and can be further complicated by quarantine requirements and other logistics.  This, coupled with the prohibition on interstate commerce of sport-hunted trophies, ***could remove the incentive to breed these species, which rely on captive breeding for their recovery.***

Appendix, Economic Analysis of the Proposed Rule, AR. 237.0126-0127 (emphasis added) (Ex. T).  The Service knew that listing the U.S. captive herds without providing an exemption from endangered species prohibitions would hinder conservation rather than encourage it.  Instead of choosing a strategy by which the FWS would exclude U.S. captive herds from the listing and/or classify the U.S. populations differently from the populations outside of the U.S. – legally supportable methods that had been successfully implemented for other similarly situated species – the Service instead chose to jeopardize the conservation by crafting an untested regulatory

---

[6] Alternative 2 refers to an endangered species listing for the three antelope, without any exemption from permit requirements and other endangered species classification prohibitions.

exemption that ultimately proved to be illegal.  The Service did not use "all methods and procedures which are necessary" to improve the conservation status of the scimitar-horned oryx, dama gazelle and addax, such as the decision ***not to list*** the U.S. captive populations.  Instead, the FWS chose a method that they knew would remove the incentives for breeding that could, someday in the future, contribute to the species' recovery.  The decision to reject legal, viable and tested methods that could prove necessary to the future delisting of the species, violated the ESA's purposes and should be vacated.

## VI.    Safari Club Has Standing To Bring This Action

Neither of the Defendant-Intervenors directly admits their intention to challenge Safari Club's standing, yet both devote significant portions of their briefs disputing the basis of the injuries that the listing of the U.S. captive herds has brought to Safari Club and its members.  This Court has already determined in the Order on Safari Club's Motion for a Preliminary Injunction that Safari Club has standing to pursue this challenge. *Safari Club International v. Salazar*, 2012 WL 1095851 *8 n.7 (D.D.C. April 2, 2012).  An assertion of economic injury does not cancel out legitimate representations of environmental injuries. *Realty Income Trust v. Eckerd,* 564 F.2d 447, 452 (D.C. Cir.1977) (owner building had standing to sue under NEPA based on environmental concerns even though primary concern was loss of tenant income).  At least one court has found economic injury sufficient to support standing in a challenge to a listing action where that economic harm can be relieved by preserving the species. *Idaho Farm Bureau v. Babbitt*, 900 F. Supp. 1349, 1359) (D. Idaho 1995).  Safari Club and its members interests, both conservation and economic, are within the zone of interests protected by the ESA.

## VII.   The FWS Has a Duty to Follow Its Own Policy

Safari Club, in its October 22, 2003 comment letter on the proposed listing, specifically requested that the Service designate a DPS composed of the populations of the three antelope

16

species living within U.S. boundaries.  *Id.* at AR 199.0004-5 (Ex. Y).  Despite its duty to address and respond to that comment, the Service claims that it had no obligation to determine whether to designate a Distinct Population Segment ("DPS") for the U.S. captive herds of the three antelope species.  However, whether or not Safari Club's comments alone triggered that obligation, the FWS imposed that obligation upon itself, once it made the decision to consider whether or not the U.S. captive herds qualified as a "population."

In its rules to list the three antelope species and exempt them from ESA prohibitions, the Service made the legal determination that **"**it would not be appropriate to list captive and wild animals separately."  70 Fed. Reg. 52319, 52320 (September 2, 2005).  The Service based this decision on the premise that "captive-held animals may not qualify as populations."  70 Fed. Reg. 52310, 52313 (September 2, 2005).  Based on what little the Service offered as explanations in these two rules, it is not possible to tell whether the FWS applied its own DPS policy and if it did, whether it applied the policy correctly.  The absence of reasoned explanation as to the decision not to establish a separate population for the U.S. captive herds of the three species makes it impossible to evaluate the Service's actions.  All that is evident from those rules is that the Service based its population consideration on an inaccurate and internally inconsistent interpretation of the ESA.  If the Service based its decision as to whether to create a DPS on that erroneous interpretation, then the Service's decision not to establish a DPS is also flawed.

If the Service did actually initiate a DPS analysis and made the determination that it would not designate a DPS, then it bore the obligation to follow the terms of its own policy in doing so.  That obligation would have included an analysis that considered establishing a population based on international boundaries separating the U.S. captive herds from those in the species' home range, rather than one based exclusively on the captive status of the U.S.

17

populations.  If in fact the FWS was basing its determination on that DPS Policy, regardless of whether DPS designation is within the agency's discretion, the Service still had a judicially enforceable obligation to follow the terms of that policy.  "Having chosen to promulgate the *DPS Policy,* the FWS must follow that policy."  *National Association of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003) (court ruled that FWS acted arbitrarily and capriciously and in conflict with DPS Policy in failing to provide rational basis for finding population of Arizona pygmy owl to be significant), citing *Steenholdt v. FAA,* 314 F.3d 633, 639 (D.C. Cir.2003) (noting that federal agencies must follow their own rules).  This is quite different from the situation in the case of *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior,* 731 F. Supp. 2d 15, 28-29 (D.D.C. 2010) cited by Federal Defendants.  Fed. Def. SJ Mem. at 21.  In *Cape Hatteras*, the Court could find no standard upon which to judge the Service's critical habitat determination.  In this case, the Court must use the DPS policy as a means of assessing the agency's decision-making, and because the Service offered no explanation of whether it applied the DPS policy, it is impossible to determine whether or why it did not consider the discreteness or significance criteria identified in the DPS policy, 61 Fed. Reg. at 4725, As a result, this Court can only find that the Service made its listing determination in an arbitrary and capricious manner.

Finally, in arguing that it has no obligation to establish a DPS, the Service fails to take into consideration its duty to carry out the conservation purposes of the ESA.  If creating a DPS was an available tool that would have benefitted the conservation of the three antelope species generally, then the Service bore an independent obligation to utilize it and yet did not.  16 U.S.C. §1532(3).

18

VIII.    **The FWS Has A Duty to Be Consistent in Interpreting the Law and Applying Precedent**

The FWS maintains and Safari Club does not dispute that the Service does not have a formal published policy to address whether or not self-sustaining captive/ranched/commercial and/or non-native populations should or may be included in the listing of the populations of the species in the wild.  The absence of a policy does not absolve the Service of its duty to be consistent in its interpretation of the law and or administrative practice with respect to similarly situated populations, or to provide a reasoned explanation for its departure from previous statutory interpretations or practice.  In listing decisions regarding other species with self-sustaining, interbreeding captive populations for which listing would pose no direct benefit or could bring harm, the Service has interpreted the ESA to permit split-listings and the Service has established acknowledged precedent in making these decisions.  In listing decisions regarding other species with self-sustaining interbreeding non-native/introduced populations that offered no direct, immediate conservation benefit to the species in the wild, the Service has interpreted the ESA to require exclusion of the non-native populations from the listing of the species generally and has established set criteria to analyze these decisions.  The FWS did not consistently apply these statutory interpretations or follow these precedents when including the U.S. non-native captive populations of the three antelope species in the listing of the species generally.  The Service offered no explanation for its departure from previous ESA interpretations and listing precedent.

Federal Defendants and this Court, in its Order on Safari Club's Motion for a Preliminary Injunction, have relied on the FWS's lack of a formal policy to excuse the Service's inconsistent behavior.  This reasoning contradicts case law that holds that, even in the absence of a formalized policy, an agency must follow its own decision-making precedent and "must also

19

treat similar cases in a like fashion." *Citizens for Environmental Quality v. U.S.,* 731 F. Supp. 970, 986 (D. Colo. 1989) citing *Squaw Transit Co. v. United States,* 574 F.2d 492, 496 (10th Cir. 1978) (court held the Forest Service would be required to act consistently with Secretary's previous decisions or provide an explanation for the change).  "Agencies are under an obligation to follow their own regulations, procedures, and ***precedents***, or provide a rational explanation for their departures." *National Conservation PAC v. FCC*, 626 F.2d 953, 959 (D.C. Cir. 1980) (emphasis added) (agency failed to comply with its own announcement of how it would publish advisory opinion requests.)

Formal adoption is not always necessary to communicate the existence of a policy.  Some courts have "gleaned" an entity's "actual policy" from the entity's "consistent practice."  *Airline Pilot's Assoc. Int'l. v. Dept. of Aviation, City of Chicago,* 45 F.3d 1144, 1154 (7th Cir. 1995) (court found that airport's stated formal policy was replaced by actual practiced policy); *LeBron v. National Railroad Passenger Corporation*, 69 F.3d 650 (2nd Cir. 1995) (court upheld Amtrak unwritten policy prohibiting political speech on billboards).

If an agency acts inconsistently in its interpretation of the law, the Court may not defer to the agency's interpretation.  *United Transportation Union v. Lewis*, 711 F.2d 233, 242 (D.C. Cir. 1983) *citing General Electric Co. v. Gilbert,* 429 U.S. 125, 141-43, (1976) (based on inconsistent agency approach, Court would not defer to Federal Railroad Administration's interpretation of provision of Safety Appliance Act).  An agency may depart from a previous statutory interpretation only if it gives a reasoned explanation for the new position.  *National Classification Committee v. U.S.*, 22 F.3d 1174, 1177 (D.C. Cir. 1994) *citing Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42, (1983) (court found ICC's shift in

interpretation of law involving tariffs on transportation of hazardous materials based on reasonable explanation of Congressional intent).

> [A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.

*Greater Boston Television Corp., v. FCC*, 444 F.2d 841, 853 (D.C.Cir.1970) (court found consistent FCC's requirement that subsidiary apply for renewal license in same manner as would apply to new license.); *M.M. & P. Maritime Advancement, Training, Educ. & Safety Program v. Department of Commerce*, 729 F.2d 748, 755 (Fed. Cir. 1984) (court overturned agency opinion based on inconsistent application of requirements and interpretation of the Educational, Scientific and Cultural Materials Importation Act).

Thus, "[a]n agency's failure to come to grips with conflicting precedent constitutes 'an inexcusable departure from the essential requirement of reasoned decision making.'" *Jicarilla Apache Nation v. U.S. Department of the Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010) quoting *Ramaprakash v. FAA,* 346 F.3d 1121, 1125 (D.C. Cir. 2003) (quoting *Columbia Broad. Sys. v. FCC,* 454 F.2d 1018, 1027 (D.C. Cir.1971)) (court rejected BIA's unexplained departure from precedent in calculating royalties owed to tribe).

Regardless of the absence of formal policy, the Service's unexplained 1) failure to consistently interpret the ESA; and 2) departure from agency precedent and practice with respect to the listing of captive and/or non-native populations of species qualifies as arbitrary and capricious conduct.   While the agency has the authority to consider each case on its own facts, that is not what the Service did in concluding that it could not separately list or exclude the captive, non-native populations of the three antelope species.   The Service's decision was based on a legal premise, not a factual one – the premise that it lacked legal authority to designate a

population composed exclusively of captive members.  This decision was erroneous and inconsistent with previous interpretations.

The FWS must base each listing decision on the individual facts pertinent to the species' conservation status.  By the same token, the FWS must accompany every listing decision with a reasoned analysis documenting the Service's basis for listing or not listing.  Similarly every decision to classify a species or DPS must be based upon a reasoned analysis.  No listing decision or designation, whether or not includes consideration of a captive or non-native population, can stand solely on the statement that the listing or designation "is not appropriate."  That is all the Service offered here.  Just as it would for any other listing determination, the Service's decision with no further explanation must qualify as arbitrary, capricious and unsupportable and must be vacated.

## IX. This Court Cannot Conduct the Scientific Analysis that the FWS Failed to Do

Without expressly admitting it, Defendant-Intervenors FoA's Memorandum highlights one of the main flaws in the Service's listing decision.  The FWS never conducted a scientific assessment of the conservation status of the U.S. non-native captive populations of the three antelope species, using the five listing factors identified in Section 1533(a)(1) of the ESA.  The Service never conducted that mandatory statutory analysis because it prematurely aborted its determination with a finding that there was no "population" to scientifically assess.[7]  To remedy this failing, FoA attempts to substitute their own Section 1533(a)(1) five factor assessment.  FoA SJ Mem. at 22-29.  Neither FoA nor this Court can substitute its scientific assessment for the one that the Service failed to perform.   For this Court to review the legality of the listing status of the

---

[7] Contrary to FoA's representations, the Service did not list the U.S. captive populations to protect captive breeding.  FoA SJ Mem. at 19 (Dkt. 73).  The only reason that the FWS listed the U.S. captive populations was because it found it inappropriate to separately designate and/or classify them.  70 Fed. Reg. 52320.

U.S. populations of the three antelope species, the Service first will have to perform such an analysis.  This Court must vacate the erroneous decision and remand this matter to the Service to direct them to conduct the necessary analysis.[8]

## X. Remand With Vacatur is the Appropriate Remedy for the U.S. Populations of the Three Antelope

Federal Defendants and Defendant-Intervenors FoA recommend remand without vacatur in the event that this Court finds the listing of the U.S. populations of the three antelope species to be in violation of the ESA and APA.  If and when this Court grants Safari Club's summary judgment motion, Safari Club intends to request separate briefing on the question of remedy, but responds briefly to the remedy arguments here rather than allow them to go unanswered.

When a rule has been found to be legally invalid, the ordinary result is vacatur.  *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,* 145 F.3d 1399, 1409 (D.C. Cir.1998).  While vacatur is the rule, remand without vacatur is the exception.  Vacatur is an equitable remedy and the court has discretion in determining whether to apply the rule or the exception.  In this case the rule should apply.

Safari Club seeks only to vacate the Service's inclusion of the U.S. populations in the endangered classification of the three antelope species generally.  Partial vacatur of only the illegal portion of a rule with broader application is a viable remedy.  *South Coast Air Quality Management Dist. v. E.P.A*., 489 F.3d 1245, 1248 (D.C. Cir. 2007) (court ordered partial vacatur of illegal portion of rule governing ozone standards).

---

[8] FoA also incorrectly claims that Safari Club is seeking to require the Service to "delist" the U.S. populations.  FoA SJ Mem. at 23 *et seq*.  Safari Club is asking the Court to vacate and remand the FWS's erroneous decision to "list" the U.S. herds.  "Delisting" these populations would be a separate process.   The only claim relating to "delisting" was in Count V of Safari Club's complaint, the briefing of which has been stayed during pending settlement negotiations between Safari Club and Federal Defendants.

To determine the applicability of remand without vacatur, the court considers "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied Signal Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150-151 (D.C. Cir. 1993) *quoting International Union v. FMSHA,* 920 F.2d 960, 967 (D.C. Cir. 1990).  The regulation that included the U.S. populations of the three antelope species is seriously deficient because it was based upon an incorrect interpretation of the law, failed to follow well-established practice and policy (or explain a departure from them), is contrary to the purposes of the ESA, and was made without any scientific basis or analysis.  Moreover, the regulatory scheme that accompanies the species' current endangered status is not what the Service originally felt was necessary for these U.S. populations.  The original listing was accompanied by regulatory exemptions from ESA prohibitions, a condition the Service deemed necessary to encourage continued conservation of the populations.  Now that the exemption rule has been invalidated, those favorable conservation conditions do not persist.  As it stands, the listing provides no conservation benefits and actually discourages conservation rather than improves it.

Partial vacatur would not be disruptive as it is desired by those with the most significant stake in U.S. population conservation -- the owners and ranchers who own and wish to own members of these species.  Partial vacatur would not affect the species in the wild.  The Service gains nothing from remand without vacatur since the endangered classification of the U.S. populations poses no benefit for conservation of the species.  In fact, Federal Defendants' memorandum offers no information on why partial vacatur would cause any type of disruption.  Defendant-Intervenors FoA offer little more than conjecture about hypothetical concerns such as wildlife "laundering," international poaching incentives and other unsupportable claims that have

already been rejected by the D.C. District Court in *Friends of Animals v. Salazar*, 626 F. Supp.2d 102, 110 (D.C. Cir. 2009). In deciding whether to vacate the illegal endangered classification of U.S. populations, the Court should focus on what would provide the greatest and most proven conservation benefit. The only answer to that question is a return to the pre-listing status that created documentable conservation successes for the species – and for that vacatur is required.

## XI.   Conclusion

The FWS ignored its own precedent and practice in classifying U.S. populations of three antelope species as endangered. The legal basis for the listing of these populations -- the decision that the Service lacked authority to separately classify or exclude the U.S. populations – was erroneous and conflicted with previous and existing statutory interpretation. The Service offered no explanation for its conclusions and deviation from past and current practices. The listing of the U.S. captive populations provides no conservation benefits for any populations of the species and in fact, discourages conservation of the species. The endangered classification of these populations clashes with the conservation purposes of the ESA. The only remedy for this arbitrary and capricious action is vacatur of the portion of the rule that included the U.S. captive populations and remand to the FWS. Safari Club respectfully requests that this Court grant its motion for summary judgment and deny summary judgment to Defendants and Intervenors.

Dated this 18th day of May, 2012.

Respectfully submitted,

/s/Anna M. Seidman
Anna M. Seidman
DC. Bar 417091
501 2nd Street NE
Washington, D.C.  20002
202-543-8733
aseidman@safariclub.org

**CERTIFICATE OF SERVICE**

I hereby certify that I caused copies of the Reply in Support of Motion for Summary Judgment and Opposition to the Cross-Motions for Summary Judgment of Defendants and Defendant-Intervenors to be served by ECF notification on all parties to this action.

Dated this 18th day of May 2012.

Respectfully submitted
/s/ Anna M. Seidman
Anna M. Seidman
D.C. Bar No. 417091
Douglas S. Burdin
D.C. Bar No. 434107
Safari Club International
501 2nd Street NE
Washington, D.C.  20002
Tel:  202-543-8733
Fax:  202-543-1205
aseidman@safariclub.org