**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL,<br><br>    Plaintiff,<br><br>    v.<br><br>KEN SALAZAR, *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| OWEN, *et al.*,<br><br>    Plaintiff,<br><br>    v.<br><br>U.S. Department of the Interior, *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| EXOTIC WILDLIFE ASSOCIATION,<br>*et al.*,<br><br>    Plaintiff,<br><br>    v.<br><br>U.S. Department of the Interior, *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civ. No. 1:11-cv-1564 BAH

(consolidated with cases
1:12-cv-00194 BAH and
1:12-cv-00340 BAH)

**INTERVENOR-DEFENDANTS DEFENDERS OF WILDLIFE,**
**HUMANE SOCIETY OF THE UNITED STATES, AND BORN FREE USA'S**
**REPLY IN SUPPORT OF FRIENDS OF ANIMALS' MOTION TO DISMISS,**
**AND INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR**
<u>**SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**</u>

Pursuant to Fed. R. Civ. Pro. 12(b)(6), and this Court's scheduling order, Intervenor-Defendants Defenders of Wildlife, The Humane Society of the United States, and Born Free USA hereby reply to the Opposition to the Motion to Dismiss filed by the Exotic Wildlife Association ("EWA") Plaintiffs.  See ECF 78-1; see also Apr. 10, 2012 Minute Order (granting Intervenor-Defendants "leave to file, by May 25, 2012, a reply brief").  Because EWA has failed to state a claim upon which relief can be granted, the Court should dismiss the case.

Alternatively, pursuant to Fed. R. Civ. Pro. 56 and Local Rule 7(h), Intervenor-Defendants move for summary judgment regarding EWA's challenge to the FWS's January 5, 2012 rule, which simply removed the unlawful blanket exemption for captive antelopes in response to Judge Kennedy's June 22, 2009 ruling, on the grounds that there are no material factual issues in dispute and Intervenor-Defendants are entitled to judgment as a matter of law.[1]

In support of this motion, Intervenor-Defendants submit the accompanying memorandum and a proposed order.

Respectfully Submitted,

     /s/
William S. Eubanks II (D.C. Bar No. 987036)
Katherine A. Meyer (D.C. Bar No. 244301)
Meyer Glitzenstein & Crystal
1601 Connecticut Avenue NW, Suite 700
Washington, D.C. 20009
(202) 588-5206 / (202) 588-5049 (fax)
beubanks@meyerglitz.com

Date:   May 25, 2012                     Counsel for Defenders, HSUS, and Born Free USA

---

[1] Pursuant to the scheduling orders of March 29, 2012 and April 10, 2012, Intervenor-Defendants are entitled to file both a reply with respect to the motion to dismiss and an opposition in response to EWA's motion for summary judgment, which Intervenor-Defendants combine in the accompanying memorandum for the Court's convenience and efficiency.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ )
SAFARI CLUB INTERNATIONAL,            )
                                      )
           Plaintiff,                 )
                                      )
           v.                         )
                                      )
KEN SALAZAR, *et al.*,                )
                                      )
           Defendants.                )
_____)
                                      )
OWEN, *et al.*,                       )
                                      )
           Plaintiff,                 )      Civ. No. 1:11-cv-1564 BAH
                                      )
           v.                         )      (consolidated with cases
                                      )      1:12-cv-00194 BAH and
U.S. Department of the Interior, *et al.*,   )      1:12-cv-00340 BAH)
                                      )
           Defendants.                )
_____)
                                      )
EXOTIC WILDLIFE ASSOCIATION,          )
*et al.*,                             )
                                      )
           Plaintiff,                 )
                                      )
           v.                         )
                                      )
U.S. Department of the Interior, *et al.*,   )
                                      )
           Defendants.                )
_____)


**INTERVENOR-DEFENDANTS' REPLY IN SUPPORT OF INTERVENORS'
MOTION TO DISMISS, INTERVENORS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT,
AND INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The Endangered Species Act and Pertinent Regulations . . . . . . . . . . . . . . . . . . . 1

        1.    The Purpose Of The ESA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        2.    The Prohibitions of Section 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        3.    Section 10 Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        4.    The FWS's Captive-Bred Wildlife Regulations . . . . . . . . . . . . . . . . . . . 6

    B.    The Antelope Listing Rule and Exemption Regulation . . . . . . . . . . . . . . . . . . . 7

    C.    Litigation Challenging The Exemption Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    D.    The Removal Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.    BECAUSE THE SERVICE HAD NO DISCRETION IN REMOVING THE
    UNLAWFUL EXEMPTION RULE, EWA'S COMPLAINT SHOULD BE
    DISMISSED FOR FAILURE TO STATE A CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.    Because Judge Kennedy Was Required To Vacate The Exemption Rule,
        Plaintiffs Have No Viable Cause Of Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.    On Remand, The Service's Decision To Allow Public Comment On Its
        Compliance With Judge Kennedy's Ruling Did Not Create A Separate Agency
        Action That Can Be Challenged Here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II.    IF THE COURT NONETHELESS CONSIDERS EWA'S CLAIMS, IT SHOULD
    REJECT THEM BECAUSE THE SERVICE ACTED REASONABLY UNDER THE
    CIRCUMSTANCES BY REMOVING THE UNLAWFUL EXEMPTION. . . . . . . . . 20

    A.    The Service Acted Permissibly By Limiting The Task Before It. . . . . . . . . . . . 23

    B.    The Service's Decision Did Not Violate The ESA. . . . . . . . . . . . . . . . . . . . . . . 26

    C.    EWA's NEPA Claim Is Also Without Merit. . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                          **PAGE**

Alabama-Tombigbee Rivers Coalition v. Kempthorne,
  477 F.3d 1250 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

American Bioscience, Inc. v. Thompson,
  269 F.3d 1077 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

American Federation of Govt. Emps., AFL-CIO v. Block,
  655 F.2d 1153 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

American Iron and Steel Inst. v. EPA,
  886 F.2d 390 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

American Society for the Prevention of Cruelty to Animals v. Ringling Brothers,
  502 F. Supp. 2d 103 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

American Wildlands v. Kempthorne,
  478 F. Supp. 2d 92 (D.D.C. 2007), aff'd 530 F.3d 991 (D.C. Cir. 2008) . . . . . . . . . . . . . . 14

Association of Civilian Techs. v. FLRA,
  22 F.3d 1150 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Camp v. Pitts,
  411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Carlton v. Babbitt,
  900 F. Supp. 526 (D.D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Citizens Against Rails-to-Trails v. Surface Transportation Board,
  267 F.3d 1144 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Citizens to Pres. Overton Park v. Volpe,
  401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Dept. of Transportation v. Public Citizen,
  541 U.S. 752 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 29

Environmental Defense Fund v. Costle,
  657 F.2d 275 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Federal Elec. Commission v. Akins,
    524 U.S. 11 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Friends of Animals v. Salazar,
    626 F. Supp. 2d 102 (D.D.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Friends of the Earth v. Laidlaw Environmental Servs., Incorporated,
    528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Hispanic Information and Telecommunication Network, Incorporated v. FCC,
    865 F.2d 1289 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Humane Society of the U.S. v. Kempthorne,
    481 F. Supp. 2d 53 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Lake Carriers' Association v. EPA,
    652 F.3d 1 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Lexecon Incorporated v. Milberg Weiss Bershad Hynes and Lerach,
    523 U.S. 26 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Marcum v. Salazar,
    810 F. Supp. 2d 56 (D.D.C. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Metzenbaum v. FERC,
    675 F.2d 1282 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Motor Veh. Mfrs. Assn. v. State Farm Mutual Auto. Insurance Company,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

National Assn. of Homebuilders v. Defenders of Wildlife,
    551 U.S. 644 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

National Mining Association v. MSHA,
    116 F.3d 520 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

National Mining Congress v. U.S. Army Corps of Eng'rs,
    145 F.3d 1399 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Nevada v. Dept. of Energy,
    457 F.3d 78 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Pacific Legal Foundation v. Andrus,
    657 F.2d 829 (6th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Papasan v. Allain,
    478 U.S. 265 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Personal Watercraft Indus. Association v. Dept. of Commerce,
    48 F.3d 540 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

Polar Bear ESA Listing and 4(d) Rule Litigation,
    818 F. Supp. 2d 214 (D.D.C. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 30

Public Citizen v. NRC,
    901 F.2d 147, 150 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 25

Roosevelt Campobello International Park v. EPA,
    684 F.2d 1041 (1st Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Sierra Club v. Clark,
    577 F. Supp. 783 (D. Minn. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Tennessee Valley Authority v. Hill,
    437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council,
    435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 30

Wells v. U.S.,
    851 F.2d 1471 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20

**FEDERAL STATUTES**

5 U.S.C. § 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

16 U.S.C. § 1531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 22

16 U.S.C. § 1532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 21

16 U.S.C. § 1533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

16 U.S.C. § 1536 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

16 U.S.C. § 1538 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 1539 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 10

42 U.S.C. § 4332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**FEDERAL REGULATIONS**

40 C.F.R. § 1508.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

50 C.F.R. § 17.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

50 C.F.R. § 17.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

50 C.F.R. § 17.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

50 C.F.R. § 402.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**INTRODUCTION**

In this case, Plaintiffs Exotic Wildlife Association and its members ("EWA") challenge the U.S. Fish and Wildlife Service's ("FWS" or "Service") January 5, 2012 rule, see 77 Fed. Reg. 431 (Jan. 5, 2012), AR 827-60, which simply removed the blanket exemption that the Service enacted in 2005 with respect to three critically imperiled antelope species, which the Honorable Judge Kennedy of this Court determined was unlawful as contrary to the plain language of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544. Friends of Animals v. Salazar, 626 F. Supp. 2d 102, 118-20 (D.D.C. 2009).

Because the Service had no discretion in removing the patently unlawful exemption, and indeed went far beyond what was necessary under the circumstances by soliciting public comment, the Court should dismiss EWA's Complaint for failure state a claim for which relief can be granted pursuant to Fed. R. Civ. Pro. 12(b)(6). Alternatively, for the reasons set forth below, the Court should deny EWA's motion for summary judgment and enter judgment for the FWS and Intervenor-Defendants Defenders of Wildlife, The Humane Society of the United States, and Born Free USA ("Intervenor-Defendants").

**BACKGROUND**

To explain why there is no merit to any of EWA's arguments, it is important to review the relevant statutory and regulatory framework, as well as the facts that bear on EWA's claims.

A.     **The Endangered Species Act and Pertinent Regulations**

1.     **The Purpose Of The ESA**

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978) ("TVA"). In shaping the legislation, Congress observed that "'[t]he two major causes of

extinction are hunting and destruction of natural habitat.'" Id. at 179 (quoting S. Rep. No. 93-307, at 2 (1973), reprinted in 1973 U.S.C.A.A.N. 2989, 2993).

    The overall purpose of the statute is to "provide a program for the conservation of . . . endangered species and threatened species." 16 U.S.C. § 1531(b). An "endangered species" is "any species which is in danger of extinction," 16 U.S.C. § 1532(6), and a "threatened" species is one that is "likely to become an endangered species within the foreseeable future." 16 U.S.C. § 1532(20). The term "species" is defined to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." Id. § 1532(16). Thus, the Service may list a species, subspecies, or distinct population segment as threatened or endangered.

    Because the value of these species is "incalculable," and extinction is irreparable, the ESA represents the "institutionalization of caution" – i.e., in implementing the statute the FWS must always give the benefit of any doubt to species, not to those who seek to exploit them for commercial gain. See, e.g., H.R. Rep. No. 93-412, at 4-5 (1973), reprinted in "A Legislative History of the Endangered Species Act of 1973," at 143-44, 97th Cong., 2d Sess. (Feb. 1982) (hereinafter "Legislative History"); TVA, 437 U.S. at 177; Roosevelt Campobello Int'l Park v. EPA, 684 F.2d 1041, 1049 (1st Cir. 1982).

    As the FWS also long ago explained and recently confirmed, the ESA applies to every member of a listed species, whether wild or captive. 44 Fed. Reg. 30044, 30044 (May 23, 1979) ("[T]he Act applies to both wild and captive populations of a species." ); 77 Fed. Reg. 431, 434 (Jan. 5, 2012) ("The Act specifically covers any species that is listed as endangered or threatened, whether it is native to the United States or non-native and whether it is in captivity or

in the wild.  The prohibitions apply to all listed specimens.").  This is because "[c]aptive

propagation and other uses of captive wildlife can benefit wild populations" in various ways,

such as by (1) "[i]ncreasing the likelihood that captive breeding populations will be established

as a source of known genetic stock to bolster or replenish populations in the wild;" (2)

"[r]educing the need to take stock from the wild for scientific or other purposes;" and (3)

"[p]roviding opportunities for research that can lead to improved management of wild

populations."  44 Fed. Reg. at 30044-45 (May 23, 1979).  Further, the Service has recognized

that there is a danger of "captive-bred animals . . . [being] used for purposes that do not

contribute to conservation, such as for pets, for research that does not benefit the species, or for

entertainment."  57 Fed. Reg. 548, 550 (Jan. 7, 1992).

### 2.      The Prohibitions of Section 9

Section 9 of the ESA prohibits the import or export of an endangered species, interstate

or foreign sale of an endangered species, shipment of an endangered species in interstate or

foreign commerce "in the course of a commercial activity," and the "take" of any endangered

species within the United States.  16 U.S.C. § 1538(a).  The term "take" is broadly defined to

mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to

engage in any such conduct."  Id. § 1532(19).  Under the plain language of the statute, the "take"

prohibition applies both to endangered animals living in the wild as well as those held in

captivity.  See Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros., 502 F.

Supp. 2d 103, 109-110 (D.D.C. 2007) (the "take" prohibition applies to wildlife held in captivity

before the species was listed as endangered).  Furthermore, none of these exceptions applies to

any listed species held "in the course of a commercial activity."  16 U.S.C. § 1538(b)(1).

3.     **Section 10 Permits**

Section 10 of the ESA affords the FWS limited authority to issue permits to allow

activities that are otherwise prohibited by Section 9 "for scientific purposes or to <u>enhance the</u>

<u>propagation or survival</u> of the affected species . . . ."  16 U.S.C. § 1539(a)(1)(A) (emphasis

added).  This limited exception authorizes the FWS to permit what would normally be an

unlawful "take" or other prohibited act where necessary to preserve the species in the wild (<u>i.e.</u>,

activities that go beyond having a neutral effect and actually have a positive effect on

conservation) – for example, to prevent the spread of wildlife disease or to allow captive

breeding designed to ensure genetic integrity and facilitate reintroduction.  <u>See, e.g.</u>, H.R. Rep.

No. 93-412, at 17 (1973), Legislative History at 156 (explaining that "[a]ny such activities to

encourage propagation or survival may take place in captivity . . . so long as this is found to

provide the most practicable and realistic opportunity to encourage the development of the

species concerned").

However, because all actions authorized by Section 10 must be "consistent" with the

overall conservation purposes of the statute, 16 U.S.C. § 1539(d), and the Act authorizes the

killing of a listed species in the name of "conservation" only "in the extraordinary case where

population pressures cannot otherwise be relieved," 16 U.S.C. § 1532(3) (definition of

"conservation"), the killing of an endangered species purely for recreation is not permitted under

Section 10.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Fund for Animals v. Turner</u>, 1991 WL 206232, at *7 (D.D.C. Sept.

27, 1991) (finding unlawful FWS regulation allowing the hunting of grizzly bears to make them

"war[y] of humans" for their own good); <u>Sierra Club v. Clark</u>, 577 F. Supp. 783, 790 (D. Minn.

1984) (reducing the level "wolf-human contact" is not a valid basis for allowing a public sport

trapping of wolves), <u>rev'd in part on other grounds</u>, 755 F.2d 608 (8th Cir. 1985); <u>Humane Soc'y</u>

<u>of the U.S. v. Kempthorne</u>, 481 F. Supp. 2d 53, 62 (D.D.C. 2006) (Kollar-Kotelly, J.) ("[t]he

language 'propagation or survival of the affected species'" in Section 10 "is, on its face,

antithetical to the killing of 43 members of an endangered species barring some direct and

immediate danger imposed by the individual animals killed to other members of the species."),

<u>vacated as moot</u>, 527 F.3d 181 (D.C. Cir. 2008).

Section 10 further provides that the FWS "shall publish notice in the Federal Register of

<u>each application</u> for an exemption or permit," that each such notice "shall invite the submission

from interested parties . . . of written data, views, or arguments with respect to the application,"

and that "[i]nformation received by the [FWS] as a part of any application <u>shall be available to</u>

<u>the public as a matter of public record at every stage of the proceeding</u>."  16 U.S.C. § 1539(c)

(emphasis added).  It also provides that the Service may "only" grant a permit if the agency finds

"and publishes in the Federal Register" that the permit (1) "was applied for in good faith," (2) if

granted and exercised "will not operate to the disadvantage of such endangered species," and (3)

will be "consistent with the purposes and policy" of the Act.  <u>Id.</u> § 1539(d).  As explained by

Congress, these requirements were intended "to <u>limit substantially the number of exemptions</u>

<u>that may be granted</u> under the act."  H.R. Rep. No. 93-412, at 17 (1973), <u>reprinted in</u> Legislative

History at 156 (emphasis added).

Under the agency's implementing regulations, persons seeking to commit an act

otherwise prohibited by Section 9, on the grounds that such activities will "enhance[ ] the

propagation or survival" of the species, must include with their permit applications "[a] full

statement of the reasons why the applicant is justified in obtaining a permit including the details

of the activities sought to be authorized by the permit," and "a statement of the applicant's willingness to participate in a cooperative breeding program."  50 C.F.R. § 17.22 (a)(1)(vii)-(viii).  In deciding whether to issue such a permit, the FWS must consider "[t]he probable and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;" "[w]hether the permit . . . would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;" "[t]he opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application;" and "[w]hether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application."  Id. § 17.22(a)(2).

### 4.     The FWS's Captive-Bred Wildlife Regulations

In 1979, the FWS issued special "captive-bred wildlife regulations" ("CBW regulations") that granted permission under Section 10 of the Act to any person to engage in activities otherwise prohibited by Section 9 with respect to non-native endangered and threatened animals that are bred in captivity in the U.S., but only if "[t]he purpose of such activity is to enhance the propagation or survival of the affected species."  44 Fed. Reg. 54002, 54007 (Sept. 17, 1979); see also 50 C.F.R. § 17.21(g)(1)(ii).  Accredited zoos and conservation facilities that breed endangered species for reintroduction programs typically rely on the CBW regulations to engage in activities that would normally be prohibited under the ESA, such as confining the animals in enclosures and manipulating their reproduction.  See, e.g., 50 C.F.R. § 17.3(a) (CBW regulations permit "normal practices of animal husbandry needed to maintain captive populations that are

-6-

self-sustaining and that possess as much genetic vitality as possible"). The FWS has made clear

that the CBW permit is available "only [to] those persons who engage in beneficial captive

breeding," 58 Fed. Reg. 68323, 68325 (Dec. 27, 1993). See also 77 Fed. Reg. 431, 434 (Jan. 5,

2012), AR 842 ("While the Service does believe that captive breeding can provide a significant

benefit to endangered species, such benefits can only be realized when the breeding program is

scientifically based and conducted in a manner that contributes to the continued survival of the

species . . . . However, breeding just to breed, without adequate attention to genetic composition

and demographics of the breeding population, may not provide a clear conservation benefit to an

endangered species."). Further, CBW registration is not available to sanction any activities that

"involve interstate or foreign commerce, in the course of a commercial activity, with respect to

non-living wildlife." 50 C.F.R. § 17.21(g)(1)(iii).

### B.      The Antelope Listing Rule and Exemption Regulation

After a fourteen-year delay, see 56 Fed. Reg. 56491, the FWS finally listed the three

antelope species at issue here as "endangered" on September 2, 2005. See 70 Fed. Reg. 52319

(Sept. 2, 2005), AR 10.[1]

---

[1] The three species are all endemic to the desert or semidesert habitat of the Sahara and Sahel
regions of North Africa. 70 Fed. Reg. at 52319, AR 10. The scimitar-horned oryx is a large,
heavy antelope with a pale coat and dark reddish cloak around the neck and chest, and long
horns that arc dramatically over its back. Although the oryx once roamed the Sahel in herds up
to 1000 strong, it is now believed to be extinct in the wild, having been decimated by hunting,
habitat loss, and severe drought. See id., AR 10. The dama gazelle is reddish brown in color
with a white head and lower body, and is one of several gazelles of North Africa to have been
severely depleted as a result of human exploitation, grazing pressure from domestic livestock,
and habitat loss. See 56 Fed. Reg. at 56491. Like the oryx, the dama gazelle could once be
found in large herds, but has now been reduced to only remnant populations due to hunting and
habitat loss. 70 Fed. Reg. at 52321, AR 12. Only small numbers of this species survive in most
of the eight countries within its historical range. Id. at 52320, AR 11. The addax is a mid-sized
antelope, grayish in winter and sandy-white in summer, with long, thin horns that spiral back and

On the same day, the agency also issued a special regulation permitting a host of otherwise unlawful activities with respect to the U.S. captive-bred members of the three species – hereinafter referred to as the "exemption rule."  70 Fed. Reg. 52310, AR 1.  The exemption rule authorized any person to "take; export or re-import; deliver, receive, carry, transport or ship in interstate or foreign commerce, in the course of a commercial activity; or sell or offer for sale in interstate or foreign commerce live wildlife . . . and sport-hunted trophies" of any scimitar-horned oryx,  addax, or dama gazelle that was "captive-bred" in the United States.  Id. at 52318, AR 9.  The FWS acknowledged that the regulation would allow hunting ranches in the U.S. to continue their commercial operations, and, in a futile attempt to make its decision consistent with the purposes of Section 10 of the statute, purported to justify this blanket exemption on the grounds that all captive-breeding of these species necessarily "enhances the propagation of the species" within the meaning of that provision of the statute.  See id. at 52310-19, AR 1-10.[2]

Pointing out that some captive-breeding facilities in the United States – but none of the ranches that allow the killing of these species for recreational purposes – have "enhanced the propagation or survival" of the three species by providing founder stock for existing

---

upward as much as 45 inches.  56 Fed. Reg. at 56491.  The most desert-adapted of the three species, the addax once roamed North Africa from the Atlantic Ocean to the Nile Valley, and possibly as far east as the Arabian Peninsula.  Following decades of decline caused by hunting and habitat destruction, there are now fewer than 600 of these animals remaining in the wild.  70 Fed. Reg. at 52319-20, AR 10-11.

[2] Although their comments do not appear in the AR for this case, many environmental groups, conservationists, and biologists had strongly objected to the proposed exemption rule because it violated the plain language of the statute, U.S. captive-bred antelopes were not needed to replenish the wild populations now or in the foreseeable future, and the exemption would inevitably undermine conservation of these imperiled species in the wild by contributing to the illegal trade in antelope trophies (as it would be difficult to differentiate between those that were killed in captivity and those that were killed in the wild).

reintroduction programs, the FWS decided to grant a broad exemption to <u>all</u> entities that engage

in captive-breeding of these animals, including those that operate canned hunts.  <u>See</u> 70 Fed.

Reg. at 52310-11, AR 1-2.  The preamble to the regulation acknowledged that current

reintroduction programs in Africa – the home range of the species – had already established

captive-bred herds of the antelopes, that entities affiliated with accredited zoos were already

involved in those programs, that until more habitat is secured for those captive-bred animals they

cannot be released into the wild, and that there are already so many captive-bred antelopes in the

United States that "surplus" animals may need to be "culled" to manage those herds.  70 Fed.

Reg. at 52313, AR 4.  Nevertheless, in an effort to justify its decision as consonant with the

"conservation" purposes of the ESA, the agency insisted that the exemption rule was "critical" to

"provide an incentive" to hunting ranches "to continue captive breeding of these species."  <u>Id.</u>

### C.    <u>Litigation Challenging The Exemption Rule</u>

Two separate lawsuits were brought challenging the exemption rule – one in the northern

district of California by the Intervenor-Defendants and several individuals (<u>Cary v. Hall</u>, Civ.

No. 05-4363 (N.D. Ca.)), and another by Friends of Animals and the Center for Biological

Diversity.  <u>See</u> <u>Salazar</u>, 626 F. Supp. 2d 102 (D.D.C. 2009).  After the government's motion to

dismiss on standing was dismissed in part, the <u>Cary</u> case was transferred to D.C., and the two

cases were consolidated before Judge Kennedy.  <u>See</u> <u>id.</u> at 109.

On June 22, 2009, Judge Kennedy agreed with the conservation organizations that in

granting a blanket exemption for <u>all</u> entities engaged in otherwise illegal activities with respect

to captive-bred members of the antelope species, the FWS had violated its duty to assess such

permit applications on a case-by-case basis, and to provide notice and an opportunity to

comment on each permit application, pursuant to the plain language of Section 10(c) of the ESA.

Thus, Judge Kennedy explained, because Section 10 provides that the FWS "shall publish notice

in the Federal Register of <u>each application</u> for an exemption or permit," that such notice "shall

invite the submission from interested parties . . . of written data, views, or arguments with

respect to the application," and that "[i]nformation received by the [FWS] as part of <u>any</u>

<u>application</u> shall be available to the public," "Congress clearly contemplated that the FWS would

exercise its authority to grant exceptions" to the prohibitions of Section 9 "by <u>responding to</u>

<u>individual applications</u>."  <u>Salazar</u>, 626 F. Supp. 2d at 116-117 (emphases added).  Judge

Kennedy further ruled that the blanket exemption "hinder[ed] the ability of individuals and

groups to participate in the meaningful way contemplated by the ESA" because without

requiring the submission of information otherwise required to obtain a Section 10 permit, "<u>it is</u>

<u>impossible to evaluate whether each permitted act will enhance the propagation or survival of the</u>

<u>species</u>."  <u>Id.</u> at 118 (emphasis added).

Finally, Judge Kennedy agreed with the conservation organizations that the FWS's

blanket exemption was also "at odds" with the legislative history of Section 10, which

demonstrates Congress's intention to "limit substantially the number of exemptions that may be

granted under the act" by requiring certain "findings" by the FWS – including that granting the

permit "will not operate to the disadvantage" of the species and will be "consistent" with the

conservation purposes of the statute.  <u>Id.</u> at 119; <u>see also</u> 16 U.S.C. § 1539(d).  Thus, Judge

Kennedy concluded, "[b]lanket exemptions under regulations are anathema to this intention

<u>because they allow the FWS to permit a great number of exemptions at once without providing</u>

<u>the detailed information to the public that would be required in an individualized analysis</u>."

<u>Salazar.</u>, 626 F. Supp. 2d at 119 (emphasis added).  Therefore, Judge Kennedy granted summary judgment to the organizations on this claim, and remanded the matter to the FWS for further proceedings.  <u>See id.</u> at 120; <u>see also</u> June 22, 2009 Order, ECF 85 (ordering "that these cases are remanded to the United States Fish and Wildlife Service of the Department of Interior for further proceedings consistent with the memorandum opinion").[3]

### D.  <u>The Removal Rule</u>

Consistent with that decision, on July 7, 2011, the FWS published a proposed rule to remove the illegal exemption.  <u>See</u> 76 Fed. Reg. 39804, AR 331.  The Service explained that, in order "to comply with the Court's order," it "propose[d] to remove the [unlawful exemption rule] and eliminate the exemption for U.S. captive-bred scimitar-horned oryx, addax, and dama gazelle from certain prohibitions under the Act."  <u>Id.</u> at 39805, AR 332.  Accordingly, the Service explained that "[a]ny person who wishes to conduct an otherwise prohibited activity with U.S. captive-bred scimitar-horned oryx, addax, or dama gazelle would need to qualify for an exemption or obtain authorization for such activity under the current statutes or regulations."  <u>Id.</u>, AR 332.  Pursuant to the National Environmental Policy Act ("NEPA"), the Service determined that a categorical exclusion applied because the proposal was "administrative and legal in nature," thus exempting the proposed removal from preparation of an Environmental Impact Statement ("EIS") or Environmental Assessment ("EA").  <u>Id.</u> at 39806, AR 333.  Although not necessary because the agency was simply removing a rule that the court held unlawful, the Service nonetheless requested public "comments and materials" concerning this

---

[3] The parties did not brief the issue of remedy (<u>i.e.</u>, vacatur versus remand), nor did Judge Kennedy provide any rationale for remanding the decision.  <u>Salazar</u>, 626 F. Supp. 2d at 120.

action, presumably to inform the Service's decision about when and how to phase in the removal required by Judge Kennedy's ruling – since, as explained by the proposal, this "would require individuals and captive-breeding operations of the three endangered antelopes to apply for . . . a permit when conducting certain otherwise prohibited activities." Id. at 39806, AR 333.

The Service received several comments from members of the public, including from Intervenor-Defendants supporting the removal going into effect immediately upon issuance of the final rule, see Comments of HSUS and Born Free USA, AR 502-24, and from canned hunting facilities and hunters generally opposing the removal in its entirety. See AR 335-501, 525-599. Rather than focusing on the amount of time needed to obtain new permits now that the unlawful exemption was being removed, many commenters chose instead to complain about the longstanding Section 10 permit system that would now apply to these facilities and hunters, and to propose novel alternatives not currently authorized by the ESA or its regulations. See AR 335-501, 525-599. No commenters raised any concerns with the Service's determination that a categorical exclusion applied under NEPA.

On January 5, 2012, the Service issued a final regulation eliminating the exemption for captive-bred antelopes in the manner that had been described in its proposal. See 77 Fed. Reg. 431, AR 827-60. As the agency explained, with the removal of the unlawful exemption, the captive members of the species remain protected by the original 2005 listing rule, and "anyone wishing to carry out otherwise prohibited activities" with respect to any such antelopes "would need to either apply for a permit . . . or for the captive-bred wildlife registration." Id. at 432, AR 836. As to the general complaints and alternative permitting schemes offered by canned hunting facilities and hunters, the agency explained that such comments were "outside the scope" of the

narrow matter before the agency, which simply sought to remove the unlawful exemption in compliance with Judge Kennedy's June 22, 2009 decision. See, e.g., id. at 434, AR 843 ("Discussion of the listing status of these species, including changing that status, is outside the scope of this rulemaking."); id. at 436, AR 851. Despite the fact that more than two years had passed since Judge Kennedy's ruling, as an additional courtesy to the affected facilities and hunters – to allow them even more time to apply for and obtain the requisite permits – the Service provided "[a]n extended effective date" of 90 days from the issuance of the final rule "to facilitate outreach to the affected communities." Id. at 431, AR 869.

## STANDARD OF REVIEW

Although a court must construe the factual allegations of the complaint in a light most favorable to the plaintiff when presented with a motion to dismiss, it must nonetheless dismiss a complaint where, assuming those facts to be true, a plaintiff "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. Pro. 12(b)(6); see also Wells v. U.S., 851 F.2d 1471, 1478 (D.C. Cir. 1987) (dismissal is proper where, "even assuming that all of its factual allegations are true, plaintiffs have failed to establish a right to relief"). Further, while "for the purposes of [a] motion to dismiss [a court] must take all the factual allegations in the complaint as true, [a court] [is] not bound to accept as true a legal conclusion" offered by the plaintiff. Papasan v. Allain, 478 U.S. 265, 286 (1986).

In the Administrative Procedure Act ("APA") context, "summary judgment is an appropriate mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." United Steel v. Pension Benefit Guaranty Corp., Civ. No. 09-cv-517 (BAH), 2012 WL 917554, at *12

(D.D.C. Mar. 20, 2012) (citations and quotations omitted).  A reviewing court should determine agency compliance with the law solely on the record on which the decision was made.  <u>Citizens to Pres. Overton Park v. Volpe</u>, 401 U.S. 402, 419 (1971); <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973).

Review of an agency's decision occurs under the APA, 5 U.S.C. § 706, which provides a right to judicial review of final agency action.  The APA provides that a court "shall set aside" final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid."  <u>Envtl. Def. Fund v. Costle</u>, 657 F.2d 275, 283 (D.C. Cir. 1981) (citing <u>Overton Park</u>, 401 U.S. 402); <u>see also</u> <u>Am. Wildlands v. Kempthorne</u>, 478 F. Supp. 2d 92, 96 (D.D.C. 2007), <u>aff'd</u> 530 F.3d 991 (D.C. Cir. 2008) ("Under the APA's standard of review, there is a presumption of validity of agency action") (citation omitted).  A reviewing court is forbidden from "substituting its judgment for that of the agency."  <u>Envtl. Def. Fund</u>, 657 F.2d at 283 (citations omitted).  Rather, the APA standard "mandates judicial affirmance if a rational basis for the agency's decision is presented . . . even though [a court] might otherwise disagree."  <u>Id.</u> (citations omitted).[4]

---

[4] Intervenor-Defendants wish to point out that EWA has <u>not</u> challenged the September 2, 2005 <u>listing</u> rule (for which the applicable statute of limitations has expired), which afforded the protections of the ESA to the critically imperiled antelope species as a whole, and which has now taken full effect as a result of the FWS's removal of the patently unlawful exemption for captive members of the species.  However, EWA's purported economic or other injury is <u>not</u> the result of the Service's action to remove an exemption that was illegal from the outset, but rather results by operation of law from the September 2, 2005 listing of the entire species, including both wild and captive members.  Accordingly, EWA cannot demonstrate the necessary causation here for standing purposes – <u>i.e.</u>, its harm is not "fairly traceable" to the removal of the unlawful exemption.  <u>See, e.g.</u>, <u>Friends of the Earth v. Laidlaw Envtl. Servs., Inc.</u>, 528 U.S. 167, 180-81 (2000) (explaining the requirements of Article III).

<u>**ARGUMENT**</u>

I.   **BECAUSE THE SERVICE HAD NO DISCRETION IN REMOVING THE**
     **UNLAWFUL EXEMPTION RULE, EWA'S COMPLAINT SHOULD BE**
     **DISMISSED FOR FAILURE TO STATE A CLAIM.**

    A.   **Because Judge Kennedy Was Required To Vacate The Exemption Rule,**
          **Plaintiffs Have No Viable Cause Of Action.**

In his June 22, 2009 order, Judge Kennedy remanded the illegal exemption rule to the

Service for "further proceedings consistent with the memorandum opinion" after finding that the

rule was "at odds" with the plain language of Section 10 of the ESA, which Congress intended to

"limit substantially the number of exemptions that may be granted under the act" by requiring

that the FWS only issue a permit upon providing the public an opportunity to comment on the

application and subsequently finding that granting the permit "will not operate to the

disadvantage" of the species and will be "consistent" with the conservation purposes of the

statute.  <u>Salazar</u>, 626 F. Supp. 2d at 119; <u>see also</u> June 22, 2009 Order, ECF 85 in Civ. No. 04-

cv-1660 (remanding the rule to the Service).

Judge Kennedy did not request briefing on the appropriate remedy, perhaps because

under the plain language of the APA, the Court must "set aside" any agency regulation that is

found to be "not in accordance with law," as Judge Kennedy found here.  5 U.S.C. § 706(2)(A).

Nor, for that matter, did the government or intervenors (EWA and Safari Club International) ever

argue that, if the exemption were found unlawful, the court should remand it <u>without</u> vacatur.

Thus, because Judge Kennedy was required to vacate the unlawful exemption, EWA has no basis

for challenging the Service's decision.  Rather, EWA's only recourse if it wants the FWS to

consider alternative ways to allow its members to engage in otherwise unlawful activities with

respect to these species – other than by obtaining a Section 10 permit, as is now the case – is to

petition the FWS to consider such alternatives, as EWA has done, for example, with respect to its petition requesting that the Service delist the species.  See Civ. No. 1:12-cv-00194 (BAH).  If at the conclusion of that proceeding, EWA is not satisfied with the agency's final decision, it may be able to challenge the decision under the APA, 5 U.S.C. § 706.

The APA directs that a court "shall . . . set aside" any agency action found to be "arbitrary, capricious, . . . or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (emphasis added).  Because the APA explicitly requires that courts "shall" set aside, or vacate, unlawful agency actions, Congress made clear its view that vacatur is mandatory relief in such circumstances.  See, e.g., Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion"); Ass'n of Civilian Techs. v. FLRA, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive").

Courts in this circuit have thus recognized that vacatur is the normal – indeed presumptive – remedy in an APA case.  E.g., Fed. Elec. Comm'n v. Akins, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case."); Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir. 2001) ("[A plaintiff who] prevails on its APA claim . . . is entitled to relief under that statute, which normally will be a vacatur of the agency's order."); Nat'l Mining Congress v. U.S. Army Corps of Eng'rs, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("We have made clear that [w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated") (quotation marks and citation omitted); In re Polar Bear Endangered Species

Act Listing and 4(d) Rule Litigation, 818 F. Supp. 2d 214, 238 (D.D.C. 2011) (Sullivan, J.)

(explaining that "[b]oth the Supreme Court and the D.C. Circuit have held that vacatur is the

presumptive remedy for this type of violation") (emphasis added).

Here, Judge Kennedy found that the exemption (and the Service's statutory interpretation

upon which the rule was premised) not only ran counter to the plain language of the ESA and its

legislative history, but also made "it is impossible to evaluate whether each permitted act will

enhance the propagation or survival of the species," thereby undermining the explicit

Congressional goals embodied in the ESA. Salazar, 626 F. Supp. 2d at 118. Indeed, Judge

Kennedy explained that the exemption rule was an "anathema" to Congress's intent. Id. at 119.

Accordingly, under the plain language of the APA, Judge Kennedy was required to vacate the

illegal exemption. See 5 U.S.C. § 706(2)(A).

The mere fact that Judge Kennedy remanded the case for "further proceedings consistent

with [his opinion]" does not provide a basis for EWA's attempt to reopen the matter as to

whether the captive members of the species should have been listed to begin with – that issue

was simply not before Judge Kennedy. Accordingly, the agency's decision to "remove" the

unlawful regulation was the only appropriate action that the FWS could have taken that was

"consistent" with Judge Kennedy's decision that the exemption violated both the plain language

and the overall purpose of the ESA. Therefore, there simply is no basis upon which EWA can

challenge the ministerial decision to remove the exemption. Rather, again, its only recourse is to

petition the FWS to promulgate a regulation that may alleviate its concerns, 5 U.S.C. § 553(e) –

it may not use this litigation to create a forum that simply does not exist under basic principles of

APA jurisprudence.

**B.      On Remand, The Service's Decision To Allow Public Comment On Its Compliance With Judge Kennedy's Ruling Did Not Create A Separate Agency Action That Can Be Challenged Here.**

Because the Service had no choice but to remove the illegal exemption, the FWS was not required to undertake a rulemaking process with public comment to accomplish this task, and the fact that the agency chose to do so does not provide EWA with a basis under either the APA or NEPA for challenging the agency's ultimate removal of the exemption.  Indeed, the D.C. Circuit has long recognized that where an agency lacks discretion to take a certain action, it need not provide notice and comment procedures before taking that action.  E.g., Metzenbaum v. FERC, 675 F.2d 1282, 1291 (D.C. Cir. 1982) (holding that, because the agency actions challenged were "non-discretionary acts," "notice and comment was unnecessary, and might even have been contrary to the public interest, given the expense that would have been involved in a futile gesture") (quotation marks and citations omitted) (emphasis added); Lake Carriers' Ass'n v. EPA, 652 F.3d 1, 10 (D.C. Cir. 2011) (explaining that, because the agency did "not have the ability to amend or reject conditions," "providing notice and an opportunity for comment . . . would have served no purpose, and we decline to remand to require EPA to do a futile thing"); Hispanic Info. & Telecomm. Network, Inc. v. FCC, 865 F.2d 1289, 1294 (D.C. Cir. 1989) (declining to require additional administrative procedures when "it would be a pointless formality in which the result was preordained").

Therefore, because the Service lacked all discretion in this instance to do anything other than jettison the unlawful exemption, all of EWA's claims must be rejected because, even viewed in a light most favorable to EWA, none of those claims can be redressed by the Court under any set of facts that EWA could posit.  Thus, EWA's APA claims (Claims 1 and 2) fail to

state a claim upon which relief can be granted because, as explained supra, the Service's

nondiscretionary act of removing the exemption did not require public comment, and,

accordingly, the Court does not have jurisdiction under the APA to hear EWA's claims

challenging purported arbitrary and capricious decisionmaking where such decisionmaking was

not required.

Similarly, EWA's Claim 3 – which alleges that the Service violated Section 7 of the ESA

by failing to ensure that removing the exemption would not "jeopardize" the species, 16 U.S.C.

1536(a)(2) – must also be dismissed for failure to state a claim because, again, the agency had no

choice but to remove the illegal exemption, in which case Section 7 is inapplicable. See Nat'l

Assn. of Homebuilders v. Defenders of Wildlife, 551 U.S. 644, 665 (2007) ("[T]he ESA's

requirements would come into play only when an action results from the exercise of agency

discretion.  This interpretation . . . giv[es] effect to the ESA's no-jeopardy mandate whenever an

agency has discretion to do so, but not when the agency is prohibited from considering" other

alternatives.); 50 C.F.R. § 402.03 ("Section 7 and the requirements of this part apply to all

actions in which there is discretionary Federal involvement or control.") (emphasis added).

Likewise, EWA's NEPA claim (Claim 4) must also fail, because courts have long held

that agencies need not engage in a NEPA analysis – a key part of which is examining

alternatives that the agency realistically could select at the end of the process – for

nondiscretionary actions such as removing an illegal rule, where the agency has only one option

from which to choose.  See, e.g., Dept. of Transp. v. Pub. Citizen, 541 U.S. 752, 770 (2004)

("We hold that where an agency has no ability to prevent a certain effect . . . the agency cannot

be considered a legally relevant 'cause' of the effect" and NEPA is inapplicable); Citizens

Against Rails-to-Trails v. Surface Transp. Bd., 267 F.3d 1144, 1151 (D.C. Cir. 2001) ("The touchstone of whether NEPA applies is discretion. . . . If the agency does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have no affect on the agency's actions, and therefore NEPA is inapplicable.").

Accordingly, because, as a legal matter, there are no circumstances in this case under which the Court could craft relief to remedy EWA's claims without violating Judge Kennedy's decision, even when the factual allegations are viewed most favorable to EWA, the Complaint must be dismissed in its entirety pursuant to Fed. R. Civ. Pro. 12(b)(6).  See, e.g., Wells, 851 F.2d at 1478 (dismissal is proper where, "even assuming that all of its factual allegations are true, plaintiffs have failed to establish a right to relief").

## II.    IF THE COURT NONETHELESS CONSIDERS EWA'S CLAIMS, IT SHOULD REJECT THEM BECAUSE THE SERVICE ACTED REASONABLY UNDER THE CIRCUMSTANCES BY REMOVING THE UNLAWFUL EXEMPTION.

In the event that the Court is nevertheless persuaded that the Service retained some discretion on remand to do something other than eliminate the unlawful exemption for captive members of the species, EWA's arguments should alternatively be dispensed with on summary judgment pursuant to Fed. R. Civ. Pro. 56, because they cannot be sustained under the facts of this case, the administrative record, the applicable law, or the deferential standard of review.  See Carlton v. Babbitt, 900 F. Supp. 526, 530 (D.D.C. 1995) (Friedman, J.) ("Given the expertise of the FWS in the area of wildlife conservation and management and the deferential standard of review, the Court begins with a strong presumption in favor of upholding decisions of the FWS.").

As a threshold matter, EWA relies heavily on an erroneous premise that the listing of these antelope species would not have occurred but for the exemption rule, and, as a result, the Service could, and should, have delisted the species on remand.  See EWA's Br., ECF 78-1, at 19-20 ("It was obvious to everyone (including FWS) that, since the listing decision would not have been made without the exemption rule, it could simply reverse the process and remove the three species from the endangered species list as a means of complying with Judge Kennedy's order.").

This argument demonstrates EWA's fundamental misunderstanding of how listing decisions work under the ESA.  The statute requires the Service to list a "species" as endangered, regardless of the economic or political effects of the decision, if the available scientific data demonstrate that the species is endangered in all, or a significant portion, of its range.  See 16 U.S.C. § 1533 (standards for listing determinations); 16 U.S.C. § 1532(6) (definition of "endangered species"); Ala.-Tombigbee Rivers Coal. v. Kempthorne, 477 F.3d 1250, 1266 (11th Cir. 2007) (Congress "added the word 'solely' before the phrase 'on the basis of the best scientific and commercial data available' to insulate the listing decision from the influence of economic factors") (emphasis added).  Following that approach, the Service found in 2005 that the three antelope species, as a whole, are critically imperiled and thus warrant listing as endangered (indeed, one of the species is functionally extinct in its historic range).  While it is true that some commenters argued that the captive members of the species should be treated differently in the final removal rule, there would have been no legal basis for doing so, and, accordingly, the FWS already rejected that approach in 2005 in connection with the listing decision, see 70 Fed. Reg. at 52320, AR 11 (FWS explaining that under the applicable statutory

scheme "[i]t would not be appropriate to list captive and wild animals separately") – a decision that has not been timely challenged by EWA.  See supra at 14 n.4.

It is true that the FWS also believed that it could provide some economic relief to the canned hunting ranches without violating its mandatory obligation not to take such factors into account when deciding whether to list the species, by issuing a separate regulation providing for a blanket exemption for the captive members of the species – an approach which Safari Club International acknowledged at the time was the "only viable solution for these captive populations in the event that the wild populations of these antelopes must be listed as endangered."  See Int.-Defs.' Br. in SCI Case, ECF 70, at 28.  However, Judge Kennedy has now ruled that this solution to that economic problem was in fact unlawful, and that those who wish to obtain a permit to engage in otherwise unlawful activities with respect to the captive members of an endangered species must apply for a permit to do so.

Therefore, again, because the statute of limitations has now expired for challenging the 2005 listing rule, EWA's only recourse here is to petition the agency to take some new action that will address its concerns – i.e., by delisting or downlisting the antelope species, designating the captive members as a "distinct population segment," or some other action that EWA believes would address its concerns.  See 5 U.S.C. § 553(e).  However, unless and until it does so, and the Service issues a final decision with respect to that matter, EWA's complaints will not properly be before the Court.

A.    **The Service Acted Permissibly By Limiting The Task Before It.**

Nor is there any basis for asserting that by soliciting public comment on the removal rule, the FWS "reopened" the matter of whether the captive antelopes should be listed.  See EWA's

Br., ECF 78-1, at 19-28.  The D.C. Circuit has explained that agencies may craft a rulemaking as narrowly or as broadly as possible to meet the particular objective at issue, and that it may disregard comments that fall outside the scope of the rule as defined by the agency.  See, e.g., Nat'l Mining Ass'n v. MSHA, 116 F.3d 520, 549 (D.C. Cir. 1997) (holding that the agency "did not act arbitrarily and capriciously simply by failing to adopt the Union's recommendations" where the agency explained in its final rule that the recommendations were "outside the scope of this rulemaking"); cf. Am. Fed'n of Gov't Emps., AFL-CIO v. Block, 655 F.2d 1153, 1156 (D.C. Cir. 1981) ("The more expansive the regulatory reach of these rules, of course, the greater the necessity for public comment.").

Likewise, in defining the scope of a rulemaking, an agency does not reopen an underlying or separate rulemaking unless an agency expresses its explicit intent to do so in that proceeding.  See, e.g., Biggerstaff v. FCC, 511 F.3d 178, 185 (D.C. Cir. 2007) ("The Commission's intention to initiate a reopening must be clear from the administrative record."); Biggerstaff, 511 F.3d at 186 ("Given the absence of any indication in either NPRM that the Commission intended to re-examine its statutory authority . . . there is no basis for the court to conclude that the Commission reopened the issue in the 2006 rulemaking."); Am. Iron & Steel Inst. v. EPA, 886 F.2d 390, 398 (D.C. Cir. 1989) (explaining that the "reopening rule" "is not a license for bootstrap procedures by which petitioners can comment on matters other than those actually at issue, goad an agency into a reply, and then sue on the grounds that the agency has re-opened the issue"); Pub. Citizen v. NRC, 901 F.2d 147, 150 (D.C. Cir. 1990) (an agency only reopens an underlying rule "[i]f in proposing a rule the agency uses language that can reasonably be read as an invitation to comment on portions the agency does not explicitly propose to

change, or if in responding to comments the agency uses language that shows that it did in fact reconsider an issue").

Here, because, as a result of Judge Kennedy's June 22, 2009 ruling, the FWS had no choice but to eliminate the unlawful exemption, its July 7, 2011 "proposed rule" made clear that it was explicitly intended "[t]o comply with" the ruling. 76 Fed. Reg. at 39805, AR 332. Thus, the Service narrowly and expressly defined the scope of its rulemaking as considering <u>only</u> the "removal" of the unlawful exemption rule – "the Service proposes to <u>remove</u> the [exemption rule] and eliminate the exemption for U.S. captive-bred scimitar-horned oryx, addax, and dama gazelle from certain prohibitions under the Act." <u>Id.</u>, AR 332 (emphasis added). The Service did <u>not</u> indicate in any way – nor could it since the listing rule was never before Judge Kennedy and thus <u>that</u> matter was <u>not</u> remanded to the agency – that it was somehow reopening the 2005 listing rule, including by considering any novel permitting schemes not currently authorized by the ESA or its regulations that would allow it to provide some <u>other</u> kind of exemption for the captive members of the species.

Although, as explained <u>supra</u>, the Service was not required to solicit public comments under the circumstances, the agency explained that it would only consider comments and materials concerning its proposal to remove the unlawful exemption, <u>id.</u> at 39806, AR 333, which presumably could have included suggestions regarding the timing of the removal to ensure that entities seeking permits under Section 10 would have sufficient time to do so, but which certainly could <u>not</u> include alternative schemes for providing a blanket exemption for the captive members of the species.

While the Service received many comments from canned hunting facilities opposing the removal rule, see AR 335-501, 525-599, those comments were made in vain in light of the obligation to comply with Judge Kennedy's decision, and were therefore outside the narrow scope of the proposed rule.  Accordingly, the Service properly explained in its final rule that many of these comments – including those that serve as the basis for EWA's claims in this lawsuit – are "outside the scope of this rulemaking."  See, e.g., 77 Fed. Reg. at 434, AR 843 ("Discussion of the listing status of these species, including changing that status, is outside the scope of this rulemaking."); id. at 436, AR 851 (finding that comments on alternative permit schemes not currently authorized by the ESA are "outside the scope of this rulemaking because they do not address the Court's ruling that 50 C.F.R. § 17.21(h) violates section 10(c) of the Act and the rescission of 17.21(h)").

Finally, it is well-established that agencies are not required to consider every possible alternative that might be conjured up during the comment process.  Motor Veh. Mfrs. Assn. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 51 (1983) (noting that "rulemaking cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man") (citing Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 551 (1978)).  This is particularly true where, as here, there is a very narrow rulemaking designed to accomplish a discrete task rather than to address a much larger issue, such as the longstanding ESA permit system enacted by Congress in Section 10, which appears to be the main thrust of EWA's arguments here.  Personal Watercraft Indus. Ass'n v. Dept. of Commerce, 48 F.3d 540, 544-45 (D.C. Cir. 1995).

Accordingly, considering the very limited scope of the Service's rulemaking endeavor, the Service acted reasonably by determining that EWA's comments were "outside the scope" of the rulemaking, and by ignoring the requests from EWA and others to embark on what those entities perceive as a systemic and widescale problem with the ESA's permitting scheme. Again, if EWA seeks such broad programmatic changes to the Service's regulatory practices, it must do so pursuant to a separate rulemaking proceeding.

**B.      The Service's Decision Did Not Violate The ESA.**

Two of EWA's claims (Claims 1 and 3) – that the Service based its removal of the unlawful exemption on unsupported factual findings and also violated the ESA – rely on a fundamentally flawed premise that the canned hunting facilities and hunters who kill these antelopes at such facilities are engaged in "conservation" of these species.  However, not only does common sense compel the conclusion that killing critically imperiled species does not "conserve" them under any construction of that term, but the administrative record in this case confirms this extremely salient fact.

EWA argues that the Court should set aside the removal rule as arbitrary because of EWA's view that the Service provided an "erroneous factual finding" in the rule that "ranchers or other holders of these species that are working for the conservation of the species will [not] reduce or eliminate their herds just because a permit or other authorization will now be required," and that "[t]here should be no reduction in herds that were actually being used for conservation purposes."  EWA's Br., ECF 78-1, at 17.  To dispute those findings, EWA cites to comments from canned hunting facilities asserting that they will, or might, reduce or eliminate

their antelope herds due to the permitting requirement, and to the Service's acknowledgment that some ranches might do so.  Id. at 18.

Importantly, however, none of the entities to which EWA cites that allows hunting of these species is engaged in conservation of the species through, inter alia, participation in the "Species Survival Plans" implemented by the Association of Zoos and Aquariums ("AZA") for these species – the sole basis upon which the genetic integrity of the species is tracked and maintained for possible future reintroductions into the wild.  Indeed, the long history of the listing rule, the exemption rule, and litigation over these species has shown that ranches that allow the lethal take of these antelopes via hunting have nothing whatsoever to do with conserving these species in the wild.  See HSUS and Born Free USA Comments, AR 503-04, 509-24 (providing detailed discussion explaining why canned hunting of these species undermines their conservation); see also Int.-Defs.' Br. in SCI Case, ECF 70, at 21-22.  For this reason, the Service stated in the final removal rule that

> [w]hile the Service does believe that captive breeding can provide a significant benefit to endangered species, such benefits can only be realized when the breeding program is scientifically based and conducted in a manner that contributes to the continued survival of the species . . . . However, breeding just to breed, without adequate attention to genetic composition and demographics of the breeding population, may not provide a clear conservation benefit to an endangered species."

 77 Fed. Reg. at 434, AR 842 (emphasis added).  Indeed, this is the very reason that Safari Club International is arguing in the companion case that the Service erred in 2005 when it listed the captive members of the species.  See SCI Opp. Br., ECF 80, at 11-12 (arguing that listing was erroneous because there is no "direct, current involvement in conservation in the wild").

In any event, any entity that is truly engaged in conserving the species should have no trouble meeting the statutory requirements that apply to Section 10 permits.  Hence, the Service

acted entirely reasonably by finding that "ranchers or other holders of these species that are <u>working for the conservation</u> of the species will [not] reduce or eliminate their herds," and that "[t]here should be no reduction in herds that were <u>actually being used for conservation purposes</u>."  77 Fed. Reg. at 433, AR 840 (emphases added); <u>see also</u> <u>Marcum v. Salazar</u>, 810 F. Supp. 2d 56, 77-78 (D.D.C. 2011) (Lamberth, J.) (upholding FWS's denial of an ESA permit to a hunter and the agency's underlying finding that the hunting of that species did not meet the definition of "conservation" under the ESA).

Similarly, EWA's claim that removing the unlawful exemption will necessarily violate the ESA by "jeopardizing" the "continued existence of the species," is baseless.  <u>See</u> EWA's Br., ECF 78-1, at 29-30.  EWA's argument hinges entirely on its illogical view that the removal rule will somehow "prevent continued conservation and recovery of these species."  EWA's Br., ECF 78-1, at 29.  However, once again, because it is clear that the entities that are likely to eliminate or reduce their herds – rather than apply for a Section 10 permit – do <u>not</u> participate in any bona fide conservation programs to reintroduce antelopes into the wild, <u>see</u> AR 503-04, 509-24; <u>see also</u> SCI Opp. Br., ECF 80, at 11-12, the elimination or reduction of those captive herds will have absolutely no effect on conservation and recovery of these species in the wild, and therefore will not violate Section 7 of the ESA or the APA.  Indeed, if anything, a decrease in hunting of captive antelopes at these facilities is likely to <u>benefit</u> these species in the wild, because, as the Service itself has stated, the available evidence demonstrates that enhanced protections for captive animals reduces or "eliminates any potential confusion as to the status of an animal or animal parts that are imported, exported, or reimported."  FWS Prelim. Inj. Br., ECF 35, at 21;

see also HSUS and Born Free USA Comments, AR 511-12 (explaining that hunting of captive members of rare species has "a negative impact on wild populations of th[e]se species").

Therefore, because the rule removing the illegal exemption (and any resulting reduction in breeding and hunting of captive-bred antelopes) will not jeopardize the species in violation of Section 7 – and indeed is likely to benefit the species' recovery in the wild – the Service's decision is completely consistent with the ESA.

### C.   EWA's NEPA Claim Is Also Without Merit.

EWA's final claim attempts to recast its earlier APA argument – that the Service should have considered alternative permit schemes under the ESA that are far outside the scope of this narrow rulemaking – as an argument that the Service should have prepared an EIS or EA pursuant to NEPA.  That argument must also be rejected for several reasons.

First, NEPA is wholly inapplicable here because there is no "major Federal action" to which NEPA could attach.  See 42 U.S.C. § 4332(C) (NEPA only applies to "major Federal action[s] significantly affecting the quality of the human environment").  Second, because no commenter – including EWA – ever notified the Service during the 30-day comment period of any concerns with the agency's determination that a categorical exclusion applied here, thus exempting the removal from NEPA review, see 76 Fed. Reg. at 39806, AR 333 (determining, in the proposed rule, that a categorical exclusion applied), see 40 C.F.R. § 1508.4 (defining "categorical exclusion"), EWA has waived its opportunity to raise this issue here.  See Nevada v. Dept. of Energy, 457 F.3d 78, 88-89 (D.C. Cir. 2006) (holding that, where an objection to an agency's NEPA compliance is not raised in comments, it is waived); see also Pub. Citizen, 541 U.S. at 764 ("Persons challenging an agency's compliance with NEPA must structure their

participation so that it . . . alerts the agency to the [parties'] position and contentions, in order to allow the agency to give the issue meaningful consideration.") (quotation marks and citation omitted); <u>Vt. Yankee</u>, 435 U.S. at 553-54 (explaining that "administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be considered' and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented'").

Third, because the removal rule simply reinstates the full panoply of ESA protections to these imperiled antelope species, which had been denied under the illegal exemption, the result of the removal rule is the same as if, on the date the Service removed the illegal exemption, the Service had <u>listed</u> the species in the first instance – precisely the legal effect of eliminating the unlawful exemption.  This fact is fatal to EWA's claim, as courts have long held that, as a matter of law, listing decisions – which must be made on the best available scientific evidence without any regard to political or economic concerns – are exempt from NEPA review.  <u>See, e.g.</u>, <u>Pac. Legal Found. v. Andrus</u>, 657 F.2d 829, 833 (6th Cir. 1981) (NEPA does not apply to listing decisions because "the Secretary must list all species which are endangered according to the factors listed in ESA . . . [which] does not leave any room for considering the factors which must be evaluated in an impact statement" under NEPA); <u>In re Polar Bear ESA Listing and 4(d) Rule Litig.</u>, 818 F. Supp. 2d 214, 236 (D.D.C. 2011) (Sullivan, J.) ("It is undisputed that an exemption from NEPA is necessary and appropriate for listing decisions under Section 4(a) of the ESA."); 48 Fed. Reg. 49244, 49244 (Oct. 25, 1983) (FWS statement that it "has ceased preparing EA's in connection with" listing decisions).

Finally, even if NEPA were applicable here, the Service has already undertaken a more than adequate examination of the alternatives in the EA that it prepared for the 2005 exemption rule.  Thus, the only alternatives available to the Service within the limited scope of this rulemaking were to (1) eliminate the exemption rule, thereby affording the full protections of the ESA to these species, or (2) leave the exemption rule in place, thereby violating Judge Kennedy's June 22, 2009 decision, as well as the plain language of the ESA.  In the EA that the Service prepared in 2005, <u>both</u> of these alternatives were in fact considered – Alternative 1 proposed to promulgate the exemption rule at 50 C.F.R. § 17.21(h) (which is the alternative the agency ultimately selected), and Alternative 3, or the "no-action" alternative, proposed that, as a result of the listing, "a person subject to the jurisdiction of the United States who breeds these species must register with the Service under 17.21(g)(1) to engage in otherwise prohibited activities or apply for an individual permit under section 10(a)(1)(A)."  Accordingly, since these issues have been thoroughly vetted by the Service in a NEPA process to which EWA has never objected, there is no basis for requiring the Service to engage in a makework exercise of analyzing the environmental impacts of the same alternatives already considered.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Intervenor-Defendants respectfully request that the Court grant Intervenor-Defendants' motion to dismiss, or, alternatively, grant Intervenor-Defendants' motion for summary judgment and enter judgment for the defendants.

Respectfully Submitted,

_____/s/_____
William S. Eubanks II (D.C. Bar No. 987036)
Katherine A. Meyer (D.C. Bar No. 244301)
Meyer Glitzenstein & Crystal
1601 Connecticut Avenue NW, Suite 700
Washington, D.C. 20009
(202) 588-5206 / (202) 588-5049 (fax)
beubanks@meyerglitz.com
kmeyer@meyerglitz.com

Date:   May 25, 2012                    Counsel for Defenders, HSUS, and Born Free USA