UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| SAFARI CLUB INTERNATIONAL, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. 11-cv-01564 (BAH) |
| KEN SALAZAR, Secretary of the Interior, *et al.*, | ) | |
| Defendants. | ) | |

---

|  |  |  |
|---|---|---|
| TERRY OWEN, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil No. 12-cv-00194 (BAH) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) | |
| Defendants. | ) | |

---

|  |  |  |
|---|---|---|
| EXOTIC WILDLIFE ASSOCIATION, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil No. 12-cv-00340 (BAH) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) | (Consolidated Cases) |
| Defendants. | ) | |

---

## FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Federal Defendants United States Department of the Interior, et al., hereby cross-move for summary judgment on Plaintiffs' Exotic Wildlife Association, et al.'s Complaint pursuant to Federal Rule of Civil Procedure 56(c) and Local Civil Rules 7 and 56.1.   This motion is supported by the accompanying Memorandum, and the administrative record.

Dated: May 25, 2012

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

SETH M. BARSKY, Section Chief
S. JAY GOVINDAN, Asst. Section Chief


/s/ Meredith L. Flax
MEREDITH L. FLAX
Sr. Trial Attorney (D.C. Bar No. 468016)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0404
Facsimile: (202) 305-0275
Meredith.Flax@usdoj.gov

**Attorneys for Federal Defendants**

Of Counsel:

Fatima Ahmad
Linus Chen
U.S. Department of Interior
Office of the Solicitor

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
SAFARI CLUB INTERNATIONAL,              )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )    Civil No. 11-cv-01564 (BAH)
                                        )
KEN SALAZAR, Secretary of the Interior, *et al.*, )
                                        )
            Defendants.                 )
_____)
                                        )
TERRY OWEN, *et al.*,                   )
                                        )
            Plaintiffs,                 )
                                        )
      v.                                )    Civil No. 12-cv-00194 (BAH)
                                        )
UNITED STATES DEPARTMENT OF THE         )
INTERIOR, *et al.*,                     )
                                        )
            Defendants.                 )
_____)
                                        )
EXOTIC WILDLIFE ASSOCIATION, *et al.*,  )
                                        )
            Plaintiffs,                 )
                                        )
      v.                                )    Civil No. 12-cv-00340 (BAH)
                                        )    (Consolidated Cases)
UNITED STATES DEPARTMENT OF THE         )
INTERIOR, *et al.*,                     )
                                        )
            Defendants.                 )
_____)

**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

On January 5, 2012, the U.S. Fish and Wildlife Service ("the Service") issued a rule that removes 50 C.F.R. § 17.21(h) in order to comply with this Court's order remanding 50 C.F.R. § 17.21(h) and requiring the Service to take further action consistent with the Court's opinion that the regulation violated the notice and comment requirements of Section 10(c) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1539(c). Plaintiffs ask the Court to set aside the rule and to put back into place this regulation that the Court has already ruled violates the law. Plaintiffs wish to revive the regulation because it allowed them to engage in certain otherwise-prohibited activities with respect to U.S. captive-bred members of the endangered scimitar-horned oryx, addax, and dama gazelle (the "Three Antelope species") without having to obtain permits.

Plaintiffs' arguments that the rule violates the ESA, Administrative Procedure Act, and the National Environmental Policy Act ("NEPA") are legally and factually flawed. They have not even come close to meeting their burden to demonstrate arbitrary agency action. To the contrary, the Service's decision was entirely rational and supported by the administrative record. For these reasons, as explained in more detail below, the Court should grant Federal Defendants' Cross-Motion for Summary Judgment and deny Plaintiffs' Motion.

## BACKGROUND

## I.    STATUTORY BACKGROUND

### A.    ESA Listing

In 1973, Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . ." 16 U.S.C. §

1531(b).  Section 4 of the ESA directs the Secretary[1] to determine by regulation whether a given species should be listed as endangered or threatened. 16 U.S.C. § 1532(6); 16 U.S.C. § 1532(20); 16 U.S.C. § 1533.  This determination is made on the basis of the "best scientific and commercial data available to him after conducting a review of the status of the species . . ." 16 U.S.C. § 1533(b)(1)(A).

Once a species has been placed upon the list of endangered species, it is unlawful under Section 9 of the ESA "for any person subject to the jurisdiction of the United States" to perform certain activities, including "taking" the species; deliver, receive, carry, transport, or ship in interstate commerce in the course of a commercial activity; and selling or offering for sale in interstate commerce. 16 U.S.C. § 1538(a)(1).  "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" any listed species.  16 U.S.C. § 1532(19).

The general prohibition against take notwithstanding, the ESA establishes specific statutory mechanisms by which a federal agency or private actor may obtain permission lawfully to take a species or its habitat.  A federal agency may obtain an "incidental take statement" through the Section 7 consultation process.  16 U.S.C. § 1536(b)(4), (o).  Furthermore, an "incidental take permit" can be obtained by a non-federal applicant under Section 10, which authorizes take that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

In addition to these provisions for incidental take, Section 10(a)(1)(A) of the ESA authorizes the Secretary to allow take "for scientific purposes or to enhance the propagation or

---

[1] Depending on the species, either the Secretary of Commerce or the Secretary of the Interior classifies a species as endangered or threatened.  16 U.S.C. § 1533(a).  The Secretary of the Interior has responsibility for the Three Antelope species.

survival of the affected species." 16 U.S.C. § 1539(a)(1)(A). Applications for permits for

scientific purposes or enhancement of propagation or survival purposes are subject to the notice

and review provisions of Section 10(c). 16 U.S.C. § 1539(c); 50 C.F.R. § 17.22. Section 10(d)

further provides for "exceptions under subsections 10(a)(1)(A) and (b)" if the Secretary finds and

publishes in the Federal Register that "(1) such exceptions were applied for in good faith, (2) if

granted and exercised will not operate to the disadvantage of such endangered species, and (3)

will be consistent with the purposes and policy set forth in section 1531 of this title." 16 U.S.C.

§ 1539(d). The Service has issued regulations setting forth general application requirements and

criteria governing issuance of individual permits for scientific purposes, enhancement of

propagation or survival, or incidental take. 50 C.F.R. § 17.22.

In 1979, under ESA Section 10 authority, the Service established a permit program for

enhancement of propagation or survival of captive-bred wildlife ("CBW Regulation"). 50 C.F.R.

§ 17.21(g). As relevant here, under the CBW Regulation, a person may "take; export or re-

import; deliver, receive, carry, transport or ship in interstate or foreign commerce, in the course

of a commercial activity; or sell or offer for sale in interstate or foreign commerce any

endangered wildlife that is bred in captivity in the United States provided . . . that . . . [certain]

conditions are met, [including that] [t]he purpose of such activity is to enhance the propagation

or survival of the affected species [and that] such activity does not involve interstate or foreign

commerce, in the course of a commercial activity, with respect to non-living wildlife." 50 C.F.R.

§ 17.21(g)(1)(ii) & (iii).

### B.     ESA Consultation

After a species is listed, under Section 7(a)(2) of the ESA, each federal agency must, in

consultation with either the Service or the National Marine Fisheries Service (or both, depending

on the species involved), insure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of the "critical habitat" of the species. 16 U.S.C. § 1536(a)(2).  To assist action agencies in complying with this provision, Section 7 and the implementing regulations set out a detailed consultation process for determining the biological impacts of a proposed activity.  16 U.S.C. § 1536; 50 C.F.R. Part 402.

### C.      ESA's Application to Foreign Species

In addition to species native to the United States, foreign species can be listed as threatened or endangered under the ESA.  16 U.S.C. § 1533(a).  Individual members of a foreign species located in the United States or on the high seas receive similar protections as domestic species, although certain key provisions of the ESA do not apply to foreign species.

For example, no critical habitat is designated for foreign species as occurs for domestic species pursuant to 16 U.S.C. § 1533(a)(3)(A).  50 C.F.R. § 424.12(h); 49 Fed. Reg. 38,900, 38,904 (Oct. 1, 1984) (explaining to a commenter that the ESA "does not contain authority to designate critical habitat in areas outside U.S. jurisdiction.").  For similar reasons, consultation under ESA Section 7(a)(2) is not required for agency actions beyond U.S. jurisdiction or the high seas.  *See* 50 C.F.R. § 402.01(a) (Section 7(a)(2) consultation requirement applies to Federal agency actions "in the United States or upon the high seas"); 50 C.F.R. § 402.02 ("Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas.").

The take prohibition of Section 9 also does not apply to species in foreign countries, but only to the U.S., U.S. territorial waters, or the high seas.  16 U.S.C. § 1538(a)(1)(B)-(C); 50 C.F.R. § 17.31.  Nevertheless, Section 9 does prohibit the import, export, possession, sale,

delivery, transportation, etc. of any listed species, including foreign species.  16 U.S.C. §

1538(a)(1)(A), (D), (E), (F) & (G).  Similarly, Section 9 implements the provisions of the

Convention on International Trade in Endangered Species of Wild Fauna and Flora, which

regulates the import and export of species listed under the Convention.  16 U.S.C. § 1538(c).

### D.     NEPA

NEPA is a procedural statute; it does not mandate a particular substantive result.  *Vt.*

*Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978); *Marsh v.*

*Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).  NEPA requires agencies to prepare an

environmental impact statement ("EIS") to be included in "every recommendation or report on

proposals for legislation and other major Federal actions significantly affecting the quality of the

human environment."  42 U.S.C. § 4332(2)(C); *see* 40 C.F.R. § 1502.3.  The two main goals of

the EIS requirement are to inject environmental considerations into the Federal agency's

decision-making process and to inform the public that the Federal agency has considered

environmental concerns.  *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004);

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001).

The regulations implementing NEPA establish procedures to assist agencies in

determining whether an EIS is required.  An agency may conduct a preliminary examination of

the proposed action, called an environmental assessment ("EA"), to determine whether a

proposed action will have significant environmental impacts such that an EIS is required.  40

C.F.R. §§ 1501.4, 1508.9.  In addition, the NEPA regulations direct agencies to identify classes

of actions, referred to as "categorical exclusions," that normally "do not individually or

cumulatively have a significant effect on the human environment."  *Id.* at §§ 1507.3(b)(2),

1508.4.  NEPA regulations exclude such actions from the requirement of preparing an EA or an

EIS.  40 C.F.R. § 1507.3(b)(2).  An agency's categorical exclusion procedures must also provide

for "extraordinary circumstances in which a normally excluded action may have a significant

environmental effect," thus requiring an EA or EIS.  *Id.* at § 1508.4.

> The Department of the Interior regulations establish categorical exclusions, including for:
>
> Policies, directives, regulations, and guidelines: that are of an administrative,
> financial, legal, technical, or procedural nature; or whose environmental effects
> are too broad, speculative, or conjectural to lend themselves to meaningful
> analysis and will later be subject to the NEPA process, either collectively or case-
> by-case.

43 C.F.R. § 46.210(i).  The regulations also provide for exceptions due to "extraordinary

circumstances," including where the agency's action may "[h]ave significant impacts on species

listed, or proposed to be listed, on the List of Endangered or Threatened Species."  *Id.* §

46.215(h).

An agency's decision to forego production of an EIS or EA in favor of a categorical

exclusion is subject to judicial review under the "arbitrary and capricious" standard of review.

*Nat'l Trust for Historic Pres. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987); *Back Country

Horsemen v. Johanns*, 424 F. Supp. 2d 89, 98 (D.D.C. 2006).


II.     **FACTUAL BACKGROUND**

A.      **The Three Antelope species**

"Historically, the scimitar-horned oryx (*Oryx dammah*), addax (*Addax nasomaculatus*),

and dama gazelle (*Gazella dama*) occupied the same general region of North Africa."  70 Fed.

Reg. 52,310 (Sept. 2, 2005).  The primary reasons for the decline of all three species are habitat

loss through desertification, permanent human settlement, competition with domestic livestock,

regional military activity, and uncontrolled killing.  *Id.*

6

Of the Three Antelope species, the scimitar-horned oryx is the most imperiled in the wild. *Id.* By the mid-1980s, it was estimated that only a few hundred were left in the wild. *Id.* However, since the late 1980s, no sightings of this species in the wild have been reported, and at least one source indicates the species is "extinct in the wild." *Id.* Captive-bred scimitar-horned oryx have been placed into large fenced areas for breeding in Morocco and Tunisia, and it is anticipated that these animals can re-establish wild populations. *Id.*

The addax was extirpated from Tunisia, Libya, and Algeria, but it is believed that remnant populations may still exist in the remote desert areas of Chad, Niger, and Mali, with occasional movements into Libya and Algeria during times of good rainfall. *Id.* In 2005, when the Service listed the species as endangered, it was believed that there were fewer than 600 addax in the wild. *Id.*

Of the Three Antelope species, the dama gazelle is the least susceptible to pressures from humans and livestock. *Id.* Nevertheless, all subspecies of the dama gazelle have declined rapidly over the last 20 years, with recent estimates of fewer than 700 in the wild. *Id.* The dama gazelle was previously extinct in Senegal, but has since been reintroduced and, in 1997, at least 25 animals existed there as part of a semi-captive breeding program. *Id.*

**B.      Regulatory History**

On November 5, 1991, the Service published a proposed rule to list the Three Antelope species as endangered under 50 C.F.R. § 17.11(h). 56 Fed. Reg. 56,491. The Service re-opened the comment period to request information and comments from the public regarding the proposed rule on June 8, 1992 (57 Fed. Reg. 24,220) and then again on July 24, 2003 (68 Fed. Reg. 43,706) and November 26, 2003 (68 Fed. Reg. 66,395).

From the outset of the rulemaking process, the Service announced that it was considering a separate regulatory scheme to cover captive-held individuals of these three species outside the species' natural ranges.  56 Fed. Reg. at 56,491, 56,492 & 56,494; *see also* 68 Fed. Reg. at 43,707.  The Service proposed such a separate regulatory scheme on February 1, 2005.  70 Fed. Reg. 5,117.  The Service sought "data and comments from the public on this proposed rule and the draft Environmental Assessment" of the impact of the proposed rule pursuant to NEPA.  *Id.* In July 2005, the Service issued a Final EA for the proposed exemption for U.S. captive-bred antelopes.  70 Fed. Reg. 52,310.  On August 9, 2005, it issued a finding of no significant impacts, concluding that the exemption would have "no discernible adverse effects" on the antelope, native wildlife and habitat, or human health.  *Id.*

On September 2, 2005, the Service issued both a final listing determination, listing the Three Antelope species as endangered ("Listing Rule"), and a final rule adding a new regulation authorizing certain otherwise-prohibited activities with U.S. captive-bred individuals of the Three Antelope species ("Management Rule").  70 Fed. Reg. 52,319 and 70 Fed. Reg. 52,310; *see also* 50 C.F.R. § 17.21(h).

## C.    Litigation History on the Management Rule

Animal rights groups filed separate lawsuits challenging the Management Rule in the U.S. District Court for the Northern District of California and this Court.  After dismissing in part on standing grounds, the Northern District of California court granted Federal Defendants' motion to transfer that case to this Court for consolidation with the other case already pending here challenging the same rule.  The cases were consolidated before Judge Kennedy, and the parties filed cross-motions for summary judgment.  Safari Club International and the Exotic Wildlife Association intervened on behalf of the Federal Defendants in both cases.

8

On June 22, 2009, Judge Kennedy issued an opinion granting in part and denying in part the parties' cross-motions for summary judgment. *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009). The Court held that the plaintiffs had standing for their ESA Section 10(c) claim only, and did not have standing for their ESA Sections 4, 7, 10(a), and 10(d) claims, or their NEPA claim. *Id.* at 110-114. On the merits of the ESA Section 10(c) claim, the Court held that the Management Rule violates Section 10(c) because, under a *Chevron* step one analysis, the Service is not allowed to issue a blanket permit for all similar activities, but must require the filing of an application, publish notice of each application, and conduct a case-by-case assessment of that application. *Id.* at 115. The Court remanded to the Service "for further proceedings consistent with the memorandum opinion." *Friends of Animals*, 04-cv-1660 (HHK), ECF No. 85-2.

To comply with the Court's Order, on July 7, 2011, the Service published a proposed rule to remove the Management Rule and eliminate the blanket permit allowing certain activities that would otherwise have been prohibited under the ESA. 76 Fed. Reg. 39,804; AR94. The Service provided a 30-day comment period on the proposed rule. *Id.* On January 5, 2012, the Service issued its final rule revising the ESA regulations by removing 50 C.F.R. § 17.21(h). 77 Fed. Reg. 431 ("Removal Rule"); AR202. The Service explained that it was changing the regulations "in response to a court order that found that the rule for these three species violated section 10(c) of the Act." AR202 at 000830. The Service also explained that "[t]he elimination of this regulation does not alter the current listing status of the species, but does now require that the Service must grant individuals authorization prior to their conducting any activity that is prohibited by the Act." *Id.* at 000833-834. The Service considered whether there were alternative means to comply with the Court's order but determined there were not. *Id.* at 000833.

9

The Service provided responses to all comments received. *Id.* at 000834-853.  The Service made the rule effective as of April 4, 2012, in order to facilitate outreach to the affected communities and "allow the affected community to either legally sell their specimens, if they choose to divest themselves of these species, or to apply for authorization or permits to continue carrying out previously approved activities." *Id.* at 000830; 77 Fed. Reg. 431.

Plaintiffs Exotic Wildlife Association, et al. ("EWA") filed suit on March 6, 2012, challenging the Removal Rule and also filed a motion for preliminary injunction the same day. *Exotic Wildlife Ass'n v. U.S. Dep't of Interior*, 12-cv-00340 (BAH).  The Court denied Plaintiffs' motion for preliminary injunction on April 3, 2012.  ECF No. 61.

### D.     Litigation History on the Listing Rule and Petitions to Delist

On June 28, 2010, Safari Club International ("SCI") submitted a petition to the Service to delist the U.S. captive-bred individuals of the Three Antelope species.  EWA submitted a similar petition to the Service, dated June 29, 2010.  The Service has not yet completed a 90-day finding on either petition.  *See* 16 U.S.C. § 1533(b)(3)(A).

On August 31, 2011, SCI filed a complaint in this Court alleging that the Listing Rule is arbitrary because, among other reasons, the Service failed to designate the U.S. captive individuals of the Three Antelope species separately and failed to exclude the U.S. captive herds from the endangered classification.  *SCI v. Salazar*, 11-cv-01564 (BAH) (D.D.C.), ECF No. 1. SCI also alleged that the Service's failure to make a 90-day finding on its petition to delist the U.S. members of the Three Antelope species violates the ESA.  *Id.*

On October 17, 2011, EWA and other individuals filed a complaint in the U.S. District Court for the Northern District of Texas alleging that the Service's failure to make a 90-day finding on their petition to delist the U.S. captive members of the Three Antelope species

violates the ESA.  *Owen v. U.S. Dep't of Interior*, 11-cv-82 (N.D. Tex.), ECF No. 1.  Federal

Defendants moved to dismiss the complaint for failure to provide adequate notice prior to filing

suit and alternatively to transfer the case to this Court to be consolidated with Safari Club

International's case.  *Id.*, ECF No. 9.  The Texas court granted the motion to transfer on February

6, 2012.  *Id.*, ECF No. 16.  The case was ultimately assigned to Judge Howell and has been

consolidated with SCI's case.[2]  *Owen v. U.S. Dep't of Interior*, 12-cv-00194 (BAH) (D.D.C.).

## STANDARD OF REVIEW

In assessing Plaintiffs' claims, the Court must apply the standard of the Administrative

Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C).  The APA provides that an agency action

may be overturned only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right."  *Marsh*, 490 U.S. at 376; *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402

(1971).  Review under the "arbitrary and capricious" standard is "highly deferential" and

"presumes the agency's action to be valid."  *Envtl. Def. Fund  v. Costle*, 657 F.2d 275, 283 (D.C.

Cir. 1981) (citing, *inter alia*, *Overton Park*, 401 U.S. at 419).  The Court's only role is to

determine whether "the decision was based on a consideration of the relevant factors and

whether there has been a clear error of judgment."  *Overton Park*, 401 U.S. at 416.  "[T]he

ultimate standard of review is a narrow one.  The court is not empowered to substitute its

judgment for that of the agency."  *Id.*

---

[2] Summary judgment briefing on Plaintiffs' and Safari Club International's claims that the
Service has failed to make timely findings on their petitions to delist has been stayed to allow the
parties to discuss settlement.  ECF No. 67 and Minute Order of 4/30/12.

In the APA context, "summary judgment is an appropriate mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *United Steel v. Pension Benefit Guar. Corp.*, --- F. Supp. 2d ---, No. 09-cv-517 (BAH), 2012 WL 917554, at *12 (D.D.C. Mar. 20, 2012) (citations omitted). A reviewing court should determine agency compliance with the law solely on the record on which the decision was made.[3] *Overton Park*, 401 U.S. 402; *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

## ARGUMENT

I. **Plaintiffs' ESA Claims Are Meritless.**

Plaintiffs make four ESA arguments: (1) the Removal Rule is arbitrary because there allegedly is no support for the existing permitting scheme; (2) the Removal Rule is arbitrary because the Service allegedly failed to consider alternatives to the permitting scheme; (3) the Removal Rule is arbitrary because the Service allegedly failed to consider delisting the U.S. captive members of the Three Antelope species; and (4) the Removal Rule violates ESA Section

---

[3] Federal Defendants note that Plaintiffs have moved the Court to supplement the administrative record with the entire records from the Listing and Management Rules. ECF No. 76. Federal Defendants opposed Plaintiffs' motion to supplement on May 18, 2012. ECF No. 79. As Federal Defendants explained in their opposition brief, the Court should deny Plaintiffs' motion because Plaintiffs have failed to demonstrate that supplementation of the Administrative Record is warranted or that one of the narrow exceptions for the consideration of extra-record materials applies. As further explained, even if the Court were to disagree, Plaintiffs have failed to show why the underline records for the Listing and Management Rules need to be added to the record for the Removal Rule, given that they have cited to only one document from the Listing and Management Rule records in the background section of their opening Summary Judgment brief. Since Plaintiffs do not cite to any extra-record documents in their argument section of their brief, Federal defendants need not address the cited document, a comment submitted on the proposed Management Rule with census numbers on the Three Antelope species, ECF No. 78-1 ("Pls' Br.") at 11 n.32 and 33.

7(a)(2), 16 U.S.C. § 1536(a)(2), because it allegedly is likely to jeopardize the continued

existence of the species.  Plaintiffs have failed to provide any legal support for their arguments,

and the claims are otherwise meritless.

### A.     The Removal Rule is Entirely Rational and Supported by the Record.

As explained above, in July 2011, the Service proposed to remove the Management Rule

in order to comply with Judge Kennedy's determination that the Management Rule violated ESA

Section 10(c) because it failed to provide the public with notice and an opportunity to comment

on individual applications for a permit to engage in certain otherwise-prohibited activities with

respect to U.S. captive members of the Three Antelope species.  The Service did not propose a

different permitting system or to delist the U.S. captive herds of these species and was under no

obligation to do so.  After providing an opportunity for comment on the proposal, the Service

issued a final rule removing the Management Rule, with a delayed effective date.  The Service

explained that the basis for its decision was to comply with the Court's order, that it "was unable

to identify an alternative other than the currently established regulations at 50 CFR 17.21(g) and

17.22 – providing for the registration of captive-bred wildlife or issuance of a permit – that

would provide the public an opportunity to comment on proposed activities being carried out

with these species," and that it "did not receive any comments or suggestions from the public

that presented a viable alternative."  AR202 at 000833-834.  The Service's decision was entirely

rational.  The Service had to act to comply with the Court's order and, conversely, not acting

would have allowed a regulation that violates the ESA to remain in place.

Plaintiffs do not argue that there was something the Service could have done to amend

the Management Rule to bring it into compliance with ESA Section 10(c).  Instead, they argue

that the January 2012 Removal Rule is arbitrary because there was no evidence that "imposing"

13

the existing permitting scheme (i.e., the regime absent the Management Rule) would not result in

holders of these species eliminating or reducing their herds of U.S. captive-bred members of the

Three Antelope species.[4]  Pls' Br. at 17-18.  Contrary to Plaintiffs' argument, the Service did not

have to consider the impact of reverting back to the existing permitting scheme that

automatically applies to any species listed as an "endangered species."  By removing the

Management Rule, the Service was not "applying" the existing permitting system for all

endangered species to holders of these animals; that system simply goes into place in the absence

of the Management Rule.  In addition, whether removing the Management Rule would lead to

negative impacts to the species or not was irrelevant, since the Service did not have discretion to

leave the Management Rule in place in light of Judge Kennedy's ruling.

    In any case, the Service appropriately responded to the comments it received on the

alleged elimination or reduction in captive herds in the U.S. absent the Management Rule.  The

Service explained that "[r]anches that currently have other endangered hoofstock already obtain

permits for the same activities with those other species" and that ranches should be able to

continue the same activities they legally conducted under the Management Rule under the

existing permit system.  AR202 at 000840-841 (Resp. to Cmt. 4).  In addition, the Service

acknowledged that, while there could be some reduction in the number of herds, it did not

---

[4] Plaintiffs also contend incorrectly that "FWS supports its rule by boldly asserting that it 'does
not believe that ranchers or other holders of these species that are working for the conservation
of the species will reduce or eliminate their herds just because a permit or other authorization
will now be required.'"  Pls' Br. at 17.  Contrary to Plaintiffs' argument, the Service did not
support or base its decision on whether or not holders of U.S. captive-bred members of the Three
Antelope species would reduce or eliminate their herds so as to avoid having to obtain a permit.
Rather, as the Service explained, it based its decision on a need to take a rule off the books that a
Court had held did not comply with the ESA.  AR202 at 000830.

believe this would "significantly influence the genetics of the remaining herds, if they are being properly maintained" and that "[t]here should be no reduction in herds that were actually being used for conservation purposes." *Id.* Given the Service's experience and expertise as the permitting authority for decades, these determinations were reasonable. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983) (particular deference is due to agencies making scientific determinations within their area of special expertise).

> **B.    The Service Adequately Responded to Comments and, to the Extent Required, Adequately Considered Alternatives.**

Plaintiffs next argue that the Removal Rule is arbitrary because the Service "completely failed to consider any alternative to the permitting scheme it announced in the proposed rule and adopted in the Final Rule." Pls' Br. at 19. Tellingly, Plaintiffs' brief is devoid of any authority to support the proposition that the Service was required to consider alternatives to the standard endangered species permitting scheme.

Nothing in the ESA or APA requires the Service to consider such alternatives absent a petition for rulemaking.[5]  No petition asking the Service to propose a different permit system has ever been submitted.  While the Service does have discretion to propose different permitting schemes, absent a petition the decision whether to propose a rule is committed to agency discretion by law within the meaning of APA Section 701(a)(2), 5 U.S.C. § 701(a)(2).  *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985) ("if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action."); *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of*

---

[5] Even where a petition for rulemaking is provided, "[i]t is only in the rarest and most compelling of circumstances that this court has acted to overturn an agency judgment not to institute rulemaking." *WWHT, Inc. v. FCC*, 656 F.2d 807, 818 (D.C. Cir. 1981).

*Interior*, 731 F. Supp. 2d 15, 29 (D.D.C. 2010) (Service's decision not to exclude any areas from critical habitat designation for the wintering piping plover was "unreviewable pursuant to the APA because there is no standard for the Court to apply to the agency's exercise of discretion to not exclude any areas.").

The Service's decision was particularly reasonable given that the Service already has a permitting system that covers the sorts of activities permitted by the rescinded rule.  If Plaintiffs wanted the agency to consider a different permitting system, they had plenty of time to petition the agency to consider such a proposal – yet, Plaintiffs never did so.

While the Service did not have to propose a different permitting system, it did have to respond to comments suggesting such a system if such comments qualify as "significant."  Here, the Service did receive comments that suggested alternatives to the permitting scheme, but these comments were not "significant," and so the Service did not have to respond to them.  Even if these comments were "significant," the Service provided adequate responses to them.

The APA requires agencies to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . ." and "[a]fter consideration of the relevant matter presented, . . . shall incorporate in the rules adopted a concise general statement of their basis and purpose."  5 U.S.C. § 553(c).  The D.C. Circuit has explained that this provision "has never been interpreted to require [an] agency to respond to every comment, or to analyse [sic] every issue or alternative raised by comments, no matter how insubstantial." *Am. Mining Cong. v. EPA*, 907 F.2d 1179, 1187-1188 (D.C. Cir. 1990) (citation omitted).  Agencies also do not have to respond to "comments which themselves are purely speculative and do not disclose the factual or policy basis on which they rest." *Home Box Office v. FCC*, 567 F.2d 9, 36 n.58 (D.C. Cir. 1977).  Rather, agencies are required to respond only to

16

"significant" comments, which are those "which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule [or] cast doubt on the reasonableness of a position taken by the agency." *Id.*

Plaintiffs allege that the Service failed to respond to the numerous comments provided on the proposed rule that criticize the existing permitting system and/or suggest an alternative permitting scheme for the U.S. captive-bred members of the Three Antelope species. However, since the comments did not offer a solution to fix the ESA Section 10(c) problem with the Management Rule, they cannot be considered "significant" as they raise points not relevant to the decision and would not, if adopted, require a change to the proposed rule. The Service acknowledged this when it responded to such comments with the statement that "[t]hese comments are outside the scope of this rulemaking because they do not address the Court's ruling that 50 CFR 17.21(h) violates section 10(c) of the Act and the rescission of 17.21(h)." AR202 at 000851 (Resp. to Cmt. 15).

While the Service was not required to respond to these comments, this does not mean that the Service did not consider alternatives. Indeed, the Service stated in the preamble to the Removal Rule that it

> considered whether there were alternative means to comply with the Court's ruling without requiring ranches or other facilities holding these species to obtain a permit or other authorization. However, the Service was unable to identify an alternative other than the currently established regulations at 50 CFR 17.21(g) and 17.22 – providing for the registration of captive-bred wildlife or issuance of a permit – that would provide the public an opportunity to comment on proposed activities being carried out with these species. In addition, the Service did not receive any comments or suggestions from the public that presented a viable alternative…

AR202 at 000834; *see also id.* at 000836 (Resp. to Cmt. 1), *id.* at 000851 (Resp. to Cmt. 15).  In addition, although the Service determined that the suggested alternative permitting schemes or changes to the existing system were outside the scope of the rulemaking, it stated that it

> will consider [the comments] as we develop ways to improve efficiency and effectiveness of our permitting process.  We are currently working on certain improvements, such as the development of electronic applications and more timely review processes.  We are considering other efficiency improvements as well.  We encourage anyone who has recommendations on how to improve our current permitting process to contact the Service's Division of Management Authority, Branch of Permits

AR202 at 000851 (Resp. to Cmt. 15).  Under the circumstances, the Service's response was more than adequate.

### C.   The Service Did Not Have to Consider Delisting the U.S. Population of the Three Antelope Species in the Context of the Removal of the Management Rule.

Plaintiffs' third ESA argument is that the rule is arbitrary because the Service refused to consider delisting the U.S. captive-bred members of the Three Antelope species, presumably in lieu of, or in conjunction with, removing the Management Rule.  Pls' Br. at 27-28.  Plaintiffs' claim lacks merit because the Service has discretion whether to propose to delist a species on its own initiative, and the Service was not required to affirmatively consider delisting as part of the rulemaking to remove the Management Rule.  Plaintiffs have filed a petition to have the U.S. captive-bred members of these species delisted, and have alleged in a separate lawsuit that the Service has failed to make a timely finding on that petition.  If the outcome of the petition process is not to Plaintiffs' satisfaction, they will have the opportunity to challenge the Service's decision at that time.

There are two ways a listed species can be considered for delisting.  First, the Service can, on its own initiative, propose a rule to delist all or part of a species.  ESA Section 4

18

authorizes the Secretary on his own initiative to list and delist species, provided the criteria for

listing or delisting are met.  16 U.S.C. § 1533(a)(1) and (c)(1); 50 C.F.R. § 424.11(d).  The

Service has substantial discretion to decide whether to propose a species for listing or delisting

on its own initiative.  *See Wyoming v. U.S. Dep't of Interior*, 360 F. Supp. 2d 1214, 1231-32 (D.

Wyo. 2005) (court lacked jurisdiction because the Service had no mandate to delist), aff'd, 442

F.3d 1262 (10th Cir. 2006).

The second way a species can be considered for delisting is through the filing of a

petition.  Section 4(b)(3)(A) of the ESA provides that an "interested person" may petition the

Secretary to add a species to the list of threatened or endangered species or to remove a species

from either list.  16 U.S.C. § 1533(b)(3)(A).  The filing of a petition triggers a series of deadlines

for responding to the petition, depending on the outcome at each stage of the process.  *See* 16

U.S.C. § 1533(b)(3)(A) (requiring a substantial information finding within 90 days to the

maximum extent practicable), § 1533(b)(3)(B) (requiring a finding whether the petitioned action

is warranted within 12 months, if a positive 90 day finding is made), § 1533(b)(3)(B)(ii)

(requiring prompt publication of a proposed rule in the Federal Register if the petitioned action is

determined to be warranted).  If the Service makes a negative 90-day finding, finds that the

petitioned action is not warranted, finds that the petitioned action is warranted but precluded, or

withdraws a proposed rule to list or delist a species, such decision is subject to judicial review.

16 U.S.C. §§ 1533(b)(3)(C)(ii), 1533(b)(6)(B)(ii).

Here, the Service has chosen not to use its inherent authority to consider delisting the

U.S. captive members of the Three Antelope species.  Plaintiffs do not allege that the Service

violated the ESA by failing to exercise this authority, nor could they.  5 U.S.C. § 701(a)(2)

(judicial review inapplicable "to the extent that . . . agency action is committed to agency

19

discretion by law"); *Wyoming*, 360 F. Supp. 2d at 1232.  Rather, Plaintiffs argue that the

Removal Rule is arbitrary because the Service failed to consider delisting the U.S. captive herds

of the Three Antelope species in conjunction with its decision to remove the Management Rule.[6]

This is another variant on Plaintiffs' argument that the Service failed to consider alternatives to

the permitting scheme.  As explained above, the Service was under no obligation to consider

alternatives.  Even if it were, delisting is not an alternative to removing the Management Rule

that the Court found was in violation of the ESA.  AR202 at 000843-844 (Resp. to Cmt. 8)

("Discussion of the listing status of these species, including changing that status, is outside the

scope of this rulemaking.").  While delisting the U.S. captive herds of the Three Antelope

species may have made the Management Rule unnecessary, the Service would still have needed

to remove the Management Rule from the Code of Federal Regulations.  As the Service

---

[6] Plaintiffs claim the Service's alleged failure to consider delisting the U.S. captive-bred herds
was arbitrary because the Listing and Management Rules "were not severable."  Pls' Br. at 27
(citing *New Jersey v. EPA*, 517 F.3d 574, 584 (D.C. Cir. 2008)).  Plaintiffs' alleged authority is
inapplicable here.  In *New Jersey*, the D.C. Circuit was considering petitions for review of a
Clean Air Act regulation that had been issued in tandem with other regulations and granted the
petition because it concluded that the agency had issued the regulation improperly.  In deciding
the appropriate remedy, the Court ordered not just the challenged regulation vacated, but also the
related regulations that were issued in tandem.  Here, in contrast to the situation in *New Jersey*,
Judge Kennedy did not address remedy in his opinion, other than to remand the Management
Rule to the Service for further action consistent with his opinion.  Judge Kennedy did not discuss
vacatur of the Management Rule, much less whether the Listing Rule also had to be vacated.
*New Jersey* does not stand for the proposition that the Service (as opposed to a court) had to
vacate the Listing Rule on its own when it rescinded the Management Rule because the rules
were issued concurrently, as Plaintiffs claim.  Furthermore, in contrast to the situation in *New
Jersey*, the Listing and Management Rules are severable.  The Listing Rule determined the legal
status of all members of the Three Antelope species based solely on the best available science, as
required by ESA Section 4(b)(1)(A), 16 U.S.C. § 1533(b)(1)(A).  The Service issued the
Management Rule using its ESA Section 10 authority to determine the appropriate management
and conservation needs for certain members of the Three Antelope species.

explained, the only proceeding consistent with the Court's opinion was to remove the Management Rule, thereby by default requiring individual applications for permits to engage in otherwise-prohibited activities pursuant to the existing permit system.  AR202 at 000836 ("the Court's finding left us no options but to rescind the current regulation at 50 C.F.R. § 17.21(h)").

While Plaintiffs cannot force the Service to use its inherent authority to propose to delist the U.S. captive-bred members of the Three Antelope species, they are not without recourse because they can petition the Service to take the same delisting action and, in fact, they have already done so.  As noted above, Plaintiffs submitted a petition to the Service on June 29, 2010 to delist the U.S. captive-bred herds of the Three Antelope species.  The Service has not yet completed a 90-day finding on the petition (and a similar petition filed by Safari Club International) to date.  Plaintiffs have brought suit alleging that the Service has violated the ESA by failing to timely respond to their petition.  *Owen v. U.S. Dep't of the Interior*, 12-cv-00194 (BAH) (D.D.C.).  The parties are discussing settlement of those claims.  ECF No. 67; April 30, 2012 Minute Order.  If Plaintiffs are dissatisfied with the outcome of the petition process, they can seek judicial review of the Service's decision.  Thus, the Service will be considering delisting the U.S. captive herds of the Three Antelope species, just as Plaintiffs desire.  However, the Service was not required to initiate that process based on its inherent authority or in conjunction with or in lieu of its rulemaking to remove the Management Rule.  Accordingly, the Court should reject Plaintiffs' argument that the challenged rule is arbitrary because the Service failed to consider delisting the U.S. captive herds of the Three Antelope species.

**D.      Plaintiffs Failed to Provide the Required Notice for their Section 7 Claim, the Service Did Not Have to Consult Under ESA Section 7, and In Any Case, the Removal Rule Will Not Jeopardize the Continued Existence of the Species.**

Plaintiffs also contend that the Service violated ESA Section 7(a)(2) because the removal of 50 C.F.R. § 17.21(h) allegedly is likely to jeopardize the continued existence of the species. Pls' Br. at 29-31.  While Plaintiffs are not entirely clear, it appears they are arguing that the Service, as an action agency, has not met its substantive obligations under ESA Section 7(a)(2) to ensure that its action is not likely to jeopardize the species.  There are several problems with Plaintiffs' argument.

First, if Plaintiffs are challenging the Service in its role as an action agency, then they were required to provide the Service with 60 days notice of their intent to sue, but they did not. 16 U.S.C. § 1540(g)(1)(A).  Section 7(a)(2) claims against an action agency are considered ESA citizen-suit claims, which are subject to the ESA's notice requirement.  *Bennett v. Spear*, 520 U.S. 154, 173-175 (1997).[7]  The notice requirement is jurisdictional, and so Plaintiffs failure to provide notice mandates dismissal of their claim.  *Research Air, Inc. v. Norton*, No. 05-cv-623, 2006 WL 508341, at *10 (D.D.C. Mar. 1, 2006); *Common Sense Salmon Recovery v. Evans*, 329 F. Supp. 2d 96, 104 (D.D.C. 2004).

---

[7] *Bennett* made a distinction between Section 7 claims "against regulated parties – both private entities and Government agencies" (also known as action agencies) and "judicial review of the Secretary's [as the consulting agency] implementation of the statute." *Bennett*, 520 U.S. at 173. Although *Bennett* held that the Service could not be sued as the consulting agency under 16 U.S.C. § 1540(g)(1)(A), the Court expressly adopted the government's view that action agencies could be sued under that provision. *Id.*; *see also Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1079 (9th Cir. 2001).

Second, even if this Court had jurisdiction, not all Federal agency actions are subject to the consultation requirements of Section 7 of the ESA.  An agency is required to consult only on actions where it has discretion to implement measures that inure to the benefit of protected species.[8]  ESA Section 7(a)(2) defines an "agency action" as "any action authorized, funded, or carried out" by a federal agency.  16 U.S.C. § 1536(a)(2).  In turn, the ESA regulations provide that "Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control."  50 C.F.R. § 402.03.  The Supreme Court has upheld that regulation, granting *Chevron* deference to the Service's interpretation of the ESA. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife* ("*NAHB*"), 551 U.S. 644, 666-667 (2007). Based on this statutory and regulatory language, the Supreme Court has made clear that the consultation requirement of Section 7(a)(2) of the ESA "covers only discretionary agency actions and does not attach to actions . . . that an agency is *required* by statute to undertake once certain specified triggering events have occurred."  *NAHB*, 551 U.S. at 669 (emphasis in original).

As discussed above, Federal Defendants had no choice but to remove the Management Rule from the regulations after Judge Kennedy's ruling that the rule violated ESA Section 10(c). *See, e.g.*, *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 16 (D.D.C. 2000) (a party that violates a court order is subject to contempt proceedings), aff'd, 75 Fed. Appx. 3 (D.C. Cir. 2003).   The Service

---

[8] Similarly, if the Court construes Plaintiffs' argument as alleging that the Removal Rule is arbitrary because it fails to conserve the Three Antelope species, the argument should be rejected.  Pls' Br. at 29.  To the extent that the Service has an affirmative duty to conserve listed species, it is limited to taking actions it has authority to take.  *See* 16 U.S.C. § 1531(c)(1) ("all Federal departments and agencies shall seek to conserve endangered species and threatened species and <u>shall utilize their authorities</u> in furtherance of the purposes of [the Act].") (emphasis added); 16 U.S.C. § 1536(a)(1) ("The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this Act.").

23

did not have the option to leave the rule in place even if it benefitted the Three Antelope species. There was no way to fix the rule to make it consistent with ESA Section 10(c) and so it had to be removed.

Plaintiffs argue that the Service did have discretion to implement a different permitting system.  But this is not the same thing as having discretion whether to remove a regulation that a Court has found violative of the statute and which cannot be fixed.  Moreover, as explained above, while the Service may have discretion to adopt a different permit system, it was not required to do so at the same time it removed the Management Rule, or at all, especially given that the Service already has a permit system in place for all endangered species that satisfies ESA Section 10(c).

In sum, Federal Defendants lack the discretion that would trigger a consultation requirement under Section 7 of the ESA, and thus Plaintiffs' ESA claim must fail.  *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125-26 (9th Cir. 1998) ("Where there is no agency discretion to act, the ESA does not apply.") (citation omitted); *NAHB*, 551 U.S. at 665, 669.

Third, even if the Court were to find that it has jurisdiction to consider Plaintiffs' Section 7(a)(2) claim and that the Service's Removal Rule constituted an "agency action" within the meaning of the ESA and ESA regulations, the Removal Rule is not likely to jeopardize the continued existence of the species, as Plaintiffs contend.  To begin with, it would be odd to find that a rule that removes a regulation found to be violative of one portion of the ESA constitutes a violation of a different section of the statute, particularly where the Removal Rule adhered to the instructions of a Court order.  Moreover, Plaintiffs have failed to demonstrate that removing the Management Rule will harm the Three Antelope species, much less jeopardize the species' continued existence.  The Service considered Plaintiffs' and others' comments that the existing

24

permitting requirements that went into place after the Management Rule was rescinded "will make the conservation efforts of [ ] private ranchers economically impossible" and "will also result in a reduction of the reproduction, numbers, and distribution of the antelope."  Pls' Br. at 30.  As the Service explained, it considered the possibility that holders of U.S. captive-bred members of the Three Antelope species might dispose of their stock rather than obtain authorization or permits before carrying out previously exempted activities and determined that it did not believe this would occur, and if it did, that it would not significantly impact the conservation of the species.  AR202 at 000840-841 (Resp. to Cmt. 4).  Consequently, Plaintiffs' argument that the Removal Rule will jeopardize the species fails.

## II.     Plaintiffs' NEPA Claim Also is Without Merit.

Like its ESA claims, Plaintiffs' NEPA claim is entirely without merit.  Plaintiffs' NEPA claim fails for two reasons.  First, the Service did not have to comply with NEPA because it lacked discretion whether to remove the Management Rule.  Second, even if the Service had discretion whether to remove the Management Rule, the Service appropriately determined that the Removal Rule is categorically excluded from NEPA requirements.

Where an agency lacks discretion concerning the action to be taken, NEPA does not apply as a matter of law.  *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151-53 (D.C. Cir. 2001) ("If . . . the agency does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have no affect on the agency's actions, and therefore NEPA is inapplicable.").  *See also Department of Transp. v. Public Citizen,* 541 U.S. 752, 770 (2004) (holding that where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency need not consider the effects in an EA); *Sac & Fox Nation of Mo. v.*

*Norton*, 240 F.3d 1250, 1260-63 (10th Cir. 2001) (Because legislation required the Secretary to

acquire land in trust for the Tribe when directed by the Tribe, NEPA analysis would have been

pointless, and the statute does not apply.); *South Dakota v. Andrus*, 614 F.2d 1190, 1193 (8th

Cir. 1980) ("Reasoning that the primary purpose of the impact statement is to aid agency

decisionmaking, courts have indicated that nondiscretionary acts should be exempt from the

requirement."). Often an agency's lack of discretion is a function of constraints in legislation.

However, as in this case, a court order can have the same effect. Here, Judge Kennedy held that

the Management Rule violates ESA Section 10(c) and remanded to the Service. On remand, the

Service determined that it had no other way to comply with Judge Kennedy's ruling but to

remove the Management Rule. Accordingly, because the Service lacked sufficient discretion to

take a different action, NEPA does not apply here as a matter of law.

Even if the Court were to determine that NEPA does apply, the Service complied with

NEPA by determining that its action qualified for a categorical exclusion. As the Service stated:

> The Service has determined that this rule is a regulatory change that is
> administrative and legal in nature. The rescission of this rule responds to a Court
> ruling finding that 50 CFR 17.21(h) violates section 10(c) of the Act and
> remanding to the agency for further proceedings consistent with its opinion. As
> such, the rule is categorically excluded from further NEPA review as provided by
> 43 CFR 46.210(i) of the Department of the Interior's Implementation of the
> National Environmental Policy Act of 1969 regulations (73 FR 61292; October
> 15, 2008).

AR202 at 000858.

Plaintiffs argue that the Service improperly invoked the categorical exclusion at 43

C.F.R. § 46.210(i) for two reasons. First, they claim the Service failed to adequately explain the

basis for the invocation of the exclusion. Pls' Br. at 31. Second, Plaintiffs contend that

"extraordinary circumstances" exist, citing the exceptions for such circumstances where the

action may "[h]ave significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species," 43 C.F.R. § 46.215(h).  Pls' Br. at 32.  Neither argument has merit.

Plaintiffs first complain that the Service's explanation for why the Removal Rule falls within the categorical exclusion is "conclusory" and "sparse."  Pls' Br. at 31.  Their contention ignores this Court's recognition that a "brief statement" does not render invocation of categorical exclusion arbitrary, though it might if substantial record evidence suggests that exceptions to the categorical exclusion are applicable.  *See Reed v. Salazar*, 744 F. Supp. 2d. 98, 116 (D.D.C. 2010) ("[I]n most instances, a short statement that a categorical exclusion has been invoked will suffice to assure a reviewing court that environmental effects have been considered.") (citing *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002), and *Wilderness Watch & Pub. Emps. for Envtl. Responsibility v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004)).  Here, Plaintiffs identify no such evidence.  They simply press their unsupported theory that the species will be harmed by rescission of the invalidated Management Rule.  The Service disagrees.  It recognized that some reduction in number of captive-bred animals might occur, but concluded this would not significantly influence the genetics of the remaining herds.  This determination, falling within the Service's area of expertise, is entitled to substantial deference.  *Baltimore Gas & Elec. Co.*, 462 U.S. at 103.

Plaintiffs cite to the requirement that agencies comply with NEPA "to the fullest extent possible" and to a D.C. Circuit case that they allege stands for the proposition that NEPA "exemptions are narrowly construed" to attempt to support their argument.  Pls' Br. at 31 (citing 42 U.S.C. § 4332 and *Calvert Cliffs Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1115 (D.C. Cir. 1971).  As explained above, however, the NEPA regulations allow an

27

agency to satisfy its NEPA obligations by invoking an applicable categorical exclusion.  So an agency fully complies with NEPA when it invokes a categorical exclusion, just as it does when it prepares an EA or EIS, so long as it has support for its choice of method of compliance. Furthermore, the passage in *Calvert Cliffs* Plaintiffs cite to involved a situation where an agency concluded it did not have to comply with NEPA because its obligations under a different statute conflicted with NEPA.  449 F.2d at 1115 n.12.  Here, the Service fully complied with NEPA by invoking a categorical exclusion; it did not claim that it could not comply with NEPA.

The Service explained its determination that the Removal Rule is "administrative and legal in nature," AR202 at 000858, given that there were no alternative means for the Service to comply with Judge Kennedy's ruling that the Management Rule violates ESA Section 10(c), *id.* at 000830.  This explanation more than adequately satisfies the Service's minimal burden to invoke the categorical exclusion for "[p]olicies, directives, regulations, and guidelines:  that are of an administrative, financial, legal, technical, or procedural nature."  43 C.F.R. § 46.210(i).

Plaintiffs next argue that the Service improperly invoked the categorical exclusion because the Removal Rule will have significant impacts on the Three Antelope species, and thus an "exception to the exception" applied.  Pls' Br. at 32.  Plaintiffs do not specify precisely why they believe the Removal Rule will have significant impacts on the Three Antelope species, but presumably their reasons would be the same as in their arguments of harm to the species elsewhere in their briefing, *i.e.*, that removing the Management Rule will harm the species because holders of U.S. captive-bred members of the species will reduce or eliminate their herds, rather than attempt to get permits through the existing permit processes.  But rather than identifying evidence of this harm, Plaintiffs improperly ask the Court to adjudge the Service's invocation of the categorical exclusion by a standard applicable to assessing whether a finding of

28

no significant impact is arbitrary,  Pls' Br. at 32-33 (citing *Sierra Club v. Peterson*, 717 F.2d

1409 (D.C. Cir. 1983)).  The Court should not do so.

As noted above, invocation of a categorical exclusion may be deemed arbitrary and

capricious if there is substantial evidence in the record that an "extraordinary circumstance"

might apply and the agency fails to explain its determination.  *See, e.g., Brady Campaign to*

*Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 17 (D.D.C. 2009) (holding that agency's

failure to consider reasonably foreseeable impacts of agency action is sufficient to render the

agency's invocation of a categorical exclusion arbitrary and capricious); *California*, 311 F.3d at

1176.  Here, there was no evidence, let alone substantial evidence in the record that the Removal

Rule would have significant impacts on the Three Antelope species.  As has been explained

already, the Service considered the possibility that holders of U.S. captive-bred members of the

Three Antelope species might dispose of their stock rather than obtain authorization or permits

before carrying out previously exempted activities and determined that it did not believe this

would occur, and, if it did, that it would not significantly impact the conservation of the species.

AR202 at 000840-41 (Resp. to Cmt. 4).  Thus, the Service adequately explained its

determination.  Plaintiffs have not shown arbitrary conduct by the agency because they have not

identified any relevant factor that the Service overlooked nor have they demonstrated a clear

error in judgment.  *Overton Park*, 401 U.S. at 416; *Milk Indus. Found. v. Glickman*, 132 F.3d

1467, 1476 (D.C. Cir. 1998).

## CONCLUSION

The Service's Removal Rule complies with the ESA and NEPA.  For the foregoing

reasons, the Court should grant Federal Defendants' Cross-Motion for Summary Judgment and

deny Plaintiffs' motion.

Dated: May 25, 2012

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

SETH M. BARSKY, Section Chief
S. JAY GOVINDAN, Asst. Section Chief


*/s/ Meredith L. Flax*
MEREDITH L. FLAX
Sr. Trial Attorney (D.C. Bar No. 468016)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0404
Facsimile: (202) 305-0275
Meredith.Flax@usdoj.gov

**Attorneys for Federal Defendants**

Of Counsel:

Fatima Ahmad
Linus Chen
U.S. Department of Interior
Office of the Solicitor