**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| SAFARI CLUB INTERNATIONAL ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| Ken Salazar, *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | Case No. 11-cv-01564 (BAH) |
| ) | (consolidated with cases |
| Terry Owen, *et al.* ) | 1:12-cv-00194-BAH and |
| ) | 1:12-cv-00340-BAH) |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| DEPT. OF THE INTERIOR, *et. al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |
| ) | |
| EXOTIC WILDLIFE ASSOCIATION, *et.* ) | |
| *al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| DEPT. OF THE INTERIOR, *et. seq.* ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**FRIENDS OF ANIMALS' COMBINED OPPOSITION TO EXOTIC**
**WILDLIFE ASSOCIATIONS' MOTION FOR SUMMARY JUDGMENT AND**
**REPLY TO ITS MOTION TO DISMISS**

## I.     INTRODUCTION

The Court should deny Plaintiffs Motion for Summary Judgment, and grant Friends of Animals' Motion for Summary Judgment (filed contemporaneously with this Opposition Memorandum) because Plaintiffs have failed to demonstrate Article III standing necessary to bring this action.  Even taking all of Plaintiffs' allegation in their Complaint and Motion for Summary Judgment as true, Plaintiffs have not demonstrated that the Fish and Wildlife Service's ("FWS") regulatory actions have caused injury-in-fact to them that could be redressed by the Court.

In the alternative, the Court should deny Plaintiffs Motion for Summary Judgment, and grant Friends of Animals' Motion to Dismiss because, again taking all of Plaintiffs allegation in their Complaint as true, they have failed to state a cause of action for which the Court can grant relief.  Distilled to its essence, the Plaintiffs' position is that the repeal of the hunting exemption was too narrow of a regulatory action.  As expressed in their comments to FWS, Plaintiffs would have preferred that the proposed rule repealing the exemption been accompanied by a broader regulatory proposal to overhaul the Section 10 permitting regulations and/or to readdress the 2005 listing the three antelope species.  Having such a preference is fine.  But where Plaintiffs miss the mark is in the assertion that their preferences for the scope of the rulemaking created a legal obligation on behalf of FWS to alter its proposal.  This is not true.  As the Chief Judge for this District just recently held, an agency is not required to address comments that are not expressly invited by the scope of the proposed rule "simply because plaintiffs believe such comments are relevant."  *Sherley v. Sebelius*, 776 F. Supp. 2d 1, 21 (D. D.C. 2011).  Because the FWS was not required to expand its rulemaking to accommodate the Plaintiffs, there is simply no valid claim for relief that can be made by Plaintiffs in a legal action under the Administrative Procedures Act, 5 U.S.C. § 706.

## II.      FACTUAL BACKGROUND

### A.      The Three Antelope Species.

The scimitar-horned oryx, addax, and dama gazelle once thrived in the deserts of northern Africa.  Humans have decimated all three populations: the "addax and scimitar-horned oryx have not been sighted [in wild herds] since the 1950s" and the dama gazelle "is on the verge of extinction."  AR 401.0082.[1]  At the beginning of the twentieth century, all three antelope species inhabited what is now Morocco[2] (AR 401.0082), but are now all but extirpated (AR 401.00119).  The most important and direct cause of this decline is hunting.  *Id.*

> Antelopes are, and have for many years been, freely hunted throughout [Egypt] at all seasons and in any numbers.  Animals of all age groups and of both sexes are hunted.  Illegal hunting of antelope in Egypt has reached an unprecedented scale in the last few years. . . . Another factor contributing to the fast and catastrophic decline of antelopes in Egypt is commercial exploitation.  Large numbers of gazelles and other species . . . are trapped and sold locally or exported.  Stuffed gazelles, ibex, and many other mammals, and their horns or skins are openly sold throughout the country and are often exported.

*Id.*

> Since World War II, the numbers of vehicles and firearms have increased by several orders of magnitude and the practice of mortised hunting has become extremely widespread.  This involves pursuing animals until they are immobilized by exhaustion and then shooting them.  This form of hunting has had a devastating impact on antelope populations in many semi-arid and arid environments.

AR 401.0126.  Poaching, hunting, civil wars, and habitat destruction have led to the demise of the three antelope species.  70 Fed. Reg. 52,319 (Sept. 2, 2005).  While some countries have

---

[1] Record cites in the Factual Background section are to the administrative record lodged by FWS in *Safari Club. v. Salazar*, a consolidated action.

[2] Addax and Oryx are extinct in Morocco, Algeria, Tunisia, Libya, and Egypt.  AR 401.0082, 401.0092, 401.0101, 401.0112, 401.0119.  The dama gazelle is threatened in Algeria and Morocco (AR 401.0082, 401.0092), but extinct in Tunisia and Libya (AR 401.0101, 401.0112).

implemented hunting bans and created protected areas, illegal hunting still runs rampant. AR

401.0082-0112. If not for hunting, both legal and illegal, the three antelope species would not be

endangered as they are today.

**B.      ESA Listing and Subsequent Administrative Action.**

FWS recognized the imperiled status of the three antelope species, and on November 5,

1991, published in the Federal Register a proposed rule to list the three antelope species as

"endangered" under the federal Endangered Species Act ("ESA"), 16 U.S.C. 1531, *et seq*. 56

Fed. Reg. 56,491, 56,491-95 (Nov. 5, 1991). This proposed rule indicated that FWS might treat

captive antelope differently than wild antelope and requested information about the status of

captive populations. *Id*. at 56,491. FWS reopened the notice and comment period three times

between June 1992 and November 2003, but FWS never finalized this proposed rule.

It was not until 2005, following a lawsuit, that FWS finally listed the antelope species as

endangered. *See* 70 Fed. Reg. at 52,319. On September 2, 2005, FWS published the Final

Listing Rule, listing the three antelope species as endangered throughout their ranges due to

habitat loss through desertification, permanent human settlement, competition with domestic

livestock, and by regional military activity and uncontrolled killing. *Id*. FWS found that, due to

these threats, the scimitar-horned oryx is most likely extinct in the wild and that the addax and

the dama gazelle are near-extinct in the wild. *Id*. FWS also found that, but for captive breeding

of the three species for the purpose of maintaining founder stock necessary for reintroduction,

the species might be extinct. *Id*. Concurrently with the Final Listing Rule, the FWS issued a

rule excluding U.S. captive-bred antelope from certain prohibitions in section 9 of the ESA as a

means to accommodate the sport hunting of these species on ranches like those owned by the

Plaintiffs. 70 Fed. Reg. 52,310 (Sept. 2, 2005) (hereinafter Hunting Exemption).

In this regard, private ranches in the United States, mainly in Texas, breed the three antelope species solely to sell "hunts" of these rare species within fenced areas.  For a hefty price—up to $5,250—these sport-hunting operations guarantee success and a mounted trophy. Declaration of Priscilla Feral in Support of FoA's Motion to Intervene (ECF No. 11) (hereinafter Feral Decl.) at ¶ 20.  In 2009, Friends of Animals filed suit against FWS for violating the ESA by promulgating the Hunting Exemption—which in effect provided a blanket exemption allowing hunters to hunt these antelopes without obtaining individual permits.  *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 102 (D.D.C. 2009).  In *Friends of Animals*, former retired Judge Kennedy of this District held that the Sport-Hunting Rule violated the ESA because it permitted the continued killing of the three antelope species without the required case-by-case showing that each proposed take will enhance the survival of the species.  *Id.* at 120.  The court remanded to FWS for further proceedings consistent with its opinion.  *Id.*

As a result of the court's decision, in July 2011, FWS finally posted its proposal to rescind the Hunting Exemption.  76 Fed. Reg. 39,804, 39,804 (July 7, 2011).  After allowing for public comment, on January 5, 2012, FWS rescinded the Sport-Hunting Rule and published the Removal of Sport-Hunting Final Rule, which took effect on April 4, 2012.  77 Fed. Reg. 431 (Jan. 5, 2012) (hereinafter Repeal of the Hunting Exemption).  Currently, FWS considers all populations of the three antelope species endangered under the ESA, and "a person will need to qualify for an exemption or obtain an authorization under the current statutory and regulatory requirements to conduct any prohibited activities."  *Id*.

C.     **Friends of Animals.**

Friends of Animals ("FoA") is a non-profit animal advocacy organization which maintains offices in Connecticut, New York, and Washington, D.C., and regularly consults and

communicates with experts, scientists, and government agencies worldwide.  Feral Decl. ¶ 3.

FoA has approximately 200,000 journal subscribers and members in the United States and

internationally.  *Id*.  FoA, its members, and staff value the ways that humans and nonhuman

species benefit from protecting native biological diversity.  *Id*.  FoA's mission is to cultivate a

respectful view of nonhuman animals, free-living and domestic.  *Id*.  Its goal is to free animals

from cruelty and institutionalized exploitation around the world.  *Id*.  FoA uses the best available

science to forward its mission through active participation in international and national policy

and law formation, including law and policy involving the Convention on International Trade in

Endangered Species of Wild Fauna and Flora ("CITES"), ratified by the United States in

September 1973, and implemented through the ESA; and through national administrative

processes, legal action, public outreach, and education.  *Id*.  FoA often participates in public

processes involving endangered species and seeks to influence legislation regarding endangered

and other protected species.  *Id*.

### III.    LEGAL BACKGROUND

**A.    The Endangered Species Act.**

The purpose of the ESA is to "provide a means whereby the ecosystems upon which

endangered species and threatened species depend may be conserved, [and] to provide a program

for the conservation of such endangered and threatened species . . . ."  16 U.S.C. § 1531(b).  The

ESA defines conservation as "the use of all methods and procedures that are necessary to bring

any endangered species or threatened species to the point at which the measures provided

pursuant to [the ESA] are no longer necessary."  *Id*. at § 1532(3).  However, the protective

provisions of the ESA do nothing to conserve a species until that species is officially "listed" as

either threatened or endangered under the terms of the ESA.  *Id*. at § 1533.

Species are listed or delisted after notice is given and there has been an opportunity to

comment. *Id*. at § 1533(b)(5).  Listing is initiated either by FWS or as a result of a petition

submitted by any interested person. *Id*. at § 1533(b)(1), (3), (5).  FWS is required to list as either

threatened or endangered any species facing extinction due to any one or any combination of the

listing factors: (1) present or threatened destruction, modification, or curtailment of its habitat or

range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3)

disease or predation; (4) inadequacy of existing regulatory mechanisms; and (5) other natural or

manmade factors affecting its continued existence. *Id*. at § 1533(a)(1)(A)-(E).  In evaluating

these factors, FWS must consider "the best scientific and commercial data available" to it in

making its decision on whether to list.  *Id*. at § 1533(b)(1)(A).

**B.      ESA Section 9 Prohibitions and Section 10 Incidental Take Permits.**

Once a species is listed, Section 9 of the ESA makes it unlawful for any person to "take"

endangered or threatened species. *Id*. at § 1538(a)(1)(B).  Congress defined "take" in the ESA to

mean, among other things, to "harass, harm, pursue," " wound," or "kill" a listed species. *Id.* at §

1532(19).  Section 9 also makes it illegal for any person to "import," "export," or "possess, sell,

deliver, carry, transport or ship in interstate or foreign commerce . . . in the course of a

commercial activity" any endangered species. *Id*. at § 1538(a)(1).  Section 9 protections apply

equally to captive and wild endangered animals.  50 C.F.R. § 10.12; H.R. Rep. No. 93-412, at 10

(1973); *Cayman Turtle Farm, Ltd. v. Andrus*, 478 F. Supp. 125, 129-30 (D.D.C. 1979).

Section 10 of the ESA provides FWS with some flexibility to grant limited exceptions to

Section 9's prohibitions for endangered species.  16 U.S.C § 1539.  Congress recognized that it

would be necessary to take actions that would otherwise violate Section 9 in order to aid in the

recovery of species.  Accordingly, Section 10(a)(1)(A) allows FWS to permit "any act otherwise

prohibited by [Section 9] for scientific purposes or to enhance the propagation or survival of the affected species." *Id*. at § 1539(a)(1)(A). FWS uses Section 10(a)(1)(A) to authorize captive breeding and reintroduction programs. For example, FWS has a permit allowing it to handle endangered Mexican wolves as part of an effort to reintroduce the species in the southwestern United States. 70 Fed. Reg. 71,554 (Nov. 29, 2005). Similarly, the National Marine Fisheries Service, FWS' counterpart for marine species, issues permits for hatchery operations involving endangered salmon. 68 Fed. Reg. 1,826 (Jan. 14, 2003). In short, under 16 U.S.C. § 1539(a)(1)(A) and 50 C.F.R. § 17.22 (2011), an agency "may" permit under Section 10 otherwise forbidden actions that will enhance the survival of an endangered species. *Conservation Force v. Salazar*, No. 10-1057, 2012 WL 1059732, *13 (D.D.C. Mar. 30, 2012).

## IV. STANDARD OF REVIEW

FoA adopts the standard of review set forth by Intervenor-Defendants Defenders of Wildlife *et al*. in their Reply in Support of Friends of Animals' Motion to Dismiss and Opposition to Plaintiffs Motion for Summary Judgment (ECF No. 82).

## V. ARGUMENT

**A.    THE PLAINTIFFS LACK STANDING TO CHALLENGE THE REPEAL OF THE HUNTING EXEMPTION.**

To maintain an action in federal court, a plaintiff must show that it has standing under Article III of the Constitution to bring each claim. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000). To establish standing, a plaintiff must demonstrate that:

(1)    he or she has suffered an injury in fact that is both (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical;

(2)    the injury is fairly traceable to the challenged action of the defendant; and

8

(3)     it is likely that a favorable judicial decision will prevent or redress
the injury.

*Laidlaw*, 528 U.S. at 180-81.[3]  Here, the Plaintiffs' claims should be dismissed for lack of

standing based on the facts in the record before the Court.

As an initial matter, the Complaint fails to allege with any clarity a specific injury that the

Plaintiffs have incurred (or may incur) as a direct result of the FWS' promulgation of the Repeal

of the Hunting Exemption.  At best, when the Complaint is read most liberally, Plaintiffs vaguely

suggest three possible injuries associated with the Repeal: (1) the "forced" sale of all or part of

their stocks of the three antelope species; (2) a general interest in the conservation of these

species worldwide; and (3) an undefined, but possibly economic, injury associated with having

to comply with FWS' existing regulations to implement Section 10 permitting.  None of these

injuries, however, are sufficiently alleged or otherwise provide Plaintiffs with standing.

First, Plaintiffs assert that since the proposal by FWS to repeal the rule, they have been

"forced" to sell off their antelope.  *See, e.g.*, Complaint for Declaratory Relief (ECF No. 1) at 8-

11.  For example, the Complaint alleges that Plaintiff Blassingame "has had to reduce the size of

his herd to 30;" that Plaintiff Dockery "has been forced to sell off three-quarters of his herd, and

now only has 53 scimitar-horned oryx;" that the Green Plaintiffs were "forced" by the rule to cut

their herd in half, "and they don't know if they will be able to keep any after the rule comes into

affect;" and that Plaintiff Seal "had about 23 Oryx, but the rule has forced him to reduce his herd

---

[3] An organization, like EWA, has standing only if one or more members are directly affected and can establish standing as a result of the alleged regulatory activity.  *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 494-95 (2009).

to 5."[4]  *Id*.   The Complaint, however, does not allege exactly how the proposed rule "forced" the

plaintiffs to reduce their herds.  This omission is fatal.

As a general rule, under the second prong of *Laidlaw*, a plaintiff need only establish a

"casual connection between [the plaintiff's] injury and the [regulation] complained of."  *Lujan*,

504 U.S. at 560.  The causal chain, however, "can be broken where a plaintiff's self-inflicted

injury results from his 'unreasonable decision . . . to bring about a harm that he knows to be

avoidable."  *Amnesty Inter'l USA v. Clapper*, 638 F.3d 118, 133 (2d Cir. 2011) (citation

omitted).  This is not to say that standing will be defeated where a plaintiff "has in some sense

contributed to his own injury."  *Id*.  But standing is defeated if the injury is so "completely due to

the plaintiffs own fault as to break the causal chain."  *Id*. (citation omitted); *see also Petro-Chem*

*Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (trade organization lacked standing

to challenge agency decision where its members' injuries were "so completely due to the

[Plaintiff's] own fault as to break the casual chain").

In this case, the Repeal of the Hunting Exemption did not require the Plaintiffs to sell off

their animals.  Instead, in promulgating the Repeal, FWS merely eliminated an unlawful, blanket

granting of a Section 10 permit.  The Repeal, and the ESA, left open another possible means for

the Plaintiffs to address their alleged interest in their herds—the Section 10 permitting process

previously promulgated by FWS.  The decision by the Plaintiffs to reduce or eliminate their

herds—in lieu of seeking a Section 10 permit—was made completely on their own.  In a possible

overreaction, the Plaintiffs chose to get rid of these animals instead of pursuing a permit.  In the

Final Rule that repealed the hunting exemption, FWS even told the ranchers that they might be

---

[4] Notably, Seal asserted that "[h]e plans to sell the remaining oryx before the proposed rule goes into effect."  If that is true, it is unclear how this suit would be able to prevent or redress his particular interest.

under the erroneous assumption that the Repeal alone would automatically alter their activities

with respect to endangered antelope, and encouraged Plaintiffs and others to apply for permits.

77 Fed. Reg. at 433.  In any case, such a self-inflicted injury cannot be used to form the basis of

standing.

Second, the Plaintiffs seem to allege some general interest in the conservation of the three

antelope species worldwide.  *See* Complaint at ¶41 (EWA ranchers "have even shipped animals

back to Africa for reintroduction into their native habitats, and are prepared to provide more

animals for reintroduction as soon as it safe and prudent to do so.").  However, once again the

Complaint fails to provide any concrete demonstration that such an interest is actually held by

the Plaintiffs, or, if it is held, that such an interest could be injured by the Repeal of the Hunting

Rule.

The Supreme Court has stated that a generalized interest in conservation of a species is

not sufficient to establish standing.  *See Lujan* at 566-67 (rejecting, for instance, the animal

nexus and vocational nexus approach to standing).  Instead, a Plaintiff must demonstrate the

desire to use or observe an animal species.  *Id.* at 562-63.  Moreover, it is not sufficient to

express some hope or desire to use a species in the future; a Plaintiff must demonstrate facts that

the government's action causes an imminent risk of injury to its interest.  *Id.* at 563-64.  Here, the

Complaint is simply bare on any allegation that the Plaintiffs intend to use or observe antelope in

Africa (or anywhere else in the world outside of their ranches).  Instead, the Complaint vaguely

suggests that the Plaintiffs care about the recovery these species in the wild, and might some day

send animals to help with the effort.  Complaint at ¶ 41.  This does not amount to a concrete

interest required by *Lujan*.  And even if it did, the Complaint is even barer with regards to how

the Repeal of the Hunting Exemption would inhibit the Plaintiffs from traveling to visit these species in their native habitat or shipping animals to Africa.

Third, Plaintiffs seem to suggest that the Repeal of the Hunting Exemption will result in some injury to them as a result of having to comply with FWS' "entirely unworkable permit program."  Complaint at ¶ 2; *see also* Plaintiffs' Memo in Support of Their Motion for Summary Judgment (ECF No. 78-1) (hereinafter, "SJ Memo") at 20 (FWS should have crafted "a permit scheme that would take account of the specific circumstances of [EWA] Ranchers.").  As an initial matter, the permitting process is required, not by FWS, but by Congress.  16 U.S.C. § 1539(a)(1)(A).  Moreover, Congress gave discretion to FWS on fashioning the permitting requirements that will best meet Congresses desire to "enhance the propagation or survival of the affected species."  *Id*. ("The Secretary *may* permit, under such terms and conditions as he *shall* prescribe . . ..) (emphasis added).  Regardless, the problem with Plaintiffs' assertion that the permitting process injures them is that nowhere in the Complaint (or in Plaintiffs' Motion for Summary Judgment) is their a sufficient explanation of: (1) why the existing Section 10 process is "entirely unworkable;" and/or (2) that the use of this permitting program will result in some concrete injury, economic or otherwise.

What seems to be of most concern to Plaintiffs is that FWS' process is too lengthy, and can result in a delay of more than 90-days in obtaining the permit.  *See* SJ Memo at 23 ("The turnaround time for initial permits must be reduced . . . [to] be mo more that [] 90-day[s].).  But how this lengthy delay will cause economic injury to Plaintiffs is speculative.  *See Wyoming v. U.S. Dept. of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) ("Record facts consisting of conclusory statements and speculative economic data are insufficient to [demonstrate injury in fact].")  Moreover, in real world practice, it turns out that FWS has turnaround these

applications, including two named Plaintiffs, quite quickly.  Since January 2012, FWS has

received and process dozens of Section 10 permit applications for the three antelope species.  77

Fed. Reg. 2314 (Jan. 17, 2012); 77 Fed. Reg. 3493 (Jan. 24, 2012); 77 Fed. Reg. 6139 (Feb. 7,

2012); 77 Fed. Reg. 6816 (Feb. 9, 2012); 77 Fed. Reg. 9687 (Feb. 17, 2012); 77 Fed. Reg. 14035

(Mar. 8, 2012); 77 Fed. Reg. 15383 (Mar. 15, 2012); 77 Fed. Reg. 17494 (Mar. 26, 2012); 77

Fed. Reg. 19311 (Mar. 30, 2012); 77 Fed. Reg. 20838 (Apr. 6, 2012); 77 Fed. Reg. 24510 (Apr.

24, 2012); 77 Fed. Reg. 26779 (May 7, 2012); and 77 Fed. Reg. 30547 (May 23, 2012).  Even

with the statutorily required 30-day public comment period, 16 U.S.C. § 1539(c), FWS has

issued the permits in less than 90-days.

Finally, the Plaintiffs might argue that if FWS would have chosen to delist the U.S.

populations in response to Judge Kennedy's order, they would have been relieved altogether

form any obligation to comply with the ESA.  But this "injury" is illusionary in the context of

this action.  If it exists at all, it is fairly traceable only to the 2005 listing decision, as delisting

was never a legal issue in the Repeal of the Hunting Exemption.  As explained further in Part

V.B, *infra*, FWS has broad authority to set the scope of its rulemakings; and once it does it is not

obligated to respond to comments and suggested alternatives that outside of its announced

rulemaking proposal.  Here, FWS was clear that it was **proposing only to remove the illegal**

**hunting exemption**.  The Plaintiffs cannot use their own comments expressing their personal

preferences that FWS expand upon this regulatory proposal as a means to bootstrap a legal

obligation on FWS to delist the species.  Because FWS was never under a legal obligation to

delist the species as a result of Judge Kennedy's order, it is impossible to find that FWS' failure

to do has resulted in any concrete injury to Plaintiffs that can be redressed by the Court.

**B.      FWS Adequately Addressed Plaintiffs' Comments In Finalizing The Repeal Of The Hunting Rule**

Plaintiffs assert that "[t]he APA requires an agency to hear comments on any proposed rule, **and requires any Final Rule issued by the agency be fashioned in light of those comments so as not to be arbitrary or capricious**. SJ Mot. at 4 (emphasis added). Notably, Plaintiffs provide no citation for this seemingly important legal proposition. And for good reason—this is a plainly erroneous interpretation of the Administrative Procedure Act ("APA").

Agency rulemaking must comply with section 553 of the APA, which requires notice of the proposed rulemaking, an opportunity for interested persons to comment on the proposed rule, and a "concise general statement" of the rule's basis and purpose. 5 U.S.C. § 553(b)-(c). Courts have made it clear that an agency "must respond to 'significant points raised by the public," but only if such comments, 'if true, raise relevant to the agency's decision and, if adopted, would require a change in the agency's proposed rule.'" *See Sherley v. Sebelius*, 776 F. Supp. 2d 1, 21 (D. D.C. 2011) (citations omitted).

In *Sherely,* the proposal at issue was a rulemaking by the National Institute of Health intended to comply with an Executive Order calling on the agency to establish guidelines for the responsible conduct of federally-funded human embryonic stem cell research. *Id*. The plaintiffs in that case made comments on the proposed regulatory guidelines that were essentially designed to persuade the agency that it should issue a "wholesale ban on such funding." *Id*. at 22. The agency largely ignored these comments, and asserted that it was not obligated to respond to them because the commentors "fundamentally misunderstood what was at issue [in the rulemaking]." *Id*. at 21. In upholding the agency action, the court gave deference to the agency's right to craft the scope of its rulemaking proposal, particularly when it required the agency to use its expertise to comply with an Executive Order. *Id*. at 21-23. Specifically, the agency "did not invite

comments on the topic of whether embryonic stem cell research should be funded at all, **nor was [the agency] obligated to do so simply because plaintiffs believe such comments are relevant**." *Id*. at 22 (emphasis added).

The same is true here.  FWS was responding to Judge Kennedy's decision that the canned hunting exemption violated the ESA.  FWS in the notice of proposed rulemaking clearly explained that it was repealing the rule in light of the court order, and that going forward hunting ranches would need to use the existing Section 10 permitting process.  76 Fed. Reg. 39804.  The agency invited comments on this narrow proposal.  Like in *Sherley*, FWS did not invite comments on broader regulatory reforms like overhauling the permitting regulations or revisiting the listing decision.  Nor was it obligated to do so to meet the preferences of the Plaintiffs.[5]

Moreover, even if FWS was required to respond to Plaintiffs comments regarding "alternatives" to the repeal, the agency was not obligated, as Plaintiffs assert, "to fashion [the final rule] in light of those comments."  SJ Mot. at 4.  In this Circuit, it has long been the law that the "agency's response to public comments need only 'enable us to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did.'"  *Public Citizen v. FAA*, 988 F.2d 197 (D.C. Cir. 1993)(citation omitted).  FWS met that obligation here.  First, it made a factual finding, not contested by the Plaintiffs, that it was necessary to repeal the Hunting Exemption to comply with Judge Kennedy's order and that the Repeal would ensure the opportunity for public comment on activities that would otherwise be prohibited by the ESA. *See* 77 Fed. Reg. at 432.  Second, it acknowledged Plaintiffs' concerns over both the adequacy of the existing permitting process and the role hunting ranches claim to have in the conservation of antelope.  Even so, the agency found that these comments did not directly address the issue at

---

[5] The Plaintiffs, of course, are free to petition the agency to take these rulemaking activities, as they have subsequently done with regards to the listing rule.

hand—the need to comply with Judge Kennedy's order and Section 10 of the ESA.  *Id*. at 432-33.

**C.      The Now Repealed Hunting Exemption Is Completely Severable From The 2005 Listing Rule.**

Plaintiffs assert that the 2005 listing rule, which included protections for capitive-bred antelope, and the 2005 Hunting Exemption were not severable, and, thus, FWS acted arbitrarily and capriciously when it repealed the latter, but not the former.  This assertion is legally incorrect for two reasons.

First, there cannot be "substantial doubt" that FWS would have proceeded with the listing rule as it is currently constituted if it would have known that the Hunting Exemption would be invalidated by Judge Kennedy.  Under the ESA, the listing of a species **is mandatory if the FWS determines that any of the five listing factors apply**.  16 U.S.C. § 1533(a)(1).  Once FWS made concluded that the species faced one or more of threats listed in Section 4 of the Act, it had no discretion to do anything but list the antelope.  Moreover, as FoA has demonstrated in its response to the Motion for Summary Judgment in *Safari Club Interl. v. Salazar*, legally there is no language in the ESA or FWS policies that state FWS **must** designate the U.S. populations of the antelope species as a designated population segment ("DPS").  In fact, if anything, the decision not to make a DPS determination for the U.S. populations **is wholly consistent with FWS policies**. The DPS process is intended as an additional means for FWS to protect species, not to select certain populations to exclude from listing for political or economic reasons. Further, even if U.S. populations were a DPS, the U.S. populations are endangered under the ESA.   In fact, the U.S. populations are **more endangered** than the African populations, because in the United States the antelope live on hunting ranches, are not subject to any binding

regulatory protection, and are vulnerable to being killed at any time.  *See* Friends of Animals

Opposition to safari Club's Motion for Summary Judgment (ECF No. 72) at 18-28.

Second, FWS did not adopt the Hunting Exemption as a precondition to the listing.

While it is true that FWS adopted the Exemption as an incentive to captive breeding, the blanket

exemption was not the only means for FWS to accomplish this goal.  FWS could have chosen, as

it has now, to use of the existing Section 10 permitting regulations.  In this regard, it should be

noted that the very purpose of Section 10(a)(1)(A) of the ESA is to encourage activities that

might benefit the species.  It was Congress that conditioned this incentive on the use of a public

process under Section 10(c), and FWS violated the law when it tried to remove this condition.  It

is doubtful that FWS, even if it could under Section 4, would have altered the listing decision

merely because it could not lawfully streamline the Section 10 process through the Hunting

Exemption.  Indeed, it is telling that in retrospect, FWS does not think that the Repeal of the

Hunting Exemption will actually negatively impact the species, whether captive-bred or wild.  77

Fed. Reg. at 433.

**D.      The Court Should Grant Friends of Animals' Motion to Dismiss.**

Plaintiffs are correct that under Fed. R. Civ. P. 12(b)(6) the Court must presume that the

Plaintiffs' factual allegations are true unless directly contradicted by affidavits.  SJ Memo. at 34.

But it its Motion to Dismiss, FoA is not challenging any of the Plaintiffs' factual allegation.

Instead, FoA asserts that even if these allegations are true, they don't establish any right of relief.

*Wells v. U.S.*, 851 F.2d 1471, 1478 (D.C. Cir. 1987).  For reasons discussed above, and in FoA's

Motion to Dismiss, FWS was under no legal obligation to address Plaintiffs' desire for a broader

rulemaking that would revise the current Section 10 permitting program or delist captive-bred

antelope.  Plaintiffs are not even challenging what FWS actually did—repeal the Hunting

Exemption. Instead, they are complaining about what FWS did not do and which in their

opinions would be helpful to their hunting operations. This action is not the right for vehicle for

such complaints. Plaintiffs should makes their proposals to FWS through the APA's petition

process, 5 U.S.C. § 553(e).[6]

## VI.   CONCLUSION

For the foregoing reasons, FoA requests this Court deny the Plaintiffs' Motion for

Summary Judgment and grant its Motion to Dismiss.

Dated this 25th day of May, 2012.

Respectfully Submitted,

/s/ Michael Ray Harris
Michael Ray Harris (DC Bar # CO0049)
Environmental Law Clinic

Ricketson Law Building
University of Denver Sturm College of Law
2255 E. Evans Avenue, Suite 335
Denver, CO 80208
Phone:  (303) 871-6140
Fax: (303) 871-6847
elc@law.du.edu

Attorney for Defendant-Intervenor
Friends of Animals

---

[6] FoA has not addressed Plaintiffs' NEPA claims in this memorandum, but instead refers the Court to pages 15-17 of its Memorandum in Support of its Motion to Dismiss (ECF No. 82).

## CERTIFICATE OF SERVICE

I certify that on April 27, 2012, I electronically filed the foregoing **FRIENDS OF ANIMALS'
COMBINED OPPOSITION TO EXOTIC WILDLIFE ASSOCIATIONS' MOTION FOR
SUMMARY JUDGMENT AND REPLY TO ITS MOTION TO DISMISS** with the Clerk of
Court using the CM/ECF system, which will send notification of such filing to the following
attorneys of record:

Meredith Flax, meredith.flax@usdoj.gov
Counsel for the Fish and Wildlife Service

Nancie G. Marzulla, Marzulla Law, nancie@marzulla.com
Counsel for EWA et al.

and

Anna M. Seidman, aseidman@safariclub.org
Counsel for the Safari Club

Dated this 25th day of May, 2012.

/s/  Michael Harris