**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL,<br>Plaintiff,<br>v.<br>KEN SALAZAR, *et al.*,<br>Defendants. | Civ. No. 1:11-cv-1564 BAH<br>(consolidated with cases<br>1:12-cv-00194-BAH and<br>1:12-cv-00340-BAH) |

**INTERVENOR-DEFENDANTS DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES, AND BORN FREE USA'S REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Intervenor-Defendants Defenders of Wildlife, Humane Society of the United States, and Born Free USA make the points set forth below in response to the opposition to their motion for summary judgment by plaintiff Safari Club International ("SCI").

1. In what can only be described as "nothing less than chutzpah being elevated to new heights," Teich v. Food & Drug Admin., 751 F. Supp. 243, 251 (D.D.C. 1990), SCI – which in 2005 told the U.S. Fish and Wildlife Service ("FWS" or "Service") that crafting a special exemption for the captive-bred antelopes was the "the only viable solution for these captive populations in the event that the wild populations of these antelopes must be listed as endangered," Comments of SCI (March 29, 2005), AR 237.0364 (emphasis added) – now insists that the agency acted unlawfully in failing to design some other approach to accomplish this result when it issued the final listing rule on September 2, 2005. However, because the "only viable" approach urged by SCI in 2005 has now been declared illegal by Judge Kennedy, see Friends of Animals v. Salazar, 626 F. Supp. 2d. 102 (D.D.C. 2009), SCI's members – like all

other members of the public who wish to engage in activities that are otherwise prohibited with respect to endangered species – must apply and demonstrate that they meet the criteria for a permit under Section 10 of the Act.

2. In an effort to support its various arguments that the FWS has violated its own "policy," deviated from its normal "practice," or ignored controlling "precedent," SCI has cobbled together a handful of examples where the agency did not include in the listing all of the members of that species. See SCI Opposition ("SCI Opp."), ECF 80, at 2-11. However, as the Intervenors have explained, by far the normal regulatory practice – and in our view the only one permitted under the plain language of the statute – is that when the agency determines that a "species" must be listed as either endangered or threatened, it must list the entire species, including both the wild and captive members, and then decide on a case-by-case basis whether otherwise prohibited activities can be permitted pursuant to the procedural and substantive requirements of Section 10. See Intervenor Summary Judgment Brief ("Interv. SJ Br."), ECF 70, at 23-27.

Indeed, the single example cited by SCI that is even remotely comparable to what SCI urges should have occurred here – i.e., that the FWS should have exempted the captive-bred members of the antelope species from its decision to list these three species as "endangered" – is the 2005 decision by the National Marine Fisheries Service to exempt, without explanation, the captive members of the Southern Resident Killer Whales from the endangered listing. See SCI Opp., ECF 80, at 4 n.3; see also 70 Fed. Reg. 69903, 69912 (Nov. 18, 2005). None of the other examples provided by SCI involve a situation where the FWS exempted captive members of a

species from an endangered listing determination, as SCI believes should have happened here.[1]

Not only is the single factually analogous example cited by SCI being challenged in the Ninth Circuit, Proie, et al. v. Nat'l Marine Fisheries Serv., Civ. No. 12-35433 (9th Cir.), but – more important for the argument advanced by SCI here – it is well established that "[a] single incident is insufficient to establish a pattern or practice." Redondo-Borges v. HUD, 421 F.3d 1, 9 (1st Cir. 2005); Jensen v. Frank, 912 F.2d 517, 523 (1st Cir. 1990) ("[a] single instance . . . falls considerably short of showing an ongoing pattern and practice"); Muttitt v. U.S. Cent. Command, 813 F. Supp. 2d 221, 231 (D.D.C. 2011) (Howell, J.) (allegation of a single FOIA violation "is insufficient as a matter of law to state a claim for relief based on a policy, pattern, or practice"). Rather, again, by far the most consistent practice – and the one that both FWS and NMFS have used in the almost forty years since the ESA was enacted – is to provide protection

---

[1] For example, chimpanzees were originally listed in 1976 as "threatened" with a special rule that exempted the captive members of the species from various prohibitions to facilitate "activities of American research institutions," 41 Fed. Reg. 45990, 45993 (Oct. 19, 1976) – an economic justification that is strictly prohibited under the ESA. See Interv. SJ Br., ECF 70, at 3-4. In 1989, the wild members of the species were upgraded to "endangered," but the FWS kept the threatened listing and exemption in place for captive chimpanzees, 55 Fed. Reg. 9129 – a matter that is currently under review by the agency, see 76 Fed. Reg. 54423 (Sept. 1, 2011). As to the Nile crocodile, both the wild and captive members were originally all listed as endangered, but then subsequently all downlisted to "threatened." See 53 Fed. Reg. 38451 (Sept. 30, 1988). Although the FWS considered a petition to downgrade the listing of the captive members of the endangered cotton-top tamarin (marmoset), see 58 Fed. Reg. 64927 (Dec. 10, 1993), it never did so. Further, unlike the listing of both wild and captive antelopes at issue here, the listings of various fish species upon which SCI relies, see SCI Opp., ECF 80, at 8-9 – the Arkansas River shiner, Santa Ana sucker, California golden trout, and Montana Arctic grayling – did not involve any members of those species held in captivity, and are therefore entirely inapposite. See 63 Fed. Reg. 64772 (Nov. 23, 1998) (Arkansas River shiner); 65 Fed. Reg. 19686 (Apr. 12, 2000) (Santa Ana sucker); 76 Fed. Reg. 63094 (Oct. 11, 2011) (California golden trout); 75 Fed. Reg. 54708 (Sept. 8, 2010) (Montana Arctic grayling). The only other example relied on by SCI is a petition to list the wild plains bison, see SCI Opp., ECF 80, at 10, that was rejected by the FWS. See 76 Fed. Reg. 10299, 10299 (Feb. 24, 2011) (finding that the petition to list "does not present substantial information indicating that listing may be warranted").

to all members of a species that is listed as "endangered" under the statute, and to allow those seeking to conduct otherwise prohibited activities with respect to those species to apply for any relevant permit. See Interv. SJ Br., ECF 70, at 23-27; see also Federal Defendants' Summary Judgment Memorandum ("Gov't Mem."), ECF 68, at 18-20.

3. Similarly unavailing is SCI's insistence that the FWS violated its own Distinct Population Segment ("DPS") Policy when it issued its final rule listing the antelopes as endangered. Although SCI inexplicably complains that the agency did not respond to SCI's suggestion that the captive antelopes be addressed separately through this regulatory mechanism, SCI Opp., ECF 80, at 16-18, SCI acknowledges – as it must – that the Service in fact "based its decision on the premise that 'captive-held animals may not qualify as populations,'" id. at 17, citing 70 Fed. Reg. 52310, 52313 (Sept. 2, 2005) (emphasis added) – a decision that in turn flows from the agency's definition of "population" which is "a group of fish or wildlife in the same taxon . . . in common spatial arrangement that interbreed when mature," 50 C.F.R. § 17.3 (emphasis added); see also Interv. SJ Br., ECF 70, at 26. As we have already explained, id. at 26 – to which there is no response by SCI – here, where the record shows that there are dozens of different facilities holding captive antelopes (at least 26 with dama gazelles, 31 with addax, and 63 with scimitar-horned oryx), see AR 221.005-221.007, it would have been factually and legally impossible for the Service to designate all of these animals as belonging to a single "population" because they simply do not exist in a "common spatial arrangement." See Interv. SJ Br., ECF 70, at 26.[2]

---

[2] As SCI itself acknowledges, it did not request that the agency list each separate facility's captive "population" as a DPS, but suggested only that "the Service designate a [single] DPS composed of the populations of the three antelope species living within U.S. boundaries."

Accordingly, no other explanation was required by the Service for declining to go that route – even though, as we have also explained, Interv. SJ Br., ECF 70, at 27, the DPS Policy additionally does not apply because the captive members of the species also cannot be considered "significant" to either the survival or recovery of antelopes in the wild within the meaning of the DPS Policy.

4. Nor is there any validity to SCI's counterintuitive suggestion that the agency's decision not to exempt captive antelopes from the protections afforded listed species somehow "violates the purposes of the Endangered Species Act" because it is contrary to the statutory definition of "conservation." SCI Opp., ECF 80, at 14. SCI asserts that because the statute defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species . . . to the point at which the measures provided [under the Act] are no longer necessary," 16 U.S.C. § 1532(3) (emphasis added), the FWS has violated this provision because its decision to list captive antelopes will result in the production of less of those animals when facilities that breed them either refuse to apply for a permit or are not able to qualify for one. Thus, in SCI's view, the mere production of more of a species furthers the species' conservation, no matter what the circumstances.

However, as we have already explained, see Interv. SJ Br., ECF 70, at 22, SCI itself has amply demonstrated – in this litigation – that the thousands of antelopes that have been bred for recreational hunting in this country are not "necessary" to recover the wild populations in Africa. See 16 U.S.C. § 1532(3) (defining "conservation" under the ESA). Indeed, in SCI's own words, "[c]aptive populations of each of the three antelope species [already] exist . . . in some of their

---

SCI Opp., ECF 80, at 16-17, citing AR 199.0004-5 (emphasis added).

historic range countries," SCI SJ Mem., ECF 45, at 2, using U.S. bred antelopes for "reintroductions into the wild" is "presently infeasible," id. at 7, and it is pure "conjecture whether U.S. non-native captive herds would ever prove to be a source of animals for reintroduction of the animals in their native ecosystems." Id. at 8 (emphasis added); see also id. at 6 ("[a]lthough the Service, and others involved in conservation of the three species, expressed hopes that U.S. non-native captive populations would someday serve as the seed populations for future reintroductions into the wild, the FWS found that no reintroductions into the wild from the U.S. non-native captive populations were currently taking place, and that, as a result, the U.S. populations had no current, direct role in restoring the species into the wild of their home range.") (emphasis added).

Thus, by no stretch of the imagination could the Service – or anyone else – conclude that continuing to allow the prolific and indiscriminate breeding of more antelopes in the United States to be killed for recreation is "necessary" to conserve these species in the wild. To the contrary, including the captive members within the listing designation and requiring those who wish to continue to breed, kill, or sell them to demonstrate that such activities are necessary to "enhance the propagation or survival" of these species in the wild, within the meaning of Section 10 of the statute, 16 U.S.C. § 1539(a)(1)(A), is the only course of action that is consistent with the conservation purposes of the statute.[3]

---

[3] SCI's reliance on Mr. Bamberger's unique situation, SCI Opp., ECF 80, at 13-14, is particularly disingenuous for several reasons: (a) Mr. Bamberger is not a member of SCI; (b) unlike SCI's members he collaborates with the Association of Zoos and Aquariums' Species Survival Plan for the oryx and does not allow any of the animals at his facility to be killed for recreation or otherwise hunted, see Interv. SJ Br., ECF 70, at 22; (c) he has already announced that he is ceasing his operations, SCI Exhibit EE, ECF 80-1, at ¶ 25; and (d) to the extent he ever needed a permit to "cull" surplus antelopes in furtherance of any true conservation program, he

**CONCLUSION**

For all of the foregoing reasons as well as those set forth in the Intervenor-Defendants' memorandum in support of their motion for summary judgment and in opposition to SCI's motion for summary judgment, judgment should be entered for the Intervenor-Defendants.

Respectfully Submitted,

/s/

Katherine A. Meyer (D.C. Bar No. 244301)
William S. Embanks II (D.C. Bar No. 987036)
Meyer Glitzenstein & Crystal
1601 Connecticut Avenue NW, Suite 700
Washington, D.C. 20009
(202) 588-5206 / (202) 588-5049 (fax)
beubanks@meyerglitz.com
kmeyer@meyerglitz.com

Counsel for Defenders, HSUS, and Born Free USA

Date: June 8, 2012

---

could simply apply for a permit to do so under Section 10.