UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. 11-cv-01564 (BAH) |
| KEN SALAZAR, Secretary of the Interior, *et al.*, | ) | |
| Defendants. | ) | |
| TERRY OWEN, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil No. 12-cv-00194 (BAH) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) | |
| Defendants. | ) | |
| EXOTIC WILDLIFE ASSOCIATION, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil No. 12-cv-00340 (BAH) (Consolidated Cases) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF FEDERAL DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Safari Club International ("SCI" or "Plaintiff") contends that the U.S. Fish and Wildlife Service's ("Service") decision to confer endangered status on all scimitar-horned oryx, addax, and dama gazelle ("Three Antelope species") was arbitrary because the Service had several options that would have allowed it to not include U.S. captive-bred individuals of the species in the listing, and using one of these options would have been in the conservation interest of the species by allowing continued captive breeding without the need to get a permit. The only even potentially applicable option that SCI raises was the possibility of a "split-listing" between wild and captive animals, which the Service used twice before. However, those two fact-specific, anomalous decisions were not "precedents" that the Service had to follow. Rather, the Service's policy, practice, and precedent has always been to extend the same status to all individuals of a listable entity,[1] in this case three "species." Accordingly, the Service was obligated only to provide a rational basis for its decision. Since the Service provided a rational basis for its decision to extend endangered status to all members of these species, the Court should uphold the decision.

---

[1] The Endangered Species Act ("ESA") requires the Service to "determine whether any <u>species</u> is an endangered species or a threatened species because of any of" five enumerated factors. 16 U.S.C. § 1533(a)(1) (emphasis added). The statute defines "species" as including "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). Thus, a "listable entity" includes species, subspecies, or "distinct population segments" only. If a grouping of animals does not constitute a listable entity, the Service cannot and is not required to analyze whether that grouping is endangered or threatened based on one or more of the five enumerated statutory factors.

# ARGUMENT

I. **THE SERVICE'S DECISION TO LIST ALL MEMBERS OF THE THREE ANTELOPE SPECIES AS ENDANGERED WAS CONSISTENT WITH SERVICE POLICY AND PRACTICE AND BASED ON YEARS OF CONSIDERATION.**

As demonstrated in our opening summary judgment brief, the Service's September 2005 decision to confer endangered status on all individuals of the Three Antelope species – whether in the wild or in captivity – was entirely consistent with the Service's policy, practice, and precedent and based on consideration of the proper listing status of these species that spanned more than a decade. ECF No. 69 ("Defs' SJ Memo") at 13-20. SCI's arguments that the Nile crocodile and chimpanzee split-listing decisions established a precedent that the Service was obligated to follow are without support or merit.

While the Service makes each listing determination on a case-by-case basis, its practice has been to extend the same listing status to all individuals of a listable entity. ECF No. 69 at 18; *see also* ECF No. 70 at 24 (Intervenor-Defendants Defenders of Wildlife, et al.'s brief, citing to various provisions establishing that listing extends to wild and captive animals). The ESA and the Service's ESA regulations support this practice. *Id.* Therefore, providing the same listing status to all members of a listable entity is the default, unless the facts indicate there should be a different result.

The Service has varied from this default practice only two times. In the cases of the Nile crocodile and the chimpanzee, the Service initially conferred the same listing status on all members of each species, but then later changed the listing status of wild (but not captive)

chimpanzees and captive or ranched (but not wild) Nile crocodiles.[2]  Both of these split-listing decisions occurred prior to the Service's issuance of its policy on distinct population segments ("DPS policy") and are anomalous, fact-specific decisions.  As such, these two decisions are not precedent because they are limited to their facts and the time period in which they were issued.

Despite all the evidence to the contrary, SCI attempts to argue that the chimpanzee decision served as precedent that the Service was obligated to follow or explain its reasons for not doing so when it made the Three Antelope species listing decision.  Pl's SJ Reply at 5, 19-22.  None of SCI's arguments is persuasive.  First, SCI claims the chimpanzee decision is precedent because it preceded the Three Antelope species listing decision.  *Id.* at 5.  While that may be true, Plaintiff's argument fails to account for the fact that in none of the hundreds of other listing decisions that preceded the Three Antelope species listing decision did the Service split-list wild and captive individuals, including the Service's initial decision to list all chimpanzees as

---

[2] SCI argues for the first time on reply that the chimpanzee decision served as precedent for another "split-listing" decision on the North American captive population of cotton-top tamarin. ECF No. 81 ("Pl's SJ Reply") at 3.  The Court should disregard this newly made argument in the first instance.  *Bd. of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996) ("To prevent this sort of sandbagging of appellees and respondents, we have generally held that issues not raised until the reply brief are waived, . . . and we do so here.") (citations omitted); *Holiday CVS, LLC v. Holder*, --- F. Supp. 2d ----, No. 12-cv-191, 2012 WL 883123, at *20 n.16 (D.D.C. Mar. 16, 2012) (refusing to consider new arguments first raised in a reply brief).  Even if the Court were to consider the argument, the cited decision was a 90-day finding and not a final listing determination, and so does not demonstrate that the Service has a practice of issuing split-listing decisions.  Furthermore, like the chimpanzee and Nile crocodile decisions, the cited decision on the cotton-top tamarin was made before the Service issued its distinct population segment policy in 1996.

threatened.[3]  Thus, the Service followed its practice and precedent when it conferred the same listing status on the Three Antelope species, whereas the chimpanzee decision was an outlier.

Second, SCI argues that the chimpanzee decision was precedent "because of the similarities between conditions of the species involved in those listings." *Id.* at 5.  However, SCI greatly overstates any similarities.  SCI claims that for both chimpanzees and the Three Antelope species, "captive populations were considered to be self-sustaining and interbreeding." *Id.*  For the chimpanzee, at best the Service determined that "some animals are specifically being managed as an interbreeding population." 55 Fed. Reg. 9,129, 9,131 (Mar. 12, 1990); *see also id.* at 9,130 ("[t]here are questions about whether and how many such populations are indeed viable, but to the extent that self-sustaining breeding groups of captive troglodytes provide surplus animals for research and other purposes, there may be reduced probability that other individuals of that species will be removed from the wild."); *id.* ("There is controversy regarding the viability and fecundity of over-all captive populations, but management of certain captive breeding groups seems to be becoming more sophisticated and successful.").  For the Three Antelope species, there is nothing in the Listing or Management Rules that establishes that the U.S. captive members of these species were self-sustaining and interbreeding.  SCI also claims

---

[3] In its opening brief, the Service pointed out that, with the exception of the chimpanzee, the captive members of all other species on the list of threatened and endangered species at 50 C.F.R. § 17.11(h) have the same status as wild members of the species.  Defs' SJ Memo at 19 n.12 (pointing specifically to zoo animals such as the African elephant, Asian elephant, panda, and Grevy's zebra).  Other specific examples that are similarly situated to the Three Antelope species include the swamp deer, Eld's brow-antlered deer, and red lechwe which are all foreign species listed in their entireties, including animals held in captivity in the United States for which the Service has issued ESA Section 10 permits to allow culling in the form of sport hunting.  *See* 50 C.F.R. § 17.11(h); *see also, e.g.*, 62 Fed. Reg. 4,548 (Jan. 30, 1997), 62 Fed. Reg. 34,481 (June 26, 1997); 66 Fed. Reg. 16,956 (Mar. 28, 2001).

that the Service chose to differentiate treatment of captive chimpanzees to avoid harm to the conservation of the species.  Pl's SJ Reply at 5.  As explained above, however, the Service also chose to differentiate treatment of U.S. captive antelopes to avoid harm to the conservation of the species, it just did so by issuing the Management Rule for these animals rather than conferring a different listing status on them because it determined it would not be appropriate to do so.  Finally, for the chimpanzee, the Service stressed the importance of captive chimpanzees for biomedical and other kinds of research.  55 Fed. Reg. at 9,130.  Captive members of the Three Antelope species do not have a similar sort of importance.  In sum, the record before the Service on the Three Antelope species was not the same as the record for the chimpanzee, and the Service appropriately determined that a split listing was not appropriate for the Three Antelope species.

Third, SCI argues that the chimpanzee decision was precedent "because within it, the Service offered an interpretation of the ESA that extended far beyond the specifics of the chimpanzee scenario." *Id.* at 5.  SCI refers to a comment that the legislative history of the ESA did not support treating "captive populations" as a distinct "species," and the Service's response that the definition of "species" in the ESA is broader than the usual biological definition of that term because it includes "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* (citing 55 Fed. Reg. at 9,121 (Resp. to Cmt. 1)). The Service further explained that "[c]aptive animals are distinct from wild populations and may have the potential to interbreed when mature." *Id.*  In other words, the Service stated that captive animals <u>might</u> be considered a separately listable entity <u>if</u> they qualify as a distinct population segment.  However, saying that some captive members of a species might qualify as a DPS is a

5

far cry from establishing a precedent that all captive animals must be considered separately or that they in fact qualify for separate listing.  In any case, as mentioned above, to the extent the Service was making a statement about the meaning of the phrase "distinct population segment" in the chimpanzee decision, any such statement was overruled when the Service issued its DPS policy six years later.

Since the Service did not deviate from its practice or precedent when it listed all members of the Three Antelope species as endangered, it did not have to explain why it did not follow the anomalous chimpanzee or Nile crocodile examples, as SCI argues.  Instead, the Service was required only to provide a rational explanation for its decision, which it did. *Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C. Cir. 1989) ("Where the reviewing court can ascertain that the agency has not in fact diverged from past decisions, the need for a comprehensive and explicit statement of its current rationale is less pressing.  Thus, . . . the court will uphold [the agency's] findings, though of less than ideal clarity, if the agency's path may reasonably be discerned . . .") (citation omitted).  The record here demonstrates that the Service thoroughly considered various options under the ESA, and whether it was appropriate to give captive members of the Three Antelope species a separate legal status, and decided it was not.  Defs' SJ Memo at 13-16.  Instead, the Service determined that a separate approach to management of captive-held animals was the appropriate approach for allowing the continued propagation of U.S. captive-bred members of the Three Antelope species, but this approach was struck down by the court, and the Service has since withdrawn that regulation.

The other option that SCI claims the Service should have used to differentially list U.S. captive members of the Three Antelope species was a native versus non-native distinction.  Pl's

SJ Reply at 7-11. SCI has specifically pointed to the cases of the Arkansas River shiner and the Arctic grayling as examples where the Service used this option.[4] ECF No. 45 ("Pl's MSJ") at 37-39. The Service has demonstrated already that the native versus non-native distinction was not relevant in this case. Defs' SJ Memo at 17-18. Instead, what was relevant to the decision on how to list the Three Antelope species was whether captive animals could be treated differently than wild ones.

SCI claims Federal Defendants' position "ignore[s] the fact that the U.S. populations of the three antelope species are both captive and non-native to the U.S. and that precedent concerning the agency's treatment of non-native populations is just as relevant as precedent related to captive populations." Pl's SJ Reply at 7-8. Federal Defendants did not ignore anything. Rather, they recognized that, because the Three Antelopes species in the U.S. are both non-native <u>and</u> captive, it would not have been sufficient for the Service to consider just the species' non-native status (but not their captive status) in determining whether U.S. members of these species could constitute a listable entity under the ESA.[5] In contrast, in all of the examples

---

[4] In its summary judgment reply, SCI raises two new examples in the cases of the Santa Ana sucker, the California golden trout and the plains bison. Pl's SJ Reply at 8-10. As with SCI's other new arguments, the Court should disregard this newly raised information. *See supra* at 3 n.2. Even if the Court were to consider this new information, for all the reasons provided herein, the new examples of the Santa Ana sucker and the California golden trout provide no more support for SCI's argument than its other examples because, in all examples, the Service separately listed native and non-native wild animals, and did not address captive animals. As for the bison, that decision post-dates the Three Antelope species decision and so could not serve as precedent.

[5] The DPS policy specifically contemplates separate listings for non-native and native wild members of the same species. The third criteria under the "significance" prong notes that the significance element can be met where the DPS "represents the only surviving <u>natural occurrence</u> of a taxon that may be more abundant elsewhere as <u>an introduced population outside</u>

7

SCI has provided, the animals in question were native or non-native <u>wild</u> animals. None included animals held in captivity. Thus, the relevant distinction here is the captive status of the animals and separately listing based on native versus non-native status was not a viable option.

## II. THE SERVICE WAS NOT REQUIRED TO DESIGNATE THE THREE ANTELOPE SPECIES IN THE UNITED STATES AS A DISTINCT POPULATION SEGMENT.

Along with the reasons set forth above, Plaintiffs' claims must also fail because the Service's decision whether to designate a DPS of the Three Antelope species is unreviewable since the agency itself initiated the listing action and was not acting pursuant to a petition. Defs' SJ Memo at 20-21. When the Service acts on its own initiative in making a listing determination, it has full discretion to consider the scope of a listing, within the bounds of the legal standards set out in the ESA (such as the definitions of endangered species and threatened species and the best available science standard). Here, the Service considered all options for how to list the Three Antelope species, and determined it "would not be appropriate to list captive and wild animals separately." AR 386. Instead, the Service determined that the entire species qualified as endangered species based on the five listing factors.[6]

---

its historic range." 61 Fed. Reg. 4,722, 4,725 (Feb. 7, 1996) (emphasis added). However, captive-held animals (and their offspring) that have been transported by humans beyond their natural range and remain completely subject to human control and therefore can be moved at will to other areas outside their range (or back into their historic range) are not "introduced populations." *See* Exec. Order No. 13,112 (1999) ("'Alien species' means, with respect to a particular ecosystem, any species . . . that is not native to that ecosystem" and "'Native species' means, with respect to a particular ecosystem, a species that, other than as a result of an introduction, historically occurred or currently occurs in that ecosystem.").

[6] Where the Service determines that an entire species qualifies as an endangered species or a threatened species, there is no need for the Service to conduct a DPS analysis, and so it does not do so. *See, e.g.,* 75 Fed. Reg. 81,794 (Dec. 28, 2010) (Final rule listing the black-hooded

Since the Service determined that the best available science indicated that the Three Antelope species qualified in their entireties as endangered species, it was not required to engage in a DPS analysis under the DPS policy. Indeed, SCI concedes that this is the case. Pl's SJ Reply at 17 ("<u>If</u> the Service did actually initiate a DPS analysis and made the determination that it would not designate a DPS, <u>then</u> it bore the obligation to follow the terms of its own policy in doing so.") (emphasis added).

Thus, SCI's complaint about the Service's decision not to designate "a DPS composed of the populations of the three antelope species living within U.S. boundaries" is that the Service provided an insufficient explanation for the decision and "the Service based its population consideration on an inaccurate and internally inconsistent interpretation of the ESA." Pl's SJ Reply at 16-17. As to the first point, the only obligation the Service had to provide an explanation for not designating a DPS arose, if at all, to respond to SCI's comment that it believed the Service should designate a DPS if the comment could be considered "significant." *Am. Mining Cong. v. EPA*, 907 F.2d 1179, 1187-1188 (D.C. Cir. 1990) (agency not required "to respond to every comment, or to analyse [sic] every issue or alternative raised by comments, no matter how insubstantial.") (citation omitted). Here, to the extent required, the Service adequately responded to the comment by stating that it would not be appropriate to separately list

---

antwren, Brazilian merganser, cherry-throated tanager, fringe-backed fire-eye, Kaempfer's tody-tyrant, Margaretta's hermit hummingbird, and southeastern rufous-vented ground-cuckoo as endangered); 76 Fed. Reg. 61,956 (Oct. 6, 2011) (Final rule listing the Ozark hellbender salamander as endangered); 76 Fed. Reg. 50,052 (Aug. 11, 2011) (Final rule listing the Cantabrian capercaillie, Marquesan imperial pigeon, Eiao Marquesas reed-warbler, greater adjutant, Jerdon's courser, and slender-billed curlew as endangered).

wild and captive members of the Three Antelope species.[7]  AR 386.  On SCI's second point, for all the reasons already provided, the Service's decision was entirely rational and consistent with its past practice and interpretation of the ESA.

SCI's final argument, that the Service was obligated to establish a DPS if doing so would further the conservation purposes of the ESA, also is without merit.  The Service fully satisfied any obligations it had to further the conservation purposes of the ESA by listing the species in their entireties and issuing a separate Management Rule to facilitate continued propagation of U.S. captive-bred members of the Three Antelope species.

### III. THE SERVICE'S DECISION TO LIST ALL MEMBERS OF THE THREE ANTELOPE SPECIES AS ENDANGERED WAS CONSISTENT WITH THE PURPOSES OF THE ESA.

Finally, the Service has already demonstrated that its decision to include all members of the Three Antelope species in the endangered classification was consistent with the conservation purposes of the ESA, because covering captive and wild individuals ensures that the animals receive the appropriate protections under the statute and that there is no confusion as to the status of a particular animal or animal part that would lead to an increase in illegal trade in the species.  Defs' SJ Memo at 22-23.  SCI tries to recast its argument in response.  SCI initially argued that

---

[7] SCI incorrectly contends that the Service's determination that "it would not be appropriate to list captive and wild animals separately" was based "on the premise that 'captive-held animals may not qualify as populations.'  70 Fed. Reg. 52,310, 52,313 (September 2, 2005)."  Pl's SJ Reply at 17.  The Service made the statement that "captive-held animals may not qualify as populations" in a response to comments on the Management Rule, not the Listing Rule.  A commenter pointed out that the Service had been referring to "populations" of the Three Antelope species and that the Service's usage was inconsistent with the regulatory definition of that term.  In response, the Service stated that it was eliminating its use of the term "populations," acknowledging without deciding that captive animals may not qualify as populations.

inclusion of U.S. captive-bred members of the Three Antelope species in the endangered classification "undermines the conservation that has been achieved for the populations living in the United States." Pl's MSJ at 40. Now, SCI argues that, because captive breeding is critical to the conservation of the species, the Service was obligated to utilize whatever means necessary to perpetuate captive breeding, but failed to do so by not using the option to not list the U.S. captive members of the species. Pl's SJ Reply at 15-16.

Even if the Court were to consider SCI's new argument, it is entirely without merit because it attempts to impose an obligation on the Service that does not exist and also ignores the facts of this case. When the Service is making a listing determination under the ESA, the Service's decision is governed by the requirements of ESA Section 4. Specifically, the Service must determine whether the species meets the definition of an "endangered species" or "threatened species" because of one or more of five enumerated factors and base its decision solely on the "best scientific and commercial data available." 16 U.S.C. § 1533(a)(1), (b)(1)(A). Since these are the factors Congress directed the Service to consider, they necessarily must be consistent with the purposes of the Act. Thus, while the general purpose of the ESA is conservation, in the context of a listing determination the Service satisfies the purposes of the statute by following the applicable standards for making such determinations.

Moreover, while the Service determined it would not be appropriate to separately list the wild and captive members of the Three Antelope species and so conferred endangered status on the entire species, the Service concurrently issued a regulatory permit under ESA Section 10 to allow captive breeding of the Three Antelope species in the United States to continue as it had before listing, provided that certain standards were met. In this way, the Service utilized its

11

authority to promote the conservation of the species. Furthermore, as discussed above, the Service had a rational basis for determining that a split-listing would not have been appropriate, and so implementing a split-listing cannot constitute a method or procedure which is necessary to improve the conservation status of the Three Antelope species.

**IV.     TO THE EXTENT ANY REMEDY IS REQUIRED, REMAND WITHOUT VACATUR WOULD BE THE ONLY APPROPRIATE REMEDY.**

SCI argues that the Court should allow additional briefing on remedy if the Court grants its motion for summary judgment, but in any case that the Court should partially vacate the listing with respect to the U.S. captive-bred herds of the Three Antelope species. Pl's SJ Reply at 23. The Service has already responded that, while the Court should uphold its rational decision to list the Three Antelope species as endangered, were the Court to disagree, any remand of the Listing Rule should be without vacatur. Defs' SJ Memo at 25-27. While the Service does not believe the Listing Rule should be vacated at all, it agrees that only partial vacatur of the listing, with respect to the U.S. captive-bred herds of the Three Antelope species, should even be considered, since SCI has not challenged the decision to list the species outside of the U.S. Nevertheless, the Service disagrees that even a partial vacatur would be appropriate for all the reasons provided and also because there has been no determination that the U.S. captive-bred herds constitute a listable entity, or conversely that the remainder of the species outside of the U.S. – which would be the listed entity if the listing of the U.S. captive-bred herds were vacated – is a listable entity. The Service agrees that additional briefing could be helpful if the Court were to find in SCI's favor, particularly since the Service will be considering the question of whether the U.S. captive-bred herds constitute a listable entity in the context of its 90-day finding on SCI's petition to delist these animals.

## **CONCLUSION**

The Service's decision to list all members of the Three Antelope species – both wild and captive – as endangered under the ESA was rational, consistent with Service policy and practice, and consistent with the purposes of the statute. Accordingly, the Court should grant Federal Defendants' cross-motion for summary judgment.

June 8, 2012                             Respectfully submitted,

                                        IGNACIA S. MORENO
                                        Assistant Attorney General
                                        Environment & Natural Resources Division

                                        SETH M. BARSKY, Section Chief
                                        S. JAY GOVINDAN, Asst. Section Chief


                                        */s/ Meredith L. Flax*
                                        MEREDITH L. FLAX
                                        Sr. Trial Attorney (D.C. Bar No. 468016)
                                        U.S. Department of Justice
                                        Environment & Natural Resources Division
                                        Wildlife & Marine Resources Section
                                        Ben Franklin Station, P.O. Box 7611
                                        Washington, D.C. 20044-7611
                                        Telephone: (202) 305-0404
                                        Facsimile: (202) 305-0275
                                        Meredith.Flax@usdoj.gov

                                        *Attorneys for Federal Defendants*

Of counsel:

Holly Wheeler
Fatima Ahmad
Linus Chen
U.S. Department of the Interior
Office of the Solicitor
Washington, D.C.