IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KEN SALAZAR *et al.* | ) | No. 11-cv-01564(BAH) |
| | ) | consolidated with |
| | ) | No. 12-cv-01340(BAH) |
| Defendants, | ) | |
| | ) | |
| _____ | ) | |
| | ) | SAFARI CLUB |
| | ) | INTERNATIONAL'S |
| EXOTIC WILDLIFE ASSOCIATION *et al.* | ) | [PROPOSED] |
| | ) | SURREPLY IN |
| Plaintiffs, | ) | SUPPORT OF SUMMARY |
| | ) | JUDGMENT |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF THE INTERIOR *et al.* | ) | |
| | ) | |
| Defendants | ) | |
| _____ | | |

This case is ripe for review.   Safari Club International ("Safari Club") challenges the

final rule of the U.S. Fish and Wildlife Service ("FWS" or "Service") that listed the scimitar-

horned oryx, dama gazelle and addax ("three antelope species") as endangered and included the

U.S. captive non-native populations of these species in that listing.   Nevertheless, in its Reply in

Support of Its Motion For Summary Judgment and Notice of Supplemental Authority ("FoA

Reply Brief"), Defendant-Intervenor, Friends of Animals ("FoA") incorrectly asserts that Safari Club's claims are not prudentially ripe for this Court's review. [1]

FoA relies on a recent opinion issued by the D.C. Court of Appeals in *American Petroleum Institute v. Environmental Protection Agency* ("*API v. EPA*"), 2012 WL 2053572, No. 09-1038 (D.C. Cir. June 8, 2012), in which the D.C. Circuit stayed a ruling based on the doctrine of prudential ripeness. Ignoring important differences between this case and *API v. EPA*, FoA incorrectly asserts that the recent ruling informs the Court's consideration of the instant matter.

In *API v. EPA*, the D.C. Circuit identified the two fundamental aspects of a prudential ripeness analysis: "fitness of the issues for judicial decision" and the extent to which withholding a decision will cause "hardship to the parties." *Id.* at *4, *citing Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967). On both of these aspects, the instant case is distinguishable from the circumstances that prompted the Court of Appeals to stay its consideration of the merits in the *API v. EPA* case. Safari Club's claims are fit for judicial review and the hardship that Safari Club and its members (and other members of the public) would be required to suffer if the Court delayed its ruling would be "immediate and significant." *Id.* at *6.

In *API v. EPA*, the D.C. Circuit rejected the finality of API's claims in great part because the EPA's ongoing administrative actions gave API a new opportunity to try to persuade the agency to promulgate a rule that could resolve API's challenges and could make continuation of API's lawsuit unnecessary.

> [T]the new proposed rulemaking **gives API a chance to convince EPA to change its mind**—it provides a relevant context in which API may persuade EPA that it would be a mistake not to provide some sort of transfer-based exclusion, either for

---

[1] Although FoA relies heavily on the ruling in *API v. EPA* for its challenge to prudential standing, FoA departs from that decision in its requested remedy. While the D.C. Circuit Court decided to hold API's petition in abeyance during the EPA's administrative process (id. at *6), FoA seeks to have Safari Club's case dismissed in its entirety. FoA Reply Brief at 6.

all hazardous secondary materials or at least for spent refinery catalysts.

*Id*. (emphasis added).

API had petitioned the Court to review EPA regulations that were having a detrimental impact on API's business. Another party, Sierra Club, had also filed suit over the same regulations and reached a settlement with the agency on their claims. As a result of that settlement, the EPA published a proposed set of new regulations. The proposed regulations were published after the parties had completed briefing on the merits of API's challenge to the existing regulations. The Court reasoned that API had an opportunity to persuade EPA to finalize the regulations in a manner beneficial to API's interests, and that the impending resolution of the rulemaking could moot API's litigation claims, which would make it unnecessary for the Court of Appeals to rule on some or all of the merits of API's case. The rulemaking in *API v. EPA* offered the public the opportunity to submit comments in an effort to convince the agency to adopt, modify or reject the proposed rule. In *API v. EPA*, the proposed rulemaking literally gave API a fresh opportunity to accomplish the goal intended by its lawsuit.

The administrative process that the FWS must follow in regard to the settlement in the instant matter is markedly different than the rulemaking at issue in *API v. EPA*. Safari Club's comment opportunities regarding the Service's actions on Safari Club's delisting petition are governed by the rulemaking procedures of the Endangered Species Act ("ESA"), 16 U.S.C. § 1533. In the instant matter, Safari Club and the FWS recently entered into a settlement, approved by this Court on June 12, 2012 (Dkt. 95), that resolved Safari Club's claim that the FWS failed to take timely action on Safari Club's petition seeking the delisting of the U.S. captive non-native populations of the three antelope species. Pursuant to that settlement, the FWS agreed, in accordance with its ESA obligations, to make a 90-day finding on Safari Club's

delisting petition by August 31, 2012.  Safari Club submitted that petition on June 28, 2010,

seeking delisting based on the Service's error in including the U.S. populations in the listing of

the three species as a whole on September 2, 2005.

        Unlike the rulemaking in *API v. EPA*, the FWS's action on Safari Club's delisting

petition will not give Safari Club a "new chance to convince [FWS] to change its mind."  The

ESA delisting petition process does not afford the public a comment opportunity at the 90-day

finding stage.  Upon receiving a petition for the listing or delisting of a species, the FWS is

required, within 90 days, to make a determination on whether the petitioned action "may be

warranted," based exclusively on the petition itself and whatever already exists in the FWS's

files.  *Colorado River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 176 (D.D.C. 2006)

(Court rejected FWS's 90 day finding based on agency's solicitation and use of information

outside of the petition and its own files); 16 U.S.C. § 1533(b)(3)(A).  If Safari Club had some

new argument or data to offer the Service, it would be prohibited from providing it to the Service

for the purpose of informing the FWS's 90-day finding.

        In acting on the petition, the Service must make one of two decisions.  First, it could

decide that delisting is "not warranted."  Since the FWS has not yet received any guidance from

this Court to the contrary, it could justify its inclusion of the U.S. captive herds of the three

antelope species with no more reasoned analysis than a single phrase -- that "it would not be

appropriate to list captive and wild animals separately"-- just as it did when it originally listed

those populations as endangered.  70 Fed. Reg. 52319, 52320 (September 2, 2005).  That would

put an end to its duty to act on Safari Club's petition.   If that is the FWS's finding, Safari Club's

only recourse will be to bring a second lawsuit, to challenge the legality of that 90-day finding.

        A "not warranted" finding will not resolve the challenges brought by Safari Club nor will

it narrow the issues in this litigation.  At most, it will give the FWS an opportunity to provide

post-hoc rationalizations for the errors it committed that led to this litigation.  The

Administrative Record involved in the FWS's consideration of Safari Club's delisting petition

would not automatically become part of the Administrative Record in this litigation.

     The potential outcomes of the administrative actions in this case and in the *API v. EPA*

case are quite different.  In *API v. EPA*, the EPA's proposed rulemaking, when finalized, would

result in new rules that could take the place of the regulation that API challenged in its litigation,

potentially mooting some of API's claims.  A "not warranted" finding on Safari Club's delisting

petition would not replace the existing listing regulation, nor would it moot Safari Club's

challenges to the legality of that listing decision.  All it would accomplish would be to require

Safari Club to pursue two separate lawsuits to achieve the same goal.

     A "not warranted" finding is certainly not the FWS's only option.  Unquestionably,

Safari Club would prefer a different result.  The FWS could issue a "may be warranted" finding

on Safari Club's petition.  A "may be warranted" finding *would* trigger a new comment

opportunity in which Safari Club could participate.  Despite this potential opportunity, a "may be

warranted" finding would not even come close to resolving Safari Club's challenges.  Even if the

FWS makes a positive finding, the harm to conservation of the U.S. captive populations of the

three antelope species would persist because these populations would remain on the endangered

species list.  The status quo would continue until such time as the Service moved forward on the

delisting petition and issued a final rule to delist (which likely would not occur for another two

or more years).  So even if one alternative open to the FWS would give Safari Club a new

opportunity to participate in the decision-making process, that benefit is outweighed by the

hardship Safari Club will have to endure in waiting for that opportunity to bear fruit.  If the Court

were to delay its ruling based on the possibility that Safari Club's challenges will be remedied by potential positive action on Safari Club's delisting petition, this Court would likely require Safari Club to wait for redress of its harms for a period of at least two years if not longer.

Under the terms of the settlement, the FWS has agreed that, if it makes a positive – "may be warranted" – 90 day finding on Safari Club's petition, it will then complete its 12-month status review on the delisting of the three antelope species by May 30, 2013.  During that nine-month period, the U.S. populations of the three antelope species will remain on the endangered species list.  Harm to the conservation of the three species and to those who own, hunt and seek to conserve them, will continue.  But even after that nine months ends, Safari Club still will not see a resolution to its challenges.

On May 30, 2013, the Service will have three additional choices.  It can decide that delisting is not warranted and the U.S. populations will remain on the endangered species list, to the continued detriment of Safari Club and its members. Alternatively, the Service could decide that delisting is warranted and issue a proposed rule to delist the U.S. captive herds.  In that case, the Service would have an additional 12-18 months to issue a final rule.  *Id*. § 1533(b)(6)(A). The outcome of that final rule determination is far from certain.  The FWS could still decide, after 12 or 18 months of consideration, not to finalize its proposed rule.  As a third alternative, the Service could make a "warranted but precluded" finding, making the determination that proposing a rule to delist is warranted but precluded by higher priority listing actions for other species.  *Id.* § 1533(b)(3)(B)(iii).  If that occurs, the U.S. captive herds could remain on the endangered species list indefinitely until the Service decides that the three antelope delisting takes priority over other actions.  Once again, Safari Club and its members will be forced to continue to endure the endangered classification of the U.S. captive herds and the resultant

deterioration of private conservation efforts carried out for these species in the U.S.

FoA attempts to suggest that the hardship suffered by Safari Club and its members boils down to the requirement that owners and/or hunters must now apply for permits to continue to sell hunts and/or hunt for members of the three antelope species in the U.S. FoA Reply Brief at 5. The permit requirements are at the root, but they do not represent a fraction of the harm caused by the U.S. populations' endangered status. As long as the three species' populations are endangered, the federally regulated and restricted status serves as an obstacle and a deterrent to private conservation efforts. It reduces the number of private ranchers willing to raise, breed and sell hunts for these herds. It lessens the value of the animals, further discouraging ownership and trade and lowers the number of herds available for genetic interchange – jeopardizing the future health of the populations. The longer the U.S. populations remain endangered, the more profound the harm to conservation of these animals will be.

In *API v. EPA*, the Court's delay in ruling on API's claims was short and finite. The EPA had committed itself to issuing a final rule by December 31, 2012, approximately six months after the Court's decision to stay the case. By that date, API would either achieve its intended result administratively or know that its recourse rested with the Court. Such would not be the case for Safari Club. Administrative relief based upon Safari Club's ability to further participate in the rulemaking process, if it comes to pass, would not result in a final rule for at least two years and possibly much longer. To force Safari Club to wait an additional two-plus years to seek a remedy from the Courts on a matter that the FWS has already delayed almost two years past statutory deadlines would be an unfair hardship to impose, and one that far exceeds the delay that was considered appropriate by the D.C. Circuit in *API v. EPA*. This is not a case where a potential conservation of judicial resources outweighs Safari Club's right to a resolution

of its claims.

WHEREFORE, Safari Club respectfully requests that this Court reject FoA's prudential ripeness challenge and move forward with its ruling on the merits of Safari Club's motion for summary judgment.

Dated this 15th day of June.

Respectfully submitted,

/s/Anna M. Seidman
Anna M. Seidman
D.C. Bar No. 417091
Safari Club International
501 2nd Street NE
Washington, D.C.  20002
Tel:  202-543-8733
Fax:  202-543-1205
aseidman@safariclub.org