IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KEN SALAZAR *et al*. | ) | No. 11-cv-01564(BAH) |
| | ) | No. 12-cv-0340 (BAH) |
| Defendants, | ) | consolidated |
| | ) | |
| _____ | ) | |

**SAFARI CLUB INTERNATIONAL'S BRIEF TO EXPLAIN
THE BASES FOR ITS PRUDENTIAL STANDING**

In response to this Court's Order of March 22, 2013, Safari Club International ("SCI") submits this brief to further explain the bases for its prudential standing to bring this action. This Court has asked SCI to brief prudential standing in light of the decision of the D.C. Court of Appeals in *Grocery Manufacturers Association v. Environmental Protection Agency*, 693 F.3d 169, 179 (D.C. Cir. 2012). In that case, the majority acknowledged prudential standing as a jurisdictional requirement and explained that, to establish prudential standing, a party "'must show that the interest it seeks to protect is arguably within the zone of interests to be protected or regulated by the statute ... in question' or by any provision 'integral[ly] relat[ed]' to it." *Id., quoting Nat'l Petrochem. Refiners Ass'n v. EPA,* 287 F.3d 1130, 1147 (D.C. Cir. 2002) (per curiam).

The main statute at issue in SCI's challenges to the listing of the U.S. populations of the scimitar-horned oryx, dama gazelle and addax ("three antelope") is Section 4 of the Endangered Species Act ("ESA"). That provision concerns the listing of species as threatened or endangered by U.S. Fish and Wildlife Service ("FWS" or "Service") so that deserving species and their

1

habitats can be conserved and recovered. 16 U.S.C. §1533. Section 9 of the ESA, which is integrally related to Section 4, details the various prohibitions (*e.g.,* taking – harm or kill – of the species allowed) that are imposed for species that are listed as endangered (such as the three species at issue here). *Id.* §1538. Importantly, Section 4 concerns not only which species are listed under the ESA, and thus receive the protections of Section 9 and other conservation benefits, but also which species should **not** be listed as endangered. In deciding whether or not to list a species, the Service must analyze a number of factors and can only list if those factors indicate that the species meets the definition of an endangered species. *Id.* §§1532(6), 1533(a)(1), (b)(1)(A). Thus, the zone of interests of the relevant ESA provisions protect both those who wish to see a species listed as threatened or endangered *as well as* those who believe that (1) the species should not be listed, (2) the statutory listing factors have not been met, (3) the prohibitions of Section 9 should not apply, and (4) the species should be managed and conserved through other means, such as sustainable use conservation. SCI squarely falls into the latter category and thus has prudential standing, as several courts have found in comparable situations.

Although prudential standing is jurisdictional, it is not an onerous obstacle to those who wish to sue to redress their injuries. The U.S. Supreme Court has explained that the "zone of interests" test was "not meant to be especially demanding." *Clarke v. Securities Indus. Assoc.,* 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (trade association representing brokers, dealers and underwriters had standing to challenge Comptroller of Currency's decision to approve bank applications for establishment of discount securities brokerage offices). In *Match-E-Be-Nash-She-Wish-Band of Pottawatomi Indians, v. Patchak*, the Supreme Court further explained that a plaintiff who is not itself the subject of the agency action is outside the zone of interests only if the plaintiff's interests are "so marginally related to or inconsistent with the

purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." 132 S.Ct. 2199, 2210 (2012) (neighboring landowners' interest in land proposed for Indian casino had prudential standing to challenge Secretary of the Interior's decision to place the land in trust on behalf of the tribe). The Court noted that prudential standing does not require evidence that Congress expressly intended the statute to benefit the party who asserts standing. *Id*.

SCI's interests in this matter are not marginally related to purposes of ESA and its listing requirements, but are instead consistent with them. The illegal listing of the U.S. populations of the scimitar-horned oryx, dama gazelle and addax both imposes unnecessary Section 9 restrictions and undermines conservation incentives that have proven to be successful in efforts to recover healthy populations of the three antelope. Thus, the challenged listing directly harms the conservation interests of SCI and its members. Because SCI members are the individuals whose conduct is most directly regulated by the listing of the three antelope species and the imposition of take restrictions, SCI is within the zone of interests protected by the ESA listing provision, 16 U.S.C. §1533, and other sections of the ESA.

SCI filed this suit to challenge the Service's violation of 16 U.S.C. §§1531 and 1533 of the ESA and 5 U.S.C. §706(2) of the Administrative Procedures Act.[1] The four counts of SCI's Complaint[2] include the following: 1) "Federal Defendants Failed to Utilize Its Authority to

---

[1] Although the ESA includes a citizen suit provision that invites "any person" to "commence a civil suit" (16 U.S.C. §1540(g)) thereby negating the zone of interests prerequisite, the U.S. Supreme Court in *Bennett v. Spear,* determined that the citizen suit provision does not apply to cases involving the Secretary of the Interior/FWS's "maladministration" of the ESA. 520 U.S. 154, 174 (1997). Thus, this brief addresses SCI's prudential standing for its APA claims.

[2] SCI's Complaint included a fifth count challenging Federal Defendants failure to act on SCI's petition to delist the three antelope species. The parties have reached a settlement agreement on that count and it will not be further referenced in this brief.

Distinguish and Specify the Portion of the Three Species' Ranges in the United States and to Exclude that Portion from the Endangered Species Listing" (SCI Complaint at 22, Dkt. 1); 2) "Federal Defendants Erroneously and Illegally Included the U.S. Captive Populations of the Three Species in the Endangered Listing Classification" (*Id*. at 23); 3) "Federal Defendants Erroneously Classified the U.S. Portions of the Species' Ranges as Endangered" (*Id*. at 25); and 4) "Inclusion of the U.S. Captive Populations Violates the Conservation Purposes of the ESA" (*Id.* at 26). In its Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("SCI SJ Mem.") (Dkt.45), supported by the standing declarations presented by SCI members, SCI demonstrated its Article III and prudential standing. In that memorandum, SCI explained that "for the purpose of applying the zone of interest test for claims under the APA, the court must look to the purposes of the substantive provisions of the statute under which the plaintiff is suing." SCI SJ Mem. at 25 (*citing Bennett v. Spear*, 520 U.S. 154, 175 (1997)). Where the plaintiff seeks review under the APA of the FWS's implementation of the ESA, the court must look "to the substantive provisions of the ESA, the alleged violations of which serve as the gravamen of the complaint." *Bennett*, 520 U.S. at 175.

SCI's Summary Judgment memorandum summarized the statements included in its members' declarations, explaining to the Court how the Service's listing of the U.S. populations of the three antelope directly undermined SCI's and its members' interests in and efforts to conserve the species (1) by reducing incentives for private ranchers to raise and breed these animals which caused fewer animals and fewer herds; and (2) by making it more difficult if not infeasible for these SCI members to continue to raise, breed and sell hunts for the three antelope as a direct consequence of the restrictions, requirements and limitations the endangered status imposes on those who privately own and wish to engage in the sustainable hunting of these

4

animals. SCI members are the individuals who are subject to the Section 9 "take" restrictions imposed by the endangered status and must obtain permits to engage in management and conservation activities for the three species. SCI SJ Mem. at 25-31; *see also* 16 U.S.C. §§ 1538, 1539 (permit provision). As explained further below, they are the individuals directly regulated and harmed by the listing rule that SCI challenges in this action and who should not be subject to the prohibitions of the ESA if, as they claim, the Service erroneously listed the three antelope.

As detailed in SCI's summary judgment memorandum, SCI's interests are consistent with not imposing ESA prohibitions for species (or populations of a species) that do not warrant listing, and instead allowing other methods to conserve a species. SCI members were among the private ranchers, owners, guides and hunters who achieved unparalleled conservation success during the period before the Service listed the three antelope species as endangered in 2005.[3] Through the unfettered ability to raise, breed and trade these animals, and the opportunity to sell hunts for members of their herds, SCI members actively participated in conservation efforts that brought U.S. population numbers from the single digits to the thousands. As a result of these activities, not only did the U.S. population numbers grow, but so did the number of ranchers participating in the raising and breeding of these animals. More animals and more individual herds supported a greater gene pool of the three species for sustaining genetic diversity and

---

[3] The unrestricted ability to engage in sustainable use conservation, including the sale of hunts for members of their herds of these three species, continued for several years, even after the Service promulgated the rule to list the scimitar-horned oryx, dama gazelle and addax (70 Fed. Reg. 52319 (September 2, 2005)) because, on the same date that it listed the species, the Service also issued a rule exempting U.S. captive populations from most ESA take prohibitions (70 Fed. Reg. 52310 (September 2, 2005). After the latter rule was successfully challenged in litigation, the Service announced its intention to withdraw the rule and subsequently did so (77 Fed. Reg. 431 (January 5, 2012), restoring the Section 9 prohibitions and restrictions against the take of members of U.S. populations, and causing SCI and SCI's members' harm. But for the erroneous inclusion of the U.S. populations in the Service's 2005 listing of the three species, no restrictions or prohibitions would have been required and SCI's harm would not have occurred.

health.  With the listing of the species and imposition of take limitations and restrictions, the incentives for private ranchers to participate in the conservation of the species diminished.  The prices of the animals dropped and fewer ranchers chose to continue to raise and breed herds.  The number of animals and herds declined as many ranchers withdrew from the business of owning, raising and selling hunts for these species.  For some, the listing made it economically infeasible to continue to participate in the conservation of the species.  For others, the listing imposed increasing difficulties for continuing to maintain healthy, genetically diverse herds.  For all, the listing meant fewer animals, fewer herds and a direct loss to those who had worked hard toward the conservation of the species.  For example, SCI member Diane Delagrange explained:

> 9. With fewer ranches able to sell hunts and obtain breeding stock, the price of hunts for these animals has and will continue to rise.  As this happens, fewer hunters will be able to afford to hunt these animals.  Hunting is what provided the incentive for the conservation of these animals in the U.S.  All that the federal listing of these species has managed to do is remove the incentives for conservation and undermine the recovery of the species.
>
> 10. We have been raising scimitar-horned Oyrx and Addax for close to 30 years and have sold specimens to other ranches and have contributed to the effort to conserve these animals so that they can someday be returned to the wild in their home countries.  Our herds alone are larger than those that live in their native countries in Africa.  Our experience raising these animals has shown us that they were perfectly adapted to Texas land, vegetation and weather.  As a result of our efforts and those of our fellow ranchers, the numbers of these animals were increasing and we were putting them far from extinction.  Federal listing and federal regulation has taken away what we achieved.  The restrictions and requirements of endangered status are doing the opposite and we are watching conservation in reverse.

Diane Delagrange Decl. Exhibit II to SCI SJ Mem.  SCI member, Timothy Mark Terry, similarly found it necessary to sell off his herds of scimitar-horned oryx and addax when he could no longer afford to maintain them due to their status as endangered.  He explained:

> 22. Those who think that listing the U.S. populations of scimitar-horned oryx, dama gazelle or addax or requiring permits to hunt those species in the U.S. will benefit those animals, fail to understand the fundamentals of the conservation of

6

> those species and other U.S. captive exotic populations like them. It is only because there were no restrictions and no permit requirements for these herds that these animals thrived in the U.S. The lack of listing and lack of permit restrictions allowed ranchers to freely raise their herds, and to trade and sell hunts for members of those herds. That gave those animals value and encouraged more and more ranchers to invest in them. Now that permits are being required, the freedom and the incentives to keep these animals is gone. The value has dropped as fewer ranchers want to assume the risk of owning the animals or to depend on the government to permit the activities necessary to make these animals financially worth maintaining. As a result, these animals are rapidly disappearing from private ranches in the U.S. Ranchers and hunters who are true conservationists – myself included – hate to see this happen and are saddened to see our industry and all of the success we have achieved for these animals disappear.

Timothy Mark Terry Decl. Exhibit CC to SCI SJ Mem. SCI Member Rew Goodenow, who serves as Chairman of SCI's Legal Task Force, described the harm to SCI's organizational interests:

> 14. Safari Club has and will continue to be harmed by the loss of hunting opportunities, the economic infeasibility of breeding and private conservation of these three species and by the loss of opportunities for SCI members to participate in sustainable use conservation for the scimitar-horned oryx, dama gazelle and addax.

Rew Goodenow Decl. Exhibit AA to SCI SJ Mem.

SCI challenged the Service's decision, made under authority of 16 U.S.C. §§1531 and 1533, to list the three antelope species as endangered. The counts of SCI's complaint included challenges to the FWS's compliance with its obligation to recognize and list only those populations that qualify for endangered status and to avoid actions that undermine the conservation policies of the ESA and discourage conservation efforts and incentives. The zone of interests for these provisions of the ESA encompass all those who are injured by the FWS's failure to comply with the statute's listing specification, and includes both those who are harmed by the agency's illegal failure to list as well as those who are injured by the erroneous listing of a species. *Maine v. Norton*, 257 F. Supp. 2d 357, 375 (D. Me. 2003) (State of Maine had

prudential standing to challenge the listing of a species within its boundaries, about which it shared with the federal government an interest in conserving); *Building Industry Association of Superior California v. Babbitt*, 979 F.Supp. 893, 900 (D.D.C. 1997) (landowners whose ability to modify species' habitat was jeopardized by species' listing had prudential standing to challenge listing).

The general purposes and policies of the ESA are the conservation of wildlife and the encouragement of efforts to do so. 16 U.S.C. §1531(b) and (c). The listing (and delisting) provisions of the ESA require that the Service list only those populations of species that qualify for endangered or threatened status and the removal of (or decision not to provide) such protections for those populations that do not qualify. 16 U.S.C. §1533(a), (b), and (c). As an organization with a sustainable use conservation mission that is inhibited by an erroneous application of federal endangered status protection that imposes unnecessary and harmful limits on the hunting of wildlife, SCI falls within the zone of interests protected by these statutory provisions. As an organization with a membership that includes those whose sustainable use-based conservation pursuits are jeopardized by the erroneous imposition of the restrictions that accompany endangered listing, SCI's interests in seeing the ESA's listing provisions applied properly and only to qualified populations places SCI squarely within the requisite zone of interests protected by these statutes

Even if SCI's interests were not based on its efforts to conserve the three antelope, and instead exclusively on its members' economic concerns about the viability of their ranching businesses, SCI would still have prudential standing to bring this action. The members of SCI who breed, trade and sell hunts for the three species, as well as those who hunt and guide for the hunts of these animals are the ones directly regulated by the listing of the three antelope. "For a

party to demonstrate standing there must be "some indicia—however slight—that the litigant before the court was intended to be protected, benefited or regulated by the statute under which suit is brought*." International Fabricare Institute v. U.S. EPA*, 972 F.2d 384, 390 (D.C. Cir. 1992) (association whose members operated public water systems had standing to challenge EPA regulations concerning maximum contaminant levels because members' operations would be directly regulated by new water standards established pursuant to the rules challenged in the litigation), *quoting Copper & Brass Fabricators Council, Inc. v. Department of the Treasury,* 679 F.2d 951, 952 (D.C. Cir.1982).

In *Building Industry Association of Superior California v. Babbitt* (*Building Industry*), the D.C. District Court found prudential standing for plaintiffs facing a situation remarkably similar to SCI and its members, based on their status as a party "regulated" by the listing of species. 979 F.Supp. 893, 901 (D.D.C. 1997). In that case, landowners whose plans to modify the habitat of fairy shrimp were harmed by the FWS's decision to federally list the shrimp sued to challenge the listing. The District Court found that because the listing caused the landowners' activities to become violations of the "take" provisions of the ESA, the landowners fell within the zone of interests of the listing provisions:

> As soon as the fairy shrimp were listed, it became a violation of the ESA to significantly modify fairy shrimp habitat. Section 9 of the ESA makes it unlawful for any person to "take any such [listed endangered] species within the United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B). Under the ESA the term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" as used in the ESA's definition of "take" includes significant habitat modification or degradation where it actually kills or injures wildlife. *Babbitt v. Sweet Home Chapter of Communities for Great Oregon,* 515 U.S. 687, 707–09, 115 S.Ct. 2407, 2418, 132 L.Ed.2d 597 (1995). Since plaintiffs are landowners who already have modified, or are in the process of modifying or are about to modify the fairy shrimp's habitat, they are directly regulated by the listing of the fairy shrimp and they therefore have prudential standing under the ESA.

9

*Id.* Just as the Building Industry Association's members' activities became the subject of regulation once the fairy shrimp were federally listed, so did the activities of SCI members who own one or more of the three antelope species and wish to sell hunts for them as well as the conduct of those who seek to hunt them. Such activities fall within the "take" provisions prohibited and/or limited by 16 U.S.C. § 1538(a)(1)(B). As they are directly regulated by the listing of the three antelope species, that status places them, and SCI, within the zone of interests of the provision and with the requisite prudential standing to sue.[4]

Unlike the litigants in *Grocery Manufacturers Association v. Environmental Protection Agency* (*Grocery Manufacturers*), SCI and its members are challenging a regulation promulgated under the authority of the exact same statutory provisions that protect SCI's conservation interests. Unlike the plaintiffs in *Grocery Manufacturers*, SCI members' conduct is being regulated by the very rule that they challenge in this litigation. In contrast, the Food Producer group in *Grocery Manufacturers* sought protection for its interests under a statute that required the EPA to assess the impact of the use of renewable fuels on the price and supply of agricultural commodities, yet the Food Producer group's litigation challenge was based upon the Clean Air Act -- an entirely different statute. The court found that although the two laws both dealt with renewable fuel sources, the two statutes were not integrally related. 693 F.3d at 179. Consequently, the court rejected the Food Producer group's argument that they were within the requisite zone of interests to establish prudential standing. SCI does not suffer from that

---

[4] SCI's standing is not undermined by the fact that, to some extent, the harms suffered by some SCI members are related to the financial burdens resulting from the listed status of the U.S. populations of the three antelope species. The landowners in *Building Industry* faced a similar situation. In that case, the court specifically ruled that the economic basis of the landowners' interests did not deprive them of prudential standing to challenge the erroneous listing of the fairy shrimp. 979 F.Supp. at 901.

prudential insufficiency.  The listing provision (16 U.S.C. §1533) and the provision prohibiting and restricting the take of listed species (16 U.S.C. §1538(a)(1)(B)) are integrally related.  Moreover, as a party whose interests and whose members' interests are jeopardized by the erroneous listing of the three antelope species conducted under authority of the ESA, SCI falls within the zone of interests Congress intended to be protected by the listing requirements and conservation purposes of the ESA.  As a party whose members' activities are directly regulated by the rule challenged in this litigation, SCI also satisfies prudential standing requirements. [5]

WHEREFORE, SCI respectfully requests that this Court acknowledge its prudential standing to pursue this litigation and that the Court grant SCI's motion for summary judgment and deny the motions for summary judgment submitted by Federal Defendants and Defendant-Intervenors in this matter.

Dated this 5th day of April, 2013.

Respectfully submitted,

/s/ Anna M. Seidman
Anna M. Seidman
Safari Club International
501 2nd Street NE
Washington, D.C.   20002
Tel:  202-543-8733
aseidman@safariclub.org
Counsel for Plaintiff, Safari Club International

---

[5] Finally, as explained in SCI's Summary Judgment Memorandum, SCI has also established its own associational standing to sue in that it has demonstrated that:
(a) its members would otherwise have standing to sue in their own right;
(b) the interests it seeks to protect are germane to the organization's purpose; and
(c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).  SCI SJ Mem. at 25, n.6.