APPEAL,CLOSED,CONSOL,STAYED,TYPE−C

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:11−cv−01564−BAH

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL v. SALAZAR et al | Date Filed: 08/31/2011 |
| Assigned to: Judge Beryl A. Howell | Date Terminated: 08/12/2013 |
| Case:  1:12−cv−00340−BAH | Jury Demand: None |
| Cause: 16:1538 Endangered Species Act | Nature of Suit: 893 Environmental Matters |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**SAFARI CLUB INTERNATIONAL**    represented by    **Douglas Scott Burdin**
SAFARI CLUB INTERNATIONAL
501 Second Street, NE
Washington, DC 20002
(202) 543−8733
Fax: 202−543−1205
Email: dburdin@safariclub.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anna Margo Seidman**
SAFARI CLUB INTERNATIONAL
501 Second Street, NE
Washington, DC 20002
(202) 543−8733
Fax: (202) 543−1205
Email: aseidman@safariclub.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TERRY OWEN**    represented by    **Paul Matthews Terrill , III**
*12cv194*
The Terrill Firm PC
810 West 10th St
Austin, TX 78701
(512) 474−9100
Fax: (512) 474−9888
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancie G. Marzulla**
MARZULLA &MARZULLA
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036−1737
(202) 822−6760
Fax: (202) 822−6774
Email: nancie@marzulla.com
*ATTORNEY TO BE NOTICED*

1

Roger Joseph Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822−6760
Fax: (202) 822−6774
Email: roger@marzulla.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROY LEIFESTER**                    represented by    **Paul Matthews Terrill , III**
*12cv194 &12CV340*                                     (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Nancie G. Marzulla**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Roger Joseph Marzulla**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**KARLTON BEAL**                     represented by    **Paul Matthews Terrill , III**
*12cv194*                                              (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Nancie G. Marzulla**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Roger Joseph Marzulla**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**STANLEY MAYFIELD**                 represented by    **Paul Matthews Terrill , III**
*12cv194*                                              (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Nancie G. Marzulla**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Roger Joseph Marzulla**
                                                       (See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RONALD GARISON**
*12cv194*

represented by **Paul Matthews Terrill , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancie G. Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger Joseph Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KEITH WALLACE**
*12cv194*

represented by **Paul Matthews Terrill , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancie G. Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger Joseph Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ED VALICEK**
*12cv194 &12CV340*

represented by **Paul Matthews Terrill , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancie G. Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger Joseph Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EDDY BLASSINGAME**
*12cv194 &12cv340*

represented by **Paul Matthews Terrill , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancie G. Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger Joseph Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**RANDAL JACOBY**                    represented by    **Paul Matthews Terrill , III**
*12cv194*                                             (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Nancie G. Marzulla**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Roger Joseph Marzulla**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**GALEN AKIN**                       represented by    **Paul Matthews Terrill , III**
*12cv194*                                             (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Nancie G. Marzulla**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Roger Joseph Marzulla**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**RANDY BRUNO**                      represented by    **Paul Matthews Terrill , III**
*12cv194*                                             (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Nancie G. Marzulla**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Roger Joseph Marzulla**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**NANCY GREEN**
*12cv194 &12cv340*

represented by **Paul Matthews Terrill , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancie G. Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger Joseph Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**JOE GREEN**
*12cv194 &12cv340*

represented by **Paul Matthews Terrill , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancie G. Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger Joseph Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**EXOTIC WILDLIFE ASSOCIATION**
*12cv194 &12cv340*

represented by **Paul Matthews Terrill , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancie G. Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger Joseph Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**DOROTHY LEA**
*12cv194*

represented by **Paul Matthews Terrill , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancie G. Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

Roger Joseph Marzulla
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LYNN FOLLIS**                    represented by   **Paul Matthews Terrill , III**
*12cv194*                                          (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Nancie G. Marzulla**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Roger Joseph Marzulla**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHASE AKIN**                    represented by   **Paul Matthews Terrill , III**
*12cv194*                                          (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Nancie G. Marzulla**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Roger Joseph Marzulla**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**TERRY CAFFEY**                  represented by   **Paul Matthews Terrill , III**
*12cv194 &12cv340*                                 (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Nancie G. Marzulla**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Roger Joseph Marzulla**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ALVIN NEW**                     represented by   **Paul Matthews Terrill , III**
*12cv194*                                          (See above for address)
                                                   *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Nancie G. Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger Joseph Marzulla**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

| | | |
|---|---|---|
| **CHARLY SEALE**<br>*12cv340* | represented by | **Nancie G. Marzulla**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

<u>Plaintiff</u>

| | | |
|---|---|---|
| **RAY DOCKERY**<br>*12CV340* | represented by | **Nancie G. Marzulla**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

<u>Plaintiff</u>

| | | |
|---|---|---|
| **THOMAS OATES**<br>*12CV340* | represented by | **Nancie G. Marzulla**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

V.

<u>Defendant</u>

| | | |
|---|---|---|
| **KENNETH LEE SALAZAR**<br>*in his official capacity as Secretary of the*<br>*U.S. Department of the Interior* | represented by | **Meredith L. Flax**<br>U.S. DEPARTMENT OF JUSTICE<br>Environment &Natural Resources Division<br>Ben Franklin Station<br>P.O. Box 7611<br>Washington, DC 20044−7369<br>(202) 305−0404<br>Fax: (202) 305−0275<br>Email: meredith.flax@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**James A. Maysonett**<br>U.S. DEPARTMENT OF JUSTICE<br>ENVIRONMENT &<br>NATURAL RESOURCES DIVISION<br>P.O.Box 7369<br>Ben Franklin Station<br>Washington, DC 20044−7369<br>(202) 305−0216<br>Fax: (202) 305−0275<br>Email: james.a.maysonett@usdoj.gov |

*ATTORNEY TO BE NOTICED*

**Defendant**

**DANIEL ASHE**                        represented by   **Meredith L. Flax**
*in his official capacity as Director of the*          (See above for address)
*U.S. Fish and Wildlife Service*                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES FISH AND**             represented by   **Meredith L. Flax**
**WILDLIFE SERVICE**                                   (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **James A. Maysonett**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF**        represented by   **Meredith L. Flax**
**THE INTERIOR**                                       (See above for address)
*12cv194 &12CV340*                                     *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **James A. Maysonett**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**FRIENDS OF ANIMALS**                 represented by   **Michael R. Harris**
                                                       ENVIRONMENTAL LAW CLINIC
                                                       University of Denver−Law
                                                       2255 East Evans Avenue
                                                       Denver, CO 80208
                                                       (303) 871−7870
                                                       Email: mharris@law.du.edu
                                                       *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**DEFENDERS OF WILDLIFE**              represented by   **William Stewart Eubanks , II**
                                                       MEYER GLITZENSTEIN &CRYSTAL
                                                       1601 Connecticut Avenue, NW
                                                       Suite 700
                                                       Washington, DC 20009
                                                       (202) 588−5206
                                                       Fax: (202) 588−5049
                                                       Email: beubanks@meyerglitz.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine A. Meyer**
MEYER GLITZENSTEIN &CRYSTAL
1601 Connecticut Avenue, NW
Suite 700
Washington, DC 20009
(202) 364−4092
Fax: (202) 588−5049
Email: katherinemeyer@meyerglitz.com
*ATTORNEY TO BE NOTICED*

**Movant**

| | | |
|---|---|---|
| **HUMANE SOCIETY OF THE UNITED STATES** | represented by | **William Stewart Eubanks , II** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **Katherine A. Meyer** (See above for address) *ATTORNEY TO BE NOTICED* |

**Movant**

| | | |
|---|---|---|
| **BORN FREE USA** | represented by | **William Stewart Eubanks , II** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **Katherine A. Meyer** (See above for address) *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **TEXAS DEPARTMENT OF AGRICULTURE** | represented by | **John Reed Clay , Jr.** OFFICE OF THE ATTORNEY GENERAL 209 West 14th Street 8th Floor Austin, TX 78701 (512) 936−2541 Email: reed.clay@oag.state.tx.us *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 08/31/2011 | 1 | | COMPLAINT against DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE ( Filing fee $ 350, receipt number 4616041829) filed by SAFARI CLUB INTERNATIONAL. (Attachments: # 1 Civil Cover |

| | | |
|---|---|---|
| | | Sheet)(rdj) (Entered: 09/01/2011) |
| 08/31/2011 | | SUMMONS (5) Issued as to DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, U.S. Attorney and U.S. Attorney General (rdj) (Entered: 09/01/2011) |
| 08/31/2011 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by SAFARI CLUB INTERNATIONAL identifying Corporate Parent NONE for SAFARI CLUB INTERNATIONAL. (rdj) (Entered: 09/01/2011) |
| 09/02/2011 | 3 | STANDING ORDER Signed by Judge Beryl A. Howell on 9/2/2011. (lcbah2) (Entered: 09/02/2011) |
| 09/21/2011 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 09/06/2011. (Seidman, Anna) (Entered: 09/21/2011) |
| 09/21/2011 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. KEN SALAZAR served on 9/7/2011 (Seidman, Anna) (Entered: 09/21/2011) |
| 09/21/2011 | 6 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DANIEL ASHE served on 9/8/2011 (Seidman, Anna) (Entered: 09/21/2011) |
| 09/21/2011 | 7 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 9/6/2011. Answer due for ALL FEDERAL DEFENDANTS by 11/5/2011. (Seidman, Anna) (Entered: 09/21/2011) |
| 09/21/2011 | 8 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. FISH AND WILDLIFE SERVICE served on 9/6/2011 (Seidman, Anna) (Entered: 09/21/2011) |
| 11/07/2011 | 9 | ANSWER to 1 Complaint by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE.(Flax, Meredith) (Entered: 11/07/2011) |
| 11/22/2011 | 10 | NOTICE of Appearance by Michael R. Harris on behalf of FRIENDS OF ANIMALS (Attachments: # 1 Certificate of Service)(Harris, Michael) Modified on 11/23/2011 to show the party represented by counsel(rdj). (Entered: 11/22/2011) |
| 11/22/2011 | 11 | MOTION to Intervene *as Defendant* by FRIENDS OF ANIMALS (Attachments: # 1 Declaration Declaration of Priscilla Feral, # 2 Exhibit Intervenor−Defendant's Proposed Answer, # 3 Text of Proposed Order, # 4 Certificate of Service)(Harris, Michael) Modified on 11/23/2011 (rdj). (Counsel is instructed to follow the procedure outlined on the civil filing pointers on the Court's website as it relates to the filing of Motions to Intervene) (Entered: 11/22/2011) |
| 12/02/2011 | 12 | NOTICE of Appearance by William Stewart Eubanks, II on behalf of DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES, BORN FREE USA (Attachments: # 1 Certificate of Service)(Eubanks, II, William) (Entered: 12/02/2011) |

| 12/02/2011 | 13 | | MOTION to Intervene by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES (Attachments: #_1 Memorandum in Support, #_2 Exhibit 1, #_3 Exhibit 2, #_4 Exhibit 3, #_5 Exhibit 4, #_6 Proposed Answer, #_7 Text of Proposed Order, #_8 Certificate of Service)(Eubanks, II, William) (Entered: 12/02/2011) |
| 12/09/2011 | 14 | | Memorandum in opposition to re _11 MOTION to Intervene *as Defendant* filed by SAFARI CLUB INTERNATIONAL. (Attachments: #_1 Exhibit Friends of Animals Memorandum in 04−1660, #_2 Exhibit Discovery Documents in 04−1660, #_3 Text of Proposed Order, #_4 Certificate of Service)(Seidman, Anna) (Entered: 12/09/2011) |
| 12/15/2011 | 15 | | MEET AND CONFER STATEMENT. (Attachments: #_1 Text of Proposed Order)(Seidman, Anna) (Entered: 12/15/2011) |
| 12/16/2011 | 16 | | Unopposed MOTION for Extension of Time to File Response/Reply as to _11 MOTION to Intervene *as Defendant* by FRIENDS OF ANIMALS (Harris, Michael) (Entered: 12/16/2011) |
| 12/16/2011 | | | MINUTE ORDER (paperless) granting _16 Unopposed Motion for Extension of Time to File Response/Reply. Proposed intervenor Friends of Animals shall file its reply by January 2, 2012. Signed by Judge Beryl A. Howell on 12/16/2011. (lcbah2) (Entered: 12/16/2011) |
| 12/16/2011 | 17 | | MINUTE ORDER (paperless) Upon consideration of the parties' Joint Meet and Confer Statement, the Court adopts the following SCHEDULING ORDER: Federal defendants shall lodge the administrative record by January 18, 2012. Any motion to supplement the administrative record shall be filed by February 17, 2012. The plaintiff shall file its motion for summary judgment by March 23, 2012. Federal defendants' cross−motion for summary judgment and opposition to plaintiff's motion shall be filed by April 27, 2012. The plaintiff's opposition to federal defendants' cross−motion and reply in further support of its motion shall be filed by May 18, 2012. Federal defendants' reply in further support of their cross−motion shall be filed by June 8, 2012. Signed by Judge Beryl A. Howell on 12/16/2011. (lcbah2) (Entered: 12/16/2011) |
| 12/16/2011 | | | Set/Reset Deadlines: Proposed Intervenor Friends of Animals Reply due by 1/2/2012. (alp) (Entered: 12/19/2011) |
| 12/16/2011 | | | Set/Reset Deadlines: Administrative Record due by 1/18/2012. Cross Motions due by 4/27/2012. Response to Cross Motions due by 5/18/2012. Reply to Cross Motions due by 6/8/2012. Motions for Summary Judgment due by 3/23/2012. Response to Motions for Summary Judgment due by 4/27/2012. Reply Motions for Summary Judgment due by 5/18/2012. Any Motions to Supplement the Administrative Record due by 2/17/2012. (alp) (Entered: 12/19/2011) |
| 12/19/2011 | 18 | | Memorandum in opposition to re _13 MOTION to Intervene filed by SAFARI CLUB INTERNATIONAL. (Attachments: #_1 Supplement, #_2 Exhibit Defenders of Wildlife Website Excerpt, #_3 Exhibit Bats Conservation International Website Excerpt)(Seidman, Anna) (Entered: 12/19/2011) |
| 12/21/2011 | 19 | | Unopposed MOTION for Extension of Time to File Response/Reply as to _13 MOTION to Intervene by BORN FREE USA, DEFENDERS OF |

| | | |
|---|---|---|
| | | WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(Eubanks, II, William) (Entered: 12/21/2011) |
| 12/22/2011 | | MINUTE ORDER (paperless) granting 19 Unopposed Motion for Extension of Time to File Response/Reply. Defenders' reply shall be filed by January 12, 2012. Signed by Judge Beryl A. Howell on 12/22/2011. (lcbah2) (Entered: 12/22/2011) |
| 12/22/2011 | | Set/Reset Deadlines: Reply due by 1/12/2012. (alp) (Entered: 12/22/2011) |
| 01/02/2012 | 20 | REPLY to opposition to motion re 11 MOTION to Intervene *as Defendant* filed by FRIENDS OF ANIMALS. (Harris, Michael) (Entered: 01/02/2012) |
| 01/12/2012 | 21 | REPLY to opposition to motion re 13 MOTION to Intervene filed by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES. (Attachments: # 1 Exhibit 5, # 2 Exhibit 6, # 3 Certificate of Service)(Eubanks, II, William) (Entered: 01/12/2012) |
| 01/18/2012 | 22 | ADMINISTRATIVE RECORD by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE. (Attachments: # 1 Exhibit 1 − Administrative Record Certification, # 2 Exhibit 2 − Administrative Record Index, # 3 Exhibit 3 − Administrative Record Privilege Log)(Flax, Meredith) (Entered: 01/18/2012) |
| 02/13/2012 | | MINUTE ORDER (paperless) The parties are ordered to SHOW CAUSE, by February 20, 2012, why Owen, et al. v. United States Department of the Interior, et al., No. 12−cv−194, and Safari Club International v. Salazar et al., No. 11−cv−1564, should not be consolidated under Federal Rule of Civil Procedure 42. If the parties agree that the cases should be consolidated, the parties are directed to confer and submit a joint proposal to modify, if necessary, the existing scheduling order in No. 11−cv−1564 by February 20, 2012. Signed by Judge Beryl A. Howell on 02/13/2012. (lcbah2) (Entered: 02/13/2012) |
| 02/13/2012 | | Set/Reset Deadlines: Joint Proposal to Modify, if necessary, the Existing Scheduling Order due by 2/20/2012. Response to Show Cause due by 2/20/2012. (alp) (Entered: 02/13/2012) |
| 02/15/2012 | 23 | ADMINISTRATIVE RECORD *(Supplement to the Administrative Record)* by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE. (Attachments: # 1 Exhibit 1 − Certification, # 2 Exhibit 2 − Index, # 3 Exhibit 3 − Privilege Log, # 4 Supplement, # 5 Supplement)(Flax, Meredith) (Entered: 02/15/2012) |
| 02/17/2012 | 24 | RESPONSE TO ORDER TO SHOW CAUSE by DANIEL ASHE, KEN SALAZAR, UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES FISH AND WILDLIFE SERVICE, DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE re Order,,. (Flax, Meredith) (Entered: 02/17/2012) |
| 02/21/2012 | | MINUTE ORDER (paperless) In light of the parties' joint 24 Response to the Court's Order to Show Cause, the Court orders that Owen, et al. v. United States Department of the Interior, et al., No. 12−cv−194, and Safari Club International v. Salazar, et al., No. 11−cv−1564, be consolidated in |

| | | |
|---|---|---|
| | | accordance with Federal Rule of Civil Procedure 42 because the cases have common issues of fact and law. See, e.g., American Postal Workers Union v. U.S. Postal Service, 422 F. Supp. 2d 240, 245 (D.D.C. 2006); Gonzalez−Quiles v. Cooperativa De Ahorro Y Credito De Isabela, 250 F.R.D. 91, 93 (D.P.R. 2007). In accordance with the joint Response, the Scheduling Order for the consolidated cases shall be as follows: Any motion by Safari Club International to supplement the administrative record for Safari Club International's listing claim shall be filed by February 22, 2012. Federal defendants shall lodge the administrative record for Plaintiffs' petition finding claims by February 29, 2012. Any motion to supplement the administrative record for Plaintiffs' petition finding claims shall be filed by March 7, 2012. The plaintiffs shall file their motion for summary judgment by March 23, 2012. Federal defendants' cross−motion for summary judgment and opposition to plaintiffs' motion shall be filed by April 27, 2012. The plaintiffs' opposition to federal defendants' cross−motion and reply in further support of their motion shall be filed by May 18, 2012. Federal defendants' reply in further support of their cross−motion shall be filed by June 8, 2012. Signed by Judge Beryl A. Howell on 02/21/2012. (lcbah2) (Entered: 02/21/2012) |
| 02/21/2012 | | Set/Reset Deadlines: Administrative Record due by 2/29/2012. Cross Motions due by 4/27/2012. Response to Cross Motions due by 5/18/2012. Reply to Cross Motions due by 6/8/2012. Dispositive Motions due by 3/23/2012. Response to Dispositive Motions due by 4/27/2012. Reply to Dispositive Motions due by 5/18/2012. Any Motion by Safari Club International to supplement the administrative record for Safari Club International's listing claim due by 2/22/2012. Any motion to supplement the administrative record for Plaintiffs' petition finding claims due by 3/7/12. (alp) (Entered: 02/22/2012) |
| 02/29/2012 | 25 | ADMINISTRATIVE RECORD *(Notice of Filing Second Supplement to the Administrative Record)* by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 supplemental document 1, # 4 supplemental document 2, # 5 supplemental document 3, # 6 supplemental document 4, # 7 supplemental document 5, # 8 supplemental document 6, # 9 supplemental document 7, # 10 supplemental document 8)(Flax, Meredith) (Entered: 02/29/2012) |
| 03/08/2012 | 26 | MOTION for Preliminary Injunction by SAFARI CLUB INTERNATIONAL (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit Exhibit A, # 4 Exhibit Exhibit B, # 5 Exhibit Exhibit C, # 6 Exhibit Exhibit D, # 7 Exhibit Exhibit E, # 8 Exhibit Exhibit F, # 9 Exhibit Exhibit G, # 10 Exhibit Exhibit H, # 11 Exhibit Exhibit I, # 12 Exhibit Exhibit J, # 13 Exhibit Exhibit K, # 14 Exhibit Exhibit L, # 15 Exhibit Exhibit M, # 16 Exhibit Exhibit N, # 17 Exhibit Exhibit O, # 18 Exhibit Exhibit P, # 19 Exhibit Exhibit Q, # 20 Exhibit Exhibit R, # 21 Exhibit Exhibit S, # 22 Exhibit Exhibit T, # 23 Exhibit Exhibit U, # 24 Exhibit Exhibit V, # 25 Exhibit Exhibit W, # 26 Exhibit Exhibit X, # 27 Exhibit Exhibit AA, # 28 Exhibit Exhibit BB, # 29 Exhibit Exhibit CC, # 30 Exhibit Exhibit DD, # 31 Exhibit Exhibit EE)(Seidman, Anna) (Entered: 03/08/2012) |
| 03/08/2012 | | |

| | | |
|---|---|---|
| | | MINUTE ORDER (paperless) In light of the plaintiff's 26 Motion for a Preliminary Injunction, the defendants shall file their Opposition to the Motion by March 19, 2012. The plaintiff shall file a Reply by March 23, 2012. Signed by Judge Beryl A. Howell on 03/08/12. (lcbah2) (Entered: 03/08/2012) |
| 03/09/2012 | | Set Deadlines: defendants shall file their Opposition to the Motion by March 19, 2012. The plaintiff shall file a Reply by March 23, 2012. (tj ) (Entered: 03/09/2012) |
| 03/09/2012 | | Reset Deadlines: Respondent to respond to the petition for a writ of habeas by 5/7/2012. (tj ) (Entered: 03/09/2012) |
| 03/09/2012 | 27 | NOTICE OF RELATED CASE by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR. Case related to Case No. 12−340. (Flax, Meredith) (Entered: 03/09/2012) |
| 03/09/2012 | | MINUTE ORDER (paperless) Upon receipt of the 27 Federal Defendant's Notice of Related Cases, the Court directs that plaintiffs, if they wish to be heard on whether Exotic Wildlife Association, et al. v. U.S. Department of the Interior, et al., 1:12−cv−00340−RBW (D.D.C.) is related, shall submit their position by March 13, 2012 at 10 A.M. Signed by Judge Beryl A. Howell on 03/09/12. (lcbah2) (Entered: 03/09/2012) |
| 03/12/2012 | 28 | NOTICE *of Position on Possible Related Case* by SAFARI CLUB INTERNATIONAL re Order, 27 Notice of Related Case (Seidman, Anna) (Entered: 03/12/2012) |
| 03/13/2012 | 29 | NOTICE of Appearance by Douglas Scott Burdin on behalf of SAFARI CLUB INTERNATIONAL (Burdin, Douglas) (Entered: 03/13/2012) |
| 03/16/2012 | 30 | ORDER consolidating Safari Club International v. Salazar, et al., Case No. 11−cv−01564 and Owen, et al. v. United States Department of the Interior, et al., Case No. 12−cv−00194, which were consolidated by this Court on February 21, 2012, with Exotic Wildlife Association, et al. v. United States Department of the Interior, et al., Case No. 12−cv−00340. The parties are directed that all filings in these consolidated cases should be made only in Case No. 11−cv−01564. The parties shall make no additional filings in Case Nos. 12−cv−00194 and 12−cv−00340. See Order for further details. Signed by Judge Beryl A. Howell on 03/16/2012. (lcbah2) (Entered: 03/16/2012) |
| 03/16/2012 | 31 | NOTICE of Appearance by Michael R. Harris on behalf of FRIENDS OF ANIMALS (Attachments: # 1 Certificate of Service)(Harris, Michael) (Entered: 03/16/2012) |
| 03/16/2012 | 32 | MOTION to Stay *Briefing on Summary Judgment Motions* by SAFARI CLUB INTERNATIONAL (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B)(Seidman, Anna) (Entered: 03/16/2012) |
| 03/16/2012 | 33 | MOTION to Expedite *Review of Safari Club International's Motion to Stay Briefing of Summary Judgment Motions* by SAFARI CLUB INTERNATIONAL (Attachments: # 1 Text of Proposed Order)(Seidman, Anna) (Entered: 03/16/2012) |

| | | | |
|---|---|---|---|
| 03/16/2012 | 34 | | MOTION to Intervene by FRIENDS OF ANIMALS (Attachments: # 1 Declaration of Priscilla Feral, # 2 Exhibit Proposed Motion to Dismiss)(rdj) (Entered: 03/19/2012) |
| 03/19/2012 | | | MINUTE ORDER (paperless) granting 33 Safari Club International's Motion for Expedited Review of Motion to Stay Briefing of Safari Club International's Motion for Summary Judgment. The Federal Defendants' Response to the Motion to Stay shall be filed on or before March 20, 2012. Safari Club International's Reply shall be filed on or before March 21, 2012. Signed by Judge Beryl A. Howell on 03/19/2012. (lcbah2) (Entered: 03/19/2012) |
| 03/19/2012 | 35 | | Memorandum in opposition to re 26 MOTION for Preliminary Injunction filed by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE. (Attachments: # 1 Declaration of Timothy J. Van Norman, # 2 Text of Proposed Order)(Flax, Meredith) (Entered: 03/19/2012) |
| 03/19/2012 | 36 | | RESPONSE re 32 MOTION to Stay *Briefing on Summary Judgment Motions* filed by CHASE AKIN, GALEN AKIN, KARLTON BEAL, EDDY BLASSINGAME, RANDY BRUNO, TERRY CAFFEY, RAY DOCKERY, EXOTIC WILDLIFE ASSOCIATION, LYNN FOLLIS, RONALD GARISON, JOE GREEN, NANCY GREEN, RANDAL JACOBY, DOROTHY LEA, ROY LEIFESTER, STANLEY MAYFIELD, ALVIN NEW, THOMAS OATES, TERRY OWEN, CHARLY SEALE, ED VALICEK, KEITH WALLACE. (Marzulla, Nancie) (Entered: 03/19/2012) |
| 03/21/2012 | 37 | | Memorandum in opposition to re 32 MOTION to Stay *Briefing on Summary Judgment Motions* filed by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE. (Attachments: # 1 Text of Proposed Order)(Flax, Meredith) (Entered: 03/21/2012) |
| 03/21/2012 | 38 | | REPLY to opposition to motion re 32 MOTION to Stay *Briefing on Summary Judgment Motions* filed by SAFARI CLUB INTERNATIONAL. (Attachments: # 1 Exhibit AA, # 2 Exhibit BB, # 3 Exhibit CC, # 4 Exhibit DD, # 5 Exhibit EE)(Seidman, Anna) (Entered: 03/21/2012) |
| 03/21/2012 | 39 | | ORDER denying 32 Plaintiff's Motion to Stay Briefing of Summary Judgment Motions. See Order for further details. Signed by Judge Beryl A. Howell on 03/21/2012. (lcbah2) (Entered: 03/21/2012) |
| 03/21/2012 | | | MINUTE ORDER (paperless) The parties in Exotic Wildlife Association, et al. v. U.S. Department of the Interior, et al, Case No. 12−cv−00340, are directed to file, by March 28, 2012, a proposed schedule for dispositive motions briefing. This schedule, to the extent possible, should adhere to the Scheduling Order already in place in Safari Club International v. Salazar, et al., Case No. 11−cv−01564. See Minute Order (Feb. 21, 2012). Additionally, if the plaintiffs in Exotic Wildlife Association, et al. v. U.S. Department of the Interior, et al, wish to file a Reply in support of their Motion for a Preliminary Injunction, Case No. 12−cv−00340, ECF No. 3, they may do so on or before March 23, 2012. The Court further directs the parties to comply with the Standing Order entered in Safari Club International v. Salazar, et al., Case No. 11−cv−01564, ECF No. 3. Signed by Judge Beryl A. Howell on 03/21/2012. (lcbah2) (Entered: 03/21/2012) |
| 03/23/2012 | 40 | | |

| | | |
|---|---|---|
| | | REPLY *in Support of Motion for Preliminary Injunction* filed by EDDY BLASSINGAME, TERRY CAFFEY, RAY DOCKERY, EXOTIC WILDLIFE ASSOCIATION, JOE GREEN, NANCY GREEN, ROY LEIFESTER, THOMAS OATES, CHARLY SEALE, ED VALICEK. (Attachments: #1 Exhibit, #2 Certificate of Service)(Marzulla, Nancie) (Entered: 03/23/2012) |
| 03/23/2012 | 41 | MEMORANDUM OPINION regarding Motions to Intervene filed by Movant Friends of Animals, ECF Nos. 11, 34, and Movants Defenders of Wildlife, The Humane Society of the United States, and Born Free USA, ECF No. 13. Signed by Judge Beryl A. Howell on 03/23/2012. (lcbah2) (Entered: 03/23/2012) |
| 03/23/2012 | 42 | ORDER granting Movant Friends of Animals' Motions to Intervene, ECF Nos. 11, 34, and granting in part and denying in part the Motion to Intervene filed by Movants Defenders of Wildlife, The Humane Society of the United States, and Born Free USA, ECF No. 13. Signed by Judge Beryl A. Howell on 03/23/2012.(lcbah2) (Entered: 03/23/2012) |
| 03/23/2012 | 43 | MOTION for Summary Judgment by CHASE AKIN, GALEN AKIN, KARLTON BEAL, EDDY BLASSINGAME, RANDY BRUNO, TERRY CAFFEY, EXOTIC WILDLIFE ASSOCIATION, LYNN FOLLIS, RONALD GARISON, JOE GREEN, NANCY GREEN, RANDAL JACOBY, DOROTHY LEA, ROY LEIFESTER, STANLEY MAYFIELD, ALVIN NEW, TERRY OWEN, ED VALICEK, KEITH WALLACE (Attachments: #1 Memorandum in Support, #2 Text of Proposed Order, #3 Certificate of Service)(Marzulla, Nancie) (Entered: 03/23/2012) |
| 03/23/2012 | 44 | REPLY to opposition to motion re 26 MOTION for Preliminary Injunction filed by SAFARI CLUB INTERNATIONAL. (Attachments: #1 Exhibit FF, #2 Exhibit GG, #3 Exhibit Y, #4 Exhibit Z, #5 Letter Requesting Oral Argument)(Seidman, Anna) (Entered: 03/23/2012) |
| 03/23/2012 | 45 | MOTION for Summary Judgment *and Memorandum in Support* by SAFARI CLUB INTERNATIONAL (Attachments: #1 Text of Proposed Order, #2 Exhibit A, #3 Exhibit B, #4 Exhibit C, #5 Exhibit D, #6 Exhibit E, #7 Exhibit F, #8 Exhibit G, #9 Exhibit H, #10 Exhibit I, #11 Exhibit J, #12 Exhibit K, #13 Exhibit L, #14 Exhibit M, #15 Exhibit N, #16 Exhibit O, #17 Exhibit P, #18 Exhibit Q, #19 Exhibit R, #20 Exhibit S, #21 Exhibit T, #22 Exhibit U, #23 Exhibit V, #24 Exhibit W, #25 Exhibit X, #26 Exhibit Y, #27 Exhibit Z, #28 Exhibit AA, #29 Exhibit BB, #30 Exhibit CC, #31 Exhibit DD, #32 Exhibit EE, #33 Exhibit FF, #34 Exhibit GG, #35 Exhibit HH, #36 Exhibit JJ, #37 Exhibit KK, #38 Exhibit II, #39 Letter Requesting Oral Argument)(Seidman, Anna) (Entered: 03/23/2012) |
| 03/23/2012 | 46 | ANSWER to 1 Complaint by FRIENDS OF ANIMALS.(rdj) (Entered: 03/26/2012) |
| 03/23/2012 | 47 | MOTION to Dismiss by FRIENDS OF ANIMALS (rdj) (Entered: 03/26/2012) |
| 03/23/2012 | 48 | ANSWER to 1 Complaint by DEFENDERS OF WILDLIFE.(rdj) (Entered: 03/26/2012) |
| 03/27/2012 | 49 | |

| | | |
|---|---|---|
| | | MOTION for Reconsideration re 42 Order on Motion to Intervene,,,,, 41 Memorandum &Opinion, *Expedited Motion* by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES (Attachments: # 1 Exhibit A − Declaration of Andrew Page, # 2 Exhibit B − Declaration of Adam Roberts, # 3 Text of Proposed Order)(Eubanks, II, William). Added MOTION to Expedite on 3/28/2012 (dr). (Entered: 03/27/2012) |
| 03/27/2012 | 51 | MOTION for Leave to File Amicus Brief by TEXAS DEPARTMENT OF AGRICULTURE (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order)(jf, ) (Entered: 03/29/2012) |
| 03/28/2012 | 50 | NOTICE of Proposed Briefing Schedule *Proposed* by DANIEL ASHE, EDDY BLASSINGAME, TERRY CAFFEY, DEFENDERS OF WILDLIFE, RAY DOCKERY, EXOTIC WILDLIFE ASSOCIATION, FRIENDS OF ANIMALS, JOE GREEN, NANCY GREEN, ROY LEIFESTER, THOMAS OATES, KEN SALAZAR, CHARLY SEALE, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR, ED VALICEK (Attachments: # 1 Certificate of Service)(Marzulla, Nancie) Modified event title on 3/29/2012 (znmw, ). (Entered: 03/28/2012) |
| 03/29/2012 | | MINUTE ORDER (paperless) granting 51 Motion to File Amicus Curiae Brief of the Texas Department of Agriculture in Support of Plaintiffs' Motion for Preliminary Injunction. The Clerk of the Court is directed to file the Amicus Curiae Brief. Signed by Judge Beryl A. Howell on 03/29/12. (lcbah2) (Entered: 03/29/2012) |
| 03/29/2012 | | MINUTE ORDER (paperless) Upon consideration of the 50 Joint Motion for Briefing Schedule, the Court enters the following SCHEDULING ORDER to control the timing of proceedings in Exotic Wildlife Association, et al. v. U.S. Department of the Interior, et al., Case No. 12−cv−00340: Federal Defendants shall lodge the Administrative Record for the January 5, 2012 Final Rule on or before April 13, 2012. Any motions to supplement the administrative record shall be filed on or before April 27, 2012. Exotic Wildlife's Motion for Summary Judgment and Exotic Wildlife's Opposition to Intervenors' Motion to Dismiss shall be filed on or before May 4, 2012. Federal Defendants' and Intervenors' Cross Motion for Summary Judgment and Opposition to Exotic Wildlife's Motion for Summary Judgment and Intervenors' Reply in Support of Motion to Dismiss shall be filed on or before May 25, 2012. Exotic Wildlife's Opposition to Federal Defendants' and Intervenors' Cross−Motion for Summary Judgment and Reply in Support of Summary Judgment shall be filed on or before June 8, 2012. Federal Defendants' and Intervenors' Reply in Support of their Cross−Motion for Summary Judgment shall be filed on or before June 22, 2012. Signed by Judge Beryl A. Howell on 03/29/12. (lcbah2) (Entered: 03/29/2012) |
| 03/29/2012 | 52 | AMICUS BRIEF by TEXAS DEPARTMENT OF AGRICULTURE. (znmw, ) (Entered: 03/30/2012) |
| 03/30/2012 | 53 | Memorandum in opposition to re 49 MOTION for Reconsideration re 42 Order on Motion to Intervene,,,,, 41 Memorandum &Opinion, *Expedited Motion* MOTION to Expedite MOTION for Reconsideration re 42 Order on Motion to Intervene,,,,, 41 Memorandum &Opinion, *Expedited Motion* filed |

| | | |
|---|---|---|
| | | by SAFARI CLUB INTERNATIONAL. (Attachments: # 1 Text of Proposed Order)(Seidman, Anna) (Entered: 03/30/2012) |
| 03/30/2012 | 54 | Memorandum in opposition to re 49 MOTION for Reconsideration re 42 Order on Motion to Intervene,,,,, 41 Memorandum &Opinion, *Expedited Motion* MOTION to Expedite MOTION for Reconsideration re 42 Order on Motion to Intervene,,,,, 41 Memorandum &Opinion, *Expedited Motion opposing Request for Expedited Briefing* filed by CHASE AKIN, GALEN AKIN, KARLTON BEAL, EDDY BLASSINGAME, RANDY BRUNO, TERRY CAFFEY, RAY DOCKERY, EXOTIC WILDLIFE ASSOCIATION, LYNN FOLLIS, RONALD GARISON, JOE GREEN, NANCY GREEN, RANDAL JACOBY, DOROTHY LEA, ROY LEIFESTER, STANLEY MAYFIELD, ALVIN NEW, THOMAS OATES, TERRY OWEN, CHARLY SEALE, ED VALICEK, KEITH WALLACE. (Attachments: # 1 Certificate of Service)(Marzulla, Roger) (Entered: 03/30/2012) |
| 04/02/2012 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Telephone Conference held off the record in chambers on 4/2/2012. (zmm, ) (Entered: 04/03/2012) |
| 04/03/2012 | | Set/Reset Deadlines: Administrative Record due 4/13/2012; Motions to supplement the Administrative Record due 4/27/2012; Exotic Wildlife's Motion for Summary Judgment and Opposition to Intervenors' Motion to Dismiss due 5/4/2012; Federal Defendants' and Intervenors' Cross Motion for Summary Judgment and Opposition to Exotic Wildlife's Motion for Summary Judgment and Intervenors' Reply in Support of Motion to Dismiss due 5/25/2012; Exotic Wildlife's Opposition to Federal Defendants' and Intervenors' Cross Motion for Summary Judgment and Reply in Support of Summary Judgment due 6/8/2012; Federal Defendants' and Intervenors' Reply in Support of their Cross−Motion for Summary Judgment due 6/22/2012.(zmm, ) (Entered: 04/03/2012) |
| 04/03/2012 | 55 | NOTICE *of Effects of Rescission Rule* by KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR (Maysonett, James) (Entered: 04/03/2012) |
| 04/03/2012 | 56 | NOTICE *of Effects of Final Rule* by CHASE AKIN, GALEN AKIN, KARLTON BEAL, EDDY BLASSINGAME, RANDY BRUNO, TERRY CAFFEY, RAY DOCKERY, EXOTIC WILDLIFE ASSOCIATION, LYNN FOLLIS, RONALD GARISON, JOE GREEN, NANCY GREEN, RANDAL JACOBY, DOROTHY LEA, ROY LEIFESTER, STANLEY MAYFIELD, ALVIN NEW, THOMAS OATES, TERRY OWEN, CHARLY SEALE, ED VALICEK, KEITH WALLACE (Marzulla, Nancie) (Entered: 04/03/2012) |
| 04/03/2012 | 57 | NOTICE by SAFARI CLUB INTERNATIONAL (Seidman, Anna) (Entered: 04/03/2012) |
| 04/03/2012 | 58 | NOTICE *re: Memo Regarding Effects of Recession of Canned Hunting Rule* by FRIENDS OF ANIMALS (Harris, Michael) (Entered: 04/03/2012) |
| 04/03/2012 | 59 | NOTICE *of Effects of Rescission Rule* by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES (Eubanks, II, William) (Entered: 04/03/2012) |

| 04/03/2012 | 60 | REPLY to opposition to motion re 49 MOTION for Reconsideration re 42 Order on Motion to Intervene,,,,, 41 Memorandum &Opinion, *Expedited Motion* MOTION to Expedite MOTION for Reconsideration re 42 Order on Motion to Intervene,,,,, 41 Memorandum &Opinion, *Expedited Motion* filed by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES. (Eubanks, II, William) (Entered: 04/03/2012) |
| --- | --- | --- |
| 04/03/2012 | 61 | MEMORANDUM OPINION regarding the Motions for a Preliminary Injunction filed by the plaintiff in Safari Club International v. Salazar, et al., Case No. 11−cv−01564, ECF No. 26, and the plaintiffs in Exotic Wildlife Association, et al. v. United States Department of the Interior, et al., Case No. 12−cv−00340, ECF No. 3. Signed by Judge Beryl A. Howell on 04/03/12. (lcbah2) (Entered: 04/03/2012) |
| 04/03/2012 | 62 | ORDER denying the Motions for a Preliminary Injunction filed by the plaintiff in Safari Club International v. Salazar, et al., Case No. 11−cv−01564, ECF No. 26, and the plaintiffs in Exotic Wildlife Association, et al. v. United States Department of the Interior, et al., Case No. 12−cv−00340, ECF No. 3. Signed by Judge Beryl A. Howell on 04/03/2012. (lcbah2) (Entered: 04/03/2012) |
| 04/06/2012 | 63 | RESPONSE re 47 MOTION to Dismiss *In Support of Friends of Animals' Motion to Dismiss* filed by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES. (Eubanks, II, William) (Entered: 04/06/2012) |
| 04/10/2012 | | MINUTE ORDER (paperless) In its 63 Response in Support of Friends of Animals' Motion to Dismiss, defendant−intervenor Defenders of Wildlife ("DOW") requests leave to file a reply brief in support of 47 Friends of Animals' Motion to Dismiss. DOW is granted leave to file, by May 25, 2012, a reply brief. Signed by Judge Beryl A. Howell on 04/10/12. (lcbah2) (Entered: 04/10/2012) |
| 04/11/2012 | | Reset Deadlines: Reply due by 5/25/2012. (tj ) (Entered: 04/11/2012) |
| 04/13/2012 | 64 | ADMINISTRATIVE RECORD *(Notice of Filing)* by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR. (Attachments: # 1 Exhibit 1 − Certification of the Administrative Record, # 2 Exhibit 2 − Administrative Record Index, # 3 Exhibit 3 − Privilege Log)(Flax, Meredith) (Entered: 04/13/2012) |
| 04/13/2012 | 65 | LARGE ADDITIONAL ATTACHMENT(S) by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR 64 Administrative Record. (Attachments: # 1 Part 2 of 3, # 2 Part 3 of 3)(rdj) (Entered: 04/16/2012) |
| 04/16/2012 | 66 | ORDER granting 49 Expedited Motion for Reconsideration of Denial of Intervention by the Humane Society of the United States and Born Free USA. See Order for further details. Signed by Judge Beryl A. Howell on 04/16/2012. (lcbah2) (Entered: 04/16/2012) |
| 04/27/2012 | 67 | Joint MOTION to Stay *Summary Judgment Briefing on 90−day Finding Claims* by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR |

| | | |
|---|---|---|
| | | (Attachments: # 1 Text of Proposed Order)(Flax, Meredith) (Entered: 04/27/2012) |
| 04/27/2012 | 68 | Cross MOTION for Summary Judgment by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR (Attachments: # 1 Text of Proposed Order)(Flax, Meredith) (Entered: 04/27/2012) |
| 04/27/2012 | 69 | Memorandum in opposition to re 45 MOTION for Summary Judgment *and Memorandum in Support* filed by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR. (Attachments: # 1 Text of Proposed Order)(Flax, Meredith) (Entered: 04/27/2012) |
| 04/27/2012 | 70 | Cross MOTION for Summary Judgment by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES (Attachments: # 1 Text of Proposed Order)(Eubanks, II, William) (Entered: 04/27/2012) |
| 04/27/2012 | 71 | Memorandum in opposition to re 45 MOTION for Summary Judgment *and Memorandum in Support* filed by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES. (Attachments: # 1 Text of Proposed Order)(Eubanks, II, William) (Entered: 04/27/2012) |
| 04/27/2012 | 72 | Memorandum in opposition to re 45 MOTION for Summary Judgment *and Memorandum in Support* filed by FRIENDS OF ANIMALS. (Attachments: # 1 Text of Proposed Order Proposed Order)(Harris, Michael) (Entered: 04/27/2012) |
| 04/27/2012 | 73 | Cross MOTION for Summary Judgment by FRIENDS OF ANIMALS (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Harris, Michael) (Entered: 04/27/2012) |
| 04/27/2012 | 74 | Unopposed MOTION for Extension of Time to *File Motion to Supplement the Administrative Record* by EDDY BLASSINGAME, TERRY CAFFEY, RAY DOCKERY, EXOTIC WILDLIFE ASSOCIATION, JOE GREEN, NANCY GREEN, ROY LEIFESTER, THOMAS OATES, CHARLY SEALE, ED VALICEK (Attachments: # 1 Certificate of Service)(Marzulla, Nancie) (Entered: 04/27/2012) |
| 04/30/2012 | | MINUTE ORDER (paperless) granting 67 Joint Motion to Stay Summary Judgment Briefing on 90−Day Finding Claims. Summary judgment briefing on the claims of Plaintiffs Safari Club International and Terry Owen, et al. that the U.S. Fish and Wildlife Service has failed to make a timely 90−day finding on their petitions to delist the U.S. captive−bred herds of the scrimitar−horned oryx, addax, and dama gazelle, see ECF No. 1 in Civil Case No. 11−cv−01564 at paragraphs 100−106; ECF No. 1 in Civil Case No. 12−cv−00194, is stayed for 30−days, through May 30, 2012. On May 30, 2012, the parties are directed to file a Joint Status Report proposing a briefing schedule on these claims if they are not resolved before then. Signed by Judge Beryl A. Howell on 04/30/2012. (lcbah2) (Entered: 04/30/2012) |
| 04/30/2012 | | MINUTE ORDER (paperless) granting 74 Unopposed Motion for Enlargement of Time to File Motion to Supplement the Administrative |

| | | |
|---|---|---|
| | | Record. Motions to supplement the administrative record in Exotic Wildlife Association, et al. v. U.S. Department of the Interior, et al., Case No. 12−cv−00340, shall be filed by May 1, 2012. Signed by Judge Beryl A. Howell on 04/30/2012. (lcbah2) (Entered: 04/30/2012) |
| 04/30/2012 | | Set Deadlines: Joint Status Report due by 5/30/2012. (tj ) (Entered: 04/30/2012) |
| 05/01/2012 | 75 | NOTICE *of Filing Answer in 12−cv−00340* by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR (Flax, Meredith) (Entered: 05/01/2012) |
| 05/01/2012 | 76 | MOTION to Supplement the Administrative Record by EDDY BLASSINGAME, TERRY CAFFEY, RAY DOCKERY, EXOTIC WILDLIFE ASSOCIATION, JOE GREEN, NANCY GREEN, ROY LEIFESTER, THOMAS OATES, CHARLY SEALE, ED VALICEK (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Certificate of Service)(Marzulla, Nancie) (Entered: 05/01/2012) |
| 05/01/2012 | 77 | ANSWER to Complaint by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR.(rdj) (Entered: 05/02/2012) |
| 05/04/2012 | 78 | MOTION for Summary Judgment *and Opposition to Motion to Dismiss* by EDDY BLASSINGAME, TERRY CAFFEY, RAY DOCKERY, EXOTIC WILDLIFE ASSOCIATION, JOE GREEN, NANCY GREEN, ROY LEIFESTER, THOMAS OATES, ED VALICEK (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit, # 4 Certificate of Service)(Marzulla, Nancie) (Entered: 05/04/2012) |
| 05/18/2012 | 79 | Memorandum in opposition to re 76 MOTION to Supplement the Administrative Record filed by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR. (Attachments: # 1 Exhibit 1 − Second Van Norman Declaration, # 2 Text of Proposed Order)(Flax, Meredith) (Entered: 05/18/2012) |
| 05/18/2012 | 80 | REPLY to opposition to motion re 45 MOTION for Summary Judgment *and Memorandum in Support* filed by SAFARI CLUB INTERNATIONAL. (Attachments: # 1 Exhibit EE, # 2 Exhibit HH, # 3 Exhibit II, # 4 Exhibit JJ, # 5 Exhibit KK, # 6 Exhibit S, # 7 Exhibit T, # 8 Exhibit Y)(Seidman, Anna) (Entered: 05/18/2012) |
| 05/18/2012 | 81 | RESPONSE re 70 Cross MOTION for Summary Judgment, 73 Cross MOTION for Summary Judgment, 68 Cross MOTION for Summary Judgment filed by SAFARI CLUB INTERNATIONAL. (Attachments: # 1 Exhibit EE, # 2 Exhibit HH, # 3 Exhibit II, # 4 Exhibit JJ, # 5 Exhibit KK, # 6 Exhibit S, # 7 Exhibit T, # 8 Exhibit Y)(Seidman, Anna) (Entered: 05/18/2012) |
| 05/25/2012 | 82 | Memorandum in opposition to re 78 MOTION for Summary Judgment *and Opposition to Motion to Dismiss* filed by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES. (Attachments: # 1 Text of Proposed Order)(Eubanks, II, William) (Entered: |

| | | | |
|---|---|---|---|
| | | | 05/25/2012) |
| 05/25/2012 | 83 | | Cross MOTION for Summary Judgment *and Reply in Support of Motion to Dismiss* by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES (Attachments: # 1 Text of Proposed Order)(Eubanks, II, William) (Entered: 05/25/2012) |
| 05/25/2012 | 84 | | Cross MOTION for Summary Judgment by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR (Attachments: # 1 Text of Proposed Order)(Flax, Meredith) (Entered: 05/25/2012) |
| 05/25/2012 | 85 | | Memorandum in opposition to re 78 MOTION for Summary Judgment *and Opposition to Motion to Dismiss* filed by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR. (Attachments: # 1 Text of Proposed Order)(Flax, Meredith) (Entered: 05/25/2012) |
| 05/25/2012 | 86 | | Memorandum in opposition to re 78 MOTION for Summary Judgment *and Opposition to Motion to Dismiss* filed by FRIENDS OF ANIMALS. (Harris, Michael) (Entered: 05/25/2012) |
| 05/25/2012 | 87 | | Cross MOTION for Summary Judgment *(Lack of Standing)* by FRIENDS OF ANIMALS (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Harris, Michael) (Entered: 05/25/2012) |
| 05/29/2012 | 88 | | REPLY to opposition to motion re 76 MOTION to Supplement the Administrative Record filed by EDDY BLASSINGAME, TERRY CAFFEY, RAY DOCKERY, EXOTIC WILDLIFE ASSOCIATION, JOE GREEN, NANCY GREEN, ROY LEIFESTER, THOMAS OATES, CHARLY SEALE, ED VALICEK. (Attachments: # 1 Certificate of Service)(Marzulla, Nancie) (Entered: 05/29/2012) |
| 05/30/2012 | 89 | | STATUS REPORT *(JOINT)* by DANIEL ASHE, KEN SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR. (Flax, Meredith) (Entered: 05/30/2012) |
| 05/30/2012 | | | MINUTE ORDER (paperless) Upon consideration of the 89 Joint Status Report, the stay in summary judgment briefing on the claims of Plaintiffs Safari Club International and Terry Owen, et al. that the U.S. Fish and Wildlife Service has failed to make timely findings on their petitions to delist the U.S. captive−bred herds of the scimitar−horned oryx, addax, and dama gazelle is hereby extended until June 12, 2012. Signed by Judge Beryl A. Howell on 05/30/2012. (lcbah2) (Entered: 05/30/2012) |
| 06/08/2012 | 90 | | REPLY to opposition to motion re 70 Cross MOTION for Summary Judgment filed by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES. (Eubanks, II, William) (Entered: 06/08/2012) |
| 06/08/2012 | 91 | | REPLY to opposition to motion re 68 Cross MOTION for Summary Judgment filed by DANIEL ASHE, KENNETH LEE SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR. (Flax, Meredith) (Entered: 06/08/2012) |
| 06/08/2012 | 92 | | |

| | | | |
|---|---|---|---|
| | | | REPLY to opposition to motion re 73 Cross MOTION for Summary Judgment *and Notice of Supplemental Autority* filed by FRIENDS OF ANIMALS. (Harris, Michael) (Entered: 06/08/2012) |
| 06/08/2012 | 93 | | RESPONSE re 84 Cross MOTION for Summary Judgment, 87 Cross MOTION for Summary Judgment *(Lack of Standing)*, 83 Cross MOTION for Summary Judgment *and Reply in Support of Motion to Dismiss and Plaintiffs' Reply in Support of Motion for Summary Judgment* filed by EDDY BLASSINGAME, TERRY CAFFEY, RAY DOCKERY, EXOTIC WILDLIFE ASSOCIATION, RONALD GARISON, NANCY GREEN, ROY LEIFESTER, THOMAS OATES, CHARLY SEALE, ED VALICEK. (Attachments: # 1 Exhibit A, # 2 Certificate of Service)(Marzulla, Nancie) (Entered: 06/08/2012) |
| 06/11/2012 | 94 | | STIPULATION re Order, *(Stipulated Settlement Agreement and Proposed Order of Dismissal)* by DANIEL ASHE, KENNETH LEE SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR. (Flax, Meredith) (Entered: 06/11/2012) |
| 06/13/2012 | 95 | | ORDER re 94 Stipulation filed by DANIEL ASHE, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR, KENNETH LEE SALAZAR. Signed by Judge Beryl A. Howell on 6/12/12. (alp) (Entered: 06/13/2012) |
| 06/15/2012 | 96 | | Unopposed MOTION for Leave to File *Surreply in Support of Summary Judgment and Memorandum in Support* by SAFARI CLUB INTERNATIONAL (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Proposed Surreply)(Seidman, Anna) (Entered: 06/15/2012) |
| 06/18/2012 | | | MINUTE ORDER (paperless) granting 96 Safari Club International's Unopposed Motion for Leave to File Surreply. Signed by Judge Beryl A. Howell on 06/18/2012. (lcbah2) (Entered: 06/18/2012) |
| 06/18/2012 | 97 | | SURREPLY to re 73 Cross MOTION for Summary Judgment filed by SAFARI CLUB INTERNATIONAL. (rdj) (Entered: 06/18/2012) |
| 06/22/2012 | 98 | | REPLY to opposition to motion re 83 Cross MOTION for Summary Judgment *and Reply in Support of Motion to Dismiss* filed by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES. (Eubanks, II, William) (Entered: 06/22/2012) |
| 06/22/2012 | 99 | | REPLY to opposition to motion re 84 Cross MOTION for Summary Judgment filed by DANIEL ASHE, KENNETH LEE SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR. (Flax, Meredith) (Entered: 06/22/2012) |
| 06/22/2012 | 100 | | RESPONSE re 92 Reply to opposition to Motion *(Response to Notice of Supplemental Authority)* filed by DANIEL ASHE, KENNETH LEE SALAZAR, U.S. FISH AND WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR. (Flax, Meredith) (Entered: 06/22/2012) |
| 06/22/2012 | 101 | | REPLY to opposition to motion re 87 Cross MOTION for Summary Judgment *(Lack of Standing)* filed by FRIENDS OF ANIMALS. (Harris, Michael) (Entered: 06/22/2012) |

| 06/27/2012 | 102 | | NOTICE *of Filing of Appendix* by SAFARI CLUB INTERNATIONAL re 91 Reply to opposition to Motion, 69 Memorandum in Opposition, 90 Reply to opposition to Motion, 72 Memorandum in Opposition, 45 MOTION for Summary Judgment *and Memorandum in Support*, 68 Cross MOTION for Summary Judgment, 70 Cross MOTION for Summary Judgment, 92 Reply to opposition to Motion, 71 Memorandum in Opposition, 81 Response to motion, 73 Cross MOTION for Summary Judgment, 80 Reply to opposition to Motion, (Attachments: # 1 Appendix Document 1, # 2 Appendix Document 2, # 3 Appendix Document 3, # 4 Appendix Document 4, # 5 Appendix Document 5, # 6 Appendix Document 6, # 7 Appendix Document 7, # 8 Appendix Document 8, # 9 Appendix Document 9, # 10 Appendix Document 10, # 11 Appendix Document 11, # 12 Appendix Document 12, # 13 Appendix Document 13, # 14 Appendix Document 14, # 15 Appendix Document 15, # 16 Appendix Document16, # 17 Appendix Document 17, # 18 Appendix Document 18, # 19 Appendix Document 19, # 20 Appendix Document 20, # 21 Appendix Document 21, # 22 Appendix Document 22, # 23 Appendix Document 23, # 24 Appendix Document 24, # 25 Appendix Document 25, # 26 Appendix Document 26, # 27 Appendix Document 27, # 28 Appendix Document 28, # 29 Appendix Document 29, # 30 Appendix Document 30, # 31 Appendix Document 31, # 32 Appendix Document 32, # 33 Appendix Document 33, # 34 Appendix Document 34, # 35 Appendix Document 35, # 36 Appendix Document 36, # 37 Appendix Document 37, # 38 Appendix Document 38, # 39 Appendix Document 39, # 40 Appendix Document 40, # 41 Appendix Document 41, # 42 Appendix Document 42, # 43 Appendix Document 43, # 44 Appendix Document 44, # 45 Appendix Document 45, # 46 Appendix Document 46, # 47 Appendix Document 47, # 48 Appendix Document 48, # 49 Appendix Document 49, # 50 Appendix Document 50, # 51 Appendix Document 51, # 52 Appendix Document 52, # 53 Appendix Document 53, # 54 Appendix Document 54, # 55 Appendix Document 55, # 56 Appendix Document 56)(Seidman, Anna) (Entered: 06/27/2012) |
| 07/06/2012 | 103 | | NOTICE *of filing of appendix* by EDDY BLASSINGAME, TERRY CAFFEY, RAY DOCKERY, EXOTIC WILDLIFE ASSOCIATION, JOE GREEN, NANCY GREEN, ROY LEIFESTER, THOMAS OATES, CHARLY SEALE, ED VALICEK (Attachments: # 1 Certificate of Service, # 2 Appendix, # 3 Appendix)(Marzulla, Nancie) (Entered: 07/06/2012) |
| 08/31/2012 | 104 | | MOTION to Hold Deadline in Paragraph 1 of Stipulated Settlement Agreement in Abeyance Pending Further Order of the Court re 94 Stipulation by DANIEL ASHE, KENNETH LEE SALAZAR, UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES FISH AND WILDLIFE SERVICE (Attachments: # 1 Text of Proposed Order)(Flax, Meredith) (Entered: 08/31/2012) |
| 09/04/2012 | | | MINUTE ORDER (paperless) granting 104 Motion to Hold Deadline in Paragraph 1 of Stipulated Settlement Agreement in Abeyance Pending Further Order of the Court. The deadline is held in abeyance until the Federal Defendants file their supplemental motion by September 6, 2012, and the Court rules on the supplemental motion. Signed by Judge Beryl A. Howell on 09/04/2012. (lcbah2) (Entered: 09/04/2012) |
| 09/06/2012 | 105 | | |

| | | |
|---|---|---|
| | | MOTION to Modify *Deadline in Paragraph 1 of Stipulated Settlement Agreement* by DANIEL ASHE, KENNETH LEE SALAZAR, UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES FISH AND WILDLIFE SERVICE (Attachments: # 1 Exhibit 1 − Declaration of David J. Hayes, # 2 Text of Proposed Order)(Flax, Meredith) (Entered: 09/06/2012) |
| 09/07/2012 | | MINUTE ORDER (paperless) granting 105 Motion to Modify Deadline in Paragraph 1 of Stipulated Settlement Agreement. The deadline in paragraph 1 of the 94 Stipulated Settlement Agreement is modified to September 13, 2012. Signed by Judge Beryl A. Howell on 09/07/2012. (lcbah2) (Entered: 09/07/2012) |
| 09/13/2012 | 106 | NOTICE *of Submission of 90−day Finding to the Federal Register* by DANIEL ASHE, KENNETH LEE SALAZAR, UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES FISH AND WILDLIFE SERVICE re Order on Motion for Miscellaneous Relief, 94 Stipulation, Order on Motion to Modify, (Flax, Meredith) (Entered: 09/13/2012) |
| 09/26/2012 | 107 | NOTICE *of Publication of 90−day Finding in the Federal Register* by DANIEL ASHE, KENNETH LEE SALAZAR, UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES FISH AND WILDLIFE SERVICE (Flax, Meredith) (Entered: 09/26/2012) |
| 10/09/2012 | 108 | RESPONSE re 107 Notice (Other) *of Federal Defendants' Filing of 90 Day Finding* filed by SAFARI CLUB INTERNATIONAL. (Seidman, Anna) (Entered: 10/09/2012) |
| 10/18/2012 | 109 | RESPONSE re 107 Notice (Other) *of Federal Defendants' Filing of 90 Day Finding* filed by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES. (Eubanks, William) (Entered: 10/18/2012) |
| 03/22/2013 | | MINUTE ORDER (paperless) Upon consideration of the pending motions, the Court directs the plaintiff in Safari Club International v. Ken Salazar, et al. (11−cv−1564) and the plaintiffs in Exotic Wildlife Association, et al. v. U.S. Department of the Interior, et al. (12−cv−340) to each supplement their briefing, by April 5, 2013, by submitting a short memorandum of law explaining the bases for prudential standing in this matter. See Grocery Mfrs. Ass'n v. EPA, 693 F.3d 169, 179 (D.C. Cir. 2012) (decided on August 17, 2012 after this Court issued its Memorandum Opinion regarding the plaintiffs' motions for preliminary injunctions). The federal defendants and defendant−intervenors may file any response to the plaintiffs' submissions by April 19, 2013, until which time this case will be STAYED. Signed by Judge Beryl A. Howell on 03/22/2013. (lcbah2) (Entered: 03/22/2013) |
| 03/22/2013 | | Case Stayed until 4/19/2013. (tg, ) (Entered: 03/22/2013) |
| 03/22/2013 | | Set/Reset Deadlines: Supplemental Briefs due by 4/5/2013; Responses due by 4/19/2013. (tg, ) (Entered: 03/22/2013) |
| 04/05/2013 | 110 | MEMORANDUM re Order,,, by CHASE AKIN, EDDY BLASSINGAME, TERRY CAFFEY, RAY DOCKERY, EXOTIC WILDLIFE ASSOCIATION, JOE GREEN, NANCY GREEN, ROY LEIFESTER, |

| | | | |
|---|---|---|---|
| | | | THOMAS OATES, ED VALICEK. (Attachments: #_1 Certificate of Service)(Marzulla, Nancie) (Entered: 04/05/2013) |
| 04/05/2013 | 111 | | MEMORANDUM re Order,,, by SAFARI CLUB INTERNATIONAL. (Seidman, Anna) (Entered: 04/05/2013) |
| 04/19/2013 | 112 | | RESPONSE re Order,,, *Concerning Plaintiffs' Prudential Standing* filed by BORN FREE USA, DEFENDERS OF WILDLIFE, HUMANE SOCIETY OF THE UNITED STATES. (Eubanks, William) (Entered: 04/19/2013) |
| 04/19/2013 | 113 | | RESPONSE re 111 Memorandum, 110 Memorandum *(Federal Defendants' Response to Plaintiffs' Supplemental Briefs on Prudential Standing)* filed by DANIEL ASHE, KENNETH LEE SALAZAR, UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES FISH AND WILDLIFE SERVICE. (Flax, Meredith) (Entered: 04/19/2013) |
| 04/19/2013 | 114 | | MEMORANDUM re Order,,, by FRIENDS OF ANIMALS. (Harris, Michael) (Entered: 04/19/2013) |
| 06/04/2013 | 115 | | NOTICE OF SUPPLEMENTAL AUTHORITY by DANIEL ASHE, KENNETH LEE SALAZAR, UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES FISH AND WILDLIFE SERVICE (Flax, Meredith) (Entered: 06/04/2013) |
| 06/05/2013 | 116 | | NOTICE *of the Publication fo the 12−Month Findings on Plaintiffs' Petitions* by DANIEL ASHE, KENNETH LEE SALAZAR, UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES FISH AND WILDLIFE SERVICE re 95 Order (Attachments: #_1 Exhibit 12−month findings (78 Fed. Reg. 33,790 (Jun. 5, 2013)))(Flax, Meredith) (Entered: 06/05/2013) |
| 06/07/2013 | 117 | | RESPONSE re 116 Notice (Other), filed by SAFARI CLUB INTERNATIONAL. (Seidman, Anna) (Entered: 06/07/2013) |
| 06/12/2013 | 118 | | NOTICE *of the Publication of a Proposed Rule and 12−month Finding on the Chimpanzee* by DANIEL ASHE, KENNETH LEE SALAZAR, UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES FISH AND WILDLIFE SERVICE (Attachments: #_1 Exhibit A)(Flax, Meredith) (Entered: 06/12/2013) |
| 08/09/2013 | 119 | 30 | ORDER denying 45 the plaintiff's Motion for Summary Judgment in the SCI Action, granting 68 the Federal Defendants' Cross−Motion for Summary Judgment in the SCI Action, granting 70 the Intervenor−Defendants Defenders of Wildlife, Humane Society of the United States, and Born Free USA's Cross−Motion for Summary Judgment in the SCI Action, granting 73 the Defendant−Intervenor Friends of Animals' Cross−Motion for Summary Judgment in the SCI Action, denying 47 the Defendant−Intervenor Friends of Animals' Motion to Dismiss in the EWA Action, denying 76 the Plaintiffs' Motion to Supplement the Administrative Record in the EWA Action, denying 78 Plaintiff Exotic Wildlife Association's Motion for Summary Judgment in the EWA Action, granting 83 the Intervenor−Defendants Defenders of Wildlife, Humane Society of the United States, and Born Free USA's Cross−Motion for Summary Judgment in the EWA Action, granting 84 the Federal Defendants' Cross−Motion for Summary Judgment in the EWA Action, denying 87 Friends of Animals' Cross−Motion for Summary |

| | | | |
|---|---|---|---|
| | | | Judgment (Lack of Standing) in the EWA Action, and denying as moot 43 the Owen Plaintiffs' Motion for Summary Judgment. See Order for further details. The Clerk of the Court is directed to close this case. Signed by Judge Beryl A. Howell on 08/09/2013. (lcbah2) (Entered: 08/09/2013) |
| 08/09/2013 | 120 | 33 | MEMORANDUM OPINION regarding 45 the plaintiff's Motion for Summary Judgment in the SCI Action, 68 the Federal Defendants' Cross−Motion for Summary Judgment in the SCI Action, 70 the Intervenor−Defendants Defenders of Wildlife, Humane Society of the United States, and Born Free USA's Cross−Motion for Summary Judgment in the SCI Action, 73 the Defendant−Intervenor Friends of Animals' Cross−Motion for Summary Judgment in the SCI Action, 47 the Defendant−Intervenor Friends of Animals' Motion to Dismiss in the EWA Action, 76 the Plaintiffs' Motion to Supplement the Administrative Record in the EWA Action, 78 the Plaintiff Exotic Wildlife Association's Motion for Summary Judgment in the EWA Action, 83 the Intervenor−Defendants Defenders of Wildlife, Humane Society of the United States, and Born Free USA's Cross−Motion for Summary Judgment in the EWA Action, 84 the Federal Defendants' Cross−Motion for Summary Judgment in the EWA Action, and 87 Friends of Animals' Cross−Motion for Summary Judgment (Lack of Standing) in the EWA Action. Signed by Judge Beryl A. Howell on 08/09/2013. (lcbah2) (Entered: 08/09/2013) |
| 10/02/2013 | 121 | 28 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 119 Order on Motion for Summary Judgment,, Order on Motion to Dismiss,,,, Order on Motion for Miscellaneous Relief,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, 120 Memorandum &Opinion,,,, by SAFARI CLUB INTERNATIONAL. Filing fee $ 455, receipt number 0090−3487873. Fee Status: Fee Paid. Parties have been notified. (Seidman, Anna) (Entered: 10/02/2013) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL,          )
                                    )
            Plaintiff,              )
                                    )
      v.                            )
                                    )
SALLY JEWELL, in her official capacity )
as Secretary of the Department of the Interior, )
*et al*.                            )          No. 11-cv-01564(BAH)
                                    )
            Defendants,             )
                                    )
_____ )

## CIVIL NOTICE OF APPEAL

Notice is hereby given this 2ND day of October 2013, that Plaintiff/Appellant

Safari Club International hereby appeals to the United States Court of Appeals for the

District of Columbia Circuit from this Court's Order (Dkt. 119) and Memorandum

Opinion (Dkt. 120), both entered on the 9th day of August 2013, in favor of

Defendants/Respondents Sally Jewell in her official capacity as Secretary of the U.S.

Department of the Interior, Daniel M. Ashe in his official capacity as Director of the U.S.

Fish and Wildlife Service, and the United States Fish and Wildlife Service and in favor of

Intervenor-Defendants/Respondents Defenders of Wildlife, Humane Society of the

United States, and Born Free USA, and in favor of  Defendant-Intervenor/Respondent

Friends of Animals.

Dated this 2nd day of October, 2013.

Respectfully submitted,

/s/ Anna M. Seidman
Anna M. Seidman
Douglas S. Burdin
Safari Club International
501 2nd Street NE
Washington, D.C.   20002
Tel:  202-543-8733
Fax:  202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org
Counsel for Plaintiff/Appellant,
Safari Club
International

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL,<br><br>Plaintiff,<br><br>v.<br><br>SALLY JEWELL, in her official capacity as Secretary of the United States Department of the Interior, *et al.*,<br><br>Defendants. | Civil Action No. 11-cv-01564 (BAH)<br>Judge Beryl A. Howell |
| EXOTIC WILDLIFE ASSOCIATION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>Defendants. | Civil Action No. 12-cv-00340 (BAH)<br>Judge Beryl A. Howell<br>(Consolidated Cases) |

**ORDER**

Upon consideration of the eleven pending motions in this case, the voluminous briefing, including memoranda, exhibits, declarations submitted in support and in opposition, supplementary material submitted by the parties, and the administrative records in both *Safari Club International v. Jewell, et al.* (11-cv-01564) ("SCI Action") and *Exotic Wildlife Association, et al. v. United States Department of the Interior, et al.* (12-cv-00340) ("EWA Action"), and the entire record herein, it is hereby

1

**ORDERED** that, for the reasons stated in the accompanying Memorandum Opinion, the plaintiff's Motion for Summary Judgment in the SCI Action, ECF No. 45, is **DENIED**; and it is further

**ORDERED** that the Federal Defendants' Cross-Motion for Summary Judgment in the SCI Action, ECF No. 68, is **GRANTED**; and it is further

**ORDERED** that the Intervenor-Defendants Defenders of Wildlife, Humane Society of the United States, and Born Free USA's Cross-Motion for Summary Judgment in the SCI Action, ECF No. 70, is **GRANTED**; and it is further

**ORDERED** that the Defendant-Intervenor Friends of Animals' Cross-Motion for Summary Judgment in the SCI Action, ECF No. 73, is **GRANTED**; and it is further

**ORDERED** that the Defendant-Intervenor Friends of Animals' Motion to Dismiss in the EWA Action, ECF No. 47, is **DENIED**; and it is further

**ORDERED** that the Plaintiffs' Motion to Supplement the Administrative Record in the EWA Action, ECF No. 76, is **DENIED**; and it is further

**ORDERED** that the Plaintiff Exotic Wildlife Association's Motion for Summary Judgment in the EWA Action, ECF No. 78, is **DENIED**; and it is further

**ORDERED** that the Intervenor-Defendants Defenders of Wildlife, Humane Society of the United States, and Born Free USA's Cross-Motion for Summary Judgment in the EWA Action, ECF No. 83, is **GRANTED**; and it is further

**ORDERED** that the Federal Defendants' Cross-Motion for Summary Judgment in the EWA Action, ECF No. 84, is **GRANTED**; and it is further

**ORDERED** that Friends of Animals' Cross-Motion for Summary Judgment (Lack of Standing) in the EWA Action, ECF No. 87, is **DENIED**; and it is further

2

**ORDERED** that the Owen Plaintiffs' Motion for Summary Judgment, ECF No. 43, is

**DENIED AS MOOT**.[1]

**SO ORDERED.**

**DATE:** August 9, 2013

*This is a final, appealable Order.*

/s/ *Beryl A. Howell*

BERYL A. HOWELL
United States District Judge

---

[1] As noted in the accompanying Memorandum Opinion, a third case, *Owen v. United States Department of the Interior*, 12-cv-00194, was previously part of this consolidated action.  The Owen case, however, was dismissed with prejudice per the parties' Stipulated Settlement Agreement, in which the federal defendants agreed to a timetable for making findings on the SCI and Owen plaintiffs' petitions to delist the U.S. captive herds of the three antelope species.  *See* Stipulated Settlement Agreement and Proposed Order of Dismissal, ECF No. 94; Order (June 13, 2012), ECF No. 95.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL, | |
| Plaintiff, | |
| v. | |
| SALLY JEWELL, in her official capacity as Secretary of the United States Department of the Interior,[1] *et al*., | Civil Action No. 11-cv-01564 (BAH) Judge Beryl A. Howell |
| Defendants. | |
| EXOTIC WILDLIFE ASSOCIATION, *et al*., | |
| Plaintiffs, | |
| v. | Civil Action No. 12-cv-00340 (BAH) Judge Beryl A. Howell (Consolidated Cases) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al*., | |
| Defendants. | |

## MEMORANDUM OPINION

This case involves issues surrounding the most effective ways under the Endangered

Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., to conserve three antelope species – the scimitar-

horned oryx, dama gazelle, and addax – whose herds have dwindled, if not disappeared, from

their native environments in North Africa. The U.S. Fish and Wildlife Service ("FWS"), which

---

[1] Secretary of the Interior Sally Jewell was substituted for former Secretary Kenneth Salazar pursuant to Federal Rule of Civil Procedure 25(d).  *See* Fed. Defs.' Resp. to Pls.' Supplemental Briefs on Prudential Standing, ECF No. 113, at 1 n.1.  Each of the consolidated actions is against Sally Jewell, in her official capacity as Secretary of the Department of the Interior, the U.S. Fish and Wildlife Service ("FWS"), and Daniel M. Ashe, in his official capacity as Director of the FWS.  The U.S. Department of the Interior is also a defendant in Case No. 12-cv-00340.  The Court refers to the defendants collectively as "federal defendants."

1

is vested with the authority to designate the three antelope species as endangered under the ESA,

has spent two decades considering these issues with input from both commercial and non-profit

groups interested in conserving the species for different ends.  These efforts culminated with the

issuance, in 2005, of two rules, one of which listed the three antelope species as endangered and

the other of which provided a blanket exemption for U.S. captive-bred herds of the same species.

In 2009, another judge in this jurisdiction found the blanket exemption rule to be invalid under

the ESA, prompting the FWS to issue a new rule repealing the exemption in 2012.  Pending

before the Court are challenges brought by two commercial groups to both the original 2005

listing rule and the 2012 repeal of the 2005 blanket exemption.  For the reasons set forth below,

the Court concludes that the agency rules will stand.[2]

       This is a consolidated case with two sets of plaintiffs challenging two separate, but

related, FWS final rules regarding the U.S. captive-bred populations of the three antelope species

at issue.[3]  The plaintiff in *Safari Club International v. Jewell*, 11-cv-01564 ("SCI Action"),

brought suit, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and the

ESA, 16 U.S.C. §§ 1531, 1533, to challenge the listing, in 2005, of U.S. captive populations of

the three antelope species as endangered species.  *See* Final Rule to List the Scimitar-Horned

Oryx, Addax, and Dama Gazelle as Endangered ("Listing Rule"), 70 Fed. Reg. 52,319 (Sept. 2,

---

[2] Although oral argument was requested, *see* SCI Letter Requesting Oral Argument, ECF No. 45-39, the Court concludes in its discretion that the issues have been amply briefed and that a hearing for oral argument is therefore unnecessary.  *See* LCvR 7(f).  As a result, the request for oral argument is denied.

[3] This case was previously also consolidated with a third action, *Owen v. United States Department of the Interior*, 12-cv-00194 ("Owen Action"), *see* Minute Order (Feb. 21, 2012), which was originally filed in the United States District Court for the Northern District of Texas.  The plaintiffs in the Owen Action brought suit to compel the Secretary of the Interior to comply with the ESA requirement to act on a delisting petition within 12 months of receiving it.  *See* Owen Compl. ("Owen Compl."), 12-cv-00194, ECF No. 1, at 2.  The Owen Action was dismissed with prejudice per the parties' Stipulated Settlement Agreement, in which the federal defendants agreed to a timetable for making findings on the Owen plaintiffs' petition to delist the U.S. captive herds of the three antelope species.  *See* Stipulated Settlement Agreement and Proposed Order of Dismissal, ECF No. 94; Order (June 13, 2012), ECF No. 95.  Since that action was dismissed with prejudice, the pending Owen plaintiffs' Motion for Summary Judgment, ECF No. 43, filed before the dismissal of the Owen plaintiffs' claims, will be denied as moot.

2005) (codified at 50 C.F.R. pt. 17); SCI Compl. ("SCI Compl."), 11-cv-01564, ECF No. 1, Counts I-IV.[4]

The plaintiffs in *Exotic Wildlife Association v. United States Department of the Interior*, 12-cv-00340 ("EWA Action"), brought suit under the APA to challenge a final rule, *see* Removal of the Regulation that Excludes U.S. Captive-Bred Scimitar Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions ("Removal Rule"), 77 Fed. Reg. 431 (Jan. 5, 2012), which removed a 2005 regulation, *see* Exclusion of U.S. Captive-bred Scimitar-Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions ("Captive-bred Exemption"),[5] 70 Fed. Reg. 52,310 (Sept. 2, 2005) (to be codified at 50 C.F.R. pt. 17).[6]  *See* EWA Compl. ("EWA Compl."), 12-cv-00340, ECF No. 1.  The Captive-bred Exemption was issued the same day as the Listing Rule and carved out a special exemption to the prohibitions normally applicable to endangered

---

[4] SCI also challenged, in Count V of its Complaint, the federal defendants' failure to act on SCI's delisting petition for the U.S. captive herds of the three antelope species.  *See* SCI Compl. at 27-28.  Count V of the SCI Complaint was dismissed with prejudice, however, pursuant to the parties' Stipulated Settlement Agreement, ECF No. 94.  *See* Order (June 13, 2012), ECF No. 95.

[5] While the Court referred to this regulation as the "Captive-bred Exemption" in its earlier Memorandum Opinions in this case, *see Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 104-09 (D.D.C. 2012) ("*SCI P.I. Decision*"); *Safari Club Int'l v. Salazar*, 281 F.R.D. 32, 34 (D.D.C. 2012) ("*SCI Intervenors Decision*"), the parties continue to refer to it with a variety of other names.  The federal defendants refer to it as the "Management Rule," *see* SCI Fed. Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. and in Supp. of Fed. Defs.' Cross-Mot. for Summ. J., ECF No. 68, at 9; the SCI plaintiff and one set of defendant-intervenors call it the "Exemption Rule," *see* SCI Mem. in Supp. of Mot. for Summ. J., ECF No. 45, at 6; Intervenor-Defendants Defenders of Wildlife, Humane Society of the United States, and Born Free USA's ("DOW defendant-intervenors") Reply in Supp. of Friends of Animals' Mot. to Dismiss and Opp'n to Pls.' Mot. for Summ. J. and Cross-Mot. for Summ. J., ECF No. 83, at 8; and the defendant-intervenor Friends of Animals terms the regulation the "Sport-Hunting Rule," *see* SCI Defendant-Intervenor Friends of Animals' Mem. in Supp. of Cross-Mot. for Summ. J., ECF No. 73-1, at 11.  The Court will continue to refer to the regulation as the "Captive-bred Exemption" for consistency, and because the Court believes that this nomenclature best describes the purpose of the rule.

[6] The EWA Action was originally before another district judge in this jurisdiction, but was transferred to the under-signed judge on March 14, 2012 over the objection of the EWA plaintiffs, because the judge to whom the case was originally assigned and the under-signed judge determined it was related to the SCI Action.  *See* Mem. Op. and Order (Mar. 16, 2013), ECF No. 30, at 2; Reassignment of Civil Case, 12-cv-00340, ECF No. 9.  The Court consolidated the SCI Action and the EWA Action on March 16, 2012.  *See* Mem. Op. and Order (Mar. 16, 2012), ECF No. 30, at 1.  At that time, the Court directed the parties to make all filings related to the consolidated action in 11-cv-01564.  *See id.* at 5.  In this Memorandum Opinion, all references to the docket are to 11-cv-01564 unless otherwise indicated.

species specifically for U.S. captive-bred scimitar-horned oryx, addax, and dama gazelle. *See id*. Since the Captive-bred Exemption was issued at the same time as the Listing Rule, the 2012 removal of the Captive-bred Exemption means that the three antelope species are subject, for the first time, to full enforcement of the regulations for endangered species.

This Court denied the plaintiffs' motions for a preliminary injunction in the SCI Action and the EWA Action that would have essentially enjoined enforcement of the endangered species listing of the three antelope species pending the outcome of this litigation. *See Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 103-04 ("*SCI P.I. Decision*").[7] The Court later granted the motions to intervene, as defendant-intervenors, of several organizations: Friends of Animals, Defenders of Wildlife, the Humane Society of the United States, and Born Free USA (collectively, the "defendant-intervenors").[8] *See Safari Club Int'l v. Salazar*, 281 F.R.D. 32, 42 (D.D.C. 2012) ("*SCI Intervenors Decision*").

Pending before the Court are ten motions: four motions in the SCI Action, namely (1) SCI's Motion for Summary Judgment, ECF No. 45, (2) Federal Defendants' Cross-Motion for Summary Judgment, ECF No. 68, (3) DOW Intervenor-Defendants' Cross-Motion for Summary Judgment, ECF No. 70, and (4) Defendant-Intervenor Friends of Animals' Cross-Motion for Summary Judgment, ECF No. 73; and six motions in the EWA Action, namely (1) EWA's Motion to Supplement the Administrative Record ("AR"), ECF No. 76, (2) EWA's Motion for Summary Judgment, ECF No. 78, (3) Defendant-Intervenor Friends of Animals' Motion to

---

[7] The SCI plaintiff and the EWA plaintiffs sought slightly different forms of injunctive relief in their motions for a preliminary injunction. "[T]he plaintiff in the SCI Action [sought] to enjoin enforcement of endangered species status for U.S. non-native captive populations of three antelope species . . . while the plaintiffs in the EWA Action [sought] more narrow relief to enjoin enforcement of [the Removal Rule]." *SCI P.I. Decision*, 852 F. Supp. 2d at 103-04 (emphasis omitted).

[8] The Court refers to the Defenders of Wildlife, the Humane Society of the United States, and Born Free USA, who have filed their briefs as a group, as the "DOW defendant-intervenors."

Dismiss, ECF No. 47, (4) Defendant-Intervenor Friends of Animals' Cross-Motion for Summary

Judgment (Lack of Standing), ECF No. 87, (5) Federal Defendants' Cross-Motion for Summary

Judgment, ECF No. 84, and (6) DOW Intervenor-Defendants' Cross-Motion for Summary

Judgment, ECF No. 83.[9]

The Court will address each set of motions in turn, first addressing the motions pending

in the SCI Action and then proceeding to the motions pending in the EWA Action.[10]  For the

reasons explained below, in the SCI Action, the Court denies SCI's Motion for Summary

Judgment, ECF No. 45, and grants the cross-motions for summary judgment of the federal

defendants, the DOW defendant-intervenors, and the defendant-intervenor Friends of Animals.

ECF Nos. 68, 70, 73.  As to the EWA Action, the Court denies EWA's Motion for Summary

---

[9] The memoranda filed in support of many of these motions are docketed twice and, to simplify citation, the Court will reference only one of the duplicate memoranda.  For example, the Federal Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Federal Defendants' Cross-Motion for Summary Judgment is docketed twice, once at ECF No. 68 and once at ECF No. 69; the Court will refer only to the memorandum at ECF No. 68.  The DOW Intervenor-Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Intervenor-Defendants' Cross-Motion for Summary Judgment is docketed at ECF Nos. 70 and 71, and the Court will refer only to the memorandum at ECF No. 70.  The Friends of Animals' Opposition to Safari Club's Motion for Summary Judgment and Memorandum in Support of Cross-Motion for Summary Judgment is docketed at ECF Nos. 72 and 73, and the Court will refer only to the memorandum at ECF No. 73.  The Federal Defendants' Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment is docketed at ECF Nos. 84 and 85, and the Court will refer only to the memorandum at ECF No. 84.  The DOW Intervenor-Defendants' Reply in Support of Friends of Animals' Motion to Dismiss, and Intervenors' Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment is docketed at ECF Nos. 82 and 83, and the Court will refer only to the memorandum at ECF No. 83.

[10] The SCI Action and the EWA Action have two separate Administrative Records ("ARs").  In the SCI Action, the federal defendants did not file the AR directly on the docket but instead filed manually a CD containing the AR for the Listing Rule.  *See* Notice of Filing of AR, ECF No. 22.  That CD consists of 401 documents totaling 2901 pages, as well as a privilege log listing the 33 documents totaling 318 pages that were withheld.  The FWS subsequently filed two Notices of Filing Supplement to the Administrative Record.  The first, filed on February 15, 2012, supplemented the AR with two additional documents totaling two pages.  *See* Notice of Filing Supplement to the AR, ECF No. 23.  Part of one of those pages, an email, was withheld and added to a revised privilege log.  *Id.*  The second, filed on February 29, 2012, supplemented the AR with 8 documents totaling 146 pages.  *See* Notice of Filing Second Supplement to the AR, ECF No. 25.  The parties in the SCI Action filed an Appendix consisting of 56 documents.  *See* Notice of Filing of AR Appendix, ECF No. 102.  The FWS filed the AR for the Removal Rule, challenged in the EWA Action, on April 13, 2012, both manually and on the docket.  *See* Notice of Filing AR, ECF No. 64; EWA AR, ECF No. 65.  The Removal Rule AR consists of 234 documents totaling 953 pages, as well as a privilege log listing the 124 documents totaling 307 pages that were withheld.  *See* EWA AR, ECF No. 65; EWA Privilege Log, ECF No. 64-3.  The parties in the EWA Action filed an Appendix consisting of 409 pages.  *See* Notice of Filing of Appendix, ECF No. 103.

Judgment, ECF No. 78, the Defendant-Intervenor Friends of Animals' Cross-Motion for

Summary Judgment (Lack of Standing), ECF No. 87, the Defendant-Intervenor Friends of

Animal's Motion to Dismiss, ECF No. 47, and the Plaintiff's Motion to Supplement the AR,

ECF No. 76, and grants the cross-motions for summary judgment of the federal defendants and

the DOW defendant-intervenors.  ECF Nos. 83, 84.

# I.   FACTUAL AND PROCEDURAL BACKGROUND[11]

## A.   Statutory And Regulatory Background Of The Endangered Species Act

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, enacted in 1973, is "the

most comprehensive legislation for the preservation of endangered species ever enacted by any

nation" in the world.  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  Indeed, it is

landmark legislation, the purpose of which is "to provide a means whereby the ecosystems upon

which endangered species and threatened species depend may be conserved, to provide a

program for the conservation of such endangered species and threatened species, and to take

such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth

in subsection (a) of this section."  16 U.S.C. § 1531(b).  A brief review of the history of the ESA

is helpful in understanding the context of the plaintiffs' challenges to the Listing and Removal

Rules.

The legislative history of the ESA reveals "[t]he long and painstaking development of the

Federal endangered and threatened species program[.]"  S. Rep. No. 97-418, at 3 (1982).  The

development of the program began in earnest in the 1960s, with the Endangered Species

Preservation Act of 1966, which was the first comprehensive attempt at species conservation.

---

[11] The factual and procedural background draws in part from this Court's earlier Memorandum Opinions regarding
the motions for preliminary injunction and the motions to intervene.  *See SCI P.I. Decision*, 852 F. Supp. 2d at 104-
09; *SCI Intervenors Decision*, 281 F.R.D. at 34-36.

*See* S. Rep. No. 97-418, at 1.  That Act "[d]eclar[ed] the preservation of endangered species a national policy[.]"  *Tenn. Valley Auth.*, 437 U.S. at 174-75.  While "the 1966 Act was an important step toward conserving endangered species, it had serious drawbacks including its failure to prohibit the taking of endangered species."  S. Rep. No. 97-418, at 2.  Thus, Congress subsequently enacted the Endangered Species Conservation Act of 1969 to "correct[ ] several of the weaknesses of the 1966 Act."  *Id.*; *see also Tenn. Valley Auth.*, 437 U.S. at 175 (noting that the 1969 legislation, for example, "empowered [the Secretary] to list species threatened with worldwide extinction" (citation and internal quotation marks omitted)).

Yet, "[e]ven with the 1966 and 1969 Acts, the endangered species program was far from adequate [because] [t]here still were no prohibitions on the taking of endangered species, and the habitat protection provisions were limited[.]"  S. Rep. No. 97-418, at 2; *see also Tenn. Valley Auth.*, 437 U.S. at 176 (explaining that while "the 1966 and 1969 legislation represented 'the most comprehensive of its type to be enacted by any nation' . . . a more expansive approach was needed if the newly declared national policy of preserving endangered species was to be realized" (footnote omitted) (citation omitted)).  Thus, although "the Acts of 1966 and 1969 [had] laid the framework for an increasingly effective endangered species conservation program, . . . the Department of the Interior ha[d] indicated some difficulties in expanding the practical effect of the program to the spirit of the original legislation[.]"  S. Rep. No. 93-307, at 3 (1973).

Responding to these difficulties, Congress promulgated the ambitious ESA, creating a statutory framework to effectuate Congress's goal of protecting vital and endangered species of animals.  Indeed, the ESA "correct[ed] the shortcomings of its previous legislative efforts," S. Rep. No. 97-418, at 2, by "construct[ing] a comprehensive means to balance economic growth and development with adequate conservation measures[,]" H.R. Rep. No. 97-567, pt. 1, at 10

(1982) (explaining that the ESA is a "multi-faceted measure . . . designed to restore species that are so depleted in numbers that they are in danger of, or threatened with, extinction").

Congress enacted the ESA for reasons "beyond the aesthetic[,]" including to ensure the continued existence of species to "perform vital biological services to maintain a 'balance of nature' within their environments" and provide "for biological diversity for scientific purposes." S. Rep. No. 93-307, at 2.  By the time the ESA was enacted in 1973, there had been "'a dramatic rise in the number and severity of the threats faced by the world's wildlife.'" *Tenn. Valley Auth.*, 437 U.S. at 177 (quoting *Endangered Species: Hearings Before the Subcomm. on Fisheries and Wildlife Conservation and the Env't of the H. Comm. on Merchant Marine and Fisheries*, 93rd Cong. 202 (1973) (statement of Nathaniel P. Reed, Ass. Sec. for Fish and Wildlife and Parks, Dept. of the Interior)).  Wary that continued threats would result in future species extinction, Congress determined that endangered "species and their preservation is of value and a matter of concern to the United States for educational and scientific reasons and because the nation has made sovereign commitments . . . to protect such species of fish and wildlife facing extinction." S. Rep. No. 93-307, at 6; *see also* H.R. Rep. No. 97-567, at 9.  Underpinning the promulgation of the ESA was the belief that "'it is in the best interest of mankind to minimize the losses of genetic variations'" because endangered species "'are keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask.'" *Tenn. Valley Auth.*, 437 U.S. at 178 (quoting H.R. Rep. No. 93-412, at 5 (1973)).  There was also apprehension that loss of endangered species would impact "the *unknown* uses that endangered species might have and . . . the *unforeseeable* place such creatures may have in the chain of life on this planet[,]" *Tenn. Valley Auth.*, 437 U.S. at 178-79 (emphasis in original), and there was recognition that "species do not exist in isolation, but evolve and fluctuate in abundance because

8

of their relationships with other species and the physical environment[,]" Eugene H. Buck et al.,

Cong. Research Serv., R41608, *The Endangered Species Act (ESA) in the 112th Congress:*

*Conflicting Values and Difficult Choices ("CRS – ESA – 112th Congress")*, at 3 (2012).  It was

these interests that led to the creation of the ESA.

> As noted, the ESA has three purposes, as enumerated in 16 U.S.C. § 1531(b):

> [1] to provide a means whereby the ecosystems upon which endangered species
> and threatened species depend may be conserved, [2] to provide a program for the
> conservation of such endangered species and threatened species, and [3] to take
> such steps as may be appropriate to achieve the purposes of the treaties and
> conventions set forth in subsection (a) of this section.

16 U.S.C. § 1531(b).

> "A major goal of the ESA is the recovery of species to the point at which the protection

of the ESA is no longer necessary."  M. Lynne Corn et al., Cong. Research Serv., RL31654, *The*

*Endangered Species Act: A Primer ("CRS – ESA Primer")*, at 5 (2012).[12]  To reach this goal, as

is relevant here, the ESA "authorizes the Department of the Interior to take measures to protect

species at risk of extinction."  *Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 646 F.3d 914, 915

(D.C. Cir. 2011).  The ESA's comprehensive scheme includes, as discussed below: (1) a

mechanism for listing a species as endangered in section 4, 16 U.S.C. § 1533, (2) prohibitions

that protect an endangered species in section 9, 16 U.S.C. § 1538(a), and (3) exemptions to these

prohibitions in section 10, 16 U.S.C. § 1539.  While the ESA, on one hand, provides strict

guidelines for the preservation of animal species, it also provides the Secretary of the Interior

some flexibility in how the agency regulates endangered species once they are designated as

---

[12] That goal is still aspirational, but the ESA has made progress.  For example, one means by which to determine the
success of the ESA is by measuring its impact on the stabilization or increase of listed species.  According to this
metric, "the ESA could be considered a success, since a large number (41% of listed species according to one study)
have improved or stabilized their population levels."  *CRS – ESA Primer* at 6 (citing U.S. Dep't of the Interior, Fish
and Wildlife Serv., *Report to Congress on the Recovery of Threatened and Endangered Species, Fiscal Years 2005-
2006*, at 2 (2006)).

endangered.  Since the parties disagree with respect to how the agency decided to regulate the

three antelope species, the Court will examine these statutory provisions in some detail.

### 1.       Section 4 – Listing Species As Endangered Under The ESA

In promulgating the ESA, Congress recognized that, in order to be successful, the ESA

must in particular "provide the Secretary[[13]] with sufficient discretion in listing and delisting

animals so that he may afford present protection to those species which are either in present

danger of extinction or likely within the foreseeable future to become so endangered[.]"  S. Rep.

No. 93-307, at 3.  Thus, section 4 of "[t]he ESA requires the Secretary of the Interior to

promulgate regulations listing those species of animals that are 'threatened' or 'endangered'

under specified criteria, and to designate their 'critical habitat.'"  *Bennett v. Spear*, 520 U.S. 154,

157-58 (1997) (citing 16 U.S.C. § 1533).

In order to make a listing determination, "the [FWS] must first define the species so the

agency can estimate its population."  *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 994 (D.C.

Cir. 2008).  The ESA explains that the term "species" "includes any subspecies of fish or wildlife

or plants, and any distinct population segment of any species of vertebrate fish or wildlife which

interbreeds when mature."  16 U.S.C. § 1532(16).

As used in this definition, the term "distinct population segment" ("DPS") is not itself

defined.  *See* Policy Regarding the Recognition of Distinct Vertebrate Population Segments

Under the Endangered Species Act ("DPS Policy"), 61 Fed. Reg. 4722, 4722 (Feb. 7, 1996).

The FWS thus promulgated its own policy, in 1996, to define this term and detail the myriad of

---

[13] As the FWS explains, "[d]epending on the species, either the Secretary of Commerce or the Secretary of the Interior classifies a species as endangered or threatened.  16 U.S.C. § 1533(a).  The Secretary of the Interior has responsibility for the Three Antelope species."  EWA Fed. Defs.' Mem. in Supp. of Fed. Defs.' Cross-Mot. for Summ. J. and in Opp'n to Pls.' Mot. for Summ. J. ("EWA Fed. Defs.' Mem."), ECF No. 84, at 2 n.1; 16 U.S.C. § 1532(15).  The Secretary of the Interior has, in turn, delegated this responsibility to the FWS.  *See Am. Wildlands*, 530 F.3d at 994 (citing 50 C.F.R. § 402.01(b)).

factors – including the "[d]iscreteness of the population segment[,]" the "[s]ignificance of the population segment[,]" and the "population segment's conservation status" – that the agency must consider in designating a population as a DPS.  *See id* at 4725.[14]

In promulgating the DPS Policy, the FWS acknowledged Congress's direction that the Secretary should use its authority with respect to designating DPSs "'sparingly'" and only in instances "'when the biological evidence indicates that such action is warranted.'"  *Id*. at 4722 (quoting S. Rep. No. 96-151, at 1397 (1979)).  While Congress recognized "that there may be instances in which FWS should provide for different levels of protection for populations of the same species[,]" S. Rep. No. 96-151, at 1397, it did not intend for this exception to swallow the general rule of listing species as a whole under the ESA.  Indeed, Congress expressed its reluctance to allow the DPS authority to be used widely, and noted that it was "aware of the great potential for abuse of this authority."  *Id*.  The FWS, in promulgating the policy, noted specifically that "[t]he Services have used this authority relatively rarely; of over 300 native vertebrate species listed under the Act, only about 30 are given separate status as DPS's."  DPS Policy, 61 Fed. Reg. at 4722.

---

[14] Specifically, before making the unusual step of designating a population as a DPS, the agency must look at a number of factors, including: (1) "[d]iscreteness of the population segment in relation to the remainder of the species to which it belongs;" (2) "[t]he significance of the population segment to the species to which it belongs;" and (3) "[t]he population segment's conservation status in relation to the [ESA's] standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?)."  DPS Policy, 61 Fed. Reg. at 4725.  A population may be considered "discrete" for purposes of classifying it as a DPS if it is either "markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors" or "delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the [ESA]."  *Id*.  In considering the "significance" of a population, the FWS may consider: (1) "[p]ersistence of the discrete population segment in an ecological setting unusual or unique for the taxon," (2) "[e]vidence that loss of the discrete population segment would result in a significant gap in the range of a taxon," (3) "[e]vidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range," or (4) "[e]vidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics."  *Id*.

An endangered species is a species that "is in danger of extinction throughout all or a significant portion of its range[.]"  16 U.S.C. § 1532(6).  While "[s]pecies may be listed on the initiative of the appropriate Secretary or by petition from an individual, group, or state agency[,]" *CRS – ESA Primer* at 8, and "[t]he public may play an active role in this process. . . . [t]he final decision on whether or not to list the species as endangered or threatened rests with the Secretary[,]" H.R. Rep. No. 97-567, at 10; *see also* 16 U.S.C. § 1533(b)(3).

The ESA states that "[t]he Secretary shall . . . determine whether any species is an endangered species or a threatened species because of any of the following factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a).

The Secretary makes a listing determination:

> solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

16 U.S.C. § 1533(b)(1)(A); *see also Am. Wildlands*, 530 F.3d at 994.

Determining "[w]hether a species has declined sufficiently to justify listing is a biological, not an economic, question[,]" H.R. Rep. No. 97-567, at 12, and thus listing decisions must be made "without reference to economic costs or private property impacts[,]"  Robert Meltz, Cong. Research Serv., RL31796, *The Endangered Species Act (ESA) and Claims of Property Rights "Takings" ("CRS – ESA – Takings")*, at 2 (2013); *see also CRS – ESA Primer* at

12

18 ("[T]he ESA makes clear that the question of whether a species is endangered or threatened is a scientific decision in which economic factors must not play a part.").

Under the ESA's listing requirements, "[a]s of February 28, 2012, a total of 1,199 species of animals and 797 species of plants were listed as either endangered or threatened under the ESA[.]"  *CRS – ESA – 112th Congress* at 2; *see also* 50 C.F.R. § 17.11(h) ("List of Endangered and Threatened Wildlife").  Such listings are made without "distinction between wild or captive populations, populations of native or non-native species or species that are bred in captivity."  SCI AR 135.0004 (FWS Letter to Hunter Schuele, dated May 7, 1993).  Indeed, out of all listed species of animals, the FWS has represented to the Court that there is only *one* instance "in which members of a species held in captivity are designated differently than members of the species in the wild."  Fed. Defs.' Notice of the Publication of a Proposed Rule and 12-Month Finding on Chimpanzees, ECF No. 118, at 1.  That one instance is the chimpanzee, and recently, on June 12, 2013, the FWS has proposed a rule to list all chimpanzees – captive and wild – as endangered.  *See id.* (citing Listing All Chimpanzees as Endangered, Proposed Rule and 12-month Petition Finding, 78 Fed. Reg. 35,201 (June 12, 2013) (to be codified at 50 C.F.R. pt. 17)).  If the FWS finalizes the rule governing chimpanzees, there will be *no* instances of members of a listed species held in captivity designated differently than members of the species in the wild.  *See id*.

## 2.    Section 9 Prohibitions

"When a species . . . is listed as either 'threatened' or 'endangered' under the [ESA], it is then subject to a host of protective measures designed to conserve the species."  *Safari Club Int'l v. Salazar (In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig. - MDL No. 1993)*, 709 F.3d 1, 2 (D.C. Cir. 2013).  The species are subject, for example, to the section 9

prohibitions, which make it unlawful "for any person subject to the jurisdiction of the United States" to, *inter alia*, "import[,]" "export[,]" "possess, sell, deliver, carry, transport, or ship, by any means whatsoever[,]" "take any such species within the United States or the territorial sea of the United States[,]" "deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species[,]" or to "sell or offer for sale in interstate or foreign commerce any such species[.]"  16 U.S.C. § 1538(a); *see also Humane Soc'y of U.S. v. Kempthorne*, 527 F.3d 181, 182 (D.C. Cir. 2008); *CRS – ESA – Takings* at 2 ("Listing and critical habitat designation trigger . . . Section 9's prohibitions[.]").

The prohibition on "take" means that it is unlawful "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  In particular, the term "harm" refers to "an act which actually kills or injures wildlife[,]" while the term "harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering."  50 C.F.R. § 17.3.  When applied to captive animals, the definition for "harass" does not include the "generally accepted" practices of animal husbandry, breeding, or aspects of veterinary care.  *Id*.

### 3.     Section 10 Permitting Exemptions

While the ESA contains strict guidelines when it comes to determining whether a species should be listed as endangered, the ESA provides more flexibility to the FWS in assessing *how* to conserve a species after it has been listed.

14

Section 10 of the ESA grants authority to the FWS to make certain exceptions to the section 9 prohibitions described above. *See* 16 U.S.C. § 1539(a)(1)(A). While the "taking" of an endangered species is generally prohibited, the ESA allows some "taking" of endangered species through its permitting program, limited to take that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity[,]" 16 U.S.C. § 1539(a)(1)(B), or "for scientific purposes or to enhance the propagation or survival of the affected species," 16 U.S.C. § 1539(a)(1)(A); *see also CRS – ESA Primer* at 14 ("For actions by private parties that might take a listed species, but without any federal nexus such as a loan or permit, the Secretary may issue permits to allow 'incidental take' of species for otherwise lawful actions.").

Section 10(c) requires the FWS to "publish notice in the Federal Register of each application for an exemption or permit which is made under this section," and further provides that "[e]ach notice shall invite the submission from interested parties . . . of written data, views, or arguments with respect to the application[.]" 16 U.S.C. § 1539(c). "Information received by the Secretary as a part of any application shall be available to the public as a matter of public record at every stage of the proceeding." *Id*. Section 10(d) additionally provides for "exceptions under subsections 10(a)(1)(A) and (b)" if the Secretary finds and publishes in the Federal Register that the exceptions are (1) "in good faith," (2) "will not operate to the disadvantage of such endangered species," and (3) "will be consistent with the purposes and policy" of the ESA. 16 U.S.C. § 1539(d).

The FWS has promulgated regulations detailing the application requirements for individual permits as well as the criteria for the issuance of permits. *See* 50 C.F.R. § 17.22. Under the authority of section 10, the FWS has also promulgated a permitting program aimed at "enhanc[ing] the propagation or survival" of captive-bred wildlife. *See* 50 C.F.R. § 17.21(g).

15

Pursuant to this regulation, a person may "take; export or re-import; deliver, receive, carry, transport or ship in interstate or foreign commerce, in the course of a commercial activity; or sell or offer for sale in interstate or foreign commerce any endangered wildlife that is bred in captivity in the United States provided that[,]" *inter alia*, "[t]he purpose of such activity is to enhance the propagation or survival of the affected species[.]"  *Id*.

### B.       Statutory Background Of The National Environmental Policy Act

The plaintiffs in the EWA Action claim that the FWS violated not only the APA and ESA but also the National Environmental Policy Act ("NEPA") in promulgating the Removal Rule. NEPA represents "a broad national commitment to protecting and promoting environmental quality."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331).  It was created to advance "three major purposes[,]" namely:

> (1) to declare protection of environmental quality to be a national policy and
> provide a mandate to all Federal agencies to effect that policy; (2) to create a
> Council on Environmental Quality to insure that the mandate is carried out; and
> (3) to establish a set of 'action forcing' procedures requiring an environmental
> impact statement on any proposed major Federal action which could significantly
> affect the quality of the environment.

S. Rep. No. 94-152, at 3 (1975).

NEPA requires federal agencies "to the fullest extent possible" to prepare an environmental impact statement ("EIS") in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(C); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 15-16 (2008).  The EIS is a "detailed statement of environmental consequences[.]" *Kleppe v. Sierra Club*, 427 U.S. 390, 394 (1976).  "The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's 'action-forcing' purpose in two important respects[,]" *Robertson*, 490 U.S. at 349, by

(1) "'ensur[ing] that the agency, in reaching its decision, will have available and will carefully consider, detailed information concerning significant environmental impacts'" and (2) "'guarantee[ing] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision[,]'" *Blue Ridge Envtl. Def. League v. NRC*, 716 F.3d 183, 188 (D.C. Cir. 2013) (quoting *Robertson*, 490 U.S. at 349).

There are exceptions to the NEPA requirement that agencies prepare an EIS, however, including that an agency need not prepare an EIS (1) "if it finds, on the basis of a shorter 'environmental assessment' (EA), that the proposed action will not have a significant impact on the environment[,]" *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2750 (2010) (citing 40 C.F.R. §§ 1508.9, 1508.13 (2009)), (2) "[w]here an agency lacks discretion concerning the action to be taken," *see* EWA Fed. Defs.' Mem. in Supp. of Cross-Mot. for Summ. J. and in Opp'n to Pls.' Mot. for Summ. J. ("EWA Fed. Defs.' Mem."), ECF No. 84, at 25 (citing *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001) (explaining that where "the agency does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have no affect [sic] on the agency's actions, and therefore NEPA is inapplicable")), and (3) where the agency action falls under a "categorical exclusion," *Reed v. Salazar*, 744 F. Supp. 2d 98, 103 (D.D.C. 2009).

### C. Overview Of The FWS's Regulatory Efforts To Conserve The Three Antelope Species And Legal Challenges To Those Efforts

The history of the FWS's regulatory efforts with respect to the three antelope species reaches back more than two decades, and litigation over those efforts reaches back nearly as long.  The Court reviews this complex web of regulatory efforts and litigation challenges below.

As a preliminary matter, however, the Court first briefly describes the three antelope species, all native to the continent of Africa, at the center of these regulatory efforts.  The scimitar-horned oryx, which once had an extensive range in North Africa, stands about 47 inches tall and weighs about 450 pounds with a generally pale coat and dark reddish brown neck and chest.  *See* Listing Rule, 70 Fed. Reg. at 52,319.  Adult oryx possess a pair of horns curving back in an arc up to 50 inches.  *See id*.  The addax, which once existed throughout the deserts and sub-deserts of North Africa, from the Atlantic Ocean to the Nile River, stands about 42 inches tall and weighs around 220 pounds with a grayish white coat and spiral horns which twist up to 43 inches long.  *See id*.  The dama gazelle, the largest of the gazelles and the smallest of the three antelope species at issue in this suit, was once common and widespread in arid and semi-arid regions of the Sahara.  This animal is about 39 inches tall at the shoulder and weighs about 160 pounds with a mostly reddish brown body, but a white head, rump, and underparts.  *See id*.  The dama gazelle's horns extend back and up, reaching a length of about 17 inches long.  *See id.*

"Wild numbers of the three antelopes have declined drastically over the past 50 years" as a result of "habitat loss, uncontrolled killing, and the inadequacy of existing regulatory mechanisms."  Captive-bred Exemption, 70 Fed. Reg. at 52,310.  As of the 2005 Listing Rule, there had been no sightings of wild scimitar-horned oryx since the mid-1980s, and there were estimates that the addax "probably numbers fewer than 600 in the wild[,]" and the dama gazelle numbers "fewer than 700 in the wild."  *Id*.[15]

Captive populations of the three antelope species exist in the United States and other parts of the world, including on ranches owned by some of the plaintiffs in this consolidated

---

[15] As of June 2013, "[t]he oryx is believed to be extirpated in the wild, the addax numbers fewer than 300, and the dama gazelle numbers fewer than 500."  12-Month Findings on Petitions to Delist U.S. Captive Populations of the Scimitar-horned Oryx, Dama Gazelle, and Addax, 78 Fed. Reg. 33,790 (June 5, 2013).

case.  As of the Listing Rule in 2005, the FWS cited estimates from the Sahelo-Saharan Interest

Group that there were "about 4,000-5,000 scimitar-horned oryx, 1,500 addax, and 750 dama

gazelle in captivity worldwide."  Listing Rule, 70 Fed. Reg. at 52,322.  As to the captive

populations within the United States, a 2004 study conducted by Dr. Elizabeth Mungall for the

EWA regarding population and habitat conditions of the three antelope species indicated that the

population of these animals held privately in Texas had soared over time, with the population of

scimitar-horned oryx increasing from 32 in 1979, to 1,006 in 1994, to 2,145 in 1996; the

population of addax increasing from 2 in 1971, to 587 in 1994, to 1,824 in 1996; and the

population of dama gazelle increasing from 9 in 1979, to 149 in 1994, to 91 in 1996, to 369 in

2003.  *See* SCI Mem. in Supp. of Mot. for Summ. J. ("SCI Mem."), ECF No. 45, at 4-5 (citing

SCI AR 221.0005, Ex. A, ECF No. 45-2, Elizabeth Cary Mungall, Submission for the Comment

Period on Proposed Listing of Scimitar-Horned Oryx, Addax, and Dama Gazelle Under the

Endangered Species Act 2 (2004)).

### 1.      FWS Regulatory Efforts From 1991-2004

It is in the context of dwindling numbers of the three antelope species in the wild that, in

1991, the FWS began a decades-long pursuit to protect the three antelope species under the ESA

by proposing an endangered status listing for these animals.  *See* Proposed Endangered Status for

Scimitar-horned Oryx, Addax, and Dama Gazelle, 56 Fed. Reg. 56,491 (Nov. 5, 1991) (to be

codified at 50 C.F.R. pt. 17).  That proposal recognized that the three antelope species "were

declining in numbers and had been eliminated in much of their range[,]" and sought feedback as

the agency considered alternatives such as listing the species "as endangered, as threatened with

special regulations, or as threatened by reason of similarity of appearance."  *Id*. at 56,491-92.

19

As a critical part of the deliberations, the FWS opened comment periods on the proposed rule on three additional occasions: on June 8, 1992, July 24, 2003, and November 26, 2003. *See Reopening of Comment Period on Proposed Endangered Status for Scimitar-horned Oryx, Addax, and Dama Gazelle*, 57 Fed. Reg. 24,220 (June 8, 1992) (to be codified at 50 C.F.R. pt. 17); *Endangered Status for Scimitar-Horned Oryx, Addax, and Dama Gazelle*, 68 Fed. Reg. 43,706 (July 24, 2003) (to be codified at 50 C.F.R. pt. 17); *Endangered Status for Scimitar-Horned Oryx, Addax, and Dama Gazelle*, 68 Fed. Reg. 66,395 (Nov. 26, 2003) (to be codified at 50 C.F.R. pt. 17). Over the course of those comment periods, the agency received a total of 56 comments, mostly from U.S. game ranchers (who accounted for 62.5% of the comments), as well as zoos and zoo organizations (8.9% of comments), governments of range countries (7.1%), hunting organizations (7.1%), exotic wildlife breeding organizations (5.4%), the general public (5.4%), and international scientific organizations (3.6%). *See* Listing Rule, 70 Fed. Reg. at 52,320. In summarizing the comments from that period, the FWS found that "*[n]o comments were submitted that demonstrate that the three antelope species do not qualify as endangered under the [ESA].*" *Id.* (emphasis added).

As early as 1991, the FWS considered that "[c]aptive and free-roaming groups, outside of the natural ranges of the species, may be covered separately from natural populations in any final rule." *Proposed Endangered Status for Scimitar-horned Oryx, Addax, and Dama Gazelle*, 56 Fed. Reg. at 56,491; SCI AR 56.0001. Indeed, over the next decade, the FWS debated this issue internally, entertained possibilities within the agency of listing the captive members of the species differently than wild members of the species, and "drafted a number of final listing rules based on these alternatives." SCI Fed. Defs.' Mem. in Opp'n to Pl.'s Mot. for Summ. J. and in Supp. of Cross-Mot. for Summ. J. ("SCI Fed. Defs.' Mem."), ECF No. 68, at 14 (citing SCI AR

20

65.0005 (draft rule to list only wild members of the three antelope species as endangered); SCI

AR 83-109 (draft rule to list captive and wild members of the three antelope species in their

native ranges as endangered); SCI AR 109.002 (draft rule to list only wild members of the three

antelope species as endangered); SCI AR 135.0014, 135.0044, 135.0071 (draft rule to list wild

members of the three antelope species as endangered and captive animals as threatened); SCI AR

140.0013 (draft rule to list all members of the three antelope species as endangered)).

The agency was keenly aware that, while there was widespread agreement that the three

antelope species were endangered in the wild, commenters largely opposed inclusion of captive

members of the species within an endangered listing.  Of the comments submitted over the

course of the comment periods, scientific authorities in two African countries, which encompass

native ranges of the three antelope species, supported the proposed rule listing as endangered all

members of the three antelope species.  Listing Rule, 70 Fed. Reg. at 52,320.  All of the other

commenters, however, including the zoo community and the exotic animal ranching community,

opposed listing the captive members of the species, which, unlike the three antelope species in

the wild, were "relatively robust."  *Id*.  Indeed, the exotic ranching community voiced "uniform"

opposition to the rule, expressing concern that it would provide a disincentive for continuing to

breed the animals.  *Id*.  The ranchers were concerned, in particular, about "the need to go through

potentially lengthy and cumbersome permit processes to continue their longstanding activities

with these species, in accordance with the regulations at 50 CFR 17.21(g)(1)."  *Id*.

The Listing Rule's drafting period appears to have stretched over a period of fourteen

years for two primary reasons.  First, the agency engaged in an active debate during which the

"proposal was never finalized due to issues about how best to address captive populations of

these species under a Section 4 listing."  SCI AR 153 (Note from Eleanora Babij, Division of

Scientific Authority ("DSA") to Reviewer, dated Oct. 28, 2002).  The SCI AR indicates that the agency was sensitive to the concerns of the exotic ranchers, noting the "legitimate desire to avoid imposing unnecessary restrictions on U.S. ranchers with large populations of these three species and at the same time not creating unnecessary permit issuance work."  SCI AR 136.0004 (Memorandum from Charles Dane, Chief of the Office of Scientific Authority ("OSA") to Chief, Division of Endangered Species, dated Mar. 14, 1994, stating "extreme[ ] frustrat[ion]" with "efforts to provide appropriate protection to the obviously endangered African antelopes"); *see also* SCI Mem. in Supp. of Mot. for Summ. J. ("SCI Mem."), ECF No. 45, at 12 ("The [FWS's] protracted deliberation over the listing status of the three species was due in great part to the agency's dilemma as to how to protect the species in the wild without severely undermining the trade and use that had so benefitted the U.S. population numbers and health of the captive herds.").  Indeed, the SCI AR is replete with documents asserting proposed means to deal with the U.S. captive-bred three antelope species in the face of the need to list the wild three antelope species as endangered.  *See, e.g.*, SCI AR 135.0008 (Memorandum from Ronald Nowak, OSA, to Charles Dane, Chief, OSA, dated Oct. 25, 1993, discussing various "alternatives for proceeding (or not proceeding)" with a final listing rule).

Second, a lack of funding for the FWS, beginning in 1995, resulted in a work backlog. *See Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1, 5-6 (D.D.C. 2003); SCI Fed. Defs.' Mem. at 1 ("In the years following [the initial 1991] proposal, the [FWS] deliberated over the proper listing status for the species in light of the large numbers of the species held in captivity, including in the United States, and then took no further action on the proposed listing rule due to funding constraints.").  Beginning in April 1995, "a number of spending moratoria . . . prohibit[ed] the [FWS] from listing species as endangered or threatened and prohibit[ed] the

designation of critical habitats for species already listed." *Forest Guardians v. Babbitt*, 174 F.3d

1178, 1183 (10th Cir. 1999); *see also* Emergency Supplemental Appropriations and Rescissions

for the Department of Defense to Preserve and Enhance Military Readiness Act of 1995, Pub. L.

No. 104-6, 109 Stat. 73 (1995).  In enacting these moratoria, Congress "'prohibited the

expenditure of the remaining appropriated funds for final determinations to list species or to

designate critical habitat which, in effect, placed a moratorium on those activities.'"  *Biodiversity*

*Legal Found.*, 285 F. Supp. 2d at 5-6 (citation omitted).  When "President Clinton waived the

moratorium the day he signed the [1996 appropriations bill] into law," the FWS had "a backlog

of 243 proposed species listings on which it was required to make a final determination," "182

candidate species whose conservation status needed determination, numerous court orders to take

various actions under Section 4 of the ESA, and 57 petitions to list species under the ESA."

*Forest Guardians*, 174 F.3d at 1183 & n.7 (citing Omnibus Consolidated Rescissions and

Appropriations Act of 1996, Pub. L. No. 104–134, 110 Stat. 1321 (1996)).  The FWS continued

to operate with a backlog for years after the moratorium was lifted.  *Forest Guardians*, 174 F.3d

at 1183.  As the SCI AR indicates, the moratorium evidently contributed to the delay in issuing

the Listing Rule.  *See* SCI AR 143 (Memorandum from Charles Dane, OSA, to Director, FWS,

dated Oct. 12, 1995, noting that "further action" in listing the three antelope species was

"deferred during moratorium"); SCI AR 149 (Note to file from Pamela Hall, DSA Biologist,

signed by Susan Lieberman, Chief, DSA, dated Jan. 23, 2001, stating that the "Division of

Scientific Authority decides NOT to move forward with a final rule at this time, as other issues

and species listing proposals are of higher priority" (emphasis in original)); SCI AR 216 (Email

from Roddy Gabel, Chief, DSA, to Peter Galvin, dated Dec. 15, 2003, noting that the DSA was

"still pushing along on [its] efforts to address [its] ESA backlog").

23

2.        **2005 Listing Rule**

After environmental and animals rights groups sued the FWS for failing to complete the rulemaking process for the three antelope species, *see* SCI Fed Defs.' Mem. at 1, 16, the agency, on September 2, 2005, listed the three antelope species as a whole, including wild and captive populations worldwide, as endangered under the ESA.  *See* Listing Rule, 70 Fed. Reg. at 52,321-22.  As noted, species may be listed as endangered or threatened based on one or more of the five listing factors in ESA section 4(a)(1).  In the case of the three antelope species, the FWS determined that the three antelope species were in danger of extinction based on four of the five factors, namely: (1) present or threatened destruction, modification, or curtailment of habitat or range, (2) overutilization for commercial, recreational, scientific, or educational purposes, (3) inadequacy of existing regulatory mechanisms, and (4) other natural or manmade factors.  *See id*. Of the five factors, the FWS determined that the three antelope species were *not* in danger of extinction based on disease or predation.  *See id*.

The Listing Rule, citing relevant scientific research, summarized in detail how these factors applied to the three antelope species, and concluded that "[b]ecause these threats place the species in danger of extinction throughout all or a significant portion of their ranges (in accordance with the definition of 'endangered species' in section 3(6) of the Act), we find that the scimitar-horned oryx, addax, and dama gazelle are endangered throughout their ranges, pursuant to the [ESA]."  *Id*. at 53,322-23.  Accordingly, the Listing Rule applied an endangered classification to the species "wherever they occur[,]" including in the captive-breeding programs which had documented success in "increas[ing] the numbers of these animals while genetically managing their herds."  *Id*.

24

With respect to the question of whether the captive members of the species would be listed separately or with some other designation, the FWS recognized "the role of captive breeding in the conservation of these species," but noted that "continued habitat loss and wonton killing have made reintroduction nonviable in most cases[,]" and concluded, consistent with its policy and practice of listing species as a whole as endangered, that "[i]t would not be appropriate to list captive and wild animals separately."  *Id*. at 52,320, 52,322; *see, e.g.*, SCI AR 155.0001 (Note to reviewers, dated Aug. 28, 2002, explaining that "[i]n order to be consistent in the way with which other listed species are treated, we propose in this notice that our most viable option is not to treat captive populations differently from the wild populations and to list all 3 antelopes species as Endangered").[16]

### 3.      2005 Captive-bred Exemption

While the FWS determined that the three antelope species must be classified as endangered and that "[i]t would not be appropriate to list captive and wild animals separately[,]" Listing Rule, 70 Fed. Reg. at 52,320, the agency simultaneously promulgated a Captive-bred Exemption, codified at 50 C.F.R. § 17.21(h), that would permit "otherwise prohibited activities that enhance the propagation or survival of the species[,]" including "take; export or re-import; delivery, receipt, carrying, transport or shipment in interstate or foreign commerce, in the course of commercial activity; or sale or offering for sale in interstate or foreign commerce."  *See* Captive-bred Exemption, 70 Fed. Reg. at 52,311, 52,317.[17]

---

[16] This document in the SCI AR contains the contact information of Robert R. Gabel, Chief of the DSA.  *See* SCI AR 155.0001.  In the SCI AR index, however, the sender is listed as "E. Babij, DSA."

[17] Specifically, 50 C.F.R. § 17.21 was amended by adding paragraph (h), which read, in part, as follows:

> (h)  *U.S. captive-bred scimitar-horned oryx, addax, and dama gazelle*.  Notwithstanding paragraphs (b), (c), (e), and (f) of this section, any person subject to the jurisdiction of the United States may take; export or re-import; deliver, receive, carry, transport or ship in interstate or foreign commerce, in the course of a commercial activity; or sell or offer for sale in interstate or

25

The FWS recognized that subjecting the captive-breeders of the three antelope species to the normal permitting process under ESA's section 10 could deter the breeders from continuing their breeding operations.  The FWS explained that "[i]t was critical that development of a rule that provides an incentive to continue captive breeding of these species proceed concurrently with the determination of their legal status under the [ESA] to ensure that no breeding programs would be disrupted by a final listing determination[.]"  *Id*. at 52,313.  Indeed, in the Record of Compliance the FWS prepared for the Captive-bred Exemption, the agency acknowledged that "[l]isting the species without exempting the U.S. captive-bred population could be a deterrent to further captive breeding."  SCI AR 237.0122, Ex. S, ECF No. 45-20, at 2 (United States Department of the Interior, Record of Compliance for a Rulemaking Document, dated Jan. 7, 2005).  The Economic Analysis of the Proposed Rule, an Appendix to the Record of Compliance, explained that listing the entire species of the three antelope without an exemption from permitting requirements "is possible, but it would remove all economic incentive to conserve the species by discouraging captive-breeding" and that "[w]ithout the ability to cover all costs of captive breeding there is no economic incentive to continue."  SCI AR 237.0128, Ex. T, ECF No. 45-21, at 3 (Appendix to Record of Compliance for a Rulemaking Document, Economic Analysis of the Proposed Rule).  Under this exemption, "each person claiming the benefit of the exception" was required to "maintain accurate written records of activities, including births, deaths, and transfers of specimens, and make those records accessible to [FWS] officials for inspection at reasonable hours[.]"  Captive-bred Exemption, 70 Fed. Reg. at 52,319.

---

foreign commerce live wildlife, including embryos and gametes, and sport-hunted trophies of scimitar-horned oryx (*Oryx dammah*), addax (*Addax nasomaculatus*), and dama gazelle (*Gazella dama*) provided: . . . [*inter alia* that] (7) Each person claiming the benefit of the exception of this paragraph (h) must maintain accurate written records of activities, including births, deaths, and transfers of specimens, and make those records accessible to [FWS] officials for inspection at reasonable hours set forth in §§ 13.46 and 13.47 of this chapter.

*See* Captive-bred Exemption, 70 Fed. Reg. at 52,318-19.

Additionally, any export of the three antelope species was required to meet certain "marking and reporting requirements for export . . . , general permit requirements and conditions . . . , and all [Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES")] requirements." *Id*. at 52,317.

In promulgating the exemption of the U.S. captive-bred three antelope species from certain prohibitions, on September 2, 2005, the FWS acknowledged that captive breeding in the U.S. had been helpful for the survival of the three antelope species, noting that "[c]aptive breeding in the United States has enhanced the propagation or survival" of the three antelope species "by rescuing these species from near extinction and providing the founder stock necessary for reintroduction." *Id*. at 52,310.  The FWS elaborated, explaining, *inter alia*, that "[c]aptive-breeding programs operated by zoos and private ranches have effectively increased the numbers of these animals while genetically managing their herds" and that "[a]s future opportunities arise for reintroduction in the antelope range countries, captive-breeding programs will be able to provide genetically diverse and otherwise suitable specimens." *Id*. at 52,310-11. Thus, although the Listing Rule deemed the three antelope species to be endangered, the FWS specifically responded to commenters' concerns by proposing, and ultimately issuing, the Captive-bred Exemption, to provide a blanket exemption from the enforcement of endangered species status for U.S. captive-bred scimitar-horned oryx, addax, and dama gazelle.

The FWS explained in response to a comment that while it "typically authorizes activities under section 10(a)(1)(A) of the [ESA] on a case-by-case basis through the issuance of individual permits or authorizations, there is no requirement that we may do so only via this process" and that "[t]he requirements for notification and opportunity for public comment under section 10(c) and publication of final determinations under section 10(d) have been satisfied

27

through this rulemaking process." *Id*. at 52,313.  It commented that exempting the U.S. captive-bred members of the three antelope species from the prohibitions of section 9 of the ESA would "reduce the regulatory impacts on captive-breeding operations" and "reduce economic costs of the listing" and that the "economic effect of the rule is a benefit to the captive-breeding operations for the three antelope species because it allows the take and interstate commerce of captive-bred specimens." *Id*. at 52,317.  Thus, recognizing the contributions of captive-breeders, the agency attempted to accommodate the concerns of commercial breeders and others that the agency's default permitting system would be too burdensome by providing a blanket exemption from otherwise prohibited activities.

4.      **2009 District Court Challenge To The Captive-bred Exemption ("2009 Decision")**

The Captive-bred Exemption was almost immediately challenged in court by two sets of plaintiffs, including all of the defendant-intervenors in this case as well as an individual plaintiff, who filed lawsuits in the United States District Court for the Northern District of California and the United States District Court for the District of Columbia.  Those lawsuits were consolidated in this jurisdiction, and SCI and EWA intervened as defendants.  *See Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 105-06 (D.D.C. 2009).  In the consolidated lawsuit, the plaintiffs alleged that the FWS unlawfully promulgated the Captive-bred Exemption in violation of several sections of the ESA and the NEPA.  *See id*. at 106.

The Court first determined that the plaintiffs only had standing "to pursue their claim that the FWS violated subsection 10(c) of the [ESA] when it promulgated the [Captive-bred Exemption.]"  *Id*. at 114-15.  The Court then granted summary judgment in favor of the plaintiffs because the Captive-bred Exemption violated section 10(c), which provides that "[t]he Secretary shall publish notice in the Federal Register of *each application* for an exemption or permit which

28

is made under this section."  16 U.S.C. § 1539(c) (emphasis added).  Specifically, the Court

determined "that the text, context, purpose and legislative history of [section 10] make clear that

Congress intended permits for the enhancement of propagation or survival of an endangered

species to be issued on a case-by-case basis following an application and public consideration of

that application" rather than in the form of a blanket exemption.  *Friends of Animals*, 626 F.

Supp. 2d at 115.  The Court provided several reasons for its decision.  First, the Court considered

the plain language of the statute, concluding that "Congress clearly contemplated that the FWS

would exercise its authority to grant exceptions under 'this section' (i.e., section 10) by

responding to individual applications."  *Id*. at 117.  Second, the Court found that the Captive-

bred Exemption undermines the purpose of section 10(c) by "hinder[ing] the ability of

individuals and groups to participate in the meaningful way contemplated by the ESA" by not

engaging in a case-by-case issuance of permits and thus rendering it "impossible to evaluate

whether each permitted act will enhance the propagation or survival of the species."  *Id*. at 118-

19 (explaining that under the Captive-bred Exemption, the "plaintiffs are deprived of the

information they would otherwise be provided to assess whether individual facilities will or are

in fact maintaining the antelope species in a manner that contributes to their propagation or

survival and thus are entitled to the exception" and that the Captive-bred Exemption "flies in the

face of the 'meaningful opportunity' that subsection 10(c) was intended to provide" (citation

omitted)).  Finally, the Court considered the legislative history of section 10, concluding that

"the FWS's interpretation that it may permit broad exceptions, as opposed to individual permits,

does appear to be at odds with this legislative history" and that "[b]lanket exemptions under

regulations are anathema to this intention because they allow the FWS to permit a great number

of exemptions at once without providing the detailed information to the public that would be required in an individualized analysis." *Id.* at 119.

The Court recognized that the FWS issued the Captive-bred Exemption "[a]t the same time that the FWS listed the antelope as endangered" so as to exempt captive-bred members of the three antelope species from the Listing Rule regulations. *Id.* at 107. The Court further acknowledged that "'[b]ased on information available to the [FWS], captive breeding in the United States has contributed significantly to the conservation of these species.'" *Id.* (quoting Captive-bred Exemption, 70 Fed. Reg. at 52,315). Nevertheless, bound by the "text, context, purpose and legislative history of section 10," *id.* at 116, the Court flatly rejected the FWS's efforts to defend the rule for a blanket exemption from ESA's section 9 prohibitions. The Court then "remanded" the consolidated cases to the FWS "for further proceedings consistent with the memorandum opinion[,]" *see* Order, 04-cv-01660, ECF No. 85-1, at 1; Order, 06-cv-02120, ECF No. 44-1, at 1, leaving the decision of how best to proceed to the agency's discretion. The Court, however, could not have been clearer that the Captive-bred Exemption was promulgated in violation of subsection 10(c) of the ESA.

### 5. Responses To The 2009 Decision

In response to the Court's decision that the Captive-bred Exemption was invalid, certain plaintiffs in this consolidated case sought to delist the three antelope species, and the FWS took steps to revoke the Captive-bred Exemption. Specifically, in 2010, both the SCI plaintiff and the Owen plaintiffs petitioned the FWS to delist the U.S. captive-bred herds of the three antelope species from the endangered species list because "enforcement of endangered status would 'remove all economic incentive to conserve the species by discouraging captive-breeding.'" SCI Mem. at 25 (citation omitted); *see also* SCI Compl. ¶ 10; Owen Compl. at 2.

30

Meanwhile, before the FWS acted on the petitions to delist the U.S. captive-bred herds, on July 7, 2011, the FWS published a proposed rule to withdraw in full the Captive-bred Exemption. *See* Removal of the Regulation that Excludes U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions, 76 Fed. Reg. 39,804 (July 7, 2011). This rule would eliminate the exclusion of the three antelope species from certain prohibitions in the ESA and require any person intending to engage in otherwise prohibited activity to qualify for an exemption or obtain a permit authorizing such activity. *See id.* at 39,804. The FWS opened the proposed rule for a 30-day comment period in which it received 93 comments, 2 from state agencies, 8 from nongovernment organizations, and 86 from individuals, most of whom were ranchers or individuals associated with ranches. The vast majority of the comments opposed the proposed regulation to repeal the Captive-bred Exemption. *See* Removal Rule, 77 Fed Reg. at 432.

### 6. SCI Action

Shortly after the FWS issued the proposed Removal Rule, the SCI Action was filed in this jurisdiction on August 31, 2011. The plaintiff alleged that the federal defendants violated the ESA and the APA by including U.S. captive-bred herds of the three antelope species in the 2005 listing determination, failing to remove U.S. captive herds from endangered species status after the 2009 Decision, and failing to respond in a timely manner to SCI's 2010 petition for delisting. *See* SCI Compl. ¶¶ 2, 10.[18]

---

[18] Specifically, the SCI plaintiff alleged in a five-count Complaint that the federal defendants (1) violated the APA and ESA by failing to utilize its authority to exclude the U.S. portions of the three antelope species from the listing (Count I), (2) violated the APA and ESA by erroneously and illegally including the U.S. captive populations of the three species in the endangered classification listing (Count II), (3) violated the APA and ESA by erroneously classifying the U.S. portions of the three antelope species as endangered (Count III), (4) violated the ESA through the inclusion of U.S. captive populations, which violates the conservation purposes of the ESA (Count IV), and (5) failed to act on SCI's delisting petition (Count V). *See* SCI Compl. at 22-28.

### 7.      2012 Removal Rule

On January 5, 2012, the FWS issued its final rule removing the Captive-bred Exemption, effective on April 4, 2012.  *See* Removal Rule, 77 Fed. Reg. 431.  The agency issued the Removal Rule as a necessary step to comply with the 2009 Decision.  *See* EWA Fed. Defs.' Mem. at 14 n.4 (explaining that "the [FWS] did not support or base its decision on whether or not holders of U.S. captive-bred members of the Three Antelope species would reduce or eliminate their herds . . . [r]ather . . . it based its decision on a need to take a rule off the books").  Indeed, the Removal Rule explained that:

> [t]his change to the regulations is in response to a court order that found that the rule for these three species violated section 10(c) of the [ESA].  These three antelope species remain listed as endangered under the [ESA], and a person will need to qualify for an exemption or obtain an authorization under the current statutory and regulatory requirements to conduct any prohibited activities.

Removal Rule, 77 Fed. Reg. at 431.

Speaking directly to "whether there were alternative means to comply with the Court's ruling without requiring ranches or other facilities holding these species to obtain a permit or other authorization[,]" the Removal Rule stated that the FWS determined there was no alternative "other than the currently established regulations at 50 C.F.R. 17.21(g) and 17.22 - providing for the registration of captive-bred wildlife or issuance of a permit - that would provide the public an opportunity to comment on proposed activities being carried out with these species."  *Id*. at 432.  The Removal Rule also noted that the FWS "did not receive any comments or suggestions from the public that presented a viable alternative."  *Id*.  The FWS provided an "extended effective date" of April 4, 2012 for the Removal Rule in order to "allow the affected community to either legally sell their specimens, if they choose to divest themselves of these

species, or to apply for authorization or permits to continue carrying out previously approved activities." *Id*. at 431.

The FWS discounted the concern "that ranchers or other holders of these species that are working for the conservation of the species will reduce or eliminate their herds just because a permit or other authorization will now be required." *Id*. at 433.  Rather, if a ranch were authorized under the Captive-bred Exemption to carry out activities with respect to the three antelope species, the FWS stressed that "the ranch should be able to continue those activities under a permit or registration." *Id*.  Furthermore, the FWS explained that ranches with other endangered animals "already obtain permits for the same activities with . . . other species." *Id*. Thus, the agency reasoned that "[t]here should be no reduction in herds that were actually being used for conservation purposes." *Id*.

### 8.    EWA Action

The EWA Action was filed on March 2, 2012, to invalidate and set aside the Removal Rule.  *See* EWA Compl. at 4.[19]  The EWA plaintiffs alleged that under the APA: (1) the Removal Rule is arbitrary and capricious because it is unsupported by factual findings and the FWS refused to consider alternatives (Counts I and II), (2) the Removal Rule was contrary to the ESA (Count III), and (3) the Removal Rule failed to comply with NEPA (Count IV).  *See* EWA Compl. at 19-24.[20]

---

[19] Seven of the nineteen plaintiffs in the Owen Action are also plaintiffs in the EWA Action.

[20] Notably, the EWA plaintiffs do not challenge the 2005 Listing Rule.  The DOW defendant-intervenors point out that "the statute of limitations has now expired" for the EWA plaintiffs to challenge the Listing Rule.  EWA DOW Mem., ECF No. 83, at 22; *id*. at 14 n.4 (noting "that EWA has <u>not</u> challenged the September 2, 2005 <u>listing</u> rule (for which the applicable statute of limitations has expired)" (emphasis in original)).  Although the DOW defendant-intervenors have not cited to any applicable statute or case law in support of this allegation, the Court construes this comment as referring to "the general six-year statute of limitations for civil actions against the federal government." *See, e.g., Conservation Force v. Salazar*, 811 F. Supp. 2d 18, 27 (D.D.C. 2011) (applying the 28 U.S.C. § 2401(a) six-year statute of limitations because "[t]he ESA prescribes no statute of limitations").  While the EWA plaintiffs may indeed be time-barred from challenging the Listing Rule because they filed their Complaint on March 2, 2012,

33

Following consolidation of the EWA Action with the SCI Action, *see* Mem. Op. and Order (Mar. 16, 2012), ECF No. 30, the Court also granted the motions to intervene of Friends of Animals, as well as a group of three organizations, Defenders of Wildlife, Humane Society of the United States, and Born Free USA. *See SCI Intervenors Decision*, 281 F.R.D. 32; Order (Apr. 16, 2012), ECF No. 66.[21]

### 9.    Denial Of Preliminary Injunctive Relief

In 2012, the plaintiffs in both the SCI and EWA Actions sought preliminary injunctive relief to enjoin enforcement of the Removal Rule, *see* EWA Mem. in Supp. of Mot. for Prelim. Inj. ("EWA P.I. Mem."), 12-cv-00340, ECF No. 3-1, at 2, and "enforcement of endangered status for U.S. non-native captive herds of the [three antelope species,]" *see* SCI Mot. for a Prelim. Inj., ECF No. 26, at 1, respectively.  This Court denied the motions for preliminary

---

the SCI plaintiff filed its Complaint challenging the Listing Rule on August 31, 2011, within six years of the issuing of the September 2, 2005 Listing Rule, and is thus within the statute of limitations to challenge the 2005 Listing Rule.  *See* SCI Compl.; EWA Compl.  The EWA plaintiffs are, however, within the statute of limitations to challenge the 2012 Removal Rule, which is the regulation that they challenge here.

[21] As this Court explained in granting the motions to intervene, these organizations have asserted numerous ties to this case.  First, each of these organizations was a plaintiff in the successful 2009 lawsuit against the FWS, in which the Captive-bred Exemption, codified at 50 C.F.R. § 17.21(h), was found to be invalid under the ESA.  *See Friends of Animals*, 626 F. Supp. 2d at 105-06.  Second, these organizations monitor applications for permits seeking authorization to engage in otherwise prohibited actions involving endangered species under section 10 of the ESA, and, in some cases, these organizations inform their membership and the public about these permit applications, including for sport hunting of animals.  *Safari Intervenors Decision*, 281 F.R.D. at 35-36.  Finally, these organizations all share a commitment to the conservation of endangered species.  *See id.*  The Court concluded that the organizations had informational standing as well as "an interest in obtaining information under section 10(c) [of the ESA] that could potentially be impaired should plaintiffs prevail" and were thus entitled to intervene as of right under Federal Rule of Civil Procedure 24(a)(2).  *See id.* at 42; Order (Apr. 16, 2012), ECF No. 66.  The Court originally granted the motions for intervention as of right only to Friends of Animals and Defenders of Wildlife and denied the motions for intervention of the Humane Society of the United States and Born Free USA because the latter two organizations had submitted outdated declarations and therefore did not satisfy the requirements for "showing that they have a sufficiently current interest which would be impaired should plaintiffs prevail in this action."  *Safari Intervenors Decision*, 281 F.R.D. at 42.  These organizations, along with Defenders of Wildlife, subsequently filed an Expedited Motion for Reconsideration of Denial of Intervention, ECF No. 49, along with more recent declarations, and asked the Court to reconsider its decision as to the Humane Society of the United States and Born Free USA.  Satisfied that the more recent declarations submitted with the Motion for Reconsideration demonstrated that the Humane Society of the United States and Born Free USA have a "sufficiently current interest which would be impaired should plaintiffs prevail in this action," the Court granted the motion and allowed these two organizations to proceed as defendant-intervenors along with Defenders of Wildlife and Friends of Animals.  *See* Order (Apr. 16, 2012), ECF No. 66, at 3 (citation omitted).

injunctions, finding that, at that stage of the proceedings, neither the SCI plaintiff nor the EWA

plaintiffs had established a likelihood of success on the merits.  *See SCI P.I. Decision*, 852 F.

Supp. 2d at 111.  Furthermore, the Court concluded that, even if the Court were persuaded on the

merits, the plaintiffs had failed to satisfy the other criteria for injunctive relief.  *See id.*

Importantly, the Court concluded that the FWS's robust permitting process would mitigate the

harm to the plaintiffs during the course of these legal proceedings, commenting that "[t]he FWS

has provided a viable permitting process through which ranchers and other interested parties

could have sought permits to continue their activities related to the Three Antelope species for

the duration of these lawsuits" and noting that "[m]any ranchers have already availed themselves

of this process and obtained permits."  *Id.* at 122-23.

  Moreover, the Court found that the public interest weighed against granting injunctive

relief, both because it was impossible to ignore the risks of complete deregulation of the captive-

bred members of the three antelope species as identified by the FWS and because the FWS's

permitting process allowed for the continued culling and sport hunting of the three antelope

species.  *See id.* at 125-26 (citing Decl. of Timothy Van Norman ("Van Norman Decl."), ECF

No. 35, Ex. 1, ¶ 3 ("Registration under the [captive-bred wildlife] program also allows a facility

to cull animals in its herd to maintain a viable and healthy herd."), ¶ 5 ("In order to allow outside

hunters to come on to a ranch to hunt animals, the facility must obtain an interstate

commerce/take permit . . . . Through the permit application process, the ranch would identify the

number of animals that would likely be culled to maintain a healthy population over a one-year

period [and] [i]f the application were approved, . . . a single permit . . . would authorize all

approved activities for a one-year period.  This single permit would allow the facility to advertise

all proposed hunts being anticipated during the one-year period to facilitate herd management,

35

since most advertisements would be considered interstate commerce, and it would authorize

individuals other than employees of the facility to lethally take listed specimens.")).

Furthermore, as to the EWA plaintiffs' motion in particular, the Court was cognizant that the

2009 Decision found the Captive-bred Exemption unlawful and that "to effectuate the over-

arching goal of the ESA to conserve endangered species, the law expressly requires the FWS to

publish in the Federal Register notice, with a 30 day comment period, of applications for permits

to handle listed species in a manner otherwise contrary to the law." *SCI P.I. Decision*, 852 F.

Supp. 2d at 126.

Following the denial of the plaintiffs' motions for injunctive relief, the Removal Rule

went into effect on April 4, 2012. *See* Removal Rule, 77 Fed. Reg. at 431. As noted, since the

Captive-bred Exemption was issued at the same time as the Listing Rule, removing the Captive-

bred Exemption has meant that the three antelope species are subject, for the first time, to full

enforcement of the regulations governing endangered species.

### 10.    FWS Settlement Agreement Regarding Delisting Petitions

After the Removal Rule went into effect, the federal defendants reached a settlement

agreement with the SCI plaintiff and the Owen plaintiffs, who had brought suit because the FWS

did not respond to their delisting petitions in a timely manner.[22] Pursuant to the settlement

agreement, the FWS agreed to a timetable for making a "90-day-finding" on their delisting

petitions, *see* Stipulated Settlement Agreement, ECF No. 94, and Count V in the SCI Complaint

and all claims in the Owen Action were dismissed with prejudice, *see* Order (June 13, 2012),

ECF No. 95.

---

[22] As the SCI plaintiff notes, it "attempted to avoid this lawsuit" by submitting a petition to delist the U.S. captive herds of the three antelope species and only brought this suit after the agency's delay in responding to that petition. SCI Mem. at 40-41.

The federal defendants subsequently made a 90-day finding on the parties' delisting petitions. *See* 90-Day Findings on Petitions to Delist U.S. Captive Populations of the Scimitar-Horned Oryx, Dama Gazelle, and Addax, 77 Fed. Reg. 58,084 (Sept. 19, 2012). In that finding, the FWS determined that the petitions "present[ed] substantial information indicating that delisting the U.S. captive animals or U.S. captive-bred members of these species may be warranted," and that the FWS was therefore "initiating a review of the status of the U.S. captive members of these species to determine if delisting the U.S. captive specimens is warranted." *Id.* at 58,084.

Following a "thorough status review of the captive antelopes covered by these petitions," the FWS agreed to issue a 12-month finding, on or before May 31, 2013, determining whether the delisting was warranted. *Id.* at 58,086; *see also* Stipulated Settlement Agreement, ECF No. 94, at 3.

### 11.    June 5, 2013 Denial Of Delisting Petitions

The FWS, on June 5, 2013, published its 12-month findings on the SCI and Owen plaintiffs' delisting petitions. *See* 12-Month Findings on Petitions to Delist U.S. Captive Populations of the Scimitar-horned Oryx, Dama Gazelle, and Addax, 78 Fed. Reg. 33,790 (June 5, 2013). The FWS denied the delisting petitions, concluding that "the U.S. captive, or U.S. captive-bred specimens of, scimitar-horned oryx, dama gazelle, and addax, do not qualify as separate 'species' or otherwise qualify for separate legal status under the [ESA]." *Id.* at 33,797. The agency reasoned that "although the [ESA] does not expressly address whether captive-held specimens of wildlife can have separate legal status, the language, purpose, operation, and legislative history of the [ESA], when considered together, indicate that Congress did not intend for captive-held specimens of wildlife to be subject to separate legal status on the basis of their

37

captive state." *Id*.  Accordingly, the FWS determined that "delisting the U.S. captive, or U.S. captive-bred specimens of, scimitar-horned oryx, dama gazelle, and addax, is not warranted." *Id*.

Notably, the FWS also made clear that the listing of the three antelope species "does not necessarily ban the hunting of these individuals on game ranches in the United States[,]" *id.*, explaining: "[w]e recognized at the time of listing the species that allowing ranches to continue in their management efforts for these species could help to ensure that a viable group of antelope would be available for reintroduction purposes if conditions in the species' native range improved[,]" *id*.  The FWS therefore supported these efforts by "authorizing well-managed ranches to conduct various management practices, including limited hunting, through our Captive-Bred Wildlife Registration regulation and permitting process." *Id*.  In assessing the effectiveness of this permitting program, the FWS noted that, "[s]ince the current regulations went into effect on April 4, 2012, we have approved 139 ranches to maintain the species, of which 107 have been authorized to conduct limited hunts to maintain viable herds on their ranches.  We accomplished this effort through use of a simple application process through which ranches obtained the necessary permits." *Id*.  Thus, as the Court anticipated in denying the plaintiffs' motions for preliminary injunctions, *see SCI P.I. Decision*, 852 F. Supp. 2d at 120-24, the FWS's permitting process has mitigated some of the harm to U.S. ranchers resulting from enforcement of the endangered species listing of the three antelope species by providing limited authorization to conduct hunts for the majority of those who have applied.

The parties' ten motions are now ripe and pending before the Court.

## II.     STANDARD OF REVIEW

### A.      Motion To Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* FED. R. CIV. P. 12(b)(6). "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original) (quoting *Twombly*, 550 U.S. at 557). Instead, the complaint must plead facts that are more than "'merely consistent with' a defendant's liability." *Id.* (quoting *Twombly*, 550 U.S. at 557). "[T]he plaintiff [must] plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *accord Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012). The Court "must assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." *Aktieselskabet AF 21. November 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008) (citations and internal quotation marks omitted).

### B.      Summary Judgment

In actions under the APA, summary judgment is the appropriate mechanism for "deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 106 (D.D.C. 2011) (citing *Richard v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)). "In such cases, a federal district court 'sits as an appellate tribunal' to review the purely legal question of whether the agency acted in an arbitrary and capricious manner." *Franks v. Salazar*,

39

816 F. Supp. 2d 49, 55-56 (D.D.C. 2011) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  Judicial review is limited to the administrative record, and the burden is on the plaintiff to prove how the decision was arbitrary and capricious.  *Id*.

### C. Administrative Procedure Act

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2).  In evaluating agency actions under this standard, courts must consider "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (citation and internal quotation marks omitted); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C. Cir. 1997).  The scope of the Court's review under this standard "is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983).

"[T]he arbitrary and capricious standard is 'highly deferential' and 'presumes agency action to be valid[.]'"  *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, Nos. 12-1092, 12-1113, 2013 U.S. App. LEXIS 15934, at *2 (D.C. Cir. Aug. 2, 2013) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997-98 (D.C. Cir. 2008)); *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).  If an agency, however, "failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action."  *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999).  At the very least, the agency must have reviewed relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S.

at 43 (internal quotation marks omitted); *see also Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988

F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or

capricious includes a requirement that the agency adequately explain its result.").

"[A]n agency acts arbitrarily or capriciously if it 'has relied on factors which Congress has

not intended it to consider, entirely failed to consider an important aspect of the problem, offered

an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise.'" *Am. Wildlands*, 530 F.3d at 997-98 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at

43). While the agency's explanation cannot "run[ ] counter to the evidence," *Motor Vehicle Mfrs.

Ass'n*, 463 U.S. at 43, courts should "uphold a decision of less than ideal clarity if the agency's

path may reasonably be discerned[,]" *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,

419 U.S. 281, 286 (1974). Furthermore, where an agency has acted in an area in which it has

"'special expertise,'" the court must be particularly deferential to the agency's determinations.

*Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan*, 512 F. Supp. 2d 32, 37 (D.D.C. 2007) (quoting

*Bldg. & Constr. Trades Dep't, AFL-CIO  v. Brock*, 838 F.2d 1258, 1266 (D.C. Cir. 1988)).

"Deferring as appropriate to the agency's expertise and looking only for 'a rational connection

between the facts found and the choice made,'" *Am. Trucking Ass'ns*, 2013 U.S. App. LEXIS

15934, at *14 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43), "we remain ever mindful that

in performing 'a searching and careful inquiry into the facts, we do not look at the [agency's]

decision as would a scientist, but as a reviewing court exercising our narrowly defined duty of

holding agencies to certain minimal standards of rationality[.]'"  *Id.* (quoting *Nat'l Envtl. Dev.

Ass'ns Clean Air Project v. EPA*, 686 F.3d 803, 810 (D.C. Cir. 2012)).

## III.   STANDING AND RIPENESS

As a preliminary matter, the Court addresses the standing of the parties to bring suit and the ripeness of the dispute between the parties.  In assessing the parties' standing, the Court draws from the entire record.[23]  As explained below, the Court concludes that both sets of plaintiffs have Article III and prudential standing, and that this lawsuit is ripe for review by this Court.

### A.     Article III Standing Of Plaintiffs In SCI And EWA Actions

Although this Court concluded that the plaintiffs had Article III standing in its evaluation of the plaintiffs' motions for preliminary injunctions, *see SCI P.I. Decision*, 852 F. Supp. 2d at 111 n.7, the Court revisits this issue in order to assure itself that it has jurisdiction over this matter, *see Conf. Group v. FCC*, No. 12-1124, 2013 U.S. App. LEXIS 13469, at *12-13 (D.C. Cir. July 2, 2013); *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005); *accord Am.*

---

[23] While the SCI plaintiff submitted declarations in support of its standing along with its Motion for Summary Judgment, the EWA plaintiffs submitted declarations in support of their standing, on March 6, 2013, with their Motion for Preliminary Injunction, but not with their Motion for Summary Judgment.  *See* EWA Pls.' Mot. for Prelim. Inj., 12-cv-00340, ECF No. 3.  The federal defendants and DOW defendant-intervenors claim that the Court may not consider the EWA plaintiffs' earlier declarations in deciding whether the EWA plaintiffs have standing.  *See* Fed. Defs.' Resp. to Pls.' Supplemental Briefs on Prudential Standing, ECF No. 113, at 4-5 (arguing that although "EWA did provide declarations in support of its standing for preliminary injunction[,]" this is insufficient because, unlike the SCI plaintiffs, "EWA failed to submit those or any other declarations in support of its motion for summary judgment, and did not refer to those declarations or incorporate them in any way into its motion for summary judgment"); DOW Intervenor-Defs.' Supplemental Brief on Prudential Standing, ECF No. 112, at 5 n.3 (arguing that "EWA has not provided declarations or other evidence demonstrating that its interests fall within the zone of interests protected by section 10").  The Court disagrees, as all materials in the record may be considered, including the declarations submitted with the plaintiffs' Motion for Preliminary Injunction, in evaluating whether the EWA plaintiffs have standing.  *See, e.g.*, *Equal Rights Ctr. v. Post Properties*, 633 F.3d 1136, 1141 n.5 (D.C. Cir. 2011) (concluding that the plaintiff "[did] not have standing on the full record"); *Pub. Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708, 714 n.22 (D.C. Cir. 1977) ("We have taken great care in reviewing the full record to identify any and all evidence which, when construed most favorably to [the plaintiff], might support a finding of standing."); *Univ. Med. Ctr. of S. Nev. v. Shalala*, 5 F. Supp. 2d 4, 5 (D.D.C. 1998) (concluding the plaintiff lacked standing "upon careful consideration of the entire record in this matter"); *Nat'l. Treasury Employees Union v. United States*, 929 F. Supp. 484, 490 (D.D.C. 1996) (granting the defendant's Motion to Dismiss for lack of standing "upon careful consideration of the parties' pleadings, the entire record herein, the arguments of counsel at the hearing held this date in the above-captioned matter, and the applicable law").  While the plaintiffs must provide support in order to establish the elements of standing "with the manner and degree of evidence required at the successive stages of the litigation[,]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), the Court may consider the declarations, affidavits, and other facts required at the summary judgment stage of proceedings that have already been provided to the Court in connection with earlier proceedings in the same matter.

*Trucking Ass'ns*, 2013 U.S. App. LEXIS 15934, at *6-14 (where Court evaluates standing of plaintiffs on third round of litigation).  While no party specifically challenges the SCI plaintiff's Article III standing, the defendant-intervenors, as explained below, challenge the EWA plaintiffs' Article III standing.  Nevertheless, the Court evaluates the standing of both sets of plaintiffs.

"[T]he irreducible constitutional minimum of standing contains three elements."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  First, the plaintiff must have suffered an "injury in fact" that is (a) "concrete and particularized[,]" and (b) "actual or imminent, not conjectural or hypothetical[.]"  *Id.* (citations and internal quotation marks omitted).  Second, the injury must be fairly traceable to the challenged action of the defendant.  *See id.*  Third, it must be likely, and not merely speculative, that the injury will be redressed by a favorable decision.  *See id.* at 561; *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

The plaintiffs have the burden of establishing that they have standing to proceed with their claims.  *Am. Library Ass'n*, 401 F.3d at 492 (citing *KERM, Inc. v. FCC*, 353 F.3d 57, 59 (D.C. Cir. 2004)).  In the case of an association, such as SCI and EWA, the association "has standing to sue under Article III of the Constitution of the United States only if (1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit."  *Am. Trucking Ass'ns*, 2013 U.S. App. LEXIS 15934, at *7-8; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

The Court first evaluates the Article III standing of the SCI plaintiff and then turns to the Article III standing of the EWA plaintiffs.

43

### 1.    SCI Plaintiff

As the Court explains below, the SCI plaintiff has established that it has Article III standing to bring its claims challenging the 2005 Listing Rule. The Court addresses each of the three elements of the standing analysis in turn.

### a.    Injury-In-Fact

First, the Court provides a brief background about the SCI plaintiff and its membership and then turns to the question of whether the SCI plaintiff has established an injury-in-fact.

The SCI plaintiff is a non-profit corporation with its principal offices in Tucson, Arizona and Washington, D.C. and 53,000 members worldwide. *See* Decl. of Rew R. Goodenow ("Goodenow Decl."), ECF No. 45-28, Ex. AA, ¶¶ 3-4. The organization's missions are "the conservation of wildlife, protection of the hunter, and education of the public concerning hunting and its use as a conservation tool." *Id*. ¶ 5. According to the Chairman of the Legal Task Force of SCI, the organization "promotes the principle and practice of sustainable use conservation, including the ability of its members to participate in a system in which private ranchers are able to raise, breed, trade and sell hunts for [the three antelope species] for the conservation benefit of those species." *Id*. ¶ 7. Under the SCI umbrella, individual SCI members own, manage, breed, and trade the three antelope species, and sell and guide hunts for them in the United States. *See id*. ¶¶ 8-9. Before the listing of the three antelope species as endangered, SCI members were able to hunt the three antelope species on private ranches in the United States without permits, and SCI argues that the populations of the antelope species were "growing and thriving" at that time. SCI Mem. at 4. As a result of the Listing Rule, however, SCI members are now subject to permitting requirements and restrictions in their ownership and use of the three antelope species.

44

The SCI plaintiff has established through a series of declarations submitted from SCI members that these restrictions, directly traceable to the Listing Rule, constitute an "injury-in-fact" by reducing financial incentives and making it more difficult for the SCI members to continue "owning and sustainably using and conserving" these animals.  SCI Mem. at 25.  Even before the Removal Rule went into effect, SCI claimed that "the dramatic drop in the value of these animals caused by the impending permit requirements and the potential legal risks of owning and maintaining animals regulated as endangered species have erased the incentive for private ranchers to continue to own, raise, breed and sell hunts for these animals."  Goodenow Decl. ¶ 12; *see id.* ¶ 11 ("[S]ince the [FWS] made known that they would be imposing permit requirements for the sale of hunts and take of members of the three species, the price of these animals has plummeted and members of [SCI] have found that it is no longer financially feasible for them to continue to own, raise, breed and sell hunts for these animal[s] or to participate in the private conservation of these three species.").

Indeed, numerous SCI members provided declarations to demonstrate the injury that enforcement of the endangered species status of the three antelope species has had and was expected to have on their lives.  For example, Laurent Delagrange, a member of SCI and president of a ranch in Texas where scimitar-horned oryx and addax are bred, asserted that "[t]he endangered listing status of these [antelope species] has already caused me harm by significantly decreasing the financial value of my herds," precipitously from $700,000 to $300,000 as a result of the then impending permitting requirements.  Decl. of Laurent Delagrange ("Delagrange Decl."), ECF No. 45-35, Ex. HH, ¶¶ 11-12.  He not only expressed concerns about the financial implications of these requirements but also that he would "los[e his] ability to help conserve these three species."  *Id.* ¶ 25.  Similarly, SCI member Travis Weir, a hunter, ranch owner, and hunting

guide, explains that "[t]he value of [his] scimitar-horned oryx started to drop around May 2011, when the ranching/hunting community got wind" of the impending FWS enforcement of the endangered species listing of these animals.  Decl. of Travis Weir ("Weir Decl."), ECF No. 45-29, Ex. BB, ¶ 11; *see id.* ¶ 19 ("When it became clear that the FWS intended to impose permit requirements, hunting conditions changed.  Practically everyone I know who owns these animals have [sic] been reducing and/or eliminating their herds.").

These concerns about predicted and actual injuries were echoed by many other SCI members.  SCI member Steve Wright, for example, provided declarations both before and after the publishing of the Removal Rule explaining, first, the injury he anticipated from the Removal Rule, and second, the injury he actually experienced.  *See* Decl. of Steve Wright ("Wright Decl."), ECF No. 45-36, Ex. JJ, ¶ 21 (explaining that "[t]he classification of U.S. scimitar-horned oryx as an endangered species, and the restrictions, limitations and bureaucracy that comes with the listing will lower their value, reduce the clientele willing to purchase hunts, undermine the species ability to generate revenue for their continued upkeep and will make it impossible for me to afford to continue to keep these animals on our ranch"); Supplemental Decl. of Steve Wright ("Wright Supp. Decl."), ECF No. 45-37, Ex. KK, ¶ 2 ("As predicted, as a result of the [FWS] publishing the rule that will end the permit exemption for the trade and hunting of the scimitar-horned oryx, I decided I could no longer participate in the ownership, breeding and conservation of the species" and "no longer own any of these animals.").  SCI member Timothy Mark Terry explained that he felt compelled to transfer his entire herd of animals − 45 scimitar-horned oryx and 35 addax − because "it would not have been financially possible for [him] to continue to raise and provide for these animals" after permits were required for selling hunts, and he chose to sell the animals "rather than take on the additional costs, risks, responsibilities, obstacles and financial

46

insecurity to [his] ranch operation" from government permitting.  Decl. of Timothy Mark Terry ("Terry Decl"), ECF No. 45-30, Ex. CC, ¶¶ 4, 10, 15.  Likewise, SCI member David Lesco asserted that he is no longer able to afford to keep the scimitar-horned oryx in light of the permitting requirements and stated that "[i]f not for the endangered status of these animals and the permit requirements and restrictions, I would continue raising and breeding my scimitar and continue to participate in the conservation of the species."  Decl. of David Andrew Lesco ("Lesco Decl."), ECF No. 45-31, Ex. DD, ¶¶ 18, 23.

While all parties agree that the SCI plaintiff has established standing, the DOW defendant-intervenors "feel compelled to point out that, while they do not contest SCI's standing in this case, that standing stems only from the economic harm that SCI's members will purportedly suffer as a result of the fact that they can no longer breed or use endangered antelopes for recreational hunting, and not from the 'conservation' harm that SCI has proffered here." DOW Intervenor-Defs.' Mem. in Opp'n to Pl.'s Mot. for Summ. J. and Intervenor-Defs.' Cross-Mot. for Summ. J. ("SCI DOW Defendant-Intervenors' Mem."), ECF No. 70, at 20.  The DOW defendant-intervenors elaborate that "while it is clear that those who cannot satisfy the strict requirements of Section 10 of the ESA . . . will no longer be able to sell canned hunts of these antelopes for profit – as a direct result of the captive members of the species being listed as 'endangered,' . . . this is not the injury that has been alleged by SCI in support of its standing in this case."  *Id*. (citation and emphasis omitted).  The Court construes the SCI plaintiff's assertion of injury somewhat differently and understands that the SCI plaintiff is asserting standing both based on economic harm as well the concomitant conservation harm that it believes results from that economic harm.  *See, e.g.*, SCI Mem. at 27-28 (emphasizing that, as a result of permitting requirements, SCI member Travis Weir's female scimitar-horned oryx "dropped in value from

47

$2,000-$2,500 to $600-700 per cow," that "[h]is dream of someday selling these animals as his retirement fund has disappeared," and that the enforcement of endangered species status of these animals would result in a "devastating conservation reversal" (citations omitted)); SCI Reply in Supp. of Mot. for Summ. J. and Opp'n to Cross-Mot. for Summ. J. of Defs. and Def. Intervenors ("SCI Reply"), ECF No. 80, at 16 (asserting both economic and conservation injury).  The Court finds that the declarations that the SCI plaintiff has proffered in support of its standing, as explained above, sufficiently demonstrate both an economic and conservation injury that is both concrete and particularized, and thereby satisfy the plaintiffs' burden to establish injury-in-fact.

### b.    Causation And Redressibility

The Court next addresses the second and third prongs of the standing analysis – whether the injury is fairly traceable to the challenged action of the defendants and whether the injury will be redressed by a favorable decision.  The SCI plaintiff demonstrates both of these elements. First, the SCI plaintiff has demonstrated that the FWS's listing of the three antelope species as endangered has resulted in economic and conservation injury to them by eliminating financial incentives for ranchers to breed, herd, and organize hunts of the three antelope species.  Second, since a decision to invalidate the listing of the three antelope species would remove permitting restrictions for these animals, a favorable decision could redress the injuries of the members of SCI.  Accordingly, on those bases, the SCI plaintiff has Article III standing to bring suit.

### 2.    EWA Plaintiffs

The Court next addresses whether the EWA plaintiffs have established Article III standing to bring their claims challenging the 2012 Removal Rule.  Although this Court concluded that the EWA plaintiffs had Article III standing in its denial of the plaintiffs' Motion for a Preliminary Injunction, *see SCI P.I. Decision*, 852 F. Supp. 2d at 111 n.7, the defendant-intervenors contest

48

this conclusion.  The defendant-intervenor Friends of Animals, in fact, moves for summary judgment on the basis that the EWA plaintiffs "have failed to demonstrate Article III standing necessary to bring this action[,]" because these plaintiffs "have not demonstrated that [the FWS's] regulatory actions have caused injury-in-fact to them that could be redressed by the Court." EWA Defendant-Intervenor Friends of Animals' Cross-Mot. for Summ. J., ECF No. 87, at 2; *see also* EWA DOW Intervenor-Defs.' Cross-Mot. for Summ. J. ("EWA DOW Mem."), ECF No. 83, at 14 n.4; Friends of Animals' Resp. to Pls. EWA's Supplemental Brief, ECF No. 114, at 2; DOW Intervenor-Defs.' Supplemental Brief Concerning Pls.' Prudential Standing, ECF No. 112, at 2.[24]  The Court disagrees.  The Court addresses each of the three elements of the standing analysis in turn, and concludes that the EWA plaintiffs have Article III standing.

### a.        Injury-In-Fact

First, the Court provides a brief background about the EWA and its membership as well as the individual plaintiffs in the EWA matter and then turns to the question of whether the EWA plaintiffs have established an injury-in-fact to bring their challenge to the Removal Rule.

The plaintiffs are the EWA and nine named members of the EWA.  The EWA is a trade organization of ranchers, headquartered in Texas, with approximately 5,000 members throughout several states.  *See* EWA Compl. at 7, ¶ 10.[25]  The organization is made up of exotic wildlife ranchers who "own and raise scimitar-horned oryx, dama gazelle, and addax on their private ranches, and market them to other ranchers."  *Id*. ¶ 10.  "[T]he largest herds of these three species are found on the ranches of members of the Exotic Wildlife Association."  *Id*. ¶ 41.  The mission of the organization is "to encourage and expand the conservation of indigenous and non-

---

[24] The federal defendants do not explicitly challenge the EWA plaintiffs' Article III standing.

[25] The EWA Complaint names ten individual plaintiffs, one of whom, Larry Johnson, submitted a Notice of Voluntary Dismissal Without Prejudice following the filing of the Complaint.  *See* Pl. Larry Johnson's Notice of Voluntary Dismissal Without Prejudice, 12-cv-00340, ECF No. 4.

indigenous hoofstock animals and to help Exotic Wildlife's members develop and strengthen the markets for their animals." *Id.* ¶ 10.

As an organization, the EWA "promotes 'conservation through commerce' and the need for 'sustainable utilization' of wildlife as a conservation tool on privately owned" ranches. *Id.* Indeed, the EWA plaintiffs assert that "[a] primary activity of Exotic Wildlife Ranchers is to conserve and recover the stocks of these three antelope species so they can eventually be reintroduced to their native habitat in Africa." *Id.* ¶ 11. The EWA plaintiffs explain that "Exotic Wildlife Ranchers have even shipped animals back to Africa for reintroduction into their native habitats, and are prepared to provide more animals for reintroduction as soon as it is safe and prudent to so." *Id.* ¶ 41. The EWA plaintiffs' Complaint also provides a description of each of the named plaintiffs, who own or manage ranches and have raised members of the three antelope species. *Id.* ¶¶ 14-22.

The Court finds that the EWA plaintiffs have demonstrated an injury-in-fact that is both "concrete and particularized" and "actual or imminent[.]" *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). Specifically, the EWA plaintiffs provided declarations showing that even before the Removal Rule was finalized and was merely announced, they suffered both economic and environmental injuries. First, the declarations demonstrate that the announcement of the Removal Rule resulted in the prices of the three antelope species dropping "dramatically." *See, e.g.*, Decl. of Eddy Blassingame ("Blassingame Decl."), 12-cv-00340, ECF No. 3-6, Ex. D, ¶ 5; Decl. of Ed Valicek ("Valicek Decl."), 12-cv-00340, ECF No. 3-14, Ex. L, ¶ 4. Second, ranchers have felt "force[d] to reduce" their herds as a result of the news that the permitting requirements would go into effect. *See e.g.*, Decl. of Ray Dockery ("Dockery Decl."), 12-cv-00340, ECF No. 3-9, Ex. G, ¶ 2; Decl. of Joe Green ("J. Green Decl."), 12-cv-00340, ECF No. 3-

50

10, Ex. H, ¶ 5; Decl. of Charly Seale ("Seale Decl."), 12-cv-00340, ECF No. 3-5, Ex. C, ¶ 11;

Decl. of Nancy Green ("N. Green Decl."), 12-cv-00340, ECF No. 3-11, Ex. I, ¶ 4; Decl. of

Thomas E. Oates ("Oates Decl."), 12-cv-00340, ECF No. 3-13, Ex. K, ¶ 2.  Third, the

declarations demonstrate the EWA plaintiffs' interest in and concern for the environment.  *See,*

*e.g.*, Decl. of Dr. Pat Condy ("Condy Decl."), 12-cv-00340, ECF No. 3-8, Ex. F, ¶ 14 (explaining

that the Removal Rule "changes the forces of the market place, such that they get out of sync with

the forces of nature.  Not simply does this seriously jeopardize the very survival of these species,

but it is also greatly demoralizing to the voluntary participation of private landowners in

endangered species conservation of exotic and/or native wildlife species").  These declarations,

together, establish an injury-in-fact.  Although the record is bare as to the experience of the EWA

plaintiffs with the permitting process following the issuance of the Removal Rule, the

announcement of the Removal Rule had already caused a measurable drop in the value of the

antelope herds, which form a basis for the EWA plaintiffs' livelihood.  This drop in the value of

the antelope herds has prompted some EWA plaintiffs to sell their herds, an action which

ranchers believe will lead to environmental harm.

    Defendant-intervenor Friends of Animals is incorrect in arguing that the EWA plaintiffs

have "fail[ed] to allege with any clarity a specific injury that the Plaintiffs have incurred (or may

incur) as a direct result of the FWS'[s] promulgation of the [Removal Rule]."  EWA Friends of

Animals Mem. in Supp. of Cross-Mot. for Summ. J., ECF No. 87-1, at 9.  Friends of Animals

also argues that the Removal Rule "did not require the Plaintiffs to sell off their animals" and that

"such a self-inflicted injury cannot be used to form the basis of standing."  *Id.* at 10.  The Court

disagrees.  For the purposes of evaluating standing, the EWA plaintiffs have alleged a concrete

injury, namely that the Removal Rule actually caused a precipitous decline in the value of the

animals that have formed a basis of their livelihood.  This alleged injury, supported by numerous declarations, is sufficient to establish Article III standing.

### b.        Causation And Redressibility

The Court next addresses the second and third prongs of the standing analysis – whether the injury is fairly traceable to the challenged action and whether the injury will be redressed by a favorable decision.  The Court concludes that the EWA plaintiffs demonstrate both of these elements.

First, the injury alleged by the EWA plaintiffs – namely that the price of their animals has fallen and that this has led them to get rid of their animals – is directly caused by the Removal Rule, which eliminated the Captive-bred Exemption on which the EWA plaintiffs had relied for many years.  The Court is not persuaded by the Friends of Animals' argument that "[b]ecause FWS was never under a legal obligation to delist the species as a result of [the 2009 Decision], it is impossible to find that FWS'[s] failure to do [sic] has resulted in any concrete injury to Plaintiffs."  *Id*. at 13.  While the premise of this argument is correct, that the 2009 Decision invalidating the Captive-bred Exemption did not *require* any alteration in the Listing Rule, the Court need not evaluate the repercussions of this decision with blinders on.  In fact, the 2009 Decision purposely left open to the FWS the full panoply of flexible options provided under the ESA to conserve the three antelope species.  The Removal Rule challenged by the EWA plaintiffs was the minimal step legally required by the 2009 Decision but not necessarily the only option available to the FWS.  Put another way, since the FWS had options broader than the "Removal Rule" available to respond to the 2009 Decision, the FWS's decision not to invoke those options has, as explained above, resulted in an injury "fairly traceable" to the removal of the Captive-bred

Exemption by causing a dramatic decrease in the value of the three antelope species. *Friends of the Earth, Inc.*, 528 U.S. at 180.

Second, for the purposes of standing, these injuries could conceivably be redressed by this Court, for example, by a decision that the FWS needs to go back to the drawing board to respond to the 2009 Decision in a way that not only complies with the 2009 Decision that the Captive-bred Exemption is invalid but also addresses the FWS's underlying rationale for promulgating the Captive-bred Exemption alongside of the Listing Rule in 2005. While a decision by this Court would not negate the 2009 Decision, it would leave the Captive-bred Exemption in place until the FWS reevaluated its response to the 2009 Decision. In sum, the Court finds that the EWA plaintiffs have demonstrated Article III standing. Accordingly, the Court denies the Defendant-Intervenor Friends of Animals' Cross-Motion for Summary Judgment, ECF No. 87, which is based solely on the alleged lack of standing of the EWA plaintiffs.

### B.      Prudential Standing Of Plaintiffs In SCI And EWA Actions

While the Court considered the Article III standing of the plaintiffs in deciding the motions for preliminary injunctions, *see Safari P.I. Decision*, 852 F. Supp. 2d at 111 n.7, the Court did not consider the prudential standing of the plaintiffs. The Court must do so here because the D.C. Circuit has made it clear that prudential standing is a jurisdictional requirement. *See Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 674 (D.C. Cir. 2013) ("[T]his Circuit treats prudential standing as 'a jurisdictional issue which cannot be waived or conceded[.]'" (citation omitted)); *Deutsche Bank Nat'l Trust Co. v. FDIC*, 717 F.3d 189, 194 n.4 (D.C. Cir. 2013) ("Prudential standing, like Article III standing, is a threshold, jurisdictional concept."). Even where plaintiffs have established Article III standing, considerations of prudential standing may prevent a court from allowing plaintiffs to proceed with their legal challenge.

53

Indeed, the D.C. Circuit's decision in *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 180 (D.C. Cir. 2012), which was decided after this Court issued its Memorandum Opinion denying the plaintiffs' motions for preliminary injunctions, highlighted that prudential standing is a jurisdictional requirement in this Circuit, despite stark disagreement in the Circuit over this issue. *See id.* at 179 (dismissing food group's claims because group lacked prudential standing); *see also id.* at 180 (Tatel, J., concurring) ("agree[ing] with those circuits that have held that prudential standing is non-jurisdictional"); *id.* at 183 (Kavanaugh, J., dissenting) (asserting that "Supreme Court precedent makes clear, however, that prudential standing is not jurisdictional"); *see also Ass'n of Battery Recyclers*, 716 F.3d at 677-78 (Silberman, J., concurring) (responding directly to the *Grocery Manufacturers Association*'s dissent that prudential standing is not jurisdictional, highlighting the different "species" of standing, which have been categorized as "prudential standing," and noting, *inter alia*, that "[i]n light of this confusing tangle of jurisprudential concepts – and especially in light of the apparent differences between statutory standing and other species of prudential standing – I think we ought to be especially hesitant to overturn past precedent on these issues until the Supreme Court has provided clear guidance").[26]

Since the parties had not explicitly addressed the question of prudential standing of either set of plaintiffs at any length in their briefs, the Court ordered the parties to supplement their

---

[26] Indeed, the language of the majority in the Supreme Court's recent decision in *United States v. Windsor*, 133 S. Ct. 2675, 2685 (2013) (Kennedy, J.), provides support for the position that prudential standing is not, in fact, jurisdictional.  There, the Supreme Court contrasts "the jurisdictional requirements of Article III and the prudential limits on its exercise."  *Id.*  The Court explains that "[w]ere this Court to hold that prudential rules require it to dismiss the case, and, in consequence, that the Court of Appeals erred in failing to dismiss it as well, extensive litigation would ensue" and that "[r]ights and privileges of hundreds of thousands of persons would be adversely affected, pending a case in which all prudential concerns about justiciability are absent."  *Id.* at 2688; *see also id.* at 2701 (Scalia, J., dissenting) (finding it "wryly amusing that the majority seeks to dismiss the requirement of party-adverseness as nothing more than a 'prudential' aspect of the sole Article III requirement of standing.  (Relegating a jurisdictional requirement to 'prudential' status is a wondrous device, enabling courts to ignore the requirement whenever they believe it 'prudent' — which is to say, a good idea.)").  Since the D.C. Circuit has clearly held that prudential standing is a jurisdictional requirement, however, the Court will proceed to an analysis of whether the parties have met that requirement.

briefing to explain the bases for prudential standing in light of this Circuit's clarification that prudential standing is a jurisdictional requirement.  *See* Minute Order (Mar. 22, 2013).  The parties all filed supplementary briefs in accordance with this Minute Order, which the Court has considered.  *See* Supplemental Brief of Pls. EWA in Supp. of Mot. for Summ. J. and Opp'n to Def.-Intervenor's Mot. to Dismiss, ECF No. 110; SCI's Brief to Explain Bases for Its Prudential Standing, ECF No. 111; DOW Intervenor Defs.' Supplemental Brief Concerning Pls.' Prudential Standing, ECF No. 112; Fed. Defs.' Response to Pls.' Supplemental Briefs on Prudential Standing, ECF No. 113; Friends of Animals' Response to Pls. EWA's Supplemental Brief, ECF No. 114.  In those briefs, the parties concede that the SCI plaintiff has met or is not required to meet prudential standing requirements, but contest whether or not the EWA plaintiffs have demonstrated prudential standing.

Prudential standing "embodies 'judicially self-imposed limits on the exercise of federal jurisdiction[.]'"  *United States v. Windsor*, 133 S. Ct. 2675, 2685 (2013) (citations omitted). "[B]y contrast" to the requirements of Article III standing, the Supreme Court has explained that "[r]ules of prudential standing . . . are more flexible 'rule[s] . . . of federal appellate practice,' . . . designed to protect the courts from 'decid[ing] abstract questions of wide public significance even [when] other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect judicial rights.'"  *Id.* at 2686 (citations omitted).  Although the Supreme Court has "not exhaustively defined the prudential dimensions of the standing doctrine," it has explained that "prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law

55

invoked.'"  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (quoting *Allen v.*

*Wright*, 468 U.S. 737, 751 (1984)).  The test for prudential standing "'is not meant to be

especially demanding.'"  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

132 S. Ct. 2199, 2210 (2012) (quoting *Clarke v. Sec. Industry Ass'n*, 479 U.S. 388, 399 (1987)).

        As is relevant here, in order to demonstrate prudential standing, a group "'must show that

the interest it seeks to protect is arguably within the zone of interests to be protected or regulated

by the statute . . . in question' or by any provision 'integral[ly] relat[ed]' to it."  *Grocery Mfrs.*

*Ass'n*, 693 F.3d at 179 (quoting *Nat'l Petrochem. & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1147

(D.C. Cir. 2002)).  "The essential inquiry [of the zone of interests test] is whether Congress

'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of

the law.'"  *Clarke*, 479 U.S. at 399-400 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347

(1984)); *see also Ass'n of Battery Recyclers*, 716 F.3d at 676 (Silberman, J., concurring)

(suggesting that prudential standing doctrine involving the zone of interests test is more

appropriately called "statutory standing" and explaining that "[t]his particular type of prudential

standing is thus typically tied to at least two statutes – the organic statute underlying a complaint

and the APA itself" and that "[t]he question of whether a plaintiff has statutory standing . . .

depends on Congressional intent – does Congress intend that this particular class of persons have

a right to sue under this substantive statute?").  The zone of interests requirement operates as "'a

gloss on the meaning of [5 U.S.C.] § 702,' which limits the universe of persons permitted to sue

under the APA to those 'adversely affected or aggrieved by agency action within the meaning of

a relevant statute[.]'"  *Bloomberg L.P. v. CFTC*, No. 13-523, 2013 U.S. Dist. LEXIS 80275, at

*90 n.23 (D.D.C. June 7, 2013) (quoting *Clarke*, 479 U.S. at 395).  In short, under the zone of

interests test, plaintiffs asserting causes of action under the APA must be "within the 'zone of

interests' of the *relevant substantive statute*." *Id.* (emphasis in original) (quoting *Ass'n of Battery Recyclers*, 716 F.3d at 676 (Silberman, J., concurring)).

The Court first turns to a discussion of the SCI plaintiff, and then to the EWA plaintiffs, and concludes that both sets of plaintiffs have demonstrated prudential standing.

### 1.    SCI Plaintiff

In this action, the SCI plaintiff has four remaining claims: three under the APA and the ESA (Counts I, II, and III) and one under the ESA (Count IV).[27]   The parties agree that the SCI plaintiff need not demonstrate prudential standing for its claims arising solely under the ESA because the Supreme Court has held that the ESA's citizen-suit provision, which provides that "any person may commence a civil suit on his own behalf," 16 U.S.C. § 1540(g), "negates the zone-of-interests test (or, perhaps more accurately, expands the zone of interests)[,]" *Bennett*, 520 U.S. at 164; *see* Fed. Defs.' Resp. to Pls.' Supplemental Briefs on Prudential Standing, ECF No. 113, at 2 (noting that "[i]f SCI's ESA claims arise under the ESA citizen-suit provision, there is no need for SCI to demonstrate prudential standing"); Friends of Animals' Resp. to Pls. EWA's Supplemental Brief, ECF No. 114, at 2 n.1 ("FoA does not challenge whether . . . SCI . . . has prudential standing."); DOW Intervenor Defs.' Supplemental Brief Concerning Pls.' Prudential Standing, ECF No. 112, at 2 ("Intervenors are of the view that SCI need not establish prudential standing here.").

As the SCI plaintiff acknowledges, however, it must have prudential standing to raise Counts I through III under the APA as the "citizen suit provision does not apply to cases involving the Secretary of the Interior/FWS's 'maladministration' of the ESA."  SCI's Brief to Explain the Bases for Its Prudential Standing, ECF No. 111, at 3 n.1 (quoting *Bennett*, 520 U.S. at

---

[27] As noted, *supra*, Count V was dismissed with prejudice per the parties' settlement agreement.  *See* Order (June 13, 2012), ECF No. 95.

174); *see also Building Indus. Ass'n v. Babbitt*, 979 F. Supp. 893, 900 (D.D.C. 1997) (explaining

that "suits (such as the instant action) to compel the Secretary to perform his statutory

responsibilities under the ESA, for example, are cognizable only under the APA" and that

plaintiffs bringing APA claims "are indeed subject to the zone-of-interests test").

Here, the relevant substantive statutory provisions at issue are section 4 of the ESA related

to the listing of species as endangered and threatened, *see* 16 U.S.C. § 1533, and section 9 of the

ESA related to prohibitions on taking, *see* 16 U.S.C. § 1538.  Since the declarations submitted by

SCI members establish that these members are "directly regulated by the listing of the three

antelope species[,]" and subject to any prohibitions regarding treatment of listed species, SCI

members, and SCI as an association, fall "within the zone of interests" of these ESA provisions.

SCI's Brief to Explain Bases For Its Prudential Standing, ECF No. 111 at 3.  Accordingly, like

the federal defendants, the Court is satisfied that the SCI plaintiff has established its burden to

demonstrate prudential standing.  *See* Fed. Defs.' Resp. to Pls.' Supplemental Briefs on

Prudential Standing, ECF No. 113, at 2 (noting that "[i]f SCI's ESA claims arise under the APA, .

. . SCI's declarations filed in support of its motion for summary judgment are likely sufficient to

satisfy its burden"); *see also Bldg. Indus. Ass'n*, 979 F. Supp. at 901 (concluding that entities

"directly regulated by the listing of the fairy shrimp" had prudential standing to challenge the

listing of these shrimp as endangered).

### 2.  EWA Plaintiffs

The Court next turns to the question of the prudential standing of the EWA plaintiffs.

While the federal defendants had not earlier raised a challenge to the EWA plaintiffs' prudential

standing, the federal defendants in their supplemental briefing argue that the EWA plaintiffs do

not demonstrate prudential standing for at least two of their claims, Counts I and II.  *See* Fed.

Defs.' Resp. to Pls.' Supplemental Briefs on Prudential Standing, ECF No. 113, at 3.  The

defendant-intervenors, meanwhile, argue that the EWA plaintiffs "cannot establish prudential

standing for any of its claims."  DOW Intervenor-Defs.' Supplemental Brief Concerning Pls.'

Prudential Standing, ECF No. 112, at 3; *see also* Friends of Animals' Response to EWA Pls.'

Supplemental Brief, ECF No. 114, at 4-11.  The Court disagrees.[28]

      In their Complaint, the EWA plaintiffs assert four causes of action under the APA: two

claims under the APA (Counts I and II), one claim under the APA and ESA (Count III), and one

claim under the APA and NEPA (Count IV).  The Court will discuss the causes of action in turn,

beginning with the EWA plaintiffs' claims brought solely under the APA.

      Although the EWA plaintiffs' causes of action in Counts I and II do not specifically

reference an ESA statutory provision, the most relevant substantive statutory provisions are

section 9 of the ESA, which is related to prohibitions on taking, *see* 16 U.S.C. § 1538, and section

10, which allows the FWS to permit "any act otherwise prohibited by [Section 9] for scientific

purposes or to enhance the propagation or survival of the affected species[,]" *see* 16 U.S.C. §

1539(a)(1)(A).  In reviewing both the Complaint and the declarations, for the reasons explained

below, the Court concludes that the EWA plaintiffs have prudential standing to raise the APA

claims in Counts I and II.

---

[28] The EWA plaintiffs argue that the federal defendants have waived their right to challenge the EWA plaintiffs' prudential standing, citing a Harvard Law Review "recent case" article for the proposition that "agencies frequently rely on the non-jurisdictional nature of prudential standing and purposefully waive any prudential standing challenges[.]"  EWA Pls.' Supplemental Brief in Supp. of Their Mot. for Summ. J. and Opp'n to Defendant-Intervenor's Mot. to Dismiss, ECF No. 110, at 18 (citing *Federal Civil Procedure – Standing – D.C. Circuit Raises Prudential Standing Sua Sponte to Dismiss Regulatory Challenge on Jurisdictional Grounds – Grocery Manufacturers Ass'n v. EPA, 693 F.3d 169 (D.C. Cir. 2012), reh'g en banc denied, No. 10-1380 (D.C. Cir. Jan. 15, 2013)*, 126 Harv. L. Rev. 1446, 1451-52 (2013)).  This argument is unavailing, however.  Regardless of the agency's reasons for not raising the prudential standing issue without prompting from the Court, the D.C. Circuit has clearly held that prudential standing is a jurisdictional issue, and thus not subject to waiver.  Accordingly, the Court must evaluate whether the EWA plaintiffs have demonstrated prudential standing.

First, the Court finds fundamentally flawed the federal defendants' argument that "EWA's prudential standing is not self-evident because it is not challenging the regulation (the listing determination) that directly regulates it.  Instead, EWA is challenging [the Removal Rule] regulation that does not regulate it at all."  *See* Fed. Defs.' Resp. to Pls.' Supplemental Brief on Prudential Standing, ECF No. 113, at 4.  The Removal Rule directly regulates the EWA plaintiffs in that it has the purpose and effect of removing the broad section 10 Captive-bred Exemption and subjecting the EWA plaintiffs to the section 9 Listing Rule restrictions, for the first time since the Listing Rule was created.  *See, e.g.*, EWA Compl. ¶ 47 ("[O]n January 5, 2012, FWS issued its final rule, removing the exemption and subjecting Exotic Wildlife ranchers to the permit requirements (as well as the civil and criminal penalties for violation) applicable to all endangered species." (footnote omitted)).  As with the SCI plaintiff, the EWA plaintiffs are now directly regulated by the requirements in section 9 under the Listing Rule as the direct and intended result of the Removal Rule.  Since the Removal Rule's purpose and impact "adversely affected or aggrieved" the plaintiffs, *see Bloomberg L.P.*, 2013 U.S. Dist. LEXIS 80275, at *90 n.23 (quoting *Clarke*, 479 U.S. at 395) (internal quotation marks omitted), by lifting the Captive-bred Exemption and imposing the "integral[ly] relat[ed]" Listing Rule restrictions, *see Grocery Mfrs. Ass'n*, 693 F.3d at 179, the EWA plaintiffs have shown that the interests that they seek to protect are "within the zone of interests to be protected or regulated by" section 9, *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 132 S. Ct. at 2210.

Second, the federal defendants argue that "the only ESA provision that EWA could rely on is ESA section 10, which was the basis for the regulatory permit that allowed EWA to engage in activities that otherwise are prohibited for endangered species."  Fed. Defs.' Resp. to Pls.' Supplemental Briefs on Prudential Standing, ECF No. 113, at 5.  Yet, the federal defendants

60

argue in conclusory fashion that "EWA's interest in having a regulatory permit cannot be within the zone of interests to be protected by ESA Section 10, given that this Court previously determined that the [FWS] promulgated the regulatory permit in violation of ESA Section 10(c)." *Id.* at 5-6 (citing 2009 Decision); *see also* Friends of Animals' Resp. to EWA Pls.' Supplemental Brief, ECF No. 114, at 5 (asserting that while "there is no doubt that EWA would be able to assert an interest in obtaining a Section 10(a)(1)(A) permit and even challenge the denial of such a permit[,]" here, the EWA plaintiffs do not have prudential standing because "EWA claims an interest in an interpretation of Section 10 already held by this court to be illegal and contrary to Congressional intent").

The Court disagrees.  As discussed in consideration of the EWA plaintiffs' Article III standing, while the 2009 Decision concluded that the Captive-bred Exemption was promulgated in violation of subsection 10(c), this ruling did not specifically vacate the regulation but instead left it to the FWS to determine how to proceed in a manner consistent with the decision.  That is, that decision did not foreclose reconsideration of other mechanisms to regulate the three antelope species in light of the benefits of U.S. captive herding of these animals.  The fact that the EWA plaintiffs believe that the FWS too narrowly construed the 2009 Decision by simply repealing the flawed Captive-bred Exemption, rather than reevaluating why it had promulgated the exemption with the Listing Rule in the first place, is enough to place the EWA plaintiffs in the zone of interests to challenge the Removal Rule.  In other words, it must be the case that where plaintiffs are within the zone of interests of a regulation that has directly regulated them for years and on which they have relied, and the agency interprets a subsequent judicial ruling related to that regulation, the plaintiffs remain within the regulation's zone of interests and may challenge the agency interpretation where they believe the agency has misinterpreted or misapplied the judicial

61

decision.  *See, e.g., Nat'l Petrochem. & Refiners Ass'n*, 287 F.3d at 1147 ("In determining

whether a petitioner falls within the zone of interests to be protected by a statute, we do not look

at the specific provision said to have been violated in complete isolation, but rather in

combination with other provisions to which it bears an integral relationship." (citation and

internal quotation marks omitted)).  In sum, the Court concludes that the EWA plaintiffs' APA

claims under the ESA are within the zone of interests regulated by sections 9 and 10.  The EWA

plaintiffs have thus demonstrated prudential standing to challenge the FWS's decision to remove

the Captive-bred Exemption that has caused the EWA plaintiffs to be subject to the Listing Rule

regulations under the APA.

      The Court next turns to the EWA plaintiffs' third claim under the ESA.  The Court agrees

with the federal defendants that the EWA plaintiffs' third claim "arises under the ESA citizen-suit

provision because EWA alleges that the [FWS], in its capacity as an action agency, violated ESA

Section 7 by failing to ensure that its action was not likely to jeopardize the continued existence

of any endangered species."  Fed. Defs.' Resp. to Pls.' Supplemental Briefs on Prudential

Standing, ECF No. 113, at 2-3.  Accordingly, since the third claim arises under the citizen-suit

provision, the EWA plaintiffs need not establish prudential standing.  *See id.* at 3; *Bennett*, 520

U.S. at 164.[29]

      Finally, the Court turns to the EWA plaintiffs' fourth claim under NEPA.  The D.C.

Circuit has explained that "NEPA, of course, is a statute aimed at the protection of the

environment."  *ANR Pipeline Co. v. FERC*, 205 F.3d 403, 408 (D.C. Cir. 2000).  Thus, in order to

demonstrate prudential standing to raise the claim under NEPA, the EWA plaintiffs must allege

---

[29] While the Court concludes that the EWA plaintiffs have standing to bring this claim, the Court, as explained *infra* in the discussion of the merits of the EWA Action, finds that it does not ultimately have subject matter jurisdiction over this claim.

that they will suffer an environmental injury.  *See id*.  Here, the EWA plaintiffs supplemented

their Motion for Preliminary Injunction with declarations providing support for their position that

they will suffer an environmental injury from the Removal Rule.  *See, e.g.*, Condy Decl. ¶ 10

(explaining that "the highly successful recovery results achieved by the Exotic Wildlife ranchers

will all come to an end if there is no longer a market force monetary incentive for these ranchers

to keep hosting and breeding these species.  And that's exactly what this FWS rule means—no

more economic incentive.  And to these species, it means a rapid decline in numbers, a loss of

genetic diversity, and likely extinction").  The federal defendants essentially concede that "[i]f the

Court determines that EWA can rely on the declarations it provided with its motion for

preliminary injunction, Federal Defendants believe it is likely that at least some of EWA's

declarations would suffice to demonstrate a sufficient interest in the environment to satisfy the

prudential standing requirement for a NEPA claim."  Fed. Defs.' Resp. to Pls.' Supplemental

Briefs on Prudential Standing, ECF No. 113, at 6.  The Court agrees.[30]

---

[30] Even if the Court is incorrect in concluding that the EWA plaintiffs have Article III and prudential standing, the result in this case would be the same since the Court finds, as explained *infra*, that the EWA plaintiffs cannot prevail on the merits of their claims.  The Court also notes that, while the defendant-intervenors contest the EWA plaintiffs' prudential standing, they make no comment about their own prudential standing.  While this Court earlier determined that the four defendant-intervenors had demonstrated Article III standing when evaluating their motions to intervene, it did not address their prudential standing as no party had explicitly raised that issue.  The Court must address the prudential standing of the defendant-intervenors here, however, because, just as this Circuit has recently reaffirmed that plaintiffs must demonstrate prudential standing, it has also made abundantly clear that defendant-intervenors must also demonstrate prudential standing.  *See Deutsche Bank Nat'l Trust Co.*, 717 F.3d at 194 n.4 (noting in decision concerning denial of motion to intervene by prospective defendant-intervenors that "[p]rudential standing, like Article III standing, is a threshold, jurisdictional concept").  While no party has briefed the prudential standing issue with respect to the defendant-intervenors, the Court finds that the four defendant-intervenors are clearly within the zone of interests to intervene in this lawsuit given the defendant-intervenors' "interest in obtaining information under section 10(c) [of the ESA] that could potentially be impaired should plaintiffs prevail."  *SCI Intervenors Decision*, 281 F.R.D. at 42.  This was the interest that formed part of the basis for the Court's granting of the defendant-intervenors' motions to intervene under Federal Rule of Civil Procedure 24(a)(2), and it is also sufficient to demonstrate the defendant-intervenors' prudential standing.  *See Deutsche Bank Nat'l Trust Co.*, 717 F.3d at 195 (explaining that the "relating to" language of Federal Rule of Civil Procedure 24(a)(2) governing Intervention of Right "suggests a sort of nexus requirement more akin to third-party prudential standing").  Accordingly, the Court reaffirms its earlier conclusion that the four defendant-intervenors have standing to intervene in this lawsuit.

### C.      Prudential Ripeness Of This Lawsuit

The Court must also address one other prudential issue in the SCI Action.  As summary judgment briefing in this case was drawing to a close, defendant-intervenor Friends of Animals, in its Reply in Support of its Motion for Summary Judgment and Notice of Supplemental Authority, set forth a new argument, in addition to the argument that the SCI plaintiff's claims lack merit, that "this case is not ripe for review."  SCI Friends of Animals' Reply in Supp. of Mot. for Summ. J. and Notice of Supplemental Authority ("FOA Reply and Notice"), ECF No. 92, at 2 (emphasis omitted); *see also* Friends of Animals' Response to EWA Pls.' Supplemental Brief, ECF No. 114, at 2 n.1 ("This Court . . . should dismiss SCI's claims for a lack of ripeness[.]")

Specifically, Friends of Animals argues that, as in the recent D.C. Circuit decision in *Am. Petroleum Inst. v. Envtl. Protection Agency*, 683 F.3d 382, 384 (D.C. Cir. 2012), here, given the FWS's legal obligation under section 4 of the ESA to respond to SCI's pending delisting petition, "the issues raised by SCI's remaining claims, which directly seek to set aside the 2005 listing rule, are not fit for judicial decision."  FOA Reply and Notice at 2-3.  Since the FWS has recently completed its 12-month findings on the SCI plaintiff's delisting petition, the Friends of Animals' ripeness argument is moot, and the Court concludes that this matter is ripe for review.  Accordingly, the Court now turns to the merits of the SCI plaintiff's claims.

## IV.      DISCUSSION

Although the SCI and the EWA Actions are consolidated, the merits of each action must be evaluated separately because the plaintiffs challenge different rules with separate administrative records.  The Court first addresses the SCI plaintiff's challenges to the 2005 Listing Rule, and then proceeds to the EWA plaintiffs' challenges to the 2012 Removal Rule.

A.      **SCI Action**

In the SCI Action, the plaintiff challenges the FWS's decision to include

U.S. non-native captive-bred populations of the three antelope species in the 2005 endangered

species classification of the species as a whole.  In moving for summary judgment, the SCI

plaintiff argues that the FWS (1) "acted arbitrarily and capriciously and in a manner inconsistent

with ongoing agency decision-making made for other similarly situated species," and (2) "ignored

the conservation mandates of the ESA and the fact that inclusion of the captive populations would

harm rather than serve the conservation of populations of the three antelope species."  SCI Mem.

at 31-32.  The federal defendants argue in response, and in support of their Cross-Motion for

Summary Judgment, that (1) the FWS's "decision to list all members of the Three Antelope

species is consistent with [FWS] policy and practice and was based on years of deliberation over

the appropriate way to list these particular species," (2) the FWS was not obligated to designate

the three antelope species located in the U.S. as a distinct population segment ("DPS") and was

not required to provide a reason for not doing so, and (3) the decision to list as endangered the

three antelope species held captive in the U.S. was consistent with the purposes of the ESA.  SCI

Fed. Defs.' Mem. at 13-25.[31]

The Court agrees with the federal defendants and defendant-intervenors that the SCI

plaintiff has not shown that the FWS acted arbitrarily and capriciously in its decision to list the

---

[31] The arguments of the federal defendants are echoed in the papers of the defendant-intervenors.  The DOW defendant-intervenors argue in support of their Cross-Motion for Summary Judgment that the SCI plaintiff has "presented no basis for setting aside the 2005 listing rule" and that, "in view of the statutory framework governing its listing decision, the FWS acted entirely properly in including the captive members of the listed species in its final 2005 listing rule – indeed, it was required by law to do so."  SCI DOW Defendant-Intervenors' Mem. at 23.  Friends of Animals argues that (1) the FWS did not abuse its discretion in choosing not to designate the U.S. captive antelope species as a DPS, (2) the FWS "did not act inconsistently with its previous practices" in listing the species as endangered, and (3) "[i]n listing the U.S. captive population as endangered, FWS both upheld the ESA's conservation mandate and properly excluded consideration of the species' commercial value."  SCI Defendant-Intervenor Friends of Animals' Opp'n to Pl.'s Mot. for Summ. J. and Cross-Mot. for Summ. J., ECF No. 73, at 17, 31, 32.

three antelope species as endangered.  As the Court concluded in evaluating the SCI plaintiff's

Motion for a Preliminary Injunction, the FWS decision to list the three antelope species as

endangered was consistent with (1) the FWS's policy and practice and (2) the purposes of the

ESA.  The Court turns to these issues *seriatim* below.

> **1.  The FWS's Listing Rule Was Consistent With The FWS's Policy And Practice And The FWS Acted Within Its Discretion In Choosing Not To Designate The Three Antelope Species As A Distinct Population Segment**

The SCI plaintiff argues specifically that the FWS "acted arbitrarily and capriciously and

in a manner inconsistent with ongoing agency decision-making made for other similarly situated

species," SCI Mem. at 31, because, in other cases involving captive and/or non-native populations

of species, the FWS "dealt separately with those captive and or/non-native populations and in

some cases had not listed them at all[,]" *id*. at 33.  The SCI plaintiff alleges that not only did the

FWS act inconsistently, and even "erratic[ally]," *id*., but it also failed to explain its justification

for the "inconsistent treatment of similarly situated populations[,]" *id*. at 34.  As this Court found

in reviewing the SCI plaintiff's Motion for a Preliminary Injunction, however, these arguments

are not persuasive.  First, the Court concludes that the FWS's decision to classify the U.S.

captive-bred antelope along with the other members of the three antelope species is consistent

with the FWS's general policy and practice.  Second, the FWS was not required to designate the

U.S. captive-bred members of the three antelope species as a DPS and acted within its discretion

in not doing so.

> **a.  The FWS's Listing Rule Was Consistent With The FWS's General Policy And Practice**

In response to the SCI plaintiff's argument that the Listing Rule was inconsistent with

agency decision-making for other similarly situated species, the federal defendants respond that

the FWS's "general practice" is "for captive members of a species to be afforded the same status as those members of the species in the wild."  SCI Fed Defs.' Mem. at 19-20.  Indeed, as the Court concluded when denying the SCI plaintiff's Motion for a Preliminary Injunction, the SCI plaintiff has "pointed to no evidence suggesting that differentiating between wild and captive animals in listing decisions is a policy of the FWS[.]"  *SCI P.I. Decision*, 852 F. Supp. 2d at 113. Instead, the SCI plaintiff relies on fewer than ten examples where the FWS listed or contemplated listing captive or non-native animals separately from wild populations – ranched nile crocodiles, captive chimpanzee populations, Southern Resident killer whales, plains bison, Arkansas River shiners, arctic graylings, Santa Ana suckers, California golden trout, and cotton-top tamarin.  *See* SCI Mem. at 34-39; SCI Reply at 3, 8-10.[32]

Contrary to the plaintiff's argument, however, all of these examples are distinguishable from the three antelope species or involve listing statuses that have since been changed so that the captive and wild members of the species are now listed together or are in the process of being

---

[32] The underlying rules relied upon by the SCI plaintiff in its briefing, *see* SCI Mem. at 34-39; SCI Reply at 3, 8-10, include: (1) Revised 12-Month Finding to List the Upper Missouri River Distinct Population Segment of Arctic Grayling as Endangered or Threatened, 75 Fed. Reg. 54,708 (Sept. 8, 2010) (excluding non-native populations of the arctic grayling living in Montana from its consideration of the listing status of native populations of that species); (2) Final Rule on Endangered Status for Southern Resident Killer Whales, 70 Fed. Reg. 69,903 (Nov. 18, 2005) (National Marine Fisheries Service ("NMFS") exempting certain captive killer whales from listing of Southern Resident killer whale DPS as an endangered species); (3) Final Rule to List the Arkansas River Basin Population of the Arkansas River Shiner (Notropis girardi) as Threatened, 63 Fed. Reg. 64,772 (Nov. 23, 1998) (listing native Arkansas River Basin population of the Arkansas River shiner as threatened but excluding non-native population of the species living in the Pecos River); (4) Endangered Status for Chimpanzee and Pygmy Chimpanzee, 55 Fed. Reg. 9129 (Mar. 12, 1990) (classifying captive chimpanzees differently than wild populations of chimpanzees); (5) Reclassification of Ranched Nile Crocodile Populations in Zimbabwe From Endangered to Threatened, 52 Fed. Reg. 23,148 (June 17, 1987) (reclassifying "ranched" populations of the species as "threatened" while leaving the other members of the species listed as "endangered"); (6) Final Rule on Threatened Status for the Santa Ana sucker, 65 Fed. Reg. 19,686 (Apr. 12, 2000) (excluding the non-native/introduced Santa Clara River population of the Santa Ana sucker from the listing of the native members of the species); (7) 12-Month Finding for a Petition to List the California Trout as Endangered, 76 Fed. Reg. 63,094 (Oct. 11, 2011) (not considering introduced populations as part of the listable entity because the FWS does not consider them part of the native population); (8) 90-Day Finding on a Petition to List the Wild Plains Bison or Each of Four Distinct Population Segments as Threatened, 76 Fed. Reg. 10,299, 10,303 (Feb. 24, 2011) (finding "no information to suggest that threats are acting on the wild plains bison such that the species may become extinct now or in the forseeable future"); (9) Finding on Petition and Initiation of Status Review on Reclassification of Cotton-top Tamarin, 58 Fed. Reg. 64,927, 64,928 (Dec. 10, 1993) (finding that reclassification of captive populations "may be warranted" and that "[t]he provision being sought by the petitioner would be similar to that now covering the chimpanzee").

67

listed together.  The Court addresses each of the SCI plaintiff's examples in turn.  First, the Arkansas River shiner, the arctic grayling, the Santa Ana sucker, and the California golden trout are completely distinguishable from the three antelope species because they do not involve a captive population.  Thus, as the defendants argue, "[b]ecause the crux of Plaintiff's argument is that the [FWS] is required to afford captive members of a species different status than wild individuals, this distinction renders [these examples] wholly immaterial here."  SCI Fed. Defs.' Mem. at 17-18; SCI Fed. Defs.' Reply at 7 n.4.  Second, the SCI plaintiff's example of the Southern Resident killer whales is also immaterial because it was the National Marine Fisheries Service ("NMFS") that listed the Southern Resident killer whales, not the FWS, and the NMFS' actions "do not establish a norm that the [FWS] is bound to follow."  *Id.* at 17 n.7.  Since these species are either fundamentally different than the three antelope species or not under the purview of the FWS, these examples do not provide any support for the SCI plaintiff's argument that the FWS acted inconsistently by listing the three antelope species as a whole.

The Court next turns to the SCI plaintiff's examples of the nile crocodile and the chimpanzee.  The FWS acknowledges that in both of these cases, it "varied from [its] default practice" of "extend[ing] the same listing status to all individuals of a listable entity."  SCI Reply in Supp. of Fed. Defs.' Cross-Mot. for Summ. J. ("SCI Fed. Defs.' Reply"), ECF No. 91, at 2.  The FWS characterizes these two examples as "outliers[,]" SCI Fed. Defs.' Mem. at 18, and "anomalous, fact-specific decisions[,]" SCI Fed. Defs.' Reply at 3, and argues that these "two decisions are not precedent because they are limited to their facts and the time period in which they were issued[,]" *id*.

The Court agrees that, even in light of the nile crocodile and chimpanzee examples, the agency's Listing Rule was not arbitrary and capricious for several reasons.  First, the vast

majority of the FWS's decisions reflect the agency's "default" practice of listing all members of a species together.  *Id.* at 2.  Indeed, while there was internal debate in the FWS about how to list the three antelope species, the SCI AR reveals that many within the FWS believed that listing the species as a whole was most consistent with precedent.  *See* SCI AR 1.0001 (Memorandum from Ronald M. Nowak, Staff Zoologist, OSA, to Chief, OSA, dated Mar. 11, 1991, explaining that "[m]ost precedent suggests that the classification of a species depends on its status in the wild and that any captive stock takes the same classification" while noting that "it might not be contrary to the intent of the law to issue a classification excepting populations in the United States"); SCI AR 28.0028 (Memorandum from Ronald M. Nowak to Chief, OSA, dated Aug. 5, 1991, stating that "[a] separate classification for captive groups is done only rarely and under very restrictive circumstances"); SCI AR 135.0008 (Memorandum from Ronald M. Nowak to Chief, OSA, dated Oct. 25, 1993, explaining that "[c]lassify[ing] entire species as endangered" would "be in keeping with most listing precedent, by which legal status depends mainly on status of species in the wild"); SCI AR 136.0006 (Note from Larry Mason, Acting Assistant Director of International Affairs, FWS, to Charlie Dane, dated Mar. 25, 1994, expressing "concern" regarding a final listing rule "that if we are to alter an existing policy that we do so separate and apart from any particular listing package and with a full understanding of all of the implications associated with such policy exchange"); SCI AR 155.0001 (Note to reviewers, dated Aug. 28, 2002, explaining that "[i]n order to be consistent in the way with which other listed species are treated, we propose in this notice that our most viable option is not to treat captive populations differently from the wild populations and to list all 3 antelopes species as Endangered").  Second, the chimpanzee and crocodile split-listing decisions were made before the FWS promulgated the DPS Policy in 1996 and thus, to the extent that these decisions represented the agency's early thinking about the

69

appropriate split-listing of a species, the agency altered its approach in 1996 with the DPS

Policy.[33]  Third, as is evidenced by the agency's decades of attention to the three antelope

species, the agency takes a case-by-case approach to its listing decisions and "provid[es] the same

listing status to all members of a listable entity [as] the default, unless the facts indicate there

should be a different result."  SCI Fed. Defs.' Reply at 2.  Having examined the specific relevant

factual circumstances, the FWS concluded that "[i]t would not be appropriate to list captive and

wild animals separately" in the case of the three antelope species.  Listing Rule, 70 Fed. Reg. at

52,320.  Thus, for those reasons, the FWS was not required to follow the example of the "split-

listing" of the chimpanzee and crocodile in its listing of the three antelope species.

    Moreover, in the cases of both the crocodile and the chimpanzee, the FWS has changed

course and reconciled or is in the process of reconciling the listing of the captive and wild

members of the species.  First, as to the crocodiles, the federal defendants point out that "[t]he

disparate listing statuses of the ranched and wild Nile crocodiles were reconciled in less than 18

months . . . and remain the same today."  SCI Fed. Defs.' Mem. at 19 n.11 (citing Reclassification

of Wild Nile Crocodile Populations in Zimbabwe from Endangered to Threatened, 53 Fed. Reg.

38,451 (Sept. 30, 1988); 50 C.F.R. § 17.11(h)).  Second, as to the chimpanzees, the federal

defendants asserted in their Cross-Motion for Summary Judgment that the FWS had "recently

petitioned to list all chimpanzees as endangered[.]"  *Id.* at 19 n.11.  The federal defendants have

since filed a notice with the Court that the FWS's proposed rule to list all of the chimpanzees as

---

[33] The SCI plaintiff cites for the first time in its Reply the example of the cotton-top tamarin, arguing that the
chimpanzee decision served as precedent for the 90-day finding that a split-listing "reclassification may be
warranted" in the case of the cotton-top tamarin.  *See* SCI Reply at 3.  As the federal defendants argue correctly,
however, even if the SCI plaintiff has not waived this argument by raising it for the first time in its Reply brief, "the
cited decision was a 90-day finding and not a final listing determination, and so does not demonstrate that the [FWS]
has a practice of issuing split-listing decisions."  *See* SCI Fed. Defs.' Reply at 3 n.2.  Indeed, per the FWS's
representation, there is no split-listing for the cotton-top tamarin today.  *See* Fed. Defs.' Notice of the Publication of
a Proposed Rule and 12-Month Finding on Chimpanzees, ECF No. 118, at 1.  Furthermore, like the chimpanzee and
crocodile, the cotton-top tamarin 90-day finding was issued before the FWS issued its DPS Policy.  *See* SCI Fed.
Defs.' Reply at 3 n.2.

endangered was filed in the Federal Register.  *See* Fed. Defs.' Notice of the Publication of a

Proposed Rule and 12-Month Finding on Chimpanzees, ECF No. 118, at 1 (citing Listing All

Chimpanzees as Endangered, Proposed Rule and 12-month Petition Finding, 78 Fed. Reg. 35,201

(June 12, 2013)).  As the federal defendants noted, "if the [FWS] finalizes the rule, there will be

no instances in which members of a species held in captivity are designated differently than

members of the species in the wild."  *Id.*; SCI Fed. Defs.' Mem. at 19 n.11.  Accordingly, these

examples do not provide support for the SCI plaintiff's position that the listing of the three

antelope species was in any way "erratic" or "inconsistent[.]"  SCI Mem. at 32, 39.  Instead, these

examples serve to highlight that the agency's "default" approach to listing species has been to list

captive and wild members of a species together.[34]  To the extent that the FWS may have been at

all "erratic" in straying from its "default" or standard approach in the examples of the crocodiles

and chimpanzees, FWS efforts are well underway to make its policy with respect to captive and

wild animals 100% consistent.[35]  Accordingly, the Court concludes that it was rational, and not

arbitrary and capricious, for the agency to list the captive and wild members of the three antelope

species together as endangered.

---

[34] Indeed, as the federal defendants indicate, "one need look only at the many threatened and endangered species that are held captive in zoos across the United States and the rest of the world to understand this point [that the listing of the chimpanzee, for example, may be an outlier, rather than the general rule]."  SCI Fed. Defs.' Mem. at 19 n.12.  "With the exception of the chimpanzee, *all* of these animals have the same listing status as those in the wild."  *Id.* (emphasis added) (citing 50 C.F.R. § 17.11(h) (*see, e.g.*, African elephant, Asian elephant, panda, Grevy's zebra)).

[35] In its Reply brief, the SCI plaintiff cites the additional example of the 90-Day Finding on a Petition to List the Wild Plains Bison or Each of Four Distinct Population Segments as Threatened, 76 Fed. Reg. 10,299, 10,300 (Feb. 24, 2011).  *See* SCI Reply at 10.  This example post-dates the SCI listing decision, as the FWS points out, however, and thus could not have served as precedent for the Listing Rule.  SCI Fed. Defs.' Reply at 7 n.4.  Furthermore, the example is distinguishable as the agency declined to move forward with listing any of the bison.  *See* 76 Fed. Reg. at 10,299 ("Based on our review, we find that the petition does not present substantial information indicating that listing may be warranted.").

### b.      The FWS Was Not Required To Designate The Three Antelope
###         Species As A DPS

The SCI plaintiff argues that the FWS, based on its DPS Policy, *see supra* note 14, was

able, in its discretion, to classify the U.S. captive members of the three antelope species as a

population separate and distinct from the antelope species living outside of the United States, yet

failed to do so, "offer[ing] no explanation why the FWS could not alternatively designate the

population based on a separation from other populations by international boundaries and

regulatory mechanisms."  SCI Mem. at 36; *see also* SCI Compl. ¶ 74 (alleging that the FWS

"illegally fail[ed] to designate the U.S. populations of the three species separately").  While the

FWS recognizes that it *may* designate a DPS, the federal defendants argue that, if the FWS is not

petitioned to designate a DPS, this is a purely discretionary decision by the agency and therefore

not reviewable.  SCI Fed. Defs.' Mem. at 20-22.  The federal defendants argue further that, to the

extent the FWS was required to respond to SCI's comment addressing the DPS issue, it did so

adequately.  The Court agrees.

The FWS may designate a DPS in two instances.  First, the agency may designate a DPS

on its own initiative, based on the factors set forth in the DPS Policy.  *See id.* at 20 (citing 16

U.S.C. § 1533(a)).  Nothing in the DPS Policy suggests that the agency is *required* to designate a

DPS at its own initiative, and, in fact, the policy emphasizes Congress's intent that the DPS

authority be used "sparingly."  *See* DPS Policy, 61 Fed. Reg. at 4722-25.   Here, the FWS

concluded, "in its expert opinion, that designating the Three Antelope species located in the

United States as a DPS (or DPSs) was not advisable (and with respect to the oryx, not possible

given that the species is thought to be extinct in the wild)."  SCI Fed. Defs.' Mem. at 21 (citing

Listing Rule, 70 Fed. Reg. at 52,320).  Moreover, the federal defendants argue that "[s]ince the

[FWS] determined that the best available science indicated that the Three Antelope species

qualified in their entireties as endangered species, it was not required to engage in a DPS analysis under the DPS policy."  SCI Fed. Defs.' Reply at 9.  The Court agrees with the federal defendants that this "exercise of discretionary judgment" regarding whether to designate a DPS "is not subject to review."  SCI Fed. Defs.' Mem at 21 (citing *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior*, 731 F. Supp. 2d 15, 28-29 (D.D.C. 2010) (concluding that a decision whether to exclude areas from a critical habitat designation was "unreviewable pursuant to the APA because there is no standard for the Court to apply to the agency's exercise of discretion to not exclude any areas")).

Second, the federal defendants may be petitioned to designate a population as a DPS under 16 U.S.C. § 1533(b)(3)(A), in which case the ESA *mandates* that the FWS respond to the petition.  *See* SCI Fed. Defs.' Mem. at 21.  In this case, it is undisputed that no party petitioned the FWS to designate the U.S. captive members of the three antelope species as a DPS.  *See id*. at 22 ("[I]n the instant case, neither SCI – nor any other interested party – petitioned the Service to designate the Three Antelope species located in the United States as a DPS (or DPSs) prior to the issuance of the Listing Rule.").

The SCI plaintiff argues, however, that even absent a formal petition, the FWS was under an obligation to respond to its comment regarding the designation of a DPS.  *See* SCI Reply at 16-17 (citing AR 199.0004-5, Ex. Y) (Letter from SCI to Chief, DSA, FWS, dated October 22, 2003, stating, *inter alia*, that "[t]he populations of these three antelope species qualify as Distinct Population Segments when analyzed under the criteria of the [FWS's] DPS policy.  In accordance with the FWS' policy, it is appropriate to assign different classifications to different DPS's of the same vertebrate taxon and therefore, while the DPS' for these antelope for North Africa may require one listing, the DPS' of the United States and South Africa need no listing at all."); *see*

*also* SCI Mem. at 37 n.11 (noting generally that "[t]he FWS received adequate notice from the comments submitted by [SCI], other members of the public, and agency officials themselves, to realize that they had an obligation to address this issue."). The SCI plaintiff is correct that there is no explicit discussion in the 2005 Listing Rule of the FWS's DPS analysis. Nevertheless, to the extent that the thrust of the SCI plaintiff's comment was a request to designate differently the U.S. captive members of the three antelope species, the Court agrees with the federal defendants that the FWS, following years of deliberation regarding the appropriate way to classify the three antelope species, and consistent with its policy and practice of listing captive and wild members of a species together, "adequately responded to the comment by stating that it would not be appropriate to separately list wild and captive members of the Three Antelope species." SCI Fed. Defs.' Reply at 9-10; *see* Listing Rule, 70 Fed. Reg. at 52,320.[36] Accordingly, the SCI plaintiff's argument that the FWS erred in not providing a more fulsome explanation of its DPS analysis fails.[37]

---

[36] The SCI plaintiff also argues that "whether or not Safari Club's comments alone triggered [the] obligation [to determine whether to designate a DPS], the FWS imposed that obligation upon itself[.]" SCI Reply at 17. Specifically, the SCI plaintiff is referring to the FWS's response to a comment in the Captive-bred Exemption rulemaking. *See id.* The commenter "noted that the proposed rule referred to 'populations' of captive-bred scimitar-horned oryx, dama gazelle, and addax, and that this usage is inconsistent with the definition of this term in the applicable regulations." Captive-bred Exemption, 70 Fed. Reg. at 52,312. In response, the FWS concurred, stating "[w]e agree that captive-held animals may not qualify as populations as defined at 50 CFR 17.3 and have changed the rule accordingly." *Id.* The Court disagrees that this comment in the Captive-bred Exemption triggered any additional obligation for the FWS with respect to the Listing Rule. The FWS's response to the comment, however, is certainly consistent with the FWS's conclusion that it was not appropriate to designate the U.S. captive members of the three antelope species apart from the species as a whole. The SCI plaintiff also suggests that "[i]f creating a DPS was an available tool that would have benefited the conservation of the three antelope species generally, then the [FWS] bore an independent obligation to utilize it and yet did not." SCI Reply at 18. The Court disagrees that the FWS was obligated to designate a DPS, and, as discussed *infra*, the Court finds that the FWS's Listing Rule was consistent with the purposes of ESA.

[37] Since the Court resolves the SCI's challenge regarding the FWS's DPS analysis on this basis, it need not reach the DOW defendant-intervenors' arguments that the captive-bred three antelope species do not constitute "populations" and do not qualify as "significant" to the wild populations. SCI DOW Defendant-Intervenors' Mem. at 26-27. Nor does the Court need to decide, as defendant-intervenor Friends of Animals urges, that "the remedy requested by SCI [that the U.S. captive populations of the three antelope species be designated as a DPS, followed by a delisting from endangered status] is not permitted under the ESA or the DPS Policy." SCI Friends of Animals' Mem. in Supp. of Cross-Mot. for Summ. J., ECF No. 73-1, at 21-22 (arguing that "[t]he DPS Policy applies to listing a DPS as

74

## 2.     The FWS's Listing Rule Was Consistent With The Purposes Of The ESA

Finally, the Court turns to the SCI plaintiff's argument that "[t]he FWS's treatment of the three antelope species is inconsistent with the conservation purposes of the ESA."  SCI Mem. at 40.  The federal defendants respond, and the defendant-intervenors agree, that the FWS's interpretation of the ESA, as embodied in the Listing Rule, is perfectly consistent with the ESA. *See* SCI Fed. Defs.' Mem. at 22.  The Court agrees.  Recognizing that the three antelope species were endangered, the FWS acted consistently with the ESA in listing the species as endangered.

As previously noted, the Endangered Species Act ("ESA") has three purposes, as enumerated in 16 U.S.C. § 1531(b):

> The purposes of this chapter are [1] to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [2] to provide a program for the conservation of such endangered species and threatened species, and [3] to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

16 U.S.C. § 1531(b).

For several reasons, the SCI plaintiff cannot show that the Listing Rule is inconsistent with these purposes.  First, the SCI plaintiff interprets the ESA as "focus[ed] on the conservation of species *within their native ecosystems*[,]" SCI Mem. at 22 (emphasis in original), yet argues that "[t]he inclusion of the U.S. non-native captive herds of the three antelope species does not directly conserve the species in their native ecosystems[,]" and it, in fact, "*undermines* the conservation that has been achieved for the populations living in the United States[,]" *id*. at 40

---

endangered or threatened, not delisting a population").  The Court also need not reach the defendant-intervenor Friends of Animals' argument that even if the U.S. population of the three antelope species were a DPS, the U.S. populations would still be considered endangered under the five endangered species listing factors in 16 U.S.C. § 1533(a)(1)(A)-(E).  *See* SCI Friends of Animals' Mem. in Supp. of Cross-Mot. for Summ. J., ECF No. 73-1, at 22-23 (noting that "[i]n fact, . . . the U.S. populations are **more endangered** than the African populations because in the U.S. the antelope live on hunting ranches, are not subject to any binding regulatory protection, and are vulnerable to being killed at any time" (emphasis in original)).

(emphasis added).  Under the SCI plaintiff's reading of the ESA, the statute's conservation purpose is focused on the conservation of species only "*within their native ecosystems*."  *Id*. at 22.  Logically, then, even if the Listing Rule has some negative impact on the conservation of the non-native members of the three antelope species in the United States, that would be outside the conservation purposes of the ESA.[38]

The Court reads the purposes of the ESA more broadly than the SCI plaintiff. Conserving species within their ecosystems is one purpose of the ESA, but other purposes are "to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a)[,]" including the CITES.  *See* 16 U.S.C. § 1531(b); SCI Fed. Defs.' Mem. at 23 n.15.  Listing the captive members of the species along with the wild members of the species fulfills these purposes in at least two ways.  First, it avoids any confusion about the source of the three antelope species.  As the federal defendants point out, since the members of the species are all protected under the ESA, "there is no confusion as to the status of a particular animal or animal part that would lead to an increase in illegal trade in the species."  SCI Fed. Defs.' Reply at 10; *see also* SCI DOW Defendant-Intervenors' Mem. at 14-15 (noting that many environmental groups had objected to the proposed Captive-bred Exemption because it "would inevitably underline conservation of these imperiled species in the wild by contributing to the illegal trade in antelope trophies (as it would be difficult to differentiate between those that were killed in captivity and those that were killed in the wild)" (emphasis in original)).  Second, listing all members of the species and requiring that ranchers of captive members of the population

---

[38] The SCI plaintiff argues simultaneously that non-native U.S. herds of the three antelope species are outside the purview of the ESA and that listing the species as a whole undermines conservation in the United States.  As the FWS points out, "SCI cannot have it both ways."  SCI Fed. Defs.' Mem. at 24.  The SCI plaintiff cannot assert that the purpose of the ESA is to protect only native wildlife while also asserting that harm to non-native U.S. captive-bred wildlife violates the ESA's purpose.

obtain the necessary permits under section 10 to "take" members of these endangered species ensures that the agency is able to keep track of the members of the species it has identified as endangered.  In that way, it also prevents or discourages captive-breeders from indiscriminately killing members of their herd, for example, if the price of trading the animals drops.  Rather than "undermining" U.S. efforts at conserving the three antelope species, the decision to list them as endangered ensures that the FWS can monitor the numbers and care of these animals.  Thus, listing U.S. captive-bred members of the three antelope species is not only consistent with the FWS's practice and policy of listing members of an animal species together, as explained *supra*, but it was rational and consistent with the ESA to list all members of the three antelope species as endangered.

The question of whether the FWS contravened the conservation purposes of the ESA with the promulgation of the Listing Rule in 2005 appears, at first blush, to require a more complex analysis because of the agency's decision to issue the Captive-bred Exemption at the same time. The Court, however, finds that the Listing Rule was rational and consistent with FWS policy and practice on its own merits, and not only because it was issued concurrently with the Captive-bred Exemption.  Thus, the fact that the Captive-bred Exemption was later ruled unlawful does not mean that the Listing Rule itself was inconsistent with the ESA, where the FWS is entitled to deference in its determination, made after over a decade of deliberation, that the split-listing of the three antelope species "would not be appropriate[.]"  Listing Rule, 70 Fed. Reg. at 52,320.

Accordingly, the Court denies the SCI plaintiff's Motion for Summary Judgment, ECF No. 45, and grants the cross-motions for summary judgment of the federal defendants, the DOW defendant-intervenors, and the defendant-intervenor Friends of Animals.  ECF Nos. 68, 70, 73.[39]

---

[39] The FWS, as noted, in responding to the SCI and Owen plaintiffs' petitions to remove the U.S. members of the three antelope species from the list of endangered species following the 2009 Decision, reaffirmed its decision to list

### B.  EWA Action

The Court next turns to the EWA Action.  In the EWA Action, the plaintiffs, Exotic Wildlife Association, as well as nine named individual plaintiffs, challenge the 2012 Removal Rule, which removed the Captive-bred Exemption that had provided an exemption for otherwise prohibited activities involving the U.S. captive-bred members of the three antelope species.  At a practical level, the removal of the Captive-bred Exemption means that ranchers are required to seek permits to continue their use of these animals.  Thus, the EWA plaintiffs' challenge, like the SCI plaintiff's challenge, is an attempt to free U.S. ranchers of captive members of the three antelope species from the prohibitions that follow from the designation of a species as endangered.  The Court first addresses the preliminary matter of the EWA plaintiffs' Motion to Supplement the AR before turning to the pending motion to dismiss and motions for summary judgment.

### 1.  Motion To Supplement The Administrative Record

The EWA plaintiffs seek to supplement the AR on grounds that the AR for the Removal Rule "necessarily includes the files on which FWS made its original decision to list these three species—and simultaneously exempt them from the unworkable permit system challenged here." EWA Pls.' Mem. in Supp. of Mot. to Supplement the AR, ECF No. 76-1, at 2.  In other words, the EWA plaintiffs argue that the Captive-bred Exemption "cannot be separated from the listing rule adopted that same day."  *Id*.  In response to the Motion to Supplement the AR, the federal

---

the species as a whole as endangered, and, accounting for the possible conservation contributions of captive ranchers, emphasized that the section 10 permitting process allows a mechanism through which the plaintiffs, and others, may continue to manage the three antelope species.  *See* 12-Month Findings on Petitions to Delist U.S. Captive Populations of the Scimitar-horned Oryx, Dama Gazelle, and Addax, 78 Fed. Reg. 33,790, 33,797 (June 5, 2013).  Accordingly, even if this Court were to find the promulgation of the 2005 Listing Rule arbitrary and capricious and thought it appropriate to remand the listing decision to the agency for further consideration, the agency has already, in acting on the SCI and Owen plaintiffs' delisting petitions, had the chance to reevaluate its 2005 Listing Rule following promulgation of the Removal Rule in the wake of the 2009 invalidation of the Captive-bred Exemption.

defendants argue that the FWS "issued the Removal Rule in order to comply with" the remand in the 2009 Decision and that "the records for the Listing and [Captive-bred Exemption] Rules were not relevant to the Service's decision whether to issue the Removal Rule, and the Service did not consider any of the documents from these records in making its decision."  EWA Fed. Defs.' Opp'n to Pls.' Mot. to Supplement the AR, ECF No. 79, at 2.  The Court agrees with the federal defendants that the AR need not be supplemented in order for the Court to consider the merits of the plaintiffs' challenge.

Under the APA, "the court shall review the whole record or those parts of it cited by a party[.]"  5 U.S.C. § 706; *see also Am. Wildlands*, 530 F.3d at 1002 ("The record consists of the order involved, any findings or reports on which that order is based and 'the pleadings, evidence, and other parts of the proceedings before the agency.'" (quoting FED. R. APP. P. 16(a))).  Hence, "[i]t is a widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997); *accord Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("In applying [the arbitrary and capricious] standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

"There are exceptional circumstances in which supplementation of the administrative record is appropriate due to some deficiency."  *Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010); *accord City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) ("[W]e do not allow parties to supplement the record 'unless they can demonstrate unusual circumstances justifying a departure from this general rule.'" (quoting *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991))); *Cape Hatteras Access Pres. Alliance v. U.S. Dep't*

79

*of Interior*, 667 F. Supp. 2d 111, 112 (D.D.C. 2009) ("A court that orders an administrative

agency to supplement the record of its decision is a rare bird.").  The D.C. Circuit has recognized

three narrow instances in which supplementation of an administrative record may be appropriate:

"(1) if the agency 'deliberately or negligently excluded documents that may have been adverse to

its decision,' (2) if background information was needed 'to determine whether the agency

considered all the relevant factors,' or (3) if the 'agency failed to explain administrative action so

as to frustrate judicial review.'"  *City of Dania Beach*, 628 F.3d at 590 (quoting *Am. Wildlands*,

530 F.3d at 1002).  Underlying these exceptions, however, is the "strong presumption" that an

agency has properly compiled the entire record of materials that it considered, either directly or

indirectly, in making its decision.  *See, e.g., Marcum*, 751 F. Supp. 2d at 78; *Maritel, Inc. v.

Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006) ("Although an agency may not unilaterally

determine what constitutes the administrative record, the agency enjoys a presumption that it

properly designated the administrative record absent clear evidence to the contrary.").  To

overcome that presumption, "a plaintiff must put forth concrete evidence that the documents it

seeks to 'add' to the record were actually before the decisionmakers."  *Marcum*, 751 F. Supp. 2d

at 78; *accord Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. 2d 150, 156 (D.D.C. 2012).

A doctrine related to "supplementing" the administrative record permits consideration of

"extra-record evidence."  *See, e.g., Nat'l Mining Ass'n*, 856 F. Supp. 2d at 156 ("A separate

standard governs judicial consideration of extra-record evidence, which consists of evidence

outside or in addition to the administrative record that was not necessarily considered by the

agency." (citation and internal quotation marks omitted)).  The D.C. Circuit has explained that

"the familiar rule that judicial review of agency action is normally to be confined to the

administrative record . . . exerts its maximum force when the substantive soundness of the

80

agency's decision is under scrutiny[.]"  *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).

When the procedural validity of an agency's action is in question, however, "it may sometimes be

appropriate to resort to extra-record information to enable judicial review to become effective."

*Id.*  Recently, the Circuit has cautioned that the exceptions announced in *Esch* are "narrow" and

that, "at most [*Esch*] may be invoked to challenge gross procedural deficiencies[.]"  *Hill*

*Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013); *accord Theodore Roosevelt*

*Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) (acknowledging that

consideration of extra-record evidence "is the exception, not the rule").

        Here, the Court finds no reason to supplement the EWA AR, nor consider extra-record

evidence, where the FWS has made crystal clear that it did *not* consider the administrative records

of the Listing Rule and Captive-bred Exemption and instead solely "issued the Removal Rule in

order to comply with [the 2009 Decision]'s remand order."  EWA Fed. Defs.' Opp'n to Pls.' Mot.

to Supplement the AR, ECF No. 79, at 2; *see also id.* at 1 ("To comply with the Court's Order,

the Service proposed removing the [Captive-bred Exemption.]"); *id.* at 2 ("[T]he records for the

Listing and [Captive-bred Exemption] Rules were not relevant to the [FWS's] decision whether to

issue the Removal Rule, and the [FWS] did not consider any of the documents from these records

in making its decision."); *id.* at 7 ("[T]he available evidence proves . . . that the [FWS] . . . did not

consider any documents from either the Listing or [Captive-bred Exemption] Rule record in

deciding to issue the Removal Rule." (citing Second Decl. of Timothy J. Van Norman ("Second

Van Norman Decl."), ECF No. 79-1, Ex. 1, ¶ 4)); *id.* at 8-9 ("[N]one of the documents from the

Listing or [Captive-bred Exemption] Rule records were considered by the agency decisionmakers

in this case.").

Instead, the Court agrees with the federal defendants that the EWA plaintiffs' argument that the "Court cannot review the Removal Rule without referring to the documents from the records for these other rules is an issue for the Court to assess when deciding the merits of Plaintiffs' claims, not a basis for supplementing the record."  EWA Fed. Defs.' Opp'n to Pls.' Mot. to Supplement the AR, ECF No. 79, at 3.  Indeed, in practical terms, it would make no difference if the agency were ordered to supplement the EWA AR because the agency was fully aware, when it issued the Removal Rule, about the protracted history of the Listing Rule and Captive-bred Exemption.[40]  That the FWS chose not to consider the underlying ARs in promulgating the Removal Rule reflects the agency's belief that the elimination of the Captive-bred Exemption was necessary to comply with the 2009 Decision and not a matter of discretion. The Court therefore denies the Plaintiffs' Motion to Supplement the Administrative Record, ECF No. 76, and proceeds to consideration of the merits of the plaintiffs' arguments in the context of deciding the pending motion to dismiss and cross-motions for summary judgment.

## 2.   Motion To Dismiss

The Court next turns to the Defendant-Intervenor Friends of Animals' Motion to Dismiss the EWA plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6).  In that motion, which

---

[40] While the agency insists that it promulgated the Removal Rule in order to comply with the 2009 Decision, the EWA AR is not entirely without reference to the agency's original justification for the Captive-bred Exemption. *See, e.g.*, EWA AR 28 (Memorandum from Teiko Saito, Acting Assistant Director – International Affairs, to Deputy Director Gould, dated Nov. 6, 2009, noting that "[t]he Service put the rule in place to exclude these animals from regulation in recognition of the contribution of captive breeding to the survival of these species and avoid applying regulation that seemed unnecessary in the face of this achievement"); EWA AR 87-88 (Director's Letter to Senator Benjamin Nelson, undated and unsigned, stating that "[w]e promulgated this rule based on our recognition that the ranchers and zoos in the United States who keep and breed these animals had already contributed to their survival – particularly for the scimitar-horned oryx, which no longer has natural populations in the wild"); EWA AR 88 (Director's Letter to Senator Benjamin Nelson, undated and unsigned, noting that alternative permitting procedures are in place "so that any changes to the regulations would not substantially affect . . . operations [of the affected ranchers]"); EWA AR 92 (Briefing for the Secretary from Rowan Gould, Acting Director, FWS, and prepared by Teiko Saito, Acting Assistant Director, FWS, dated Feb. 2, 2009, explaining that "[c]aptive-breeding operations in the United States and elsewhere have provided these species for reintroduction in their native range and are poised to continue to do so in the future").  Thus, the agency did not disregard its original purposes for the Captive-bred Exemption in promulgating the Removal Rule.

the DOW defendant-intervenors support, *see* ECF No. 83, Friends of Animals argues that "[t]his

is a case about whether an agency can repeal a regulation that violates a statute" and "[t]he

answer to that question must be 'yes.'"  EWA Friends of Animals Mem. in Supp. of Mot. to

Dismiss ("EWA Friends of Animals' Mot. to Dismiss Mem."), ECF No. 47, at 1.  Friends of

Animals contends that, since the 2009 Decision ruled that the Captive-bred Exemption violated

the ESA, the FWS "had no choice" but to repeal it.  *Id*.  Friends of Animals argues, as noted, that

(1) the EWA plaintiffs' challenges to the Removal Rule under the APA "fail to state a cause of

action because the [FWS] was simply responding to a court decision that required it to repeal" the

Captive-bred Exemption, *id*. at 8, (2) the "[r]epeal of a rule that violates the ESA cannot be said

to itself violate the ESA," *id*. at 14, and (3) there was no NEPA analysis required in this case, *id*.

at 15-17.  The DOW defendant-intervenors support Friends of Animals' Motion to Dismiss

arguing that because the FWS had no discretion in removing the unlawful rule, the EWA

plaintiffs' Complaint should be dismissed for failure to state a claim.  *See* EWA DOW Mem. at

15-20.

      The Court agrees with the EWA plaintiffs, however, that Friends of Animals' arguments

do not test the sufficiency of the Complaint and instead go to the merits of the case.  On the

merits, Friends of Animals' first two arguments are, as the EWA plaintiffs assert, "flawed."

EWA Pls.' Mem. in Supp. of Mot. for Summ. J. and Opp'n to Def.-Intervenor's Mot. to Dismiss

("EWA Mem."), ECF No. 78-1, at 36.  First, Friends of Animals argues that the EWA plaintiffs

have failed to state a claim in their first two causes of action, which allege APA violations, *see*

EWA Compl. ¶¶ 49-56, because they cannot possibly mount a challenge to the Removal Rule

where the FWS "was simply responding to a court decision that required it to repeal the [Captive-

bred Exemption]."  EWA Friends of Animals' Mot. to Dismiss Mem. at 8.  This argument is

unavailing.  It is premised on the assumption that the 2009 Decision compelled the FWS to issue

the "Removal Rule" specifically, and the Court disagrees with this premise.  The 2009 Decision

concluded that "the text, context, purpose and history of section 10 show a clear Congressional

intent that permits must be considered on a case-by-case basis," and the Court therefore granted

summary judgment to the plaintiffs "with respect to their claim that the FWS violated subsection

10(c) when it promulgated the [Removal] Rule."  *Friends of Animals*, 626 F. Supp. 2d at 120.

The 2009 Decision did not, however, simply vacate the Captive-bred Exemption, but instead

remanded the Captive-bred Exemption to the FWS "for further proceedings consistent with the

memorandum opinion."  Order, 04-cv-01660, ECF No. 85-1, at 1.  As the EWA plaintiffs argue,

"[t]here is simply nothing in either the opinion or order that required FWS to issue the [Removal

Rule]."  EWA Mem. at 37.  Indeed, while the decision to issue the Removal Rule was certainly

consistent with the 2009 Decision and deemed to be the only appropriate response by the FWS on

remand, there is disagreement between the parties about what the 2009 Decision required of the

agency with colorable arguments on both sides.  As noted, the 2009 Decision left open to the

agency the full panoply of its options under the ESA to address the same policy choice reflected

in the Captive-bred Exemption without dictating which option (other than foreclosing the legally

barred blanket exemption) the agency should adopt.  Thus, the EWA plaintiffs may challenge the

final agency rule, and this Court will consider the challenges in the context of deciding the

parties' cross-motions for summary judgment.

  Defendant-intervenor Friends of Animals' second argument is likewise unavailing.

Friends of Animals moves to dismiss the EWA plaintiffs' third cause of action for failing to state

a claim because the EWA plaintiffs "take[ ] the remarkable position . . . that the action of

repealing a rule found to violate the ESA itself violates the ESA."  EWA Defendant-Intervenor

Friends of Animals' Mem. in Supp. of Mot. to Dismiss, ECF No. 47, at 14.[41]  The Court disagrees with Friends of Animals' general conclusion that it is necessarily "illogic[al]" of the FWS to claim that the repeal of a rule that violates the ESA could possibly violate the ESA.  *Id.*  While the 2009 Decision found the Captive-bred Exemption violated the ESA, it left the agency with discretion about how to comply with the decision.  At the motion to dismiss stage, the plaintiff need only state a plausible claim.  Here, the EWA plaintiffs have done so by challenging the Removal Rule, and the Court will therefore deny the Motion to Dismiss as to the EWA plaintiffs' third cause of action.

Finally, Friends of Animals seeks to dismiss the EWA plaintiffs' fourth cause of action, alleging that the FWS failed to comply with NEPA and that this failure "was arbitrary, capricious and otherwise not in accordance with law."  EWA Compl. ¶ 63.  The Court again believes that the EWA plaintiffs have stated a plausible claim as to the NEPA violation, as explained *infra*, and the Court therefore denies the motion to dismiss of Friends of Animals, ECF No. 47, in which the DOW defendant-intervenors joined, *see* ECF No. 83, and proceeds to assess the merits of this claim in deciding the cross-motions for summary judgment.

### 3.    Cross-Motions For Summary Judgment

The Court next turns to the pending cross-motions for summary judgment.  In their Motion for Summary Judgment, the EWA plaintiffs argue specifically that (1) the Removal Rule violates the APA because (a) the FWS ignored evidence in the EWA AR that the Removal Rule would result in ranchers being forced to reduce or eliminate their herds, (b) the FWS failed to consider alternatives to the permitting scheme, and (c) the FWS specifically failed to consider the

---

[41] Specifically, in the third cause of action, the EWA plaintiffs state that "[b]ecause FWS's adoption of this rule causes Exotic Wildlife ranchers to reduce or eliminate their herds of African antelope – the vast majority of the remaining populations of these three species – FWS's actions are directly contrary to its statutory duty [under the ESA] to ensure that its actions are 'not likely to jeopardize the continued existence of any endangered species' and thus contrary to law." EWA Compl. ¶ 59 (citation omitted).

alternative of delisting the U.S. captive-bred populations of antelope even though the Listing Rule and Captive-bred Exemption were not severable; (2) the Removal Rule is contrary to law because it destroys rather than conserves the species as required by the ESA; and (3) the Removal Rule is contrary to law because the FWS failed to consider the environmental impacts as required by NEPA.  *See* EWA Mem. at 16-34.

The federal defendants argue in response and in support of their Cross-Motion for Summary Judgment that (1) the Removal Rule is entirely rational and supported by the EWA AR; (2) the FWS adequately responded to comments and, to the extent required, adequately considered alternatives to the Removal Rule; (3) the FWS did not have to consider delisting the U.S. population of the three antelope species in the context of the removal of the Captive-bred Exemption; (4) the EWA plaintiffs failed to provide the required notice for their section 7 ESA claim, the FWS was not subject to the consulting requirements under ESA section 7, and, in any case, the Removal Rule will not jeopardize the continued existence of the species; and, finally, (5) the EWA plaintiffs' NEPA claim is without merit.  *See* EWA Fed. Defs.' Mem. at 13-29.[42]

The Court addresses these arguments in turn, and concludes, after the benefit of reviewing the complete AR in this matter, that the FWS's promulgation of the Removal Rule was rational and was not in violation of the APA, ESA, or NEPA.

> a.    **The Removal Rule Was Rational And Supported By The EWA AR**

The Court first turns to the EWA plaintiffs' argument that the Removal Rule "cannot

---

[42] The federal defendants' arguments are echoed by the DOW defendant-intervenors, which also move for summary judgment in the event that the Court considers the EWA plaintiffs' claims, arguing that (1) the FWS acted permissibly by simply removing the Captive-bred Exemption rather than reopening the 2005 Listing Rule; (2) the FWS's decision did not violate the ESA; and (3) EWA's NEPA claim is also without merit.  *See* EWA DOW Mem. at 20-31.

withstand scrutiny" under the APA and that "[i]n promulgating the challenged Rule, FWS ignored the administrative record for both [the Removal Rule] and the tandem (and inseverable) 2005 listing rule[.]"  EWA Mem. at 2-3.  The FWS argues in response that the "Removal Rule is [e]ntirely [r]ational and [s]upported by the [r]ecord."  EWA Fed. Defs.' Mem. at 13.  The Court agrees.

In the 2009 Decision, the court concluded that the Captive-bred Exemption was promulgated in violation of subsection 10(c) of the ESA.  *See Friends of Animals*, 626 F. Supp. 2d at 115-20.  While the 2009 Decision did not specifically *vacate* the Captive-bred Exemption, and instead remanded the case to the FWS "for further proceedings consistent with the memorandum opinion[,]" *see* Order, 04-cv-01660, ECF No. 85-1, at 1; Order, 06-cv-02120, ECF No. 44-1, at 1, it is clear from that decision that the Captive-bred Exemption was invalid, could not be enforced, and had to either be removed or modified in some way, *see Friends of Animals*, 626 F. Supp. 2d at 120 ("Because the court concludes that the text, context, purpose and history of section 10 show a clear Congressional intent that permits must be considered on a case-by-case basis, the court grants summary judgment to plaintiffs with respect to their claim that the FWS violated subsection 10(c) when it promulgated the Rule.").  While the 2009 Decision left it to the FWS's discretion as to how exactly to remove or modify the Captive-bred Exemption, the FWS was required to respond in a manner consistent with the court's Order.  Since the agency's response, in the form of the Removal Rule, was perfectly consistent with the court's Order, the Court concludes that the Removal Rule was rational.

In issuing the Removal Rule, the FWS was clear that it was removing the Captive-bred Exemption specifically "in response to a court order that found that the rule for these three species violated section 10(c) of the Act."  Removal Rule, 77 Fed. Reg. at 431; *see id*. at 432

(noting that the FWS issued the proposed Removal Rule "[t]o comply with the Court's order");
*id.* (noting that "the reason for which the proposal was made" was "that the exclusion violated the
provisions of section 10(c) of the [ESA]"); *id.* (explaining that "the Court's finding left us no
options but to rescind the current regulation"); *id.* at 434 (noting that the FWS is "taking this
action as necessary to comply with the Court's order"); *id.* at 435 ("The removal of the regulation
at 50 CFR 17.21(h) is based on the Court decision that the regulation is in violation of section
10(c) of the [ESA]."); *id.* at 436 ("The proposed rule only addressed the Court's finding that the
regulations at 50 CFR 17.21(h) violate section 10(c) of the [ESA].").

The EWA plaintiffs insist, however, that the FWS erred in not considering the ARs of the
Listing Rule and the Captive-bred Exemption, which were issued in tandem, as well as comments
in the record that ranchers would reduce or eliminate their herds in response to the Removal Rule.
*See* EWA Mem. at 17-18.  While the agency could have devised another way to respond to the
2009 Decision, one that perhaps more clearly revisited why the agency promulgated the Captive-
bred Exemption in the first place, the Court concludes that it was not required to do so in the face
of a Court decision ruling that regulation invalid.  Indeed, even if the Court were to disagree with
the FWS's narrow construction of the 2009 Decision, it finds that construction and the FWS's
response in the form of the Removal Rule rational.  Accordingly, the Court will not disturb the
FWS's decision.  *See, e.g., Envtl. Def. Fund, Inc.*, 657 F.2d at 283 (explaining that the "highly
deferential" arbitrary and capricious standard "mandates judicial affirmance if a rational basis for
the agency's decision is presented . . . even though we might otherwise disagree").

The Court appreciates the plaintiffs' view that the FWS construed the 2009 Decision too
narrowly as focused on the illegal aspect of the Captive-bred Exemption, and did not properly
account for the needs and benefits of the U.S. captive-bred herds of the three antelope species.

88

Indeed, the agency was faced with the legitimate and important equities presented by commercial groups and the success of conservation efforts by these groups.  Yet, while the agency could have responded to these equities in some other manner, it was not required to do so where it was faced with the necessity of complying with a court Order in removing an invalid rule.[43]

The EWA plaintiffs suggest that the Removal Rule was improperly based on the agency's erroneous factual findings that ranchers would not be forced to reduce or eliminate their herds in response to the Removal Rule.  *See* EWA Mem. at 17-18.  But the federal defendants could not be clearer that they did not base the Removal Rule on any such findings, but instead "on a need to take a rule off the books that a Court had held did not comply with the ESA."  EWA Fed. Defs.' Mem. at 14 n.4.  While the plaintiffs may find the FWS's narrow rulemaking frustrating, they have not shown any way in which it was arbitrary and capricious.

The EWA plaintiffs also suggest that it was arbitrary and capricious for the FWS to "impose an arbitrary, one-size-fits-all Rule never meant to apply to these three antelope species." EWA Mem. at 19.  The FWS responds that it did not "impose" a permitting system, but rather that the permitting system "simply goes into place in the absence of the [Captive-bred Exemption][,]" and that, furthermore, it was irrelevant if the Removal Rule would lead to negative effects, as the agency had no discretion to leave the Captive-bred Exemption in place. EWA Fed. Defs.' Mem. at 14.  The Court again agrees with the FWS.  In light of the procedural posture following the 2009 Decision, the agency was required to comply with the 2009 Decision and had to remove or modify the Captive-bred Exemption consistent with that decision.  While

---

[43] To the extent that the federal defendants make an argument that the EWA plaintiffs are essentially seeking to appeal the 2009 Decision, the Court does not view the EWA plaintiffs' argument in that way.  The EWA plaintiffs are not attempting to subvert the 2009 Decision but rather they construe that ruling more broadly as an opportunity to revisit the FWS's original reasoning for promulgating the Captive-bred Exemption, which was closely intertwined with the decision to list the three antelope species as endangered.

the FWS acknowledged that "the Court did not mandate [the FWS] to apply the same permitting scheme established in 50 CFR 17.22 or the registration process identified in 50 CFR 17.21(g)," the agency "could find no alternative approach other than the existing statutory and regulatory procedures."  Removal Rule, 77 Fed. Reg. at 432.  Nor did the agency believe that commenters had "provided reasonable alternatives to this approach."  *Id*.  Accordingly, since the agency could not find any alternative approach to further the policy objectives reflected in the Captive-bred Exemption, the Removal Rule simply removed the invalid Captive-bred Exemption, rather than promulgating a new permitting process for the captive-bred three antelope species, thus defaulting to the section 10 permitting process.

The D.C. Circuit has explained that "'an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'"  *Lone Mountain Processing v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).  "Failing to supply such analysis renders the agency's action arbitrary and capricious."  *Id*. (citing *Ramaprakash v. FAA*, 346 F.3d 1121 (D.C. Cir. 2003)).  Here, where the agency was clear that it was removing the Captive-bred Exemption in response to the Court Order (and following litigation in which it had zealously advocated to save that very regulation), and that it had considered, but ultimately found no alternatives, the Court finds the agency's rulemaking was rational.

### b.      The FWS Adequately Considered Alternatives

The Court next turns to the EWA plaintiffs' argument that the "FWS also completely failed to consider any alternative to the permitting scheme it announced in the proposed rule and adopted in the Final Rule."  EWA Mem. at 19.  The FWS argues in response that it was not

required to consider alternatives to the standard permitting process, that it was only required to respond to comments to the extent that the comments were "significant," and that, even though it found the commenters' suggestions regarding alternatives "outside the scope of [the Removal Rule] rulemaking," it did consider alternative means of complying with the 2009 Decision.  EWA Fed. Defs.' Mem. at 15-18.

For several reasons, the Court agrees with the FWS that its consideration of alternatives was reasonable and not arbitrary and capricious.  First, as the FWS contends, the EWA plaintiffs point to no "authority to support the proposition that the [FWS] was required to consider alternatives to the standard endangered species permitting scheme[,]" which provides a robust alternative to the blanket exemption codified in the invalid Captive-bred Exemption.  *Id.* at 15. To the extent that the EWA plaintiffs believed, for example, that it was appropriate for the agency to delist the antelope species as a result of the 2009 Decision that the Captive-bred Exemption was invalid, the appropriate recourse was to challenge the Listing Rule, as did the SCI plaintiffs, or petition for the delisting of members of the species, as EWA plaintiffs did along with other named plaintiffs in the Owen Action.[44]

Second, the agency adequately responded to the comments submitted critiquing the FWS's default permitting system or suggesting a possible alternative permitting process for the three antelope species by explaining that "[t]hese comments are outside the scope of this

---

[44] In a related point, the EWA plaintiffs argue that the Listing Rule and the Captive-bred Exemption "were not severable," and thus that "it was arbitrary and capricious for FWS to keep the listing while revoking the exemption[,]" *see* EWA Mem. at 27-28; *see also id.* at 28 ("FWS's refusal to even consider that the two 2005 rulemakings were halves of a single action—and that revoking one half left a rule that would harm the species—was arbitrary and capricious.").  In support of this argument, the plaintiffs cite to *New Jersey v. EPA* for the proposition that "'[s]everance and affirmance of a portion of an administrative regulation is improper if there is 'substantial doubt' that the agency would have adopted the severed portion on its own.'"  *See* EWA Mem. at 27 (quoting *New Jersey v. EPA*, 517 F.3d 574, 584 (D.C. Cir. 2008)).  In this case, however, the Listing Rule and the Captive-bred Exemption were not "portion[s]" of a single regulation.  To the contrary, while the FWS promulgated the Captive-bred Exemption in tandem with the Listing Rule, these rulemakings were distinct, and functioned independently. Thus, when the 2009 Decision found the Captive-bred Exemption invalid, there was no obligation for the agency to reconsider the Listing Rule.

91

rulemaking because they do not address the Court's ruling that 50 CFR 17.21(h) violates section 10(c) of the [ESA] and the rescission of 17.21(h)[,]" and by committing to consider such comments as the FWS "develop[s] ways to improve the efficiency and effectiveness of our permitting process."  Removal Rule, 77 Fed. Reg. at 436.  In fact, the FWS not only responded to the comments but invited the commenters to submit *additional* comments regarding the efficiency of the permitting process.  *See id*. (noting that while certain comments were "outside the scope of this rulemaking[,]" the agency was "currently working on certain improvements," "considering other efficiency improvements[,]" and "encourage[s] anyone who has recommendations on how to improve our current permitting process to contact the Service's Division of Management Authority, Branch of Permits").

Third, the result of the Removal Rule, as noted, is that the ranchers and others previously subject to the Captive-bred Exemption are now subject to the FWS's section 10 permitting process.  This regulatory process provides an opportunity for notice and comment that allows the agency the benefit of public input, which is valuable to the agency because it cannot be in all places at all times on its own.  While the permitting process may be more burdensome for the ranchers who now must individually apply for permits to keep the three antelope species, the section 10 permitting process has numerous benefits, including (1) providing discretion to the FWS about how many permits to approve for "takes" of the three antelope species, (2) providing information to the agency and to the public about which ranches are acting consistently with the ESA's conservation purposes in running businesses involving members of endangered species, and (3) preventing ranchers, who perhaps decide to retire or are frustrated with decreasing prices of the three antelope species, from simply killing off members of the species.  Given that the

agency already had this permitting process in place, it was rational that the FWS would default to this process in light of the 2009 Decision.[45]

Finally, the agency noted in the Removal Rule that it *did* "consider[ ] whether there were alternative means to comply with the Court's ruling without requiring ranches or other facilities holding these species to obtain a permit or authorization[,]" but that it "was unable to identify an alternative other than the currently established regulations at 50 CFR 17.21(g) and 17.22 – providing for the registration of captive-bred wildlife or issuance of a permit – that would provide the public an opportunity to comment on proposed activities being carried out with these species." Removal Rule, 77 Fed. Reg. at 432.  In sum, the Court views the FWS's response to the 2009 Decision, in the form of the Removal Rule, as rational and adequate given the posture in which the agency found itself following the 2009 Decision.

### c. The EWA Plaintiffs Failed To Provide The Required Notice For Their Section 7 ESA Claim (Count III)

The Court next turns to the EWA plaintiffs' argument that the Removal Rule "will prevent continued conservation and recovery of these species of endangered antelope," including under Section 7(a)(2) of the ESA, which requires agencies to ensure that their actions are "'not likely to jeopardize the continued existence of any endangered species or threatened species.'"  EWA Mem. at 29; *see also* EWA Compl. at ¶¶ 57-59 ("Third Cause of Action").  The federal defendants argue that the EWA plaintiffs' section 7 citizen-suit claim must be dismissed because the EWA plaintiffs did not provide the FWS with notice of this particular claim sixty days in advance of filing suit.  *See* EWA Fed. Defs.' Mem. at 22; EWA Fed. Defs.' Reply in Supp. of Fed

---

[45] While there is no question that applying for permits to engage in otherwise prohibited activities related to the three endangered antelope species imposes some burden, the Court is cognizant that even under the Captive-bred Exemption, ranchers were required to maintain detailed records, subject to audit by the FWS, regarding these animals.  *See* Captive-bred Exemption, 70 Fed. Reg. at 52,319.  Moreover, the burden of applying for a permit to engage in such otherwise prohibited activities involving an endangered species seems imminently reasonable when even recreational fishermen are frequently required to obtain licenses to "take" fish, which are not listed as endangered.

Defs.' Cross-Mot. for Summ. J., ECF No. 99, at 4-5.  The Court will grant summary judgment to the federal defendants as to this claim, Count III of the EWA plaintiffs' Complaint, for two reasons.

First, section 7 states that "[n]o action may be commenced" under the citizen-suit provision of the ESA "prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation[.]"  16 U.S.C. § 1540(g)(2)(A); *see also Common Sense Salmon Recovery v. Evans*, 329 F. Supp. 2d 96, 104 (D.D.C. 2004) (finding letter that failed to mention permitting claims did not satisfy notice requirement).  The notice requirement "'put[s] the agencies on notice of a perceived violation of the statute and an intent to sue.'"  *Research Air, Inc. v. Norton*, No. 05-623, 2006 WL 508341, at *10 (D.D.C. Mar. 1, 2006) (quoting *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998)); *see also Conservation Force v. Salazar*, 715 F. Supp. 2d 99, 104 (D.D.C. 2010) (finding letter that did not specifically indicate intent to challenge 12-month finding was insufficient because "it would be unfair [to the agency] to permit this claim to proceed").  "[T]his sixty-day notice requirement is mandatory and jurisdictional." *See Research Air, Inc.*, 2006 WL 508341, at *10 (dismissing ESA citizen-suit claim where plaintiffs' letter did not "give[ ] notice of what conduct allegedly violated the ESA"); *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 26-28 (1989).  The EWA plaintiffs failed to provide any evidence that they gave the federal defendants sixty days written notice of their intent to bring their section 7 claim.  Second, the EWA plaintiffs do not refute the federal defendants' argument, nor even address it.  *Compare* EWA Pls.' Reply in Supp. of Mot. for Summ. J., ECF No. 93, *with* Owen Pls.' Mem. in Supp. of Mot. for Summ. J., ECF No. 43-1, at 6 (citing Owen AR 1269) (Owen plaintiffs' asserting that they provided proper notice by serving the Secretary with written

94

notice of intent to sue on June 30, 2011, more than three months before filing suit on October 17,

2011).  Accordingly, the Court will grant summary judgment as conceded to the federal

defendants on the section 7 claim.

The federal defendants also suggest that the EWA plaintiffs' other ESA claims should also

be dismissed if the Court construes them as citizen-suit provision claims.  *See* Fed. Defs.'

Response to Pls.' Supplemental Briefs on Prudential Standing, ECF No. 113, at 2.  The Court

does not, however, view those claims in this manner as explained, *supra*, in this Court's

discussion of the EWA plaintiffs' prudential standing.  The EWA plaintiffs add confusion to this

issue by appearing to argue that the ESA citizen-suit provision applies to all of their ESA claims.

*See* EWA Pls.' Supplemental Brief in Supp. of Their Mot. for Summ. J. and Opp'n to Def.-

Intervenor's Mot. to Dismiss, ECF No. 110, at 12 (suggesting that *Bennett v. Spear* rule negating

the zone-of-interests test, which only applies to claims brought under the ESA citizen-suit

provision, applies to all of the EWA plaintiffs' claims).  The Court does not construe the EWA

claims in that way and instead construes the EWA plaintiffs' claims in Counts I and II as arising

under the APA, and thus not subject to the citizen-suit provision, nor the 60-day notice of intent

to sue requirement.[46]

### d.      The EWA Plaintiffs' NEPA Claim Is Unavailing

Finally, the Court turns to the EWA plaintiffs' argument that the Removal Rule was

contrary to law because the FWS was required under NEPA to consider the environmental

impacts of the Removal Rule.  *See* EWA Mem. at 31-34.  Specifically, the EWA plaintiffs claim

that the FWS "circumvented compliance" with the NEPA requirement that "'major federal

actions significantly affecting the quality of the human environment'" be accompanied by an

---

[46] Even if the Court were incorrect in its assessment of these claims, however, and all of the EWA plaintiffs' claims
are subject to dismissal, the result would still be the same because the Court concludes that the EWA plaintiffs
cannot prevail on the merits of their claims.

Environmental Impact Statement ("EIS"), and that a federal action involving "'unresolved conflicts concerning alternative uses of available resources'" should have been preceded by an effort by the agency to develop alternatives to the Removal Rule. *Id*. at 31 (quoting 42 U.S.C. § 4332).

The federal defendants argue, in response, that the EWA plaintiffs' claim fails for two reasons: "[f]irst, the [FWS] did not have to comply with NEPA because it lacked discretion whether to remove the [Captive-bred Exemption]" and "[s]econd, even if the [FWS] had discretion whether to remove the [Captive-bred Exemption], the [FWS] appropriately determined that the Removal Rule is categorically excluded from NEPA requirements." EWA Fed. Defs.' Mem. at 25. The DOW defendant-intervenors likewise assert that "courts have long held that agencies need not engage in a NEPA analysis – a key part of which is examining alternatives that the agency realistically could select at the end of the process – for nondiscretionary actions such as removing an illegal rule, where the agency has only one option from which to choose." EWA DOW Mem. at 19 (emphasis omitted) (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004)). The Court agrees with the federal defendants and defendant-intervenors that (1) the FWS lacked discretion in issuing the Removal Rule, and, consequently, (2) the categorical exclusion was properly invoked even if the FWS had discretion to do more than merely repeal the invalid Captive-bred Exemption.

> **(i)** **NEPA Does Not Apply To The Removal Rule Because The FWS Did Not Have Discretion In Issuing The Removal Rule**

The D.C. Circuit has explained that if an "agency does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have no affect on the agency's actions, and therefore NEPA is inapplicable."

96

*Citizens Against Rails-To-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001).

Here, since the Court accepts the FWS's argument that "it had no other way to comply with [the

2009 Decision] but to remove" the Captive-bred Exemption as rational, and not arbitrary and

capricious, under the APA, it also concludes that it was reasonable for the FWS to believe that

NEPA compliance was not required here as a matter of law.  *See* EWA Fed. Defs.' Mem. at 25-

26.[47]

The EWA plaintiffs contend that an EIS was required and "[t]he rulemaking does not

demonstrate that FWS took a hard look at the problem the permitting requirement will create nor

does it make a convincing showing that the impact of the permitting requirement in the

challenged rule will be anything other than devastating for the endangered antelope."  EWA

Mem. at 33.  The EWA plaintiffs also insist that NEPA requires "[t]he consideration of

alternatives . . . independent of the duty to prepare an Environmental Impact Statement" and that

"[w]hen no Environmental Impact Statement is prepared, the analysis must still be presented in

an Environmental Assessment[,]" but the "FWS prepared neither."  *Id*.  Since the Court accepts

as rational the FWS's conclusion that it viewed itself as lacking discretion about whether to issue

the Removal Rule, however, the NEPA requirements are "inapplicable."  *Citizens Against Rails-

To-Trails*, 267 F.3d at 1151; *see also Dep't of Transp.*, 541 U.S. at 770 (explaining that an

agency with "no ability to prevent a certain effect . . . did not need to consider the environmental

effects").

---

[47] This finding is not inconsistent with the Court's determination, discussed *supra*, that the EWA plaintiffs
demonstrated redressibility for the purposes of establishing Article III standing.  Although the FWS was required by
the 2009 Decision to remove or find a way to modify the Captive-bred Exemption to comport with the ESA, it was
possible, for example, that the agency could have done so in a way that was irrational and in violation of the APA, in
which case a Court's decision vacating the rule would have provided redress to the plaintiffs.

(ii)     **The FWS Issued The Removal Rule Pursuant To A Categorical Exclusion Exception**

Even if NEPA applied, the Court agrees with the federal defendants that the FWS

"complied with NEPA by determining that its action qualified for a categorical exclusion."

EWA Fed. Defs.' Mem. at 26.[48]

> In the Removal Rule, the FWS invoked the categorical exclusion, stating in relevant part:
>
> The [FWS] has determined that this rule is a regulatory change that is administrative and legal in nature.  The rescission of this rule responds to a Court ruling finding that 50 C.F.R. 17.21(h) violates section 10(c) of the Act and remanding to the agency for further proceedings consistent with its opinion.  As such, the rule is categorically excluded from further NEPA review as provided by 43 C.F.R. 46.210(i) of the Department of the Interior's Implementation of the National Environmental Policy Act of 1969 regulations (73 F.R. 61292; October 15, 2008).

Removal Rule, 77 Fed. Reg. at 437.

An agency is not subject to the NEPA requirement to "prepare an EIS and or even an EA

if it finds that its proposed action is subject to a 'categorical exclusion.'"  *Reed v. Salazar*, 744 F.

Supp. 2d 98, 103 (D.D.C. 2010).  A categorical exclusion "means a category of actions which do

not individually or cumulatively have a significant effect on the human environment and which

have been found to have no such effect in procedures adopted by a Federal agency in

implementation of these regulations (§ 1507.3) and for which, therefore, neither an

environmental assessment nor an environmental impact statement is required."  40 C.F.R. §

1508.4.  A variety of actions are categorically excluded from NEPA review, including, as is

---

[48] The DOW defendant-intervenors argue that the Court need not even reach this issue because the EWA plaintiffs have waived review of the FWS's "determination that a categorical exclusion applied here" because no commenter, "including EWA . . . ever notified the Service during the 30-day comment period of any concerns" regarding the agency's determination.  EWA DOW Mem. at 29 (citing Removal Rule, 76 Fed. Reg. at 39,806 (stating that "the proposed rule is categorically excluded from further NEPA review")); *see also Dep't of Transp.*, 541 U.S. at 764 ("Persons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." (alteration in original) (citation omitted)).  Since the Court finds that the EWA plaintiffs' NEPA claim cannot succeed on the merits, however, the Court need not reach the waiver issue.

relevant here, "Policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature[,]" 43 C.F.R. § 46.210(i), which the FWS invoked as the applicable categorical exclusion here, *see* Removal Rule, 77 Fed. Reg. at 437.

Once an agency determines that the action is categorically excluded from NEPA, the "agency's 'decision to classify a proposed action as falling within a particular categorical exclusion will be set aside only if a court determines that the decision was arbitrary and capricious.'" *Back Country Horsemen of Am. v. Johanns*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006) (quoting *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1023 (10th Cir. 2002)); *Nat'l Trust for Historic Pres. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987). Where, however, "an agency finds that its proposed action falls within a categorical exclusion, the agency must then determine whether there are any 'extraordinary circumstances' that nevertheless require the agency to perform an environmental evaluation." *Reed*, 744 F. Supp. 2d at 116; 40 C.F.R. § 1508.4 (explaining that "[a]ny procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect").

The EWA plaintiffs contend that the categorical exclusion does not apply for two reasons: (1) the "FWS's conclusory assertion that the Final Rule is simply a legal change is not supported by the record, is further contradicted by FWS's earlier position with regards to the permits, and is not sufficiently reasoned to allow FWS to apply the exclusion[,]" and (2) "the [FWS's] own regulations remove any possibility that this rulemaking could be exempt from NEPA compliance, because exemptions cannot apply to decisions that have a significant impact on endangered species." EWA Mem. at 32.

99

The Court finds both of the EWA plaintiffs' arguments unavailing.  First, the federal defendants were not required to provide an elaborate explanation of the reasons for applying the categorical exclusion.  Rather, the "'[d]ocumentation of reliance on a categorical exclusion . . . need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did.'"  *See Reed*, 744 F. Supp. 2d at 116 (quoting *Wilderness Watch & Pub. Employees for Envtl. Responsibility v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004)).  Indeed, "'[i]n most instances, a short statement that a categorical exclusion has been invoked will suffice to assure a reviewing court that environmental effects have been considered.'"  *Id.* (quoting *Wilderness Watch & Pub. Employees for Envtl. Responsibility*, 375 F.3d at 1095).  Here, the Court finds that the federal defendants, after considering the alternatives and comments submitted and determining that there were no alternative means to comply with the 2009 Decision, provided sufficient "documentation" by explaining in a short statement in the Removal Rule that it was a necessary "regulatory legal change that is administrative and legal in nature."  Removal Rule, 77 Fed. Reg. at 437.

Second, the EWA plaintiffs have not established that any extraordinary circumstances existed such that an "exception[ ] to the [categorical exclusion] exception" applied in this case. EWA Mem. at 32; *see also* 40 C.F.R. § 1508.4 ("Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.").  Indeed, where "there is substantial evidence in the record that an extraordinary circumstance might apply, an agency may act arbitrarily and capriciously by failing to explain its determination that a categorical exclusion is applicable."  *Reed*, 744 F. Supp. 2d at 116 (citing *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1,

17 (D.D.C. 2009) (holding that agency's failure to consider reasonably foreseeable impacts

renders agency's invocation of a categorical exclusion arbitrary and capricious)).  An

extraordinary circumstance exists where actions "meet any of the criteria listed" below:

> (c) Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources . . . . (d) Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.  (e) Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.  (f) Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects . . . . (h) Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species . . .

43 C.F.R. § 46.215.  In particular, the EWA plaintiffs suggest that the Removal Rule qualifies as

an extraordinary circumstance under 43 C.F.R. § 46.215(h) because it "'[h]a[s] significant

impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened

Species or ha[s] significant impacts on designated Critical Habitat for these species.'"  EWA

Mem. at 39 (quoting 43 C.F.R. § 46.215(h)).

The Court disagrees.  While the declarations submitted by the EWA establish that the

plaintiffs have suffered an injury-in-fact from the Removal Rule in the form of a decrease in

value and disincentive to continue raising the U.S. captive-bred three antelope species, these

declarations do not establish that the Removal Rule will have a "significant impact" on the three

antelope species.  Indeed, while the analysis for standing required a demonstration of injury-in-

fact *to the plaintiffs*, the NEPA analysis requires that the record contain substantial evidence of

the "significant impacts" *on the three antelope species* themselves or on the "designated Critical

Habitat for these species."  43 C.F.R. § 46.215(h).  *See, e.g., Friends of the Earth, Inc. v. Laidlaw

Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181-82 (2000) (explaining that "[t]he relevant showing

for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff"

101

and that "[t]o insist upon the former rather than the latter as part of the standing inquiry . . . is to raise the standing hurdle higher than the necessary showing for success on the merits"); *Humane Soc'y of United States v. Hodel*, 840 F.2d 45, 47 (D.C. Cir. 1988) (concluding both that plaintiff environmental organization had standing and that the FWS "complied with NEPA when it permitted hunting at the Chincoteague preserve"); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1239 (D.C. Cir. 1996) (concluding that "the claims for which plaintiffs have standing [including a NEPA claim] lose on the merits").  Thus, while the plaintiffs have demonstrated that the Removal Rule has caused them harm, the plaintiffs have not made the requisite showing of any "significant impact" on the three antelope species or their habitat.

Rather than direct the Court to any "substantial evidence in the record that an extraordinary circumstance might apply" in this instance, *Reed*, 744 F. Supp. 2d at 116, because of any "significant impact" on the three antelope species or their "Critical Habitat[,]" 43 C.F.R. § 46.215(h), the plaintiffs rely on the conclusory argument that "the administrative action exception does not apply to rules that '[h]ave significant impacts on species listed, or proposed to be listed, on the List of Endangered Species or have significant impacts on designated Critical Habitat for these species.'"  EWA Mem. at 39 (quoting 43 C.F.R. § 46.215(h)).  That unsupported argument is unavailing where the record suggests that the FWS properly invoked the categorical exclusion in this instance, and that, while the FWS believes that the Removal Rule was non-discretionary, the agency nonetheless considered the environmental impact of its decision.

Here, the "'[FWS's] decision to classify a proposed action as falling within a particular categorical exclusion will be set aside only if [the Court] determines that the decision was arbitrary and capricious[.]'"  *Brady Campaign to Prevent Gun Violence*, 612 F. Supp. 2d at 15 (internal quotation marks omitted) (quoting *Back Country Horsemen of Am. v. Johanns*, 424 F.

102

Supp. 2d 89, 98 (D.D.C. 2006)).  In other words, "[t]his Court's function is to 'ensure that the

agency has adequately considered and disclosed the environmental impact of its actions and that

its decision is not arbitrary and capricious.'"  *Id.* at 17 (quoting *City of Olmsted Falls, Ohio v.*

*Fed. Aviation Admin.*, 292 F.3d 261, 269 (D.C. Cir. 2002)).  "The scope of this review includes

an inquiry into whether the agency has made its decision based on a 'consideration of the relevant

facts' and whether it has 'failed to consider an important aspect' of the issues associated with its

decision."  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

  While invoking the categorical exclusion because it believed that the Removal Rule was

subject to a categorical exclusion from NEPA by its very nature, the FWS also acknowledged the

potential impact of the regulation on the three antelope species, stating "that there may be an

economic impact if people believe that the elimination of [the Captive-bred Exemption] changes

the status of the species and therefore creates a change in activities that may be authorized."

Removal Rule, 77 Fed. Reg. at 433.  The FWS concluded, however, following decades of

consideration of the issues at stake, that "[p]rovided that the ranch, zoo, or individual is carrying

out activities that benefit or enhance the propagation or survival of the species, as was previously

required under the [Captive-bred Exemption], otherwise prohibited activities, including limited

hunting for herd management purposes, can be authorized."  *Id.*  Thus, while the agency

considered the Removal Rule non-discretionary on its part, the FWS believed that while the

plaintiffs and others may need to make adjustments to comply with the new permitting

requirements, "this change to the regulations should not stop ranches from conducting activities

that were previously authorized[.]"  *Id.*  In the face of the agency's reasoned analysis, the

plaintiffs point to no substantial evidence in the record that "extraordinary circumstances" existed

here, or that the agency failed to consider relevant facts, or an important aspect of issues

associated with the Removal Rule.  Accordingly, the plaintiffs have simply not established that any extraordinary circumstance exists, that an "exception to the exception," applied here, *see* EWA Mem. at 32, or that the FWS's invocation of the categorical exclusion exception was arbitrary and capricious.  *Cf. Reed*, 744 F. Supp. 2d at 117-18 (finding extraordinary circumstances where "[p]laintiffs point to" nine different sources of evidence that the annual funding agreement "may have significant impacts on public health or safety, refuge lands and other ecologically significant or critical areas, or endangered species").  Thus, the EWA plaintiffs' NEPA claim fails.

The EWA plaintiffs, who filed their lawsuit after the statute of limitations had passed to challenge the 2005 Listing Rule, *see supra* note 20, have aggressively challenged the Removal Rule, which eliminated the Captive-bred Exemption on which they have relied for many years. The Court, however, rejects all of their arguments that the promulgation of the Removal Rule was arbitrary and capricious and contrary to law, and finds that the agency's promulgation of the Removal Rule was a rational response to the 2009 Decision holding the Captive-bred Exemption invalid.  Accordingly, the Removal Rule will stand.

V.    **CONCLUSION**

For the reasons explained above, in the SCI Action, the Court denies the SCI plaintiff's Motion for Summary Judgment, ECF No. 45, and grants the cross-motions for summary judgment of the federal defendants, the DOW defendant-intervenors, and defendant-intervenor Friends of Animals.  ECF Nos. 68, 70, 73.  As to the EWA Action, the Court denies the EWA plaintiff's Motion for Summary Judgment, ECF No. 78, the Defendant-Intervenor Friends of Animals' Motion to Dismiss, ECF No. 47, the EWA Plaintiffs' Motion to Supplement the Administrative Record, ECF No. 76, and the Defendant Intervenor Friends of Animals' Cross-

Motion for Summary Judgment (Lack of Standing), ECF No. 87, and grants the cross-motions for

summary judgment of the federal defendants and the DOW defendant-intervenors.  ECF Nos. 84,

83.  As to the Owen Action, the Court denies as moot the Owen Plaintiffs' Motion for Summary

Judgment, ECF No. 43.  An appropriate Order will accompany this Memorandum Opinion.

**DATED: August 9, 2013**

/s/ *Beryl A. Howell*

BERYL A. HOWELL
United States District Judge